## IN  THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DEBORAH S. SKEANS,      :
Executrix of the ESTATE OF FRANK E. :
PAVLIS,          :
             :
    Plaintiff       :
             :
   v.         :  C.A. No.
             :
KEY COMMERCIAL FINANCE LLC,  :  **JURY DEMANDED**
KEY COMMERCIAL FINANCE   :
PROPERTIES, LLC, EQUITY PROS, LLC, :
and MOBILE AGENCY, LLC,    :
             :
    Defendants.     :

## VERIFIED COMPLAINT

Plaintiff Deborah S. Skeans, Executrix of the Estate of Frank E. Pavlis ("Mr. Pavlis"), by and through undersigned counsel, brings this action seeking injunctive, declaratory, and compensatory relief, in connection with certain promissory notes purportedly issued by Defendant Key Commercial Finance LLC ("KCF") to Mr. Pavlis in 2014.  Specifically, Plaintiff seeks a declaration by this Court that, to the extent the notes were, in fact, issued to Mr. Pavlis, they are *void ab initio* because (i) KCF was not a legal entity at the time KCF purported to issue them, and (ii) the notes were fraudulently executed.  Once voided, Mr. Pavlis' $7,000,000 "investment" should be ordered returned.  In the alternative, if those notes are not declared *void ab initio*, Plaintiff asserts common law causes of action for fraud, fraudulent concealment, conversion, and unjust enrichment, and seeks general damages, punitive damages, and any other relief as this Court deems fit and proper.

## INTRODUCTION

1.     This case is borne of the worst sort of financial elder abuse.  In 2013 and 2014, when he was in his late-nineties, Mr. Pavlis unknowingly fell victim to a serial fraudster named Justin Billingsley ("Billingsley").  Billingsley and Mr. Pavlis were both members of the same religious community, and Billingsley held himself out as a savvy businessman and financial advisor. Exploiting their shared faith and Mr. Pavlis' advanced age, Billingsley befriended Mr. Pavlis, gained his trust and confidence, and then persuaded him to "invest" millions of dollars in various entities in which Billingsley had ownership and/or financial interests.

2.     Billingsley, both individually and on behalf of one or more of the named Defendant entities, solicited Mr. Pavlis' investment through a repeated pattern of misrepresentation, deception, and fraud.  In perpetrating this scheme, Billingsley conspired with a third party, Allwest Investments, LLC ("Allwest") to (i) persuade Mr. Pavlis to invest $7,000,000 in Allwest as a "real estate investment," and then, (ii) almost immediately divert those funds to KCF, which Billingsley controlled.  KCF then used Mr. Pavlis' ill-gotten funds to finance Allwest's business endeavors, at significant financial benefit to KCF.  While KCF, Allwest, and Billingsley all profited handsomely from their use of Mr. Pavlis' money, Mr. Pavlis received nothing.

3.     Worse still, Billingsley and KCF have gone to extraordinary lengths to deceive Mr. Pavlis and his representatives into believing that his "real estate investment" was, and continues to be, secure, while at the same time manufacturing documents to fit this fraudulent narrative.  Perhaps the most blatant of these after-the-fact fabrications occurred in late 2014 (or, as appears more likely, years later), when Billingsley and KCF re-cast Mr. Pavlis' $7,000,000 investment in Allwest *as an investment in KCF itself!*

4.     In September and November 2014, KCF purportedly issued two Convertible Promissory Notes (the "Notes") to Mr. Pavlis in the amount of $3,000,000 and $4,000,000, respectively.  Both Notes represented that KCF was a Delaware limited liability company.  Both Notes purportedly were accompanied by "Note Purchase Agreements," which also represented that KCF was "duly organized, validly existing and in good standing" under Delaware law.

5.     However, KCF did not even exist as a corporate entity at the times the Notes were "issued."  Rather, KCF was not formed until December 2014.

6.     Assuming that these Notes were, in fact, created and issued to Mr. Pavlis in 2014,[1] both Notes were facially invalid and/or fraudulent.  Both represented that KCF was an existing Delaware limited liability company when, in fact, KCF was not formed until December 2014.  Thus, at the time KCF was purporting to issue securities, it lacked both legal capacity and a legally-recognized form.  Moreover, both Notes and their accompanying Note Purchase Agreements were signed by a KCF "Executive Vice President" who, upon information and belief, never even worked for KCF.

7.     Put differently, after conspiring with Allwest to funnel Mr. Pavlis' $7,000,000 investment from Allwest's bank account to its own, KCF and Billingsley literally papered over their illicit conduct by purporting to issue convertible promissory notes (from a non-existent entity) that would not come due for another five years, when Mr. Pavlis would be 103 years old.

8.     Given Mr. Pavlis' advanced age and implicit trust, Billingsley was easily able to manipulate Mr. Pavlis into believing that his $7,000,000 investment was safe and would be

---

[1]    As further explained below, there is considerable reason to believe that Billingsley, acting on behalf of KCF, may have fabricated these notes in or around 2017, when Mr. Pavlis' duly appointed representative began asking Billingsley to provide documentation relating to Mr. Pavlis' investment in Allwest.

repaid.  Billingsley and KCF were able to perpetrate their fraud by creating documents that Mr. Pavlis would reasonably have believed were legitimate (assuming he saw them at all), when in fact they were nothing more than mere fabrications.

9.      When Mr. Pavlis' representatives began to seek information regarding his investments vis-à-vis Billingsley, Billingsley continued his assurances that Mr. Pavlis' investments were secure and that KCF was a vibrant company.  It turns out, however, that KCF and Billingsley created three KCF subsidiaries – Defendants Key Commercial Finance Properties, LLC, Equity Pros LLC, and Mobile Agency, LLC – to which KCF funneled Mr. Pavlis' funds with no corresponding obligation to repay those funds.

10.     Again, assuming that the KCF Notes were validly issued, Mr. Pavlis was never told that his funds would be diverted to entirely different entities, and he certainly never authorized any such use of his funds.  Indeed, none of KCF's subsidiaries existed in 2014; they were not formed until 2016.

11.     Sadly, Mr. Pavlis passed away on August 24, 2018, never having seen a penny of the $7,000,000 that KCF misappropriated from him through the actions of its agent, Billingsley.  To date, neither Billingsley nor the Defendant entities have provided any explanation or documentation to show how Mr. Pavlis' Allwest investment ended up in KCF's bank account, how those funds have been deployed since, and where they are now.  Rather, they have continued to stonewall attempts at any sort of accounting.

12.     Plainly, Mr. Pavlis' funds have been unlawfully solicited, misappropriated, and withheld.  At best, KCF, acting by and through Billingsley, issued convertible notes to Mr. Pavlis that were facially deficient and *void ab initio*.  At worst, they perpetrated an unconscionable

fraud on Mr. Pavlis.   In either event, the Defendants have unlawfully taken possession of $7,000,0000 of Mr. Pavlis' money, and they are obligated to return those funds immediately.

13.     Whether through declaratory judgment and restitution, or an award of damages, Mr. Pavlis is entitled to the immediate return of the ill-gotten $7,000,000 with which Defendants have enriched themselves at Mr. Pavlis' expense.

