# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEBORAH S. SKEANS, Executrix of the ESTATE OF FRANK E. PAVLIS,<br><br>*Plaintiff*,<br><br>v.<br><br>KEY COMMERCIAL FINANCE, LLC, KEY COMMERCIAL FINANCE PROPERTIES, LLC, EQUITY PROS, LLC, and MOBILE AGENCY, LLC,<br><br>*Defendants*.<br><hr>JUSTIN BILLINGSLEY and KEY COMMERCIAL FINANCE, LLC,<br><br>*Third-Party Plaintiffs*,<br><br>v.<br><br>DEBORAH S. SKEANS and DARBIN SKEANS,<br><br>*Third-Party Defendants*. | C.A. No. 1:18-cv-01516-CFC |

## THIRD-PARTY COMPLAINT

Third-Party Plaintiff Justin Billingsley ("Mr. Billingsley") and Defendant and Third-Party Plaintiff Key Commercial Finance, LLC ("KCF" and, together with Mr. Billingsley, "Third-Party Plaintiffs"), by and through their undersigned counsel, bring this third-party complaint pursuant to Rule 14(a) of the Federal Rules of Civil Procedure against Deborah S. Skeans, in her individual capacity ("Ms. Skeans"), and her husband Darbin Skeans ("Mr. Skeans"), alleging as follows:

## INTRODUCTION

1.      This is an action for defamation and tortious interference with prospective economic advantage against Ms. Skeans and Mr. Skeans (together, the "Skeanses"), who acted to destroy the reputation of KCF and Mr. Billingsley in order to advance their own interests. The Skeanses, connected to Mr. Billingsley through their shared faith, maliciously painted Mr. Billingsley as a conman who was taking advantage of an elderly, wealthy gentleman to the tune of millions of dollars. Using their faith community and far reaching connections in the close-knit real estate community, the Skeanses were successfully able to smear KCF and Mr. Billingsley and destroy their business.

2.      Specifically, in the first quarter of 2017, Billingsley, through KCF, worked tirelessly to build a two-sided single family residential buying and selling ecosystem. This new model, which Billingsley believed would be a way to upset the residential real estate market, included the digital platforms BuyEveryHome.com, NoUglyHomes.com, RealtyProClub.com, and The HUB (a customized CRM (Customer Relationship Management) system with prospect and lead management sales follow-up and video messaging). All were on track and doing well.

3.      After the direct-to-homeowner side of the platform was completed, tested, and found to be successful, KCF began work to design, engineer, and build the direct-to-rental portfolio owner side of the platform. KCF went live with the system, RentalProClub.com, in the last quarter of 2018. Owners of portfolios of rental properties could buy and sell properties in an online marketplace as an alternative to the MLS.[1]

4.      Unlike other such services, RentalProClub.com's business model involved allowing property owners to list properties for sale for free, while charging commissions only to

---

[1] "MLS" is the multiple listing system which is used by real estate brokers to widely share information concerning real estate listings.

buyers. This disruptive and innovative strategy was set to be very upsetting to the real estate industry, especially to big competitors launching very similar systems with the old antiquated method of real estate compensation like the Sperry Van Ness system, SFR Hub.com.

5. The late Frank E. Pavlis ("Mr. Pavlis"), whose estate is purportedly represented by Ms. Skeans in her capacity as executrix in this action, was an investor in KCF. Mr. Billingsley was very supportive and helpful in the Skeanses' personal investments with Mr. Pavlis, which included a $500,000 investment in a real estate scheme with a private school that their grandchildren attended, and also a $3,000,000 investment into an assisted living facility controlled by the Skeanses that originally was not enough to finish the project as it ran a million over budget due to a supposed mistake from a local contractor that was also working on the Skeanses' personal projects. As the majority of the board members of the assisted living facility suspected foul play, the Skeanses were ousted from the board but later viscously fought their way back into control with accusations of fraud and much more.

