DA-1

SVN | IMPERIAL REALTY     « Back to Search



PA #RM029163

Phone:    484.245.1002
Fax:      610.266.9268
Email:    debby.skeans@svn.com

# Deborah Skeans, CCIM, MAI

*Senior Advisor*

**About Me**    Listings

## Biography

Principal, Managing Director and Senior Advisor for SVN | Imperial Realty. With over 45 years of real estate experience, she has specialized in the Lehigh Valley market, participating in the development, valuation, consultation or marketing of a wide variety of commercial, residential development, industrial, agricultural and institutional property for both the private and public sectors. She and her husband Darbin T Skeans, CCIM, have developed a number of projects in the Lehigh Valley, both for their own and for third parties. A commercial real estate appraiser from 1980 to 2000, she was one of the first women in the greater Philadelphia area to earn the MAI designation and created one of the region's strongest commercial appraisal firms. She switched to brokerage in 1999 and uses her experience to assist the SVN|Imperial office as it helps clients build and maintain strong real estate portfolios.

Career highlights and development experience:

• 470 acres of prime interchange land sold to St. Luke's Hospital for $38.6 million in two transactions;
• strategized & brokered the sale of over 3,000 acres of estate property (over 50 parcels exceeding $50 million in value) to various buyers for a wide variety of uses;
• consultation regarding disposition of a key New York City property for redevelopment (transaction closed for over $200 million);
• the strategic planning and acquisition of over 30 downtown commercial properties by the City of Allentown for the development of a $150 million ice hockey arena, including development and oversight of a comprehensive relocation policy for affected owners and tenants;
• Project consulting, operational team creation and development responsibility of a $7.5 million assisted living facility in Lehigh County, PA

## Specialties

Industrial
Land
Senior Housing
Tenant Representation
Asset Recovery (SVNART)



EXHIBIT

D - 1

4|29|2020 CG

DA-2

# Frank Edward Pavlis

1916 - 2018







Send Flowers

➤ Share

Frank Edward Pavlis, 101 yrs., died August 24, 2018 at Legacy Place
Cottages. He was born October 29, 1916 on a wooded farm in Grand
Traverse County, Michigan. His father was born in Chicago, Illinois and
his mother on a wheat farm in northern Minnesota. In 1947, Frank
married Ethel Piehl who died in 2002 after a long illness. The couple had
no children. He earned a B.S. degree in chemical engineering in 1938 at
Michigan Technological University, a M.S. degree in 1939 at the
University of Michigan and completed the Advanced Management
Program in 1957 at the Harvard Business School. In 2014 the Michigan
Technological University awarded Pavlis with an honorary Doctor of
Philosophy degree for his accomplishments. In the spring of 1939 Pavlis
was employed by Leonard P. Pool, a young Detroit executive, to design

and construct a prototype process plant to separate 99.5% pure oxygen from atmospheric air. When the challenging project was successfully completed a year later, the young entrepreneurs decided to found a new company to manufacture and to sell or lease air separation plants to large users of oxygen and nitrogen gases. On October 1, 1940, a new company named Air Products, Incorporated, was founded in Detroit, Michigan. Pavlis was the first employee, the Chief Engineer. The new company made an important contribution to the success of World War II. In 1943, it moved its operations to Chattanooga, Tennessee, in 1946 to Emmaus, PA, and in 1957 to Trexlertown, PA, a suburb of Allentown, PA. Currently, the company called Air Products and Chemicals, Inc. has annual revenues of approximately ten billion dollars and operations in fifty countries. Pavlis retired from Air Products in 1980 after forty years of service. He had various positions including Chief Engineer, Treasurer, Vice President Engineering, Vice President Finance and Vice President International/World Trade. He also served on the Board of Directors for 28 years. He traveled around the world five times during his lifetime. Pavlis was a member of the Allentown Central congregation of Jehovah's Witnesses. He will be buried in the small Michigan cemetery where his wife, parents, grandparents, brother and sister are buried. The Memorial talk will be on Sept 10, Monday at 4 pm at the Kingdom Hall of Jehovah's Witnesses, 4571 Indian Creek Rd., Macungie PA 18062-9766 Contributions to Jah Jireh Homes of America-Allentown, 2051 Bevin Dr, Allentown, PA 18103. They will be used to fund charitable care at Legacy Place Cottages. The Robert C. Weir Funeral Home is in charge of arrangements. www.WeirFuneral.com

To Plant Memorial Trees in memory, please visit our Sympathy Store.

Published in Morning Call from Aug. 30 to Sep. 1, 2018.

## MEMORIAL EVENTS

**SEP**
**10**

**Service**
4:00 PM

Kingdom Hall of Jehovah's Witnesses

🌻 **Send Flowers**

Funeral services provided by

Robert C Weir Funeral Home

1802 W Turner St
Allentown, PA 18104

610-433-7936

Send Flowers

📞 **Order by phone:**  (866) 764-7853

## MEMORIES & CONDOLENCES

What would you like to say about Frank?

Not sure what to say? ⌄

Your Name

Your Email Address

Your Relationship                                    ⌄

☑ Get email updates for this page

### Add Memory

Posting Guidelines │ FAQ

**4 entries**

Frank and Ethel were our neighbors at 36th & Congress Sts. in South
Whitehall Township. They visited us even after we moved from there.
They were down-to-earth. You couldn't ask for nicer neighbors. Frank was
a genuine "Mensch."
Richard & Darlene (Tami) Ochs

**Richard & Darlene Ochs**

We offer our condolences. We pray in your behalf, and we offer the hope
of welcoming back our loved ones on a Paradise earth. Psm 37:29

Mr. Pavlis was a generous benefactor of Circle of Seasons Charter School.
I offer my sincere condolences to his family and friends, especially the
Skeans family.

**Stacey Prohaska**

**Amy N. Kranch**

## INVITE OTHERS TO ADD MEMORIES

Share to let others add their own memories and condolences

## ADVICE & SUPPORT

| The Five Stages of Grief |
| --- |

| Sympathy Advice |
| --- |

| What Is a Eulogy? |
| --- |

| Funeral Flower Etiquette |
| --- |

View All Advice & Support Articles

Contact Us

FAQ

Privacy Policy

Terms of Use

# Legacy®

© 2020 Legacy.com All rights Reserved

DA-3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DEBORAH S. SKEANS, Executrix of the ESTATE OF FRANK E. PAVLIS, <br><br> *Plaintiff*, <br><br> v. <br><br> KEY COMMERCIAL FINANCE, LLC, KEY COMMERCIAL FINANCE PROPERTIES, LLC, EQUITY PROS, LLC, and MOBILE AGENCY, LLC, <br><br> *Defendants.* <br> *Third-Party Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     C.A. No. 1:18-cv-01516-CFC |

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST REQUESTS FOR ADMISSION**

Plaintiff, Deborah S. Skeans, Executrix of the Estate of Frank E. Pavlis ("Plaintiff"), objects and responds to Defendants' First Requests for Admission as follows:

**GENERAL OBJECTIONS**

A.      Plaintiff objects to each request for admission that seeks materials or information protected by the attorney-client privilege, work product doctrine, or any such or similar applicable privilege, protection or immunity.

B.      Plaintiff objects to each request for admission that seeks materials or information already in the requesting party's possession or equally available to the requesting party.

C.      Plaintiff objects to all instructions and definitions as imposing obligations or conditions inconsistent with, or more stringent than, those imposed by the Federal Rules of Civil Procedure.  Plaintiff will respond in accordance with the Rules and consistent with the plain meaning of the words used in each request for admission.

D.    These responses are based upon information presently known by Plaintiff.  It is anticipated that further discovery, investigation, legal research and analysis will supply additional factual conclusions and legal contentions.  Plaintiff reserves the right to rely on such additional discovery, investigation, legal research and analysis, and to make such additions, changes, and variations to these responses as warranted.

## RESPONSES TO REQUESTS FOR ADMISSION

1.    Admit that the Estate of Frank E. Pavlis is no longer the holder of the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million (attached as Ex. 1 hereto).

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around September 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  On or about September 19, 2017, Mr. Pavlis signed an "Assignment of Note," the terms of which purported to transfer Mr. Pavlis' interests in the referenced note to "Frank E. Pavlis TOD Watchtower Bible and Tract Society of New York, Inc."

2.    Admit that the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million (attached as Ex. 1 hereto) was transferred on the date of Frank E. Pavlis' death to the Watchtower Bible and Tract Society of New York, Inc., c/o Charitable Planning Office, 100 Watchtower Drive, Patterson, NY 12563-9204.

**Response**: Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around September 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  On or about September 19, 2017, Mr. Pavlis signed an "Assignment of Note," the terms of which purported to transfer Mr. Pavlis' interests in the referenced note to "Frank E. Pavlis TOD

2

Watchtower Bible and Tract Society of New York, Inc."

   3.  Admit that Frank E. Pavlis assigned the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million on September 19, 2017, the date of the "Assignment of Note" (attached as Ex. 2 hereto).

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around September 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  On or about September 19, 2017, Mr. Pavlis signed an "Assignment of Note," the terms of which purported to transfer Mr. Pavlis' interests in the referenced note to "Frank E. Pavlis TOD Watchtower Bible and Tract Society of New York, Inc."

   4.  Admit that Frank E. Pavlis had capacity to assign the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million on September 19, 2017, the date of the "Assignment of Note" (attached as Ex. 2 hereto).

**Response**: Plaintiff objects to this request on the grounds the phrase "had capacity" is vague and ambiguous.  To the extent the request is referring to Mr. Pavlis' legal and/or mental capacity, Plaintiff objects on the grounds that it calls for a legal conclusion and/or a medical opinion, neither of which Plaintiff is obligated or able to provide.  Plaintiff further objects to this request on the grounds that it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around September 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  Plaintiff admits that, in her lay opinion, Mr. Pavlis had capacity to sign the "Assignment of Note."  Plaintiff is without knowledge or information as to whether Mr. Pavlis understood the contents or import of the "Assignment of Note," other than her belief that Mr. Pavlis signed the "Assignment of Note" on the recommendation and advice of his estate planning counsel.

   5.  Admit that Frank E. Pavlis was never deemed to be incompetent or to otherwise lack capacity.

**Response**: Plaintiff objects to this request on the grounds the phrase "was never deemed to be incompetent or otherwise lack capacity" is vague and ambiguous.  To the extent the request is referring to Mr. Pavlis' legal and/or mental capacity, Plaintiff objects on the grounds that it calls for a legal conclusion and/or a medical opinion, neither of which Plaintiff is obligated or able to provide.  Subject to and without waiving these objections, Plaintiff admits as follows:  Plaintiff admits that, to her knowledge, Mr. Pavlis had never been found to have been legally or mentally incompetent by any medical professional or as a result of any legal proceeding.

6.     Admit that Deborah Skeans was aware of the "Assignment of Note" (attached as Ex. 2 hereto) at the time that it was signed by Frank E. Pavlis.

**Response**: Admitted.

7.     Admit that Deborah Skeans was aware of the existence of both (a) the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million (attached as Ex. 1 hereto), and (b) the Key Commercial Finance, LLC Convertible Promissory Note dated November 1, 2014, in the amount of $4 million (attached as Ex. 3 hereto) before the date of Frank E. Pavlis' death.

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Notes were valid legal instruments and/or were actually issued to Mr. Pavlis, in or around September 1, 2014 or November 1, 2014, respectively, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  Plaintiff admits that she was aware of the existence of copies of documents purporting to be the referenced Promissory Notes prior to the date of Mr. Pavlis' death.

8.     Admit that the Key Commercial Finance, LLC Convertible Promissory Note dated November 1, 2014, in the amount of $4 million (attached as Ex. 3 hereto) was bequeathed to the Watchtower Bible and Tract Society of New York, Inc. as part of Mr. Pavlis' estate.

4543013
**A-14**

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around November 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Plaintiff further objects to this request on the grounds that the phrase "was bequeathed to the Watchtower Bible and Tract Society of New York, Inc. as part of Mr. Pavlis' estate" is vague and ambiguous and calls for a legal conclusion. Subject to and without waiving these objections, Plaintiff responds as follows:  Denied.

      9.     Admit that the Estate of Frank E. Pavlis is no longer the holder of the Key Commercial Finance, LLC Convertible Promissory Note dated November 1, 2014, in the amount of $4 million (attached as Ex. 3 hereto).

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around November 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff responds as follows:  Denied.

      10.    Admit that Frank E. Pavlis did not disclaim his signature on either of the Note Purchase Agreements attached as Exhibit 4 or Exhibit 5.

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the documents attached as Exhibits 4 and 5 were actually issued to and/or signed by Mr. Pavlis.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such documents as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the note purchase agreements and related notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*. Subject to and without waiving these objections, Plaintiff responds as follows:  Plaintiff lacks knowledge or information sufficient to admit or deny whether Mr. Pavlis signed either of the documents attached as Exhibits 4 and 5, and if Mr. Pavlis did sign these documents, lacks knowledge or information sufficient to admit or deny whether he ever disclaimed his signature on those documents.

      11.    Admit that Frank E. Pavlis made an investment in or a loan to a charter school known as Circle of Seasons in 2014 in excess of $390,000.

**Response**: Plaintiff objects to this request on the grounds it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, as the issues in this case relate to the fraudulent misappropriation of funds Mr. Pavlis invested, and does not relate to any loans Mr. Pavlis made to entities not named in, or otherwise involved with, this lawsuit.  Subject to and without waiving this objection, Plaintiff admits as follows:  Mr. Pavlis made a loan to Circle of Seasons in the approximate amount of $415,000.00 in 2014.

12.     Admit that Deborah Skeans assisted with the making of the loan referenced in

Request No. 11.

**Response**: Plaintiff objects to this request on the grounds it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, as the issues in this case relate to the fraudulent misappropriation of funds Mr. Pavlis invested, and does not relate to any loans Mr. Pavlis made to entities not named in, or otherwise involved with, this lawsuit.    Plaintiff objects to this request on the grounds that phrase "assisted with the making of the loan referenced in Request No. 11" is vague and ambiguous.  Subject to this objection, Plaintiff admits as follows:  Plaintiff admits that she requested that Justin Billinglsey ask Mr. Pavlis to make a loan to Circle of Seasons.

13.     Admit that Frank E. Pavlis' net worth at the date of his death exceeded $70 million.

**Response**: Plaintiff objects to this request on the grounds it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, as the issues in this case relate to the fraudulent misappropriation of funds Mr. Pavlis invested, and does not relate to Mr. Pavlis' net worth at the date of his death.  Subject to this objection, Plaintiff responds as follows:  Denied.

14.     Admit that Deborah Skeans spoke directly with Craig Harris, a reporter from the

Arizona Republic, relating to Mr. Justin Billingsley and Frank E. Pavlis.

**Response**: Admitted.

15.     Admit that Darbin Skeans spoke directly with Craig Harris, a reporter from the Arizona Republic, relating to Mr. Justin Billingsley and Frank E. Pavlis.

**Response:**  Admitted.

STRADLEY RONON
STEVENS & YOUNG, LLP

*/s/ Joelle E. Polesky*
Joelle E. Polesky (ID No. 3694)
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Tel: (302) 295-4856
Fax: (302) 295-4801
Email: jpolesky@stradley.com

*Attorneys for Plaintiff, Deborah Skeans,*
*Executrix of the Estate of Frank E. Pavlis*

Dated: April 27, 2020

4543013
**A-17**

DA-4

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2
                        - - -
3

      DEBORAH S. SKEANS,          :   CIVIL ACTION
4     Executrix of the ESTATE     :   NUMBER
      OF FRANK E. PAVLIS,         :   1:18-cv-01516-
5              Plaintiff,     :   CFC
               v.             :
6     KEY COMMERCIAL FINANCE,     :
      LLC, KEY COMMERCIAL         :
7     FINANCE PROPERTIES, LLC,    :
      EQUITY PROS, LLC, and       :
8     MOBILE AGENCY, LLC,         :
                 Defendants.   :
9
                        - - -
10
                 Thursday, May 7, 2020
11
                        - - -
12
13          Oral deposition of DAVID SCOTT
14    WYLLIE, taken remotely via Zoom, at the law
15    offices of Henderson, Brandt & Vieth, P.A.,
16    360 East Henry Street, Suite 101, Spartanburg,
17    South Carolina  29302, beginning at 1:15 p.m.,
18    reported stenographically by Cheryl L.
19    Goldfarb, a Registered Professional Reporter,
20    Notary Public, and an approved reporter of the
21    United States District Court.
22                      - - -
           VERITEXT LEGAL SOLUTIONS
23            MID-ATLANTIC REGION
         1801 Market Street - Suite 1800
24        Philadelphia, Pennsylvania  19103

Page 2

1  A P P E A R A N C E S :
2
3      STRADLEY RONON STEVENS & YOUNG, LLP
       BY:  WILLIAM E. MAHONEY, JR., ESQUIRE
4        CAMERON REDFERN, ESQUIRE
       2005 Market Street, Suite 2600
5      Philadelphia, Pennsylvania  19103
       215.564.8000
6      wmahoney@stradley.com
       credfern@stradley.com
7      Representing the Plaintiff
       (Via Zoom)
8
9
       HALLORAN FARKAS & KITTILA, LLP
10     BY:  WILLIAM E. GREEN, JR., ESQUIRE
       5801 Kennett Pike, Suite C
11     Wilmington, Delaware  19807
       302.257.2011
12     wg@hfk.law
       Representing the Defendants
13     (Via Zoom)
14
15     HENDERSON, BRANDT & VIETH, P.A.
       BY:  GEORGE "BUCK" BRANDT, III, ESQUIRE
16     360 East Henry Street, Suite 101
       Spartanburg, South Carolina  29302
17     864.582.2962
       gbrandt@hbvlaw.com
18     Representing the Witness
       (Via Zoom)
19
20             - - -
21  A L S O   P R E S E N T :
22     DEBORAH S. SKEANS (Via Zoom)
23     DARBIN SKEANS (Via Zoom)
24     JUSTIN BILLINGSLEY (Via Zoom)

Page 3

1              I N D E X
2              - - -
3  WITNESS:  DAVID SCOTT WYLLIE
4  QUESTIONED BY:              PAGE:
5     MR. MAHONEY              6
6              - - -
7          E X H I B I T S
8  NUMBER  DESCRIPTION        MARKED FOR ID
9
10    P-91   E-mail dated May 21, 2015      21
       and Durable General Power of
11     Attorney, KCF002793 through
       002802
12    P-92   Document entitled, "Frank's Time   84
       Sheets," P-000100 through 000103
13
14    P-93   Correspondence from Flamm      101
       Walton, KCF003866 through
       003871
15
16             - - -
17
       PREVIOUSLY MARKED DOCUMENTS
18
       NUMBER.................PAGE
19
20    P-75..................54
21    P-76..................92
22    P-77..................76
23
24             - - -

Page 4

1          DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page  Line
5  (None)
6
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9  Page  Line  Description
10  (None)
11
12
13  STIPULATIONS
14  Page  Line
15  (Pursuant to Federal Rules of Civil Procedure)
16
17
18  QUESTIONS MARKED
19  Page  Line
20  (None)
21
22
23
24

Page 5

1          THE COURT REPORTER:  The
2  attorneys participating in this
3  deposition acknowledge that I am not
4  physically present in the deposition room
5  and that I will be reporting this
6  deposition remotely.
7          They further acknowledge that in
8  lieu of an oath administered in person, I
9  will administer the oath remotely.  The
10  parties and their counsel consent to this
11  arrangement and waive any objections to
12  this manner of reporting.
13          Please indicate your agreement
14  by stating your name and your agreement
15  on the record.
16      MR. GREEN:  William Green, on
17  behalf of defendants.  We consent.
18          MR. MAHONEY:  Bill Mahoney, on
19  behalf of plaintiff.  We consent.
20      MR. BRANDT:  George Brandt, III,
21  on behalf of the deponent.  We consent.
22          THE COURT REPORTER:  Will you
23  please raise your right hand.
24              - - -

2 (Pages 2 - 5)

DAVID SCOTT WYLLIE

Page 6

1    DAVID SCOTT WYLLIE, after having
2    been first duly sworn/affirmed, was
3    examined and testified as follows:
4    - - -
5    THE COURT REPORTER:  Thank you.
6    - - -
7    EXAMINATION
8    - - -
9    BY MR. MAHONEY:
10   Q.    Good afternoon, Mr. Wyllie.  My
11   name is Bill Mahoney, as you may know.  I
12   represent the plaintiff in connection with
13   litigation.
14   We served a subpoena upon you.
15   And am I correct that you are appearing for
16   this video deposition pursuant to that
17   subpoena?
18   A.    Yes.
19   Q.    Okay.  Can I just ask you a
20   question.  At least as I look at the computer
21   screen ahead of me, you look like you're
22   looking at a different screen.
23   There we go, okay.
24   MR. BRANDT:  You'll just have to

Page 7

1    look out of the corner of your eye.  It's
2    not appearing on both screens.  It's
3    appearing on one.
4    MR. MAHONEY:  Okay, terrific.
5    BY MR. MAHONEY:
6    Q.    Mr. Wyllie, have you ever been
7    deposed before?
8    A.    No.
9    Q.    Your lawyer may have told you
10   this, but it's essentially a
11   question-and-answer series.  I'll be asking you
12   questions.  Your job is to answer to the best
13   of your recollection and ability.  If you have
14   any questions regarding my questions, if you
15   don't understand something, if it's not clear,
16   just let me know.  I will do my level best to
17   rephrase the question so you can answer it.
18   Is there any reason why you
19   think you may not be able to testify truthfully
20   today?
21   A.    I don't understand your
22   question.
23   Q.    Are you taking any medication
24   that you believe --

Page 8

1    A.    Oh.
2    Q.    -- would interfere with your
3    ability to testify truthfully?
4    A.    Oh, I see.  No.
5    Q.    There are a number of people who
6    are participating in this.  It's largely going
7    to be you and I speaking.  But if at any point
8    in time, you or they want to take a break, just
9    let us know.  The only thing I would ask is
10   that if I have a question pending, you answer
11   that question before we take a break.
12   Is that fair enough?
13   MR. BRANDT:  All answers need to
14   be oral so that she can hear it.  So not
15   only speak orally, but speak loudly so
16   that she can hear.  She's taking down --
17   THE WITNESS:  My apologies.
18   MR. BRANDT:  -- everything that
19   you're saying.
20   A.    Yes.
21   MR. MAHONEY:  That's okay.
22   Thank you, Buck.
23   BY MR. MAHONEY:
24   Q.    And you're represented by

Page 9

1    counsel here today, Mr. Wyllie?
2    A.    Yes.
3    Q.    I'm going to begin by asking you
4    some general background questions.
5    But first, have you done
6    anything, other than speaking with your
7    counsel, to prepare for this deposition?
8    A.    I -- what do you mean "prepare"?
9    I don't understand.
10   Q.    Well, have you reviewed any
11   documents?
12   A.    The -- there's something
13   published online, like the court document.
14   Q.    Okay.  So you reviewed that?
15   A.    I looked at it.
16   Q.    Anything else?
17   A.    Hmm.  I think it's just the
18   online documents that I read over.
19   Q.    Okay.
20   A.    Yeah.
21   Q.    Apart from speaking --
22   A.    Nothing -- nothing was sent to
23   me.
24   Q.    Okay.  Apart from speaking with

3 (Pages 6 - 9)

DAVID SCOTT WYLLIE

Page 38

1  serving in that role, because he was there
2  full-time.  You know, be aware of this
3  happening, which I think he already had
4  knowledge of.  Just try to put a fence around
5  it.
6       Q.     When you say "administrator,"
7  you're talking about Mr. Killgore?
8       A.     Yes.
9       Q.     Okay.  Did there come a time
10  when either you or Mr. Killgore or somebody
11  else got Mr. Pavlis a new phone or took some
12  action to change his phone number?
13      A.     I don't think he got a new
14  phone.  I think -- hmm.  I don't know if he got
15  a new phone number.
16             What would -- what would happen
17  is, it would -- any calls coming in would go to
18  the main like switchboard.  And then who is
19  this?  You know, what's the nature?  Just kind
20  of filtering -- filtering those.
21             MR. MAHONEY:  Okay.  Cam, would
22      you mind putting that power of attorney
23      back up on the screen, please.  And I
24      want to go to the first page of the

Page 39

1  document.
2             (Pause)
3             Hey, Cam?
4             MS. REDFERN:  Sorry.  I thought
5      it was up.
6             MR. MAHONEY:  Okay.  No.
7             MS. REDFERN:  Here you go.
8             MR. MAHONEY:  I'm sorry.  Let's
9      go to the first page of the exhibit,
10      which is the e-mail.
11             Great.  Thank you.
12  BY MR. MAHONEY:
13      Q.     Now, Mr. Wyllie, this is an
14  e-mail from you to a gentleman named Justin
15  Billingsley.  It's dated May 21st of 2015.
16      A.     Right.
17      Q.     And it just says, "Frank's POA."
18  And I'll represent to you that the power of
19  attorney we just went through is what was
20  attached to this e-mail.
21             Who is Mr. Billingsley?
22      A.     I was told that he was Frank's
23  financial advisor.
24      Q.     Who told you that?

Page 40

1      A.     Darbin Skeans.
2      Q.     Do you recall the context in
3  which Mr. Skeans told you that?
4      A.     Back when I was learning about
5  what was happening to Mr. Pavlis with the
6  phone, you know, with the scams, Darbin Skeans
7  said I should reach out to Justin Billingsley.
8             I didn't know who that was.  He
9  said, that's Frank's financial advisor.  I
10  believe Darbin Skeans provided me his -- either
11  his contact information or his phone number.
12      Q.     When do you recall first
13  speaking with Mr. Billingsley?
14      A.     I -- about -- about this time,
15  but I don't remember exactly when.
16      Q.     Why did you send Mr. Billingsley
17  a copy of the power of attorney that Mr. Pavlis
18  and you signed about a month before?
19      A.     I believe Mr. Billingsley
20  requested that.
21      Q.     Do you recall why he wanted to
22  see it?
23      A.     Nope.  I'm assuming.  Am I
24  allowed to say that?

Page 41

1      Q.     You are.
2      A.     Okay.  I'm assuming because he
3  was his financial advisor.  It was a document
4  that he should have or needed or . . .
5      Q.     Do you recall having any
6  discussions with Mr. Billingsley about
7  Mr. Pavlis' financial condition, investments,
8  anything along those lines?
9      A.     You said about Mr. Pavlis' --
10  what was the first word?
11      Q.     His financial condition,
12  investments, anything along those lines.
13      A.     At this time?
14      Q.     No.  I'm asking you, when do you
15  recall first having any discussion with
16  Mr. Billingsley about that?
17      A.     Hmm.  I honestly don't -- don't
18  remember when that was.
19      Q.     But do you recall having
20  discussions with Mr. Billingsley about
21  Mr. Pavlis' financial condition?
22      A.     Yeah.  Yes.
23      Q.     Putting aside the time frame, if
24  you would, walk me through the discussion or

11 (Pages 38 - 41)

DAVID SCOTT WYLLIE

Page 46

1 would always include me after that, because I
2 was Frank's power of attorney.
3      Q.      So is it fair to say that you
4 never met Mr. Billingsley or spoke with him
5 prior to you becoming power of attorney for
6 Mr. Pavlis?
7      A.      Yeah, that's correct.
8      Q.      Did you ever keep any notes of
9 these meetings?
10      A.      Some of them.  Just from my
11 recollection of things, just trying to figure
12 out what's what, you know, because like I said,
13 a lot of that information was so far over my
14 head.
15      Q.      Do you still have copies of the
16 notes you kept?
17      A.      Unh-unh.  No.  They really --
18 they were meaningless to me.
19      Q.      I'm sorry, you said, no, you
20 don't have copies of them?
21      A.      I don't, no.
22      Q.      What happened to those notes?
23      A.      There weren't -- there weren't
24 many.  It was just things that I wanted to ask

Page 47

1 questions about, you know, because I didn't
2 understand something, and, you know, would
3 cross them off or . . .
4           And, you know, once I felt
5 that -- they were kind of like reminders for
6 me.  And I just discarded them.
7      Q.      Did Mr. Pavlis have any
8 particular habit in terms of note-taking?
9           For example, do you recall him
10 taking notes at meetings between him, you and
11 Mr. Billingsley?
12      A.      So to answer your first
13 question, he was -- ==he was remarkably==
14 ==fastidious with like his ledger for checks.==  I
15 think it was all in pencil.
16           Like he -- he wrote -- well, he
17 wrote himself a lot of reminders.  I know that.
18 But he was -- ==he was pretty sharp, I'll tell==
19 ==you, for an older guy.==
20           But I don't recall him taking
21 notes during those meetings with
22 Mr. Billingsley.
23      Q.      Okay.  Do you ever --
24      A.      He just sat there and listened.

Page 48

1      Q.      I'm sorry.
2      A.      He just sat there and listened.
3      Q.      Do you ever recall learning that
4 he took notes after a meeting or made notes
5 after a meeting?
6      A.      You mean while I was still
7 there?
8      Q.      At any point in time.
9      A.      Hmm.  Not that I'm aware of.
10           MR. MAHONEY:  Mr. Wyllie, I know
11 you mentioned when we first spoke that it
12 would be good for you to get up and walk
13 around a little bit.
14           So why don't we do this.  Why
15 don't we take a five-minute break and
16 then we'll reconvene in about five
17 minutes.
18           Is that all right?
19           THE WITNESS:  Sure.
20           MR. MAHONEY:  Okay.  Terrific.
21           - - -
22           (Whereupon, a recess was taken
23 from 2:10 p.m. to 2:20 p.m.)
24           - - -

Page 49

1           MR. MAHONEY:  Back on the
2 record.
3 BY MR. MAHONEY:
4      Q.      Mr. Wyllie, if I understand your
5 testimony correctly, Mr. Pavlis mentioned to
6 you the possibility of becoming his power of
7 attorney, right?
8      A.      Yes.
9      Q.      And that was the first time --
10      A.      Hold it.  Hold it.  Hold it.
11 Say that again.
12      Q.      Sure.  I thought you testified
13 earlier that the first time the concept or the
14 idea of you becoming Mr. Pavlis' power of
15 attorney came up during a meeting that you had
16 or a discussion that you had with Mr. Pavlis
17 and Ms. Scott.
18      A.      Correct.
19      Q.      Okay.  Prior to that, had anyone
20 ever discussed with you the possibility of
21 becoming Mr. Pavlis' power of attorney?
22      A.      I don't think so.
23      Q.      Did Mr. Skeans ever discuss it
24 with you?

13 (Pages 46 - 49)

DAVID SCOTT WYLLIE

1    He said to Mr. Pavlis that
2  because we're coming up to an election year,
3  and that would -- that would affect the market,
4  or somehow the election year would have an
5  impact on how investments performed, or
6  something of that nature.
7    Sorry, I don't have the details.
8    Q.   No, no, no.  That's quite all
9  right.  And I'm going to show you a document in
10  a minute that may refresh your recollection.
11  It may not, but . . .
12    Before I do that, do you ever
13  recall discussing with Mr. Billingsley any
14  desire on either your part or on his part to
15  move Mr. Pavlis' investments from Glenmede
16  Trust to some other firm or some other
17  investment advisory outfit?
18    A.   Just a portion, you know, a few
19  million -- a few million dollars.
20    Q.   I don't understand what you just
21  said.  Can you explain that to me?
22    A.   Can you ask the question again
23  and I'll try to re-answer?
24    Q.   Yes.  At, you know, this point

1  in time, either before or within a month or so
2  after this meeting in July down in
3  Philadelphia, do you recall Mr. Billingsley
4  indicating to you that he would like to see
5  Frank's investments move from Glenmede Trust to
6  some other advisory firm, trust company,
7  brokerage firm, some other place, so that
8  Glenmede would no longer have any control or
9  influence over Mr. Pavlis' investments?
10    A.   I don't think it was at this --
11  this particular time.  Was is that?  July 2015?
12    Q.   Correct.
13    A.   Sometime after, that -- that was
14  suggested.  But at this time, I think he
15  primarily talked about investing some
16  additional money into some other sort of
17  investment.
18    Q.   Okay.  Do you have any
19  recollection of the specifics of that other
20  investment?
21    A.   No.  Actually, I didn't even
22  know -- I didn't even know what the company was
23  or what -- I mean, who they were, what they did
24  or what the investment was.  It's just, I

1  guess, all part of financial planning.
2    That's about it.  That's the
3  best I can do.
4    Q.   Do you ever recall
5  Mr. Billingsley indicating to you that
6  Mr. Pavlis had invested any money either with
7  Mr. Billingsley or in a company or companies
8  that Mr. Billingsley controlled or was
9  affiliated with?
10    A.   Say -- say the first part of
11  that question again.  I'm sorry.
12    Q.   That's all right.
13    Do you recall Mr. Billingsley
14  ever indicating to you that Mr. Pavlis had
15  invested any money either through
16  Mr. Billingsley or in a company that
17  Mr. Billingsley had some affiliation with or
18  control over?
19    A.   So this time you said, did I
20  ever hear him say anything about money he had
21  invested.  I think the first time you said --
22  you didn't say "had".
23    Q.   Okay.  Well, I don't want to get
24  hung up.  I did not intend to draw a

1  distinction on that word.
2    A.   So are we talking past money he
3  invested up to this point or future?  That's
4  what I'm talking about.
5    Q.   That's a fair distinction.
6  Let's talk about past money, and then I'll ask
7  you about future.
8    A.   Well, because of what Darbin
9  Skeans initially told me, I knew that
10  Mr. Billingsley had invested some of Frank's
11  assets somewhere.
12    I'm sorry, I keep looking at the
13  screen because I'm looking at your face.
14  Sorry.
15    Q.   Oh, is that --
16    A.   That's why.  I like talking to a
17  face.  Sorry.
18    Q.   And it's funny, because I like
19  seeing your face as well.  But we can't do it
20  simultaneously.  So I appreciate you making the
21  effort.
22    What do you recall Mr. Skeans
23  telling you about that?
24    A.   When -- let's see, what exactly

DAVID SCOTT WYLLIE

Page 70

1   did he say? I think early on -- I don't know
2   when -- I think early on, that he had
3   mentioned, when he told me who Mr. Billingsley
4   was, that he was Frank's financial advisor and
5   that Frank has invested money -- I think the
6   word was "through him," is what he said.
7        Q.    Okay.  Do you recall anything
8   more about that conversation?
9        A.    With Darbin Skeans?
10       Q.    Yes, sir.
11       A.    I don't, no.  It was just brief.
12       Q.    Did you ever have a discussion
13  with Mr. Skeans again about any investments
14  that Mr. Pavlis made either with or through
15  Mr. Billingsley?
16       A.    I don't think so specifically.
17  Just several times when Mr. Skeans asked me,
18  have you talked to Justin Billingsley about
19  Frank's investments, he asked me that several
20  times.  What specific investments, I have no
21  idea.
22       Q.    Okay.  I appreciate that.
23             Now, we were talking about prior
24  to July or so of 2015.  And then you drew the

Page 71

1   distinction between prior to that or future.
2   So, again, let me stick in the past for the
3   moment.
4             Did Mr. Billingsley ever mention
5   to you any investments that Mr. Pavlis had made
6   either through him or with any company that he
7   had some connection with?
8        A.    I don't believe he ever said
9   that it was investments with companies that
10  Mr. Billingsley were -- was affiliated with.  I
11  think it was more he said that he has -- he had
12  made some investments for Mr. Pavlis.
13       Q.    Okay.
14       A.    But I don't -- I don't recall
15  hearing of where.  It didn't really matter to
16  me, so.
17       Q.    Did you ever have a discussion
18  with Mr. Pavlis about any investments that he
19  made either with or through Mr. Billingsley?
20       A.    Later on, he asked about his
21  investments, of about how much he was making on
22  those investments.
23       Q.    Mr. Pavlis?
24       A.    Mr. Pavlis did.

Page 72

1        Q.    Do you know what investments he
2   was referring to?
3        A.    Whatever investments that
4   Mr. Billingsley made.
5        Q.    And what do you recall
6   responding to Mr. Pavlis when he asked you
7   that?
8        A.    I don't know.  That was my
9   response.  I don't know what -- what he did,
10  where he invested, how much it was.  I have no
11  clue.
12       Q.    Were you ever party to a
13  discussion between Mr. Billingsley and
14  Mr. Pavlis where they talked about those
15  investments?
16       A.    Yes.  I answered that before.
17  You have to look back.
18       Q.    And what do you recall of that
19  discussion or those discussions?
20       A.    Yeah, one, maybe two in his room
21  where he talked about his investments and the
22  market and why this was good.  But I -- I don't
23  think I knew the name of the stock or where
24  those investments were at that time.

Page 73

1        Q.    Okay.  Do you ever recall either
2   seeing or learning after the fact that
3   Mr. Billingsley provided Mr. Pavlis with any
4   documentation relating to his investments?
5        A.    I remember one item that he
6   provided to Mr. Pavlis.  It was a -- a
7   binder-type, soft cover binder, like spiral,
8   with -- it was some sort of financial
9   portfolio, something like that.  Frank showed
10  it to me and asked me to explain it to him.
11       Q.    I take it that you did not
12  explain it to him?
13       A.    Uh-hum.  Yes, I looked at it.
14  And I said, I have -- I don't know.
15       Q.    Do you know where Mr. Pavlis
16  kept that spiral-bound document that he showed
17  you?  Did he keep it in his apartment
18  somewhere?
19       A.    He kept everything in his
20  apartment.
21       Q.    What do you mean by that?
22       A.    And it was --
23       Q.    Go ahead.  Continue.  I'm sorry.
24       A.    It -- he handed it to me.  And,

19 (Pages 70 - 73)

DAVID SCOTT WYLLIE

Page 110

1  about Mr. Billingsley.  And then you used the
2  phrase, quote, invest this money, get out of
3  Glenmede.
4          Was that your understanding,
5  that Mr. Billingsley was trying to get
6  Mr. Pavlis to get out of Glenmede, and you
7  felt, for some reason, uncomfortable with that?
8      A.    I felt uncomfortable with a
9  number of things.  Mr. Billingsley, evidently
10  as a financial advisor, being able to point out
11  to Mr. Pavlis the red flags in his current
12  investments -- again, not -- I didn't
13  understand that, but he explained them to Frank
14  in a way that Frank seemed to grasp.  And Frank
15  would always say, so then what would -- what
16  should I do?
17          And the answer basically was to
18  reinvest more wisely.  That's the -- that was
19  the thrust.
20      Q.    Okay.
21      A.    So -- and then Mr. Billingsley,
22  you know, was calling me.  It just accelerated.
23  And at the same time, occasionally Darbin
24  Skeans would ask me, have you talked to

Page 111

1  Mr. Billingsley about Frank's finances.  That
2  was kind of odd.  I just -- it felt like -- I
3  needed some outside source.  I don't know
4  what's happening here.
5          So I figured, you know, this
6  person, who evidently was reputable, could
7  explain what -- what was going on.
8      Q.    Do you recall this person's
9  name?
10      A.    Steven -- Steven Nadel.
11      Q.    How do you spell that last name?
12      A.    I don't know.
13      Q.    Can you give me your best shot
14  phonetically?
15      A.    Phonetically, it's not even
16  spelled to phonetically.  N-a-i -- no,
17  N-a-d-e-l.
18      Q.    Okay.  So Steven Nadel.  And you
19  think he was with Securities America?
20      A.    I believe that's the name.
21      Q.    What town was he in?
22      A.    From Doylestown.
23      Q.    Doylestown, okay.
24          Do you know if he's still there?

Page 112

1      A.    I have no idea.
2      Q.    So you and Mr. Pavlis drove down
3  to Doylestown to meet with him or did he come
4  up?
5      A.    Oh, he came.
6      Q.    How long was that meeting?
7      A.    I don't know.  An hour, maybe.
8      Q.    What do you recall him
9  recommending, if anything, during that meeting?
10      A.    Well, he seemed to also see red
11  flags.  I -- this is just my opinion.  He
12  seemed to explain it more succinctly to
13  Mr. Pavlis.
14      Q.    Than whom?
15      A.    Than anyone previous.
16      Q.    Okay.  And what -- I'm sorry.
17  Go ahead.
18      A.    No, that's it.  Than anyone
19  previous.  I was answering your question.
20      Q.    Generally speaking, what do you
21  recall him explaining to Mr. Pavlis at that
22  meeting?
23      A.    That at his age, you know,
24  this -- you need something so that if --

Page 113

1  similar to Mr. Pavlis, but -- I mean, I'm
2  sorry, similar to Mr. Billingsley, similar, but
3  he felt that he could do better without
4  changing -- without changing Mr. Pavlis'
5  wishes, you know, like when he died.
6      Q.    Did you and Mr. Pavlis have any
7  further meetings with Mr. Nadel after that
8  initial meeting?
9      A.    At the attorney's.
10      Q.    Was it Mr. Nadel or somebody
11  else who recommended Mr. Stevens?
12      A.    It was him.
13      Q.    Okay.  Did he explain to you why
14  he recommended Mr. Stevens?
15      A.    I didn't ask.  I imagine it's
16  somebody he might have worked with or . . . I
17  don't know.  Or maybe that was his expertise.
18      Q.    So at some point prior to
19  March 10th of 2016, you, Mr. Pavlis, and
20  Mr. Nadel went to Mr. Stevens' office; is that
21  right?
22      A.    I met him there.
23      Q.    Okay.  You didn't drive there
24  together, but --

29 (Pages 110 - 113)

DAVID SCOTT WYLLIE

Page 126

1　now, because you didn't get a chance to
2　complete the answer.
3　　　　When did you first learn that
4　you were being replaced as power of attorney?
5　　A.　I got a letter in the mail from
6　a law firm, and I don't remember the name of
7　it, letting me know that I was no longer power
8　of attorney --
9　　Q.　Okay.
10　　A.　-- which is a moot point,
11　because I wasn't power of attorney.
12　　Q.　I understand. You thought you
13　were until you spoke with Mr. Stevens, right?
14　　A.　Right.
15　　Q.　Okay. I'll represent to you
16　that Ms. Skeans became power of attorney
17　effective March 31 of 2016.
18　　　　Did you have any further
19　communication or interaction with Mr. Pavlis
20　after Ms. Skeans became the power of attorney?
21　　A.　He called me or somebody called
22　me from Legacy Place asking me the name of the
23　dentist that I took him to. I think it was a
24　dentist.

Page 127

1　　Q.　But apart from that, any
2　further --
3　　A.　That's it.
4　　Q.　Is there any particular reason
5　why you didn't continue to have interaction
6　with Mr. Pavlis?
7　　A.　Well, my interaction was, you
8　know, helping him. So I was no longer going to
9　do that, so that . . .
10　　Q.　Did you continue to go to Legacy
11　Place?
12　　A.　For -- briefly. And then I
13　resigned.
14　　Q.　I'm sorry, then you what?
15　　A.　Resigned.
16　　Q.　Okay. Resigned from what?
17　　A.　Legacy Place, the board, you
18　know, volunteer.
19　　Q.　The board, okay.
20　　　　After you were no longer power
21　of attorney, did you have any further
22　communication with Mr. Billingsley?
23　　A.　You mean after I got that --
24　that letter from that law firm?

Page 128

1　　Q.　Well, whenever you learned that
2　you were not going to continue as power of
3　attorney, from that point forward, did you have
4　any further communications with
5　Mr. Billingsley?
6　　A.　Well, I didn't learn that I was
7　no longer going to be power of attorney,
8　because I told Mr. Pavlis that I was resigning
9　as power of attorney. So that was already
10　determined by me.
11　　　　The official letter that came
12　saying that someone else was now power of
13　attorney was, I guess, just a means of
14　formality.
15　　　　And after that letter, I don't
16　think I have talked to Mr. Billingsley since.
17　I don't remember.
18　　Q.　All right. Do you recall,
19　after -- let's just say after you resigned from
20　the Legacy Place board -- which I believe was
21　in April of 2016. Does that sound about right?
22　　A.　That sounds -- yeah, that
23　sounds -- I don't know. Actually, something
24　doesn't sound right.

Page 129

1　　Q.　No?
2　　A.　I don't know.
3　　Q.　But do you recall Mr. Skeans in
4　particular making any effort to try to reach
5　out to you or discuss anything with you as it
6　related to Mr. Pavlis?
7　　A.　No, not that -- not that I
8　remember.
9　　Q.　Do you recall Mrs. Skeans
10　reaching out to you and trying to engage you to
11　discuss anything relating to Mr. Pavlis?
12　　A.　I was in a restaurant parking
13　lot, and she came over and banged on my window,
14　had words with me. And I didn't really say
15　much to that.
16　　Q.　What do you recall her saying to
17　you?
18　　A.　That I owe Mr. Pavlis an
19　apology.
20　　Q.　Anything else?
21　　A.　That's all -- that's what I
22　recall. It was very brief. I was on my way to
23　an appointment, so I didn't . . .
24　　Q.　Did she indicate to you why she

33 (Pages 126 - 129)

DA-5

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
                         - - -
 3
    DEBORAH S. SKEANS,          :   CIVIL ACTION
 4  Executrix of the ESTATE     :   NUMBER
    OF FRANK E. PAVLIS,         :   1:18-cv-01516-
 5             Plaintiff,       :   CFC
                  v.            :
 6  KEY COMMERCIAL FINANCE,     :
    LLC, KEY COMMERCIAL         :
 7  FINANCE PROPERTIES, LLC,    :
    EQUITY PROS, LLC, and       :
 8  MOBILE AGENCY, LLC,         :
               Defendants.      :
 9
                         - - -
10
               Wednesday, April 29, 2020
11
                         - - -
12
13         Oral deposition of DEBORAH S.
14  SKEANS, taken remotely via Zoom, at 222 North
15  28th Street, Allentown, Pennsylvania  18104,
16  beginning at 9:32 a.m., reported
17  stenographically by Cheryl L. Goldfarb, a
18  Registered Professional Reporter, Notary
19  Public, and an approved reporter of the United
20  States District Court.
21                       - - -
22
              VERITEXT LEGAL SOLUTIONS
23               MID-ATLANTIC REGION
             1801 Market Street - Suite 1800
24          Philadelphia, Pennsylvania  19103
```

Page 2

```
1 A P P E A R A N C E S :
2
3   STRADLEY RONON STEVENS & YOUNG, LLP
     BY:  WILLIAM E. MAHONEY, JR., ESQUIRE
4       CAMERON REDFERN, ESQUIRE
     2005 Market Street, Suite 2600
5    Philadelphia, Pennsylvania  19103
     215.564.8000
6    wmahoney@stradley.com
     credfern@stradley.com
7    Representing the Plaintiff
     (Via Zoom)
8
9
     HALLORAN FARKAS & KITTILA, LLP
10   BY:  WILLIAM E. GREEN, JR., ESQUIRE
        THEODORE A. KITTILA, ESQUIRE
11   5801 Kennett Pike, Suite C
     Wilmington, Delaware  19807
12   302.257.2011
     wg@hfk.law
13   tk@hfk.law
     Representing the Defendants
14   (Via Zoom)
15
        - - -
16
17 A L S O   P R E S E N T :
18
     DARBIN SKEANS (Via Zoom)
19
     JUSTIN BILLINGSLEY (Via Zoom)
20
21      - - -
22
23
24
```

Page 3

```
1         I N D E X
2          - - -
3  WITNESS:  DEBORAH S. SKEANS
4  QUESTIONED BY:            PAGE:
5    MR. GREEN
6          - - -
7        E X H I B I T S
8  NUMBER   DESCRIPTION        MARKED FOR ID
9
   D-1    Deborah Skeans, CCIM, MAI      16
10   Biography
11 D-2    Frank Edward Pavlis obituary    29
       in Morning Call
12
   D-3    Last Will and Testament      40
13   P-003904 through 003909
14 D-4    E-mail dated November 5, 2012    73
       P-000266
15
   D-5    Assignment of Note and      82
16   Convertible Promissory Note
       for $3 million, P-000092
17   through 000099
18 D-6    Two-page handwritten document   86
       P-000065 and 000066
19
   D-7    Letter dated March 6, 2015     88
20   P-000086
21 D-8    E-mails dated from September 26   92
       through October 1, 2017
22   P-001975 through 001977
23 D-9    E-mail dated July 14, 2016     112
       and attachment, KCF003845
24   through 003849
```

Page 4

```
1        E X H I B I T S
2  NUMBER   DESCRIPTION        MARKED FOR ID
3
   D-10   E-mails dated July 14 and 18,   122
4      2016 with attachment,
       KCF003872 through 003876
5
   D-11   E-mail dated September 17,    134
6      2013, P-000561 through 000563
7  D-12   E-mail dated June 8, 2014     139
       P-000843
8
   D-13   E-mail dated March 27, 2018    149
9      P-002617 and 002618
10
          - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1        DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page   Line    Page   Line
5   51  20-23   131   4-9
6  132   4-7    145  22-23
7
8
9  REQUEST FOR PRODUCTION OF DOCUMENTS
10 Page   Line   Description
11 (None)
12
13
14 STIPULATIONS
15 Page   Line
16 (Pursuant to Federal Rules of Civil Procedure)
17
18
19 QUESTIONS MARKED
20 Page   Line   Question
21 130  17-19   "Well, sure.  Now, this is a
22        member of the board that you
23        don't want to talk about?"
24
```

DEBORAH S. SKEANS

Page 6

1           - - -
2           DEBORAH S. SKEANS, after having
3   been first duly sworn, was examined and
4   testified as follows:
5           - - -
6           THE WITNESS:  I do.
7           THE COURT REPORTER:  Thank you
8   very much.
9           - - -
10          EXAMINATION
11          - - -
12  BY MR. GREEN:
13      Q.     Good morning, Ms. Skeans.
14      A.     Good morning.
15      Q.     I'm going to go over the general
16  ground rules.  I know you have watched at least
17  three depositions.
18          Have you ever been deposed
19  before?
20      A.     Yes.
21      Q.     When was that?
22      A.     I think about ten years ago,
23  there was a -- a matter in our office and there
24  was a deposition.  And then about a year ago,

Page 7

1   there was a commission dispute in our office
2   with one of our agents, and I believe I spoke
3   at that deposition.  I was certainly there.
4       Q.     So was that two different
5   depositions?
6       A.     Two different ones.  One was ten
7   years ago.  One was last year.
8       Q.     Ten years ago, what was the case
9   about?
10      A.     We had an agent in our office,
11  in our real estate office, that was a partner.
12  And he and another agent left our office.  And
13  there was a dispute about files.  And so there
14  was a deposition.  It never went to trial.  It
15  was resolved.  But there was a deposition in
16  that matter.
17      Q.     Got it.  Okay.  So you've done
18  this before and you know the general ground
19  rules?
20      A.     I believe so.
21      Q.     You're under oath.
22      A.     Yes.
23      Q.     You have to answer verbally.  We
24  have to try not to speak over each other.  The

Page 8

1   court reporter has to take down everything you
2   say.
3           If I ask a question and you
4   don't understand it, please let me know.  If
5   you answer, I will assume you understand the
6   question.
7           Do you understand so far?
8       A.     Yes, I do.
9       Q.     We can take breaks when you
10  want.  But if I've asked a question, I need to
11  you answer it before we take a break.
12          Is there anything that would
13  prevent you from testifying truthfully today?
14      A.     No.
15      Q.     Are you on any medications that
16  could affect your ability to testify?
17      A.     No.
18      Q.     Did you do anything in
19  preparation for this deposition?
20      A.     I looked over a couple of pages
21  of my notes.
22      Q.     What notes are these?
23      A.     They were my original note when
24  I met -- when I was made power of attorney.  I

Page 9

1   took an iPad note of my very first discussion
2   with Frank and Glenmede.
3       Q.     Are you aware if that's
4   something that we've been produced in
5   discovery?
6       A.     I believe so.
7       Q.     Generally speaking, what's the
8   content of that, so I can see if I remember
9   seeing it in the discovery?
10      A.     It was just that Frank had a
11  trust with Glenmede.  Ed Lentz I knew was his
12  attorney.  Susan Mucciarone was the person in
13  charge of Frank.  And it was a short meeting
14  that established -- it was the very first
15  meeting with Glenmede.
16      Q.     And Susan Lucciarone -- am I
17  saying that right, Lucciarone?
18      A.     Mucciarone, I believe.
19      Q.     Is it Mucciarone with an "M"?
20      A.     M-u-c-c.  Mucciarone.
21      Q.     Thank you.  And about when was
22  this, timewise?
23      A.     That would have been early
24  April 2016.

3 (Pages 6 - 9)

DEBORAH S. SKEANS

Page 26

1 that he had been an early employee at Air
2 Products.
3     Q.     And there came a point when you
4 found out that he had a lot of money; is that
5 true?
6     A.     We never knew how much money
7 Frank had.  We assumed he had considerable
8 money, because he was an early employee at Air
9 Products.  Air Products had done very well.  He
10 had no children.  And he lived modestly.  So
11 most of us came to the conclusion that he had
12 money.
13     Q.     Understood.  Are you aware if he
14 was generous with his money?  Did he give to
15 charity?
16     A.     I had no idea in 2010 what he
17 had specifically or who he gave to.
18     Q.     Okay.
19     A.     Excuse me.
20     Q.     There was --
21     A.     Excuse me, with one caveat.
22 When the wife -- when the Allentown
23 congregation wanted to build a new Kingdom
24 Hall -- I'm trying to think of the year.  I

Page 27

1 would say about '05, somewhere around there --
2 my Uncle Joe -- the property cost $250,000.  My
3 Uncle Joe went to Frank, and he came back to --
4 to Darbin and I, who were simply talking to the
5 elders in our Hall about the acquisition, and
6 he said, Frank and I are contributing equally
7 to buy the land for the Kingdom Hall.
8             So I did know that he was
9 disposed to assist in what we would consider
10 theocratic efforts.  So he and my Uncle Joe,
11 the two of them did that.
12             MR. GREEN:  Got it.  Thank you.
13             Okay.  I'm going to attempt
14     again to show a document, and so bear
15     with me here.  Oh, one more click.
16 BY MR. GREEN:
17     Q.     And now I think -- well, let me
18 start it this way:  Mr. Pavlis passed away,
19 yes?
20     A.     Yes.
21     Q.     Are you aware there was an
22 obituary in the Morning Call newspaper?
23     A.     Yes.
24     Q.     Did you read the obituary?

Page 28

1     A.     Yes.
2     Q.     Did you have any other
3 involvement with the obituary?
4     A.     Oh, yes.  Frank wrote his own
5 obituary.
6     Q.     Really?
7     A.     Yes.
8     Q.     How do you know that?
9     A.     Because when I became power of
10 attorney, he had a binder.  And in his binder,
11 he had several drafts of an obituary.  He was a
12 very, very organized man.  He prepared for his
13 death for a long time.  And he had multiple
14 versions of the obituary.  And then he would
15 occasionally ask me to sit and decide whether
16 he wanted something tweaked or changed.
17             And I believe that, you know,
18 in -- in substantial form, or if not in exact
19 form, that obituary was approved by Frank
20 Pavlis.  And I was instructed to put it in the
21 newspaper --
22     Q.     Understood.
23     A.     -- at his death.
24             MR. GREEN:  Understood.

Page 29

1             Now, what I'm showing on your
2     screen is going to be Defendants'
3     Exhibit 2.  I can represent I basically
4     printed this screen from the Morning Call
5     newspaper.  And I printed it as a PDF and
6     saved it.  And that's what we're looking
7     at.
8                 - - -
9             (Whereupon, Exhibit D-2 is
10     marked for identification.)
11                 - - -
12 BY MR. GREEN:
13     Q.     Do you recognize this photograph
14 of Mr. Pavlis?
15     A.     Yes.
16     Q.     And you recognize that because
17 you knew what he looked like?
18     A.     Yes.
19     Q.     Do you have an idea of when this
20 picture was taken?
21             I might be able to make it
22 bigger.
23     A.     I do not know when it was taken.
24     Q.     I'm going to scroll through the

DEBORAH S. SKEANS

Page 34

1 28 years."
2          Did his lifestyle reflect that
3 he was this sophisticated of a businessperson?
4      A.    He lived a nice upper middle
5 class lifestyle.  He had a nice home off Cedar
6 Crest Boulevard before he lived in -- until
7 Ethel died.
8          He worked for Mr. Pool for three
9 dollars a day.  He was a scientist.  When he
10 was asked to become treasurer by Mr. Pool, he
11 said, how can I be treasurer?  I don't know
12 anything about finance.  And Leonard's response
13 was, anybody who can live on three dollars a
14 day can become my treasurer.
15          That's when, you know, he did
16 make some effort and he did the Harvard class.
17 And he educated himself in order to do the job
18 he was assigned.
19      Q.    I'm going to scroll down a
20 little bit more.
21          "The Memorial talk will be on
22 September 10, Monday at 4:00 p.m. at the
23 Kingdom Hall of Jehovah's Witnesses," and
24 there's the address.

Page 35

1          Did you attend the memorial
2 talk?
3      A.    Yes, I did.
4      Q.    Do you know if Justin
5 Billingsley attended the memorial talk?
6      A.    I saw him at the back of the
7 Hall.
8      Q.    I'm going to move on to the next
9 sentence.  "Contributions to Jah Jireh Homes of
10 America - Allentown" -- oh, I'm sorry, that's a
11 sentence.  Let me phrase that differently.
12          "Contributions to Jah Jireh
13 Homes of America - Allentown, 2051 Bevin Drive,
14 Allentown, Pennsylvania  18103.  They will be
15 used to fund charitable care at Legacy Place
16 Cottages."
17          And that's the same Jah Jireh
18 and Legacy Place Cottages that we were speaking
19 of earlier?
20      A.    Yes, it is.
21      Q.    Is the official name of the
22 organization Jah Jireh Homes of America -
23 Allentown?
24      A.    Yes.

Page 36

1      Q.    Is there a different Jah Jireh
2 Homes of America or is it all just one
3 organization?
4      A.    Yes, there -- there was.  I
5 think they may now be -- I don't know what the
6 situation is.  There's a Jah Jireh Homes of
7 America that's centered in Georgia.
8      Q.    Got it.  Is that affiliated with
9 the Jah Jireh that's in Allentown?
10      A.    No.
11      Q.    Is it also a Jehovah's Witness
12 charitable entity?
13      A.    It was -- to our
14 understanding -- to my understanding, it's a
15 501(3)(c) like we are.  It was created by a
16 group of Brothers in order to try to develop a
17 similar facility in the Atlanta area.  I don't
18 believe that they ever built a project.
19      Q.    Now, I'm just scrolling down,
20 because this is how it printed out.  There's
21 "Memorial Events" and then "Memories and
22 Condolences," something of a memory book here
23 as it printed out.  And there's one I wanted to
24 look at.

Page 37

1          There's a memory here or there's
2 an entry here that says, "Mr. Pavlis was a
3 generous benefactor for Circle of Seasons
4 Charter School.  I offer my sincere condolences
5 to his family and friends, especially the
6 Skeans family."  And based on the formatting,
7 it looks like it's signed by a Stacey Prohaska.
8          Do you see that?
9      A.    Yes.
10      Q.    What is Circle of Seasons
11 Charter School?
12      A.    Circle of Seasons Charter School
13 is a 501(3)(c) in the Allentown area, that it's
14 a charter school.  Stacy Prohaska was an
15 employee of the school, that one of her
16 responsibilities was dealing with financial
17 matters.
18      Q.    Gotcha.  Now, you said, "was an
19 employee."
20          Is she still an employee?
21      A.    No.  I believe she now works for
22 one of the -- she works for another non-profit
23 in the area.
24      Q.    Got it.  And do you have any

DEBORAH S. SKEANS

Page 38

1 connection with Circle of Seasons Charter
2 School?
3       A.       Yes.  Well, my grandchildren go
4 there.  I have two grandchildren, and they both
5 attend the charter school.
6       Q.       Were you ever on the board of
7 Circle of Seasons Charter School?
8       A.       No.
9       Q.       Was your son or daughter-in-law
10 ever on the Circle of Seasons Charter School
11 board?
12      A.       No.  Although my daughter -- my
13 daughter-in-law does head one of the committees
14 or subsidiaries, something or other, the last
15 few years.  In fact, I think she just might
16 have stepped down.
17      Q.       Got it.
18      A.       She helped.
19           MR. GREEN:  Okay.  I'm going to
20 hit stop share on this.
21           Oh, wait.  I think I want to
22 show another document.
23           Well, I can start without a
24 document.

Page 39

1 BY MR. GREEN:
2       Q.       You're the executrix of the
3 Frank Pavlis estate; is that true?
4       A.       Yes.
5       Q.       How did you come to be the
6 executrix of the Frank Pavlis estate?
7       A.       Frank asked me to become
8 executrix.  And he met with Ed Lentz, and they
9 made paperwork to make me the executrix.
10      Q.       And Ed Lentz was Frank Pavlis'
11 attorney?
12      A.       Longtime attorney.
13      Q.       Did Ed Lentz write the Will --
14      A.       Yes.
15      Q.       -- for Mr. Pavlis?
16      A.       I believe so.
17           MR. GREEN:  Let's look at his
18 Will real quick.  I'm going to hit share
19 screen.  And then with any luck, I'm
20 going to get this right.
21           Whoops, I have to hit one more
22 button.  Hang on.  There we go.
23           Now, this is a document that was
24 just recently produced in discovery.  If

Page 40

1 you get dizzy while I scroll, just look
2 away from the screen a second.  It starts
3 at P-003904 and ends on P-003909.  Let me
4 scroll up.  The first line is "Last Will
5 and Testament."
6           I guess I'll mark this as
7 Defendants' Exhibit 3.
8           - - -
9           (Whereupon, Exhibit D-3 is
10 marked for identification.)
11           - - -
12 BY MR. GREEN:
13      Q.       Have you seen this document
14 before?
15      A.       Yes.
16      Q.       Can you tell me what it is?
17      A.       I believe you're representing it
18 to be, and I believe it to be, Frank's Last
19 Will and Testament.  I did not see the date at
20 the end when you were scrolling.  I assume it's
21 the last Will.
22      Q.       Sure.  You know what?  I can
23 give you control of this.  And this might be
24 fun.

Page 41

1           Do you have a mouse or
2 something?  Rather, what are you watching this
3 on?  Are you on a tablet or a computer?
4       A.       I'm on a computer.
5       Q.       Okay.  So let's see.  So I'm
6 going to try to give you control here.  Now, if
7 you want to, try to scroll through.
8       A.       Let's see.  Up on the top, under
9 "View Options," I can hit for "Request Remote
10 Control."
11      Q.       Yes.  Please do that.
12      A.       There we go, request.
13      Q.       Oh, and I have to approve you.
14      A.       Click to start.
15           Did you approve me?
16      Q.       I approved you.
17      A.       It says I am controlling . . .
18 Okay, let's try it with this.
19      Q.       I just want you to scroll.
20      A.       There we go.  I can use it with
21 the keyboard.  It's easier.
22      Q.       Terrific.
23      A.       Alrighty.
24      Q.       And I'm really just having you

11 (Pages 38 - 41)

DEBORAH S. SKEANS

Page 58

1    going to stop sharing this a second and
2    then come back.
3  BY MR. GREEN:
4    Q.    Now, you had mentioned before,
5  in listing the assets of the estate, you
6  mentioned a $1 million Allwest note and a
7  $4 million Key Commercial Finance note.
8        Because it's part of the
9  litigation, you're also aware that there is a
10 $3 million Key Commercial Finance note, yes?
11   A.    Yes.
12       MR. MAHONEY:  I'll object to the
13   extent that it calls for a legal
14   conclusion as to whether that note truly
15   exists or was valid.
16       I don't want to keep
17   interrupting you, Bill, on this.
18       MR. GREEN:  Sure.
19       MR. MAHONEY:  With that standing
20   objection whenever you or Ms. Skeans
21   refers to that note, I'm happy to let you
22   ask questions about it.
23       MR. GREEN:  Gotcha.
24 BY MR. GREEN:

Page 59

1    Q.    So when I say $3 million note,
2  I'm going to mean some representation, some
3  piece of writing that looks like it says it's a
4  note, and says it's a note for $3 million, and
5  says it was due -- I believe it was
6  September 2019.  I don't have the date on the
7  top of my head.  So we're talking about the
8  same note.
9        You're aware of that $3 million
10 note, yes?
11   A.    Yes.
12   Q.    Did you intentionally not
13 include the $3 million note in your list of
14 estate assets?
15   A.    Yes.
16   Q.    Why did you not include the
17 $3 million note in the list of estate assets?
18   A.    Because that note had a TOD
19 assignment on it at Ed Lentz's request.  It was
20 the only note that we were aware of at the time
21 the TODs -- a TOD was requested.  And so we
22 processed with Mr. Billingsley the TOD.  So at
23 death, that note transferred to the beneficiary
24 under his Will, which was Watchtower.

Page 60

1    Q.    Understood.  The $3 million note
2  is still in the litigation, though, yes?
3        MR. MAHONEY:  I'm sorry, Bill.
4    Finish your question.  I'm sorry.
5        MR. GREEN:  Oh, sure.
6  BY MR. GREEN:
7    Q.    The $3 million note is still a
8  subject of this litigation, though, yes?
9        MR. MAHONEY:  I'll object to the
10   extent it calls for a legal conclusion.
11       Deb, you can give your view.
12   A.    In my under -- to my
13 understanding, yes, it is.
14 BY MR. GREEN:
15   Q.    Does Watchtower know about this
16 litigation?
17   A.    Yes.
18   Q.    How does Watchtower know about
19 this litigation?
20   A.    They have been -- I informed
21 Watchtower of the difficulties I was having to
22 secure information concerning the monies that
23 were due them under the Will.  And they were
24 aware of our hiring of counsel.  They were

Page 61

1  aware of our preparation for litigation.
2    Q.    Was there anybody in particular
3  at Watchtower you spoke with?
4    A.    Initially, the attorney at the
5  charitable planning office was Erna Neufeld,
6  N-e-u-f-e-l-d.  Erna, unfortunately, passed
7  away from cancer a couple years ago.  And then
8  Christine Benham became the attorney that
9  primarily handled Frank's estate.  And Attorney
10 Rick Moake at Watchtower has been in
11 communication with me.  And I spoke very
12 briefly to one other attorney at Watchtower
13 during this whole period, and his name was John
14 Miller.
15   Q.    I guess I'll start at the end.
16       What did you tell John Miller
17 about this litigation?
18   A.    John Miller and I had a phone
19 call.  And I was very concerned about the
20 conduct of Mr. Billingsley.  But I felt that it
21 was inappropriate to file litigation against a
22 Brother.  And we talked about that issue.
23   Q.    Why was it inappropriate to file
24 litigation against a Brother?

16 (Pages 58 - 61)

DEBORAH S. SKEANS

Page 66

1 Justin Billingsley?
2     A.     It was recommended by Judah
3 Schroder, a friend of ours, that Justin might
4 be a good person to meet.
5     Q.     Who is Judah Schroder?
6     A.     Judah Schroder is a longtime
7 friend of my husband's.  He lived in New York.
8 He also worked for Watchtower as a volunteer
9 during portions of his life.
10     Q.     So Mr. Skeans knew Mr. Schroder
11 when they worked at or volunteered at
12 Watchtower in New York?
13     A.     He knew -- he knew Judah for
14 many years, even when he was a child.  Judah's
15 father was a long time, full-time volunteer for
16 Watchtower.  And Judah actually kind of was
17 raised in an environment near the headquarters.
18 And so I had even met Judah as a child, when he
19 was a child.  I knew his mother and father.
20 And Darbin knew his mother and father.
21     Q.     Did Judah Schroder facilitate
22 the introduction to Justin Billingsley?
23     A.     Yes.
24     Q.     Around when was that, ballpark?

Page 67

1     A.     I think that was in late 2012.
2 Excuse me.  Excuse me.  '11.
3     Q.     Eleven?
4     A.     I would say that was -- let me
5 think a minute.  Sometime late '11, late '11,
6 early -- yeah, late '11, early -- yeah, late
7 '11.  I think that's correct.
8     Q.     Were you introduced to
9 Mr. Billingsley in person or did you first meet
10 him online or telephone?
11     A.     In person.  Judah arranged for a
12 meeting up in New York City.  And the four of
13 us met.  I mean, the four of us were there,
14 Judah, Justin, Darbin and I.
15     Q.     What was the purpose of you
16 meeting Mr. Billingsley in New York?
17     A.     Judah was aware that we were
18 developing the non-profit Legacy Place project.
19 And we were talking to many Brothers and
20 Sisters that would be interested in assisting
21 in that project as volunteers, as we were.  And
22 we also had Frank Pavlis in mind, because we
23 knew that he was a potential major donor and --
24 and wanted to reside there.

Page 68

1     Q.     Was the idea that Justin
2 Billingsley would work for or volunteer for Jah
3 Jireh in some capacity?
4     A.     The primary reason we met with
5 him was so that he would have -- he might be
6 introduced to Frank.  And if Frank wished to
7 share with him his financial situation, the
8 context in which he might want to make the
9 donation that he had already been talking to us
10 about, that he would be able to do so without
11 us being so close or so privy to Frank's
12 private financial matters.
13     Q.     Understood.  Thank you.
14          Did you introduce
15 Mr. Billingsley to Mr. Pavlis?
16     A.     Darbin and -- and/or I or
17 together, yes.
18     Q.     Actually, do you remember the
19 first time that you were in the same room as
20 Justin and Mr. Pavlis at the same time?
21     A.     I honestly -- I don't exactly
22 remember our first meeting.  I do remember one
23 time being in Frank's apartment on Hamilton
24 Street with Justin being there.

Page 69

1     Q.     Sure.  I guess I'll ask it a
2 different way.
3          What was Justin's intended role
4 with Mr. Pavlis?
5     A.     Although my Uncle Joe and Darbin
6 had had conversations with Frank about donating
7 in some way to the Legacy Place project,
8 similar to my uncle donating and us donating,
9 there was hesitation on the part of Darbin and
10 I to become fully engaged with Frank on his
11 personal financial situation.
12          And it was felt by Mr. Schroder
13 that with Justin's background, working in
14 financial matters and advising people
15 financially, that this might be a good
16 introduction.  And if Frank liked him, that
17 that might be an opportunity to further those
18 discussions one step away from Darbin and I.
19     Q.     Understood.  Thank you.
20          Well, did Mr. Billingsley and
21 Mr. Pavlis get on well?
22     A.     I was not tremendously engaged
23 at this point.  Most of the conversations
24 around that time were by Darbin and Mr. Pavlis.

18 (Pages 66 - 69)

DEBORAH S. SKEANS

Page 70

1 But, yes, I believe that based on our
2 representation of who Justin was, that Frank
3 felt comfortable with him.
4      Q.     Now, did Mr. Billingsley also --
5 I'm jumping a bit, but did Mr. Billingsley
6 pitch investment opportunities to you?
7      A.     Yes.
8      Q.     Did you pitch any business
9 opportunities to Mr. Billingsley?
10      A.     Not that I recall.
11      Q.     Did you ever offer him a job?
12      A.     No.
13      Q.     Did you ever approach him to be
14 a member of the board of Jah Jireh?
15      A.     I did not.  My husband may have.
16      Q.     Did you ever invite him to take
17 part as a board member of a non-profit
18 organization?
19      A.     My husband was having
20 conversations with various people to see if
21 they had interest in supporting the non-profit.
22 I did not.
23      Q.     And I think you already said --
24 you can correct this if I'm saying it wrong --

Page 71

1 Mr. Billingsley had a role in facilitating
2 Mr. Pavlis' donation to Legacy Place; is that
3 correct?
4      A.     Yes.
5      Q.     Now, walk me through that role.
6 And, again, let me make that into a question.
7           I guess, if you would, describe
8 how it was that Mr. Billingsley helped
9 facilitate Mr. Pavlis' investment or donation
10 to Legacy Place.
11      MR. MAHONEY:  Yes.  I'll object
12 to the characterization as "investment."
13      But, Deb, you can answer the
14 question.
15      A.     I don't know any details.  All
16 we did was introduce Mr. Billingsley to Frank
17 Pavlis.  What they discussed, I was not privy
18 to.
19           My discussions with Frank at
20 that point centered exclusively on his interest
21 in living at Legacy Place.  And I spent several
22 meetings talking to him about the structure of
23 Legacy Place, what his room would look like.
24           Darbin spent a lot of time on

Page 72

1 how he could get his things moved there and all
2 the practical things that would come with a
3 major, you know, relocation at his age.
4 BY MR. GREEN:
5      Q.     Understood.  So the idea was,
6 you communicated directly with Frank about the
7 living facility.  And Justin's role was to
8 communicate with Frank about any sort of
9 charitable donation to Legacy Place?
10      A.     Yes.
11      MR. GREEN:  All right.  Don't
12 mind me.  I'm scrolling through some
13 documents, while I see if I want to show
14 you anything yet before our 11:00 break.
15      Well, here, let me do this:  So
16 I'm going to go throw up a document here.
17 I think I'm up to Defendants' 4.
18      I guess for my own purposes,
19 what I'm going to do here is, I'm going
20 to scroll to the bottom so I can see the
21 Bates numbers, so I can read them into
22 the record.
23      So this is Defendants' 4 and
24 it's Bates P-000266.

Page 73

1           - - -
2           (Whereupon, Exhibit D-4 is
3      marked for identification.)
4           - - -
5 BY MR. GREEN:
6      Q.     This purports to be an e-mail
7 from Justin Billingsley, dated November 5,
8 2012, to Debby Skeans regarding Frank Pavlis.
9           Do you see this, Mrs. Skeans?
10      A.     Yes, I do.
11      Q.     Okay, great.  The technology is
12 working.
13           So Justin here says, "Debby,
14 Sorry for the delay.  Please see below."
15           And I'm going to scroll down.
16 Here, let me size this a little bit better, and
17 why don't I let you have control of it to
18 scroll through.
19           I'm going to ask you, once
20 you're done scrolling through -- if you would,
21 please request control of the document.
22      A.     Uh-hum.  I think I'm still
23 controlling it.  It still says I'm supposed to
24 be able to.  Let's see.  Nope.

19 (Pages 70 - 73)

DEBORAH S. SKEANS

Page 74

1          I guess you have to actually
2  stop it and start it.
3      Q.      Let me try it again.
4      A.      Now I request.  Okay.
5          MS. REDFERN:  Sometimes you
6  might have to click the screen, Debby,
7  once, and then you should be able to
8  scroll.
9          THE WITNESS:  No.  It worked
10  before.  Let's see, let's try it again.
11  Maybe because -- here, my request has to
12  go to you, too.
13          MR. GREEN:  Here you go.  I have
14  approved you.
15          THE WITNESS:  Well, good.
16          MR. GREEN:  No?
17          THE WITNESS:  It says I'm
18  controlling it.  Let's see.
19          MR. GREEN:  There you go.  You
20  just selected some stuff.
21          Is it large enough for you to
22  see it?
23          THE WITNESS:  Yes.  Well, it's a
24  little small, but I can read it.

Page 75

1          MR. GREEN:  Here, I'm going to
2  bump it up a notch.
3          THE WITNESS:  Yes, why don't you
4  scroll it up.
5          MR. GREEN:  I'll steer.
6  BY MR. GREEN:
7      Q.      Now, I'll scroll down a bit.
8  This is an e-mail dated November 1, 2012,
9  11:07 a.m. --
10      A.      Uh-hum.
11      Q.      -- from Debby Skeans to Justin
12  Billingsley, cc:  Darbin Skeans.  And the
13  subject line is, "Frank Pavlis."
14          Here it says, "Justin, To follow
15  up on our conversation last Friday, I am going
16  to try to put together a bit of a notebook with
17  pages or sections related to," and then a list
18  of bullet points.
19          Do you remember sending this
20  e-mail to Justin?
21      A.      Yes, I believe so.
22      Q.      What was the purpose of sending
23  this e-mail to Justin?
24      A.      It was to support his efforts in

Page 76

1  discussion with Frank.
2      Q.      To support his discussions with
3  Frank regarding what?
4      A.      Regarding the discussion of a
5  donation to Legacy Place, to Jah Jireh Homes of
6  America.
7      Q.      Got it.  Well, how much did Jah
8  Jireh Homes of America need?
9      A.      Well, we projected at that
10  point, it would be a six -- six-and-a-half
11  million dollar project.  We knew that between
12  my uncle and aunt and our donation, we would
13  probably have -- let's see -- about a million
14  and a half -- a million, a million and a half
15  dollars.  And we felt that we probably needed
16  50 percent of project cost in order to finance
17  it with no personal guarantees from anyone.  So
18  we had hoped to raise about $3 million.
19      Q.      Actually, do you have in your
20  mind how much Mr. Pavlis' contribution to Jah
21  Jireh was?
22      A.      Yes, I believe he contributed
23  three million, which is more than we expected.
24  My uncle immediately -- and then his widow --

Page 77

1  donated about 600, and we donated between 400
2  and 500,000.
3      Q.      Do you recall when the donation
4  was actually made?
5          MR. MAHONEY:  Which donation,
6  Bill?
7          MR. GREEN:  The $3 million
8  donation that Ms. Skeans just mentioned.
9      A.      I believe he tried to do it
10  right at the end of the year, so that he could
11  get the deduction for 2012.  So I think it was
12  at the end of 2012.
13  BY MR. GREEN:
14      Q.      After Legacy Place got the
15  donation, how soon between the donation and the
16  project being completed did you start building?
17      A.      Oh, we were already in
18  entitlement on this land.  The -- let's see.
19  Move-in was December of 2014.  Construction
20  took about a year and a half, a year, year and
21  a half.  So we were already in Salisbury
22  Township getting approvals.
23          So this project was, you know,
24  moving ahead.  But we needed to definitely know

20 (Pages 74 - 77)

DEBORAH S. SKEANS

Page 82

1  talking about the board of directors of
2  Jah Jireh at different times. I'm
3  actually going to change directions a
4  little bit now. I'm going to want to
5  talk about the note assignment.
6      I'm going to throw up another
7  document. It looks like I did it right.
8  So this is Defendants' 5. The Bates
9  number starts at P-000092 through
10  P-000099.
11      - - -
12      (Whereupon, Exhibit D-5 is
13  marked for identification.)
14      - - -
15 BY MR. GREEN:
16  Q.    Ms. Skeans, have you seen this
17 document before?
18  A.    Yes.
19  Q.    Do you know what this document
20 is?
21  A.    Yes. I believe it's the
22 assignment of the note that was provided to me,
23 of the Key Commercial Finance $3 million note.
24  Q.    Did you facilitate acquiring

Page 83

1 Mr. Pavlis' signature on this assignment?
2  A.    Yes.
3  Q.    Were you there in the room when
4 he signed it?
5  A.    Yes.
6  Q.    And this Assignment of Note --
7  A.    That's my -- that's my
8 recollection, yes.
9      Pardon me?
10  Q.    What's your understanding of the
11 purpose of the Assignment of Note?
12  A.    Because of Frank's advanced age,
13 he was very interested in having his affairs in
14 order, and so was Ed Lentz.
15      So Ed Lentz, who I had made
16 aware of the note, he had a copy of the note
17 that I gave him after I received it from
18 Justin, had wanted to have everything TOD'd to
19 Watchtower.
20      So this had not had a TOD on it.
21 So he requested that we get it. And I believe
22 he, in fact, Ed Lentz, was the one who worked
23 with Justin's attorney to do so.
24  Q.    What does "TOD" stand for?

Page 84

1  A.    Transfer on death.
2  Q.    What's your understanding of the
3 significance of a transfer on death provision?
4  A.    This did not go into the estate.
5 It went directly to the beneficiary.
6  Q.    So this note, with the caveats
7 that Mr. Mahoney put in before, this note is
8 held by Watchtower now; is that right?
9  A.    Yes.
10      MR. MAHONEY: Objection. Calls
11 for a legal conclusion.
12      Debby, you can answer.
13  A.    (Continuing) To my belief, yes.
14      MR. GREEN: I'll scroll through
15 this. This is the Assignment of Note.
16 And then the Exhibit A is a copy of the
17 note.
18      I'm going to stop sharing that
19 and we're back.
20 BY MR. GREEN:
21  Q.    Let's talk about the board of
22 Jah Jireh for a bit. You named in the
23 beginning, you had Judah Schroder. George -- I
24 think it's Stadtlander? Am I saying that

Page 85

1 right?
2  A.    Yes. I know he was very
3 involved when we were doing the initial
4 projections. Whether he eventually made it on
5 the board, I believe he did, but I'm not sure.
6 I was never on the board. So my husband
7 really, you know, I mean, knew exactly -- you
8 know, knew the details about the board.
9  Q.    Well, who selected the board
10 members?
11  A.    Darbin and fellow board members
12 already on.
13  Q.    Did you have a role on the board
14 members?
15  A.    No.
16      MR. GREEN: Bear with me a
17 moment.
18      (Pause)
19      I'm going to change directions.
20 I'd like to talk about Frank Pavlis
21 again.
22      Now, produced in discovery were
23 a lot of documents that had handwritten
24 notes and things on them. I want to look

22 (Pages 82 - 85)

DEBORAH S. SKEANS

Page 102

1  with Jah Jireh?
2      A.      I do not.
3      Q.      Do you feel free to express your
4  concerns with the board of directors of Jah
5  Jireh?
6      A.      Yes, I feel free to express my
7  concerns.
8      Q.      Why?
9      A.      Because my money and my
10 husband's money and my uncle's money and dear
11 friend's money all made it possible.  My
12 mother-in-law lived there, as did my aunt, my
13 mother's best friend, and other very close
14 family and friends.
15     Q.      Do you have any impact on the
16 composition of the board?
17     A.      No.
18     Q.      Did you ever try to have an
19 impact on the composition of the board?
20     A.      No.  Well, I -- you know what?
21 I'll qualify that, because did I have opinions?
22 Did I express opinions?  I'd have to say I did
23 that.
24     Q.      Did there come a time when you

Page 103

1  had a falling out with the board?
2      A.      There were individual members on
3  the board that I think -- that I felt were
4  acting inappropriately.
5      Q.      When was that?
6      A.      Mostly beginning in December of
7  2015.
8      Q.      What was happening that you
9  thought was inappropriate?
10     A.      During 2015, which is the first
11 year of this startup, we were having
12 management -- I say "we," the organization was
13 having managerial difficulties.  And
14 administratively, it was struggling.
15 Financially, it was struggling.  And by the
16 fourth quarter of 2015, I made my concerns on
17 its financial health known to the board.
18     Q.      How did you know it was
19 struggling financially?
20     A.      Because I did assist the board.
21 That's why I said I created reports for them.
22 I had been involved in the original financial
23 modeling of the operation.  We had arranged
24 with a bank that knew Dar -- knew us well to

Page 104

1  finance this project.
2              So I often was the in-between
3  person, with my husband, with the bank.  So I
4  did get financial reports as to the health of
5  the operation.  We didn't have enough residents
6  during 2015 to pay our bills.
7      Q.      Understood.  Is Jah Jireh set up
8  as a non-profit organization?
9      A.      It has always been a non-profit
10 501(3)(c) from its inception to today.
11             MR. GREEN:  I'm sorry.  Bear
12      with me.  I think I might want to look at
13      a document.
14 BY MR. GREEN:
15     Q.      Well, tell me about these
16 frictions in December of 2015.
17             Was there anything in particular
18 that was happening that was wrong?
19     A.      By the end of 2015, the -- we
20 only had 12 residents in a facility that was
21 built for 40.  Although -- and, unfortunately,
22 state inspections of the facility were dismal.
23 When you only have 12 people in a facility for
24 40 and you have a mortgage and you have staff,

Page 105

1  you have tremendous shortfalls each month.
2              And Darbin was dealing with the
3  board on these issues during 2015.  I was
4  peripherally aware of the financial impact of
5  these things.  I was not privy to the board
6  discussions.
7              But in early December, at a
8  board meeting, I learned that my husband had
9  decided to step back from being the president
10 of the board.  He would stay on the board, but
11 he would relinquish his presidency to Rob Wood.
12             And I was viciously attacked by
13 Kathy McCollette at a meeting and told that I
14 was too critical of management and staff.
15     Q.      Who is Kathy McCollette?
16     A.      She was an employee of a company
17 that was hired in order to help train staff.
18 She then morphed into a volunteer capacity.
19 And by December of 2015, she was working with
20 Mr. Wyllie in administrative tasks at Legacy
21 Place as a volunteer.  She also was the backup
22 POA for Mr. Pavlis.  I did not know that at
23 that point.
24     Q.      And I think I heard you say that

27 (Pages 102 - 105)

DEBORAH S. SKEANS

Page 106

1 she had viciously attacked you at a board
2 meeting.
3           What did she say?
4      A.    Not at a board meeting.  I was
5 not in board meetings.
6      Q.    I'm sorry.
7      A.    At a weekend -- usually, because
8 most of the board members were from
9 out-of-town, they would hold the board meeting
10 on a weekend.  And during that weekend,
11 there -- the fellow who created Jah Jireh
12 Charity Homes in England was actually visiting,
13 Mr. Eddie Delaney.
14           And he was more aware of what
15 happened with the board, Darbin -- this -- this
16 sudden decision for Darbin to step down.  And
17 it was suggested that there be a small meeting
18 to address concerns of the board.
19           And Mr. Delaney, Insoo Cho,
20 David Wyllie, Micah Killgore, Kathy McCollette
21 and my husband were at that meeting.  And I
22 don't recall if there was anybody else.  That's
23 about it.
24           And at that meeting, for the

Page 107

1 first time, Kathy McCollette told me that
2 caregivers at the home were upset with my
3 criticism and my behavior.  And she kind of
4 went on a ten-minute tirade.
5           I sat there stunned.  I asked
6 her why she had never mentioned it before.  She
7 said she didn't need to.
8           Mr. Wyllie didn't say anything.
9 Mr. Killgore didn't say anything.  And that was
10 about the end of the meeting.
11      Q.    Do you recall what your
12 criticisms were?
13      A.    I was not told anything.  She
14 represented that I was critical of their -- the
15 way they did their job.
16      Q.    Well, how would they know that
17 you were critical of the way they did their
18 job?
19           MR. MAHONEY:  Objection.  It
20 calls for speculation.
21           You can ask her if she has some
22 understanding as to that, but she's not
23 in their heads.
24           MR. GREEN:  Fair enough.

Page 108

1 BY MR. GREEN:
2      Q.    Let me unpack it.  We'll start
3 from the beginning.
4           What were your criticisms, if
5 you had any, of the way they did their job?
6      A.    I was power of attorney for my
7 Aunt Margaret, Margaret Banko.  My husband was
8 power of attorney for his own mother, and I
9 dealt with my mother-in-law.  I also had power
10 of attorney for Raymond Brensinger, who was my
11 mother's dearest friend.
12           Because of those relationships,
13 I did have to interact with staff.  Many times,
14 things were done incorrectly.  This was a
15 startup.  Our staff was learning.  Our
16 administrator was learning.  It was his first
17 job in health care.
18      Q.    Who was your administrator?
19      A.    Micah Killgore.  And as a
20 result, we had issues between family and people
21 of responsibility with regard to residents.  We
22 also had problems with the state.
23           So as a result of my interaction
24 with the caregivers, dealing with people I was

Page 109

1 responsible for, that was my understanding of
2 what she was complaining about.  But it was a
3 shock to me.
4      Q.    Did there come a time when the
5 board, the personnel on the board, changed?
6      A.    The board has -- the board
7 changed throughout the years.  From startup to
8 here till now, there have been various changes.
9      Q.    Well, understood.
10           Say in May of 2016, did you
11 voice frustration about Legacy Place with
12 Justin Billingsley?
13      A.    Yes.
14      Q.    What was Justin's reaction?
15      A.    He agreed with me.  He -- he --
16 I spoke to him as a confidante who knew what we
17 had gone through to create this place of
18 security for these older ones.  And I was
19 appalled at the conduct of David Wyllie.  And I
20 was frustrated with the board not taking action
21 to heal the financial drain on the limited
22 resources of the operation.
23      Q.    Why were you appalled with the
24 conduct of David Wyllie?

28 (Pages 106 - 109)

DEBORAH S. SKEANS

Page 110

1     A.     Because it was brought to my
2  attention by Ed Lentz on March 31st, I believe
3  it was, that there had been two attempts to
4  move Frank's entire trust from Glenmede to
5  Fidelity under -- that David Wyllie was
6  involved in that.  That Glenmede had just hired
7  special counsel to fight the transfer.  And
8  that immediately he needed to be removed as POA
9  and that Frank needed a new POA.
10         And they asked if I would do
11  that.  And Frank and Ed Lentz asked if I would
12  serve as POA, because David was going to be
13  removed that day from those responsibilities
14  because of his conduct toward Frank.
15     Q.     At this time, was David Wyllie
16  also a board member --
17     A.     Yes.
18     Q.     -- of Jah Jireh?
19         How was his conduct as a board
20  member?
21     A.     I don't know.  I wasn't on the
22  board.
23     Q.     Understood.
24         Did you come to have an

Page 111

1  understanding of his conduct on the board?
2     A.     I don't know what you mean.
3     Q.     Sure.  Well, it's fairly
4  close-knit.  There aren't that many players
5  here.  There aren't that many layers between
6  you and the board members or you and the staff.
7         Did you have an understanding of
8  the dynamic in the board?
9         MR. MAHONEY:  Yes, I'm going to
10     object to the prelude to that question.
11         But you can answer the question
12     itself, Deb.
13     A.     There -- there was a lot of
14  distance between me and many individual board
15  members, because they were not geographically
16  present.
17         So we had board members who were
18  from out-of-town.  They didn't see what was
19  going on at Legacy Place.  They got reports
20  from Micah Killgore, from David Wyllie and
21  Micah Killgore and from Greg Grove, who was the
22  board member primarily invested with financial
23  responsibility.
24         So these board members that

Page 112

1  would consider Jah Jireh business once or twice
2  a year were being informed by a very limited
3  number of people that were on site.
4         MR. GREEN:  Understood.
5         I want to look at a document
6     real quick.  On my count, I'm up to D-9.
7     This is Bates stamped KCF003845.  It's a
8     one-page e-mail with an attachment --
9     there are actually two attachments --
10     dated Thursday, July 14, 2016 from Debby
11     Skeans to Justin Billingsley's e-mail
12     address.
13            - - -
14         (Whereupon, Exhibit D-9 is
15     marked for identification.)
16            - - -
17  BY MR. GREEN:
18     Q.     Now, if you would, take a look
19  at this e-mail and tell me if you recognize it.
20     A.     It appears to be an e-mail from
21  me to Justin.
22     Q.     Do you remember what was going
23  on around this time?
24     A.     Yes.  Around July of 2016, this

Page 113

1  was right when the board had come to a decision
2  that it would be best for there to be two Jah
3  Jireh organizations.  This is when Jah Jireh
4  Homes of America became the -- they retained
5  the name Jah Jireh Homes of America and moved
6  it to Atlanta.  And Jah Jireh Homes of
7  America - Allentown, which is how we were
8  titled by deed on the real estate, came to be
9  non-profit for Allentown.
10         And the board had decided for
11  Allentown to be under the control of its own
12  board, and they would have their own board in
13  Georgia.
14     Q.     Now, this e-mail says, "Justin,
15  Grove's response has provoked Les, who has
16  responded to him and the LP attorney.  I also
17  send you an initial summary of the reasons for
18  Greg's removal as Treasurer.  I think it has to
19  be to come to closure.  The bank needs to be
20  spoken to and it's only so long this kind of
21  stuff stays quiet . . . a scandal could occur.
22  I have a meeting with Glenmede tomorrow."
23         What's the scandal that could
24  occur?

DEBORAH S. SKEANS

Page 114

1    A.    I was very concerned that what
2    Mr. Wyllie had done would become known in the
3    Allentown area and that it would look as though
4    that somebody at Legacy Place was attempting to
5    defraud him.
6          MR. GREEN:  I want to include
7    the attachments with this as one part of
8    this exhibit.
9          MR. MAHONEY:  The e-mail and the
10   attachments, Bill, will all be D-9?
11         MR. GREEN:  Yes, please.  I just
12   need to find them and bring them up.
13   BY MR. GREEN:
14   Q.    I hope you see the first
15   attachment.  It's starts at KCF003846.  And
16   that's still part of D-9.  Let me make it a
17   little bit larger.  The first line is, "Reasons
18   for Removal of Greg Grove from the position of
19   Treasurer."
20         Do you remember writing this
21   document, Ms. Skeans?
22   A.    I remember writing it.
23   Q.    Are you familiar with its
24   content?

Page 115

1    A.    It's been a long time since I
2    wrote it and it was never sent.
3    Q.    You sent to it Mr. Billingsley?
4    A.    I sent the draft to
5    Mr. Billingsley.  And I sent the draft to
6    Joseph Plunkett, who was the Legacy Place
7    attorney.  Those are the only two people that I
8    believe got that draft.  It was not sent to the
9    board.
10   Q.    Understood.
11         Do you know if any action was
12   taken with respect to the spirit of this
13   document?
14   A.    I don't believe anything was
15   taken.  This was an opinion that I had, and I
16   don't believe it was ever voiced.  I know it
17   was not voiced to the board by me.  I chose not
18   to send it.
19   Q.    Did any of the problems
20   mentioned in that e-mail get fixed?
21   A.    They got fixed by the separation
22   of the two non-profits.  Greg Grove left the
23   Legacy Place board in Allentown.  He became
24   part of the Legacy Place Atlanta identity.

Page 116

1          And my husband was restored to
2    presidency of the Allentown board.  Several
3    members were removed.  One had -- one or two of
4    them had, you know, withdrawn.  One or two
5    might have been removed.  And I believe one and
6    then another board member was added to
7    Allentown.  So it was resolved by a separation
8    of the two organizations.
9    Q.    Understood.  Now, I hope I'm
10   sharing the second attachment, which is at
11   KCF003849.
12         Have you seen this document
13   before?
14   A.    It was not addressed to me.  But
15   I was aware of -- of the e-mail or its general
16   content.
17   Q.    Why don't you tell me, what's
18   going on here in this letter?
19   A.    Because there was a separation
20   of the two non-profit organizations, the
21   original domain, JJHA.org, the Atlanta group
22   wanted to keep that.
23         So it was acceptable to Darbin
24   and the remaining board members that they have

Page 117

1    the JJHA identity.  And Darbin and the
2    Allentown board decided they would go by
3    LegacyPlace.org, so that there would be
4    identification of the two.
5          They would still coexist.  And,
6    in fact, there was going to be a joint web
7    page, because it was impossible for the
8    Allentown group to transfer the domain,
9    JJHA.org, to the Atlanta group because of HIPAA
10   concerns.  All of the e-mails were JJHA.org.
11   So we could not hand off or they could not hand
12   off the domain.
13         And there was about two months
14   of -- it got, I think -- I couldn't understand
15   why it was contentious.  But there was two
16   months where Mr. Grove insisted that they get
17   the domain.  Les is Darbin's brother.  And he
18   had originally secured all the domains.  That's
19   why he was involved.
20         And Les said, we can't give you
21   those -- that one domain that has all of the
22   operational details.  We can give you the other
23   domains that have JJHA in them, like -- he had
24   like 20 other variations on the name, and they

DEBORAH S. SKEANS

Page 118

1 could have those.
2          But JJHA.org, which is how we
3 were becoming known online, had to become --
4 had to just go neutral.  It had to go neutral.
5          So there was a landing page
6 website where if somebody typed in JJHA.org,
7 they could choose to go to Atlanta -- well,
8 actually, if they stayed on it, they would go
9 there, or they had so many seconds to click and
10 come back to Allentown.
11          So this was a period of time,
12 about two months, after it was already
13 determined that there would be an Allentown
14 board again, people who really saw what was
15 going on in Allentown, instead of being misled
16 by people who had been running it.
17          And I believe Greg Grove was
18 very misled by some things that were said.  And
19 so he believed that -- he was very critical of
20 Darbin at this point in time.
21   Q.     Who do you think misled Greg
22 Grove?
23   A.     Excuse me?
24   Q.     It sounded like you had said

Page 119

1 that Greg Grove had been misled.
2   A.     I think -- I think a lot of the
3 representations made by Mr. Wyllie, by Kathy
4 McCollette and even the administrator, Micah
5 Killgore, did mislead Greg Grove.
6   Q.     What do you think they said to
7 mislead Greg Grove?
8   A.     Their criticism of our behavior.
9   Q.     Do you have an understanding of
10 what their criticism of your behavior was?
11   A.     I never was provided with more
12 information other than ten minutes of diatribe
13 that I had from Kathy McCollette, which I found
14 out was, except for one or two people, totally
15 in error.
16   Q.     Were you present for the Kathy
17 McCollette diatribe?
18   A.     Yes.  I told you that was at the
19 small meeting that was held in December of
20 2015, where I sat there and she told the board
21 members and Mr. Delaney about these concerns,
22 which she had never voiced to me.
23          And that resulted in me being
24 asked not to come to Legacy Place.  And it

Page 120

1 resulted in my husband choosing to step down
2 from presidency and let things sort out.
3   Q.     At that time, you had mentioned
4 you were power of attorney for at least one
5 Legacy Place resident.
6          Am I getting that right?
7   A.     I was power of attorney for two,
8 Raymond Brensinger and Margaret Banko.
9   Q.     Did that request that you not
10 come to Legacy Place complicate your ability to
11 act as power of attorney over those residents?
12   A.     Yes, and to visit my
13 mother-in-law and Mr. Pavlis.
14   Q.     That request that you not go to
15 Legacy Place, was that enforced?
16   A.     It was not something -- it
17 was -- it was strongly recommended by that --
18 by Kathy.  I tried to accede to her request for
19 about a month, just to let things cool down.  I
20 didn't know what was going on.  And then my
21 mother-in-law began to get frantic because she
22 wasn't seeing me.
23          So I went over and broke down
24 crying with her.  And two caregivers were

Page 121

1 there.  And they said, why are you crying?
2 Your mother-in-law is okay.
3          And I said, no, I'm crying
4 because obviously I have upset you.
5          And the two caregivers assured
6 me that that was not the case.
7          And then I asked them, well, how
8 does staff feel about me?  And except for one
9 that I was aware of in dealings with my
10 mother-in-law, who she was difficult and she --
11 I could understand that she was not happy with
12 me.
13          Other than that, they reassured
14 me and said, no, they loved me and that -- that
15 they didn't know where those -- why I felt as I
16 did.
17          At that point, I went back and I
18 wrote a letter to two board members saying, I
19 don't understand what's going on.
20          MR. GREEN:  Thank you for that.
21 I want to look at another document.  This
22 will be Defense 10.  And we're still in
23 the same vein here.  This is an e-mail
24 with the Bates stamp KCF003872.

31 (Pages 118 - 121)

DEBORAH S. SKEANS

Page 122

```
 1                - - -
 2            (Whereupon, Exhibit D-10 is
 3      marked for identification.)
 4                - - -
 5            MR. GREEN:  The bottom e-mail
 6      is -- oh, I can make that bigger.
 7            THE WITNESS:  I can see it.
 8            MR. GREEN:  Okay.
 9            MR. MAHONEY:  I can't.  So if
10      you don't mind, Bill.
11            MR. GREEN:  Of course.
12            MR. MAHONEY:  Thank you.
13            MR. GREEN:  Is that enough or I
14      can go another --
15            MR. MAHONEY:  No, that's fine.
16      Thank you.
17      BY MR. GREEN:
18      Q.      The bottom e-mail is dated
19      July 14, 2016, and it's an e-mail to David
20      Wilson.  Now, subject line is, "Confidential."
21            Who is David Wilson?
22      A.      David Wilson was an advisor to
23      the board.  And he was located at Watchtower.
24      But it was not in his Watchtower role that made
```

Page 123

```
 1      him an advisor to the board.  He had been a
 2      friend of the family for a long time.  And he
 3      was involved in all the early discussions on
 4      the formation of Legacy Place.
 5            Because, however, he was at
 6      Watchtower and was a full-time volunteer, he
 7      chose not to become a board member.  But he
 8      still attended all of the board -- board
 9      functions -- not the meetings, but the
10      functions -- and so he was a confidante of
11      Darbin and me concerning Legacy Place.
12      Q.      Could you read this e-mail to
13      me?
14      A.      Yes.  "Much has transpired
15      within JJHA/Legacy Place that you have been
16      protected from.  No changes to the Board have
17      occurred despite agreement to do so early in
18      June.  Here is a summary of the reasons why
19      three donor families (Pavlis, Banko and Skeans)
20      demand that the Board change (and Darbin regain
21      control) . . . in addition to the months of
22      slander that Darbin and I have endured.  Wyllie
23      attempted to defraud Frank Pavlis . . . it is
24      documented and Darbin had to report it to the
```

Page 124

```
 1      Board because Rob and Larry and Greg (the
 2      executive committee) did not.  Financially, we
 3      are almost out of money and ready to close.
 4      The donors have expressed that they will not
 5      give more money if the current Board stays in
 6      place.  That challenges their very homes.  I am
 7      so disillusioned with so many, David.  Let's
 8      talk."
 9      Q.      Do you believe that David Wyllie
10      attempted to defraud Frank Pavlis?
11      A.      Yes, I believe that he -- in
12      absolute opposition to the power of attorney
13      power that he held, which instructed him he had
14      nothing to do with the trust -- that he
15      attempted to move that trust without Ed Lentz's
16      or Glenmede's knowledge.
17            And I consider -- I don't know
18      what motives he had beyond that.  But that was
19      absolutely not appropriate for a power of
20      attorney to do.
21      Q.      That sentence goes on that
22      "Darbin had to report it to the Board because
23      Rob and Larry and Greg did not."
24            Is it the case that David
```

Page 125

```
 1      Wyllie -- or let me rephrase that.
 2            Do you think that Rob and Larry
 3      and Greg knew what David Wyllie was doing?
 4      A.      This -- this e-mail is from
 5      July 14th of 2016.  As soon as we found out
 6      what Wyllie was attempting to do, my husband
 7      called Rob, who was the president of the board,
 8      and I believe also Larry Andrews, who at that
 9      time might have been vice president, and he
10      told them what we had just gone through with
11      Frank at Attorney Lentz's office and what we
12      had learned.
13            In addition to the attempt to
14      transfer, Ed Lentz had also told us that day
15      that another very strange-looking power of
16      attorney that did not have the limitations to
17      touch the trust had also surfaced.  And Frank
18      had no idea where it came from.  Frank was not
19      in agreement with those transfers.  He didn't
20      recall them.  And so we told them all that.
21            Darbin did not have a place on
22      the executive committee at that point.  We
23      became aware, or Darbin became aware, actually,
24      I should say, that the entire board was not
```

DEBORAH S. SKEANS

Page 126

1 informed of what Mr. Wyllie did.
2          Mr. Wyllie, when he was
3 contacted that his power of attorney was
4 removed, never returned to Legacy Place. Never
5 met with me. Never met with my husband. I
6 don't believe he ever met -- no, he never met
7 with Ed Lentz. And he resigned from the board.
8      Q.     Have you spoken to him since?
9      A.     I only spoke to him one time. I
10 happened to cross him in a parking lot as a
11 restaurant maybe six, nine months -- no, I
12 don't know. Quite a long time afterward. I
13 re -- I tried to get in touch with him, because
14 it was hard to step into the role of POA
15 without any transfer of information. And also,
16 we were very hurt by his conduct at Legacy
17 Place.
18          And I asked him -- I walked up
19 to his car, I saw him in the car, and I walked
20 up to his car, and I said, David, please call
21 Darbin and arrange a meeting. This needs to be
22 talked through.
23          And he said he'd think about it.
24 But he never did.

Page 127

1      Q.     I think we may have covered this
2 earlier. But did you know David Wyllie before
3 he was on the board of Jah Jireh?
4      A.     Not really. I mean, I knew the
5 name. I had met him very peripherally, maybe
6 in the early years of our marriage, but I did
7 not really know him.
8      Q.     All right. I scrolled up to the
9 top of the document. And it looks like you
10 forwarded this e-mail to Justin.
11          MR. KITTILA: Bill, did you mark
12 this e-mail?
13          MR. GREEN: Yes. This is
14 Defense 10, isn't it?
15          THE COURT REPORTER: Yes. This
16 is 3872?
17          MR. GREEN: Yes, 3872.
18          THE COURT REPORTER: Yes.
19          MR. KITTILA: Thank you.
20 BY MR. GREEN:
21      Q.     Now, this document also has an
22 attachment, and it's the change needed summary,
23 which I'm going to put up. I think you see now
24 what's the attachment, which will be part of

Page 128

1 D-10. And starts at Bates number 3874 and it
2 goes to 3876. I'm going to enlarge it so it's
3 legible.
4      A.     Yes, that's easier.
5      Q.     I realize this is a long time
6 ago.
7          Do you remember writing this
8 document?
9      A.     Yes.
10      Q.     Why were you sharing this with
11 Justin?
12      A.     Because he was my confidante at
13 that point. He was a dear friend. And I
14 thought he shared with me the shock at what
15 Mr. Wyllie had attempted to do.
16          He had been a confidante on some
17 of the problems we were going through in order
18 to try to get Legacy Place back on a fiscally
19 sound basis and to try to get the board to
20 understand what was going on in Allentown,
21 while, you know, they were in other places.
22          And so during that struggle --
23 and I was also aware that he had worked with
24 David Wyllie during 2015, when David was power

Page 129

1 of attorney.
2          So I believed that he might have
3 some knowledge of -- of David's conduct, which
4 he denied. And that as I was trying to work
5 through with Darbin how to transition Legacy
6 Place back to a local board that could stay
7 more involved with what was happening there, so
8 that it could pass state inspections, it could
9 go beyond 12 residents, and it could become
10 financially solvent to maintain its mortgage,
11 he would understand those issues. And so I was
12 sharing them with him.
13      Q.     I'm going to scroll through the
14 document a little bit to see if there's
15 anything I want to ask about.
16          On the top of Page 2 here, it
17 says, "Coercion by one member of the Executive
18 Committee of Board president to 'step down'
19 from authority on December 2015 for the purpose
20 of gaining control, without Board knowledge and
21 with instruction that President not inform the
22 Board of the discussion."
23          What was this? Do you know what
24 you meant by that?

33 (Pages 126 - 129)

DEBORAH S. SKEANS

Page 138

1 says, "The goal is to accept residents by
2 mid-2014."
3        Was Legacy Place able to accept
4 residents by mid-2014?
5    A.   No, we weren't ready.  And
6 approved, inspected and opened our doors early
7 in December 2014.
8    Q.   Understood.
9        Now, when you say you met Gary
10 Miller, what was the purpose of you meeting
11 Gary Miller, if it wasn't for Jah Jireh?
12    A.   Well, we had hoped he would come
13 to Jah Jireh, learn about it, want to support
14 it, share the information, because he was in a
15 congregation that could have had old people
16 that needed a place like Jah Jireh, too.  So
17 the information was not only for donating, it
18 was also for residency.
19        But the reason Justin wanted us
20 to meet Gary Miller was because he said he was
21 in the real estate business and that he might
22 be somebody we might want to do some business
23 with.  So Justin arranged the meeting.
24        MR. GREEN:  I'm sorry, bear with

Page 139

1    me a moment.
2        I'm jumping around a little bit.
3    I've got a different document on the
4    screen now, which should be Defense 12,
5    and it is Bates P-000843.  It's an e-mail
6    from Debby Skeans, dated June 8, 2014 to
7    Justin Billingsley, "Subject:  Frank."
8           - - -
9        (Whereupon, Exhibit D-12 is
10    marked for identification.)
11           - - -
12 BY MR. GREEN:
13    Q.    If you would, Ms. Skeans, could
14 you read the e-mail for me?
15    A.   Sure.  "I have an idea for a
16 real estate-based investment for Frank.  It is
17 something we are doing already and I need
18 someone to bounce the idea off of and if Frank
19 is deemed appropriate to approach, your
20 involvement.  I want to be sure it makes sense.
21 It can mean 15 percent per year for two years
22 and accomplish quite a bit of good in an area
23 that he is interested in.  Let's talk tonight
24 or tomorrow, if you can.  Thanks."

Page 140

1    Q.    Do you remember sending this
2 e-mail?
3    A.    Yes.
4    Q.    What did you have in mind?
5    A.    The Circle of Seasons note.
6    Q.    Oh, this is related to the
7 Circle of Seasons note?
8    A.    Absolutely.  It was the two
9 years.  If you see, it was the two years until
10 they were going to be able to buy it.  They
11 were in the lease-purchase.  This was going to
12 be a loan, you know, for a school in a piece of
13 real estate.
14        Unfortunately, we couldn't give
15 him, you know, a security interest in the land,
16 because all they had was a leasehold.  But, you
17 know, they had a leasehold.  It was a favorable
18 leasehold, because Penn State had made the rent
19 very, very low, so that they could get three
20 years of, you know, operation in, in order to
21 finance.  So everybody was working together.
22        But, yes, this is absolutely the
23 Circle of Seasons idea.
24    Q.    Thank you.  Let's see, I've got

Page 141

1 another question.  I'm changing directions a
2 bit again.
3    A.    Okay.
4    Q.    We talked earlier about the
5 $3 million Key Commercial Finance note.  There
6 was also a $4 million Key Commercial Finance
7 note, with the caveats from Mr. Mahoney
8 regarding the validity of those instruments.
9        Under Mr. Pavlis' escape plan,
10 who is the beneficiary of the $4 million note?
11        MR. MAHONEY:  Objection.  Calls
12    for a legal conclusion.
13        But, Deb, you can answer to the
14    extent you can.
15    A.    It's very easy.  Watchtower is
16 the beneficiary of everything, including the
17 note.
18 BY MR. GREEN:
19    Q.    Is Watchtower the holder of the
20 $4 million note now?
21    A.    No.  It's in the estate.  But
22 they are the beneficiary under the Will of
23 everything.
24    Q.    Why is it still in the estate?

36 (Pages 138 - 141)

DEBORAH S. SKEANS

Page 142

1    A.    Because the estate is still
2 open.
3    Q.    What else has to happen before
4 the estate can close?
5         MR. MAHONEY: Objection. Calls
6    for a legal conclusion.
7    A.    I don't believe we have final,
8 you know, IRS, all of the paperwork needed by
9 Mr. Lentz to -- to close the estate. I don't
10 think he has everything that he needs.
11 BY MR. GREEN:
12    Q.    Are you aware of anything
13 holding up the transfer or the distribution of
14 the $4 million note to Watchtower?
15         MR. MAHONEY: Objection. Calls
16    for a legal conclusion.
17         But you can answer, Deb.
18    A.    As far as I know, that will be
19 automatic when the estate is closed. But it's
20 not closed. It's not, you know, Glenmede and
21 Ed Lentz know why it's not closed.
22 BY MR. GREEN:
23    Q.    Did Glenmede tell you why it's
24 not closed?

Page 143

1    A.    No, I'm not privy to that part.
2 I mean, I'm not a trust -- I'm not a trust
3 expert. And I'm not an expert in -- in closing
4 estates. So they advise me when they can close
5 the estate. They had to have attorney general
6 approval. I know that. It goes through the
7 AG's office. I see that in the e-mails.
8    Q.    Does Glenmede Trust own the
9 note?
10         MR. MAHONEY: Objection. Calls
11    for a legal conclusion.
12    A.    No. Glenmede is not on the
13 note. This note is in the estate.
14 BY MR. GREEN:
15    Q.    Okay.
16    A.    But the trust, they were a
17 trustee of the trust.
18    Q.    Is Mr. Pavlis' revokable trust
19 from December 2002, is that still in effect?
20         MR. MAHONEY: Objection. Calls
21    for a legal conclusion.
22    A.    Yes.
23 BY MR. GREEN:
24    Q.    Do you have an understanding if

Page 144

1 it's still in effect?
2    A.    I have an understanding it's
3 still in effect.
4    Q.    Do you have an understanding of
5 who holds at present the $4 million note?
6         MR. MAHONEY: Objection.
7    Instruct her not to answer to the extent
8    it calls for any attorney-client
9    privileged communications.
10         To the extent you can answer
11    without divulging any communications with
12    counsel, Debby, you can answer.
13    A.    I believe the note is in the
14 estate. I've said that several times.
15 BY MR. GREEN:
16    Q.    Now, on Monday, Justin
17 Billingsley was deposed, testified at a
18 deposition here. During the day, we had a
19 conference call with the court.
20         Are you aware that Justin
21 Billingsley is willing to try to mediate this
22 case?
23         MR. MAHONEY: I'm going to
24    instruct her not to answer.

Page 145

1    A.    I don't know what
2 Mr. Billingsley --
3         MR. MAHONEY: Deb, let me
4    finish, please.
5         I'll instruct her not to answer
6    to the extent, Bill, it would reveal any
7    communications between Ms. Skeans and
8    counsel.
9         If she can answer it without
10    divulging those communications, then feel
11    free, Deb.
12    A.    (Continuing) I heard nothing on
13 Monday that indicated that Justin's at a point
14 of mediation.
15 BY MR. GREEN:
16    Q.    Well, I can represent that
17 Mr. Billingsley and Mr. Billingsley's counsel
18 told the court that Mr. Billingsley is willing
19 to submit this to mediation in the courts.
20         Is this the first time you're
21 hearing that?
22         MR. MAHONEY: Objection. Same
23    instruction, Deb. Same objection.
24         THE WITNESS: I'm not going to

37 (Pages 142 - 145)

DEBORAH S. SKEANS

Page 146

1    say what Attorney Billing -- Attorney
2       Mahoney and I talked about.
3  BY MR. GREEN:
4       Q.      All right.  Fair enough.
5               Sitting here, without divulging
6  attorney-client privileged communications, do
7  you have any reaction to hearing that Justin is
8  willing to mediate?
9       A.      My reaction is, I don't believe
10 we've been told all the truth yet.
11      Q.      What haven't you heard the truth
12 about?
13      A.      The financial matters of Key
14 Commercial and the many other entities that he
15 created.
16      Q.      Is there anything in particular
17 you're looking for?
18              MR. MAHONEY:  I'll object to
19      relevance of this.
20              But, Debby, if you have --
21      A.      I'm trying --
22              MR. MAHONEY:  -- something to
23      answer, feel free to give it.
24      A.      (Continuing)  We have spent over

Page 147

1  four years trying to find out from
2  Mr. Billingsley exactly how much money was
3  invested and earned on that investment.  We
4  spent over four years trying to find out where
5  it went.
6               I am not satisfied, listening to
7  the depositions to this point, that we have
8  been told the entirety of where it went, what
9  it earned while it was invested, and whether
10 they're not -- and whether there is recovery
11 possible.
12 BY MR. GREEN:
13      Q.      When you say "recovery
14 possible," what do you mean?
15      A.      I don't think we've been told
16 sufficient information to know whether or not
17 there are any assets to any of the companies
18 that seem to make up Key Commercial Finance or
19 the repositories of wherever monies went in
20 this whole elaborate period -- you know,
21 elaborate scheme or period of time.
22              I mean, money went to some
23 companies, went to other companies.  There's
24 money earned on companies.  There's never even

Page 148

1  been given a complete listing of properties
2  that were flipped, despite the fact they say
3  the majority of the business was flipping.
4               There's never been a
5  comprehensive list of how these monies were
6  used, what monies were earned, where it went
7  and what is left.
8               MR. GREEN:  Understood.  I think
9       I'm going to take a short break.  And I
10      want to see what else I have on my
11      checklist.
12              MR. MAHONEY:  Okay, that's fine.
13              MR. GREEN:  If we can take five,
14      I'd appreciate it.
15              MR. MAHONEY:  Sure.
16              MR. GREEN:  So 1:14.
17              - - -
18              (Whereupon, a recess was taken
19      from 1:14 p.m. to 1:20 p.m.)
20              - - -
21              MR. GREEN:  All right.  I'm
22      going to throw up another document, D-13.
23      I'm going to scroll to the bottom so I
24      get the actual Bates number, P-002617,

Page 149

1  and it has an attachment, which will also
2  be part of D-13.  It's dated March 27,
3  2018, from Debby Skeans to Roberta
4  Valerio.
5               - - -
6               (Whereupon, Exhibit D-13 is
7       marked for identification.)
8               - - -
9  BY MR. GREEN:
10      Q.      Ms. Skeans, do you know who
11 Roberta Valerio is?
12      A.      Uh-hum.  Roberta was the
13 caregiver at Legacy Place.  She originally
14 worked for Legacy.  Then she worked somewhere
15 else.  And when Frank began to fail after I had
16 POA, we brought her in, first part-time and
17 then full-time, to be Frank's supplemental
18 caregiver.
19      Q.      Around when was that, that she
20 started?
21      A.      She started very few hours
22 supplementally to the Legacy staff early in
23 2017 because of Frank's failing health.  Legacy
24 is a personal care facility, not a nursing

38 (Pages 146 - 149)

DEBORAH S. SKEANS

Page 150

1 home.  So they only have so much staff.
2          So Frank paid Roberta to have a
3 little -- a little extra attention.  And then
4 as he got more needy, her hours increased.  And
5 when he fell in late 2017, she became more --
6 she had -- she gave more hours.
7    Q.     Understood.
8          Do you remember sending this
9 e-mail?
10    A.     Yes.
11    Q.     Could you read this e-mail to
12 me?
13    A.     It's from me to Roberta.  "Here
14 is the slightly revised letter.  Darb suggests
15 that in addition you provide a short
16 handwritten or typed note that is addressed to
17 Brother Billingsley that says that you were
18 instructed to copy the letter to the two people
19 at Bethel that he knows.  (Erna has visited
20 several times and, of course, Brother Weaver
21 was there so is top of mind).  Thanks . . . and
22 let me know if tomorrow is a good day to chat
23 with Frank."
24    Q.     And that's the Erna that you had

Page 151

1 mentioned earlier?
2    A.     That's the attorney in the
3 charitable planning office, yes, the one that
4 died of cancer.
5    Q.     Yes.  She was at the charitable
6 planning office at Watchtower?
7    A.     Correct.
8    Q.     Who is Brother Weaver?
9    A.     Brother Weaver is Brother Leon
10 Weaver.  He's a member of what we call a branch
11 committee.  And he had been to see Frank to
12 thank him for a donation that was made to
13 Watchtower that year.
14    Q.     Briefly, what's a branch
15 committee?
16    A.     It's an organizational committee
17 at Watchtower that handles a branch.  The
18 branch is the United -- in this case, it's the
19 United States and some of the territories.
20          And they're simply a group of
21 Brothers that collectively handle the
22 administrative things related to it.
23    Q.     Understood.
24          The first sentence says, "Here

Page 152

1 is the slightly revised letter."
2          Did you draft the attachment?
3    A.     No.  Roberta did.  She had asked
4 my thoughts on it.  She spent a lot of time
5 with Frank.  She was trying -- all of us were
6 trying to get Brother Billingsley to -- to --
7 to visit Frank and explain things.  And -- and
8 Frank was very distraught that Justin wouldn't
9 come to see him and explain things.  And every
10 time we had to give him a progress report, he
11 got more concerned.
12          And so Roberta, with him,
13 prepared a short letter to be sent to Justin on
14 Frank's behalf.
15    Q.     We're going to look at the
16 attachment now.  This is the attachment, and
17 the attachment is 2618.
18          So just real quick, this is the
19 attachment.  Do you happen to know if this had
20 been signed and sent to Mr. Billingsley?
21    A.     I don't believe it was ever
22 signed and sent.
23          MR. GREEN:  Okay.  Thanks.  I'm
24 towards the end of my outline.  So I'm

Page 153

1 going to take another short break and
2 I'll be, you know, no more than five
3 minutes.  And we might be able to wrap up
4 a little bit early.
5          MR. MAHONEY:  Okay.  That's
6 fine, Bill.
7          MR. GREEN:  Thanks.  Off the
8 record.
9            - - -
10          (Whereupon, a recess was taken
11 from 1:25 p.m. to 1:31 p.m.)
12            - - -
13          MR. GREEN:  We can go back on
14 the record.
15          Thank you for your time,
16 Mrs. Skeans.  We're going to wrap here.
17          THE WITNESS:  Alrighty.
18          MR. MAHONEY:  All right.  Thank
19 you, Bill.
20          MR. GREEN:  Thank you, Bill.
21          (Witness excused.)
22          (Whereupon, the deposition was
23 concluded at 1:31 p.m.)
24            - - -

39 (Pages 150 - 153)

# DA-6

                                                Page 1

1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE

2
                          - - -
3

     DEBORAH S. SKEANS,          :   CIVIL ACTION
4    Executrix of the ESTATE     :   NUMBER
     OF FRANK E. PAVLIS,         :   1:18-cv-01516-
5              Plaintiff,        :   CFC
                 v.              :
6    KEY COMMERCIAL FINANCE,     :
     LLC, KEY COMMERCIAL         :
7    FINANCE PROPERTIES, LLC,    :
     EQUITY PROS, LLC, and       :
8    MOBILE AGENCY, LLC,         :
                 Defendants.     :
9
                          - - -
10

11              Monday, April 27, 2020

                          - - -
12

13          Oral deposition of JUSTIN C.
14   BILLINGSLEY, taken remotely via Zoom, at
15   122 Sherwood Hill Road, Brewster, New York
16   10509, beginning at 9:30 a.m., reported
17   stenographically by Cheryl L. Goldfarb, a
18   Registered Professional Reporter, Notary
19   Public, and an approved reporter of the United
20   States District Court.
21                        - - -
22

             VERITEXT LEGAL SOLUTIONS
23              MID-ATLANTIC REGION
          1801 Market Street - Suite 1800
24        Philadelphia, Pennsylvania  19103

Page 2

```
 1  A P P E A R A N C E S :
 2
 3     STRADLEY RONON STEVENS & YOUNG, LLP
       BY:  WILLIAM E. MAHONEY, JR., ESQUIRE
 4        CAMERON REDFERN, ESQUIRE
       2005 Market Street, Suite 2600
 5     Philadelphia, Pennsylvania  19103
       215.564.8000
 6     wmahoney@stradley.com
       credfern@stradley.com
 7     Representing the Plaintiff
       (Via Zoom)
 8
 9
       HALLORAN FARKAS & KITTILA, LLP
10     BY:  WILLIAM E. GREEN, JR., ESQUIRE
          THEODORE A. KITTILA, ESQUIRE
11     5801 Kennett Pike, Suite C
       Wilmington, Delaware  19807
12     302.257.2011
       wg@hfk.law
13     tk@hfk.law
       Representing the Defendants
14     (Via Zoom)
15
                    - - -
16
17  A L S O  P R E S E N T :
18
       DEBORAH S. SKEANS (Via Zoom)
19
       DARBIN SKEANS (Via Zoom)
20
21                  - - -
22
23
24
```

Page 3

```
 1              I N D E X
 2  WITNESS:  JUSTIN C. BILLINGSLEY
 3  QUESTIONED BY:              PAGE:
 4     MR. MAHONEY               7
 5             - - -
 6         E X H I B I T S
 7  NUMBER  DESCRIPTION        MARKED FOR ID
 8
    P-59   E-mail dated April 15, 2013    13
 9         P-000435
10  P-60   E-mail chain dated April 21    18
           through April 23, 2013
11         KCF000110 through 000112
12  P-61   E-mail dated January 11, 2014,   29
           KCF000498
13
    P-62   E-mail dated April 29, 2014    68
14         KCF000752
15  P-63   E-mails dated May 6, 2014       75
           KCF000898 and 000899
16
    P-64   E-mails dated May 2 and 7,      78
17         2014, KCF000906 and 000907
18  P-65   E-mail dated May 30, 2014       84
           and attachment, KCF000936
19         through 000949
20  P-66   E-mail dated September 26,     151
           2014, KCF001325
21
    P-67   E-mail dated September 26,     153
22         2014, KCF001331
23  P-68   Mobile Corporation Note       156
           Purchase Agreement, KCF012339
24         through 012348
```

Page 4

```
 1       E X H I B I T S (Continued)
 2  NUMBER  DESCRIPTION        MARKED FOR ID
 3
    P-69   Documents relating to wire    163
 4         transfers, P-000067 through
           000079
 5
    P-70   E-mail dated November 4, 2014   175
 6         and NPL Purchase and Services
           Agreement Template, KCF001380
 7         through 001401
 8  P-71   E-mail dated November 7, 2014   181
           and $6 million Promissory Note
 9         dated May 20, 2014, KCF001455
           through 001457
10
    P-72   E-mails dated December 1,      187
11         2014, KCF001509
12  P-73   E-mail dated April 15, 2015    225
           P-001719
13
    P-74   E-mail dated May 11, 2015      231
14         KCF002792
15  P-75   E-mails dated July 13 and 14,  233
           2015, KCF003289 and 003290
16
    P-76   E-mail dated August 24, 2015   237
17         and Durable Power of Attorney
           KCF003336 through 003345
18
    P-77   Two-page handwritten document  239
19         dated July 23, 2015 and letter
           dated March 6, 2015, P-000084
20         through 000086
21  P-78   E-mail dated May 11, 2016      249
           P-001800 and 001801
22
    P-79   Fax dated 11/19/2016 from      256
23         Christine Lachapelle
           P-000104 through 000122
24
```

Page 5

```
 1       E X H I B I T S (Continued)
 2  NUMBER  DESCRIPTION        MARKED FOR ID
 3
    P-80   E-mails dated December 7,      261
 4         2016 and January 17, 2017
           KCF004442 and 004443
 5
    P-81   E-mails dated December 7,      267
 6         2016 and January 15, 2017
           P-001904 and 001905
 7
    P-82   E-mails dated December 7,      268
 8         2016 and January 15, 2017
           KCF005867 through 005869
 9
    P-83   E-mail dated May 21, 2018      274
10         P-003460 through 003463
11  P-84   E-mail dated June 25, 2018     278
           P-003488
12
    P-85   E-mails dated June 25, 2018 and  282
13         29, 2018, P-003493 through
           003495
14
    P-86   Key Commerical Finance, LLC    285
15         Confidential Private Placement
           Memorandum, fax dated June 29,
16         2018, P-003497 through 003541
17  P-87   Subscription Agreement of Key   287
           Commercial Finance, LLC,
18         KCF009281 through 009292
19  P-88   E-mail dated December 18,      307
           2018, KCF013194
20
    P-89   E-mail dated September 30,     337
21         2017, P-001973
22  P-90   Article entitled, "Once-high-  344
           flying Quepasa chief Jeff
23         Peterson under fire as $9M
           gone in online startups"
24         P-000160 through 000168
```

2 (Pages 2 - 5)

Page 6

```
1         - - -
2
     PREVIOUSLY MARKED DOCUMENTS
3
     NUMBER................PAGE
4
5    P-2.....................97
6    P-3.....................100
7    P-4.....................124
8    P-5.....................167
9    P-7.....................212
10   P-8.....................213
11   P-9.....................214
12   P-10...................220
13   P-38.....................43
14   P-40...................116
15   P-47...................191
16   P-52...................202
17   P-53...................199
18   P-57...................228
19
        - - -
20
21
22
23
24
```

Page 7

```
1      DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page  Line
5  (None)
6
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9  Page  Line  Description
10 (None)
11
12
13 STIPULATIONS
14 Page  Line
15 (Pursuant to Federal Rules of Civil Procedure)
16
17
18 QUESTIONS MARKED
19 Page  Line
20 (None)
21
22
23
24
```

Page 8

```
1       THE COURT REPORTER:  Counsel, if
2  you wish, I won't read my statement with
3  regard to swearing in the witness
4  remotely into the record.
5       MR. MAHONEY:  I'm happy to
6  consent on behalf of the plaintiff.
7       MR. GREEN:  We consent on behalf
8  of the defendant.
9       THE COURT REPORTER:  Mr.
10 Billingsley, will you please raise your
11 right hand.
12       - - -
13       JUSTIN C. BILLINGSLEY, after
14 having been first duly sworn/affirmed,
15 was examined and testified as follows:
16       - - -
17       THE WITNESS:  I do.
18       - - -
19       EXAMINATION
20       - - -
21 BY MR. MAHONEY:
22 Q.     Good morning, Mr. Billingsley.
23 A.     Good morning.
24 Q.     Please tell me how you first
```

Page 9

```
1  came to know Frank Pavlis.
2  A.     I was introduced to Frank by
3  Debby and Darbin Skeans.
4  Q.     Under what circumstances?
5  A.     Debby and Darbin Skeans wanted
6  me to meet Frank to talk about his finances,
7  talk about a project that they were considering
8  with Legacy Place.
9  Q.     When do you recall first
10 speaking with Mr. Pavlis?
11 A.     When do I recall?  I don't
12 remember the date.  It would have to be late
13 2011, perhaps early 2012.
14 Q.     Tell me generally what you did
15 in terms of either assisting Mr. Pavlis or
16 speaking with Mr. Pavlis about his finances.
17 A.     We talked about everything.  I
18 don't remember in detail.  We talked about many
19 things related to his finances.
20 Q.     At a high level, tell me what
21 you recall, the topics.
22 A.     I -- outside of talking about
23 his finances, I don't recall specific topics.
24 It was too long ago.
```

JUSTIN C. BILLINGSLEY

Page 22

1    Q.     So sitting here today, you're
2 saying that you don't recall the fact that
3 Mr. Pavlis invested that money?
4    A.     I believe he did.
5    Q.     And what role, if any, did you
6 play in his investment of the money?
7    A.     I had explained it, introduced
8 it, similar to as I did with Darbin and Debby,
9 and put him in contact with those responsible.
10    Q.     And who did you put him in
11 contact with?
12    A.     I believe it was Michael
13 Silberman.
14    Q.     Were you present during any
15 communications between Mr. Pavlis and
16 Mr. Silberman?
17    A.     I seem to remember a phone call,
18 but I -- I don't recall.
19    Q.     Did you maintain any notes or
20 any documentary record of any discussions that
21 you had with Mr. Pavlis relating to his
22 investment in Mobile Pro?
23         MR. GREEN:  Object to form.
24    A.     I don't recall notes.  If there

Page 23

1 was anything that was by way of a note or
2 anything else, it's been produced.
3 BY MR. MAHONEY:
4    Q.     Okay.  So it's your
5 understanding that anything you had has been
6 produced in discovery?
7    A.     Yes.
8    Q.     Now, I'll represent to you that
9 Mr. Pavlis did, in fact, send half a million
10 dollars, I believe it was via wire, to Wilson
11 Sonsini.  And then within a week or two, that
12 $500,000 was wired back from Wilson Sonsini to
13 Mr. Pavlis.
14         Do you know why?
15         MR. GREEN:  Object to form.
16    A.     I have no idea.
17 BY MR. MAHONEY:
18    Q.     Do you recall discussing it with
19 Mr. Pavlis?
20    A.     I do not.
21    Q.     Do you recall ever proposing to
22 Mr. and Mrs. Skeans that they be involve in a
23 real estate venture with you and Gary Miller?
24    A.     I remember we spoke about a lot

Page 24

1 of different opportunities, yes.
2    Q.     Well, I'm talking about this
3 particular opportunity.
4         What do you recall about that?
5         MR. GREEN:  Object to form.
6         THE WITNESS:  Could you restate
7    the question?
8 BY MR. MAHONEY:
9    Q.     Yes.  Tell me what you recall
10 about the proposal that you made to the Skeans
11 to enter into an LLC agreement between you and
12 Mr. Miller.
13    A.     And you're asking me what I
14 recall?
15    Q.     Yes, that's fair enough.
16    A.     Yeah.  We had spoken about many
17 different real estate opportunities together.
18    Q.     Did the Skeans approach you
19 about this or did you approach them about it?
20    A.     I believe it was mutual.  They
21 had approached me about help that they needed
22 so that it was a mutual discussion back and
23 forth.
24    Q.     Well, when did they approach you

Page 25

1 about help they needed?
2    A.     Towards the very beginning of
3 how our relationship began.
4    Q.     And what help did they need?
5    A.     They needed me to help bring
6 understanding to their Legacy Place, their
7 assisted living business opportunity.
8    Q.     Mr. Miller had nothing to do
9 with that, correct?
10         MR. GREEN:  Object to form.
11    A.     Had nothing to do with what?
12 BY MR. MAHONEY:
13    Q.     With what we were just talking
14 about.
15    A.     We were talking about a few
16 different things.  What in specific?
17    Q.     All right.  Did Mr. Miller have
18 anything to do with Legacy Place?
19    A.     He came to a -- a conference in
20 Chicago that Darbin and Debby sponsored and
21 considered it.  He was involved in looking at
22 it.
23    Q.     Isn't it true he was there just
24 to speak with you and the Skeanses about a

7 (Pages 22 - 25)

Page 34

1 Investments, yes.
2     Q.     Is it your belief that when he
3 sent that wire, he thought he was investing in
4 something other than Allwest Investments?
5     A.     It was his understanding that we
6 were getting things started.
7     Q.     What does that mean?
8     A.     That we were getting our
9 investments, our investment project started
10 that he and I had been discussing for a long
11 time.
12     Q.     So tell me what investment
13 project you're referring to.
14     A.     We had gone back and forth
15 talking about many different ways to make
16 money.  And at this point, we had talked about
17 investing, about him putting money with some of
18 the work that I was doing, and that we had
19 talked a lot about Gary being a good operator.
20 So it made sense to him at the time to get
21 started.
22     Q.     I'm still not clear on what you
23 mean by your project.
24     So we know that a million

Page 35

1 dollars went from Mr. Pavlis to Allwest
2 Investments, right?
3     A.     Yes.  Are you asking is that
4 true --
5     Q.     Yes.
6     A.     -- or that's what we know?
7     Q.     Well, it's the same thing,
8 right?
9     You know that happened, correct?
10     A.     It's true.  I believe it's true.
11 I don't know what we all know on the call
12 today.  But, yes, that statement is true.
13     Q.     I'm only interested in what you
14 know.  So he invests a million dollars with
15 Allwest.
16     Are you suggesting that when he
17 made that investment, he thought it was for or
18 in connection with some other project that you
19 were going to be leading?
20     MR. GREEN:  Object to form.
21     You can answer.
22     THE WITNESS:  Could you re --
23     could you repeat the question, Mr.
24     Mahoney?

Page 36

1     MR. MAHONEY:  Cheryl, can you
2 read it back, please.
3     - - -
4     (Whereupon, the court reporter
5 read back the following:
6     "QUESTION:  I'm only interested
7 in what you know.  So he invests a
8 million dollars with Allwest.
9     "Are you suggesting that when he
10 made that investment, he thought it was
11 for or in connection with some other
12 project that you were going to be
13 leading?")
14     - - -
15     A.     Yes.
16 BY MR. MAHONEY:
17     Q.     Okay.  And what project was
18 that?
19     A.     That's the project that
20 eventually became Key Commercial Finance.
21     Q.     When did you first start
22 discussing the project that eventually became
23 Key Commercial Finance with Mr. Pavlis?
24     A.     It's hard to remember.  We had

Page 37

1 so, so many discussions and so, so many
2 meetings over the many, many months.
3     I -- if I remember right, the
4 first time that opportunity came up in
5 discussion was in a meeting where he and I and
6 Darbin and Debby were talking about the need
7 for him to invest in real estate with his
8 portfolio.
9     Q.     So you recall that there was an
10 actual meeting among the four of you to discuss
11 diversifying, if you will, Mr. Pavlis'
12 portfolio to have a real estate component?
13     Is that a fair summary?
14     A.     There were many meetings with
15 the four of us, talking about many different
16 investment topics.  We had spoken about, again,
17 many topics.
18     Was one of those topics the need
19 for him to invest in real estate?  Yes.
20     Q.     And you have a recollection that
21 in one of those meetings, that it was discussed
22 with the Skeanses and Mr. Pavlis that
23 Mr. Pavlis will invest in a project that
24 eventually would become known as Key Commercial

JUSTIN C. BILLINGSLEY

Page 38

1 Finance; is that correct?
2          MR. GREEN:  Object to form.
3          You can answer.
4     A.     I'm sorry, Mr. Mahoney, I'm
5 trying to -- it felt like your question had a
6 couple different pieces.  I'm just trying to
7 put them together in my head.
8          I'm sorry, could you repeat it
9 back?
10 BY MR. MAHONEY:
11    Q.     Yes.  So it's your testimony
12 that the Skeanses were aware that when
13 Mr. Pavlis invested in Allwest, he was actually
14 investing in a project that would eventually
15 become Key Commercial?  Is that your testimony?
16    A.     That the Skeanses were aware?
17 You said that the Skeanses were aware?
18    Q.     Yes.  Uh-hum.
19    A.     Yes, it's my understanding.
20    Q.     And it's your understanding or
21 your belief that one or more meetings when that
22 was discussed took place before Mr. Pavlis
23 invested a million dollars in Allwest
24 Investments; is that correct?

Page 39

1          MR. GREEN:  Object to form.
2          You can answer.
3     A.     So is it correct that the
4 Skeanses' understanding that all of our
5 discussions culminated in an investment with
6 the Skeanses?
7 BY MR. MAHONEY:
8     Q.     No, that's not what I asked.
9 That's not what I asked.
10         This meeting, whether it was one
11 or more meetings where the concept that
12 eventually became Key was discussed among you,
13 the Skeanses and Mr. Pavlis, did some of those
14 meetings take place before Mr. Pavlis invested
15 a million dollars with Allwest in early 2014?
16    A.     Yes.
17    Q.     Okay.  And do you know why the
18 Skeanses were involved in those discussions?
19    A.     I don't know why they -- I know
20 what I think.  But your question is why they
21 were there?
22    Q.     No.  I said --
23    A.     No, I don't know if they were --
24    Q.     Okay.

Page 40

1     A.     Pardon me?
2     Q.     What is your understanding as to
3 why then?
4     A.     The Skeanses were highly active
5 in investment opportunities with Mr. Pavlis.
6 They had a keen interest in Mr. Pavlis' money.
7     Q.     Tell me what you explained to
8 Mr. Pavlis as to how the project would work.
9          If he's investing money in
10 Allwest, how did you explain to him that that
11 would at some point really be an investment in
12 your project that became Key, Key Financial?
13         MR. GREEN:  Object to form.
14    A.     Tell you how I explained it to
15 him, how it would work?
16 BY MR. MAHONEY:
17    Q.     What did you tell him about that
18 investment and how it would work as it relates
19 to Key Commercial?
20    A.     There was never a -- a perfectly
21 defined here's how it would work.  Frank was
22 highly engaging.  So I would have an idea.  He
23 would want it changed.  He would have an idea.
24 I wouldn't be willing.  And we would go back

Page 41

1 and forth, back and forth, back and forth until
2 eventually things settled in and he got
3 comfortable and I got comfortable.  So there
4 was never a definitive here's how it will work.
5     Q.     Well, tell me about how the
6 concept progressed over time in your
7 discussions with Mr. Pavlis.
8     A.     I don't believe it happened that
9 way.  I don't believe it happened in -- in such
10 an easily definable manner.  Things were very
11 fluid and we were constantly responding to the
12 opportunities and what he liked and didn't
13 like.
14    Q.     Okay.  I'm talking about Key
15 Commercial Finance, not other things.
16         Are we on the same page there?
17    A.     I believe so, yes.
18    Q.     So if it's your testimony,
19 Mr. Billingsley, that Mr. Pavlis, from the
20 beginning, when he invested his first million
21 dollars with Allwest, really understood that it
22 was going to be ultimately an investment in
23 something with you that became Key Commercial,
24 why did he invest in Allwest at all?  Why not

11 (Pages 38 - 41)

JUSTIN C. BILLINGSLEY

Page 46

1          MS. REDFERN:  All right.  It's
2     set.
3  BY MR. MAHONEY:
4     Q.     Mr. Billingsley, this is what
5  purports to be an Allwest RE Partners
6  Subscription Agreement.
7          MR. MAHONEY:  And, Cam, if you
8     flip to the next page.
9  BY MR. MAHONEY:
10    Q.     You'll see that this is the
11 first page of the agreement with some account
12 information blacked out.
13         Do you recall presenting an
14 Allwest subscription agreement to Mr. Pavlis?
15    A.     Yes, I believe I did.
16    Q.     And do you recall when that was?
17    A.     No.  No, I don't recall when.
18         MR. MAHONEY:  Cam, flip through,
19    please, a couple pages.  You'll get to a
20    page with a date on it.
21         MS. REDFERN:  (Scrolling through
22    document.)
23         MR. MAHONEY:  Okay.
24 BY MR. MAHONEY:

Page 47

1     Q.     Mr. Billingsley, do you
2  recognize the writing on that page?
3     A.     Do I recognize the writing?  No,
4  I don't recognize the writing.
5     Q.     So that's not your writing?
6     A.     I don't have any reason to
7  believe that's my writing, no.
8     Q.     This indicates that on the 28th
9  day of January 2014, that Mr. Pavlis was
10 investing a million dollars in a two-year note.
11         Do you recall having a
12 discussion with Mr. Pavlis about him investing
13 a million dollars for a two-year note from
14 Allwest?
15    A.     Well, he sure could have.  We
16 talked about many different documents.  We
17 looked at many different versions of these
18 documents.  This could have easily been one of
19 the ones that he and I discussed at length.
20    Q.     My question is, do you recall
21 discussing it with him?
22    A.     I believe I've answered that it
23 could have been one of the many that we
24 discussed easily.

Page 48

1     Q.     Well, "could have been" implies
2  that it may not have been.
3          I'm asking you, do you
4  specifically have a recollection of discussing
5  with Mr. Pavlis a million dollar investment for
6  a two-year note from Allwest?
7     A.     I'm sure we discussed this
8  document with many others, yes.
9     Q.     And do you recall telling
10 Mr. Pavlis anything about, for example, the
11 terms of this two-year note?  What was he
12 getting in return for his million dollar
13 investment?
14    A.     Yeah.  These were the topics
15 constantly in discussion with Mr. --
16 Mr. Pavlis.  ==He -- this was one of the parts==
17 ==of -- of the work that was so fluid with Frank.==
18 ==It was constantly in development.==
19    Q.     Well, how could something be
20 constantly in development when it appears that
21 he's actually agreeing to spend a million
22 dollars to get a two-year note?
23         MR. GREEN:  Object to form.
24 BY MR. MAHONEY:

Page 49

1     Q.     Wasn't the note already
2  prepared?
3          MR. GREEN:  Object to form.
4     A.     We prepared many different
5  documents, and then he wanted them changed.
6  BY MR. MAHONEY:
7     Q.     Okay.  Stick with me.  I'm
8  talking about this one.
9          Was the note already prepared at
10 the time that you presented this to Mr. Pavlis
11 for his signature?
12         MR. GREEN:  Object to form.
13         THE WITNESS:  I don't understand
14    the question.
15         MR. MAHONEY:  Okay.  Turn to the
16    next page, please, Cam.
17         Thank you.
18 BY MR. MAHONEY:
19    Q.     Mr. Billingsley, do you
20 recognize the writing on this page?
21    A.     Not particularly, no.
22    Q.     When you sat down -- and
23 presumably that's Mr. Pavlis' signature.
24         Is that your understanding?

13 (Pages 46 - 49)

JUSTIN C. BILLINGSLEY

Page 58

1    Q.    You can't remember the beginning
2 of a question 30 seconds ago, and yet you can
3 remember dates of meetings.  Okay.
4          MR. GREEN:  Objection,
5 argumentative.
6          MR. MAHONEY:  Read that back,
7 please.
8               - - -
9          (Whereupon, the court reporter
10 read back the following:
11          "QUESTION:  So after Mr. Pavlis
12          made this million dollar investment in
13          Allwest, tell me what discussions you had
14          with him after that relating to what you
15          contend was the project that ultimately
16          became Key Commercial.")
17               - - -
18    A.    Tell you what discussions I had
19 that became Key?  We would talk about on many
20 occasions all of the many moving parts.  We
21 talked about the Key Commercial Finance
22 project.
23 BY MR. MAHONEY:
24    Q.    What did you tell him about it?

Page 59

1    A.    We would talk about ideas about
2 how to do things better, do things stronger,
3 how to address his concerns, how to consider
4 everything that he wanted it to be and in the
5 context of something that I could get done.
6    Q.    What did he tell you he wanted
7 it to be?
8    A.    That's a really long list.
9 Frank was extremely particular and -- and very,
10 very picky.  Yeah, I -- I couldn't recall the
11 many, many dynamics that Frank would require
12 and talk about.
13    Q.    Let me ask you this:  If, in
14 fact, there was an understanding, even before
15 he invested the first million dollars, that
16 ultimately that would go to this entity Key
17 Commercial Finance, after he invested the
18 million dollars, why didn't you have your
19 lawyers draw up papers to create something
20 called Key Commercial Finance?
21          MR. GREEN:  Object to form.
22    A.    Yeah, I don't recall that it
23 happened that way.  I believe we were
24 constantly in efforts to do just that.

Page 60

1 BY MR. MAHONEY:
2    Q.    You understand that Key
3 Commercial Finance was not created as a legal
4 entity until December of 2014, right?
5          MR. GREEN:  Object to form.
6    A.    Yeah.  My attorneys had
7 explained to me that it was fine.  It would get
8 done eventually.  Everything was doing well.
9 BY MR. MAHONEY:
10    Q.    Let me unpack it a little bit.
11          So, again, are these the
12 attorneys at Snell & Wilmer?
13    A.    We had many attorneys in
14 addition to Snell & Wilmer.  There were others.
15    Q.    Okay.  Well, which attorneys
16 told you that it was okay, you didn't have to
17 worry about filing paperwork to create Key
18 Commercial Finance?
19          MR. GREEN:  I'm going to object
20          to the extent this asks for
21          attorney-client privileged information.
22          MR. MAHONEY:  He's already said
23          it before.  But at the moment, I'm just
24          asking for the attorneys.

Page 61

1 BY MR. MAHONEY:
2    Q.    So who were they besides Snell &
3 Wilmer?
4    A.    Again, we had several attorneys.
5 One that comes to mind would be Hillel Goldman.
6 We had an attorney -- an attorney I talked to a
7 lot was Martin Hewitt.
8    Q.    And is it your testimony that --
9 I'm sorry, go ahead.  I didn't mean to cut you
10 off.
11    A.    No.  I think that's all I can
12 recall for now.  I believe that it feels like
13 there were more.
14    Q.    Is it your testimony that Mr.
15 Gold -- did you say Hillel Goldman?
16    A.    Yes.
17    Q.    Was it your testimony that
18 Mr. Goldman and Mr. Hewitt advised you that it
19 was okay to hold off forming Key Commercial
20 Finance for almost a year?
21          MR. GREEN:  Object to form.  And
22          object to --
23    A.    No.
24          MR. GREEN:  -- attorney-client

JUSTIN C. BILLINGSLEY

Page 62

1    privilege.
2  BY MR. MAHONEY:
3    Q.    No what?
4    A.    No, that's not at all what I
5  said.
6    Q.    Okay.  Well, I asked you who
7  gave you the advice.  Because you said just a
8  few questions ago, that you were advised by
9  your counsel that you didn't have to worry
10 about getting the LLC formed right away.
11         Now, I'm asking you, apart from
12 Snell & Wilmer, what other attorneys told you
13 that, if any?
14         MR. GREEN:  Object to form.
15    And I'm going to object to questions
16    about attorney-client privileged
17    information.
18         MR. MAHONEY:  You can object.
19    He can answer.
20    A.    Yeah, I believe you're
21 misstating me.  Can we have the record read
22 back as to what I said?
23         MR. MAHONEY:  That's all right,
24    Cheryl, I don't want to waste time on

Page 63

1    that.
2    A.    (Continuing) Here's my point,
3  Mr. Mahoney.  That's not what I said at all.  I
4  said the attorneys told me it was going fine.
5  Everything was fine.
6         And you're trying to make it as
7  if --
8  BY MR. MAHONEY:
9    Q.    I asked you what attorneys told
10 you that.  You said Snell & Wilmer.
11         Now I'm asking you, did other
12 attorneys tell you that as well?
13         MR. GREEN:  Objection to form.
14    Object to attorney-client privileged
15    information.
16    I think we should move on.
17         MR. MAHONEY:  Well, you may
18    think what you like, Bill, but I'd like
19    an answer to my question.
20         THE WITNESS:  Yeah, I believe
21    asked and answered.
22         MR. MAHONEY:  Okay.  You're not
23    the attorney, sir.
24         MR. GREEN:  Yes.  Justin, you

Page 64

1  can't object.
2         So just for my benefit, what's
3  the actual question right now?
4         MR. MAHONEY:  That's all right.
5  I think we've gotten the answer that
6  we're going to get out of
7  Mr. Billingsley.
8  BY MR. MAHONEY:
9    Q.    So didn't you think -- I mean,
10 you had been involved in finance for quite some
11 time as of January 2014, right?
12    A.    What do you mean by "finance"?
13    Q.    Well, you had been involved in a
14 number of ventures raising money, et cetera,
15 right?
16    A.    I wouldn't characterize it that
17 way at all.
18    Q.    Well, let me put it this way:
19 Given your professional experience as of
20 January of 2014, didn't you think it would be
21 important to have something documenting this
22 company that you contend Mr. Pavlis was
23 agreeing to invest in at or around the time
24 that he made his initial investment?

Page 65

1         MR. GREEN:  Object to form.
2         You can answer.
3    A.    I think given my business
4  experience, it was important to have attorneys
5  hired that were involved that I could rely on.
6  BY MR. MAHONEY:
7    Q.    Do you know what attorneys, if
8  any, prepared the documentation in
9  December 2014 that actually created Key
10 Commercial Finance, LLC?
11    A.    You're asking which attorneys
12 created the -- submitted the formation
13 documentation for Key?
14    Q.    Correct, if any did.
15    A.    I'm confident an attorney did do
16 the documentation.  I want to say it was
17 Hillel, but I'm not certain.  I don't recall.
18    Q.    Do you recall that being a
19 complicated or involved process, creating that
20 LLC?
21    A.    A complicated or involved
22 process?
23    Q.    Yes.
24    A.    I was not involved very much at

17 (Pages 62 - 65)

JUSTIN C. BILLINGSLEY

Page 66

1 all with that type of the process.  I hired
2 people and trusted that they'd do their job.
3      Q.      What do you recall of your
4 discussions with Mr. Pavlis about an additional
5 investment in Allwest Investments in or around
6 May of 2014?
7           MR. GREEN:  Object to form.
8      A.      What do I recall?  What do I
9 recall about what, Mr. Mahoney?  Discussions
10 with Mr. Pavlis?
11 BY MR. MAHONEY:
12      Q.      Yes, about that second
13 investment.
14      A.      We had talked about that he
15 wanted to do more.  And it was important to me
16 that he was relying upon all of the
17 professionals in his world, which is -- I
18 remember him wanting to create liquidity in
19 various ways.  I insisted that he create
20 liquidity directed from his brokerage company,
21 because I would be able to trust that they were
22 involved.  To my understanding, that's what he
23 did.
24           So there was several layers of

Page 67

1 professional expertise involved that I felt I
2 could trust in the lineup.
3      Q.      Are you aware of anybody who you
4 considered one of his other professionals who
5 knew anything about either Allwest or Key
6 Commercial?
7      A.      I would -- I would sure hope so.
8 He was -- he was a very wealthy man.  He was
9 sure paying a lot of people.
10      Q.      Did you provide any information
11 to any of those professionals relating to
12 Allwest or Key Commercial?
13      A.      I don't recall.  I do recall
14 never feeling the need to, because he was --
15 there was constant conversation between he and
16 I that he had been speaking to them.
17      Q.      Let me back up.
18           Do you recall sending
19 information or speaking with any of those
20 professionals about a potential investment in
21 Blue Mountain Enterprises?
22      A.      I -- I don't recall.  We --
23 again, I trusted Frank's discussion with me.
24 And he many times would explain that he had

Page 68

1 been in touch with -- he had been in touch with
2 his brokers.  He had been in touch with
3 individuals in his world, his attorneys.
4           MR. MAHONEY:  Cam, would you put
5 up 195, please.
6           MS. REDFERN:  This will be P-62.
7                - - -
8           (Whereupon, Exhibit P-62 is
9 marked for identification.)
10                - - -
11 BY MR. MAHONEY:
12      Q.      Mr. Billingsley, this is an
13 e-mail from you to a gentleman named Rick
14 Reveria (sic) at Blue Mountain, dated April 29,
15 2014.
16           Do you recall having
17 communications with Mr. Reveria relating to a
18 potential investment by Mr. Pavlis?
19      A.      At that time, I had been
20 speaking to Rick a lot.  Rick and I were
21 speaking about many, many different things.
22 He -- he ran Greg's company.  So it would -- it
23 would very much make sense that I had spoken to
24 him about Mr. Pavlis.

Page 69

1      Q.      And why in late April of 2014
2 were you discussing with him a potential
3 $6 million investment by Mr. Pavlis?
4      A.      As I mentioned, things were
5 highly fluid.  I was constantly doing
6 everything in my power to make Frank's
7 participation with his money the best it could
8 possibly be.  He was a very good friend of
9 mine.  It was very important to me that things
10 be done right.
11           So I'm sure I was out doing
12 everything in my power to talk to everybody I
13 could possibly talk to about doing the best for
14 Frank.
15      Q.      Do you know why Mr. Pavlis did
16 not invest any money with Blue Mountain?
17           MR. GREEN:  Object to form.
18           You can answer.
19      A.      At this time, I don't recall.
20 They had a lot -- a lot of investors.  They
21 had, I believe, right at $400 million in their
22 fund.  So I don't recall.
23 BY MR. MAHONEY:
24      Q.      Do you recall what sort of

18 (Pages 66 - 69)

JUSTIN C. BILLINGSLEY

Page 70

1 return that opportunity offered to Mr. Pavlis
2 if he had invested?
3     A.    No, I don't recall.
4     Q.    Now, in your second paragraph
5 here, you write, "Frank is also of the opinion
6 that the height of the current market values is
7 a good time to take some profits and diversify.
8 His current stock and bond portfolio is worth
9 no less than $70 million.  He is highly liquid.
10 Although he has great investment experience
11 with real estate in the past he is currently
12 not invested at all in real estate at the
13 present."
14          What was your understanding of
15 Mr. Pavlis' experience with real estate
16 investments?
17     A.    I believe, just as I said, that
18 he had great investment experience.
19     Q.    What was it?  What did you
20 understand made up that great investment
21 experience with real estate?
22     A.    His explanations to me that his
23 investment experience with real estate was
24 great.

Page 71

1     Q.    You didn't have any further
2 discussion with him about what sort of
3 investment experience he had with real estate?
4     A.    I'm sure we did.  At this time,
5 I can't recall the details of conversations
6 five years ago.
7     Q.    Did you have any discussion with
8 him about the potential capital gains exposure
9 and related tax liability that he would incur
10 if he sold his Air Products stock to raise some
11 portion of the $6 million?
12     A.    He would talk about tax all the
13 time.  I know he was incredibly sensitive to it
14 and -- and would always talk about offsets and
15 deductions that he had created.
16          He had said that the tax people
17 in his investment firm were watching it very
18 closely and constantly giving him advice on --
19 on how to manage it.
20     Q.    Do you know how he came up with
21 the number of $6 million?
22     A.    If I recall, he had explained
23 that it was a number that his tax planning
24 professionals at his investment firm had worked

Page 72

1 out that he could do that without having any
2 damage or cost, any economic inefficiencies, to
3 my understanding.
4     Q.    Do you recall having any
5 discussion or interaction with Ed Lentz, who
6 was Mr. Pavlis' estate planning attorney, about
7 a potential investment in Blue Mountain?
8     A.    Yeah, I believe -- I believe I
9 do recall a phone conversation with Mr. Lentz.
10     Q.    Tell me what you recall of that
11 conversation.
12     A.    I seem to remember that he -- I
13 don't believe he was in favor of -- of Frank
14 investing anything.
15     Q.    In anything or in this
16 opportunity with Blue Mountain?
17     A.    I remember his explanation to me
18 was that he didn't think that Frank should
19 invest in anything.
20     Q.    Anything at all, including
21 stocks?
22     A.    I don't know what he meant by
23 the phrase.
24     Q.    What else do you recall in your

Page 73

1 discussion with Mr. Lentz on the topic?
2     A.    Not much.  It was a pretty brief
3 conversation.
4     Q.    Why were you speaking with him
5 at all about this?
6     A.    It was very important to me to
7 talk to all of Frank's invest -- all of his
8 professionals.
9     Q.    Okay.  So that was --
10     A.    I believe it was --
11     Q.    I'm sorry.  Go ahead.
12     A.    So I believe it was important to
13 me to talk to Mr. Lentz and to make sure that
14 he was aware.
15     Q.    Did you ever speak with
16 Mr. Lentz about Mr. Pavlis investing $6 million
17 with Allwest?
18     A.    I don't recall.
19     Q.    Well, if it was important to you
20 that you speak with Mr. Lentz about a potential
21 investment in Blue Mountain, wouldn't it also
22 have been important to speak with him about
23 where the money ultimately was invested?
24     A.    I didn't say it was important

19 (Pages 70 - 73)

JUSTIN C. BILLINGSLEY

Page 74

1 for me to talk with him about an investment
2 with Blue Mountain.
3     Q.     I think that's exactly what you
4 said.  But if you have a different answer, you
5 can give it.
6     A.     No, that's not at all what I
7 said.  What I said was, it was important to me
8 that Mr. Lentz know that I exist, that I was
9 involved, that I was there working with Frank.
10     Q.     What discussions did you have
11 with Mr. Pavlis about him ultimately making the
12 $6 million investment with Allwest, for a total
13 of $7 million invested with Allwest?
14     A.     What discussions did I have?
15 Can you be more specific or should I just --
16     Q.     Do you recall any discussions
17 with Mr. Pavlis about investing an additional
18 $6 million in Allwest?
19     A.     Any additional questions?  Frank
20 had hundreds of questions constantly.
21     Q.     Tell me what you recall of the
22 discussions you had with Mr. Pavlis leading up
23 to his investment of $6 million in Allwest.
24     A.     Yeah.  So he -- he would want to

Page 75

1 know, you know, what it was doing, how it was
2 working, the risk involved, rate of return, how
3 it would work, on and on and on.
4     Q.     What did you tell him, for
5 example, about rate of return?
6     A.     I don't recall.  We spoke about
7 many different iterations, many different
8 things that we were . . .  As I mentioned, it
9 was constantly in development.
10     Q.     Were you speaking with any other
11 individuals about investing in Allwest?  Again,
12 the time frame being from January through, say,
13 July of 2014.
14     A.     January through July.  I don't
15 recall.  That seemed to be what we were looking
16 to develop and build.  But, yeah, I don't
17 recall.
18         MR. MAHONEY:  Cam, I'd like you
19 to put up Document 209, please.
20         MS. REDFERN:  This will be P-63.
21             - - -
22         (Whereupon, Exhibit P-63 is
23     marked for identification.)
24             - - -

Page 76

1 BY MR. MAHONEY:
2     Q.     Mr. Billingsley, this is an
3 e-mail exchange between you and Ed Lentz, dated
4 May 6, 2014.  And the bottom-most e-mail is
5 from you to him, with a copy to Mr. Revetria at
6 Blue Mountain, and the subject is "Master
7 Services Agreement."
8         And you say, "Dear Ed, Please
9 see attached.  This is a sample MSA document
10 for your review.  This is the document
11 typically used to formalize the financial
12 relationship."
13         And he responds, "So Frank would
14 become a member in Codfish?  If so, how is his
15 percentage interest calculated and what is
16 current value of Codfish fund?"
17         Do you recall sending
18 information to Mr. Lentz relating to something
19 called "Codfish"?
20     A.     I remember sending these
21 documents to Mr. Lentz.  Codfish, I believe,
22 was -- was one of the subentities that Greg
23 would use.  Specifically, I don't remember the
24 details of this interchange.

Page 77

1     Q.     Okay.
2     A.     But in concept, it looks --
3 looks right.
4     Q.     So you'll agree that this was
5 more than just you wanting to let Mr. Lentz
6 know you exist.  You were actively providing
7 documentation for his review, right?
8     A.     In the context of this
9 conversation, it's a bit more detailed as to
10 the Blue Mountain investment.  I remember at
11 one point, Frank became pretty annoyed that I
12 was having this kind of interaction with Ed,
13 because he was frustrated in the estate
14 planning attorney to be giving any kind of
15 investment advice and investment analysis.
16     Q.     Well, didn't Mr. Pavlis
17 specifically ask you to discuss it with
18 Mr. Lentz?
19     A.     No.  I remember him wanting me
20 to just introduce myself and talk about the
21 idea that we were looking to put something
22 together with Frank.
23         MR. MAHONEY:  All right.  Let's
24     take a five-minute break.

20 (Pages 74 - 77)

JUSTIN C. BILLINGSLEY

Page 78

1                    - - -
2           (Whereupon, a recess was taken
3     from 11:00 a.m. to 11:09 a.m.)
4                    - - -
5           MR. MAHONEY:  Back on the
6     record.
7           Cam, would you put up 211,
8     please.
9           MS. REDFERN:  This will be P-64.
10                   - - -
11          (Whereupon, Exhibit P-64 is
12    marked for identification.)
13                   - - -
14   BY MR. MAHONEY:
15      Q.     Mr. Billingsley, this is an
16   e-mail from you to somebody named Jon Needell
17   at, it looks like, Redwood, Kairos Real Estate
18   Partners.  It's dated May 7th of 2014.  And the
19   subject is, "Investor Referral Value Fund IV."
20          In fairness, let me read what
21   you write.  You say, "Dear Jon, My name is
22   Justin Billingsley.  I live in Danbury,
23   Connecticut and I have an investment
24   relationship by the name of Frank Pavlis.  He

Page 79

1    has an interest in participating in a real
2    estate investment.  His investable net worth is
3    well over 70 million.  Could you please provide
4    me with some information on some of the
5    opportunities with Redwood RE?"
6           Why were you writing to
7    Mr. Needell about Mr. Pavlis' possible
8    investment with his firm?
9       A.     I was continuing to try to find
10   good opportunities to develop the best
11   opportunity that we could for Key Commercial.
12      Q.     Well, how would that be a Key
13   Commercial opportunity, if Mr. Pavlis was going
14   to invest in this fund?
15      A.     Mr. Pavlis would invest with Key
16   Commercial, was our discussion, and then Key
17   Commercial would JV with a larger group like
18   Redwood or Blue Mountain or any of the many
19   options we were considering at the time.
20      Q.     Do you recall making a proposal
21   to Mr. and Mrs. Skeans around the same time
22   about doing some sort of venture with them
23   using Mr. Pavlis' money?
24      A.     Yes.  There was lots of

Page 80

1    discussion about that.
2       Q.     With whom?  With them?
3       A.     With them, yes.
4       Q.     When you say, "lots of
5    discussion," what do you mean?
6       A.     There were multiple
7    conversations with Darbin and Debby about them
8    participating in the investment opportunity
9    with Frank.
10      Q.     Did that ever come to fruition?
11      A.     No.
12      Q.     Do you know why it did not?
13      A.     Yes.
14      Q.     Why?
15      A.     Debby became super aggressive
16   and started to behave in ways that I thought
17   were very unstable, started attacking many
18   different people in her world that she had
19   allowed them to believe they could trust her.
20   And it just seemed like it would be a horrible
21   idea.
22      Q.     Well, you're the one who
23   proposed it initially, correct?
24      A.     That's not the way I remember

Page 81

1    it.
2       Q.     Do you think they proposed to
3    you that you all be involved in some venture
4    with Frank's money?
5       A.     Yes.
6       Q.     Really?  Tell me what you recall
7    of the conversation of a meeting where the
8    Skeanses proposed that to you.
9       A.     There were many.  It was the --
10   it was the basis of many conversations.  There
11   were -- even from the outset, there was, come
12   meet this gentleman, see what kind of
13   opportunities we can develop.
14          They wanted me to support
15   their -- their opportunity with their assisted
16   living business.  And they wanted me to join
17   it, many times making me offers to join the
18   board and continue.
19          You know, Debby wanted to raise
20   a lot more money.  They wanted to put together
21   a partnership, of which Debby would use her
22   reach and access to other investors, beginning
23   with Frank, and -- and then we would do real
24   estate -- do a real estate project together.

21 (Pages 78 - 81)

JUSTIN C. BILLINGSLEY

Page 82

1     Q.      And it's your recollection that
2   because you felt that she became aggressive and
3   unstable, that you weren't interested in
4   pursuing the opportunity with them; is that
5   right?
6           MR. GREEN:  Object to form.
7           You can answer.
8     A.      That would -- yeah, that would
9   be the simple version of it.
10  BY MR. MAHONEY:
11    Q.      Okay.  And you think all that
12  took place by May of 2014?
13    A.      Yeah, I don't recall the exact
14  time frames.  But there was a time when, you
15  know, her and Darbin had led a lot of
16  individuals to believe and trust in them in
17  connection with an assisted living company.
18  And everything wound up into constant fighting,
19  horrible, horrible accusations, quite similar
20  to the ones she's made of me.
21           And, you know, it was -- it was
22  disappointing that she behaved that way, but
23  not nearly as disappointing as it was that
24  Darbin would allow it.

Page 83

1     Q.      Again, just so I have your
2   testimony.  It's your understanding you had
3   many conversations with the Skeanses about
4   doing some sort of real estate investment
5   venture using Frank's money, but you decided
6   not to proceed with that rather than them
7   saying they weren't interested; is that your
8   testimony?
9     A.      No, that's not what I said.
10    Q.      Is it true?
11    A.      Is what true?
12    Q.      What I just said, is that true?
13  You mentioned that there were multiple meetings
14  where there were discussions about some sort of
15  venture with the Skeanses and you using Frank's
16  money, but --
17    A.      That's true.
18    Q.      Okay.  And you indicated that
19  nothing came to fruition because you didn't
20  want to proceed because you had concerns about
21  Debby's behavior?
22    A.      That's true.
23    Q.      Okay.  I just wanted to make
24  sure I've got that down.

Page 84

1     A.      That wasn't what you said
2   previously.  But what you just said was true,
3   yes.
4           MR. MAHONEY:  Cam, let's take a
5       look at 220 and 221.
6           MS. REDFERN:  Together these
7       will be P-65.
8           - - -
9           (Whereupon, Exhibit P-65 is
10      marked for identification.)
11          - - -
12  BY MR. MAHONEY:
13    Q.      Mr. Billingsley, the first
14  document you're looking at here is an e-mail
15  from you to Mr. Miller.  It's dated May 30th,
16  2014.  And the subject is, "Pavlis Sub
17  Agreement - $6 million."  And the attachment is
18  the subscription agreement relating to
19  Mr. Pavlis' $6 million investment in Allwest.
20          And you write here, "Dear Gary,
21  Please see the attached sub agreement for
22  Frank's six million.  This is 100 percent of
23  what we need Frank to sign.  Once we are
24  together we will need to work out the terms of

Page 85

1   the note.  The note is never signed by him
2   though as he is already subscribed to it.  You
3   are the one that signs the note and then we
4   give Frank all the docs for his keeping."
5           So when you indicated here that,
6   "Once we are together we will need to work out
7   the terms of the note," what were you referring
8   to?
9     A.      Just the financial arrangements,
10  the economic relationships of the -- of the
11  project that we were contemplating.
12    Q.      So is it fair to say that as of
13  the time that Mr. Pavlis signed this second
14  subscription agreement with Allwest, that you
15  had not presented him yet with a note?
16    A.      I don't -- I don't read it to
17  say that.
18    Q.      I'm asking you, is that true?
19          MR. GREEN:  Object to form.
20    A.      Is what true, Mr. Mahoney?
21  BY MR. MAHONEY:
22    Q.      When you had Mr. Pavlis sign the
23  subscription agreement for the $6 million, did
24  you present him with a note corresponding with

22 (Pages 82 - 85)

Page 86

1  that $6 million investment?
2      A.    I don't recall.  I -- we
3  presented many different documents with
4  Mr. Pavlis.  We talked about all kinds of
5  documents.  And they took many different shapes
6  and forms and titles.  I remember, you know,
7  understanding the documents to be certain
8  things, and the names would change.
9          I remember at one point, our
10  attorneys at Snell & Wilmer said, look, really
11  what this is, is a funding agreement.  It's not
12  a note at all.
13          So that, you know, we would use
14  vernacular based upon our understanding, but
15  we're not attorneys.
16      Q.    But presumably, because you
17  mentioned several times how particular
18  Mr. Pavlis was, presumably before he parted
19  with another $6 million, he would have wanted
20  to know what the terms were of that
21  arrangement, right?  For example, what would be
22  his rate of return?
23          MR. GREEN:  Object to form.
24      A.    And the question is what,

Page 87

1  Mr. Mahoney?
2  BY MR. MAHONEY:
3      Q.    The question is, did you discuss
4  with Mr. Pavlis, for example, what his rate of
5  return would be on this $6 million investment
6  before he agreed to make it?
7      A.    We -- we discussed hundreds of
8  times he -- probably hundreds.  Felt like
9  hundreds.
10      Q.    I'm not interested in what --
11      A.    I wasn't finished answering the
12  question, Mr. Mahoney.
13      Q.    Well, you're not answering the
14  question, Mr. Billingsley.
15      A.    If given a chance, I might have.
16      Q.    I'm not interested in multiple
17  discussions.
18          I'm interested in, did you tell
19  Mr. Pavlis, before he made this $6 million
20  investment, what the terms of the note would
21  be?
22      A.    So what I was trying to say was,
23  we had spoken many times before and many times
24  after.  The changes even after he wired the six

Page 88

1  million were constant.  We were constantly
2  going -- I was constantly going down and
3  talking with him about the new documents, the
4  new documents.
5          Again, you know, maybe this
6  doesn't support your story line or the way you
7  want to see it, but it was a very fluid
8  arrangement.  And Frank trusted that we would
9  get it done right and that we would work with
10  all of our -- all of our heart, of which I did.
11  And that's -- that was the end result, was that
12  it was a very fluid arrangement.
13      Q.    So your testimony is that
14  Mr. Pavlis parted with $6 million without
15  knowing exactly what the repayment terms would
16  be?
17          MR. GREEN:  Object to form.
18      A.    I don't -- I can't sit here and
19  say what he knew or didn't know at the time.
20  BY MR. MAHONEY:
21      Q.    Did you tell him exactly what
22  the repayment terms would be?  That's a pretty
23  simple question.
24      A.    I believe I've answered it,

Page 89

1  Mr. Mahoney.  We spoke about many different
2  iterations, many different versions, and it
3  changed before and it changed after.
4      Q.    I'm talking about before he made
5  the $6 million investment, what was your
6  understanding as to what the repayment terms
7  would be on the note.
8      A.    I understand --
9          MR. GREEN:  Object to form.
10          MR. MAHONEY:  Let me finish.
11          MR. GREEN:  Okay.
12  BY MR. MAHONEY:
13      Q.    I understand you're saying they
14  changed down the road.  I'm talking about at
15  the time he decided -- or let's just say at the
16  time he signed the subscription agreement.
17      A.    You're asking -- you're asking
18  for the --
19      Q.    Did you tell him the terms of
20  the note as of the time he signed the
21  subscription agreement?
22      A.    No, I don't think it happened
23  like that.  I think it was, he felt that we
24  were close enough in our understanding.  He

23 (Pages 86 - 89)

JUSTIN C. BILLINGSLEY

Page 90

1 felt that he knew enough to send the money for
2 us to get started. We had signed several
3 documents, many documents. And I felt that he
4 felt -- I know that he felt very comfortable in
5 where things were.
6        MR. MAHONEY: Cam, next 221,
7    please, which is the second piece of
8    P-65.
9 BY MR. MAHONEY:
10   Q.    All right. Mr. Billingsley,
11 this is a second subscription agreement. This
12 one is for $6 million.
13        MR. MAHONEY: Cam, if you flip
14    through for a couple of pages.
15 BY MR. MAHONEY:
16   Q.    Again, do you recognize the
17 writing on that page?
18   A.    You're talking about at the top
19 of the page?
20   Q.    Yes. Someone wrote "Frank
21 Pavlis."
22        Do you recognize that writing?
23   A.    It looks like it could have been
24 my writing. I'm not certain. We had many

Page 91

1 documents.
2    Q.    Well, you don't have many
3 different types of writing, do you?
4        MR. GREEN: Object to form.
5    A.    Oddly enough, you know, I do.
6 My wife always makes fun of me that I'll begin
7 writing a letter and end it with incredibly
8 different handwriting.
9 BY MR. MAHONEY:
10   Q.    Do you recall meeting with
11 Mr. Pavlis and having him sign this
12 subscription agreement?
13   A.    It -- it wouldn't surprise me.
14 We -- we met on many times and signed many
15 documents, many forms of different subscription
16 agreements.
17   Q.    You'll see, by the way, this
18 purports to be a $6 million face amount in
19 connection with a two-year note.
20        Do you see where --
21        MR. MAHONEY: Cam, if you go
22    back. I'm sorry, that page would have
23    been fine, too.
24 BY MR. MAHONEY:

Page 92

1    Q.    Do you see where it says
2 two-year note, that box has been crossed off?
3    A.    I see that, yes.
4    Q.    So is it your understanding that
5 when Mr. Pavlis signed this, he was under the
6 impression that this note would mature in two
7 years?
8        MR. GREEN: Object to form.
9    A.    I can't speak to what he
10 understood or he knew. I can tell you one of
11 the things that -- ==one of his agitants was that==
12 ==he did not want the money to come back to his==
13 ==estate. So he was constantly pushing for a==
14 ==longer term, a longer term. Very annoyed and==
15 ==worried about the investments maturing and==
16 ==coming back to his estate and creating a tax to==
17 ==him personally.==
18 BY MR. MAHONEY:
19   Q.    Walk me through that. Tell me
20 what you recall of his expression of that
21 concern.
22   A.    I just did. Do you want me to
23 repeat it?
24   Q.    Is there anything else you can

Page 93

1 add?
2    A.    It was his concern. He did not
3 want the money to come back to his personal
4 estate. ==In his expressions, he wanted the==
5 ==money to pass to his trust at his death.==
6    Q.    Well, if that were the case,
7 then why is he apparently agreeing here or why
8 did you discuss with him a two-year note?
9        MR. GREEN: Object to form.
10   A.    Yeah, I can only imagine it was
11 one of the things that he would have said.
12 This is fine for now. We'll have to change
13 this, at which I believe eventually we did.
14 BY MR. MAHONEY:
15   Q.    You didn't think to put in
16 writing any of these discussions with
17 Mr. Pavlis?
18        You're talking about a fair
19 amount of money here, right, a total of
20 $7 million?
21        MR. GREEN: Object to form.
22 BY MR. MAHONEY:
23   Q.    And it didn't occur to you to
24 confirm what he was telling you so you had a

24 (Pages 90 - 93)

JUSTIN C. BILLINGSLEY

Page 94

1 record of it?
2     A.     To make a record of what he was
3 telling me?
4     Q.     Yes.
5     A.     I mean, I would have had to have
6 made a -- that would have been a pretty
7 expansive record.  I know Mr. Pavlis was pretty
8 secret, pretty private.  I believe that would
9 have really annoyed him.
10     Q.     So it didn't occur to you after
11 one of these meetings with Mr. Pavlis, when you
12 went home, just to jot down a couple of notes
13 to confirm what you discussed?
14         MR. GREEN:  Object to form.
15         THE WITNESS:  What was the
16     question, Mr. Mahoney?
17 BY MR. MAHONEY:
18     Q.     You're saying that it never
19 occurred to you that even without him knowing
20 about it, after one of these meetings, it never
21 occurred to you just to take down some notes so
22 that you would have a record yourself of what
23 he wanted through these investments?
24         MR. GREEN:  Object to form.

Page 95

1     It's also argumentative.
2         You can answer.
3     A.     Writing down things that he said
4 without him knowing about it would have felt
5 dishonest.
6 BY MR. MAHONEY:
7     Q.     And by the way, is it your
8 understanding that Gary Miller was aware that
9 these two investments that Mr. Pavlis had made
10 in his company weren't really intended to be
11 for his company?
12         MR. GREEN:  Object to form.
13     A.     I don't know what Gary Miller
14 knew.
15 BY MR. MAHONEY:
16     Q.     Well, did you tell Gary Miller
17 that the plan from the beginning was that Frank
18 was going to invest $7 million, or first a
19 million and then six, in Allwest, but really he
20 was investing in Key Commercial?
21         MR. GREEN:  Object to form.
22     A.     Yeah, I believe right back at
23 the very beginning, there -- there could have
24 been some discussion very, very early on about

Page 96

1 me buying Allwest, me owning Allwest, and Gary
2 retiring out of Allwest.  But I -- I believe
3 those conversations went away pretty quickly.
4 And then we definitely settled into an
5 understanding that everything would become Key.
6 BY MR. MAHONEY:
7     Q.     Did he express any discomfort
8 with the fact that even though you say you had
9 this understanding that everything would become
10 Key, that he was obligated or his company was
11 obligated to pay back $7 million worth of
12 notes?
13         MR. GREEN:  Objection to form.
14     A.     I don't know what he was
15 uncomfortable with.
16 BY MR. MAHONEY:
17     Q.     I didn't ask you that.  I asked
18 you, did he tell you that?
19     A.     Did he tell me what?
20     Q.     That he was uncomfortable with
21 the fact that his company was obligated, under
22 these documents, the $7 million repayment of
23 notes?
24     A.     Uncomfortable with it?  No.  He

Page 97

1 was a seasoned business professional this way.
2 He wanted things done quicker.  He was trusting
3 me and my legal team.  And quite often got
4 annoyed that things weren't done quick enough.
5         But then as soon as we -- you
6 know, we would try to get stuff done, he would
7 want to make a change.  So we would -- there
8 was a lot of back and forth in the process as
9 we went through the iterations.
10         MR. MAHONEY:  Cam, let's put up
11     CHRON010, 10.
12         MS. REDFERN:  This one was
13     previously marked P-2.
14 BY MR. MAHONEY:
15     Q.     All right.  Mr. Billingsley, P-2
16 purports to be a confidential private placement
17 memorandum for Key Commercial Finance, LLC,
18 dated August 1, 2014.
19         Are you familiar with this
20 document?
21     A.     I had familiarity with the
22 single page that I'm looking at.
23     Q.     Do you recall, as of August 1st,
24 2014, Key Commercial Finance having a private

25 (Pages 94 - 97)

JUSTIN C. BILLINGSLEY

Page 98

1 placement memo?
2    A.    I seem to recall, yes.
3    Q.    Who prepared this memo, this
4 PPM?
5    A.    It was mostly me.
6    Q.    How did you know what to put in
7 it?
8    A.    I took examples from other PPMS
9 I found.  I took examples from the PPM that
10 Wilson Sonsini had developed.  I asked for some
11 advice.  Jeff Peterson had a lot of input on
12 how to properly organize the thinking, risk
13 factors, things like that.  So a lot of
14 different conversations with professionals
15 around me and examples of documents that I had.
16          MR. MAHONEY:  Hold on for one
17 second.
18          - - -
19          (Whereupon, a discussion was
20 held off the record.)
21          - - -
22 BY MR. MAHONEY:
23    Q.    Did you have any attorney review
24 this before you presented it to anyone?

Page 99

1    A.    I don't recall.
2    Q.    And what was the purpose of you
3 preparing this private placement memo?
4    A.    In the hopes that -- that, you
5 know, I would continue to be able to progress
6 everything that I was working to progress on.
7 I was looking to speak to many, many investors.
8 And I was looking to speak to many great
9 partners like Redwood, like Blue Mountain, in
10 the hopes that I would be able to do what I was
11 out to do.
12    Q.    Did you speak with other people
13 besides Mr. Pavlis about this private placement
14 memorandum?
15    A.    I believe I did, yes.
16    Q.    Who else do you recall speaking
17 with about this private placement memorandum?
18    A.    About that private placement
19 memorandum?
20    Q.    Yes.
21    A.    I don't recall.
22    Q.    You can't recall anyone other
23 than Mr. Pavlis; is that right?
24    A.    I don't believe I said that I

Page 100

1 recalled giving this to Mr. Pavlis.  Did I?
2    Q.    I thought you did, but let's be
3 clear.
4          Did you provide this private
5 placement memorandum to Mr. Pavlis?
6    A.    It seems to make sense.  I don't
7 recall.  We looked at many versions of many
8 documents.
9    Q.    Okay.
10    A.    It was a very long time ago.
11          MR. MAHONEY:  Cam, let's take a
12    look at P-3, which is CHRON009.
13 BY MR. MAHONEY:
14    Q.    Mr. Billingsley, this purports
15 to be a subscription agreement of Key
16 Commercial Finance, LLC, a Delaware Limited
17 Liability Company, effective as of August 18th,
18 2014.
19          Do you recognize this document?
20 And if you want to flip through it, feel free.
21    A.    And do you want me to tell you
22 whether or not I recognize it?
23    Q.    Yes, I do.
24          THE WITNESS:  Cam, let me

Page 101

1    request control, please.
2 BY MR. MAHONEY:
3    Q.    Well, before we spend a lot of
4 time, if you intend to read the whole thing,
5 I'm going to stop you there.
6          Do you recall having a
7 subscription agreement prepared as of
8 August 18th, 2014 for Key Commercial Finance?
9    A.    As of -- yeah, it seems to make
10 sense that we did; yes.
11    Q.    And why did you prepare the
12 subscription agreement?
13    A.    Because we were looking to do
14 the business that we were focused on doing.
15          Let me take some time,
16 Mr. Mahoney.  If you'd like me to speak to the
17 specifics of this document, let me take some
18 time to review it.
19    Q.    Yes.  I'm not asking you to
20 speak to the specifics of the document.
21    A.    But you just did.
22    Q.    No, I didn't.  I asked you if
23 you recalled the document.  So I'm going to
24 continue to ask questions.

26 (Pages 98 - 101)

JUSTIN C. BILLINGSLEY

Page 102

1          Who prepared this document?
2     A.     That's a good question.  Let me
3 take some time to review it and I'll let you
4 know.
5          (Pause)
6          Yes, Mr. Mahoney, this looks
7 like a document that I would have prepared.
8     Q.     I didn't catch the last part of
9 what you said, Mr. Billingsley.
10     A.     Sorry.  It looks like a document
11 that I would have prepared.
12     Q.     Presumably, you prepared this on
13 or before August 18th of 2014; is that right?
14     A.     I wouldn't be able to recall
15 when I prepared it.
16     Q.     Well, if you prepared it, and
17 the first page says, "Effective as of
18 August 18, 2014," does that not indicate to you
19 that you prepared this on or before August 18th
20 of 2014?
21     A.     No, that doesn't indicate that
22 to me at all.
23     Q.     Why would that not indicate that
24 this was prepared as of that date?

Page 103

1     A.     Because it's -- it could have
2 easily been prepared quite a bit before.
3     Q.     Right.  That's why I said on or
4 before.
5     A.     It could have been prepared
6 after.
7     Q.     Well, then why would you have an
8 effective date of August 18th of 2014 if it was
9 prepared after that date?
10     A.     I just don't remember this --
11 the circumstances related to this.  And you're
12 asking me to testify under oath that I do.  So
13 my answer to you is that I -- I don't remember
14 if this was prepared on or before or after
15 August 18th.
16     Q.     And I'm asking you, why would
17 you think it might be prepared after
18 August 18th of 2014?
19     A.     Because as I've explained, we
20 were under a very fluid document circumstance.
21 Startups are very messy.  I was working really
22 hard to make sure Frank got exactly what he
23 wanted.  Frank was crystal clear on what he
24 wanted.  And changes were constantly made.

Page 104

1     Q.     Well, I'll go back.  Strike that
2 for a second.
3          So let's go through it.  Go to
4 the signature page, if you will, which is six
5 or seven pages in.
6          When did Mr. Pavlis sign this
7 document?
8     A.     I don't recall.
9     Q.     Do you recognize his signature
10 there?
11     A.     Which signature?
12     Q.     Well, there's only one signature
13 by Mr. Pavlis.
14          Do you recognize that as his
15 signature?
16     A.     Do I recognize Frank's signature
17 as his?  Yes, I believe I do.
18     Q.     And is that your signature
19 beneath his?
20     A.     Yes, it looks like it is.
21     Q.     And when do you recall signing
22 this?
23     A.     Oh, I don't recall.  We did this
24 many times.

Page 105

1     Q.     I'm talking about this
2 particular document.
3     A.     I just don't recall when we
4 would have done this particular document.
5     Q.     Why did you have Mr. Pavlis sign
6 this document?
7     A.     Because it was important to have
8 documents in place with Mr. Pavlis.
9     Q.     Once you had Mr. Pavlis sign
10 this document, what happened to the original?
11     A.     This is the original.
12     Q.     Well, in fairness, this is a
13 copy that was produced in discovery.
14          I'm asking if I wanted to find
15 the actual document that had Mr. Pavlis' actual
16 signature on it, where would I find that?
17     A.     I -- I don't understand.  We
18 produced it to you.  We're looking at it.
19     Q.     No.  I'm talking about the
20 original.  Mr. Pavlis presumably took a pen and
21 signed his name, right?
22     A.     Yes.
23     Q.     Okay.  Where would I find or
24 where would you find that document that has his

27 (Pages 102 - 105)

JUSTIN C. BILLINGSLEY

Page 106

1 wet signature, if you will, his actual
2 pen-to-paper signature?
3      A.      Oh, the paper version?  When we
4 converted to digital, all of the originals were
5 made digital.
6      Q.      And then what did you do with
7 the originals?
8      A.      I would imagine with all of our
9 paperwork, it was discarded.
10      Q.      When did that take place?
11      A.      When did we dis -- we moved to
12 different offices, we would become more and
13 more paper light and more and more digital,
14 until we got to the point where we were
15 entirely digital.  The paperwork just became
16 too difficult to move from office to office.
17      Q.      Would there be some digital
18 record of when a document such as this was
19 converted into a digital format?
20      A.      Whatever was produced.
21      Q.      I'm asking you if you know
22 whether there would be a digital footprint, if
23 you will, that would show when this document
24 was converted to a digital format for your

Page 107

1 recordkeeping.
2      A.      I -- I don't know.  We would
3 have -- we would have one of our admins take a
4 box of paperwork and -- and scan it down at the
5 local Staples or scan it somewhere.  I don't
6 know what the process was.  And we would upload
7 it into digital files.
8      Q.      Now, let me ask you this:  This
9 document indicates that Key Commercial Finance
10 was a Delaware Limited Liability Company.  And
11 if you go back to the first page of the
12 subscription agreement --
13          MR. MAHONEY:  And, Cam, I don't
14      know who's controlling it, but if
15      somebody would go back to the first page
16      of this document.
17          THE WITNESS:  Sure.
18          MR. MAHONEY:  And the next page,
19      the actual agreement, please.
20          There you go.  Go back one.
21      Okay.
22 BY MR. MAHONEY:
23      Q.      So this document says that,
24 again, Key is a Delaware Limited Liability

Page 108

1 Company and it begins, "This Subscription
2 Agreement of Key Commercial Finance, LLC, a
3 limited liability company organized under the
4 laws of Delaware, is entered into and made
5 effective as of August 18th, 2014 by and among
6 Frank Pavlis," and has his address, and it
7 continues, "and all other persons or entities
8 who shall execute and deliver this Agreement or
9 authorized counterparts or facsimiles of the
10 same pursuant to the provisions hereof."
11          So as I read that, that purports
12 to say that the agreement was entered into on
13 August 18th of 2014.
14          Do you have a reason to doubt
15 that?
16      A.      I have a reason to doubt how you
17 read it?
18      Q.      Do you have a reason to doubt
19 that this was entered into on or about
20 August 18th of 2014?
21      A.      If I have reason to doubt it.
22      I -- I would be hesitant -- I
23 think it makes sense to conclude that.  Again,
24 there were so many versions and so many

Page 109

1 documents, but I -- I'm fine to be comfortable
2 to say that -- that August 18th is a date.
3      Q.      Well, I understand it's a date.
4          My question is, is it the date
5 on or about which this agreement was made?
6      A.      Yeah, I don't -- I wouldn't say
7 that that's when it was made.  It could have --
8 I could have accidentally or inadvertently
9 failed to keep the dates crisp on the document.
10 There were many versions and I'm not a lawyer.
11 I had my lawyers to review this.  They said it
12 all looked fine.
13      Q.      Again, which lawyers reviewed
14 this document?
15      A.      I believe Snell & Wilmer.
16      Q.      Okay.
17      A.      I also believe -- I also believe
18 Martin Hewitt and I think Hillel also -- you
19 know, we had lots of attorneys review this.
20      Q.      Why would you have three
21 attorneys review it instead of just one?
22      A.      It was over the course of many
23 years.  It wasn't -- you know, again, I note
24 your story line wants to make everything happen

28 (Pages 106 - 109)

JUSTIN C. BILLINGSLEY

Page 110

1 in a crisp moment to find a definitive serial
2 thrust that you're looking for.  But this was
3 over the course of many years and many
4 attorneys being hired and engaged.  And every
5 time an attorney or a firm would get engaged,
6 they would want to know the backstory and
7 understanding.  And this was part of that.
8     Q.     Well, that may be you explaining
9 things to attorneys.  But in terms of someone
10 saying, yes, this document is good and it could
11 be signed, is it your testimony that multiple
12 attorneys were involved in that process?
13     A.     In reviewing documents before
14 they were signed?
15     Q.     Yes.
16     A.     I don't recall having those
17 discussions.
18     Q.     And once Mr. Pavlis signed this
19 document, you indicated that you had the paper
20 agreement for some period of time.
21           Did you leave a copy with
22 Mr. Pavlis?
23     A.     Yeah, for a long time, he had
24 a -- a big binder with everything in it.

Page 111

1     Q.     Now, you say, "for a long time."
2 To your knowledge, did there come a time when
3 he no longer had that binder?
4     A.     Yeah, he -- I don't recall all
5 the exact specifics.  But if I can remember
6 right, he was looking to get ready to move over
7 to the Skeanses' business opportunity at
8 Legacy.  And that had delayed so, so many
9 times.  But in him trying to get ready and
10 prepare, he was extremely careful about those
11 types of things.  He wanted me to pick the
12 documents up and keep them in our office.
13     Q.     When do you recall Mr. Pavlis
14 asking you to pick up his binder of documents
15 and keeping them at your office?
16     A.     I don't recall.  It was sometime
17 in -- sometime in that time frame.
18     Q.     You can't even give me a year?
19     A.     No.  It shouldn't be hard to
20 figure out.  It's whenever he was -- I don't
21 know.  Maybe six months to 12 months before he
22 was moving over to Legacy Place.  I just don't
23 recall the details.
24     Q.     What did you do with that

Page 112

1 binder?
2     A.     Every piece of paperwork we had,
3 it was converted to digital.
4     Q.     Did you tell Mr. Pavlis that you
5 were discarding the originals after you had
6 converted documents to digital?
7     A.     I don't remember having that
8 conversation.
9     Q.     Is it fair to say, though, that
10 when you did convert to digital, you just took
11 the documents, and whoever it was scanned them
12 as they were and uploaded them to some digital
13 storage facility or platform?
14     A.     Whatever was produced is what --
15 is what it was.
16     Q.     So let's go back to the
17 signature page on this.
18           Now, the document purports to be
19 a subscription agreement between Mr. Pavlis and
20 Key Commercial Finance, which, of course,
21 didn't exist in August of 2014, correct?
22           MR. GREEN:  Object to form.
23 BY MR. MAHONEY:
24     Q.     You're aware of that, right,

Page 113

1 Mr. Billingsley?
2     A.     I don't recall the dates.  We
3 had attorneys involved.  I was relying on the
4 attorneys to do their jobs.
5     Q.     Right.  Okay.  So this document
6 says, "The undersigned hereby represents and
7 warrants that all of its answers to this
8 Investor Questionnaire are true as of the date
9 of its execution of the Subscription Agreement
10 pursuant to which it purchased Notes of the
11 Company."
12           Do you see that?
13     A.     I see that.
14     Q.     Okay.  So this, by definition,
15 the signature page relates to an investor
16 questionnaire, not a subscription agreement.
17           Can you explain that?
18           MR. GREEN:  Object to form.
19     A.     I don't read it that way.  It
20 says, "execution of the Subscription
21 Agreement."
22 BY MR. MAHONEY:
23     Q.     Okay.  So even though it says,
24 "The undersigned hereby represents and warrants

29 (Pages 110 - 113)

JUSTIN C. BILLINGSLEY

Page 122

1 fluid environment where there were many, many
2 documents, many, many trips. That when we
3 would decide to sign a version, then we would
4 sign it. And this is what I believe happened
5 in this case. And then we would have more
6 documents and then we would sign those, and
7 then things would change.
8     Q.     Isn't it true, Mr. Billingsley,
9 that you created this document in 2018 in
10 response to my request for documents relating
11 to Mr. Pavlis' investments?
12     MR. GREEN: Object to the form.
13 BY MR. MAHONEY:
14     Q.     Is that true?
15     A.     That I created this document?
16 That's -- that's not true.
17     Q.     So you didn't create this
18 document or any other documents in response to
19 my request for them in 2018? Is that your
20 testimony?
21     A.     I sent you documents that I had.
22     Q.     And my question is, when you
23 sent them -- and I'll represent to you you sent
24 this in June of 2018.

Page 123

1     My question is, did you create
2 those documents in or around June of 2018 or
3 are you saying that you simply found them in
4 your digital storage file, or whatever you call
5 it, and provided them to me?
6     MR. GREEN: I'll object to form.
7     You can answer.
8     A.     Explain that I created them,
9 Mr. Mahoney. What does that mean?
10 BY MR. MAHONEY:
11     Q.     Yes, it means they didn't exist
12 before June of 2018. And then they existed
13 before you sent them to me in June of 2018.
14     A.     How could anybody conclude such
15 a ridiculous thought? There is incredible
16 amounts of evidence and proof that there were
17 many, many versions of documents. Why -- why
18 would I not have documents? Why would I need
19 to create them, when I had so many documents
20 and I had legal counsel involved? Why would I
21 do that? What's . . .?
22     Q.     Well, this is one-way street,
23 Mr. Billingsley. I ask the questions. You
24 give the answers.

Page 124

1     So you're saying that you didn't
2 create them in 2018; is that right?
3     A.     No, I did not create these
4 documents for the first time in 2018; no.
5     Q.     And would your answer be the
6 same if I asked you about the private placement
7 memorandum that we looked at earlier today that
8 was purportedly dated August 1st of 2014?
9     Did you create that document in
10 or around June of 2018 or was that document
11 created in or around August of 2014?
12     A.     That was definitely at the time
13 that the document was useful is when -- when it
14 was created. We were constantly working on
15 documents. Jeff Peterson was working with me.
16 Silberman was working with me. Don Bivens.
17 You know, yeah, there was lots of documents.
18 There's not -- there's no chance that I created
19 documents to send you in 2018.
20     MR. MAHONEY: All right. Cam,
21 we're done with this. Thank you.
22     Cam, can we look at CHRON101,
23 which was previously marked as P-4.
24 BY MR. MAHONEY:

Page 125

1     Q.     All right. Mr. Billingsley,
2 this is a copy of what purports to be a
3 $3 million convertible promissory note dated
4 September 1, 2014 from Key Commercial Finance,
5 LLC to Mr. Pavlis.
6     Tell me when this document was
7 created, please.
8     A.     I don't recall.
9     Q.     Was it created on or before
10 September 1 of 2014?
11     A.     I would believe it was. We were
12 working on these documents months before that.
13     Q.     Months before. So you started
14 the process of drafting a promissory note
15 months before September of 2014; is that right?
16     A.     Correct.
17     Q.     Do you recall presenting this to
18 Mr. Pavlis for signature?
19     I take that back. In fairness,
20 the note is not signed by Mr. Pavlis. The
21 corresponding note purchase agreement is.
22     Do you recall having or
23 presenting Mr. Pavlis with a copy of the note
24 and the note purchase agreement for his

JUSTIN C. BILLINGSLEY

Page 130

1    more time to hit request?
2         THE WITNESS:  Okay.  Thank you.
3         (Pause)
4    A.     So, Mr. Mahoney, you'd like to
5  know who prepared this document?
6  BY MR. MAHONEY:
7    Q.     That's the question.
8    A.     I worked largely with Jeff
9  Peterson and Michael Silberman on preparing
10 this document.
11   Q.     Why would they have any role in
12 preparing a document on behalf of Key
13 Commercial Finance?
14   A.     Everything was working together
15 at that time.  We were working to have JV
16 structures, JV opportunities between -- across
17 all the entities that were involved with Mobile
18 Corporation, Key Commercial Finance.  We were
19 looking for good opportunities to be together.
20   Q.     Well, the word "Mobile" is not
21 mentioned in this document.
22        So, again, why would they have
23 any role in preparing it?
24   A.     That was the intent, was that we

Page 131

1  would be working together in the future in all
2  of this work.
3    Q.     So whose idea was it to have
4  this note be dated September 1, 2014?  Why that
5  date?
6    A.     Dated what date?
7    Q.     The note itself is dated
8  September 1, 2014.
9    A.     Yeah, it just would have been
10 the organic process that was happening with
11 Frank in all of the business operations at that
12 time.
13   Q.     Well, by this point, Mr. Pavlis
14 had already invested $7 million in Allwest,
15 correct?
16   A.     No, I've never agreed to that.
17   Q.     Oh, that's right.  It's your
18 view that he actually invested in Key
19 Commercial, right?
20   A.     That was his intent, was that
21 there would be a broader, bigger picture,
22 bigger project.
23   Q.     So by this point, the $7 million
24 had left Mr. Pavlis' possession.

Page 132

1    Why wasn't this note made for
2  $7 million?
3    A.     I forget all the details that
4  were -- we were working with Frank.  Frank was
5  very particular about all of these details.  I
6  could have answered that question very well
7  maybe five or six years ago.  I don't remember
8  all the details that influenced that decision
9  now.
10   Q.     This purports to be a note that
11 would pay Mr. Pavlis eight percent annually for
12 a period of five years.  But the interest would
13 not be paid until the end of the five-year
14 period.
15        Is that your understanding?
16   A.     I -- I don't recall.  If you
17 would like me to work through the document, I
18 can verify that.
19   Q.     No.  I'm going to ask you to
20 accept the representation that I made that
21 that's what it says.
22        And my question is this:  How
23 did you come up with eight percent interest
24 annually, but payable at the end of five years?

Page 133

1    A.     I had worked with, you know,
2  everyone that was in our world at that time.  I
3  know that the -- the pref payment of eight
4  percent, preferred payment of eight percent,
5  was something that was very standard with Greg,
6  Greg Owen, and his portfolio.  It was something
7  that Gary had used a lot with his work at
8  Landsmith, with the 30, 40, $50 million that
9  they were working.
10        Jeff had said that it was a good
11 rate, it was a healthy relationship, way to
12 structure the relationship.  And I remember
13 talking to the guys at Snell & Wilmer about it,
14 and they said it makes sense, also.
15   Q.     Now, again, Key Commercial
16 Finance, LLC did not exist as a corporate
17 entity as of September 1, 2014.  And by
18 definition, it had no business operations up
19 and to that point, correct?
20        MR. GREEN:  Objection.  Calls
21 for a legal conclusion.
22 BY MR. MAHONEY:
23   Q.     You can answer.
24   A.     I remember my attorneys had

34 (Pages 130 - 133)

JUSTIN C. BILLINGSLEY

Page 134

1  instructed me and advised me that we absolutely
2  could conduct business and be very engaged in
3  business.  And that the formality of document
4  filings shouldn't stop or impede us doing work
5  and business.
6      Q.      Okay.  But as a person involved
7  in that business, didn't you have some interest
8  in getting all of this done the right way?
9          MR. GREEN:  Objection, form.
10     A.      I believe it absolutely was done
11  the right way.
12  BY MR. MAHONEY:
13     Q.      Apart from trying to document
14  Mr. Pavlis' investment, what other business was
15  Key Commercial in as of September 1 of 2014?
16     A.      I was attempting many, many
17  business endeavors.  As we previously
18  discussed, I was working to engage with larger
19  JV groups, with Redwood and Blue Mountain, I
20  believe many others.  We were looking to
21  comfortably -- I was working hard to position
22  Key to be involved in a public -- Mobile
23  Corporation going public.
24          Mobile Corporation, we had made

Page 135

1  arrangements for their very high valued brand
2  called Mobile.agency to be part of the Key
3  ecosystem, which would perfectly position us
4  for acquisition by Mobile Corporation when
5  Mobile Corporation went public and they had
6  liquidity to do so.
7          I was working and very excited
8  about potentials with the Skeanses previous.
9  You know, we were -- that's a very long list of
10  opportunities that I was working to develop.
11     Q.      As of September 1 of 2014, did
12  Key Commercial Finance have a bank account?
13     A.      I don't recall.  That was --
14  that was Chad's work.  I left the
15  administrative work to Chad.  We -- we had
16  this -- we worked hard in our lanes.
17     Q.      As of September 1, 2014, do you
18  know whether Key Commercial Finance had
19  generated any revenue whatsoever as a result of
20  its operations?
21     A.      I don't -- I don't believe
22  revenue has anything to do with a viable
23  business opportunity.  LinkedIn didn't generate
24  a penny of revenue for seven years after

Page 136

1  that --
2      Q.      I didn't ask you that question.
3          THE COURT REPORTER:  I'm sorry,
4  you cut out.
5          MR. MAHONEY:  That's all right.
6  BY MR. MAHONEY:
7      Q.      It's a yes or no question,
8  Mr. Billingsley.
9          As of September 1, 2014, had Key
10  Commercial Finance generated any revenue?
11     A.      I -- as of 2014, generated --
12     A.      I'm sorry, as of September 1,
13  2014.
14     A.      Yeah, I don't recall.  We could
15  have.  I don't recall.
16     Q.      What exactly was Key Commercial
17  Finance's business?
18     A.      So the -- the large scale
19  structure was through the means of flipping,
20  buying, remodeling and selling, to -- to have
21  good revenue generation, steady revenue
22  generation, that the capital would then be used
23  and any possible revenues that could be
24  generated would be used to develop a technology

Page 137

1  platform for the real estate industry.
2      Q.      Did you explain that to
3  Mr. Pavlis?
4      A.      Oh, yes.  Frank was -- was very
5  interested in technology, which is, I'm sure,
6  what led him to invest in Mobile Corporation.
7          Frank agreed with me that the
8  real estate industry was ripe for massive
9  disruption through technology and the ability
10  to -- to create a much more organized market.
11     Q.      You said that Mr. Pavlis was
12  very interested in technology?
13     A.      Yeah.  The investment
14  opportunity with technology, yeah.  He saw it
15  as --
16     Q.      You have to -- I'm sorry, finish
17  your response, please.
18     A.      He saw it as a -- as an
19  attractive investment opportunity.
20     Q.      What did he say to you that led
21  you to believe that?
22     A.      His, you know, constant reading
23  all of his magazines, newspapers.  He would
24  talk about opportunities inside technology

35 (Pages 134 - 137)

JUSTIN C. BILLINGSLEY

Page 138

1  investments.  I remember him educating me
2  extensively on technology investments related
3  to ETFs, which he invested in a lot.  And he
4  was very attracted to, you know, potential
5  opportunities with technology investments.
6      Q.     You're aware the man never even
7  had a computer, right?
8      A.     Oh, yeah.  I thought it was
9  ironic and awesome that he understood things
10 the way he did, given that he was not a user in
11 any respect.  Just awesome.
12         MR. MAHONEY:  Okay.  Sure.
13     Cam, let's go down to the
14     signature page of this note.
15 BY MR. MAHONEY:
16     Q.     Mr. Billingsley, this purports
17 to be signed by Michael Silberman on behalf of
18 Key Commercial Finance, LLC, as executive vice
19 president.
20         How is it that Mr. Silberman's
21 signature came to be on this document?
22     A.     Yeah, you'll have to ask Jeff.
23     Q.     Well, I'm asking you.
24     A.     I didn't collect the signature

Page 139

1  from Michael.  Jeff Peterson did.  We were
2  working.  I was -- I was very attracted to the
3  opportunity with Mobile Corp. creation.  Who in
4  the world wouldn't be with a public company
5  CEO, if it had a company that he took up to
6  half a billion dollar market cap, traded on the
7  NASDAQ and the S&P, had massive liquidity event
8  and was able to garnish extraordinary support
9  from unbelievably reputable and powerful
10 profiles like Alan Bersin, who was then the
11 assistant secretary --
12     Q.     I'm going to interrupt you --
13     A.     -- of Homeland Security --
14     Q.     I'm going to interrupt you
15 because you're not answering my question.
16         MR. MAHONEY:  Cheryl, please
17     read back the question.
18             - - -
19     (Whereupon, the court reporter
20     read back the following:
21     "QUESTION:  Mr. Billingsley,
22     this purports to be signed by Michael
23     Silberman on behalf of Key Commercial
24     Finance, LLC, as executive vice

Page 140

1  president.
2         "How is it that Mr. Silberman's
3     signature came to be on this document?
4         "ANSWER:  Yeah, you'll have to
5     ask Jeff.
6         "QUESTION:  Well, I'm asking
7     you.")
8             - - -
9  BY MR. MAHONEY:
10     Q.     So what's your understanding as
11 to why Mr. Silberman's name appears on this
12 note as executive vice president of Key
13 Commercial Finance?
14         MR. GREEN:  Well, objection to
15     the form.  I think he answered that.
16         MR. MAHONEY:  Yes, I don't think
17     he did.
18 BY MR. MAHONEY:
19     Q.     But answer my question, please.
20     A.     Mr. Mahoney, will you interrupt
21 me again?
22     Q.     If you don't answer my question,
23 I surely will, yes.
24         So --

Page 141

1      A.     Would you prefer my questions
2  (sic) be brief according to your opinion or
3  would you like the truth?
4      Q.     I'd like you to answer my
5  questions.
6         So let me go at it this way:
7  When did Mr. Silberman become the executive
8  vice president in Key Commercial Finance?
9      A.     So there's a bigger answer to
10 your question, although I'm sure that, again,
11 it doesn't paint your story well.
12     Q.     No.  I'd just like the answer to
13 the question that I put to you.
14         When did he become executive
15 vice president of Key Commercial Finance, LLC?
16         MR. GREEN:  Object to form.
17     A.     So as I was explaining, there
18 were lots of reasons why I was relying upon
19 Jeff to gather this signature to help with the
20 document development.  The time of which
21 Michael became executive vice president, you
22 know, he was -- it was never something
23 incredibly formal.  It was Jeff required it.
24 Jeff said if we're going to do this, let's do

36 (Pages 138 - 141)

Page 142

1 it right. He trusted Silberman as CFO of
2 Quepasa when it went public back in '99, 2000.
3 And he wanted Silberman to -- to be -- if we
4 were going to continue to develop in the way
5 that we were planning and moving, he wanted
6 Silberman to be involved that way.
7         It made good sense to me.
8 Silberman was a highly trained licensed CPA,
9 skillful, very skillful man. So for a time,
10 there was an informal understanding and
11 acceptance by everyone that -- that he was the
12 executive vice president.
13 BY MR. MAHONEY:
14     Q.    So it's your testimony that he
15 was executive vice president for an LLC that
16 didn't exist yet.
17         Over how long a period of time
18 was this?
19         MR. GREEN: Object to the form.
20 BY MR. MAHONEY:
21     Q.    You can answer.
22     A.    I don't agree with any of that.
23     Q.    Okay. How long was he the
24 executive vice president of Key Commercial

Page 143

1 Finance?
2     A.    I don't recall. It was brief.
3     Q.    Why was it brief? If this was
4 all a plan to work with or for Mobile, why did
5 he not continue for nothing other than a brief
6 period of time?
7     A.    Things were becoming uncertain
8 in Mobile. Things were degrading at Mobile and
9 beginning to erode. And at the right time, I
10 no longer deemed it appropriate, for -- for Key
11 Commercial Finance, for Michael to be involved
12 that way.
13     Q.    Did Key Commercial pay Michael
14 Silberman any money in connection with his role
15 as executive vice president?
16     A.    I don't recall. I know we --
17 there was a lot of back and forth, a lot of the
18 monies that we paid attorneys. It wouldn't
19 surprise me at all if -- if Michael was
20 compensated through just the -- you know, all
21 of the goings-on that was happening at that
22 point.
23     Q.    What does that mean, "all of the
24 goings-on"?

Page 144

1     A.    The different entities that were
2 being formed and developed. And everyone was
3 trying hard to get Mobile to take its -- to go
4 public, its public filing. It's qualified for
5 it.
6         I was trying hard to be in the
7 right position at the right time with Key
8 Commercial Finance. So there was -- there was
9 lots of back and forth with everything we were
10 all trying to do.
11     Q.    You indicated that Mr. Peterson
12 wanted this done correctly, right?
13     A.    I believe Jeff worked really
14 hard to do everything correctly, yeah.
15     Q.    So if you had all of this back
16 and forth that if Mr. Silberman, through
17 Mr. Peterson, signed off as executive vice
18 president of Key Commercial, can you explain to
19 me why there was not a single e-mail up to and
20 including September 1 of 2014 between or among
21 you or either of those gentlemen that make any
22 reference to this?
23         MR. GREEN: I have an objection
24 to form.

Page 145

1     A.    I don't -- I don't think it's
2 appropriate or healthy to conclude that there
3 wasn't a single e-mail. I -- again, as I've
4 made it clear, e-mails were a very almost
5 infinitesimal small fraction of the
6 communication that happened.
7 BY MR. MAHONEY:
8     Q.    Do you have any idea how many
9 e-mails you produced in discovery in this case,
10 or I should say the defendants produced?
11     A.    I would imagine thousands upon
12 thousands. I don't know.
13     Q.    So how is it that either
14 Mr. Silberman or Mr. Peterson got this signed
15 document back to you so you could present it to
16 Frank?
17     A.    I don't recall. There was lots
18 of documents. It was a highly active time. I
19 don't recall the particulars on that.
20     Q.    Well, if he sent it by mail with
21 a cover letter, would you have kept the cover
22 letter?
23     A.    I don't recall. It was --
24 again, if this was important, somebody should

JUSTIN C. BILLINGSLEY

Page 146

1  have asked years ago.  It's been so many years,
2  I don't know.
3      Q.     If it was important, don't you
4  think you should have kept everything?
5              MR. GREEN:  Object to form.
6      A.     Well, that would be you assuming
7  I didn't.
8  BY MR. MAHONEY:
9      Q.     Okay.  Now around the same time,
10 September of 2014, Mr. Pavlis invested
11 $2 million in Mobile Corp., correct?
12     A.     Yeah, I don't -- I don't have a
13 clear memory as to when that happened.  That
14 sounds about the right time.
15     Q.     Okay.
16     A.     There should be documents for
17 it.
18     Q.     Yes.  Why did Mr. Pavlis, to
19 your knowledge, invest -- and it was two
20 separate investments, one at the beginning of
21 September, one at the end of September 2014.
22            To your knowledge, why did he
23 invest $2 million in Mobile Corp.?
24     A.     Well, as I mentioned, he was

Page 147

1  attracted to the opportunity.  He was attracted
2  to all the details and profiles involved.
3            You would have to ask those that
4  solicited and serviced that investment, though,
5  if you want a precise answer.
6      Q.     Okay.  So I presume from that,
7  that you believe you did not solicit or service
8  it.  So who did?
9      A.     How it was explained to me was
10 that the law firm of Wilson Sonsini was acting
11 as the -- as the registered representative in
12 that respect to talk to investors and speak
13 with them about those details.
14     Q.     Are you saying that you didn't
15 speak with Mr. Pavlis about investing in Mobile
16 Corp.?
17     A.     I spoke to many, many people
18 about Mobile Corporation.
19     Q.     I'm only interested in one
20 person, Mr. Pavlis.
21     A.     Did I speak with him about
22 investing?  Define speak to.  I introduced
23 Mobile Corp., and we talked about Mobile Corp.
24     Q.     So tell me how it is then that

Page 148

1  you believe somebody other than you was
2  involved in soliciting his decision to invest
3  in Mobile Corp.
4              MR. GREEN:  Object to form.
5              You can answer.
6      A.     Yeah.  He had interaction with
7  others.  I would -- I would assume that those
8  conversations happened there.
9  BY MR. MAHONEY:
10     Q.     How do you know he had
11 interactions with others about Mobile Corp.?
12     A.     I'm drawing that conclusion from
13 the fact that $500,000 was sent back from
14 Wilson Sonsini to Mr. Pavlis.  I had no -- I
15 had no idea of that.  So, obviously, there was
16 a lot of coordination going on there with
17 Mr. Pavlis from the Mobile Corp. guys.
18     Q.     So your testimony is based upon
19 an inference you're making from something that
20 happened back in April or so of 2013; is that
21 right?
22              MR. GREEN:  Object to form.
23              THE WITNESS:  I don't understand
24     the question.

Page 149

1  BY MR. MAHONEY:
2      Q.     Yes.  Well, you made reference
3  to the fact that $500,000 went back to
4  Mr. Pavlis.
5      A.     That was what you said.
6      Q.     And you're saying you don't know
7  anything about that; is that right?
8      A.     I don't; that's correct.
9      Q.     So I'm talking about September
10 of 2014.  So why would you assume that other
11 people spoke with Mr. Pavlis and solicited that
12 investment?
13     A.     Oh, because that was a very big
14 part of their operation requirements, is that
15 there had to be lots of due diligence and
16 discussion with the investors, of which they
17 did.
18     Q.     Were you party to any
19 conversations between Mr. -- or involving
20 Mr. Pavlis and anybody on behalf of Mobile?
21     A.     I don't recall.
22     Q.     Isn't it true that you were the
23 point person for these investments?
24              MR. GREEN:  Object to form.

38 (Pages 146 - 149)

JUSTIN C. BILLINGSLEY

Page 150

1    A.    Yeah, I don't believe so.  I
2 believe that I would make an introduction and
3 then the experts would do their job.
4 BY MR. MAHONEY:
5    Q.    Okay.  But just so I'm clear,
6 are you stating that as a matter of fact or is
7 that an assumption?
8         I know the part about making the
9 introduction, I get.  But when you say the
10 experts doing their job, do you know that that
11 took place or is that an assumption?
12    A.    I believe it took place.
13    Q.    Okay.  Do you recall having
14 communications with Mr. Silberman regarding the
15 documents going to you so you could present
16 them to Mr. Pavlis?
17    A.    I remember some discussions back
18 and forth about finished documents, completed
19 documents.  If I recall, he wanted me to give
20 them to Frank.
21    Q.    Give the completed documents?
22    A.    Pardon me?
23    Q.    That somebody wanted you to give
24 the completed documents to Mr. Pavlis?

Page 151

1    A.    That's -- that's all I can
2 recall.
3         MR. MAHONEY:  Cam, I'm sorry, it
4    just occurred me.  You can take this
5    document down now.
6 BY MR. MAHONEY:
7    Q.    Did Mr. Pavlis ever tell you who
8 he spoke with on behalf of Mobile about these
9 investments?
10    A.    I remember talking with Frank
11 about these topics.  I don't recall him
12 mentioning names.
13         MR. MAHONEY:  Cam, put up
14    document 246, please.
15         MS. REDFERN:  This will be P-66.
16              - - -
17         (Whereupon, Exhibit P-66 is
18    marked for identification.)
19              - - -
20 BY MR. MAHONEY:
21    Q.    Mr. Billingsley, this is an
22 e-mail dated September 26th of 2014 from
23 Mr. Silberman to a gentleman named Jonathan
24 Beecher, Tim Ingram and Omar Alam, if I'm

Page 152

1 pronouncing that correctly.
2         Do you know any of those
3 gentlemen?
4    A.    I seem to remember that those
5 were attorneys at Wilson Sonsini.
6    Q.    And Mr. Silberman -- and in
7 fairness, you were not copied on this.  But
8 Mr. Silberman writes, on September 26th, "Frank
9 making another $1 million investment.  Please
10 prepare new docs for that investment.  E-mail
11 only direct to Justin.  Not Frank."
12         Do you recall any discussion
13 with Mr. Silberman about you getting these
14 documents and not them going directly to Frank?
15    A.    Yeah.  I remember that he was
16 worried to make sure it was done right, because
17 Frank didn't have an e-mail address.  So he was
18 worried to make sure that it was all going to
19 get to Frank as it should be and -- and called
20 me to make sure that I was getting it done
21 right.
22    Q.    But I thought you said a moment
23 ago that you only recall getting the completed
24 documents from Mobile?

Page 153

1         MR. GREEN:  Object to form.
2    A.    In my opinion, that's what he's
3 talking about.
4         MR. MAHONEY:  Okay.  Cam, put up
5    249, please.
6         MS. REDFERN:  This is P-67.
7              - - -
8         (Whereupon, Exhibit P-67 is
9    marked for identification.)
10              - - -
11 BY MR. MAHONEY:
12    Q.    Mr. Billingsley, this is another
13 e-mail from September 26th of 2014.  This one
14 from Jonathan Beecher directly to you,
15 attaching a number of documents.
16         And he says, "Hello, Justin.  I
17 hope you are doing well.  In connection with
18 the proposed investment from Frank E. Pavlis in
19 Mobile Corporation's convertible note
20 financing, attached please find the following,"
21 and he attaches a note purchase agreement, a
22 draft convertible note.  And number three is,
23 "PDF Signature Page Packet."  And a little
24 farther down, he provides instructions as to

39 (Pages 150 - 153)

JUSTIN C. BILLINGSLEY

Page 154

1 how the documents should be executed.
2         Does that refresh your
3 recollection that you were involved in
4 obtaining Mr. Pavlis' signature on documents
5 related to his investment in Mobile Corp.?
6         MR. GREEN:  Object to form.
7         You can answer.
8     A.     No.  But it does refresh my
9 memory that Michael was trying to get me to be
10 more helpful in more investments from Frank,
11 and which is why these documents were sent to
12 me.
13         But I -- if I remember right,
14 this was either right at or after the initial
15 investments were completed and the documents
16 were completed.
17 BY MR. MAHONEY:
18     Q.     Is it your testimony that you
19 did not present documents to Mr. Pavlis for his
20 signature in connection with either of these
21 two investments in Mobile Corp. in September of
22 2014?
23     A.     Did I -- did I present them to
24 him?

Page 155

1     Q.     Yes, for signature.
2     A.     For signature?  I don't -- I
3 don't recall any of that.  I was trying to be
4 helpful with Michael.  Michael was good at his
5 job.  I don't remember trying to do his job,
6 no.
7     Q.     I'm not sure that answers my
8 question.
9         Do you remember giving documents
10 to Frank for him to sign relating to a Mobile
11 investment?  Yes or no.
12     A.     I -- I don't recall.  I -- I
13 don't believe I recall that.
14         MR. MAHONEY:  Cam, can you put
15     up 250, please.
16 BY MR. MAHONEY:
17     Q.     And while she is putting that
18 up, Mr. Billingsley, did anyone at Mobile
19 indicate to you that they had, in fact,
20 contacted or reached out directly to Mr. Pavlis
21 to obtain his signature on documents relating
22 to Mobile investments?
23     A.     Yeah, I don't recall.  I
24 remember it was difficult, because, of course,

Page 156

1 Frank didn't have an e-mail.  I remember us
2 trying to be helpful.  I do remember there was
3 discussion that they had been speaking with
4 Frank.  I can't remember to what extent I was
5 and how I was involved in trying to help that
6 happen.
7         MR. MAHONEY:  Okay.  Do you have
8     that doc, 250?
9         MS. REDFERN:  Yes, and it's
10     P-68.
11         MR. MAHONEY:  Great.  Thank you.
12         - - -
13         (Whereupon, Exhibit P-68 is
14     marked for identification.)
15         - - -
16 BY MR. MAHONEY:
17     Q.     Mr. Billingsley, I'll represent
18 to you that this is a note purchase agreement
19 between Mobile Corporation and Mr. Pavlis.  And
20 if you flip toward the end, you'll see
21 Mr. Pavlis' signature under the heading
22 "Investor."
23         Do you see that?
24     A.     Okay.

Page 157

1     Q.     Do you recognize the writing
2 beneath his name there, where someone printed
3 "Frank E. Pavlis"?
4     A.     Do I recognize it?
5     Q.     Yes.
6     A.     I don't know.  It looks like it
7 could be my handwriting.
8         MR. MAHONEY:  Cam, let's go to
9     the next page or two.
10 BY MR. MAHONEY:
11     Q.     This is an investor
12 questionnaire.
13         MR. MAHONEY:  Go to the next
14     page, please.
15 BY MR. MAHONEY:
16     Q.     And it appears that Mr. Pavlis'
17 signature is there.  The date is 9/28/14.  And,
18 again, someone wrote his name and then wrote
19 his address.
20         Do you recognize that as your
21 writing, Mr. Billingsley?
22     A.     Yeah, I wouldn't be certain, but
23 it doesn't look -- it doesn't look too
24 dissimilar.

40 (Pages 154 - 157)

JUSTIN C. BILLINGSLEY

Page 158

1    Q.    Do you know who put the "X" and
2 the circle by the signature line?
3    A.    No.
4    Q.    Do you recall doing that to
5 indicate where Mr. Pavlis should sign a
6 document?
7    A.    I -- I don't recall.
8    Q.    Now, what do you recall, if
9 anything, telling Mr. Pavlis about Mobile
10 Corp., about the business that Mobile Corp. was
11 in?
12    A.    I remember explaining to him
13 that I was excited to be a part of it.  I was
14 very impressed by -- I had recently met with
15 Alan Bersin and his wife, who was a judge.  We
16 had spoken about the project.  I had recently
17 met with Howard Dean, the --
18    Q.    Yes, I'm going to interrupt you
19 again, because you're not answering my
20 question.
21       My question was, what did you
22 explain to Mr. Pavlis about the business that
23 Mobile Corp. was in?
24    A.    I was explaining that to you.

Page 159

1    Q.    Okay.  Well, get to the business
2 part.  I'm not interested in other people who
3 were involved.  I'm interested in what you
4 understood Mobile Corp. was doing and what you
5 communicated about it to Frank.
6    A.    Well, it was a startup.  So
7 those that were involved was extremely
8 important.  The executive profile and the board
9 profile is very, very important with a startup.
10    Q.    Are you incapable of telling me
11 what business Mobile Corp. was in?
12    MR. GREEN:  Objection.
13    Argumentative.
14 BY MR. MAHONEY:
15    Q.    You can answer.  Are you
16 incapable of answering that question?
17    A.    I'm capable of answering it in
18 the way I'd like to.  I think it's a bigger
19 answer than you're prepared for.
20    Q.    I don't think it is.  So I'm
21 going to ask again, I'm only interested in what
22 business Mobile Corp. was in.
23       So what business was Mobile
24 Corp. in, to your understanding?

Page 160

1    A.    Yeah.  So the focus of the
2 business model was to springboard off of great
3 executive profiles into public and consumer
4 perspective and viewpoint.  And with these
5 profiles, David Lopez, associated with Jennifer
6 Lopez, all of these -- Marco Lopez, associated
7 with Carlos Slim, who gave us a deal with
8 Tracfone, all of this was to be a part of a
9 consumer platform where we would create
10 business, basically a work environment, through
11 mobile devices.
12    Q.    When you say, "a work
13 environment through mobile devices," what does
14 that mean?
15    A.    Where individuals could be
16 economically productive using a mobile device.
17 So if someone was on a train or stuck in
18 traffic or in the middle of their shifts as
19 waiters and nurses, that they could earn five
20 bucks, ten bucks using their mobile devices
21 with micro jobs.
22       Which was why Mobile Agency was
23 so important, because we had engineered a way
24 to source and originate off-market houses,

Page 161

1 derelict houses, through individuals driving
2 around with their mobile devices.  So we could
3 create a large, highly untrained, highly tech
4 sophisticated army, if you will, of individuals
5 that would help us locate discount buy
6 opportunities, soccer moms, pool guys, lawn
7 guys, UPS salesmen.  So that's -- that was the
8 business objective and business model.
9    Q.    That wasn't Mobile Corp.  That
10 was Mobile Agency, right?
11    A.    That was all part of the same
12 thing.  It was all to be one big ecosystem.
13 Everything was about mobile.  It was -- that's
14 what we originally were going to do with all
15 the platforms, is roll them into a large
16 ecosystem where individuals could make money on
17 their -- on their mobile devices.
18    Q.    Were you aware of Mobile Corp.
19 having any involvement with real estate?
20    A.    Mobile Corp. had an involvement
21 with me.  Mobile Corp. had an involvement with
22 Jeff Romney, who is very real estate-driven,
23 and he's the cousin of Mitt Romney, and his
24 expansive network into real estate individuals.

41 (Pages 158 - 161)

JUSTIN C. BILLINGSLEY

Page 162

1    We had -- Bill Marriott was a
2  highly paid advisor from the Marriott Hotels.
3    And through our deal with
4  Tracfone with Carlos Slim and Marriott and
5  Romney, the infrastructure was coming together,
6  in my opinion, nicely.
7    Q.    As of September of 2014, are you
8  aware of Mobile Corp. spending one penny on
9  real estate investments?
10    A.    Mobile Corp. spending a penny on
11  real estate? Boy, I hope not.
12    Q.    Okay. All right. Why do you
13  say you hope not?
14    A.    Because that wouldn't any make
15  any sense. It was a technology company looking
16  to provide a real estate service.
17    Q.    Let's go through --
18    MR. MAHONEY: Cam, can you put
19  up 135, please.
20  BY MR. MAHONEY:
21    Q.    And while she's doing that, were
22  you involved at all in helping Mr. Pavlis
23  physically get from his house to his bank to
24  wire money to Mobile Corp.?

Page 163

1    A.    I don't recall. I drove Frank
2  around a lot when I went down there.
3    MR. MAHONEY: Okay. So what's
4  the exhibit number?
5    MS. REDFERN: Yes, P-69.
6    MR. MAHONEY: Thank you.
7    - - -
8    (Whereupon, Exhibit P-69 is
9  marked for identification.)
10    - - -
11  BY MR. MAHONEY:
12    Q.    Mr. Billingsley, these are
13  handwritten notes of Mr. Pavlis. The first
14  page that is in front of you says, "Real Estate
15  Investments. $1 million wire transfer to
16  Wilson Sonsini Goodrich Rosati Transaction
17  Trust."
18    And then beneath that he writes,
19  "Transfer number 1 - September 16, 2014.
20  Transfer number 2 - September 26, 2014."
21    Do you have any idea why
22  Mr. Pavlis would have believed that these
23  investments in a technology company were,
24  quote, real estate investments?

Page 164

1    A.    Why would I believe that that's
2  Frank's handwriting?
3    Q.    Because I'm telling you it is.
4    You can't tell us that you
5  recognize Mr. Pavlis' handwriting?
6    MR. GREEN: Object to form.
7  BY MR. MAHONEY:
8    Q.    You can answer.
9    A.    Yeah, I -- I wouldn't believe
10  because you told me, Mr. Mahoney. You also
11  told me that there would be an attorneys' eyes
12  only contract in place at the beginning of all
13  this, didn't you?
14    Q.    No, I didn't.
15    MR. GREEN: All right. Hang on
16  a second.
17    Justin, just stick with the
18  questions.
19    THE WITNESS: Okay.
20  BY MR. MAHONEY:
21    Q.    So are you sitting here telling
22  me that you don't recognize that to be
23  Mr. Pavlis' handwriting?
24    A.    I would have no reason to

Page 165

1  believe that that's Frank's handwriting.
2    Q.    Did you ever see him write
3  something?
4    A.    Yes.
5    Q.    And you don't believe this is
6  his writing at all? I just want to make sure
7  we're crystal clear on that point.
8    A.    I have no reason to believe that
9  that's --
10    MR. GREEN: Object to the form.
11    A.    (Continuing) -- Frank's
12  handwriting.
13    MR. MAHONEY: Cam, scroll up to
14  the next note.
15  BY MR. MAHONEY:
16    Q.    Okay. Again, Mr. Pavlis'
17  handwriting, and it's referencing a transfer of
18  $1 million. And if you go down, you'll see
19  someone wrote "Reference," and there's a number
20  there. And then it ends with, "If have
21  questions, call Justin Billingsley."
22    Now, the phone number
23  203-240-7160, was that your number at the time
24  in September of 2014?

42 (Pages 162 - 165)

JUSTIN C. BILLINGSLEY

Page 166

1     A.     My phone number in September of
2 2014 was 203-240-7160, yes.
3     Q.     Okay.  So do you have an idea
4 why Mr. Pavlis, if you weren't really involved
5 with these investments and it was other folks
6 at Mobile, do you know why he would write, "If
7 have questions, call Justin Billingsley"?
8     MR. GREEN:  Object to form.
9     A.     I wouldn't believe that he wrote
10 this for a minute.
11 BY MR. MAHONEY:
12     Q.     So you think somebody else wrote
13 it?
14     A.     Definitely.
15     Q.     Why do you think that?
16     A.     Because I don't have any reason
17 to believe he did.
18     MR. MAHONEY:  All right.  Why
19     don't we take a five-minute break.  And
20     then, Cam, we'll head into our breakout
21     room.
22          - - -
23     (Whereupon, a recess was taken
24     from 1:46 p.m. to 1:54 p.m.)

Page 167

1          - - -
2     MR. MAHONEY:  All right, Cheryl.
3 BY MR. MAHONEY:
4     Q.     Mr. Billingsley, did you listen
5 in on Mr. Miller's deposition the other day?
6     A.     Yes, I did.
7     Q.     Do you recall when he testified
8 that you were paid as a consultant to Allwest
9 to help raise money?
10     A.     I remember him saying something
11 like that, yeah.
12     Q.     Do you agree with that?
13     A.     No.
14     Q.     Tell me why you disagree with
15 that.
16     A.     He later also mentioned that I
17 was very involved in business strategy,
18 operations.  ==The work that I did and help that==
19 ==I offered Gary with Allwest was far greater==
20 ==than -- than capital.==
21     MR. MAHONEY:  Cam, let's take a
22     look at what's been marked as P-5.  It's
23     CHRON105.
24 BY MR. MAHONEY:

Page 168

1     Q.     Mr. Billingsley, this is a copy
2 of the second convertible promissory note and
3 the corresponding note purchase agreement dated
4 November 1 of 2014.
5     Explain to me how this note came
6 into being.
7     THE WITNESS:  Cam, may I have
8     control of the document, please?
9 BY MR. MAHONEY:
10     Q.     And, again, I'm going to ask
11 you, why do you need to look at the document in
12 order to answer that question?
13     A.     How could I not look at the
14 document if you'd like me to talk about it?
15     Q.     Well, you're familiar with the
16 document, right?
17     A.     I don't know.  I haven't looked
18 at it.
19     Q.     Oh, okay.  So you're suggesting
20 that maybe it's not what you remember.  I'm
21 representing to you that this is the document
22 that in pleadings in this case, the defendants
23 have admitted was, in fact, issued to
24 Mr. Pavlis.

Page 169

1     So with that understanding, tell
2 me how this document came to be.
3     A.     Yeah, I would need -- I would
4 need to see the document.  I am not admitting
5 anything.  I think the document needs to just
6 be something that I can review.
7     MR. MAHONEY:  Bill, are you
8     going to weigh in on this?
9     MR. GREEN:  Well, let him flip
10     through it.
11     And, Justin, just flip through
12     it and satisfy yourself that this is what
13     it says it is.
14     Do you have control over it,
15 Justin?
16     THE WITNESS:  I'm trying.  I
17     think I have to ask again.  Yes, it's not
18     working.
19     Cam, could you maybe just give
20     me a slow scroll on the document?
21     (Pause)
22     MS. REDFERN:  (Scrolling through
23     document.)
24 BY MR. MAHONEY:

43 (Pages 166 - 169)

JUSTIN C. BILLINGSLEY

Page 170

1    Q.    Okay.  You've had a chance to
2  review the document?
3        THE WITNESS:  Thank you very
4  much, Cam.
5    A.    To Mr. Mahoney, your question is
6  if I recognize it?
7  BY MR. MAHONEY:
8    Q.    Do you recognize it?
9    A.    Yes, I recognize it.
10    Q.    Now, tell me how this document
11  came to be.
12    A.    Very similar to the first note.
13  I worked with Jeff Peterson on it.
14    Q.    I'll represent to you, apart
15  from the amount and some of the dates, it's
16  identical to the note that we saw dated
17  September 1 of 2014, including being signed by
18  Mr. Silberman.
19        So is it your testimony that
20  Mr. Silberman continued to be executive vice
21  president of Key Commercial Finance, LLC as of
22  November 1 of 2014?
23    A.    That was my --
24        MR. GREEN:  Object to the form.

Page 171

1    A.    (Continuing) -- understanding,
2  yes.  That was my understanding, yes.
3  BY MR. MAHONEY:
4    Q.    Who made him executive vice
5  president, by the way?
6        MR. GREEN:  Object to form.  I
7    think we covered this the last segment.
8        MR. MAHONEY:  Yes.  I don't
9    recall his answer, so I'd like to know
10    who appointed him executive vice
11    president of Key Commercial.
12    A.    Yeah, I don't know that it was
13  some incredibly formal appointing ceremony or
14  moment.  It was an understanding.
15  BY MR. MAHONEY:
16    Q.    Why didn't you just sign it?
17    A.    Jeff and I thought it would be
18  best, given the fact that we were looking to --
19  all of this was of a single initiative
20  originally, that's why Mobile was to be so
21  focused on real estate.  That's why Key was so
22  focused on real estate.  It was one -- it was
23  to become one initiative.
24        So Jeff and I talked through it.

Page 172

1  I believe we had some discussions.  I assume
2  Jeff had some discussions with Bivens and
3  everyone else involved at the time.  I know
4  Jeff didn't make one decision without the board
5  being involved.
6        So I would assume that this was
7  discussed.  And it was thought to be the best
8  idea to have Silberman do it.
9    Q.    Are you aware of any document
10  memorializing any agreement in Mobile Corp. on
11  the one hand and Key Commercial Finance on the
12  other?
13    A.    A document memorializing?  I
14  would say it was more of an understanding at
15  this point.
16    Q.    So why was this issued in
17  November of 2014.  Why not sooner?  Why not
18  later?
19    A.    I don't recall.  We had many
20  meetings, many discussions with Frank.
21    Q.    Who is "We"?
22    A.    Myself, the Mobile crew,
23  particularly myself.
24    Q.    Why is this note a six-year note

Page 173

1  rather than a five-year note that we saw in the
2  September 2014 note?
3    A.    I know Frank was -- was super
4  sensitive to making sure that the investments
5  wouldn't come back to him.  That might have had
6  something to do with it.  Other than that, I
7  don't recall the details.  It's very long ago.
8    Q.    Are you aware that Michael
9  Silberman has denied having any involvement
10  with Key Commercial?
11    A.    With all this liability, it
12  wouldn't surprise me at all.
13    Q.    What liability?
14    A.    Your ferociously angry lawsuit.
15    Q.    Have you spoken to Mr. Silberman
16  since the lawsuit was filed?
17    A.    I don't recall.  I don't believe
18  so, since the lawsuit was filed.  No, I don't
19  believe I have.
20    Q.    Is there any reason why you
21  would not have reached out to him to say, hey,
22  Mike, we both know you were executive vice
23  president.  Why are you denying that you were?
24        MR. GREEN:  Object to form.

44 (Pages 170 - 173)

JUSTIN C. BILLINGSLEY

Page 174

1    A.    Yeah.  Things did not end well
2 when Mobile finally imploded.  So we didn't
3 necessarily end up as -- as drinking buddies.
4 BY MR. MAHONEY:
5    Q.    Did Mr. Silberman sign any other
6 documents as executive vice president of Key
7 Commercial Finance?
8    A.    I don't recall.  We -- we were
9 in play with a lot of documents.
10   Q.    Have all those documents been
11 produced, to your knowledge, in discovery?
12   A.    Absolutely.
13   Q.    Now, do you recall, in late
14 2014, your mother preparing documents relating
15 to Mr. Pavlis' investment in Allwest?
16        MR. GREEN:  Object to form.
17        THE WITNESS:  Could you restate
18   your question, Mr. Mahoney?
19 BY MR. MAHONEY:
20   Q.    Yes.  Do you recall your mother
21 preparing documents reflecting the investment
22 between Mr. Pavlis and Allwest Investments?
23   A.    That question assumes that she
24 did, and she did not.

Page 175

1    Q.    Is your mother's name Deborah
2 Billingsley?
3    A.    Yes.
4    Q.    Were you aware that somebody
5 drafted documents, say, beginning in November
6 of 2014 and into December, purporting to
7 memorialize Mr. Pavlis' investment with Allwest
8 Investments?
9    A.    I -- am I aware if somebody did?
10   Q.    Yes.
11   A.    I was the one mostly doing that.
12 I was interacting with a lot of individuals.
13 So am I aware that someone else did?  I don't
14 know that I understand that question.
15        MR. MAHONEY:  All right.  Hey,
16   Cam, put up CHRON258, please.
17        MS. REDFERN:  This will be P-70.
18        - - -
19        (Whereupon, Exhibit P-70 is
20   marked for identification.)
21        - - -
22 BY MR. MAHONEY:
23   Q.    Mr. Billingsley, you're looking
24 at P-70, which purports to be an e-mail from

Page 176

1 Deborah Billingsley, dated November 4th, 2014,
2 to you.  The subject is, "Operating Agreement."
3 And apparently attached to the e-mail was an
4 NPL purchase and services agreement template.
5        And she writes, "Hi, Justin.
6 It's a start . . .  The names are changed and a
7 few minor corrections.  Sorry I can't complete
8 it, but have no knowledge of financial
9 arrangement or any details of agreement."
10        Does that refresh your
11 recollection as to whether your mother helped
12 prepare documents in connection with Pavlis'
13 investment with Allwest?
14   A.    Yeah.  It helps me remember she
15 absolutely did not.  So an NPL purchase and
16 services agreement is a non-performing loan
17 purchase and service agreement.
18        This was some of the work that
19 Gary and I were trying to do, was trying to
20 purchase portfolios of non-performing loans
21 from mortgage servicers.  So we had been -- I
22 had been talking to many aggregators of these
23 types of financial instruments.  This e-mail
24 was absolutely about that.

Page 177

1    Q.    Okay.  But when she writes,
2 "Sorry I can't complete it," does that not
3 indicate that she made some effort to complete
4 it?
5        MR. GREEN:  Object to form.
6    A.    The -- the operating agreement?
7 BY MR. MAHONEY:
8    Q.    Yes.  Isn't that what she's
9 referring to?
10   A.    I don't -- I don't believe she's
11 referring to the LLC operating agreement.  This
12 could have easily been a different op -- a
13 different entity, be a different LLC.  It could
14 have been Allwest Number II, LLC, Allwest
15 Number XII, LLC.  It could have had nothing to
16 do with Allwest at all.
17   Q.    Are you aware of something
18 called Allwest XII, LLC?
19   A.    No.  I'm just saying
20 hypothetically.  And again, even this 1.1 says,
21 "Are these professional groups still active
22 with Allwest?"
23        There's no -- no inference here
24 that this document or effort in document

45 (Pages 174 - 177)

Page 182

```
1  retained net earnings; 3) three-year note."
2          Now, do you know why she would
3  be updating any note to reflect those changes?
4      A.    Sure.  I would imagine I had a
5  conversation with Gary and I asked her to make
6  some adjustments and send me the document.
7      Q.    Why would you make these
8  adjustments?
9      A.    Because of discussions I was
10 having with Gary and discussions I was having
11 with Frank.  As I mentioned, everything was
12 fluid.
13     Q.    Well, this is now late November
14 of 2014.
15          Are you aware of Mr. Pavlis
16 receiving any note from Allwest relating to his
17 $7 million investment?
18          MR. GREEN:  Object to the form.
19     A.    I don't recall.  I -- I -- you
20 know, we looked at many documents together.
21          MR. MAHONEY:  Cam, let's go to
22     the attached document.
23 BY MR. MAHONEY:
24     Q.    Now, this is what was attached
```

Page 183

```
1  to that e-mail, Mr. Billingsley.  It purports
2  to be an Allwest Investments, LLC promissory
3  note for Frank E. Pavlis Revokable Living
4  Trust.  It's $6 million and it's dated May 20th
5  of 2014.
6          And now if you go down to
7  Paragraph 1, it says, "Promise to Pay.  For
8  value received, Paramax RE, LP, a Delaware
9  Limited Partnership, promises to pay to the
10 order of the Frank E. Pavlis Revokable Living
11 Trust, and trustees and assigns, the sum of
12 $6 million."
13         Okay.  Do you recall seeing this
14 document?
15     A.    Do I recall this exact document?
16 No.  There were many versions of it.
17     Q.    And you understood that,
18 ultimately, the final version of this was, in
19 fact, a promissory note between Allwest
20 Investments, LLC and Mr. Pavlis, right?
21         MR. GREEN:  Object to form.
22     A.    Can you restate the question?
23 BY MR. MAHONEY:
24     Q.    Yes.  You understood that
```

Page 184

```
1  ultimately, a promissory note was signed
2  reflecting Mr. Pavlis' $6 million investment in
3  Allwest?
4      A.    Well, I -- I just don't recall.
5      Q.    Can you explain this to me.  Why
6  would your mother be working or why would
7  anybody be working on a note in late
8  November 2014 that purported to reflect a
9  $6 million investment made in May of 2014?
10     A.    You're talking about the date
11 disparity?
12     Q.    Yes, I am.
13     A.    As I mentioned, there were tons
14 of changes.  The documents were in constant
15 flux.
16     Q.    Well, I'll represent to you that
17 the first time we see a promissory note like
18 this is in November of 2014.
19         So how could it have been in
20 flux between May and November when it doesn't
21 appear until November?
22         MR. GREEN:  Object to form.
23     A.    You mean because you don't have
24 e-mail evidence of it, you don't think it
```

Page 185

```
1  exists?
2  BY MR. MAHONEY:
3      Q.    No, because none of it was
4  produced to us in discovery.  And since you've
5  said several times we've gotten everything, I'm
6  asking you, how could it have been -- let me
7  finish -- how could it have been in a state of
8  flux from May until November, when the first
9  documentary evidence of this note is in
10 November?
11     A.    Yeah.  No.  There were many
12 paper versions that I was meeting with Frank.
13 Obviously, all of my meetings had paperwork in
14 it.  So the documents were constantly changing.
15         When we finally went digital, we
16 cleaned all that up.  We only kept what we
17 thought we needed.  Everything else was
18 discarded.
19     Q.    Again, you don't recall when you
20 went digital?
21     A.    It wasn't some great big moment.
22 It was as we moved offices and as we got tired
23 of carrying around filing cabinet after filing
24 cabinet, we just -- it was a process that
```

47 (Pages 182 - 185)

JUSTIN C. BILLINGSLEY

Page 186

1 eventually took over.
2    Q.    Well, how many offices did Key
3 Commercial have from, say, 2014 through today?
4    A.    We had an office down in Katonah
5 that we were at for a couple of years.  I think
6 I officed a little bit out of the Manhattan
7 office, from Mobile Corporation in the MetLife
8 Building.  That was actually before Katonah.
9 And then Katonah.  And then we had an office in
10 Danbury, over at a big complex called "The
11 Summit."  We were there for a while.  And then
12 we had an office, I believe, over at Mill Plain
13 Road.  And then eventually we just moved our
14 offices to home offices.
15    Q.    Can you explain to me why if, in
16 fact, Mr. Pavlis had signed note purchase
17 agreements and accepted two separate notes from
18 Key Commercial in September and November 2014,
19 why anybody is bothering to document a note
20 between Allwest and Mr. Pavlis?
21    A.    You know, Frank would go back
22 and forth.  Frank would worry that things
23 were -- could be better.
24         I -- Gary and I were trying to

Page 187

1 figure out basically his -- his push to retire.
2 His daughter and her husband wanted to be
3 involved with Allwest.  So we talked a lot
4 about, you know, me owning Allwest entirely
5 eventually.
6         And then we had some discussions
7 about Paramax.  And then there were a few other
8 iterations.  And then eventually it all landed
9 that we would -- I would do it with Key
10 Commercial Finance.
11         MR. MAHONEY:  All right.  Cam,
12    put up 270, please.
13         MS. REDFERN:  This will be P-72.
14             - - -
15         (Whereupon, Exhibit P-72 is
16    marked for identification.)
17             - - -
18 BY MR. MAHONEY:
19    Q.    Mr. Billingsley, this is an
20 e-mail exchange between you and Mr. Miller on
21 December 1st, 2014.  You e-mailed Mr. Miller.
22 The subject is, "Pavlis Note."  And it says,
23 "Dear Gary, Please see attached.  When may we
24 discuss?"

Page 188

1         And it looks like the attachment
2 is just an e-mail from your mother to you.  And
3 the subject says, "Pavlis Note 5."
4         Does that indicate to you that
5 this was yet another iteration of a note
6 between Allwest and Mr. Pavlis?
7    A.    I don't recall.
8    Q.    He writes back to you after you
9 forward the note to him.  He says, "Justin,
10 this note needs a lot more details and
11 understanding.  Preference is six percent and
12 two percent cost for asset management to cover
13 your fee.  Total eight percent."
14         Do you understand what he's
15 referring to there when he says a "two percent
16 for asset management to cover your fee"?
17    A.    I believe that was an iteration
18 of -- of what we were thinking and trying to
19 develop.  But outside of the obviously stated,
20 no, I don't remember the -- the details five
21 years ago.
22    Q.    Did you ever tell Mr. Pavlis, in
23 connection with his investments, whether he
24 made them at Allwest or at Key Commercial, that

Page 189

1 you would be getting a fee in connection with
2 the $7 million he invested?
3    A.    Oh, yeah.  Yeah, he -- in fact,
4 Frank was always quite annoyed that I wouldn't
5 accept his money.  So he, you know, would
6 always try to buy lunch, and I wouldn't let
7 him.  So, yeah, he well understood that I would
8 be in a position to make money with this
9 project.
10    Q.    Where would that agreement with
11 Mr. Pavlis be memorialized?  What document
12 reflects your agreement with him that you would
13 be paid some form of asset management fee or
14 other fee in connection with his $7 million
15 investment?
16         MR. GREEN:  Object to form.
17    A.    I believe it's absolutely
18 implied by the documents in place and by the
19 understanding inferred in investing in a
20 company that is going to start up.
21 BY MR. MAHONEY:
22    Q.    What document do you believe
23 implies that Mr. Pavlis agreed to that?
24    A.    That he signed subscription

48 (Pages 186 - 189)

JUSTIN C. BILLINGSLEY

Page 190

1 agreements.  That he signed notes, you know,
2 purchase agreements.  That he got PPMs that
3 made clear that there would be expenses,
4 administrative expenses, operating expenses,
5 staff expenses.
6      Q.     Is there anything that you can
7 think of in any of those documents that
8 specifically indicates that Justin Billingsley
9 was going to be getting a fee in connection
10 with the $7 million investment?
11      A.     We didn't land on the -- we
12 didn't finish or complete this concept of me
13 getting a fee.  I never did get a fee.  It was
14 in concept form in this e-mail, with much more
15 broader context and discussions on the phone.
16      So the way that Mr. Pavlis
17 understood that I would be compensated ended up
18 being exactly as I was compensated.
19           MR. MAHONEY:  Okay.  Cam, can we
20 go to 275, which I think was already
21 marked, but I could be wrong about that.
22           MR. GREEN:  Mr. Mahoney, one
23 second.  I'm sorry.  My . . .
24           MR. MAHONEY:  That's okay.  Do

Page 191

1      you want to take a couple minute break?
2           THE WITNESS:  No.  We have a
3      dead possum in our backyard and my
4      daughter just saw it.  She's quite upset
5      about it.
6           Okay.  I think we have an all
7      clear.
8           MS. REDFERN:  So, yes, that was
9      P-47, Bill.
10           MR. MAHONEY:  Thanks, Cam.
11 BY MR. MAHONEY:
12      Q.     All right.  If you go down the
13 bottom, we'll work our way back up.
14      So this e-mail trail begins with
15 the e-mail we just looked at where Mr. Miller
16 writes to you on December 1st that the "note
17 needs a lot more details and understanding."
18      You write back the next day,
19 December 2nd, "Gary, We must keep the
20 guaranteed interest to Frank as initially
21 represented to him, which was at eight percent.
22 My cost will need to be above that.  I think it
23 is fine that the profit split is after the ten
24 percent to AW but I have represented to Frank

Page 192

1 that his participation is 40 percent."
2           When did you make the
3 representation to Mr. Pavlis that in addition
4 to eight percent, his participation in the
5 profit split was 40 percent?
6           MR. GREEN:  Object to form.
7 BY MR. MAHONEY:
8      Q.     You can answer.
9      A.     Let me finish reading this,
10 Mr. Mahoney, so I can certainly have greater
11 clarity and understanding here.
12      (Pause)
13      So your question is, when did I
14 make those representations to Frank?
15      Q.     Yes.
16      A.     I don't recall.  It would have
17 been many, many times throughout the year, the
18 two to three years that we were talking about
19 these projects.
20      Q.     So you told Mr. Pavlis on
21 multiple occasions that in addition to him
22 receiving an eight percent return on his money,
23 he was also going to get 40 percent of the
24 profit split; is that right?

Page 193

1      A.     No, that's not what I said.  I
2 said that we had talked about his profit
3 participation, many, many times.  This would
4 have been potentially one instance.
5      Q.     Well, it says that you had
6 represented to Frank that his participation is
7 40 percent.
8      That indicates, does it not,
9 that you told Mr. Pavlis that his participation
10 would be 40 percent?
11      A.     Yeah, but this -- this also
12 fails to understand the context then of talking
13 to Gary in the context of Allwest.
14      At this point, Gary was very
15 motivated to try to get as much of the
16 opportunity as he reasonably could.  And we
17 were going back and forth, understanding that
18 it -- it was starting to get minimal, that his
19 opportunity would become minimal.
20      Q.     I don't understand that.
21      Whose opportunity would become
22 minimal?
23      A.     Gary's opportunity in the
24 project going forward.

49 (Pages 190 - 193)

JUSTIN C. BILLINGSLEY

Page 194

1      So I -- I would interpret this
2  to read that this would follow up phone
3  discussions that would have been happening and
4  at which he would have been explaining why
5  can't we do this with Allwest.  Why can't we do
6  more with Allwest.
7      And I would probably have been
8  explaining to him, in the context of an Allwest
9  world, an Allwest investment, this is something
10  of what -- this is what it would have to look
11  like.
12      Q.    Do you ever recall directing
13  Mr. Miller not to reach out and contact
14  Mr. Pavlis directly?
15      A.    We did talk to Frank together.
16  As is custom in the business, I had him sign
17  non-disclosures, as he had me sign
18  non-disclosures and non-circumvents.
19      Q.    Okay.  You didn't answer my
20  question.
21      Did you tell Mr. Miller that he
22  was not to speak directly to Mr. Pavlis?
23      MR. GREEN:  Object to form.
24      Asked and answered.

Page 195

1      A.    I don't -- I don't recall ever
2  expressing that directly to Mr. Miller.
3  BY MR. MAHONEY:
4      Q.    Why was it that your
5  brother-in-law, Chad Self, became the sole
6  member of Key Commercial?
7      A.    Yeah, I thought -- I don't think
8  he was really.  It was our understanding and
9  impression that we were partners.  His -- his
10  side of the work and his work role was to be
11  productive on the admin side with payroll, with
12  documents with the attorneys, document filings,
13  entity formations, tax, banking.  But we
14  understood that we were partners in the
15  endeavor.
16      Q.    Well, you understand -- in fact,
17  you were listening in to Mr. Self's deposition
18  last week.  You understand that he is, in fact,
19  identified as the sole member of Key Commercial
20  Finance in the documents filed with the State
21  of Delaware, correct?
22      A.    That's my understanding and
23  always has been from my legal advice, that --
24  that that's not as relevant as is operational

Page 196

1  understanding.  But that's fine.  It was good
2  for us to do it the way we did it according to
3  the advice -- according to the advice that we
4  received.
5      Q.    Again, who gave you that legal
6  advice?
7      A.    I believe that was Snell &
8  Wilmer.  Hillel Goldman.  Generally those two.
9      Q.    When these law firms, by the
10  way, were giving you this advice in 2014, how
11  did you pay them?
12      MR. GREEN:  Object to form.
13      A.    I -- I don't understand the
14  question, "How did you pay them?"
15  BY MR. MAHONEY:
16      Q.    Well, presumably, they billed
17  you for their advice, correct?
18      A.    I don't have a working
19  understanding as to how -- how that -- how
20  billing procedures work with law firms.
21      Q.    Well, typically, lawyers do work
22  and then bill their clients for whom they do
23  work.
24      And my question is, since you've

Page 197

1  said several times that multiple law firms did
2  work for you in connection with one or more of
3  these documents, I'd like to know how you paid
4  them.
5      A.    I would imagine they submitted
6  us bills and we'd give them payment.
7      Q.    Out of what account did that
8  payment come?
9      A.    I don't know.  I -- I generally
10  left that to Chad and the bankers and
11  accountants and wasn't involved in that -- that
12  type -- that side of the work at all.
13      MR. MAHONEY:  All right.  Give
14  me a second.  I'm just reading something
15  here.
16      (Pause)
17  BY MR. MAHONEY:
18      Q.    I'm going to represent to you
19  that Key Commercial Finance was legally formed
20  on December 10th of 2014.
21      You don't have any reason to
22  doubt that, right?
23      MR. GREEN:  Object to form.
24      A.    I don't have any reason to

50 (Pages 194 - 197)

JUSTIN C. BILLINGSLEY

Page 206

1    A.    I believe I did, if I remember
2 correctly.
3    Q.    Did you provide a copy of the
4 note as countersigned by Mr. Miller after he
5 e-mailed it to you on December 16th, 2014?
6    A.    I don't recall. I believe I
7 did. Things changed pretty quickly after this
8 document, and Frank was no longer content with
9 the Allwest arrangement, which is what got us
10 looking to make the changes.
11    Q.    I'll get to that. But going
12 back to this promissory note, in addition to
13 eight percent annual interest, Paragraph 3
14 says, "Earnings. 40 percent of annual net
15 retained earnings (Annual earnings less sum of
16 Applicable Costs and Allwest Investment Share)
17 shall be paid to the Note Holder annually."
18        So in addition to interest,
19 according to this note, Mr. Pavlis was getting
20 40 percent of net retained earnings after
21 certain other costs were cut out, right?
22    A.    After applicable costs, correct,
23 investment share.
24    Q.    Now, I'll represent to you that

Page 207

1 neither of the two notes that allegedly issued
2 from Key Commercial to Mr. Billingsley say
3 anything about any return on investment other
4 than the eight percent annually.
5        Can you explain why this note
6 would provide for some payment in addition to
7 eight percent, but the Key Commercial notes do
8 not?
9    A.    Yeah, it's foggy, of course,
10 five years back. If I remember right, what
11 Frank did not like about this was that it
12 was -- it was rooted in the concept of him
13 participating in real estate transactions.
14        He wanted more of a VC, venture
15 capital, type participation in the -- in being
16 able to earn more than what is put here. He
17 was worried that his earnings wouldn't be as
18 significant and -- and was more interested in
19 having share, ownership share of the company
20 that was successful in making more money.
21    Q.    Okay. I'm not sure I understood
22 that.
23        Is it your testimony that after
24 Mr. Miller and Mr. Pavlis signed this note in

Page 208

1 December of 2014 that would have given him
2 eight percent, plus 40 percent of net retained
3 earnings as defined, that he grew dissatisfied
4 with that return?
5    A.    Yes. Because it was -- it was
6 40 percent less costs and after Allwest's
7 participation in the investment. So, yeah,
8 he -- he didn't like that.
9    Q.    Well, can you explain why he
10 signed it if he didn't like it?
11    A.    Yeah. It was -- it was a
12 version that we were talking about at the time.
13        Like I said, he signed many
14 versions of this. This one just ended up, you
15 know, being cycled through with Gary. But this
16 was a version that he had -- you know, after I
17 signed it -- after I got it -- had it signed,
18 Frank would call and say, I've been thinking
19 about it. And we would analyze Gary's
20 operating costs, we would analyze Gary's
21 position in the investment, in the, you know,
22 net profit proceeds, and he wouldn't -- he
23 wouldn't like it. So I would get to work on
24 making a better deal for him.

Page 209

1    Q.    But explain to me how promissory
2 notes from Key Commercial that only pay eight
3 percent over five and six years is a better
4 deal than eight percent plus some percentage of
5 retained earnings.
6    A.    Well, it's --
7        MR. GREEN: Object to form.
8    A.    (Continuing) It's a lot better
9 deal.
10 BY MR. MAHONEY:
11    Q.    How is it better?
12    A.    The eight percent wasn't
13 anything that Frank was interested in. Frank
14 was interested in owning a portion of the
15 company. So Frank was very interested in that
16 note converting to equity and then earning a
17 portion of the company that did everything that
18 we wanted to do.
19        Had it not been destroyed by
20 Skeans' slander, it would have -- you know,
21 everything that we built would be worth many
22 millions, and that would have been worth a lot
23 greater earning, in Frank's opinion.
24    Q.    So you're saying that Mr. Pavlis

53 (Pages 206 - 209)

JUSTIN C. BILLINGSLEY

Page 210

1  expressed to you his optimism that Key
2  Commercial would be a successful company, and
3  he wanted to have equity ownership interest in
4  that company; is that right?
5      A.    He wanted a venture capital
6  opportunity in his portfolio, is what he would
7  explain.  And he would say, you know, I'd like
8  to -- I believe that your company is going to
9  be worth a lot.  I want to participate in its
10  growth and its earnings and its ownership.
11      Q.    What did you tell him about Key
12  Commercial that presumably made him so
13  enthusiastic about it?
14      A.    Oh, the way that I had expected
15  to shore up the company by using the capital
16  in -- in transactions, fix-and-flip, to create
17  stability and then to use the capital to build
18  the technology platform that would be very
19  disruptive (sic) to an industry begging for it.
20      Q.    And you felt that Mr. Pavlis
21  understood that and was willing to invest
22  $7 million into it?
23      A.    I felt Mr. Pavlis was passionate
24  about it, yeah.  He was very passionate that I

Page 211

1  was an operator that could -- could get it
2  done.
3      Regretfully, I wasn't able to
4  get it done in the face of extraordinary
5  slander.  But to be able to build the platform
6  just as we did, deliver it to marketplace as --
7  as promised, with lots of value.
8      Q.    Okay.  Are you aware of any
9  document that reflects any sort of update to
10  Mr. Pavlis explaining what Key Commercial was
11  doing, how it was progressing along with its
12  digital platform for real estate?  Anything
13  along those lines?
14      A.    No.  Frank, he didn't like
15  documents.  It annoyed him.  He wanted things
16  to be kept clean.  He had too much in his
17  apartment already.  He was in a very tiny,
18  little apartment.  And he didn't e-mail.  So he
19  really wanted everything to be verbal in
20  updates that way.
21      MR. MAHONEY:  All right.  Why
22      don't we take a five-minute break.
23          - - -
24      (Whereupon, a recess was taken

Page 212

1      from 2:54 p.m. to 2:59 p.m.)
2          - - -
3      MR. MAHONEY:  Back on the
4      record.
5      Cam, would you please put up
6      what was marked as P-7.
7  BY MR. MAHONEY:
8      Q.    Mr. Billingsley, this is an
9  e-mail, dated April 2nd, 2015, from you to your
10  brother-in-law, Chad Self, at equitypros.co and
11  the attachment is "Scan 6."  And beneath that,
12  it looks like somebody at heath11539@aol.com
13  forwarded the document to you.
14      Is that your wife's e-mail
15  address?
16      A.    Yes, it is.
17      Q.    Do you know why she was
18  forwarding a document to you?
19      A.    I -- I don't recall.  I would
20  imagine, for some reason, I was -- yeah, I
21  don't recall.
22      MR. MAHONEY:  Okay.  Cam, let's
23      go to the attachment, please.
24  BY MR. MAHONEY:

Page 213

1      Q.    This purports to be an
2  "Amendment to Allwest RE Partners Subscription
3  Agreement."  And if you scroll down to the
4  bottom, you'll see that there's only writing on
5  the right-hand side of the page, and it's been
6  signed by Mr. Pavlis.
7      Do you recall having Mr. Pavlis
8  sign this document?
9      A.    Not this document.  We signed
10  many documents.
11      Q.    But you don't have any
12  recollection of this particular one?
13      A.    No.
14      MR. MAHONEY:  Cam, if you don't
15      mind, let's go to P-8, which is 043 and
16      044.
17  BY MR. MAHONEY:
18      Q.    This is another e-mail.  This is
19  again from Chad Self's e-mail address to you.
20  And the subject is, "Scan+6.pdf."
21      And if you turn to the
22  attachment, it's again the "Amendment to
23  Allwest RE Partners Subscription Agreement."
24      And this time, if you turn to

54 (Pages 210 - 213)

JUSTIN C. BILLINGSLEY

Page 214

1 the signature page, you'll see it is now signed
2 by Mr. Pavlis -- or still signed by Mr. Pavlis,
3 but it looks like Mr. Self added his signature.
4        Do you see that?
5    A.    Yes, I see that.
6    Q.    And you also note that somebody
7 typed in a date above Mr. Pavlis' signature as
8 4/2/2015.
9        Who added that date?
10   A.    I have no idea.
11   Q.    Do you know why the date was
12 added?
13   A.    No.  I would imagine it was the
14 date Frank signed the document.
15       MR. MAHONEY:  Cam, P-9, please,
16   which is CHRON049.
17 BY MR. MAHONEY:
18   Q.    This is an e-mail exchange
19 between you and Gary Miller.
20       MR. MAHONEY:  And if you go to
21   the bottom, Cam.
22 BY MR. MAHONEY:
23   Q.    You're writing Mr. Miller
24 April 3rd.  Again, it's the same subject,

Page 215

1 "Scan+6."  And you say, "Dear Gary, See
2 attached.  Can you do the wire today?"
3        What wire were you referring to,
4 by the way?
5    A.    Right.  I don't -- I don't
6 recall.  We did lots of wires back and forth.
7 I don't know.
8    Q.    Well, it was mostly back, right?
9 It was mostly Allwest sending money to Key
10 Commercial, correct?
11       MR. GREEN:  Object to form.
12   A.    I don't recall.
13 BY MR. MAHONEY:
14   Q.    Do you recall Key West ever
15 sending any money to Allwest?  I'm sorry, Key
16 Commercial sending any money to Allwest?
17   A.    Yeah.  I think Key or one of its
18 subsidiaries would have been involved in a
19 financial relationship with Allwest at some
20 point.
21   Q.    Why would Key Commercial be
22 sending any money to Allwest or a subsidiary?
23       You know what?  I'm sorry, let
24 me stop that.

Page 216

1        If that took place, would I find
2 it on the financial records or in the financial
3 records that the defendants have produced in
4 this case?  Particularly the general ledgers,
5 would I expect to find it there?
6    A.    Yes.
7    Q.    And on that point, can you state
8 with certainty that all of the general ledgers
9 and profit and loss statements and related
10 documents for every company related to Key
11 Commercial has been produced in discovery?
12       MR. GREEN:  Object to form.
13   Calls for a legal conclusion as well.
14       MR. MAHONEY:  That makes no
15   sense at all, Bill.
16 BY MR. MAHONEY:
17   Q.    But you can answer the question,
18 Mr. Billingsley.
19   A.    We had a -- an accountant, a
20 CPA, doing all of our books.  Every penny that
21 went through our world in any respect was
22 accounted for by -- by Dawn, Dawn Brolin.
23       And to my understanding,
24 although we recently discovered that there was

Page 217

1 quite a mistake made, yes, everything has been
2 produced.
3    Q.    Okay.  So let's talk about the
4 mistake first.
5        What's the mistake you're
6 referencing?
7    A.    After, I think it was, Chad's
8 deposition, we discovered that she, in fact,
9 did not complete the 2019 finances.  So she did
10 not complete the 2019 financial reporting and
11 just simply carried everything over from 2018
12 and did no work at all on 2019, and offered
13 that report mistakenly.
14   Q.    I'm sorry, what was that last
15 word?
16   A.    Mistakenly.
17   Q.    When you say "she," who is
18 "she"?
19   A.    Dawn Brolin and her staff.
20   Q.    Oh, Dawn, I'm sorry.  I thought
21 you said Don.
22       Is she correcting that mistake?
23   A.    Yes.  We're working on it to get
24 it corrected.  She is very apologetic and very

55 (Pages 214 - 217)

JUSTIN C. BILLINGSLEY

Page 226

1        And you write, "Dear Debby and
2  Darbin.  Please see attached.  How do you pass
3  this up?  Wow," four exclamation points.  And
4  what you're forwarding here appears to be an
5  e-mail and a model agreement from a Michelle
6  Panizza at Blue Mountain Realty.
7        Do you recall forwarding this
8  document to the Skeanses?
9     A.     Yes, roughly.
10    Q.     Why did you forward it to them?
11    A.     The Skeanses had been asking for
12 an opportunity to meet Greg, which is why they
13 flew out to California and met with Greg and
14 myself and spent quite a bit of time looking at
15 this investment opportunity with Greg and Blue
16 Mountain.
17    Q.     Well, that trip to California
18 took place before April of 2015, right?
19    A.     I would hope so.  Yeah, they --
20 yeah, they wouldn't send documents before they
21 met each other.
22    Q.     You indicated that you were the
23 one who decided not to proceed with any
24 business venture involving the Skeanses' and

Page 227

1  Mr. Pavlis' money in early 2014 because you
2  believed, I think your words were, that
3  Ms. Skeans had become increasingly unstable and
4  aggressive.
5        Do you recall that?
6     A.     Yes.
7     Q.     So if that's the case, why were
8  you considering some dealings with them over a
9  year later?
10    A.     Why was it a year later?  I see
11 April 2015.
12    Q.     Yes.  You said this is why you
13 didn't pursue some venture that you had
14 originally proposed to them back in early 2014,
15 before Mr. Pavlis invested his $6 million.
16    A.     Yeah.  It's -- so it was quite a
17 bit of time after April 15th, 2015 when things
18 started to look so ugly.
19    Q.     So it was after April 2015; is
20 that right?
21    A.     Correct.
22        MR. MAHONEY:  Gotcha.  Okay.
23        Cam, can you put up 295, please.
24        MS. REDFERN:  This was

Page 228

1  previously marked P-57.
2        MR. MAHONEY:  Great.  Thank you.
3  BY MR. MAHONEY:
4     Q.     Mr. Billingsley, this is an
5  e-mail exchange between you and Mr. Miller,
6  dated April 18th -- I'm sorry, his e-mail to
7  you is April 18th of 2015.  You respond on
8  April 21st.  And he's providing you with a
9  overview of, quote, the number to date.  And he
10 talks about Chicago home investments and
11 various other properties that presumably
12 Allwest was invested in.
13        Is that your understanding, that
14 Allwest had used Mr. Pavlis' funds to invest in
15 each of these properties or groups of
16 properties?
17    A.     Is it my understanding?  Yes.
18    Q.     Okay.  And you wrote back to him
19 on the 21st.  "Dear Gary, If I can get the
20 financial relationship with Allwest and the
21 $7 million Allwest you have had over the last
22 year to be backdated as we spoke, how does
23 ownership of Allwest get organized going
24 forward?"

Page 229

1        What were you referring to there
2  when you were talking about getting the
3  financial relationship with Allwest and the
4  $7 million that Allwest had to be backdated?
5     A.     What I'm referring to in what
6  sense, the financial relationship?
7     Q.     Presumably you meant it.  So
8  what did you mean by writing this?
9     A.     So this was related to the
10 conversation explained earlier, that we were
11 constantly contemplating as to whether or not I
12 would end up owning Allwest and phasing Gary
13 out or if that wouldn't happen.
14    Q.     But what does backdating
15 anything have to do with that?
16    A.     Just backdating the
17 relationship, backdating the circumstances.
18 Get everything basically going back and
19 starting over.  If I ended up owning Allwest,
20 then we would reconsider.
21    Q.     So were you proposing that you
22 would backdate documents?
23        MR. GREEN:  Object to form.
24    A.     No.  Just circumstances.

58 (Pages 226 - 229)

JUSTIN C. BILLINGSLEY

Page 230

1  BY MR. MAHONEY:
2      Q.      How do you backdate
3  circumstances in a business relationship
4  without backdating documents?
5      A.      Just go back and reconsider
6  circumstances at an earlier date.
7      Q.      Again, I don't know what that
8  means.
9      A.      So going back to -- going back
10  to an earlier circumstance.  And at this point,
11  we had gone through, as I had explained, it
12  feels like, countless times now, many, many
13  iterations of what we were trying to get done.
14          So this sentence inferred if --
15  if -- if I were to just end up with ownership
16  with Allwest, then we would basically reset,
17  restart our thinking and how we would structure
18  everything.
19      Q.      So as of April of 2015, fair to
20  say that you did not have a firm understanding
21  or agreement between Key Commercial and
22  Allwest?
23          MR. GREEN:  Object to form.
24      A.      No, that's not true at all.  Key

Page 231

1  Commercial was thriving and established.  Gary
2  was trying to convince me to change things, to
3  reconsider things.  And so that's what this
4  discussion was about.
5          MR. MAHONEY:  All right.  Cam,
6      061, please.
7          MS. REDFERN:  This will be P-74.
8          - - -
9          (Whereupon, Exhibit P-74 is
10      marked for identification.)
11          - - -
12  BY MR. MAHONEY:
13      Q.      Mr. Billingsley, this is another
14  e-mail exchange between you and Mr. Miller.
15  You write to him on May 11th, 2015.  The
16  subject is, "Financial relationship with
17  Frank."
18          And you write, "Dear Gary, It is
19  becoming clear that we are going to need to
20  keep the original deal in place for Frank's
21  money.  When can you talk today?"
22          And he writes back, "Anytime.
23  Now is okay."
24          What were you referring to when

Page 232

1  you wrote that it's becoming clear that you
2  need to keep the original deal in place for
3  Frank's money?
4      A.      Yeah, I -- we were having so
5  many phone conversations, the context of this
6  is the only thing that would define its
7  meaning.
8      Q.      I don't know what that means.
9  What do you mean by that?
10      A.      The context of our discussions
11  verbally is the only thing that would define
12  what that would mean.
13      Q.      Well, what were the contexts of
14  your discussions verbally, then?
15      A.      I don't recall.  It's just too
16  long ago.
17      Q.      You don't know what you're
18  referring to here when you talk about "the
19  original deal in place for Frank's money"; is
20  that right?
21      A.      It could have meant many
22  different things in this -- in this e-mail.
23      Q.      So the answer is, you don't
24  recall, correct?

Page 233

1          MR. GREEN:  Objection.  Asked
2      and answered.
3          You can answer.
4      A.      I believe it could have meant
5  many different things.
6  BY MR. MAHONEY:
7      Q.      When did you first meet David
8  Wyllie?
9      A.      I remember the time frame.  It
10  would have been pretty early on.  Darbin and
11  Debby introduced me to David.  I would ballpark
12  it maybe late 2012, early 2013.  Actually, I
13  believe it would almost -- almost have to be
14  sometime throughout 2012.
15      Q.      Do you recall having any
16  dealings with Mr. Wyllie with regard to
17  Mr. Pavlis' assets or his estate?
18      A.      Can you explain "dealings"?
19          MR. MAHONEY:  Yes.  Cam, put up
20  CHRON304.
21          MS. REDFERN:  This will be P-75.
22          MR. MAHONEY:  Thank you.
23          - - -
24          (Whereupon, Exhibit P-75 is

59 (Pages 230 - 233)

JUSTIN C. BILLINGSLEY

Page 234

1    marked for identification.)
2           - - -
3  BY MR. MAHONEY:
4        Q.     Mr. Billingsley, this is an
5  e-mail exchange between you and a gentleman
6  named Irwin Warren in July of 2015.
7           Who is Mr. Warren?
8        A.     I believe Mr. Warren was an
9  attorney that I was introduced to by Don
10 Bivens.
11       Q.     And I apologize, the bottom of
12 this begins with an e-mail exchange between you
13 and another attorney in Philadelphia, William
14 Hangley.  And on July 13th, you wrote to
15 Mr. Hangley, Mr. Warren and some others,
16 including Mr. Bivens and Wyllie, "David and I
17 would like to bring Frank to meet you in the
18 interests of advancing discussion with you
19 connected to his estate."
20       Why did you want to meet with
21 Mr. Hangley or anyone else about Mr. Pavlis'
22 estate in July of 2015?
23       A.     The -- Mr. Wyllie had some
24 concerns.  I'm trying to remember the details.

Page 235

1  I remember that Mr. Wyllie had asked me a lot
2  of questions I didn't know answers to.  I went
3  to Don Bivens, and he referred me to
4  Mr. Hangley.  And Mr. Hangley referred me to
5  Mr. Irwin.
6        Q.     What was the nature of the
7  questions that he asked you?
8        A.     I don't recall specifically.  He
9  wanted to know how to do a good job at what he
10 was going to try to do.  He wanted to know --
11 have verification that Frank's current
12 brokerage was doing things right and doing a
13 good job and wanted to understand some things
14 about Frank's trust.  Just general care and
15 concern matters, is what I understood it to be,
16 that he was trying to review and think through.
17       Q.     Well, why is it that you
18 initiated some contact with Mr. Hangley?  And
19 then it looks like, if you scroll up in the
20 e-mail exchange, it looks like you scheduled a
21 meeting with Mr. Hangley and Mr. Irwin to
22 discuss Mr. Pavlis' estate.
23       A.     So what was the question?
24       Q.     Yes.  Why did you schedule that

Page 236

1  meeting?
2        A.     I certainly didn't go to the
3  meeting.  I was looking to support Frank and
4  his then power of attorney that I knew Darbin
5  and Debby to support.  They're the ones that
6  insisted David become the power of attorney.
7  And David seemed to have legal questions.
8           So I asked my attorney for
9  the -- a referral.  They set up a meeting.  And
10 then from what I understood, David took Frank
11 to the meeting.  I don't believe I knew
12 anything past that.
13       Q.     Mr. Wyllie didn't tell you what
14 took place at the meeting or as a result of the
15 meeting?
16       A.     I believe that we talked.  I
17 believe that he had come to the conclusion that
18 things were okay, that things were good.  His
19 concerns were put to rest pretty well, from
20 what I understood.
21          MR. MAHONEY:  Okay.  Cam, put up
22 CHRON307 and 308, please.
23          MS. REDFERN:  These will be P-76
24 together.

Page 237

1          MR. MAHONEY:  Thank you.
2           - - -
3          (Whereupon, Exhibit P-76 is
4  marked for identification.)
5           - - -
6  BY MR. MAHONEY:
7        Q.     Mr. Billingsley, this is an
8  e-mail, August 24th, 2015, from you to
9  Mr. Wyllie.  The subject is, "POA," power of
10 attorney.
11          And you write, "Dear David,
12 Please let me know that you received this.
13 Thank you."
14          And if we turn to the
15 attachment, this is an unsigned form of Durable
16 Power of Attorney purporting to make Mr. Wyllie
17 the POA for Mr. Pavlis.
18          Why were you sending Mr. Wyllie
19 an unsigned draft or an unsigned copy of a
20 durable power of attorney between him and
21 Mr. Pavlis?
22       A.     I don't recall the details.
23 If -- if I remember right, he wanted to see
24 additional documents maybe to compare with his.

60 (Pages 234 - 237)

JUSTIN C. BILLINGSLEY

Page 238

1 I don't recall the details.
2    Q.    Do you know whether Mr. Wyllie
3 was, in fact, the power of attorney for
4 Mr. Pavlis as of August 24th of 2015 or not?
5    A.    As of August 2015. I don't
6 recall. I -- I don't recall definitively. I
7 seem to remember me asking him to send me an
8 executed power of attorney if I was going to be
9 interacting with him going forward in
10 connection with Frank's investments. I feel
11 like he sent those to me, but I -- I don't
12 remember.
13    Q.    But my question is, why are you
14 sending this to him?
15    A.    I believe in a phone
16 conversation, he had asked for it. He had
17 said, hey, do you have any documents I can look
18 at. I want to -- I want to say I remember that
19 he wanted documents to compare with stuff that
20 his attorney was giving him.
21    Q.    Do you recall whether Mr. Wyllie
22 and/or you made any effort to move Mr. Pavlis'
23 assets away from Glenmede Trust to another
24 institution, in particular Fidelity?

Page 239

1    A.    I remember there was a moment
2 when Debby was very, very angry and had
3 mentioned something about that type of
4 accusation. I had never -- I had never seen
5 any details on it, that I can remember.
6    Q.    Do you know whether Mr. Wyllie
7 took any steps to move those assets away from
8 Glenmede?
9    A.    The only thing I could know of
10 that he did was meet with the attorneys that I
11 made introduction for.
12        MR. MAHONEY: Cam, can you put
13    up CHRON136, please.
14        MS. REDFERN: This will be P-77.
15        - - -
16        (Whereupon, Exhibit P-77 is
17    marked for identification.)
18        - - -
19 BY MR. MAHONEY:
20    Q.    Mr. Billingsley, I will
21 represent to you that at least the top portion
22 of this are Mr. Pavlis' notes. And it purports
23 to be notes of a visit that Justin and David
24 made on July 23rd of 2015.

Page 240

1        Do you recall meeting with
2 Mr. Pavlis in or around July of 2015 with
3 Mr. Wyllie as well?
4    A.    No, I don't have any
5 recollection of that. And I have no reason to
6 believe that this is Mr. Pavlis' handwriting.
7    Q.    Do you have reason to doubt that
8 it's Mr. Pavlis' handwriting?
9    A.    Sure.
10    Q.    And what's your basis for saying
11 that you doubt it is?
12    A.    Because it was produced by you.
13    Q.    Okay. Anything else besides
14 that?
15    A.    That it defends and supports
16 your horrible allegations. Yeah, that's the
17 basis for it.
18    Q.    How does this defend and support
19 my horrible allegations?
20    A.    Because you have it up on the
21 screen.
22    Q.    Okay. Is there anything in the
23 substance here that you can read that makes you
24 think that it's not Mr. Pavlis or not his

Page 241

1 writing, rather?
2    A.    Nothing that would make me think
3 it is.
4    Q.    Do you recall advising
5 Mr. Pavlis or at least discussing with him that
6 he should give all of his Air Products shares
7 to Watchtower and then sell off his remaining
8 shares and buy bonds because they were lower
9 risk? Do you recall a discussion along those
10 lines?
11    A.    I remember I met with Mr. Pavlis
12 once or twice with Darbin. And Darbin had
13 spoken to Mr. Pavlis about -- about that topic,
14 yes.
15    Q.    So you don't recall having a
16 discussion like that with Mr. Pavlis where
17 Darbin Skeans was not present?
18    A.    No, I don't.
19        MR. MAHONEY: Cam, scroll down
20    to the next page or two. There's another
21    handwritten note.
22 BY MR. MAHONEY:
23    Q.    Do you recognize any writing on
24 this page?

JUSTIN C. BILLINGSLEY

Page 242

1     A.     No, I don't.
2     Q.     Do you see that somebody wrote,
3  "Written by Justin on Tuesday, August 25th,
4  2015"?
5     A.     I see that at the top, yeah.
6     Q.     Is that your writing where it
7  says, "Does the Air Products stock get involved
8  in any transactions with other investors?"
9     A.     Is that my writing?  No, I don't
10  have any reason to believe that's my writing.
11     Q.     Do you have any reason to
12  understand why Mr. Pavlis would have written,
13  "Written by Justin on Tuesday, August 25th,
14  2015"?
15     A.     I don't believe he wrote that.
16     Q.     Who do you think wrote it?
17     A.     I think someone other than
18  Mr. Pavlis.
19     Q.     Do you know who?
20     A.     I don't know who wrote that.
21     Q.     And then beneath that question,
22  then it says, "Such as short selling options,
23  puts or anything else that would involve
24  another investor," it looks like it's the same

Page 243

1  writing as whoever wrote "Written by Justin."
2  Then it says, "FEP called Glenmede (Brian
3  Green)," there's a phone number and continues,
4  "And asked" -- it looks like "same (Justin)
5  question," or maybe "above question." I can't
6  quite make that out.  And it concludes by
7  writing, "Answer no."
8         Is it still your contention that
9  you didn't write that question for Mr. Pavlis
10  to ask of Glenmede?
11     A.     I don't believe that this is my
12  handwriting or Frank's, no.
13         MR. MAHONEY:  All right.  You
14     can get rid of that, Cam.
15         Thank you.
16  BY MR. MAHONEY:
17     Q.     Why did you, or more correctly,
18  I think, why did Chad Self form Equity
19  Partners, LLC -- I'm sorry, Equity Pros, LLC?
20  Forgive me.
21     A.     On the advice of counsel.
22     Q.     All right.  What was your
23  understanding as to why that entity needed to
24  be formed?

Page 244

1     A.     Equity Pros, similar to other
2  entities, from my understanding, were to be
3  operating entities.
4     Q.     Do you know how Equity Pros was
5  funded?
6     A.     In what respect?
7     Q.     In any respect.  How did it get
8  the money that it used to conduct its business?
9     A.     I believe money came in from
10  transactions.  Money was funded from Key.
11  Money was funded from -- depending upon the
12  transaction, from what I understood, if cash
13  was generated, it was passed to Equity Pros
14  as -- as the operating entity.
15     Q.     Did you keep Mr. Pavlis informed
16  as you created Equity Pros?
17         And you may recall from
18  Mr. Self's deposition, there were a number of
19  other entities that were created.  Did you keep
20  Mr. Pavlis informed of all that?
21     A.     I believe I did get advice from
22  counsel that it would make sense not only from
23  an asset protection standpoint, but also in the
24  event that we would be able to move into being

Page 245

1  acquired or merged or sold, to be able to sell
2  one of our entities and to bundle the
3  technology that was appropriate to that
4  business model in each entity.
5         So from what I understand, there
6  was quite a lot of tax planning, quite a lot of
7  business strategic thinking that was tied up in
8  there.
9     Q.     That wasn't my question.
10         The question was, did you keep
11  Mr. Pavlis apprised of developments --
12     A.     Oh.
13     Q.     -- relating to his investment?
14     A.     Yes, I believe we did discuss.
15  Counsel was giving developments of how things
16  were moving along and all the details related
17  to that, yes.
18     Q.     And again, this is now 2016.
19  This is, according to you, a couple years after
20  Mr. Pavlis agreed that ultimately Key
21  Commercial would be in possession of his
22  $7 million investment.  And not a single
23  written report to Mr. Pavlis?  Is that your
24  testimony?

62 (Pages 242 - 245)

JUSTIN C. BILLINGSLEY

Page 246

1          MR. GREEN:  Object to form.
2   BY MR. MAHONEY:
3      Q.      You can answer, Mr. Billingsley.
4      A.      I know on several of our
5   meetings, I would provide written reports to
6   Mr. Pavlis.  We would look at them.  We would
7   talk about them.  We would go out to breakfast.
8   We would go out to lunch.  And I would ask him
9   if he'd like to keep it.  He'd say no, you just
10  keep it.
11     Q.      So he never wanted to keep any
12  of that information; is that your testimony?
13     A.      No, he didn't.  Not after things
14  were moving along and --
15     Q.      How about the -- I'm sorry.
16  Finish.
17     A.      No, not after things were moving
18  along.  At the beginning, you know, we did give
19  him documents and he did keep them.  And then
20  at a certain point, he just wanted me to take
21  it all back.  He was fastidious about things
22  cluttering up.  And he was getting ready to
23  move.  So he was, for a long time, preparing
24  for that.

Page 247

1      Q.      Again, you're talking about his
2   move into Legacy Place?
3      A.      Correct.
4      Q.      How about once he moved to
5   Legacy Place, did he tell you that he still
6   didn't want to have any documents?
7      A.      I don't know that he said that.
8   We -- after we talked about it several times,
9   we didn't just continue to talk about it.  So I
10  don't recall that topic coming up again in our
11  later discussions.
12     Q.      Do you recall that Debby Skeans
13  became Mr. Pavlis' power of attorney sometime
14  in late March of 2016?
15          Does that sound about right?
16     A.      Yeah.  I don't know.  I don't
17  have any understanding of the time frame.
18     Q.      Well, you know at some point,
19  she became power of attorney, correct?
20     A.      Correct.
21     Q.      And after she became power of
22  attorney, you recall her asking you for
23  information about Mr. Pavlis' investments,
24  right?

Page 248

1      A.      Yes.
2      Q.      What do you recall telling her
3   about Mr. Pavlis' investments, when she first
4   began asking?
5      A.      I was quite cautious at the
6   beginning.  It felt inappropriate and dirty for
7   Debby to become the power of attorney, given
8   how hard she had solicited Frank for money,
9   given how involved she was in Frank.
10          And at some point, I grew quite
11  worried of her connection with Sperry Van Ness'
12  platform that was in direct competition to all
13  that I was building with Frank's money.
14          So I was very cautious.  Debby
15  never provided any documentation as to her
16  being a power of attorney for a very, very long
17  time.  So I was just continuing to be as
18  cautious as I could with Debby.
19     Q.      But you did provide her some
20  information, right?
21     A.      Eventually, I believe I did.
22          MR. MAHONEY:  Cam, let's put up
23     311 and 312.
24          MS. REDFERN:  Together these

Page 249

1   will be P-78.
2          MR. MAHONEY:  Thank you.
3              - - -
4          (Whereupon, Exhibit P-78 is
5   marked for identification.)
6              - - -
7   BY MR. MAHONEY:
8      Q.      Mr. Billingsley, this is a
9   May 11th, 2016 e-mail from you to Debby Skeans.
10  The subject is, "Frank's inventory."  And you
11  attach a document from Equity Pros.
12          And your cover e-mail says,
13  "Dear Debby, Sorry for delay.  Please see
14  attached."
15          Why were you sending her this
16  information relating to what you call Frank's
17  inventory?
18     A.      She had requested it.
19     Q.      Well, what did she actually
20  request?
21     A.      How Frank's money was invested.
22     Q.      Okay.  And so you provided this
23  to her.  And if I add this up, it's roughly
24  $3 million of total cost.

63 (Pages 246 - 249)

JUSTIN C. BILLINGSLEY

Page 250

1    Did you say anything to
2 Ms. Skeans, when she asked how Mr. Pavlis'
3 money was invested, that, in fact, it was
4 invested through a company that you owned, Key
5 Commercial?
6        MR. GREEN: Object to form.
7        THE WITNESS: Can you rephrase
8    the question, Mr. Mahoney, so I can
9    understand it better?
10 BY MR. MAHONEY:
11    Q.    Yes.  When Ms. Skeans asked you
12 for information on Frank's investments on or
13 before May 11th of 2016, did you inform her at
14 all that Mr. Pavlis had invested in Key
15 Commercial Finance, a company that you
16 controlled?
17    A.    No.  I believe at this time, I
18 was still operating from the position of
19 caution.  At this point, she had shown herself
20 to be quite unstable.  And I had still -- I
21 believe at this point, I still had not seen any
22 documented legal proof or evidence that she was
23 Frank's power of attorney.
24    Q.    Well, then why did you provide

Page 251

1 her even with this information?  Why didn't you
2 say, Debby, until I'm convinced that you are
3 actually Frank's power of attorney, I think
4 it's inappropriate that I share any
5 information?
6    A.    Yes, Debby was quite a powder
7 keg.  I was trying real hard not to provoke her
8 and keep things non-adversarial.
9    Q.    So how did providing some
10 information about Mr. Pavlis' investment, but
11 not all of it, how did that accomplish that
12 goal?
13        MR. GREEN: Object to form.
14    A.    I believe it accomplished that
15 goal.
16 BY MR. MAHONEY:
17    Q.    How?
18    A.    That she got a report that she
19 requested.
20    Q.    Okay.  But you said she
21 requested information relating to his
22 investments, right?  And you only gave her
23 information relating to part of his investment.
24 And I'd like to know why.

Page 252

1    A.    Yeah, I don't think it was that
2 fact pattern at all.  Debby simply requested an
3 update.  I don't remember the exact terminology
4 that she used.  But whatever she requested, I
5 believe that this was a -- an adequate
6 response.
7    Q.    Do you have any reason to think
8 that Ms. Skeans knew, prior to you sending this
9 to her, how much Mr. Pavlis had invested or
10 where he had invested that money?
11    A.    I have no idea what Mrs. Skeans
12 knew.
13    Q.    Do you recall, throughout the
14 course of 2016 and into 2017, both Mr. and
15 Mrs. Skeans repeatedly asked you to come to
16 Allentown and visit Frank, and you repeatedly
17 chose not to come, for whatever reason?
18        MR. GREEN: Object to form.
19    A.    You're asking me if I remember?
20 BY MR. MAHONEY:
21    Q.    Yes.
22    A.    Yeah, I don't believe that's the
23 way it went.  I don't believe I chose not to
24 come.

Page 253

1    Q.    Did you meet with Mr. Pavlis in
2 person at any point between May of 2016 and,
3 let's say, the end of that year?
4    A.    Yeah, I -- I don't recall.  I
5 recall I was willing.  I recall there was a
6 couple of times when I tried to come down and
7 they were going on a cruise.  And then Debby
8 had delegated that meeting to someone I didn't
9 know, someone that worked for her.  And I
10 didn't feel comfortable with that.
11        So we had decided until they got
12 back from their very, very lengthy cruise -- I
13 think they went on -- it was at least two one-
14 or two-month cruises during that time frame,
15 maybe even three.  There were very prolonged
16 periods of time that they were out-of-town.
17 And despite my attempts to come down and meet
18 with them, also, they were unavailable.
19    Q.    So fair to say, then, you don't
20 recall meeting with Mr. Pavlis from May through
21 December of 2016?
22    A.    I don't remember.  I -- I have a
23 very foggy recollection.  I thought that we
24 might have.  But I'm having a hard time

64 (Pages 250 - 253)

JUSTIN C. BILLINGSLEY

Page 254

1 gathering it. So I can't quite gather it right
2 now. I seem to have a small recollection that
3 we did.
4 Q. But no specifics, right, in
5 terms of --
6 A. Not as I sit here.
7 Q. Are you familiar with a project
8 referred to as 866 Regal Street?
9 A. 866 Regal?
10 Q. Yes.
11 A. Yes, I believe I am.
12 Q. And what's your understanding of
13 that project?
14 A. If you could put that form back
15 up and let me verify if that was our big
16 custom-build. I'm pretty sure it was. So if
17 it was the big custom-build, that was a project
18 where we had bought -- I think we bought a
19 lot --
20 THE WITNESS: Thank you, Cam.
21 A. (Continuing) Yeah, 866 Regal.
22 So we had bought a lot, tore down the house,
23 re-subdivided the lot, and built a custom spec
24 home.

Page 255

1 BY MR. MAHONEY:
2 Q. Was that home ultimately sold
3 for a profit or a loss?
4 A. For a profit.
5 Q. Do you recall approximately how
6 much the profit was?
7 A. I don't recall.
8 Q. Do you recall when that property
9 was sold?
10 A. No, I don't recall.
11 Q. Assuming the property was sold
12 and there was a profit, would we expect to see
13 some amount of money related to that
14 transaction flow into Equity Pros' general
15 ledger?
16 A. Oh, absolutely, yeah. Every --
17 every penny that was generated from Allwest, we
18 had Eide Bailly audit exhaustively every tiny
19 penny. And the gentleman there at Eide Bailly,
20 I forget his name, I think it was
21 Joshua-something, had spent a lot of time
22 making sure every penny that was given to
23 Allwest and every ounce -- every penny of the
24 profits were returned.

Page 256

1 MR. MAHONEY: Cam, let's put up
2 CHRON139.
3 MS. REDFERN: This will be P-79.
4 - - -
5 (Whereupon, Exhibit P-79 is
6 marked for identification.)
7 - - -
8 BY MR. MAHONEY:
9 Q. Mr. Billingsley, I'll represent
10 to you that this is a fax cover sheet from a
11 fax dated November 19th, 2016. At the upper
12 right-hand side, it says, "From: Christine
13 Lachapelle." It was "To: Debby Skeans." The
14 re line is "Frank Pavlis." And it says, "Dear
15 Debby, Please note Frank's docs."
16 Who was Christine Lachapelle?
17 A. She was someone that worked for
18 us.
19 Q. Do you know why she was faxing
20 to Ms. Skeans documents? And I'll represent to
21 you they are the September 21, 2014 Key
22 Commercial note for $3 million and the
23 corresponding note subscription agreement.
24 A. That -- I don't know what she

Page 257

1 sent nor do I know why.
2 Q. Do you recall Ms. Skeans
3 continuing, after receiving the information
4 that you sent in May for Equity Pros,
5 continuing to ask you about information
6 relating to Mr. Pavlis' investments?
7 A. This -- this document is dated
8 after litigation began. I would suppose that
9 you subpoenaed Christine for document
10 production.
11 Q. No. Litigation didn't begin
12 until 2018. This is dated 2016.
13 A. 2016. Sorry. I was looking at
14 2019. But it's just 11/19.
15 Okay. So I got sidetracked
16 there. Sorry, Mr. Mahoney. What was your
17 question?
18 Q. You recall Ms. Skeans asking for
19 additional information relating to Mr. Pavlis'
20 investment, right?
21 A. Yes.
22 Q. And isn't it true that you told
23 Ms. Lachapelle to send the documents relating
24 to the September 1, 2014 promissory note to

JUSTIN C. BILLINGSLEY

Page 258

1 Ms. Skeans in or around mid-November 2016?
2    A.    I wouldn't submit to that. I
3 don't know what she sent.
4    Q.    Okay. Well, if you turn to
5 the --
6        MR. MAHONEY: Cam, just flip
7    through it quickly.
8 BY MR. MAHONEY:
9    Q.    What she sent is exactly what I
10 just said, which is a copy of the September 1,
11 2014 note and corresponding note purchase
12 agreement.
13    A.    Okay.
14    Q.    My question is, did you ask or
15 direct Ms. Lachapelle to send that to
16 Ms. Skeans?
17    A.    I don't recall.
18    Q.    Do you know why Ms. Lachapelle
19 would be sending to Ms. Skeans in November 2016
20 documents relating to the $3 million note, but
21 not documents relating to the $4 million note?
22    A.    I wouldn't think that something
23 was withheld. If we're going to send this, why
24 wouldn't we send both?

Page 259

1    Q.    Well, that's a good question.
2 But she didn't. So I'm asking why.
3    A.    No, I -- I don't have any
4 recollection of this. The documents were
5 available at any time. Now that my attorneys
6 were working with us on the documents, it
7 was -- it was not a secret in any respect.
8    Q.    Did you ever tell Debby Skeans
9 that there was a second note?
10    A.    I don't -- I don't recall at
11 all.
12    Q.    I think you mentioned earlier
13 something about an investment in Mobile Corp.
14        Do you recall investing
15 approximately a half a million dollars of the
16 money that you received or Key Commercial
17 received from Mr. Pavlis into some form of
18 investment with Mobile Corp.?
19        MR. GREEN: Object to form.
20    A.    You're asking if I recall
21 investing in Mobile Corp.?
22 BY MR. MAHONEY:
23    Q.    Yes.
24    A.    Yes, I believe we were doing

Page 260

1 everything in our power to develop the best
2 opportunities we could. And investing in
3 Mobile Corp. was an important part of that.
4    Q.    Were you aware that when
5 Mr. Pavlis invested the $2 million in Mobile
6 Corp. back in September of 2014, that Mobile
7 Corp. had virtually no money?
8        MR. GREEN: Object to form.
9    A.    I would have no way of knowing
10 that. I never had access to that information
11 at all.
12 BY MR. MAHONEY:
13    Q.    Did you have any sense of how
14 Mobile Corp. was doing while you were acting as
15 its president or in some other capacity?
16    A.    Yeah. The audited financials
17 that -- by -- they had audited financials from
18 a huge accounting firm, EKSH, I believe. The
19 members of the board that I would occasionally
20 speak to gave lots of encouraging remarks. The
21 CEO was highly enthusiastic. So everyone I
22 spoke to was highly enthusiastic about the
23 project.
24    Q.    Are you surprised to learn that

Page 261

1 they had almost no money in the bank at the
2 time that Mr. Pavlis invested $2 million in
3 September 2016?
4        MR. GREEN: Object to form.
5    A.    I don't remember how I felt at
6 the time about -- you're asking me if I'm
7 surprised to learn now?
8 BY MR. MAHONEY:
9    Q.    Yes.
10    A.    Oh. No, not necessarily. I
11 don't think that -- I don't know how much money
12 was raised at that point. I don't think it was
13 much at all. And I know that there was an
14 enormous amount of effort being put forth. So
15 I'm sure there was expense related.
16        MR. MAHONEY: Cam, would you
17    mind putting up CHRON333.
18        MS. REDFERN: This will be P-80.
19        - - -
20        (Whereupon, Exhibit P-80 is
21    marked for identification.)
22        - - -
23 BY MR. MAHONEY:
24    Q.    While we're waiting for that,

66 (Pages 258 - 261)

JUSTIN C. BILLINGSLEY

Page 266

1 comfortable disclosing details. Please provide
2 proof that you are, in fact, the power of
3 attorney?
4     A.    Yeah.  Yeah.  Looking back on
5 it, I wish I would have.
6     Q.    Okay.
7     A.    However, as I had mentioned,
8 Debby is -- is very volatile and erratic.  And
9 I was working hard to do damage control to not
10 set her off.  I was, in my opinion, working in
11 the best interests of keeping Frank's
12 investment safe and healthy and well-guarded
13 from those I didn't know to be authorized for
14 it.
15     Q.    Okay.  But you didn't bother to
16 ask the question.  She's telling you that she
17 has the power of attorney, right?
18           You understood she had the power
19 of attorney?
20     A.    It's not my duty to ask that
21 question.
22           MR. MAHONEY:  Okay.  Cam, would
23     you put up 345, please.
24           MS. REDFERN:  This will be P-81.

Page 267

1               - - -
2           (Whereupon, Exhibit P-81 is
3     marked for identification.)
4               - - -
5 BY MR. MAHONEY:
6     Q.    Mr. Billingsley, this is an
7 e-mail -- not exchange -- just two e-mails from
8 Mrs. Skeans.  The first one is the December 7th
9 e-mail that I just went over with you.  And
10 then she's sending a follow-up e-mail, or at
11 least a tag-along e-mail, on September 15th of
12 2017.
13           And she writes, "Justin, I've
14 been hoping to discuss the possible Allwest
15 investment with you.  Your last communication
16 indicated it perhaps was not completed but I
17 did find in our files this paperwork that seems
18 to indicate Allwest Investments in Frank's
19 name.  Please review and let me know how to
20 reconcile."
21           And then she says, "Frank also
22 received a call last week (he said it was a
23 woman from Arizona) related to some
24 investments.  I cannot call her back since he

Page 268

1 did not get her number.  Frank is concerned
2 about the call.  Can you shed some light on
3 it?"
4           Do you recall receiving this
5 e-mail?
6     A.    I don't recall receiving it.
7 But I'm reading it.  I recall seeing it right
8 now.
9           MR. MAHONEY:  Cam, go to 347,
10     please.  I probably should have just
11     started with this one, actually,
12     but . . .
13           MS. REDFERN:  This will be P-82.
14               - - -
15           (Whereupon, Exhibit P-82 is
16     marked for identification.)
17               - - -
18 BY MR. MAHONEY:
19     Q.    This is the same two e-mails
20 that Ms. Skeans sent you.  And then you reply
21 on September 15th of 2017.  You say, "Dear
22 Debby, Hello and thank you for the e-mail.  I
23 am also eager to catch up with you and hope all
24 is going well.  As we have discussed a few

Page 269

1 times, Frank's investment is with Key
2 Commercial Finance and always has been.  Do you
3 remember all of the documents that I sent you
4 on Key Commercial Finance earlier in the year?"
5           So first off, what conversations
6 are you referring to when you say, "As we have
7 discussed a few times, Frank's investment is
8 with Key Commercial Finance"?
9     A.    I must have been referring to
10 phone conversations that I had with her.
11     Q.    Well, why would you be having a
12 phone conversation with her if you didn't trust
13 or believe that she was power of attorney?
14           MR. GREEN:  Object to form.
15     A.    Yeah, I had already sent the Key
16 docs.  My impression was that all of the Key
17 docs were sent.  And yeah, I was looking to --
18 to satisfy Debby's questions as best I could.
19 BY MR. MAHONEY:
20     Q.    When you say, "Do you remember
21 all the docs that I sent you on KCF earlier in
22 the year," is that what you're referring to?
23     A.    I'm assuming.
24     Q.    Okay.  Did you ever discuss with

68 (Pages 266 - 269)

JUSTIN C. BILLINGSLEY

Page 274

1    MS. REDFERN:  And we're on P-83.
2       - - -
3       (Whereupon, Exhibit P-83 is
4    marked for identification.)
5       - - -
6       MR. MAHONEY:  Go down to the end
7    of that document, Cam.
8       MS. REDFERN:  (Scrolling through
9    document.)
10      MR. MAHONEY:  Okay.
11   BY MR. MAHONEY:
12   Q.    So, Mr. Billingsley, this is an
13   e-mail exchange between or, rather, among you,
14   myself and Mr. Bivens.  And we'll see on
15   May 19th, you write to me, "Based upon our
16   'your eyes only agreement,' please
17   consideration this presentation link to see
18   most of the platforms that we have built and
19   wholly own."
20      And then if you scroll up, you
21   follow up by saying, another e-mail to me, "As
22   it is important for me to know as soon as
23   possible if I am likely to get back on stable
24   footing with the Skeanses please let me know

Page 275

1    your first convenience for a presentation
2    appointment this week."
3       And you are referring to you
4    wanting to run through the platform; is that
5    right?
6    A.    I'm sorry, there was a big -- a
7    big distortion right there, the last three or
8    four words of your sentence.  Would you mind?
9    Q.    Yes.  In this follow-up e-mail,
10   the presentation appointment, you were
11   referring to wanting to show me what Key
12   Commercial was all about, essentially the link
13   that you had provided in the prior e-mail,
14   right?
15      MR. GREEN:  Object to form.
16      You can answer.
17   A.    I don't know if that's right.  I
18   don't remember what I meant in the context of
19   this sentence.  I think, perhaps, I was also
20   looking to have a sit-down discussion with --
21   with the Skeanses.
22      MR. MAHONEY:  Okay.  Cam, if you
23   scroll up.
24   BY MR. MAHONEY:

Page 276

1    Q.    You'll see an e-mail from me to
2    you, Mr. Billingsley, copying Mr. Bivens.
3       MR. MAHONEY:  Keep going up.
4    Right there.
5    BY MR. MAHONEY:
6    Q.    You'll see on May 21st, I wrote,
7    "Mr. Billingsley, I've reviewed the attachments
8    you sent with your e-mail dated May 19th, and I
9    don't see how they provide any information
10   relating to the core issue - what happened to
11   Frank Pavlis' money?"  And then I proceed to
12   indicate to you the types of documents that I
13   wanted to see.
14      MR. MAHONEY:  Keep scrolling
15   back up toward the top.
16   BY MR. MAHONEY:
17   Q.    I sent a follow-up e-mail on
18   June 7th --
19      MR. MAHONEY:  Cam, where are
20   you?  I'm sorry.
21      MS. REDFERN:  Yes, this thread
22   ends at this May e-mail.
23      MR. MAHONEY:  All right.  So
24   then I must have the wrong document.  But

Page 277

1    since we're here.
2    BY MR. MAHONEY:
3    Q.    You write back, "Mr. Mahoney,
4    much if not all of the documents you are
5    looking forward are available.  I will work
6    with Don to figure out how far down this rabbit
7    hole I want to go given my standing with
8    Frank's investments are sound and healthy."
9       So you believe the investments
10   were sound and healthy as of May 21st of 2018;
11   is that right?
12   A.    Yeah, I believe I was --
13      MR. GREEN:  Object to form.
14   A.    (Continuing)  I believe I was
15   referring to the fact that neither of the notes
16   had come due.  I hadn't known really in any
17   respect the degree and the damage that Debby's
18   slander had done.  I was unaware of her work
19   with SFRhub, her motivations with SFRhub.  So
20   things seemed to be on good footing at that
21   point.
22      MR. MAHONEY:  Cam, would you
23   mind putting up 393, please.
24      MS. REDFERN:  This will be P-84.

70 (Pages 274 - 277)

JUSTIN C. BILLINGSLEY

Page 278

1              - - -
2         (Whereupon, Exhibit P-84 is
3      marked for identification.)
4              - - -
5  BY MR. MAHONEY:
6      Q.     Okay.  This is an e-mail from
7  Mr. Bivens to me.  It's dated Monday, June 25th
8  of 2018.  He copies you.
9         And he writes, "Bill, Justin
10 informs me that he has now tracked down and is
11 immediately ready to produce to you the PPM and
12 sub agreement for Key Commercial Finance given
13 to Frank Pavlis, which was also reviewed and
14 discussed with Frank's attorney Ed Lentz, and
15 with the Skeanses, before Frank made his
16 investments."
17        Is that accurate?  Did you or
18 somebody else discuss the private placement
19 memo and subscription agreement for Key
20 Commercial with Ed Lentz and the Skeanses
21 before Mr. Pavlis made his investments?
22     A.     I don't know what Don was
23 referring to here.  I didn't send this e-mail.
24     Q.     Right.  But you received it.

Page 279

1         Do you recall --
2      A.     You didn't ask if I received it,
3  though.  You asked about the context of that
4  statement.  I don't understand what Don was
5  thinking at that point.
6      Q.     Well, you understood that I was
7  still looking for documents, correct?
8      A.     I don't know that I would say I
9  understood that.  I believe we had already sent
10 quite a bit of documentation to you so far.
11     Q.     So when he writes, "Justin
12 informs me that he has now tracked down and is
13 immediately ready to produce to you the PPM and
14 sub agreement, are you saying that you don't
15 believe you told him that?
16        MR. GREEN:  Object to form.
17     A.     Yeah.  I don't know what Don
18 meant by this sentence.  I didn't write it.
19 BY MR. MAHONEY:
20     Q.     So no idea?  That's your
21 testimony?
22     A.     What Don wrote?
23        MR. GREEN:  Object to the form.
24 BY MR. MAHONEY:

Page 280

1      Q.     You have no idea what he's
2  referring to here; is that your testimony?
3      A.     I didn't write that sentence.  I
4  don't know what Don was referring to.
5      Q.     I didn't ask you that either.
6         I'm asking you if it's your
7  testimony that you have no idea what he's
8  referring to in that first sentence?
9         MR. GREEN:  Objection.
10        Mischaracterizes his testimony.  Object
11     to form.
12 BY MR. MAHONEY:
13     Q.     You can answer.
14     A.     Yeah.  Sitting here trying to
15 think through it, I -- I don't know what Don
16 would have been referring to.
17     Q.     Okay.  The last two sentences of
18 Mr. Bivens' e-mail says, "Justin has also
19 engaged an attorney, not our law firm, to
20 produce a comprehensive Investors Report, that
21 is nearly completed.  The expectation is that
22 the Investors Report will be ready to
23 distribute next week."
24        I'll represent to you that, to

Page 281

1  my knowledge, we were never provided an
2  investors report.
3         What's your understanding as to
4  the comprehensive investors report that
5  Mr. Bivens is referring to?
6      A.     I don't -- I don't recall at
7  this moment.  If I remember right, we had
8  spoken to a law firm.  I know we had at this
9  point engaged Eide Bailly.  And I believe we
10 were speaking through the Eide Bailly CPA,
11 Joshua Hayes, I believe was his name.  I
12 believe he had introduced us to someone that
13 could put together a big report, an attorney.
14 So I think that's what we were looking at.
15     Q.     Are you aware of anyone
16 preparing or at least beginning that
17 comprehensive investors report?
18     A.     As I just explained, yeah, I
19 remember us talking to somebody about it.  I
20 don't recall the details right now.
21     Q.     Okay.  I'm not talking about a
22 discussion.
23        Do you recall laying eyes on
24 either a completed investors report or a draft

71 (Pages 278 - 281)

JUSTIN C. BILLINGSLEY

Page 282

1 of an investors report?
2   A.   I don't recall how far it went.
3 I -- I -- it sounds very familiar that we did
4 engage a firm and we had lots of discussions
5 with them. I know that we had spent a lot of
6 time and money preparing the very extensive and
7 complex screen recordings of all of the
8 platform that was being built. I believe we
9 gave that to you, also.
10        And -- and I very much remember
11 that we had been speaking to -- to a firm about
12 putting together a good reporting presentation
13 for us.
14        MR. MAHONEY: Cam, I'm sorry,
15 what did I say that CHRON number was?
16        MS. REDFERN: This one is 84.
17        MR. MAHONEY: CHRON084, okay.
18 Do me a favor and put up 395, please.
19        MS. REDFERN: Now, this will be
20 85, P-85.
21        MR. MAHONEY: P-85, thank you.
22             - - -
23        (Whereupon, Exhibit P-85 is
24 marked for identification.)

Page 283

1             - - -
2 BY MR. MAHONEY:
3   Q.   So, Mr. Billingsley, this is an
4 e-mail that you sent to me June 29th of 2018,
5 copying Mr. Bivens. The subject is, "Re:
6 Documents you have requested from Justin
7 Billingsley."
8        And you write, "Bill, I have
9 faxed the original PPM, Sub Agreement and JV
10 Agreements to the fax number listed in your
11 e-mail sig," presumably my signature line. "I
12 am sorry this has taken longer than expected
13 but these documents were not easy to find as I
14 was not expecting to have to provide them."
15        So where did you find those
16 documents and why was it not easy to pull them
17 together, particularly if you were digital by
18 now?
19        MR. GREEN: Object to form.
20        You can answer.
21   A.   ==Yeah, I don't recall the==
22 ==details. I recall these were extremely,==
23 ==extremely busy times. And, you know, if we've==
24 ==got 30 or 40 folders of documents, it's -- I==

Page 284

1 believe we sent, in our document production,
2 over 12,000 documents to you. So it would make
3 sense that it would take a while to find what I
4 was looking for.
5 BY MR. MAHONEY:
6   Q.   Do you think you provided me
7 12,000 documents in or around June of 2018?
8   A.   I believe it was over --
9 something around 12,000 documents and e-mails
10 that we submitted in our document production.
11   Q.   Well, that's in connection with
12 this litigation. It hadn't started as of June
13 of 2018.
14   A.   But it's -- I think it's a good
15 indicator as to how many documents there are.
16   Q.   So where did you find these
17 documents, the private placement memo and the
18 subscription agreements?
19   A.   I don't recall.
20   Q.   Did anyone assist you in trying
21 to retrieve them?
22   A.   I don't recall.
23        MR. MAHONEY: All right. Cam,
24 if you can flip to 397.

Page 285

1        MS. REDFERN: This will be P-86.
2        MR. MAHONEY: Okay. Thank you.
3             - - -
4        (Whereupon, Exhibit P-86 is
5 marked for identification.)
6             - - -
7 BY MR. MAHONEY:
8   Q.   Mr. Billingsley, I'll represent
9 to you that this is the fax that you sent me.
10 If you look at the top, it has a line that
11 says, "To: Bill Mahoney, Page 1 of 45,
12 June 29th of 2018, From: Justin Billingsley."
13        Do you recognize the 1845 number
14 as being your number or the number associated
15 with Key Commercial Finance?
16   A.   No, I don't recognize that
17 number. We've had many, many numbers.
18   Q.   Okay. You don't doubt that you
19 actually faxed this packet of documents to me,
20 do you?
21   A.   No, I don't doubt that.
22   Q.   So it's your testimony that you
23 had to go back and dig through and somehow find
24 this private placement memo, among other

72 (Pages 282 - 285)

JUSTIN C. BILLINGSLEY

Page 286

1 documents, that you sent to me on June 29th of
2 2018, right?
3     A.     You're asking me if I had to
4 look for it?
5     Q.     Yes. Remember you just had the
6 e-mail where you said it took some time to find
7 it?
8     A.     Yes, I believe I had to look for
9 it.
10    Q.     What's that?
11    A.     Yes, I believe I had to look for
12 it.
13    Q.     Let me ask you this:  Instead of
14 looking for it, did you spend time in June of
15 2018 creating this document, the private
16 placement memo?
17         MR. GREEN:  Object to form.
18    A.     No, I did not.
19 BY MR. MAHONEY:
20    Q.     Who is Adrienne Dean?
21    A.     I don't -- I don't recognize the
22 name.
23         MR. MAHONEY:  Cam, can you do me
24 a favor and pull up document number 105.

Page 287

1         MS. REDFERN:  This was
2 previously marked P-5.
3         MR. MAHONEY:  Pull it up. Let
4 me see it. I may have the wrong one.
5 Cam, is that it?  I'm sorry.
6         MS. REDFERN:  Yes.
7         MR. MAHONEY:  Then I definitely
8 have the wrong one.  Okay.  Let's pull up
9 106.
10         MR. GREEN:  Cam, can you mute
11 your microphone?
12         MS. REDFERN:  Yes.  This will be
13 P-87.
14         MR. MAHONEY:  Great.  Thank you.
15         MS. REDFERN:  Sorry, it's taking
16 a minute.
17         MR. MAHONEY:  Okay.
18             - - -
19         (Whereupon, Exhibit P-87 is
20 marked for identification.)
21             - - -
22 BY MR. MAHONEY:
23    Q.     Mr. Billingsley, this is another
24 document that was produced by the defendants in

Page 288

1 this case.  Feel free to take a look through
2 it, please.  That purports to be a subscription
3 agreement of Key Commercial Finance, LLC, on
4 the first page with an effective date of June,
5 and there's a blank, of 2018.
6         Do you recall receiving this
7 document from an Adrienne Dean?
8     A.     No, I don't know an Adrienne
9 Dean.
10    Q.     Do you recall requesting a
11 document from Ms. Dean or somebody who's at
12 something called C -- that's the letter "C" --
13 C2 Group, LLC?
14    A.     No, I -- as I mentioned, I
15 worked with Jeff Peterson on these documents.
16 We worked on several different versions of
17 these documents.  And -- and were expecting to
18 present them to many different investors over
19 the course of the whole time.
20         So it doesn't surprise me that
21 there's a document dated June 18.
22    Q.     Were you still working with
23 Mr. Peterson in 2018?
24    A.     I don't recall.  I --

Page 289

1     Q.     I'm sorry, go ahead.  Do you
2 have something else to add?
3     A.     Yeah, I believe I was, actually.
4     Q.     And in what capacity were you
5 working with him?
6     A.     We were just trying to put
7 something together that would -- that would
8 work.  We were working very hard to salvage
9 Mobile Corporation.  We were working very hard
10 to get things put back together.  Yeah, as I'm
11 thinking through it, we were pretty active, if
12 I recall right.
13    Q.     Did that end or is that still
14 going on?
15    A.     No, it's -- it's ended.
16    Q.     Why has that ended, to your
17 knowledge?
18    A.     Yeah, I -- I believe he decided
19 he could get nothing more from me.
20    Q.     This Mr. Peterson?
21    A.     Yes.
22         MR. MAHONEY:  This document
23 here, which, again, I'll represent to
24 you -- and during the next break, I

73 (Pages 286 - 289)

JUSTIN C. BILLINGSLEY

Page 290

1    promise you I'll get you the e-mail.
2    But, Bill Green, for your benefit, the
3    Bates number is KCF009280, which is an
4    e-mail dated June 19th of 2018 from
5    Adrienne Dean to Mr. Billingsley.
6         This subscription agreement was
7    attached to that e-mail. She forwarded
8    it to him June 19th. And I will
9    represent to you that the subscription
10   agreement that is attached to
11   Mr. Billingsley's fax to me, which we
12   just went through -- Cam, what was that
13   e-mail? I'm sorry, what was that
14   document, the 45-page fax?
15        MR. GREEN: Is that P-86?
16        MS. REDFERN: Are you talking
17   about the one we just did prior to this?
18   It was P-86. It was CHRON397, P-86.
19        MR. MAHONEY: Okay.
20   BY MR. MAHONEY:
21   Q.    Again, Mr. Billingsley, if you
22   can just look at the first couple of pages of
23   this, because I want to flip back to that
24   document.

Page 291

1         MR. MAHONEY: Cam, actually,
2    better yet, can we do a side-by-side?
3         MS. REDFERN: Yeah, I'll set
4    that up. So you want this one?
5         MR. MAHONEY: I want that one
6    and then when you get to P-86, if you
7    flip through a handful of pages.
8         MS. REDFERN: Okay.
9         MR. MAHONEY: Give me a second.
10   About ten pages in, you'll see a
11   subscription agreement effective
12   August 18th of 2014.
13        MS. REDFERN: All right. So
14   we've got P-86 on the left and P-87 on
15   the right.
16        MR. MAHONEY: If you can get to
17   the first page of the subscription
18   agreement of both.
19        There you go. Thank you.
20        Wait, Cam. I'm sorry. You're
21   looking at -- yes. No, no, not the
22   convertible note.
23        MS. REDFERN: (Scrolling through
24   document.)

Page 292

1         MR. MAHONEY: That's the one.
2    Thank you.
3         Can you make the one on the
4    right a little smaller, Cam? There we
5    go. Thank you.
6         All right. I appreciate
7    everyone's patience there.
8    BY MR. MAHONEY:
9    Q.    So, Mr. Billingsley, I'll
10   represent to you, and you can feel free to
11   scroll through them, that with the exception of
12   changing the date and adding Mr. Pavlis'
13   information, the form of subscription agreement
14   that you received from Ms. Dean in June of 2018
15   is identical to the one that you faxed to me
16   less than ten days later on June 29th.
17        Can you explain to me that
18   coincidence?
19   A.    This is -- this is a
20   subscription agreement?
21   Q.    Right.
22   A.    Isn't it also identical to the
23   same one e-mailed or faxed to you in 2016?
24   Q.    You never faxed anything to me

Page 293

1    in 2016.
2    A.    Or that was faxed to Debby
3    Skeans from Christine Lachapelle in 2016.
4    Q.    No, it's not at all. This is a
5    subscription agreement of Key Commercial
6    Finance. This one is dated in June of '18.
7    A.    Got it. This was a very
8    standard document for us. I don't know who
9    Dean is. It's just not ringing a bell.
10        But we worked hard to get
11   comfortable with this document. I thought it
12   was a very good document that Jeff had given to
13   me. And, you know, why would Jeff be motivated
14   to give it to me in 2018? None of the fact --
15   none of the logic would make sense. And
16   it's -- it's completely in harmony with the
17   documents that were faxed to Debby in 2016.
18        So, yeah, this was the -- this
19   was the original document that Jeff and I
20   worked on back in, I would say, early 2014,
21   that we went back and forth on, back and forth
22   on, that I ended up using for Frank at the end
23   of 2014. And we continued to use it and
24   present it to many different other investors

74 (Pages 290 - 293)

JUSTIN C. BILLINGSLEY

Page 294

1 and continued to promote it throughout our
2 business operations.
3     Q.     Why do you think Mr. Peterson
4 sent this to you or was behind Ms. Dean sending
5 it to you?
6         MR. GREEN:  Objection, form.  I
7     don't think that's what he said.
8     A.     I didn't say that Dean was --
9 again, I don't know who Dean is.  I have no
10 idea why she sent that to me.  I'm not familiar
11 with her at all.
12 BY MR. MAHONEY:
13     Q.     Do you know somebody who has an
14 e-mail address of cray@c2groupllc.com?
15     A.     Cray@c2group?
16     Q.     Correct, llc.com.
17     A.     No, that doesn't sound familiar
18 at all.
19     Q.     Okay.
20     A.     Just feel free to slap this on,
21 Mr. Mahoney.  Maybe this is not the context at
22 all.  But it's just I'm confused.
23         Isn't this the same exact
24 document that we -- that Christine faxed in

Page 295

1 2016?
2     Q.     I don't know that it is, quite
3 frankly.
4         My question is, what was going
5 on in June of 2018, shortly before you provided
6 this subscription agreement to me?
7     A.     Yeah.  It was a standardized
8 document at that point.  And I think it's a
9 good document.
10     Q.     But, again, you have no idea who
11 Ms. Dean is or cray@c2groupllc?
12     A.     I'm trying really hard to
13 remember.  Her first name was what again?
14     Q.     Adrienne?
15     A.     And it's spelled D-e-a-n?
16     Q.     Correct.
17     A.     Yeah.  Sorry.  Absolutely no
18 idea.
19     Q.     Okay.  Let me shift gears for a
20 moment.  And explain to me, because you
21 mentioned it a couple times, how did -- well,
22 say that the Skeanses defamed you.  But walk me
23 through that.  What are you referring to?
24     A.     You know, I -- I'm pretty angry

Page 296

1 about that.  Would you like the two- to
2 three-minute version or the 30- to 45-minute
3 version?
4     Q.     You can give me the two to
5 three.
6     A.     I'm shocked and appalled that
7 this has taken place.  I think for the version
8 that you would like to hear or are asking
9 about, it has more to do with the reporter from
10 the Arizona Republic contacting Debby, and
11 Debby making such false, knowingly destructive
12 comments about me.
13     Q.     Okay.  So you're aware that you
14 and Key Commercial Finance filed a Third-Party
15 Complaint against Mr. and Mrs. Skeans, correct?
16     A.     In defense of this lawsuit, yes.
17     Q.     Okay.  And that Third-Party
18 Complaint indicates that you believe that
19 something that Mrs. Skeans said or Mr. Skeans
20 said to this reporter, Craig Harris, somehow
21 defamed you and Key Commercial, correct?
22     A.     Yes.
23     Q.     What is it that you believe
24 either Mr. or Mrs. Skeans told the reporter

Page 297

1 that you believe was defamatory?
2     A.     We'd have to look back into the
3 written article for all of the -- all of the
4 juicy details.
5         I know that they -- Debby had
6 told the reporter that Frank was in failing
7 memory; that Frank didn't know what he was
8 doing, even though at the same time she was
9 taking, what, six, seven, $8 million from
10 Frank.  And characterized my engagement with
11 Frank as -- as just wrongly -- it was very,
12 very malicious, how she characterized it.  I
13 think she had motive.
14     Q.     What's your basis for saying
15 that she made any of those statements to the
16 reporter?
17     A.     She told it to the reporter.
18 The reporter printed it.  And she told it to my
19 attorney, Don Bivens.  And Don Bivens warned
20 her.
21     Q.     So is it your belief that
22 Mrs. Skeans told the reporter that Mr. Pavlis
23 had had problems with his memory?
24     A.     That's what -- that's what the

75 (Pages 294 - 297)

JUSTIN C. BILLINGSLEY

Page 310

1 now.
2 Q. Do you recall, sitting through
3 Mr. Self's deposition, where he indicated that
4 you and he had several meetings with entities,
5 one of them being, I believe you said, this
6 Amherst.
7   Do you recall meeting with
8 anyone from Amherst?
9 A. I do.
10 Q. And what was the nature or the
11 subject of that discussion?
12 A. The discussion began with a very
13 direct approach of acquiring or purchasing our
14 platform.
15 Q. Who made the approach?  Who are
16 the individuals from Amherst saying that they
17 wanted to acquire the platform?
18 A. At the time, we were approached
19 by a fellow by the name of Robby McDonald.
20 Q. I'm sorry, did you say Robby or
21 Robin?
22 A. Robby, R-o-b-b-y.
23   And we dealt with many different
24 people there.  And no other names are coming to

Page 311

1 mind.
2 Q. And to your knowledge, what was
3 Mr. McDonald's position at Amherst?
4 A. It had to do with strategic
5 work, strategic business development.
6 Q. And when did you first have
7 discussions with him about Amherst wanting to
8 acquire your platform?
9 A. Stroker was another one.  Ryan
10 Stroker was acquisitions director there.
11   What time?  It was actually
12 right around October, November of -- no.  It
13 would have been -- it would have been December,
14 January.  Somewhere around December, somewhere
15 in the first quarter of 2019, December of 2018,
16 when those discussions initially happened.
17 Q. And when did the discussions
18 end?
19 A. Around -- around June.  May --
20 May or so, I would say, of 2019.
21 Q. And I take it they chose not to
22 proceed with the acquisition of the platform?
23 A. Yeah.  They, mostly in phone
24 conversation, had explained that, you know,

Page 312

1 they had come across the -- and this is -- this
2 is probably important for this discussion.
3 These are not the types of things that people
4 e-mail, in my opinion.  I don't think someone
5 that is wanting to court the company or
6 purchase them and finds out something horrible,
7 horrible that's in a big newspaper said by
8 someone, that they're going to turn around and
9 fire up an e-mail.  I think their own risk
10 management would be -- would deter that
11 greatly.
12   So it happened almost all the
13 time in phone conversations.  I remember the
14 call from the Amherst guy that said, look, we
15 came across this.  And this is just way too
16 toxic, the publicity.  We've got to be very
17 careful of our -- of our company reputation.
18 And that was that.
19 Q. Who said that?
20 A. I don't remember.  It was
21 someone -- someone on the legal side had called
22 and said, I'm calling on behalf of Amherst.  I
23 think it was one of their attorneys, maybe, or
24 general counsel, and had said, you know,

Page 313

1 discussions are over.
2 Q. Did you make any notes of that
3 conversation?
4 A. I don't -- I don't believe so,
5 no.
6 Q. During your discussions,
7 whenever they began, either last quarter of
8 2018, first quarter of 2019 through May, June
9 of 2019, did Amherst provide you with any
10 documentation that reflected their interest in
11 possibly acquiring the platform?
12 A. Yeah.  There was significant
13 back and forth -- extensive back and forth
14 documents of us presenting what the transaction
15 could be.
16   I remember at one point, we had
17 e-mailed to them just different thoughts,
18 different abilities, different ways that we
19 could work together.  So, yeah, there was
20 correspondence.
21 Q. Do you know whether that
22 extensive back and forth in that e-mail
23 correspondence, was that produced in connection
24 with this litigation?

79 (Pages 310 - 313)

JUSTIN C. BILLINGSLEY

Page 314

1    A.    I have no knowledge of whether
2 it was or not.
3         MR. MAHONEY: Bill, do you have
4 any understanding as to whether the
5 e-mails he's talking about have been
6 produced?
7         MR. GREEN: No. You know,
8 sitting right here as we're talking about
9 it, I'm not sure.
10        Maybe I can ask a little bit
11 more about these e-mails.
12        What time frame again was this,
13 Justin?
14        MR. MAHONEY: According to your
15 client, it was between last quarter of
16 2018, first quarter of 2019, and May or
17 June of 2019.
18        MR. GREEN: I imagine these were
19 picked up in the first round of
20 discovery, but I'm not familiar offhand
21 right now.
22        MR. MAHONEY: I can tell you, I
23 don't recall seeing any such documents.
24 So we're going to have to circle back to

Page 315

1 that.
2 BY MR. MAHONEY:
3    Q.    Apart from Amherst, did you
4 exchange documents, whether it be e-mail or
5 written correspondence, with any other entity
6 that you believe was interested in acquiring
7 the platform, but because of this article, they
8 declined to proceed?
9    A.    Did I exchange documents? I
10 don't recall any big document exchanged.
11 Again, almost all of this was phone
12 discussions.
13   Q.    What about e-mails? You said
14 that you are aware of e-mails, and as you put
15 it, quote, extensive back and forth documents
16 with Amherst.
17        I'm asking, do you recall any
18 similar documents with any other entity that
19 you thought was interested in acquiring the
20 platform?
21   A.    I don't recall.
22        MR. MAHONEY: Okay. Let's go
23 off the record for five minutes or so.
24        - - -

Page 316

1         (Whereupon, a recess was taken
2     from 5:21 p.m. to 5:32 p.m.)
3         - - -
4         MR. MAHONEY: Let's go back on.
5 BY MR. MAHONEY:
6    Q.    Mr. Billingsley, had you ever
7 come up with a valuation for your platform?
8    A.    We've talked to a few about it.
9 I know Chad has talked to a few on the
10 technology side about it.
11        One of the valuations came from
12 a company that has a very, very similar
13 technology footprint by the name of Roofstock.
14 Their platform when they launched was worth an
15 estimated 20 -- 20 million. They had just
16 completed a $76 million A round. They're
17 currently up to 120-something A, I believe.
18        There is estimated value on the
19 Sperry Van Ness hub of SFRhub.com that has,
20 from what I understand, an estimated value well
21 over 10 million.
22   Q.    My question was, did anyone, to
23 your knowledge, ever place a valuation on your
24 platform?

Page 317

1    A.    Yeah, the -- back in the day of
2 our early discussions with Amherst, we had
3 initial discussions of 12 to $14 million.
4    Q.    So -- I'm sorry, I cut you off.
5 Go ahead. Finish that.
6    A.    Twelve to $14 million came up in
7 discussions several times.
8    Q.    Is that reduced to writing
9 anywhere?
10   A.    I don't recall. I don't -- I
11 don't recall.
12   Q.    All right. Do you recall in
13 Mr. Self's deposition, we went through the
14 ledger and the P&L and, one, there wasn't a
15 valuation for something call Rental Pro Club.
16 The valuation for Realty Pro Club was fairly
17 modest, I think a hundred grand, give or take.
18        Why is the valuation for Realty
19 Pro Club so low if you think it's worth
20 millions of dollars?
21        MR. GREEN: Object to form.
22   A.    Yeah. I didn't say I thought it
23 was worth millions of dollars. These were the
24 discussions, touch points that we were using,

80 (Pages 314 - 317)

JUSTIN C. BILLINGSLEY

Page 318

1 to develop a context of thinking. I don't know
2 that I have an understanding of technology
3 evaluation.
4        I will admit that another
5 mistake that our accountant lamented was not
6 including Rental Pro Club. She said she
7 remembered that she had been asked to. So
8 she's intending to fix that immediately, also,
9 since you triggered my memory on that.
10        The other thing I would say is
11 that Realty Pro Club really, in many respects,
12 is just a website. The domain and the brand
13 and the design is valuable. There is coding
14 behind Realty Pro Club that goes into our
15 database system, which is called "The Hub."
16 The Hub has significant value. And that's
17 plugged into the back of Mobile Agency, Buy
18 Every Home and Realty Pro Club.
19 BY MR. MAHONEY:
20     Q.     Okay.
21     A.     I'm happy to opine on that a
22 little bit, if it would color the discussion
23 that you're wanting to have.
24     Q.     No. I'm just curious if you had

Page 319

1 a professional value the platform.
2     A.     I see. No, I don't believe we
3 did.
4     Q.     You mentioned -- was it
5 SFRhub.com?
6        What's your understanding of
7 that entity?
8     A.     Very similar to Rental Pro Club.
9 Very similar to Renters Warehouse. Very
10 similar to Roofstock. They are bringing on
11 portfolios of houses from portfolio owners and
12 creating a transaction marketplace.
13     Q.     What makes you think Debby or
14 Darbin Skeans had anything to do with
15 SFRhub.com?
16     A.     Debby and Darbin Skeans are
17 extremely affiliated with Sperry Van Ness.
18 Sperry Van Ness owns SFRhub. And Darbin and
19 Debby are very, very motivated for Sperry Van
20 Ness to do well as a company as a whole.
21     Q.     So what makes you think that
22 SFRhub.com is owned by Sperry Van Ness as
23 opposed to being an independent franchise out
24 in Arizona --

Page 320

1        THE COURT REPORTER: Wait, wait,
2 wait. You cut out. I mean, it didn't
3 cut out, it got messed up.
4        "So what makes you think that
5 SFRhub.com is owned by Sperry Van Ness as
6 opposed to being an independent
7 franchise . . ."
8        MR. MAHONEY: Yes.
9 BY MR. MAHONEY:
10     Q.     I'll pick up with, independent
11 franchise based in Arizona run by a gentleman
12 named Jeffrey Cline?
13     A.     So your question is, what makes
14 me think it's -- I'm sorry, I tried to put it
15 back together.
16     Q.     You said that you thought that
17 SFRhub.com is owned by Sperry Van Ness.
18        Do you know that to be true
19 or --
20     A.     No, I --
21     Q.     -- do you understand it to be a
22 franchise, among many, many franchises, under
23 the SVN umbrella?
24     A.     Yeah. So Sperry Van Ness is

Page 321

1 owned by a local franchise -- I'm sorry, SFRhub
2 is owned by the franchise, the Clines.
3        The connectivity that becomes
4 real dangerous to Rental Pro Club is that all
5 of these independently owned franchises are in
6 great demand and pursuit and intent to sell
7 single-family residential, because they are
8 commercial real estate businesses.
9        To be able to put a
10 single-family residential marketplace inside
11 that commercial real estate marketplace, where
12 all of these commercial brokers have got
13 enormous outreach connections, network for
14 residential deals to be pushed through one
15 channel is the thinking, is the business model
16 that Jeffrey Cline explained to me.
17        And the way of which all of
18 those franchises have got such an economic
19 opportunity to sell through that -- that
20 platform is, I think, a very fundamental
21 economic motivator.
22        And I think the second one is --
23 is that when Sperry Van Ness pushes an
24 incredible culture of devotion and -- and

81 (Pages 318 - 321)

JUSTIN C. BILLINGSLEY

Page 322

1 allegiance and support from the franchise
2 owners, as most very, very successful franchise
3 operations do, and they really have a hard push
4 on the rising tide, raise all boats.
5          So it -- the idea of my platform
6 reaching the marketplace with a completely
7 inverted model that would very potentially,
8 very severely impact their model is lots of
9 motivation to -- to stop it.
10    Q.    What makes you think that
11 Mr. and Mrs. Skeans or their franchise had any
12 dealings with SFRhub.com?
13          I'm not asking for your opinion.
14 I'm asking for fact.
15    A.    I don't believe that we've had
16 the chance to do any discovery on that yet. I
17 believe in that discovery part of the
18 third-party claim, we'll find the fact that is
19 so important and I'm confident is there.
20    Q.    Okay. But I'm asking about
21 what's your basis for saying it now.
22    A.    As I explained to you --
23    Q.    Are you aware of any document?
24 Are you aware of any fact to say that Debby and

Page 323

1 Darbin Skeans have had dealings with
2 SFRhub.com?
3    A.    The fact -- it's a large enough
4 fact in my mind that the Skeans would betray
5 Frank's ability to have his assets returned
6 back to his estate and that they would perform
7 this -- this -- you know, this witch hunt
8 assault on my business endeavors. And that
9 that coincidentally brings incredible economic
10 benefit to Sperry Van Ness is a pretty powerful
11 fact.
12    Q.    Okay. Well, that's your
13 opinion. I'm going to ask it one more time.
14          Are you aware of any fact that
15 supports your opinion that the Skeanses had any
16 dealings with SFRhub.com?
17          You understand what a fact is,
18 right?
19    A.    I would say not yet.
20    Q.    "Not yet" meaning sitting here
21 today, you don't have any facts to support your
22 belief that the Skeanses had any dealing with
23 SFRhub.com?
24    A.    Not yet.

Page 324

1    Q.    I'm sorry?
2    A.    Yeah, not yet.
3    Q.    Okay. So at the moment, you
4 have nothing. You think you'll find something.
5 But right now, you've got nothing to support
6 your belief, correct?
7          MR. GREEN: I object to form.
8    A.    Yeah, I don't know that that's
9 correct. I believe motive is fact.
10 BY MR. MAHONEY:
11    Q.    Okay. Apart from your belief
12 that motive is fact, are you aware of any other
13 facts?
14    A.    Their vicious and malicious
15 assault that was baseless and entirely without
16 fact.
17    Q.    Anything else that you consider
18 a fact that suggests or confirms that the
19 Skeanses had any dealings with SFRhub.com?
20    A.    Yeah, the gravity and how
21 egregious this assault is and -- and the
22 obvious aligned motivation. How in the world
23 they could go from being my friend to this,
24 there's got to be some dark reasons.

Page 325

1    Q.    Did you have any discussions
2 with anyone from Sylvan Road Capital about
3 acquiring your platform?
4    A.    Yes.
5    Q.    And who did you speak with
6 there?
7    A.    Oh, man, I cannot remember. The
8 guy that I spoke with most, I did end up having
9 a few discussions with one of the owners, the
10 CEO, Gavin.
11          They asked me to fly down to
12 Atlanta. So I flew down and we had an all-day
13 meeting about acquisition of the platform.
14 Gavin -- I'm sorry, I can't remember his last
15 name. It might come to me.
16          And then the other -- Alex. And
17 the fellow I dealt with the most there was Alex
18 Kahn, K-a-h-n.
19    Q.    Are you aware of any written
20 documentation that would reflect any
21 discussions between you and anyone on behalf of
22 Key Commercial on the one hand and anyone at
23 Sylvan Road Capital?
24    A.    I believe there was some, but

82 (Pages 322 - 325)

JUSTIN C. BILLINGSLEY

Page 330

1    A.    C-h-e-n.
2    Q.    And what was his position at
3 Pintar?
4    A.    Oh, I'm sorry.  No, he didn't
5 work at Pintar.  He was a partner in a
6 brokerage firm that we engaged to either
7 connect us with an acquisition partner or raise
8 capital for us.
9    Q.    Who was that firm?
10    A.    I'll have to get it to you.  I
11 don't remember the -- I can easily find it.
12 His name is Steven Chen.
13        But we had a -- I believe it was
14 an engagement agreement.  And he introduced us
15 to several investors.  We took several meetings
16 in the city.  And our -- my original intent was
17 to raise capital to remove Frank's investment.
18 That's how we were supposed to do it at the
19 beginning, and that's why Steven was involved.
20        But everyone Steven took us to,
21 he explained that it was just impossible for
22 them to get over the article.
23    Q.    So Steven Chen told you that.
24        Was he the one that introduced

Page 331

1 you to Sylvan Road and Pintar and Amherst?
2    A.    No.  He introduced us Pintar.
3 He introduced us to Adam Whitmire.
4    Q.    And what company is Adam
5 Whitmire with?
6    A.    Whitmire -- Whitmire Capital,
7 Whitmire Financial Group, something like that.
8        Adam and his partner were
9 developing their platform, called
10 "housefolios.com."  And they had thought that
11 we would be an excellent acquisition partner.
12    Q.    Let me ask you this:  When each
13 of these folks told you that they just couldn't
14 continue with you because of the article, did
15 you make any effort to convince them otherwise?
16        For example, did you ask people
17 whom you believe respected you to talk to them
18 and tell you, hey, this is what Justin is all
19 about.  The article is all wet.  Anything like
20 that?
21    A.    Yeah.  Yeah.  I -- and it just
22 didn't matter.  I had Don Bivens call a few he
23 knew real well.
24        They just said, look, we get it.

Page 332

1 We love the tech.  We love the guy.  We just
2 can't -- it's just too -- it's just too toxic,
3 too nasty.
4        And then, you know, my other big
5 guy that would have called anybody before this
6 would have been Greg Owen.  I knew him for
7 15 years.  And he would have been happy to call
8 anyone.  But this was gone now.
9    Q.    Well, why wasn't he still happy
10 to call someone on your behalf?
11    A.    Because of the article.  The
12 article was just way too toxic.  We haven't
13 been able to do anything since then.
14    Q.    No.  My question, though, is,
15 why wouldn't Mr. Owen make an effort on your
16 behalf?
17    A.    Because of the article.
18        Also was an attorney by the name
19 of Will Rosellini, who was going to do quite a
20 bit of work with us, for us.  Will has
21 several -- has got several successful
22 businesses that he's done in the past.  He is
23 currently a public company CEO.  He has five
24 master's degrees, highly entrepreneurial.  He's

Page 333

1 a real estate broker, licensed attorney.
2        He worked with us for about
3 eight months on Rental Pro Club.  We hired him
4 as a consultant.  And he joined us for our
5 operations meetings twice a week.  He was an
6 expert or all things operations and an expert
7 in IP technologies, was looking to get two
8 patents filed for us, technology IP, sorry.
9 And he also just couldn't continue with us
10 because of the article.
11    Q.    Do you have any documentation
12 indicating that he couldn't continue with you
13 because of the article?
14    A.    No, not that I recall.
15    Q.    What was his name again?
16    A.    Will Rosellini.  The word
17 Rose-l-l-i-n-i.
18    Q.    And to your knowledge, where
19 does he currently work or where is he based?
20    A.    He currently works in Puerto
21 Rico, based in Puerto Rico.
22    Q.    So you mentioned a little while
23 ago, when I asked if Rental Pro Club made any
24 money, you indicated that making money wasn't

84 (Pages 330 - 333)

JUSTIN C. BILLINGSLEY

Page 338

1    marked for identification.)
2              - - -
3 BY MR. MAHONEY:
4    Q.    Mr. Billingsley, this is an
5 e-mail from Debby Skeans to Don Bivens, with a
6 copy to you and Darbin Skeans, dated
7 September 30th of 2017, and the subject is
8 "Pavlis investments."
9         And Mrs. Skeans writes to Don
10 Bivens, "While Justin did call us Thursday and
11 we look forward to a visit soon, it is
12 difficult for us to confirm that we 'retract
13 any concerns' since we simply need to know
14 more.  That said, we do not wish to contribute
15 to a witch hunt and do not intend to speak to
16 the reporter again.  Other than expressing
17 surprise at a second investment and
18 disappointment that we do not know more about
19 the Key investment, we do not believe we told
20 him anything at the initial discussion that
21 requires our disavowel.  Below is a text of an
22 e-mail that we intend to send which we hope
23 will clarify our position."  And she signs off,
24 "Debby."

Page 339

1         Now, do you recall getting this
2 e-mail?
3    A.    I believe I do.
4    Q.    And the proposed e-mail to
5 Craig -- and that's Craig Harris, the man who
6 was writing the article -- she writes, "Darbin
7 and I have spoken to both Attorney Bivens and
8 Mr. Billingsley and have had a number of
9 questions answered and anticipate receiving
10 additional information shortly.  Neither
11 Mr. Pavlis nor we wish to be used to negatively
12 influence any investigations of Mr. Billingsley
13 or any company related to him.  Be advised that
14 Mr. Pavlis was capable of and was making his
15 own investment decisions in 2014.  Hope this
16 clarifies things."
17         So do you have any doubt that
18 Ms. Skeans actually sent that e-mail to
19 Mr. Harris?
20    A.    Well, I believe I do.
21    Q.    And what's your basis for
22 doubting that?
23    A.    Because he quoted her in a
24 national publication as saying the exact

Page 340

1 opposite.  Craig Harris is one of the most
2 celebrated reporters in Arizona.
3    Q.    So you don't believe she sent
4 it.  I'll represent to you that she did, in
5 fact, send it to him.
6         Why do you think that Mr. Harris
7 quoted Debby Skeans to say something that is
8 inconsistent with that?
9    A.    I don't know what Mr. Harris was
10 thinking or why he did what he did.
11    Q.    Is it your position or your
12 understanding that neither Key Commercial, nor
13 my related entity, currently owns any real
14 estate?
15    A.    Absolutely not.  There is no
16 real estate, no asset owned anywhere.
17    Q.    So, for example, what happened
18 to the investment in Danger TV?
19    A.    That's still there.  It's
20 certainly not an asset yet.
21    Q.    Well, what do you have that
22 represents that investment?
23    A.    I -- I don't know.
24    Q.    You have documentation, right?

Page 341

1    A.    Yes, absolutely.
2    Q.    And where would I find that
3 documentation?
4    A.    I would assume it was produced,
5 if it met your search terms.  If not, happy to
6 get it to you.
7    Q.    Okay.  What about the --
8    A.    Based upon -- based upon the
9 advice from counsel, of course.
10    Q.    Sure.  Sure.  What about any
11 investments that you made in Bitcoin or Bitcoin
12 contracts?
13    A.    Yeah, that was very, very
14 temporary.  The money went in.  We were looking
15 at technology development around smart
16 contracts.  And the money was sold at a profit.
17 And there's absolutely none owned anywhere.
18    Q.    So how much money of Frank
19 Pavlis' $7 million that he put into Allwest was
20 returned to Key Commercial or a related entity?
21    A.    I don't understand the question.
22    Q.    Well, we know that he, "he"
23 being Mr. Pavlis, parted with $7 million,
24 correct?

86 (Pages 338 - 341)

JUSTIN C. BILLINGSLEY

Page 346

1 maybe just two or three more paragraphs.
2 Let me finish that page real quick. I
3 haven't looked at this in an awful long
4 time.
5      All right. Next page, please,
6 Cam.
7      Okay. Scroll down a little bit
8 more, please.
9      MS. REDFERN: (Scrolling through
10 document.)
11      THE WITNESS: All right. A
12 little bit more.
13      MS. REDFERN: (Scrolling through
14 document.)
15      THE WITNESS: Okay. Scroll a
16 little bit more.
17      MS. REDFERN: (Scrolling through
18 document.)
19      THE WITNESS: All right. A
20 little bit more.
21      MS. REDFERN: (Scrolling through
22 document.)
23      A.     So, Mr. Mahoney, I would say at
24 the very top of the article, it mentions a

Page 347

1 Pennsylvania elderly man. And I have blamed
2 Debby's anger for the reporter being attentive
3 to Frank being elderly in a predatory way.
4 Like --
5 BY MR. MAHONEY:
6      Q.     Well, was he not elderly?
7      A.     Please let me finish.
8      Q.     Okay.
9      A.     The second reference of friends
10 and family mentioning that he was without a
11 good memory, suffering from memory loss,
12 continues to paint a picture of something that
13 was untrue that builds on the concept of Frank
14 being elderly.
15      Of course, he was elderly, but
16 it was notable because of her slander, which
17 was all wrapped up at the end in this quote
18 from Debby Skeans. "Billingsley and Pavlis
19 were introduced by mutual friends after Pavlis
20 had lost money in financial scams." Debby
21 again volunteered that there were financial
22 scams in an effort to make it look like I was
23 involved in them. "Billingsley was supposed to
24 make sure Pavlis wouldn't get ripped off again,

Page 348

1 said Debby Skeans, who has Pavlis' power of
2 attorney."
3      So her comments, her support,
4 Billingsley, "now 101, said in a recent
5 telephone interview" --
6      Q.     You meant to say Pavlis.
7      A.     Pavlis. I'm sorry, I don't know
8 what I said. "I hope you can unravel this for
9 me," that was all orchestrated by Debby because
10 of her fanning this flame, making it so much
11 worse -- look so much worse than it was.
12      THE WITNESS: Cam, can you
13 scroll down? I don't know if there's any
14 more left.
15      A.     (Continuing) Yeah, so then
16 there's just this constant threat of Pavlis --
17 about a year after Pavlis loaning money, Mobile
18 needing money again.
19      So Arizona being very, very
20 sensitive to any problems related to the
21 elderly as a retirement state, when this
22 reporter -- and later, the reporter actually
23 confessed to Don Bivens that it weren't for the
24 Pavlis reporting, he probably wouldn't have

Page 349

1 gotten clearance to report the story, because
2 of -- of the tone and the accusations of elder
3 abuse that Debby brought. So I believe that
4 that all makes a really, really ugly picture,
5 when it wasn't.
6 BY MR. MAHONEY:
7      Q.     Okay. So let's just break that
8 down.
9      Frank Pavlis was, in fact,
10 elderly in 2014 and he was even more elderly in
11 2017, right?
12      A.     I said he was elderly. The
13 point was that it became notable because of
14 Debby's lies.
15      Q.     Well, she didn't write the
16 article, right?
17      A.     I believe she basically did,
18 yeah.
19      Q.     What's your basis for saying
20 that?
21      A.     Because of how extensively she
22 probably spoke to Craig, how angry she was, all
23 of the accusations.
24      Q.     Okay. Well, you weren't party

88 (Pages 346 - 349)

JUSTIN C. BILLINGSLEY

Page 350

1 to that conversation, right, so you don't know
2 what she said to him?
3     A.     I see what he wrote.
4     Q.     Right.  So what he wrote that
5 you pointed out that you find troublesome is,
6 at the beginning when they talk about Mr. --
7 they don't even mention his name, they talk
8 about an elderly Pennsylvania investor.
9 There's a reference to friends and family who
10 indicated that Mr. Pavlis had memory issues.
11           That doesn't say that it was
12 Debby Skeans who said that, correct?
13    A.     I believe it does, yeah.
14 Friends and family, I think, does point
15 directly to Debby.
16    Q.     Well, how does it point directly
17 to Debby when it says "friends and family" --
18    A.     Because it later --
19    Q.     -- not --
20    A.     Because it later quotes her.
21    Q.     Okay.  But it quotes her as
22 saying that you were supposed to make sure that
23 Frank wouldn't get ripped off again, right?
24    A.     It quotes her as the source for

Page 351

1 all of this information.
2     Q.     Where is there any place that
3 says Ms. Skeans is a source for anything other
4 than the quote about you being supposedly
5 brought in to make sure that Mr. Pavlis
6 wouldn't get ripped off again?
7     A.     It was what Craig told Don
8 Bivens when we were trying to convince Craig
9 not to publish this story.
10    Q.     I think you said that Craig
11 Harris told Don that but for the Pavlis angle,
12 he wouldn't have been able to publish this?
13    A.     But for the Pavlis facts, for
14 the Pavlis toxicity is what gave the -- what
15 put it over the top for him.  And it's what
16 gave him so much confidence to put it on the
17 front page and make it such a prominent
18 article.
19    Q.     Okay.  And what else did
20 Mr. Bivens tell you that Mr. Harris had told
21 him?
22    A.     That he was absolutely going to
23 publish it.  That they had questions about it
24 until -- until they got ahold of Debby.

Page 352

1     Q.     What else did Mr. Bivens tell
2 you that Mr. Harris told him?
3     A.     I don't recall at this moment.
4 There were -- there were several things, but I
5 don't recall at this moment.
6     Q.     Did you ever write them down
7 anywhere?
8     A.     No, I don't write things down.
9 I stay busy.
10    Q.     All right.  And you read this
11 whole article, correct?
12    A.     I don't -- I don't recall ever
13 reading the whole article.  It makes me sick.
14    Q.     So apart from the things that
15 you attribute to Debby, you don't think there's
16 anything in here that paints in a negative
17 light?
18    A.     I think what Debby -- the lies
19 and slander that she brought to this article is
20 what gave all of that the reason for being
21 believable.
22    Q.     Let me ask you this, by the way:
23 If you go to -- yes, right there, "Keeping
24 Mobile afloat."  Right beneath the quote from

Page 353

1 Mr. Pavlis, where it says, "Pavlis, now 101,
2 said in a recent telephone interview that he
3 remembered Billingsley visiting him a few years
4 ago in his home and that Billingsley persuaded
5 him to invest, 'but I don't remember how much
6 it was.'"  The next line, "'I hope you can
7 unravel this for me,' Pavlis said."  And then
8 it says, "Billingsley declined to answer
9 questions about Pavlis."
10          Now, why on earth would you
11 decline to answer questions about Mr. Pavlis if
12 you felt and your lawyer was telling you that
13 Ms. Skeans was somehow poisoning the story with
14 lies?
15          MR. GREEN:  Object to form.
16 BY MR. MAHONEY:
17    Q.     Why wouldn't you set the record
18 straight?
19          MR. GREEN:  Object to form.
20    A.     I don't know that I had an
21 understanding as to the extent of all of her
22 lies until after the article was published.
23 BY MR. MAHONEY:
24    Q.     Well, why would you decline to

89 (Pages 350 - 353)