## PARTIES

14.     Plaintiff, Deborah S. Skeans, is the duly appointed Executrix of the Estate of Frank E. Pavlis.   At all relevant times, and until his death on August 24, 2018, Mr. Pavlis was a resident of Allentown, Pennsylvania.   Mr. Pavlis' Estate is in the process of being probated in Lehigh County, Pennsylvania.

15.     Defendant Key Commercial Finance LLC, is a limited liability company organized under the laws of Delaware in December 2014, with a principal place of business located at 1511 Route 22, Suite 152, Brewster, New York, 10509.   Upon information and belief, its registered agent for service of process is United Corporate Services, Inc., located at 874 Walker Rd., Suite C, Dover, Delaware, 19904.

16.     Defendant Key Commercial Finance Properties, LLC is a wholly-owned subsidiary of KCF and a limited liability company formed under the laws of Delaware, with a principal place of business located at 1511 Route 22, Suite 152, Brewster, New York, 10509. Upon information and belief, its registered agent for service of process is Northwest Registered Agent Service, Inc., 8 The Green, Dover, Delaware 19901.

17.     Defendant Equity Pros, LLC is a wholly-owned subsidiary of KCF and a limited liability company formed under the laws of Connecticut, with a principal place of business located at 1511 Route 22, Suite 152, Brewster, New York, 10509.   Upon information and belief,

its registered agent for service of process is Hillel Goldman, 57 North Street, Suite 214, Danbury, Connecticut 16810.

18.     Defendant Mobile Agency, LLC is a subsidiary of KCF and a limited liability company formed under the laws of Delaware, with a principal place of business located at 1511 Route 22, Suite 152, Brewster, New York, 10509.  Upon information and belief, its registered agent for service of process is Northwest Registered Agent Service, Inc., 8 The Green, Dover, Delaware 19901.

## JURISDICTION

19.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

20.     This Court also has jurisdiction over Plaintiff's request for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, the Declaratory Judgment Act.

## FACTUAL ALLEGATIONS

21.     At the time of his death, Mr. Pavlis was 101 years old.  He was a widower, with no children, who resided in a senior personal care facility located in Allentown, Pennsylvania.

22.     Born in 1916, Mr. Pavlis put himself through college, and he graduated from Michigan Technological University in 1938.  He graduated at the top of his class with a BS in Chemical Engineering.  After graduating from Michigan Tech, Mr. Pavlis went on to earn a Master's Degree from the University of Michigan.

23.     When he entered the workforce, Mr. Pavlis became the first employee at Air Products & Chemical Co. ("Air Products"), then a fledgling company located in Detroit, Michigan. Earning $3 a day as chief engineer, Mr. Pavlis helped design an affordable oxygen

generator that became the foundation of the company's product line. In 1961, Air Products became a publicly-traded company, and moved its headquarters to Allentown, Pennsylvania.

24.     During his 40 years with the company, Mr. Pavlis rose through the ranks, joining the Board of Directors in 1952 and serving as vice president for engineering and finance before retiring in 1980 as vice president for international/world trade.

25.     Over the course of his career, Mr. Pavlis accumulated a substantial amount of Air Products' stock.   However, both while he was employed and throughout his retirement, Mr. Pavlis led a modest lifestyle.   As a result, he amassed a sizeable estate.

26.     Mr. Pavlis, then in his late-nineties, was introduced to Billingsley in 2012.   Due to his wealth, his age, and his trusting nature, Mr. Pavlis had been targeted by prior scams and deceptions.   Because Billingsley and Mr. Pavlis were members of the same religious community, those close to Mr. Pavlis believed he could be trusted to provide objective financial advice.

27.     They were wrong. Instead, Billingsley relied on their common faith to befriend Mr. Pavlis and gain his trust and confidence, only to almost immediately betray that trust and confidence.   Billingsley quickly began to extract money from Mr. Pavlis through a series of "investments" in start-up companies in which Billingsley had financial interests.

28.     Over the course of roughly two years, Billingsley convinced Mr. Pavlis to give him almost $10,000,000 for a variety of purported "investments." [2]   As described below, each of these investments was the product of fraud, deception, and a concerted effort by Billingsley and

---

[2]     Although this Complaint and the relief sought herein focus on Mr. Pavlis' $7,000,000 investment in Allwest, which somehow made its way into KCF's possession and control, Billingsley solicited Mr. Pavlis to invest an additional $2,500,000 in a separate entity known as Mobile Corp.  As explained herein, every penny of that investment was spent within days or weeks of hitting Mobile Corp's bank account, with over $100,000 going to Billingsley himself.  That money is long gone, and Mobile Corp is defunct.

the Defendants to hide from Mr. Pavlis the scope and nature of their conduct.  At the time of his death, Mr. Pavlis had not received a penny of the millions he entrusted to Billingsley and the Defendants.

29.    Put bluntly, Billingsley was a serial fraudster, and Mr. Pavlis was an easy and trusting mark.

### *LoanGo: Billingsley's First Fraud*

30.    By the time Billingsley met Mr. Pavlis in 2012, Billingsley had already begun his fraudulent scheming.

31.    On information and belief, these schemes began with the online payday loan start-up "LoanGo"—which Billingsley created with his recurring partner in fraudulent enterprises, Jeffrey Peterson ("Peterson"), and a third party, John Keith Ayers ("Ayers").

32.    LoanGo established a pattern that would become familiar: it targeted the savings of naïve and/or financially unsophisticated retirees through the sale of high-risk, low-return "securities" that, invariably, proved worthless.

33.    LoanGo was registered in Utah in 2011.  At all relevant times, Billingsley was Vice President and a Director of LoanGo.   At all relevant times, Peterson was CEO and Chairman of the Board of Directors of LoanGo. Ayers served as President and a Director. The three men were the only directors of LoanGo and owned equal shares of the company.

34.    Beginning in September 2011, Billingsley and Peterson began soliciting investments in LoanGo by selling promissory notes. Although both Billingsley and Peterson resided in Arizona, neither registered with the state as securities salespersons or dealers. Nor did they register their promissory notes with the state of Arizona.

35.     Many of LoanGo's investors were first introduced to Billingsley through insurance seminars Billingsley held at a recreational vehicle park in Casa Grande, Arizona. When attendees solicited his independent investment advice, Billingsley pumped up LoanGo. Although Billingsley relentlessly pushed LoanGo on the unsuspecting retirees, he never provided *any* documentation about the company before taking their money.

36.     Even though LoanGo was a start-up, with no holdings and no track record of success, Billingsley marketed LoanGo to investors as a low-risk, high-reward investment. Often, investors gave their money to Billingsley based on nothing more than their personal trust that he was acting in their best interests.

37.     Even after LoanGo began defaulting on its promissory notes, Billingsley continued to solicit and accept investments from new investors.

38.     The investors never received any interest payments or a refund of their principal investments.

39.     In June 2015, the Securities Division of the Arizona Corporation Commission ("Division") filed a regulatory action against Billingsley and his spouse. Included in that action were Peterson, Ayers, and Ayers' spouse.

40.     The Division alleged numerous violations of Arizona securities laws, including failure to register as a securities salesperson or dealer, the offer of sale of unregistered securities, misrepresentation, and fraud in the sale of securities.