6. The Skeanses wanted to go into business with KCF and Mr. Billingsley, together with Mr. Pavlis, using Mr. Pavlis' money. When Mr. Pavlis ultimately decided to invest exclusively with Mr. Billingsley and KCF without the Skeanses, the Skeanses became irate.

7. The Skeanses were not just upset by the fact that Mr. Pavlis had decided against including them in his dealings with Mr. Billingsley. The Skeanses, who were owners of SVN Imperial Realty, one of the largest franchises of Sperry Van Ness, or SVN Commercial Real Estate Advisors, issued by franchisor SVN International Corp. (collectively, "SVN"), realized that Mr. Billingsley's new real estate business represented a direct threat to their business interests. Specifically, SVN established its own website, SFRHub.com, for the buying and selling of single-family residential properties. Because SFRHub.com's traditional business model involved

charging fees to both sellers and buyers, Billingsley's RentalProClub.com's free-listing business model directly challenged SVN's traditional model.

8. RentalProClub.com was initially successful, listing more than 2,000 properties by more than 180 portfolio owners in its first 45 days. However, in an article published on December 14, 2017, in the *Arizona Republic* and on its website, *azcentral.com*, Ms. Skeans was quoted as making false and defamatory statements about Mr. Billingsley and KCF. Specifically, in an effort to paint Mr. Billingsley as a scam artist, Ms. Skeans claimed that Mr. Pavlis suffered from "memory loss" when he invested in KCF. Mr. Pavlis, despite his advanced age, suffered from no such memory loss. That statement was false. It was also defamatory—implying that Mr. Billingsley and KCF had taken unfair advantage of Mr. Pavlis.

9. Indeed, in an email to Mr. Billingsley's counsel sent on September 30, 2017, Ms. Skeans had written "Be advised that Mr Pavlis was capable of and was making his own investment decisions in 2014"—when he invested in KCF.

10. In addition, to protect their interests in SVN and its traditional business model, the Skeanses interfered with Mr. Billingsley's and KCF's prospective business relations with third parties, including prospective investors in KCF and RentalProClub.com. Those prospective investors included Amherst Residential, Sylvan Road Capital, and Pintar Investment Company, all of which were large real estate investment trusts (REITs).

11. As a result of the Skeanses' false and defamatory statements and the Skeanses' interference, Mr. Billingsley and KCF were unable to build on the initial success of RentalProClub.com. Prospective investors and strategic partners walked away. Because of the Skeanses' bad acts, KCF was unable to repay a $4 million convertible promissory note issued to

Mr. Pavlis that matured on September 29, 2019, and has very little prospect of repaying the additional $3 million convertible promissory note due in 2020.

## PARTIES

12. Plaintiff Justin Billingsley (as previously defined, "Mr. Billingsley") is a resident of New York.

13. Plaintiff Key Commercial Finance LLC (as previously defined, "KCF") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York. KCF's members are all residents of the State of New York.

14. Defendant Deborah Skeans (as previously defined, "Ms. Skeans") is a resident of Allentown, Pennsylvania.

15. Defendant Darbin Skeans (as previously defined, "Mr. Skeans") is a resident of Allentown, Pennsylvania.

## JURISDICTION

16. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because all of the parties are residents of different states and the matter involves damages in excess of $75,000. Additionally, this Court has supplemental jurisdiction under 28 U.S.C. § 1367.

17. This Court has personal jurisdiction over Ms. Skeans and Mr. Skeans pursuant to Rule 4(k)(1)(B) of the Federal Rules of Civil Procedure because they are parties joined under Rule 14 and can be served within a judicial district of the United States and not more than 100 miles from where the summons is issued.

## FACTUAL ALLEGATIONS

**A. Billingsley Meets Pavlis Through the Skeanses.**

18. Mr. Billingsley was introduced to the Skeanses in 2013 as someone who could help them with their finances, and who might be willing to serve as a director and board member of their assisted-living facility business, Jah-Jireh Homes of America ("Jah-Jireh"), which was planning to open its first facility, called Legacy Place Cottages, in Allentown, Pennsylvania.