41.     Specifically, the Division alleged that Billingsley misrepresented LoanGo and the individuals' investments in a variety of ways, both affirmatively and through omission. Those misrepresentations included, but were not limited to (i) describing the investment as being low-risk and high-reward when, in reality, it was speculative and high-risk, (ii) failing to disclose that

Billingsley would receive a commission from his investments, and (iii) failing to disclose that LoanGo had defaulted on investments while soliciting new investors.

42.    The Division also alleged that Peterson and Billingsley cashed out their own investments with new investor money, swapping investors' risk for their own.

43.    The Division further alleged that Billingsley engaged in fraudulent behavior by falsifying subscription agreements to create the appearance that investors were accredited and therefore qualified to invest. Testifying to the Division, investors alleged that the agreements included forged statements of consent.

44.    In a unanimous opinion, the Arizona Corporation Commission ("Commission") upheld the charges against Billingsley, Peterson, and Ayers, ordering restitution of $250,000 to the defrauded investors and imposing fines on Billingsley and others.   The Commission's findings confirm that Billingsley and his co-conspirators committed numerous securities violations and that Billingsley, specifically, committed securities fraud through misrepresentations and failures to disclose material information.

45.    Although the Commission did not issue its damning decision until October 2017, the fraudulent conduct at issue took place in 2011 and 2012.  And it was in 2012, fresh off of his LoanGo scam, that Billingsley first met and befriended Mr. Pavlis.

46.    In much the same way that he beguiled and then fleeced retirees in Arizona, Billingsley saw in Mr. Pavlis an opportunity to relieve a trusting and elderly man of considerable wealth.  Over the next two years, Billingsley systematically defrauded Mr. Pavlis by soliciting his investment in start-up ventures that no disinterested person would ever think appropriate for someone in his late nineties.  But Billingsley had no such qualms, because he stood to benefit handsomely at the expense of his "Brother" in fellowship.

### *Mobile Corp: Billingsley's Schemes Become More Ambitious*

47.     Shortly after they were introduced, Billingsley began cultivating Mr. Pavlis' friendship and trust.  Aware of Mr. Pavlis' wealth, Billingsley began soliciting Mr. Pavlis to invest in an Arizona-based company called Mobile Pro Corporation, later renamed Mobile Corporation ("Mobile Corp.").

48.     Formed in early 2013, Mobile Corp. was a social media start-up that purported to connect vendors with potential employers who may want the retain their services.  Initially, Billingsley served as the head of Mobile Corp.'s New York "marketing office," an office that, upon information and belief, existed in name only.  Sometime in 2014 and continuing through roughly June 2015, Billingsley was Mobile Corp.'s President.

49.     In April 2013, at Billingsley's solicitation and direction, Mr. Pavlis wired $500,000 from his bank account to an account maintained on behalf of Mobile Corp. by Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini"), a California-based law firm.  Investors like Mr. Pavlis would wire funds into a "transaction account" at Wilson Sonsini, and then Wilson Sonsini would wire the funds into Mobile Corp.'s bank account.

50.     Notably, apart from bank records reflecting the wire transfer out of his account to Wilson Sonsini, Mr. Pavlis had no other documents in his possession relating to this investment.  Upon information and belief, neither Billingsley nor Mobile Corp. provided him with any such documents.

51.     Within weeks of Mr. Pavlis' original $500,000 investment, all of that money was gone.  Mobile Corp. did not invest that money in its business.  Rather, it wired almost half of it to Inter123, a separate company controlled by Peterson, Mobile Corp's Chairman and CEO – and Billingsley's cohort in the LoanGo fraud.  An additional $250,000 was wired to other entities

and individuals, including Billingsley.  On May 17, 2013, Mobile Corp. transferred $50,000 to Billingsley, which amount plainly was a "commission" that Mobile Corp. paid him for soliciting Mr. Pavlis' investment.

52.     Although the convertible promissory note Mobile Corp. purportedly issued to Mr. Pavlis became due in or around October 2014, none of Mr. Pavlis' initial $500,000 investment was ever repaid.

53.     Meanwhile, in September, 2014, even as Mobile Corp. was reneging on its promise to Mr. Pavlis and others like him, Billingsley again solicited Mr. Pavlis to invest in the company.  Relying on Billingsley's representations, Mr. Pavlis again wired funds to Wilson Sonsini.  On September 16, 2014, Mr. Pavlis wired $1,000,000 to the firm.  Ten days later, on September 26, 2014, Mr. Pavlis wired an additional $1,000,000 to the same account.

54.     Neither Billingsley nor Mobile Corp. has ever provided any documentation to Mr. Pavlis corresponding with either of these additional investments. Mr. Pavlis was never given any convertible notes, subscription agreements, private placement memoranda, accredited investor questionnaires, or any of the other documents that typically come along with an investment in a private company.

55.     The only documents that Mr. Pavlis had in his possession were several hand-written notes that he appears to have made in connection with his September 2014 investments. One note appears to be Mr. Pavlis' written authorization to his bank to wire transfer $1,000,000 to a Wilson Sonsini "Transactions Trust."  At the bottom of this note, Mr. Pavlis wrote:  "If you have questions, call Justin Billingsley," with Billingsley's phone number.

56.     The other note purports to memorialize Mr. Pavlis' two $1,000,000 transfers to the Wilson Sonsini "Transaction Trust" and the dates of those transfer.  Notably, at the top of that note, there is a notation, again in Mr. Pavlis' hand, that reads, "Real Estate Investments."

57.     These notes are instructive.  They confirm that Mr. Pavlis relied on Billingsley as more than a trusted advisor; he looked to him to handle the details of his investments, authorizing Billingsley to deal directly with others regarding those transactions.  By taking on this role of trusted advisor and confidante, Billingsley was able to shield Mr. Pavlis from any information that might have warned him of the on-going fraud.

58.     Further, these notes also confirm that Mr. Pavlis believed that his $2,000,000 was going into "real estate investments."  Mobile Corp. was *not* a real estate company, however.  It was a social media platform.  Plainly, Billingsley misled Mr. Pavlis into believing he was investing in something related to real estate, when in fact those funds were going to Mobile Corp., an entity that had nothing whatsoever to do with real estate.

59.     Worse still, at the time Billingsley orchestrated Mr. Pavlis' $2,000,000 investment in Mobile Corp. (i.e., September 2014), Mobile Corp.'s bank account actually had a negative balance.

60.     Rather than telling Mr. Pavlis that Mobile Corp. was close to insolvency, or confessing to Mr. Pavlis that his initial investment was already gone, never to be seen again, Billingsley doubled down by manipulating Mr. Pavlis to invest an additional $2,000,000 into the company.

61.     Mr. Pavlis' September 2014 investments were quickly spent as well.  On September 19, 2014, Mobile Corp. received the first $1,000,000 wire from Mr. Pavlis.  Over the next three days, Mobile Corp. made the following wire transfers out of its bank account:

- September, 19, 2014: $250,000 to Inter123 (a company controlled by Peterson)

- September 19, 2014: $200,000 to Morgan Stanley Smith Barney, f/b/o Charlie & Rita Gardner.

- September 22, 2014: $50,000 to "Movilpro de Mexico."

- September 22, 2014: $77,455 to Immuebles Carso, Mexico.

- September 23, 2014: $79,430 to Mobile Corp.'s payroll service firm.