19. After spending time with the Skeanses, they introduced Mr. Billingsley to Mr. Pavlis, to help them persuade Mr. Pavlis to invest $3 million in Jah-Jireh, and an additional $500,000 in a real estate deal with the school attended by the Skeanses' grandchildren. Mr. Pavlis made those investments with the Skeanses.

20. Ms. Skeans and her son, Thomas Skeans, were paid commissions on the real estate deal.

21. The Skeanses later convinced Mr. Pavlis to invest another $3 million in Jah-Jireh after the initial $3 million investment was exhausted due to the previously stated mismanagement of the original investment.

22. The Skeanses paid for Mr. Billingsley to fly to Chicago for a meeting and dinner event at a hotel, using Mr. Pavlis' money to solicit more investments for Jah-Jireh. There were more than 50 people in attendance at the dinner event.

23. The Skeanses wanted to raise millions of dollars more for additional facilities to be built. They wanted Mr. Billingsley to work full-time for Jah-Jireh, but he declined.

24. The Skeanses also used Mr. Pavlis' money to take an all-expense-paid trip to Europe with a few employees to tour other facilities.

25. The Skeanses built up a large board of directors for Jah-Jireh, but disputes arose and the Skeanses were removed from the board.

26. In retaliation for their removal, the Skeanses made personal attacks on the other board members, accusing them of fraud and other misconduct. Eventually, they fought their way back on to the board and regained control of Jah-Jireh.

27. Mr. Billingsley went on a business trip to California with the Skeanses, paying his own expenses, to meet with Mr. Billingsley's real estate contacts there, and to work on a proposed joint venture to be known as Skeans Real Estate Partners. Together, they compiled complex spreadsheets, pro-forma financial statements, and investor documents for the proposed joint venture.

### B. Pavlis Invests with Billingsley.

28. Ms. Skeans and Mr. Skeans, together with Mr. Billingsley, approached Mr. Pavlis for a $500,000 investment. Mr. Pavlis liked the proposal and decided that he wanted to invest $1 million.

29. However, Mr. Pavlis decided that he wanted to invest exclusively with Mr. Billingsley. When Mr. Billingsley decided that he did not want to partner with the Skeanses, the Skeanses became irate.

30. Mr. Pavlis had a net worth of more than $100 million, including thousands of shares of founders' stock in Air Products and Chemicals, Inc. (NYSE:APD), a publicly traded company with a current market capitalization of more than $50 billion. With the help of large law firms such as Weil, Gotshal & Manges and Hangley Aronchick Segal Pudling & Schiller, Mr. Billingsley met with large hedge funds and money managers in an effort to find a more advantageous broker relationship for Mr. Pavlis, but his assets ultimately remained with his long-time brokerage firm, Glenmede Investment Management LP ("Glenmede").

31. In 2013, Mr. Billingsley joined Mobile Pro Corporation, later renamed Mobile Corporation ("Mobile Corp."), a company formed and controlled by internet entrepreneur Jeffrey Peterson, the founder of Quepasa, an online sensation that once reached a market value of $400 million, and Michael Silberman, Mobile Corp.'s chief financial officer, who had worked for Peterson at Quepasa.

32. Mobil Corp. was formed in March 2013 to create a mobile employment platform for micro-jobbing and freelancer work. Mr. Billingsley headed Mobile Corp.'s New York office and later served as Mobile Corp.'s President.

33. Mr. Billingsley introduced Jeffrey Peterson and Michael Silberman to Mr. Pavlis. After discussing the Mobile Corp. investment opportunity with Peterson and Silberman, Mr. Pavlis understood and was excited about Mobile Corp.'s business model, its prestigious board of directors, and high profile investors and advisors, including Howard Dean (former governor of Vermont, former head of the Democratic National Committee, and U.S. Presidential candidate), Dennis Burke (former U.S. Attorney for the District of Arizona), Alan Bersin (former Assistant Secretary of the U.S. Department of Homeland Security), Marco Lopez (Senior Advisor to Mexican billionaire Carlos Slim), and Phil Gordon (the Mayor of Phoenix, Arizona).