62.    As a result of these payments, Mobile Corp.'s bank account balance dipped to approximately $170,000 by September 29, 2014, less than a week after Mr. Pavlis' $1,000,000 investment.  Put differently, within 10 days of receiving Mr. Pavlis' supposed investment in the company, Mobile Corp.  spent almost all of it.

63.    With Mobile Corp.'s funds bottoming out and Billingsley's urgency rising, Billingsley returned to Mr. Pavlis and extracted a *second* $1,000,000 investment, which was deposited in Mobile Corp's account on September 29, 2014.  The second $1,000,000 disappeared with similar speed, through outgoing payments that followed a familiar pattern:

- September 29, 2014: $150,000 to Inter 123.

- September 29, 2014: $76,247 to Immuebles Carso, Mexico.

- September 29, 2014: $100,000 to Morgan Stanley Smith Barney f/b/o Charlie and Rita Gardner.

- October 6, 2014: $100,000 to Inter 123.

- October 6, 2014: $76,307 to Immuebles Carso, Mexico.

- October 9, 2014: $55,489 to Internet Escrow Services, Rancho San Margarita, California.

- October 17, 2014: $18,748 to Mobile Corp.'s payroll service firm.

- October 23, 2014: $25,214 to Internet Escrow Services, Rancho San Margarita, California.

- October 31, 2014: $23,743 to Mobile Corp.'s payroll service firm.

64.     On information and belief, Charlie and Rita Gardner, who received $300,000 of the funds Mr. Pavlis invested, were prior investors in Mobile Corp.  Thus, by October 2014, the start-up was essentially operating as a Ponzi scheme, soliciting new investments to pay off prior investors.

65.     Whenever Mr. Pavlis invested money in Mobile Corp., Billingsley profited.  On October 1, 2014, shortly after Mr. Pavlis' funds were deposited with Mobile Corp., Billingsley received $50,000 via wire transfer.

66.     Similar wire transfers out of Mobile Corp.'s account continued through November 2014.  By the end of that month, its account balance totaled less than $14,000. With astonishing quickness, Mr. Pavlis' $2,000,000 investment in Mobile Corp. was squandered within ten (10) short weeks of his investment.

67.     Launched in March 2013, Mobile Corp. effectively ceased to exist by 2016.

68.     During its short lifespan, Mobile Corp. never generated *any* revenue from any commercial activity.   Instead, every penny in its accounts was the product of third-party investors: over a period of two years, Mobile Corp. banked over $9,000,000 from an untold number of investors.  Of those investors, Mr. Pavlis was far and away the most lucrative for Mobile Corp., having invested – and lost – $2,500,000, all as a result of Billingsley's solicitations and misrepresentations.

69.     Clearly, Mr. Pavlis' investment in Mobile Corp. was the product of fraudulent and deceptive actions.  Even viewed generously, as a legitimate investment, the modest 8% per annum on Mr. Pavlis' (purported) Mobile Corp. promissory note suggests that Billingsley misrepresented the risk posed by even a *healthy* social media start-up.  Moreover, even if

Billingsley initially, and properly, disclosed Mobile Corp.'s risks to Mr. Pavlis in April 2013, he plainly knew by September 2014 that the company was effectively insolvent, devoid of any means of generating revenue, and in rapid decline.

70.     Billingsley also knew that Mobile Corp. was in no positon to repay Mr. Pavlis on his original investment which, according its term sheet, was to have been repaid (with interest) by October 2014.

71.     Nonetheless, Billingsley persuaded Mr. Pavlis to invest another $2,000,000 and did so by misrepresenting that the investment was related to real estate, a subject the elderly Mr. Pavlis was comfortable with, as opposed to social media, of which he knew nothing—Mr. Pavlis has never possessed a social media account of any kind.

72.     Billingsley provided Mr. Pavlis with no documentation related to his September 2014 investments, further suggesting that he actively misled Mr. Pavlis about the nature of his investments.

73.     Billingsley profited off of Mr. Pavlis in numerous ways.  For instance, Billingsley served as President of the company, and as such he received an annual salary of $100,000, all derived from investments from people like Mr. Pavlis.   Although labeled "President," Billingsley's sole function at Mobile Corp. was soliciting investments.

74.     During this period, Billingsley also received almost $275,000 in "loan advances" from Mobile Corp.  Upon information and belief, these "loans," which Billingsley never repaid, were in fact commissions Billingsley received for convincing investors like Mr. Pavlis to turn over their savings.

### *Key Commercial Finance LLC: Billingsley Goes All In on Frank Pavlis*

75.     At the same time he was fleecing Mr. Pavlis on behalf of Mobile Corp., Billingsley conceived a scheme to defraud Mr. Pavlis on a much larger scale, a scheme under which Billingsley would re-route $7,000,000 of Mr. Pavlis money to KCF, an entity over which Billingsley exercised sole control.

76.     In or around January 2014, Billingsley solicited Mr. Pavlis to invest in Allwest, a California-based company that bought distressed residential properties, rehabilitated them, and then re-sold them.  In order to lend an air of legitimacy to this solicitation, Billingsley presented Mr. Pavlis with a 67-page Allwest "Investor Overview" booklet and Subscription Agreement for an investment in Allwest promissory notes.

77.     Based upon Billingsley's solicitations, Mr. Pavlis made what he reasonably believed were two investments in Allwest.  On January 28, 2014, Billingsley had Mr. Pavlis sign the Allwest Subscription Agreement, under which Mr. Pavlis agreed to invest $1,000,000 in Allwest in exchange for a promissory note to be issued by Allwest.

78.     That same day, again at Billingsley's direction, Mr. Pavlis wired $1,000,000 from his brokerage account into his banking account.  Several weeks later, Billingsley took Mr. Pavlis to his local bank, where Mr. Pavlis obtained a cashier's check for $1,000,000.  Mr. Pavlis gave that check to Billingsley in connection with his Allwest investment.  Upon information and belief, Billingsley arranged to have that check deposited, but it remains a mystery as to whether it ever made its way to Allwest or not.

79.     Several months later, in May 2014, Billingsley persuaded Mr. Pavlis to make a much larger investment in Allwest.  On May 23, 2014, Mr. Pavlis wrote a personal check for

$6,000,000, made payable to Allwest Investments.   Mr. Pavlis made it clear that he understood that money to be a "real estate investment," as that is what he wrote on the face of the check.

80.     Mr. Pavlis again gave the check to Billingsley, who forwarded it to Allwest.  The check was endorsed by Gary Miller, Allwest's President, and presumably deposited into Allwest's bank account.  (Copies of Mr. Pavlis' 2/19/14 withdrawal slip fir $1,000,000 and his 5/23/14 personal check to Allwest, as endorsed, are attached hereto as Exhibit "A.")

81.     Thus, by May 2014, Mr. Pavlis was under the reasonable belief that he had invested $7,000,000 in Allwest, a real estate development company, at the direction and solicitation of his trusted friend and financial advisor, Billingsley.

82.     In fact, Billingsley had entirely different designs for that money.  Shortly after Mr. Pavlis invested in Allwest, Billingsley orchestrated the wholesale transfer of Mr. Pavlis' $7,00,000 from Allwest to KCF.  Billingsley, acting by and through KCF, then used Mr. Pavlis' $7,000,000 as he wished.