34. Mr. Pavlis decided initially to make a significant investment in Mobile Corp. On information and belief, this investment was $1 million and was paid through Wilson Sonsini Goodrich & Rosati, which was serving Mobile Corp. as its securities counsel. On information and belief, in September 2014, Mr. Pavlis decided to invest an additional $1 million in Mobile Corp.

35. Because Peterson and Silberman dealt directly with Mr. Pavlis, and because Mr. Billingsley did not have a role in controlling Mobile Corp. and did not have access to its bank

accounts, Mr. Billingsley was not immediately aware of Mr. Pavlis' investments and had no knowledge of the use of funds by Mobile Corp.

36. Mr. Billingsley received salary payments from Mobile Corp., but did not solicit investments and did not receive commissions.

**C. Pavlis Makes the Investments at Issue in this Litigation.**

37. Mr. Billingsley also introduced Mr. Pavlis to Allwest Investments, LLC ("Allwest"), a California-based company that bought distressed residential properties, rehabilitated them, and then re-sold them. Mr. Billingsley gave Mr. Pavlis an Allwest Investor Overview booklet and Subscription Agreement.

38. On January 28, 2014, Mr. Pavlis signed the Allwest Subscription Agreement. However, Mr. Pavlis later rejected the Allwest investment documents in favor of an investment in KCF, at the urging of Ms. Skeans and Mr. Skeans. Because Mr. Pavlis rejected the investment documents, KCF did not sign the investment documents and they were not considered to be executed.

39. When Mr. Pavlis advised his brokers that he wanted to liquidate certain assets to make the investment in KCF, Mr. Pavlis' brokers from Glenmede traveled to Allentown to meet with Mr. Pavlis to discuss the investment in KCF and to verify Mr. Pavlis' capacity, soundness of mind, and understanding of the investment in KCF. The result of this meeting was the wiring of $6 million by Glenmede to Mr. Pavlis' banker. Similar precautions were taken by Ed Lentz, Esq., Mr. Pavlis estate attorney, and Mr. Pavlis' banker: after Mr. Billingsley explained the investment to Mr. Pavlis' banker, Mr. Pavlis' banker met privately with Mr. Pavlis to confirm Mr. Pavlis' capacity, will, and intent, after which he approved the transaction.

40. Mr. Pavlis wrote a personal check dated May 23, 2014, for $6 million, payable to Allwest Investments. Allwest had an agreement with KCF under which Allwest was the operating entity in a business consisting of the building and remodeling of over 50 homes in California, Atlanta, and Chicago. Although Mr. Pavlis made payments to Allwest, his investment was based on an agreement with KCF that was drafted by Snell & Wilmer L.L.P. (the largest law firm in Arizona). Additionally, all investments were audited by Eide Bailly LLP, a large and well-respected certified public accountant and business advisory firm.

41. Mr. Pavlis understood that he was investing in KCF, and that his investment was to be used initially to fund Allwest's real estate development business.

42. In September and November 2014, after a great deal of discussion with Mr. Pavlis and many versions of the documents being worked through, KCF issued two convertible promissory notes (the "Notes") to Mr. Pavlis in the amounts of $3 million and $4 million. Mr. Pavlis signed the Notes and also signed corresponding Note Purchase Agreements with KCF. The Notes had maturity dates of September 29, 2019, and November 30, 2020, respectively.

43. About two years after Mr. Pavlis made his investment, Gary Miller, the principal of Allwest, wished to retire. Beginning at that time and over a period of about one-and-a-half years, $7 million was transferred to KCF from Allwest, all audited and found to be accurate according to Eide Bailly LLP.