83.     Upon information and belief, KCF principally used Mr. Pavlis money to provide funding to Allwest for various projects between 2014 and 2018.[3]  Although the terms of these loans were exceptionally favorable to KCF and Billingsley, and, on information and belief, have been paid back in full, Mr. Pavlis' received no compensation for funding the deal or assuming the entirety of the deal's risk.

84.     Thus, KCF and Billingsley not only misappropriated the money that Mr. Pavlis intended to be invested in Allwest, but they also profited substantially from their illicit use of his funds.

---

[3]     Upon information and belief, KCF, through Billingsley, "invested" over $500,0000 of Mr. Pavlis' Allwest's money in Mobile Corp. between February and May 2015.

85.     At no time did Mr. Pavlis authorize the transfer or re-direction of his Allwest investment to KCF or any other entity.   Nor was Mr. Pavlis made aware that his Allwest investment had been commandeered by KCF and Billingsley.   Upon information and belief, whenever Mr. Pavlis asked Billingsley about his investment, Billingsley assured him that his Allwest investment was performing well and that he had nothing to worry about.

86.     Apart from the Allwest Subscription Agreement relating to Mr. Pavlis' initial $1,000,000 investment in early 2014, upon information and belief, neither Allwest, KCF, nor Billingsley has ever provided Mr. Pavlis with any documentation reflecting his investments in Allwest – no promissory notes, no Subscription Agreement relating to Mr. Pavlis' $6,000,000 investment, and certainly no document indicating that his Allwest investment was being re-routed to KCF, an entity that he had never heard of and which did not even exist at the time.

### _KCF Purported to Issue Promissory Notes to Mr. Pavlis in Late 2014_

87.     In what appears to have been an attempt to legitimize (or at least paper over) this unauthorized transfer of Mr. Pavlis' Allwest investment to KCF, in late 2014 KCF purportedly issued two convertible promissory notes (the "Notes") to Mr. Pavlis, the combined nominal face value of which was $7,000,000, the exact amount that Mr. Pavlis invested in Allwest.

88.     The first Note is dated September 1, 2014, and purports to reflect a $3,000,000 investment by Mr. Pavlis.   The Note states that both the principal and interest in the amount of 8% per annum is payable on September 1, 2019 – when Mr. Pavlis would have been 102 years old.   The Note also clearly identifies KCF as a "Delaware limited liability company."   (A copy of the putative 9/1/14 Note is attached hereto as Exhibit "B.")

89.     The Note was purportedly accompanied by a Note Purchase Agreement, also dated September 1, 2014.  (A copy of the putative 9/1/14 Note Purchase Agreement is attached hereto as Exhibit "C".)  The Note Purchase Agreement purports to memorialize Mr. Pavlis' $3,000,000 investment in KCF in exchange for the Note.

90.     Like the Note itself, the Note Purchase Agreement confirms that KCF is a Delaware limited liability company.  Indeed, the Note Purchase Agreement contains the following language, under the heading "***Representations and Warranties of the Company***":

> The Company represents and warrants to each Investor that:
>
> (a)     The Due Incorporation, Qualification, etc.  Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(*Id.* at ¶ 2 (a).)

91.     The Note Purchase Agreement also states that the "sale and purchase of the Notes shall take place at a closing to be held on September 30, 2014 . . . . At the Closing, the Company will deliver to each of the investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note." (*Id.* at ¶ 1 (b).)

92.     The second Note, dated November 1, 2014, is substantively identical to the first Note, except that it purports to relate to a $4,000,000 investment and has a maturity date of November 1, 2020, when Mr. Pavlis would have been 103 years old.  It, too, names its issuer as "Key Commercial Finance LLC, a Delaware limited liability company."  (A copy of the 11/1/14 Note is attached hereto as Exhibit "D").

93.    The second Note is also accompanied by a Note Purchase Agreement, dated November 1, 2014.  (A copy of the putative 11/1/14 Note Purchase Agreement is attached hereto as Exhibit "E".)   Apart from dates, this second Note Purchase Agreement is identical to its September 2014 counterpart.

94.    As noted above, at the time the Notes were issued and the Note Purchase Agreements ostensibly signed, KCF was *not* a registered Delaware limited liability company.  It did not become a Delaware limited liability company until December 10, 2014.  Thus, KCF did not have the legal capacity or form to enter into the Note Purchase Agreement, much less issue the Notes.

95.    The provenance and validity of the Notes and corresponding Note Purchase Agreements, are suspect, at best, separate and apart from KCF's legal non-existence.

96.     First, Mr. Pavlis never invested a penny in KCF, in 2014 or at any other time. Nor was there was ever any "closing" at which Mr. Pavlis received the Notes in exchange for the "corresponding purchase price for the Note," as set forth in the Note Purchase Agreements.

97.    Second, both documents are signed by Michael Silberman ("Silberman"), as "Executive Vice President" of KCF.  However, upon information and belief, Silberman was never employed by KCF, as its Executive Vice President or in any other capacity.[4]   In fact, Silberman has explicitly denied having any affiliation with KCF, confirming in a June 2017 email exchange that he "had nothing to do with this Billingsley venture . . . ." (*See* 6/27/17 email exchange between Silberman and others, attached hereto as Exhibit "F".)

---

[4]    It bears noting that Silberman was the Chief Financial Officer of Mobile Corp. throughout its short existence.

98.     Third, and perhaps most suspiciously, the Note Purchase Agreements both purport to have Mr. Pavlis' signature attached to them.  However, the signature page for each documents stand alone, on separate pages that makes no reference whatsoever to KCF, the Note Purchase Agreement, or any other identifying information.

99.     Rather, the pre-printed signature page, entitled "Investors," has just three lines:  a "Date" line, a "Name" line, and a "Title" line.  The documents do not support any conclusion that Mr. Pavlis actually signed the pages.  Moreover, even if he did, they do not support that Mr. Pavlis knew what he was signing or that the signature page would be attached to the Note Purchase Agreements.

100.     Even if the KCF Notes and Note Purchase Agreements were legitimate (they are not), Billingsley never disclosed to Mr. Pavlis—a prudent man his entire life—the outsized risks associated with investing in KCF, nor did he divulge his own personal pecuniary gain from Mr. Pavlis' investments.

101.     Billingsley never explained to Mr. Pavlis what business KCF was in, what risks were associated with investing in KCF, or why any investment in a start-up commercial finance entity like KCF–much less a $7,000,000 investment–was appropriate or suitable for Mr. Pavlis.

102.     In "selling" Mr. Pavlis these notes, Billingsley provided no private placement memoranda or other documentation that would normally accompany high-risk investments like KCF.

103.     The terms of the Notes were also astonishingly unfavorable.   Mr. Pavlis' purported investment of $7,000,000 promised only an 8% annual return, to be repaid (if ever) five and six years later, when Mr. Pavlis would be 102 and 103 years old, respectively.

104.    Not only were the notes' 8% annual return far below what Mr. Pavlis could have earned in the stock market, they were purportedly issued by a start-up entity, and they were wholly unsecured—even when it was finally formed in December 2014, months after "issuing" the notes, KCF lacked any assets, receivables or other collateral by which to secure the Notes.