44. Although Mr. Pavlis initially invested in KCF's real estate business, Mr. Pavlis later agreed that KCF would continue to further its goal of developing a digital platform and related tools, which ultimately became RealtyProClub.com, RentalProClub.com, BuyEveryHome.com, NoUglyHomes.com, and The HUB. KCF and its subsidiaries developed those platforms and tools,

but as discussed below, were unable to sell them because of the interference of and the untrue and defamatory statements made by the Skeanses.

### D. The Skeanses Defame Billingsley and KCF.

45. In September 2017, the Skeanses flew to Arizona to meet with Craig Harris, a reporter from the *Arizona Republic* and *azcentral.com*, to discuss Mr. Billingsley. The Skeanses made a number of false and defamatory allegations, including that Mr. Pavlis had suffered from "memory loss" for over a decade, including during the time he invested in KCF. Their intent was clear: to make Mr. Billingsley and KCF appear to be scam artists who had preyed upon an elderly man. Ironically, at the same time that the Skeanses were attempting to portray Mr. Pavlis as not having capacity to make such investments, the Skeanses themselves were seeking to have Mr. Pavlis invest in their businesses.

46. The Skeanses were motivated by their resentment toward Mr. Billingsley for having decided not to go into business with them and by their wish to protect their interests in the newly established SVN business, SFRHub.com, which faced a direct competitive threat from KCF's RentalProClub.com.

47. On the same trip, the Skeanses met with Mr. Billingsley's Arizona counsel, Don Bivens, Esq., of Snell & Wilmer L.L.P., and repeated their defamatory statements against Mr. Billingsley. Mr. Bivens, a recent chair of the 55,000-member Section of Litigation of the American Bar Association, strongly cautioned the Skeanses about their actions against Mr. Billingsley. Although they admitted their statements to the reporter in their meeting with Mr. Bivens, they later denied them in an email.

48. The Skeanses subsequently denied having made any such allegations against Mr. Billingsley. However, the *Arizona Republic* and *azcentral.com* printed an article by Craig Harris

on December 14, 2019, quoting Ms. Skeans by name and repeating the Skeanses' false and defamatory allegations against Mr. Billingsley.

49. The impact of the Skeanses' statements were felt by Mr. Billingsley. With the article by Mr. Harris available on the Internet, the Skeanses' comments were published to the world, leading to a number of prospective business partners, including Amherst Residential, Sylvan Road Capital, and Pintar Investment Company, determining that they would not do business with either Mr. Billingsley or KCF.

50. Mr. Pavlis had granted a power of attorney to a friend, David Wyllie. Ms. Skeans attacked the power of attorney, accusing Mr. Wyllie of fraud and other misconduct, and persuaded Mr. Pavlis to revoke it and grant a new power of attorney to her. She then began demanding information from Mr. Billingsley regarding Mr. Pavlis' investments. However, Ms. Skeans failed to provide Mr. Billingsley with adequate documentation of her purported role as representative of Mr. Pavlis' estate. Mr. Billingsley responded through his counsel, Don Bivens.

51. Mr. Pavlis died on August 24, 2018.

### COUNT I
**(Defamation)**

52. Third-Party Plaintiffs incorporate and restate the allegations of the preceding paragraphs as though set forth in full herein.

53. The Skeanses made false statements purporting to be facts, including the statement that Mr. Pavlis suffered from memory loss during the time that he invested in KCF.

54. The Skeanses communicated those false statements to third persons, including Craig Harris, a reporter, knowing that he would publish those false statements in the newspaper and online, as retaliation against Mr. Billingsley for not going into business with them and as a defensive strategy for the SVN rental portfolio platform SFRHub.com.

55. The Skeanses communicated those false statements intentionally and with malicious intent toward Mr. Billingsley and KCF.

56. The Skeanses made *per se* slanderous statements regarding Mr. Billingsley and KCF because such slanderous statements maligned Mr. Billingsley and KCF in their trade, business, or profession.