105.    In other words, assuming *arguendo* that Pavlis knowingly (i) authorized the transfer of his $7,000,000 Allwest investment to KCF, and (ii) agreed to accept the Notes as after-the-fact evidence of his investment in KCF, this simple "fact" remains:  Billingsley, on behalf of KCF, solicited the nonagenarian Mr. Pavlis to part with $7,000,000 in exchange for unsecured Notes issued by a start-up company whose chances of failure were, like all start-up companies, significant, and whose modest returns Mr. Pavlis would receive (if he received it at all) when he was 103 years old.

106.    No reasonable investor with his wits about him would ever agree to such an unfavorable, lop-sided deal, and no honest person would ever advise or encourage him to do so. There are only two possible narratives here.  Either Billingsley and KCF preyed upon Mr. Pavlis' trusting nature and advanced age to persuade him to invest $7,000,000 in KCF with which KCF and Billingsley could do what they pleased for at least five years; or the Notes and Note Purchase Agreements are complete fabrications, created long after KCF and Billingsley commandeered Mr. Pavlis' Allwest investment in an effort to cover up an appalling fraud.

107.    In light of recent events, there is little question that after orchestrating the unauthorized transfer of Mr. Pavlis' Allwest investment to KCF, all of KCF and Billingsley's efforts have been singularly focused on covering up their fraudulent conduct and diverting Mr. Pavlis funds to other entities over which KCF and Billingsley have control.

### *KCF and Billingsley Fabricate Documents To Hide Their Scheme*

108.    Upon information and belief, KCF never provided Mr. Pavlis with the above-mentioned Notes or Note Subscription Agreements, nor did it provide him with any other documents relating to any purported investments in KCF.

109.    It was not until 2016, after Plaintiff, then acting in her capacity as Mr. Pavlis' duly-appointed Power of Attorney, requested that Billingsley provide her with information relating to Mr. Pavlis' possible  "real estate" investments that any documents relating to KCF surfaced.

110.    After a lengthy delay, on November 11, 2016, Billingsley provided Plaintiff a copy of the September 1, 2014, KCF Note purporting to reflect a $3,000,000 investment. Notably, he did not provide a copy of the November 1, 2014, Note that purported to reflect an additional $4,000,000 investment.

111.    At the time, Plaintiff reasonably believed that the $3,000,000 Note was, in fact, a legitimate investment.  It was not until late 2017, when she first became aware that Mr. Pavlis had apparently invested $2,000,000 in Mobile Corp., that Plaintiff pressed Billingsley to provide additional information about both Mobile Corp. and KCF.

112.    Billingsley refused to provide any information for months.  Finally, in or around February 2018, Billingsley produced a copy of the second, $4,000,000 KCF Note, dated November 1, 2014.[5]  This was the first time that Plaintiff had ever seen or known of a second Note.

---

[5]    In addition to the second Note, Billingsley also provided a copy of the corresponding Note Purchase Agreement.

113.    Over the next several months, as Plaintiff, through counsel, sought additional information, Billingsley continued to dissemble and delay, even as he insisted that Mr. Pavlis' "investments" were legitimate and properly documented.

114.    When Billingsley finally produced additional documents on June 29, 2018, they all but confirmed that he, on behalf of KCF, had perpetrated an unconscionable fraud on Mr. Pavlis and was fabricating documents to cover their tracks.

115.    Billingsley first produced what purports to be a KCF "Confidential Private Placement Memorandum" ("PPM"), dated August 1, 2014, together with a "Subscription Agreement" dated August 18, 2014, and purporting to bear Mr. Pavlis' signature.  (Copies of the PPM and Subscription Agreement are attached hereto as Exhibits "G" and "H", respectively.)

116.    Billingsley produced these documents as further "evidence" that Mr. Pavlis had, in fact, knowingly and voluntarily agreed to purchase the KCF Notes.  However, to the extent the PPM even existed in 2014, it refers to KCF's offering of Class A shares in the company; it makes no mention whatsoever of convertible promissory notes, which are entirely distinct from, and have characteristics and terms entirely different from equity shares.

117.    Moreover, the PPM purports to relate to an offering of 10,000,000 shares at $.10 per share, for a total amount of $1,000,000.  Given that KCF and Billingsley contend that Mr. Pavlis invested $7,000,000 in KCF, this PPM plainly had nothing to do with Mr. Pavlis' supposed purchase of the KCF Notes.

118.    Similarly, the August 18, 2014, Subscription Agreement relates solely to the same Class A shares identified in the PPM.  Indeed, the document specifically states that it relates to "ownership of the Units offered for sale as further described in the attached Private Placement Memorandum dated as of August 1, 2014 . . . ."

119.    More suspicious still is the signature page attached to the Subscription Agreement.  The signature page reads as follows:  "The undersigned hereby represents and warrants that all of its answers to *this Investor Questionnaire* are true as of the date of its execution of the *Subscription Agreement pursuant to which it purchased Notes of the Company*."  (Emphasis added.)  This language is followed by what purports to be Mr. Pavlis' signature.  Beneath Mr. Pavlis' signature, Billingsley appears to have signed his name above a line that reads simply (and cryptically), "Name of Signatory (Entities only)."

120.    This document bears all of the hallmarks of an after-the-fact fabrication.  First, its plain language confirms that this signature page is from an "Investor Questionnaire," not the Subscription Agreement itself.[6]  Moreover, even though the Subscription Agreement, by definition, is limited to the Class A shares described in the PPM, the language of this signature page references the purchase of "Notes of the Company."  There is no reference whatsoever to "Notes" in the Subscription Agreement.

121.    Finally, the signature line above which Billingsley signed does not even mention KCF; the "Signatory" is Billingsley himself.  This is in stark contrast to the September 1, 2014, Note and corresponding Note Purchase Agreement – issued just two weeks later – which was purportedly signed by Silberman, as KCF's Executive Vice President.

122.    Upon information and belief, the PPM and Subscription Agreement are fabrications that KCF and Billingsley slapped together in recent months in an attempt to continue the fiction that Mr. Pavlis agreed to invest in KCF in any way, at any time.

---

[6]    It bears noting that neither Billingsley nor KCF has ever produced an Investor Questionnaire purporting to bear Mr. Pavlis' signature.

123.    On June 29, 2018, Billingsley also provided Mr. Pavlis' counsel with three Joint Venture Agreements ("JVAs") between KCF and three of its subsidiary limited liability companies, the other Defendants in this action.   Copies of the JVAs are attached hereto at Exhibit "I".)   As with every other document produced by Billingsley and KCF, these JVAs are likely fraudulent, or at least created to abet KCF and Billingsley's fraud.

124.    KCF's joint venture agreement with "Key Commercial Finance Properties LLC," a Delaware limited liability company, is dated December 9, 2016.   This subsidiary was not formed until December 12, 2016.

125.    KCF's joint venture agreement with "Mobile Agency LLC," a Delaware limited liability company, is dated July 10, 2015.  Mobile Agency LLC was not formed until November 7, 2016.

126.    KCF's joint venture agreement with "Equity Pros, LLC," a Connecticut limited liability company, is dated August 28, 2015.  Equity Pros was not formed until September 11, 2015.

127.    More troubling still is the fact that each of the JVAs provide that KCF "may, at its sole discretion, contribute funds to SUBSIDIARY for the purpose of ensuring that SUBSIDIARY is able to meet its operating expense obligations; provided, however, that under no circumstances shall such fund transfers be construed as a loan from PARENT to SUBSIDIARY."