57. Mr. Billingsley and KCF suffered damages to their reputations and through loss of investments and income caused by the Skeanses' false and defamatory statements.

## COUNT II
### (Injurious Falsehood)

58. Third-Party Plaintiffs incorporate and restate the allegations of the preceding paragraphs as though set forth in full herein.

59. The Skeanses made or published false statements regarding Mr. Billingsley and KCF, stating that Mr. Pavlis had memory loss with respect to his investment in KCF. The statements were made or published by the Skeanses in reckless disregard of the statements' truth or falsity and with the intent to harm Mr. Billingsley and KCF's business and to harm Mr. Billingsley in their mutual religious community.

60. The Skeanses should have known that the statements were not true or acted in reckless disregard to the trust or falsity of the statements.

61. The statements made by the Skeanses was not true or substantially true and the Skeanses were not privileged in making these statements.

62. The statements that were made by the Skeanses regarding Mr. Billingsley and KCF led to the loss of substantial amounts of business, harming both Mr. Billingsley and KCF.

63. Third-Party Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT III
### (False Light/Invasion of Privacy)

64. Third-Party Plaintiffs incorporate and restate the allegations of the preceding paragraphs as though set forth in full herein.

65. The Skeanses made or published false statements regarding Mr. Billingsley and KCF.

66. The Skeanses' statements placed Mr. Billingsley and KCF in a false light which was highly offensive to a reasonable person: without any knowledge of the true facts regarding Third-Party Plaintiffs' dealings with Mr. Pavlis, the Skeanses made it appear that both took advantage of an elderly person.

67. The light in which Third-Party Plaintiffs were placed by the statements made was offensive enough for prospective business partners to not work with either Mr. Billingsley or KCF.

68. The Skeanses should have known that the statements were not true or acted in reckless disregard of the truth or falsity of the statements.

69. The statements made by the Skeanses were not true or substantially true and the Skeanses were not privileged in making the statements.

70. Third-Party Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT IV
### (Tortious Interference with Prospective Economic Advantage)

71. Third-Party Plaintiffs incorporate and restate the allegations of the preceding paragraphs as though set forth in full herein.

72. Mr. Billingsley and KCF had prospective economic relationships with third parties, including Amherst Residential, Sylvan Road Capital, and Pintar Investment Company, that were likely to benefit Mr. Billingsley and KCF.

14

73. The Skeanses had knowledge of those relationships.

74. The Skeanses engaged in wrongful conduct toward Mr. Billingsley and KCF by interfering with those relationships.

75. The Skeanses intended to disrupt Mr. Billingsley and KCF's economic relationships with Amherst Residential, Sylvan Road Capital, and Pintar Investment Company, among others, or knew that disruption was likely to occur because of their conduct.

76. Mr. Billingsley and KCF's prospective economic relationships with Amherst Residential, Sylvan Road Capital, and Pintar Investment Company, among others, were disrupted by the Skeanses' conduct.

77. Mr. Billingsley and KCF suffered reputational and economic harm caused by the Skeanses' conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Third-Party Plaintiffs Justin Billingsley and Key Commercial Finance, LLC respectfully request that the Court grant them the following relief:

A. Granting them damages in an amount to be determined at trial;

B. Awarding them the expenses incurred by them in this litigation, including reasonable attorneys' fees, to the extent allowed by law;

C. Granting such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Dated:  October 22, 2019 | **HALLORAN FARKAS + KITTILA LLP** |
| | |
| | <u>*/s/ Theodore A. Kittila*          </u> |
| | Theodore A. Kittila (No. 3963) |
| | James G. McMillan, III (No. 3979) |
| | 5803 Kennett Pike, Suite C |
| | Wilmington, Delaware  19807 |
| | Phone:  (302) 257-2011 |
| | Fax:  (302) 257-2019 |
| | Email:    tk@hfk.law |
| |             jm@hfk.law |
| | |
| | *Counsel for Defendants and Third-Party Plaintiffs* |