128.    Put differently, KCF has permitted itself to funnel assets – which consist principally (if not exclusively) of Mr. Pavlis' ill-gotten investment funds – to subsidiaries that have no obligation to repay the funds or provide collateral to secure the transfers.

129.    There is no evidence that Mr. Pavlis ever agreed to invest his funds in KCF, much less have his funds diverted to its subsidiaries. In much the same way that KCF and Billingsley redirected and commandeered Mr. Pavlis' Allwest investments, they have now created vehicles by which they can redirect what remains of Mr. Pavlis' funds to entities with which he has no conceivable connection, even in the fictional narrative spun by KCF and Billingsley.

130.    As if the foregoing were not damning enough, Billingsley withheld perhaps the most offensive and telling document for last.  On July 13, 2018, Billingsley produced, for the first, time, a putative "Funding Agreement" between KCF and Allwest.  (A copy of the Funding Agreement is Attached hereto as Exhibit "J".)

131.    The Funding Agreement is dated September 20, 2016, two years after Mr. Pavlis' investment.  Not coincidentally, the funding agreement between KCF and Allwest was entered into shortly after Mr. Pavlis' representatives began inquiring into his investments.

132.   Among other things, the Funding Agreement states that "KCF has provided funding to Allwest under loan arrangements that have been subject either to verbal agreement terms or only loose written documentation."   The irony of this statement is palpable – while KCF wants us to believe that it prepared Notes, Note Purchase Agreements, and other documents "confirming" Mr. Pavlis' 2014 "investment" in KCF, it was happy to fund Allwest's business ventures without any documentation whatsoever.

133.    The Funding Agreement is instructive for another reason: a heavily redacted section titled "KCF Indemnification for Secondary Investor Claims" that plainly refers to Mr. Pavlis.  It states that:

> The parties hereto acknowledge and agree that (i) KCF investor [REDACTED], despite documenting his investment as an investment in KCF (and not Allwest) advanced an aggregate of [REDACTED] of such

invested funds directly to Allwest at the request of KCF and on KCF's behalf to expedite KCF's further investment of such funds in Allwest, (ii) [REDACTED] is not an investor in Allwest with respect to such invested funds (including any interest or other return thereon), and Allwest has no direct liability to [REDACTED] with respect to such invested funds, and (iii) KCF is solely liable to [REDACTED] for repayment of such invested funds in accordance with the provisions of the written investment agreement entered into by KCF and [REDACTED].

134.    It further states that KCF "shall defend, indemnify, and hold harmless" Allwest from any claim by the [REDACTED] secondary investor.

135.    This provision begs several obvious questions.  For instance, why would KCF request Mr. Pavlis to advance investment funds to Allwest, if everyone understood that Mr. Pavlis was really investing in KCF?  And why would any investor assume the risk of giving $7,000,000 to Allwest, when that alleged transaction was never documented and presumably provided no financial benefit at all to Mr. Pavlis?  Finally, what sense does it make that Mr. Pavlis would do this solely to "expedite KCF's further investment of such funds in Allwest," when Mr. Pavlis could (and in fact did) invest directly in Allwest himself?

136.    The Funding Agreement is nothing more than a post-hoc attempt by KCF, through Billingsley, to create a veneer of legitimacy to obscure his highly-lucrative defrauding of Mr. Pavlis.

## COUNT I

## DECLARATORY JUDGMENT

137.    Plaintiff incorporates the averments in the proceeding paragraphs as if set forth in their entirety here.

138.    As the detailed factual background demonstrates, the interests of the parties here are adverse, the controversy is ripe for determination, and Mr. Pavlis has no adequate remedy at law.

139.    On February 20, 2014, Mr. Pavlis gave Billingsley a cashier's check for $1,000,000 that Billingsley sent to Allwest Investments, in California.  Billingsley represented at the time that the payment was for a promissory note.

140.    Allwest never repaid Mr. Pavlis on the note, and Billingsley has never provided any documentation as to the disposition of those funds.

141.    On May 23, 2014, Mr. Pavlis, on Billingsley's recommendation, wrote a personal check in the amount of $6,000,000, made payable to Allwest.  The only notation is the memo on the check, which states simply "Real Estate Investment."

142.    Subsequently, KCF purports to have issued two Notes to Mr. Pavlis, which Notes Mr. Pavlis ostensibly purchased pursuant to corresponding Note Purchase Agreements.

143.    Mr. Pavlis' "signature" on both Note Purchase Agreements stands alone, on a separate sheet of paper that makes no reference to the promissory note.  Upon information and belief, Mr. Pavlis did not knowingly sign the Note Purchase Agreements and did not intend to commit himself to any investment in or with KCF.

144.    Mr. Pavlis intended to invest $7,000,000 in Allwest, not KCF, as evidenced by the fact that his checks were made payable to Allwest, not KCF.  No contemporaneous documentation suggests in any way that any portion of Mr. Pavlis' investment in Allwest was intended for KCF.

145.    Further, at the time The Notes were issued and the Note Purchase Agreements "signed", KCF was *not* a validly organized and existing Delaware limited liability company.  It

was not registered as a Delaware limited liability company until December 10, 2014 and there is no evidence suggesting it intended to organize and exist before that date

146.    Because KCF was *not* a recognized entity under Delaware law at the time it issued the promissory notes, it did not have the *capacity* to enter into valid contracts.

147.    Absent legal capacity, the promissory notes issued by KCF, totaling $7,000,000 of Mr. Pavlis' funds, are *void ab initio*.

148.    Further, to the extent *any* legitimate investment occurred, Mr. Pavlis invested in Allwest, not KCF, and Defendants' attempt to retrospectively revise that investment months later is patently fraudulent.

149.    Moreover, the promissory notes issued by KCF to Mr. Pavlis are signed by Silberman who, on information and belief, was never affiliated with KCF.

150.    Because KCF did not have the legal capacity to enter into a contract at the time the KCF notes were issued, and because the KCF were fraudulently executed, Mr. Pavlis respectfully requests that this Court declare the notes void and order Defendants to repay, as restitution, Mr. Pavlis' full $7,000,000.

## COUNT II

## COMMON LAW FRAUD

151.    Plaintiff incorporates the averments contained in all the preceding paragraphs as if set forth in their entirety here.

152.    Defendants, individually and/or together, defrauded Mr. Pavlis out of $7,000,000. They did so by gaining his trust and confidence, by misrepresenting their intentions, by misrepresenting the risk and reward of the investments they were recommending, by failing to disclose their own individual interest in the investments being recommended, by misrepresenting

where the funds from his investment would actually go, and by creating multiple fake documents in an attempt to cover up these actions.

153.   Defendants' affirmative acts include, but are not limited to:

a.   On or around January 28, 2014, misrepresenting, through Billingsley, that Mr. Pavlis was investing in Allwest Investments when in reality his funds were going to KCF.

b.   Orchestrating and implementing the transfer of Mr. Pavlis' $7,000,000 Allwest to KCF.

c.   On October 1, 2014, issuing a fraudulent promissory note for $3,000,000 on behalf of KCF, which was not yet a legal entity.

d.   On November 1, 2014, issuing a fraudulent promissory note for $4,000,000 on behalf of KCF, which was not yet a legal entity.

e.   On September 20, 2016, creating a fraudulent Funding Agreement between KCF and Allwest Investments which purports to legitimize KCF's misappropriation of Mr. Pavlis' Allwest investment in January 2014.

154.   As a result of Defendants' fraudulent acts, as more fully set forth above, Mr. Pavlis has suffered damages, including, but not limited to the loss of his $7 million investment in Allwest.

## COUNT III

## FRAUDULENT CONCEALMENT

155.   Plaintiff incorporates the averments in the proceeding paragraphs as if set forth in their entirety here.

156.    Defendants have engaged in an on-going pattern of deception specifically intended to obscure their misrepresentations, fraud, and self-dealing.

157.    First, by placing Billingsley in the position of Mr. Pavlis' trusted advisor, Defendants allowed Billingsley to personally shield Mr. Pavlis from any information that might have warned him of the fraudulent nature of Defendants' investment schemes.

158.    By disguising their frauds as multi-year or long-term investments, Defendants delayed any immediate or short-term inquiry into their fraudulent schemes.

159.    For instance, Mr. Pavlis is purported to have entered into multiple investments with Defendants, in a number of forms.  His purported promissory notes from KCF were not due to be repaid until 2019 and 2020, respectively.

160.    When Mr. Pavlis' representatives began to inquire into his investments in 2016, Defendants engaged in a pattern of deception intended to obscure the fraudulent nature of their scheme, which pattern is more fully detailed at paragraphs 109-137 above.

161.    For instance, on September 20, 2016, shortly after Mr. Pavlis' representatives first contacted Billingsley, Allwest and KCF entered into a fraudulent "Funding Agreement" purporting to memorialize Mr. Pavlis' knowledge of the underlying nature of their relationship.

162.    This pattern of deception continued through 2017, as Billingsley repeatedly refused to turn over any documentation of Mr. Pavlis' investments.  On numerous occasions, Billingsley delayed providing, or outright refused to provide, necessary information and documentation of Mr. Pavlis' investments.

163.    In June 2018, Billingsley produced several documents purporting to memorialize Mr. Pavlis' investments; these documents are, on information and belief, fake and/or fraudulent and an attempt to create a veneer of legitimacy for Defendants' scheme.

164.    This on-going course of conduct was such that a reasonable person would have no knowledge of any injury from the Defendants' actions.

165.    As a result of Defendants' fraudulent concealment, Mr. Pavlis has suffered damages, including, but not limited to the loss of his $7 million investment in Allwest.

## COUNT IV

## CONVERSION

166.    Plaintiff incorporates the averments in the proceeding paragraphs as if set forth in their entirety here.

167.    Defendants currently retain control of Plaintiff's $7,000,000, even though Mr. Pavlis specifically invested in Allwest, not KCF or its subsidiaries.

168.    Defendant KCF re-routed Mr. Pavlis' funds to KCF without Mr. Pavlis' knowledge, in violation of a duty to Mr. Pavlis, through its agent Billingsley, who served as Mr. Pavlis' trusted financial advisor.  KCF has retained possession and control over those illicit funds since 2014.

169.    Moreover, on information and belief, KCF has and will continue to divert Mr. Pavlis' funds to its subsidiaries, entities that did not exist at the time Mr. Pavlis invested his funds in Allwest, through transactions that were not contemplated (and could not be contemplated) at the time Mr. Pavlis invested his funds in Allwest.

170.    Defendants' possession of those funds, separately or together, was secured through a backchannel conspiracy with Allwest, without Mr. Pavlis' knowledge or consent, and is thus both wrongful and in contravention of Mr. Pavlis' rights to his funds.

171.    As a result of Defendants' wrongful conversion, Mr. Pavlis has suffered damages, including, but not limited to the loss of his $7 million investment in Allwest.

## COUNT V

## UNJUST ENRICHMENT

172.    Plaintiff incorporates the averments in the proceeding paragraphs as if set forth in their entirety here.

173.    Defendants retain control over Mr. Pavlis' funds and continue to use them for their own purposes, at Mr. Pavlis' expense.

174.    In 2014, Mr. Pavlis wrote two checks, totaling $7,000,000 to Allwest Investments, a California real estate company.   That money was intended as a real estate investment in the recipient of Mr. Pavlis' checks.   Without Mr. Pavlis' knowledge or consent, however, that money was transferred to KCF.   As such, to the extent KCF currently retains any of that investment, it does so wrongfully, inequitably, and at Mr. Pavlis' expense.

175.    Similarly, to the extent that Mr. Pavlis' funds are in the possession of KCF's subsidiaries, that possession is not contemplated by any contract (to the extent *any* of the various contracts produced by Defendants are deemed valid) to which Mr. Pavlis is a party, nor was it the intention of Mr. Pavlis that these entities benefit from his investment in Allwest.

176.    Mr. Pavlis lacked any knowledge that his funds would be used to enrich KCF and/or its subsidiaries and did not consent to the transfer of funds to any Defendant.   As a result, Defendants' continued possession and dissipation of Mr. Pavlis' funds for their own ends is wrongful, inequitable, and at Mr. Pavlis' expense.

177.    Through the structure of the Defendant entities and contracts between the Defendant entities, Defendants have sought to shield themselves from liability and any obligation to return Mr. Pavlis' funds.

178.    In the absence of any commercial or contractual relationship with KCF's subsidiaries, Mr. Pavlis lacks any adequate remedy at law.

179.    As a result of Defendants' unjust enrichment at Mr. Pavlis' expense, Mr. Pavlis has suffered damages, including, but not limited to the loss of his $7 million investment in Allwest.

WHEREFORE, Plaintiff Deborah S. Skeans, Executrix of the Estate of Frank E. Pavlis respectfully requests the Court enter an order against Defendants Key Commercial Finance LLC, Key Commercial Finance Properties, LLC, Equity Pros, LLC, and Mobile Agency, LLC:

      a.      Declaring the promissory notes void;

      b.      Ordering Defendants pay damages in the amount of at least $7 million, plus interest;

      c.      Awarding punitive damages;

      d.      Ordering Defendants pay Mr. Pavlis' reasonable attorneys' fees and costs; and

      e.      Awarding such other and further relief as the Court deems just and proper.

STRADLEY RONON
STEVENS & YOUNG, LLP

_____*/s/ Joelle E. Polesky*_____
Joelle E. Polesky (ID No. 3694)
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Tel: (302) 295-4856
Fax: (302) 295-4801
Email: jpolesky@stradley.com

*Attorneys for Plaintiff,*
*Deborah S. Skeans, Executrix of the*
*Estate of Frank E. Pavlis*

OF COUNSEL:

William E. Mahoney, Jr.
Spencer R. Short
Stradley Ronon Stevens & Young LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Tel: (215) 564-8059
Fax: (215) 564-8120

Dated: October 1, 2018

## VERIFICATION

I, Deborah S. Skeans, state that I am the Executrix of the Estate of Frank E.

Pavlis, that I am authorized to make this Verification on behalf of the Estate of Frank E. Pavlis,

and that the facts contained in the foregoing Complaint are true and correct to the best of my

knowledge, information, and belief. I understand that these statements are made subject to the

penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: _9/28/18_                    By: _____
                                        Deborah S. Skeans, Executrix of the Estate
                                        of Frank E. Pavlis