DA-7

| From: | Justin Billingsley <justin@guardmymoney.com> |
|---|---|
| Sent: | Monday, November 5, 2012 7:29 PM |
| To: | Debby Skeans <debby.skeans@svn.com> |
| Subject: | RE: Frank Pavlis |

Debby:
Sorry for the delay.
Please see below.

**GUARD*my*MONEY**
protect what's yours

Justin Billingsley
866 699 9062 M 203 240 7160 O 203 546 8564
justin@guardmymoney.com skype jcb1114
**From:** Debby Skeans [mailto:debby.skeans@svn.com]
**Sent:** Thursday, November 01, 2012 11:07 AM
**To:** Justin Billingsley
**Cc:** Darbin Skeans
**Subject:** Frank Pavlis

Justin:

To follow up on our conversation last Friday, I am going to try to put together a bit of a notebook with pages or sections related to:

- type of care in a "small house" model, as contrasted with typical more institutional Assisted Living or Skilled Nursing homes (Kathy and I have a call scheduled for today; I am asking for her suggestions on this....I'd really like to take him to visit a home...Green Hill, NJ, ideally)
  - this is exactly what he needs. He needs to have a word picture created that shows him a day in the life. Perhaps a services schedule, activities schedule, transportation and so on. The more he can live it the greater he will trust it. Specificity always builds trust and vagueness always creates distance.
- competitive market analysis, with type of facility, rooms, cost per month, perhaps some qualitative comments
  - He needs to see comps of like care facilities and comps of greater care facilities. He also needs to see what is offered for care in connection with these rates. Just a very broad picture of what the industry offers in terms of service and what it costs.

- entitlement schedule and construction schedule...a timeline that clearly shows our path if funds available (he should like a timeline!)
  - yes

- simple financial projections, with and without debt, showing impact on individual room rates
  - this is pretty assumptive and may be a bit of an overload. Your call. I would vote it down.

- building floor plans and individual room plan for him (Darb is asking engineer and architect to see if his room can be enlarged slightly)
  - this would be huge. The more specificity the better.

- by next week, the architect will have better front elevations of the double house; til then, I will use the simple elevation from the charette
- Care plan: in the event funds are assured, the Board is considering hiring the administrator early so they can assist in development; that person will also be Frank's contact person for all his personal care. They will either be very experienced in administration or a nurse, or both. This should help him see that a specific person, with a specific job assignment, will be available for him next year.
  - We will need to tread lightly here as he sees this issue as a problem for the IRS to scrutinize. I would recommend that we suggest this but avoid putting it into writing. Will just make him nervous.

Is there anything else you recommend we include? I would say a day in the life, the comps, lots of good pics of his room and elevations and lowering the monthly to $1500 - $2500.

Are you scheduled for another visit? Yes. Be there with you this Fri and Sat. Meeting with him also.

Who should provide to him? I think that you or Darbin should drop it off.

--
**Debby Skeans, CCIM, MAI**| Senior Advisor
Sperry Van Ness | Imperial Realty
968 Postal Road, Suite 110 | Allentown, PA 18109
Phone 484.245.1002 | Fax 610.266.9268
debby.skeans@svn.com|www.svn.com
All Sperry Van NessOffices Independently Owned and Operated.


EXHIBIT
D-4
4|29|2020 CG
PENGAD 800-631-6989

A-118

P-000266

# DA-8

1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2
                        - - -

3
     DEBORAH S. SKEANS,          :   CIVIL ACTION
4    Executrix of the ESTATE     :   NUMBER
     OF FRANK E. PAVLIS,         :   1:18-cv-01516-
5             Plaintiff,         :   CFC
                  v.             :
6    KEY COMMERCIAL FINANCE,     :
     LLC, KEY COMMERCIAL         :
7    FINANCE PROPERTIES, LLC,    :
     EQUITY PROS, LLC, and       :
8    MOBILE AGENCY, LLC,         :
                  Defendants.    :
9
                        - - -

10
                  Friday, April 24, 2020
11
              C O N F I D E N T I A L
12
                        - - -

13
14        Oral deposition of GARY W. MILLER,
15   taken remotely via Zoom, at 65 Shoreline,
16   Freeport, Grand Bahama, beginning at 12:04 p.m.
17   EDT, reported stenographically by Cheryl L.
18   Goldfarb, a Registered Professional Reporter,
19   Notary Public, and an approved reporter of the
20   United States District Court.
21                      - - -
22
              VERITEXT LEGAL SOLUTIONS
23               MID-ATLANTIC REGION
            1801 Market Street - Suite 1800
24        Philadelphia, Pennsylvania  19103

Page 2

```
 1  A P P E A R A N C E S :
 2
        STRADLEY RONON STEVENS & YOUNG, LLP
 3      BY:  WILLIAM E. MAHONEY, JR., ESQUIRE
           CAMERON REDFERN, ESQUIRE
 4      2005 Market Street, Suite 2600
        Philadelphia, Pennsylvania  19103
 5      215.564.8000
        wmahoney@stradley.com
 6      credfern@stradley.com
        Representing the Plaintiff
 7      (Via Zoom)
 8
        HALLORAN FARKAS & KITTILA, LLP
 9      BY:  WILLIAM E. GREEN, JR., ESQUIRE
           THEODORE A. KITTILA, ESQUIRE
10      5801 Kennett Pike, Suite C
        Wilmington, Delaware  19807
11      302.257.2011
        wg@hfk.law
12      tk@hfk.law
        Representing the Defendants
13      (Via Zoom)
14
        GRIFFITH HORN & SHEEHAN, LLP
15      BY:  DAVID R. GRIFFITH, ESQUIRE
           JAMES SHEEHAN, ESQUIRE
16      1530 Humboldt Road, Suite 3
        Chico, California  95928
17      530.812.1000
        david@davidgriffithlaw.com
18      jameson@griffithandhorn.com
        Representing the Witness
19      (Via Zoom)
20   - - -
21  A L S O  P R E S E N T :
22      DEBORAH S. SKEANS (Via Zoom)
23      DARBIN SKEANS (Via Zoom)
24      JUSTIN BILLINGSLEY (Via Zoom)
```

Page 3

```
 1              I N D E X
 2           - - -
 3  WITNESS:  GARY W. MILLER
 4  QUESTIONED BY:              PAGE:
 5     MR. MAHONEY             8
 6           - - -
 7     E X H I B I T S
 8  NUMBER   DESCRIPTION         MARKED FOR ID
 9
       P-35   E-mail dated September 16,      18
10     2013, P-000555
11  P-36   E-mail dated January 10, 2014     22
       and ParaMax RE Partnership
12     Agreement, P-000814 through 000820
13  P-37   E-mail dated January 17, 2014     28
       P-000821
14
       P-38   Allwest Real Estate Partners     30
15     Investment Overview, P-000001
       through 000064
16
       P-39   E-mail dated March 24, 2014     46
17     KCF000546
18  P-40   E-mail dated April 3, 2014     50
       and Allwest RE Partners
19     Subscription Agreement
       KCF000661 through 000674
20
       P-41   E-mails dated April 3 and 7,     52
21     2014, KCF000683 and 000684
22  P-42   E-mail dated June 1, 2014     67
       with attachment, KCF000957
23     through 000959
24
```

Page 4

```
 1     E X H I B I T S  (Continued)
 2  NUMBER   DESCRIPTION         MARKED FOR ID
 3
       P-43   E-mail dated July 1, 2014     70
 4     KCF001041
 5  P-44   E-mails dated October 31 and     73
       November 3, 2014, KCF001377
 6     and 001378
 7  P-45   E-mail dated November 4, 2014     80
       KCF001379
 8
       P-46   E-mail dated November 18, 2014     82
 9     KCF001454
10  P-47   E-mails dated December 2, 2014     84
       KCF001542 through 001545
11
       P-48   E-mail dated December 2, 2014     96
12     KCF001546
13  P-49   E-mails dated December 1 and 2,     98
       2014, KCF001554 through 001557
14
       P-50   E-mail dated December 13,     102
15     2014, KCF001566
16  P-51   E-mail dated December 16,     105
       2014 and NPL Purchases and
17     Services Agreement
       KCF001621 through 001640
18
       P-52   E-mail dated December 16,     107
19     2014 and The Frank E. Pavlis
       Revokable Living Trust
20     Promissory Note for $6 million
       KCF001644 through 001647
21
       P-53   E-mails dated December 29 and     119
22     30, 2014, KCF001716 through
       001714
23
24
```

Page 5

```
 1     E X H I B I T S  (Continued)
 2  NUMBER   DESCRIPTION         MARKED FOR ID
 3
       P-54   E-mail dated February 4, 2015     126
 4     and Allwest RE Partners
       Subscription Agreement
 5     KCF001863 through 001876
 6  P-55   E-mails dated March 6 and 9,     127
       2015, KCF002131
 7
       P-56   Amendment to Allwest RE     137
 8     Partners Subscription Agreement
       Allwest0221 and 0222
 9
       P-57   E-mails dated April 17 and     142
10     21, 2015, KCF002728 and 002729
11  P-58   Funding Agreement dated     145
       September 20, 2016
12     Allwest0210 through 0210
13
              - - -
14
15     PREVIOUSLY MARKED DOCUMENTS
16     NUMBER.................PAGE
17
       P-9....................134
18
19           - - -
20
21
22
23
24
```

Page 6

1      DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page   Line
5  119   7-8
6
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9  Page  Line  Description
10 (None)
11
12
13 STIPULATIONS
14 Page   Line
15 (Pursuant to Federal Rules of Civil Procedure)
16
17
18 QUESTIONS MARKED
19 Page   Line
20 (None)
21
22
23
24

Page 7

1        THE COURT REPORTER:  The
2  attorneys participating in this
3  deposition acknowledge that I am not
4  physically present in the deposition room
5  and that I will be reporting this
6  deposition remotely.
7        They further acknowledge that in
8  lieu of an oath administered in person, I
9  will administer the oath remotely.  The
10 parties and their counsel consent to this
11 arrangement and waive any objections to
12 this manner of reporting.
13        Please indicate your agreement
14 by stating your name and your agreement
15 on the record.
16        MR. MAHONEY:  This is Bill
17 Mahoney, on behalf of the plaintiff.  We
18 agree.
19        MR. GREEN:  Bill Green, on
20 behalf of defendants.  We agree.
21        MR. GRIFFITH:  David Griffith,
22 on behalf of Gary Miller.  We agree.
23        THE COURT REPORTER:  Thank you.
24 Mr. Miller, will you please

Page 8

1  raise your right hand.
2        - - -
3        GARY W. MILLER, after having
4  been first duly sworn/affirmed, was
5  examined and testified as follows:
6        - - -
7        THE WITNESS:  I do.
8        THE COURT REPORTER:  Thank you
9  very much.
10        - - -
11        EXAMINATION
12        - - -
13 BY MR. MAHONEY:
14    Q.     Good morning, Mr. Miller.  My
15 name is Bill Mahoney, and I represent the
16 plaintiff in this litigation.  Thank you very
17 much for taking time to submit to deposition
18 here.
19        Let me begin by asking, have you
20 ever been deposed before?
21    A.     No.
22    Q.     Okay.  Hopefully, it will be a
23 painless process.  It's basic a Q and A.  I ask
24 the questions, you answer to the best of your

Page 9

1  ability truthfully and honestly, as you just
2  took the oath.
3        If at any point you don't
4  understand a question that I put to you, please
5  let me know.
6        This is not an endurance test.
7  If you want to take a break, totally fine.  The
8  only thing I would ask is that if I have a
9  question pending, that you answer the question
10 before we take a break.
11        And typically -- we did another
12 deposition earlier in the week -- we took
13 breaks anywhere between, you know, every hour,
14 hour and a half, so it's not too difficult
15 making you sit there.  But if you want to get
16 up sooner, just say so, and we'll accommodate
17 you.
18        MR. MAHONEY:  There's also an
19 opportunity -- and, David, I don't know
20 if you've done this before.  Monday was
21 the first time I did.  But when we take
22 our first break, if you want to have a
23 separate virtual conference room or
24 breakout room with you and Mr. Miller,

3 (Pages 6 - 9)

GARY W. MILLER

Page 86

1    A.    That has nothing to do with the
2 notes.  I mean, it was a funding agreement
3 between the parties.
4    Q.    All right.  And it's your
5 understanding that in or around November --
6 this is now December 1, 2014 -- that that's one
7 of the documents that Mr. Billingsley was
8 putting together?
9    A.    Correct.
10    Q.    Okay.  And then he writes back
11 December 2nd, "Gary, We must keep the
12 guaranteed interest to Frank as initially
13 represented to him, which was at eight percent.
14 My cost will need to be above that.  I think it
15 is fine that the profit split is after the ten
16 percent to Allwest but I have represented to
17 Frank that his participation is 40 percent."
18         Do you know what he's talking
19 about there?
20    A.    Well, that's what -- that was
21 basically what he was trying to obviously put
22 in the funding agreement as far as the -- the
23 details of the payments and how everything was
24 being compensated for.

Page 87

1    Q.    By the way, was it your
2 understanding that Mr. Pavlis was going to be a
3 party to this funding agreement?
4    A.    I don't -- I don't recall if he
5 was going to be party of it.  I think it was
6 being handled again from Key.
7    Q.    If you go down the same
8 paragraph by Mr. Billingsley, the last couple
9 lines, the sentence begins, "Finally, the
10 three one-year terms will be necessary as Frank
11 has recently made it clear that he expects full
12 liquidation and payment to his trust to happen
13 immediately upon his death."
14         Now, when he's talking about
15 three one-year terms, did you understand him to
16 be referring to a note to Mr. Pavlis reflecting
17 his investment in Allwest?
18    A.    No.
19    Q.    What did you understand that to
20 mean?
21    A.    That it would be his -- the
22 terms that he was negotiating with Frank with
23 Key.
24    Q.    So as of December 2nd, 2014, do

Page 88

1 you believe that you had heard of Key
2 Commercial by then?
3    A.    Yes.
4    Q.    Tell me, to the best that you
5 can recall, what Mr. Billingsley had discussed
6 with you relating to Key as of early
7 December 2014.
8    A.    Well, I believe I stated it
9 earlier.  But to the effect that it was his
10 management company to manage his investors.
11 And I had no agreements with his investors
12 relating to, you know, anything that ran from
13 Key.
14         Yeah, so Justin was setting --
15 had set up this entity to manage his private
16 equity firm, if you want to call it that.
17    Q.    But you understood at this point
18 that Mr. Pavlis had invested $7 million to date
19 with Allwest Investments, right?
20    A.    Correct.
21    Q.    And Mr. Billingsley had no
22 authority to take any action on behalf of
23 Allwest Investments, correct?
24    A.    Well, not in the -- not in an

Page 89

1 ownership state.  But he was a consultant.
2    Q.    Right.  Understood.
3         But in terms of, for example,
4 Mr. Billingsley couldn't tell you, okay, you
5 need to take Mr. Pavlis' money, and I want you
6 to put it with Key Commercial or some other
7 business, right?
8    A.    Oh, yes, he did.
9    Q.    No.  He may have told you that.
10 He couldn't direct you to do that?
11    A.    Well, he was directing me.  That
12 was the whole arrangement with Frank.
13    Q.    So explain that to me.  So
14 what's your understanding of Mr. Pavlis'
15 knowledge of anything relating to Key
16 Commercial?
17    A.    I don't know if it was Key, but
18 it was Justin.  He was, you know, his financial
19 manager, and that's what he said.  He said, run
20 everything through Justin.
21    Q.    When did Mr. Pavlis tell you
22 that?
23    A.    On our first conversation.
24    Q.    So when you come toward later in

DA-9

| | |
|---|---|
| **From:** | Debby Skeans <debby.skeans@svn.com> |
| **Sent:** | Sunday, June 8, 2014 10:25 AM |
| **To:** | Justin Billingsley <justin@guardmymoney.com> |
| **Subject:** | Frank |

Justin

I have an idea for a real estate based investment for Frank...it is something we are doing already and I need someone to bounce the idea off of and, if Frank is deemed appropriate to approach, your involvement.

I want to be sure it makes sense.

It can mean 15% per year for two years....and accomplish quite a bit of good in an area that he is interested in....let's talk tonite or tomorrow, if you can.

thanks,

Deb

--

**Debby Skeans, CCIM, MAI** | Senior Advisor
Sperry Van Ness | Imperial Realty
968 Postal Road, Suite 200 | Allentown, PA 18109
Phone 484.245.1002 | Fax 610.266.9268
debby.skeans@svn.com | www.svn.com

"All Sperry Van Ness® Offices Independently Owned and Operated."



EXHIBIT

D-12

4|29|2020 CG

**A-125**

CONFIDENTIAL

P-000843

DA-10

Case 1:18-cv-01516-CFC-SRF Document 81-2 Filed 06/17/20 Page 11 of 103 PageID #: 993
Case 1:18-cv-01516-CFC-SRF Document 81-2 Filed 06/17/20 Page 11 of 103 PageID #: 993

To: Bill Mahoney    Page 2 of 37                      2018-02-21 20:36:40 (GMT)              16468614614  From: Christine Lachapelle

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

### KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$3,000,000                                                                                  September 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **THREE MILLION AND 00/100 Dollars** ($3,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) September 1, 2019 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof. This Note is one of the "**Notes**" issued pursuant to the Note Purchase Agreement dated as of September 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement). Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.    *Definitions*.  As used in this Note, the following capitalized terms have the following meanings:

(a)    "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

(b)    "**Event of Default**" has the meaning given in **Section 4** hereof.

(c)    "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

**A-127**

(d)    "**Lien**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e)    "**Majority in Interest**" shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f)    "**Note Purchase Agreement**" has the meaning given in the introductory paragraph hereof.

(g)    "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term "**Obligations**" shall not include any obligations of Company.

(h)    "**Person**" shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i)    "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(j)    "**Transaction Documents**" shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2.    *Interest*.  Accrued interest on this Note shall be payable at maturity.

3.    *Prepayment*.  Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4.    *Events of Default*.  The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a)    *Failure to Pay*.  The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note.docx

To: Bill Mahoney    Page 4 of 37                    2018-02-21 20:36:40 (GMT)              16468614614 From: Christine Lachapelle

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

(b)    *Voluntary Bankruptcy or Insolvency Proceedings.*  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(c)    *Involuntary Bankruptcy or Insolvency Proceedings.*  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

5.    ***Rights of Investor upon Default.***  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b) or 4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b) and 4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

6.    *Conversion.*

(a)    *Automatic Conversion.*  In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $3,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

(b)    *Automatic Conversion on Change of Control.*  In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note.docx

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis. The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions. Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

(c)    *Conversion Procedure*. Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests. The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)    *Fractional Membership Interests; Interest; Effect of Conversion*. No fractional Membership Interests shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence. In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

7.    *Change of Control*. Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full. The term **"Change of Control"** means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note.docx

Case 1:18-cv-01516-CFC-SRF Document 81-2 Filed 10/01/18 Page 15 of 103 PageID #: 997
Case 1:18-cv-01516-CFC-SRF Document 81-2 Filed 08/17/20 Page 15 of 103 PageID #: 997

To: Bill Mahoney    Page 6 of 37                    2018-02-21 20:36:40 (GMT)              16468614614 From: Christine Lachapelle

Company is cancelled or converted or a combination thereof occurs. The term **"Change of Control Payment"** means an amount equal to one (1) times the outstanding principal amount of such Note.

8.    ***Successors and Assigns***. Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.    ***Waiver and Amendment***. Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.    ***Transfer of this Note or Securities Issuable on Conversion Hereof***. With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.    ***Assignment by the Company***. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.    ***Notices***. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.    ***Pari Passu Notes***. Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note.docx

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

14.      *Usury.* In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

15.      *Waivers.* The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

16.      *Governing Law.* This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

kcf Form of Convertible Note.docx

The Company has caused this Note to be issued as of the date first written above.

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By:

Name:  Michael Silberman
Title:  Executive Vice President

# DA-11

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

### KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$4,000,000                                                                November 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **FOUR MILLION AND 00/100** Dollars ($4,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) November 1, 2020 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof. This Note is one of the "**Notes**" issued pursuant to the Note Purchase Agreement dated as of November 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement). Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      *Definitions.* As used in this Note, the following capitalized terms have the following meanings:

        (a)     "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

        (b)     "**Event of Default**" has the meaning given in **Section 4** hereof.

        (c)     "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

**A-135**

(d)     **"Lien"** shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e)     **"Majority in Interest"** shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f)     **"Note Purchase Agreement"** has the meaning given in the introductory paragraph hereof.

(g)     **"Obligations"** shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term **"Obligations"** shall not include any obligations of Company.

(h)     **"Person"** shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i)     **"Securities Act"** shall mean the Securities Act of 1933, as amended.

(j)     **"Transaction Documents"** shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2.     *Interest*.  Accrued interest on this Note shall be payable at maturity.

3.     *Prepayment*.  Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4.     *Events of Default*.  The occurrence of any of the following shall constitute an **"Event of Default"** under this Note and the other Transaction Documents:

(a)     *Failure to Pay*.  The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note Pavlis 11:14.docx    -2-

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

(b) *Voluntary Bankruptcy or Insolvency Proceedings*. The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(c) *Involuntary Bankruptcy or Insolvency Proceedings*. Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

5. ***Rights of Investor upon Default***. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

6. *Conversion*.

(a) *Automatic Conversion*. In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $4,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

(b) *Automatic Conversion on Change of Control*. In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note Pavlis 11:14.docx    -3-

**A-137**

Case 1:18-cv-01516-CFC-SRF  Document 81-2  Filed 08/17/20  Page 22 of 103 PageID #: 1004
Case 1:18-cv-01516-CFC-SRF  Document 91-1  Filed 10/01/19  Page 28 of 109 PageID #: 66

To: Bill Mahoney     Page 23 of 37              2018-02-21 20:36:40 (GMT)              16468614614 From: Christine Lachapelle

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis. The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions. Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

(c)     *Conversion Procedure*. Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests. The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)     *Fractional Membership Interests; Interest; Effect of Conversion*. No fractional Membership Interests shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence. In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

7.     *Change of Control*. Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full. The term "**Change of Control**" means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note Pavlis 11:14.docx   -4-

Company is cancelled or converted or a combination thereof occurs. The term **"Change of Control Payment"** means an amount equal to one (1) times the outstanding principal amount of such Note.

8.   *Successors and Assigns*. Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.   *Waiver and Amendment*. Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.   *Transfer of this Note or Securities Issuable on Conversion Hereof*. With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.   *Assignment by the Company*. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.   *Notices*. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.   *Pari Passu Notes*. Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note Pavlis 11:14.docx   -5-

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

14.    *Usury*.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

15.    *Waivers*.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

16.    *Governing Law*.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

kcf Form of Convertible Note Pavlis 11:14.docx    -6-

The Company has caused this Note to be issued as of the date first written above.

KEY COMMERCIAL FINANCE LLC
A Delaware Limited Liability Company

By: _____

Name:  Michael Silberman
Title:  Executive Vice President

DA-12

# KEY COMMERCIAL FINANCE LLC

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of September 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

## RECITALS

A.    On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000. This Agreement and the Note shall be collectively referred to below as (the "**Transaction Documents**").

B.    Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.    Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    *The Notes.*

    (a)    *The Notes.* Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

    (b)    *Delivery.* The sale and purchase of the Notes shall take place at a closing to be held on September 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 1511 Route 22 Suite 152 Brewster NY 10509 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**"). At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note. Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**"). At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price. Each of the Notes will be registered in such Investor's name in the Company's records.

(c)    *Investor's Commitment to Fund the Closing; Binding Obligation.*  Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I.**  Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

(d)    *Use of Proceeds.*  The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

(e)    *Payments.*  The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

2.    *Representations and Warranties of the Company.*  The Company represents and warrants to each Investor that:

(a)    *Due Incorporation, Qualification, etc.*  The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(b)    *Authority.*  The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

(c)    *Enforceability.*  Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)    *Non-Contravention.*  The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws ("**Charter Documents**") or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

(e)    *Approvals.*  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

stockholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby.

(f)     *No Violation or Default.* The Company is not in violation of or in default with respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(g)     *Intellectual Property.* To the best of its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights of, others.

3.     ***Representations and Warranties of Investors.*** Each Investor, for that Investor alone, represents and warrants to the Company upon the acquisition of the Note as follows:

(a)     *Binding Obligation.* Such Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Each of this Agreement and the Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)     *Securities Law Compliance.* Such Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act of 1933 (the **"Securities Act"**), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Such Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration. Such Investor has not been formed solely for the purpose of making this investment and is purchasing the Note to be acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. Such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time. Such Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act.

(c)     *Access to Information.* Such Investor acknowledges that the Company has given such Investor access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by such Investor, and has furnished such Investor with all documents and other information required for such Investor to make an informed decision with respect to the purchase of the Note.

4.     ***Conditions to Closing of the Investors.*** Each Investor's obligations at the Closing or Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

(a)     *Representations and Warranties*. The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)     *Governmental Approvals and Filings*. Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)     *Legal Requirements*. At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)     *Proceedings and Documents*. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

(e)     *Transaction Documents*. The Company shall have duly executed and delivered to the Investors the following documents:

> (i)     This Agreement; and
>
> (ii)    Each Note issued hereunder.

5.     ***Conditions to Obligations of the Company***. The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

(a)     *Representations and Warranties*. The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)     *Governmental Approvals and Filings*. Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)     *Legal Requirements*. At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)     *Purchase Price*. Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I**.

6.    *Miscellaneous.*

(a)    *Waivers and Amendments.*  Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent.  Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto.  Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterparty signature page to this Agreement, together with a supplement to **Schedule I** hereto.  Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

(b)    *Governing Law.*  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(c)    *Survival.*  The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d)    *Successors and Assigns.*  Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(e)    *Registration, Transfer and Replacement of the Notes.*  The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes.  Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary.  Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered.  Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f)    *Assignment by the Company.*  The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

(g) *Entire Agreement.* This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(h) *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I**, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(i) *Payment of Fees and Expenses.* Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

(j) *Separability of Agreements; Severability of this Agreement.* The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale. Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors. Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors. If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(k) *Counterparts.* This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

**COMPANY:**

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____
Name: Michael Silberman
Title: Executive Vice President

**A-149**

## INVESTORS

DATE: 8-21-19

NAME: Frank E Parlus

TITLE: FRANK E. PANLIS

## SCHEDULE I

| Name and Address | Closing Note Principal Amount |
|---|---|

Closing: September 30, 2014

**Frank Pavlis**
1500 Hamilton St.
Allentown, PA 18102                    **$3,000,000**

I-1

**Exhibit A**

**FORM OF NOTE**

## Exhibit B

### DISCLOSURE SCHEDULE

None.

# DA-13

## KEY COMMERCIAL FINANCE LLC

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of November 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

## RECITALS

A.     On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000. This Agreement and the Note shall be collectively referred to below as (the **"Transaction Documents"**).

B.     Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.     Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     *The Notes.*

(a)     *The Notes.* Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

(b)     *Delivery.* The sale and purchase of the Notes shall take place at a closing to be held on November 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 51 Bedford Rd., Katonah, NY 10536 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**"). At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note. Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**"). At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price. Each of the Notes will be registered in such Investor's name in the Company's records.

(c)　*Investor's Commitment to Fund the Closing; Binding Obligation.* Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I**. Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

(d)　*Use of Proceeds.* The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

(e)　*Payments.* The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

2.　***Representations and Warranties of the Company.*** The Company represents and warrants to each Investor that:

(a)　*Due Incorporation, Qualification, etc.* The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(b)　*Authority.* The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

(c)　*Enforceability.* Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)　*Non-Contravention.* The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws (**"Charter Documents"**) or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

(e)　*Approvals.* No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

-2-

A-156

stockholders of any Person) is required in connection with the execution and delivery of the Transaction
Documents executed by the Company and the performance and consummation of the transactions
contemplated thereby.

        (f)    *No Violation or Default.* The Company is not in violation of or in default with
respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation
applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to
which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect,
would result in such a violation or default), where in each case, such violation or default, individually, or
together with all such violations or defaults, could reasonably be expected to have a material adverse effect on
the Company.

        (g)    *Intellectual Property.* To the best of its knowledge, the Company owns or possesses
sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets,
licenses, information, processes and other intellectual property rights necessary for its business as now
conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights
of, others.

    3.    *Representations and Warranties of Investors.* Each Investor, for that Investor alone,
represents and warrants to the Company upon the acquisition of the Note as follows:

        (a)    *Binding Obligation.* Such Investor has full legal capacity, power and authority to
execute and deliver this Agreement and to perform its obligations hereunder. Each of this Agreement and the
Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with
its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or
affecting the enforcement of creditors' rights generally and general principles of equity.

        (b)    *Securities Law Compliance.* Such Investor has been advised that the Note and the
underlying securities have not been registered under the Securities Act of 1933 (the **"Securities Act"**), or any
state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and
applicable state securities laws or unless an exemption from such registration requirements is available. Such
Investor is aware that the Company is under no obligation to effect any such registration with respect to the
Note or the underlying securities or to file for or comply with any exemption from registration. Such Investor
has not been formed solely for the purpose of making this investment and is purchasing the Note to be
acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not
with a view to, or for resale in connection with, the distribution thereof. Such Investor has such knowledge
and experience in financial and business matters that such Investor is capable of evaluating the merits and
risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic
risk of such investment for an indefinite period of time. Such Investor is an accredited investor as such term
is defined in Rule 501 of Regulation D under the Securities Act.

        (c)    *Access to Information.* Such Investor acknowledges that the Company has given
such Investor access to the corporate records and accounts of the Company and to all information in its
possession relating to the Company, has made its officers and representatives available for interview by such
Investor, and has furnished such Investor with all documents and other information required for such Investor
to make an informed decision with respect to the purchase of the Note.

    4.    *Conditions to Closing of the Investors.* Each Investor's obligations at the Closing or
Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

(a)    *Representations and Warranties*. The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)    *Governmental Approvals and Filings*. Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)    *Legal Requirements*. At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)    *Proceedings and Documents*. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

(e)    *Transaction Documents*. The Company shall have duly executed and delivered to the Investors the following documents:

(i)    This Agreement; and

(ii)    Each Note issued hereunder.

5.    *Conditions to Obligations of the Company*. The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

(a)    *Representations and Warranties*. The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)    *Governmental Approvals and Filings*. Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)    *Legal Requirements*. At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)    *Purchase Price*. Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I**.

-4-

6.    *Miscellaneous*.

(a)    *Waivers and Amendments*.  Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent.  Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto.  Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterpart signature page to this Agreement, together with a supplement to **Schedule I** hereto.  Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

(b)    *Governing Law*.  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(c)    *Survival*.  The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d)    *Successors and Assigns*.  Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(e)    *Registration, Transfer and Replacement of the Notes*.  The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes.  Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary.  Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered.  Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f)    *Assignment by the Company*.  The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

      (g)     *Entire Agreement.* This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

      (h)     *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I**, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

      (i)     *Payment of Fees and Expenses.* Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

      (j)     *Separability of Agreements; Severability of this Agreement.* The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale. Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors. Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors. If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

      (k)     *Counterparts.* This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

COMPANY:

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name: Michael Silberman
Title: Executive Vice President

**INVESTORS**

DATE: 11-21-14

NAME: Frank E Pavlis

TITLE: Frank E Pavlis

Case 1:18-cv-01516-CFC-SRF Document 81-2 Filed 08/17/20 Page 47 of 103 PageID #: 1029

2018-02-21 20:36:40 (GMT)    16468614614 From: Christine Lachapelle

**SCHEDULE I**

| Name and Address | Closing Note Principal Amount |
|---|---|
| **Closing: November 30, 2014** | |
| **Frank Pavlis** | |
| 1500 Hamilton St. | |
| Allentown, PA 18102 | $4,000,000 |

I-1

**Exhibit A**

**FORM OF NOTE**

### Exhibit B

### DISCLOSURE SCHEDULE

None.

# DA-14

| From: | Debby Skeans <debby.skeans@svn.com> |
|---|---|
| Sent: | Sunday, October 1, 2017 9:23 AM |
| To: | Harris, Craig <craig.harris@arizonarepublic.com> |
| Cc: | Darbin Skeans (user) <darbin.skeans@svn.com> |
| Subject: | Re: Follow Up on Frank Pavlis |

Craig

Sorry for the delay in responding; we were out of pocket yesterday. Darbin and I have spoken to both Atty Bivens and Mr Billingsly and have had a number of questions answered and anticipate receiving additional information shortly. After speaking with Mr Pavlis, neither he nor we wish to be used to negatively influence any investigations of Mr Billingsly or any companies related to him.

You should also be aware that Mr Pavlis was capable of and was making his own investment decisions in 2014.

Hope this clarifies things.
Debby

Deborah S. Skeans, CCIM, MAI
SVN Imperial Realty
1611 Pond Rd. Allentown, PA. 18104
direct line:
484-245-1002
debby.skeans@svn.com

**From:** Harris, Craig <Craig.Harris@arizonarepublic.com>
**Sent:** Friday, September 29, 2017 8:11:44 PM
**To:** Debby Skeans
**Subject:** Follow Up on Frank Pavlis
Dear Debby,
It was a pleasure to meet you and your husband while you were in Phoenix. I received this e-mail today from Don Bivens, and I wanted to follow up with you and your husband as to whether you have "retracted any concerns" you expressed about Mr. Pavlis and investments made with Mobile Pro Corp and Key Commercial.
I would like to visit with you regarding this, as I'm finishing my story.
Please give me a call. I look forward to hearing from you. Thank you.

**Craig Harris**
Senior Reporter

 | THE ARIZONA REPUBLIC

PART OF THE USA TODAY NETWORK
Mobile: 602.509.3613
Office: 602.444.8478
craig.harris@arizonarepublic.com
@charrisazrep on Twitter

azcentral.com • The Arizona
Republic • La Voz

**From:** Bivens, Don [mailto:dbivens@swlaw.com]
**Sent:** Friday, September 29, 2017 4:58 PM
**To:** Harris, Craig
**Cc:** Flannery, Pat
**Subject:** RE: Meeting next week
Craig, thanks for this. I left you a voicemail on you cell phone earlier this afternoon, which you should check. The Skeans have retracted any concerns they may have expressed to you about Mr. Pavlis, having sat down with Justin Billingsley and reviewed matters. I would encourage you to call them again, to the extent you are relying upon them as a source.
I appreciate this list. Remember, Snell & Wilmer has never represented Mobile Corporation. As to Quepasa, it was a public company and made regular public financial disclosures every quarter like any other public company in good standing with the SEC. All available online to anyone. Easily accessible to you.
Yes, I understand that Mobile Corporation had audited financial statements, which were a precondition to any application for becoming a public company, which was the business plan. Have you previously asked for these audited financial statements?
You are correct that neither I have ever been an officer of Key Commercial Finance. With Justin Billingsley's permission, I have disclosed to you the Justin is a current client of Snell & Wilmer, and that we perform legal services for Key Commercial Finance. But our role is one of outside legal counsel.
As soon as I have more details from Justin Billingsley I will relay them to you. I will forward him your list of questions. Feel free to reach out anytime.
DON
Don Bivens
SNELL & WILMER, L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004
602-382-6549 office
602-708-1450 cell
dbivens@swlaw.com
http://www.swlaw.com/attorneys/don_bivens



**EXHIBIT**
D-8
4/29/2020 CG
PENGAD 800-631-6989

**A-167**

Snell & Wilmer

Denver, Las Vegas, Los Angeles, Los Cabos, Orange County, Phoenix , Reno, Salt Lake City, Tucson

**From:** Harris, Craig [mailto:Craig.Harris@arizonarepublic.com]
**Sent:** Friday, September 29, 2017 4:40 PM
**To:** Bivens, Don
**Cc:** Flannery, Pat
**Subject:** Meeting next week

Hi Don,

Thanks so much for calling me yesterday regarding a potential visit with Justin and Jeff during the week of Oct. 2-6, 2017.

Here are some of the things I would like to visit about:

1) Were any quarterly or annual financial records produced for Quepasa (the most recent business) or Mobile Pro Corp? If so, could you produce those?

2) Were any audits done for Quepasa or Mobile? If so, could you produce those?

3) Based upon reporting I have done, it appears money was transferred from Mobile to Inter123, Mr. Peterson's privately held company. A mobile board member has told me the board did not authorize these payments. What did Inter123 do with these funds, which I understand are in excess of $2 million.

4) Based on reporting I have done, it appears Mobile funds were used for extensive travel (possibly first class), five-star hotels as well as department store shopping, limousine services, nail and hair salons and frequent ATM withdrawals. Why was investor money spent on these things?

5) I understand Frank Pavlis made a $2 million investment in Mobile and between a $2 million to $3 million investment in Key Commercial, based on reporting I have done. Friends and relatives of Mr. Pavlis have told me he has had memory loss for at least the past decade (during the time he made these investments). Mr. Pavlis in a phone interview told me he remembers giving money to Mr. Billingsley, but does not recall how much was invested nor where the money went. Could you please account for how much Mr. Pavlis invested in each company and whether it's your understanding he made the investments willingly. It's also my understanding that Mr. Billingsley and Inter123 had large sums of money transferred from Mobile, shortly after Mr. Pavlis made his investments in that company.

6) Could you please list the officers for Key Commercial. The company's website earlier this month had a list of individuals named on the leaderships team, including Mr. Billingsley, Mr. Peterson and Mr. Bivens ( who told me he is not an officer). The website no longer has any names or photos of the leadership team.

I truly appreciate your willingness to sit down with me. If Mr. Peterson and Mr. Billingsley are unable to fly to Phoenix, as Mr. Bivens suggested yesterday, I would be happy to do a conference call with them next week.

As all of you are likely aware, I have left numerous phone messages on the cell phones of Mr. Peterson and Mr. Billingsley, informing them of the story I was working on and the issues I wanted to discuss. I also want you to know I have talked to investors who contend fraud has possibly been committed with their money, and I would like to discuss that with Mr. Peterson and Mr. Billingsley.

I also have conducted former lawyers for both gentlemen, and I have contacted Mr. Peterson's criminal defense attorney in an effort to make sure that both Mr. Peterson and Mr. Billingsley were well aware of the issues I wanted to discuss.

As I hope you can see, I want to give both of them every opportunity to respond in order to get their side of the story. I am available any time from Oct. 2 to 6, 2017.

However, I want all of you to be aware that this story will publish on azcentral, The Arizona Republic and the USA Today network of 110 newspapers with or without your cooperation.

I look forward to meeting you next week. If you have any questions, please call me at either of the numbers below. I have copied my editor, Pat Flannery. Thank you.

**Craig Harris**
Senior Reporter

 **THE ARIZONA REPUBLIC**

PART OF THE USA TODAY NETWORK
Mobile  602.509.3613
Office:  602.444.8478
craig.harris@arizonarepublic.com
@charrisazrep on Twitter

azcentral.com • The Arizona
Republic • La Voz

**From:** Bivens, Don [mailto:dbivens@swlaw.com]
**Sent:** Tuesday, September 26, 2017 9:07 AM
**To:** Harris, Craig
**Subject:** Re: got your voicemail of this morning

Great.

Don Bivens
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren
Phoenix, Arizona. 85004
602-382-6549 office
602-708-1450 cell
dbivens@swlaw.com <mailto:dbivens@swlaw.com>

On Sep 25, 2017, at 9:43 PM, Harris, Craig <Craig.Harris@arizonarepublic.com <mailto:Craig.Harris@arizonarepublic.com>> wrote:

I'll try to call shortly after 2. Thanks

**A-168**

Sent from my iPhone

On Sep 25, 2017, at 9:13 PM, Bivens, Don <dbivens@swlaw.com<mailto:dbivens@swlaw.com>> wrote:

Tues afternoon should work. After 2. Pick a time.

Don Bivens
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren
Phoenix, Arizona. 85004
602-382-6549 office
602-708-1450 cell
dbivens@swlaw.com<mailto:dbivens@swlaw.com><mailto:dbivens@swlaw.com>


On Sep 25, 2017, at 2:31 PM, Harris, Craig
<Craig.Harris@arizonarepublic.com<mailto:Craig.Harris@arizonarepublic.com><mailto:Craig.Harris@arizonarepublic.com>> wrote:

Don,

Just saw the e-mail....Do you have any other time this afternoon or tomorrow?

-Craig

From: Bivens, Don [mailto:dbivens@swlaw.com]
Sent: Monday, September 25, 2017 1:49 PM
To: Harris, Craig
Subject: got your voicemail of this morning

Craig:

How about a call at 2:15? I have a slot open then before a 2:30 commitment. Will that work?

DON

Don Bivens
SNELL & WILMER, L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004
602-382-6549 office
602-708-1450 cell
dbivens@swlaw.com<mailto:dbivens@swlaw.com><mailto:dbivens@swlaw.com>
http://www.swlaw.com/attorneys/don_bivens
<image001.png>
Denver, Las Vegas, Los Angeles, Los Cabos, Orange County, Phoenix , Reno, Salt Lake City, Tucson

**A-169**

CONFIDENTIAL

DA-15



# FITZPATRICK LENTZ & BUBBA
### ATTORNEYS AT LAW

FITZPATRICK LENTZ & BUBBA, P.C. • 4001 SCHOOLHOUSE LANE • PO BOX 219 • CENTER VALLEY, PA 18034-0219
STABLER CORPORATE CENTER • PHONE: 610.797.9000 • FAX: 610.797.6663 • www.flblaw.com

Edward J. Lentz

Joseph A. Fitzpatrick, Jr.

Joseph A. Bubba

Timothy D. Charlesworth

Douglas J. Smillie*

Emil W. Kantra II

Joseph S. D'Amico, Jr.*

Michael R. Nesfeder

Catherine E. N. Durso

Jane P. Long

Erich J. Schock

James A. Bartholomew

_ob M. Sitman*

Edward Hoffman, Jr.*

Steven T. Boell

Joshua A. Gildea

Marie K. McConnell*

Anthony S. Rachuba IV*

Barbara S. Zicherman†

Maraleen D. Shields

Thomas J. Schlegel*

Colin J. Keefe†

Gretchen L. Geisser*

Kenneth R. Charette*

Mallory J. Sweeney*

o admitted in New York
o admitted in New Jersey

James G. Kellar
1927-2002

Douglas Panzer*
Of Counsel
Intellectual Property Law

Albertina D. Lombardi*
Kathleen M. Mills
Of Counsel

March 6, 2015

610-797-9000

Mr. Frank E. Pavlis
2051 Bevin Drive, #114
Allentown, PA 18103

Dear Frank:

I hope you've gotten through the snow at your new location, and I'd appreciate a call from you at some point next week. I received a call from Lehigh County this week, and I gather that you are still being pursued by "scammers". I'm not talking about the real estate investments that you made that I did not necessarily agree with; I'm referring to people who offer "prizes" in an effort to misappropriate funds. You told me that this has happened to you in the past, and I am truly concerned that it may be happening again. Please call me so that we can discuss.

Cordially,

Edward J. Lentz

EJL:kp

Give L. my New phone No.

484-860-3964



EXHIBIT
D-7
4/29/2020 CG

A-171

P-000086

DA-16

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# KEY COMMERCIAL FINANCE, LLC

**Minimum Offering Amount:**    $3,000,000

**Maximum Offering Amount:**    $10,000,000

## August 1, 2014

### *Confidential – Not for General Release – For Accredited Investors Only*

This document has been prepared for and offered to certain specific persons based on factors that are not of general applicability. This Private Placement Memorandum of Key Commercial Finance LLC (such document this "Memorandum;" Key Commercial Finance LLC, together with its subsidiaries, the "Company") is not intended for use or consumption by any person other than the one to whom it has been delivered.

The Company is offering from a minimum of 10,000,000 and a maximum of 10,000,000 of Class A Shares of the Company (such offering altogether, the "Offering"). The Offering is only extended to accredited investors, as that term is used in the applicable securities laws of the United States, in reliance upon certain exemptions from registration under the Securities and Exchange Act of 1933, as amended (the "Act"). Such exemption includes Regulation D promulgated under the Act and the regulations authorized thereunder and promulgated by the Securities and Exchange Commission (the "SEC"), including Sections 4(2) and 4(6) of the Act. Applicable state laws are discussed further below. By way of summary:

|  | Shares offered | Price per share | Commissions | Proceeds to the Company |
|---|---|---|---|---|
| Class A Shares | 10,000,000 | $.10 | $0.00 | $1,000,000 |

The Securities are highly speculative. Investment in the Company involves a substantial degree of risk. This Memorandum explains some of these risks. The Company cannot fully hedge or mitigate all applicable risks. No Investor is guaranteed any level of return and should not make any investment in the Company that the Investor is not willing and able to lose entirely.

The Offering does not constitute an offer. The Investor's initials on this document do not constitute the acceptance of an offer nor create a contract. The Investor's initials shall evidence only that the Investor has read, understood, and has had reasonable opportunity to ask and have answered

Case 1:18-cv-01516-CFC-SRF Document 81-2 Filed 08/17/20 Page 58 of 103 PageID #: 1040

Case 1:18-cv-01516-CFC-SRF Document 1-1 Filed 10/01/18 Page 58 of 109 PageID #: 58
To: Bill Mahoney    Page 2 of 45    2018-06-29 13:18:11 (GMT)    18453638464 From: Justin Billingsley

questions about the representations made on the initialed page. Pursuant to the corporate governance documents of the Company including its operating agreement, none of the Securities are transferable. There is no secondary market for the Securities. The Securities may be subject to dilution, diminution in value, or other losses up to the entire amount of any investment in the Company. No broker or broker-dealer has been retained by the Company for purposes of the Offering or for any other sale or transfer of any of its Securities.

This Memorandum is not a stock certificate.

## Key Terms – Summary of Offering

| | |
|---|---|
| Type of Security: | Class A Shares |
| Offering Size: | 10,000,000 to 10,000,000 Shares. |
| Offering Price per Share: | $.10 |
| Minimum Purchase Size: | $250,000 |
| Dividends: | Dividends are not guaranteed, cumulative, or pro-rated. Dividends are issued only upon an affirmative vote of all of the shares of the Company entitled to so vote. |
| Liquidation Preference: | In the event of the liquidation, winding-up, or dissolution of the Company, the Investor is not entitled to any preferential access to the assets or business functions of the Company. |
| Conversion Rights: | There is no conversion right in the Securities unless so authorized by a vote of all of the shares in the Company entitled to so vote. |
| Voting Rights: | Unless so authorized to the contrary by a vote of all shares in the Company entitled to so vote, none of the Securities shall be entitled to a vote. |
| Information Rights: | Owners of Shares shall have a right, upon reasonable notice and demand, to inspect the books of the Company in a format of reasonable accessibility. The Company may determine in its sole discretion the time, location, format, and frequency that such inspections are permitted, which discretion shall not be exercised unreasonably, capriciously, or categorically. |
| Further Agreements: | No Securities shall be deemed transferred except subject to separate |

written Subscription Agreements. This Memorandum is not an agreement.

Closing:  Securities may be transferred in one or several closings according to the terms of separate written Subscription Agreements between the Company and individual Investors.

## Notices to Investors

### No Registration

None of the Securities of the Company are registered with the Securities and Exchange Commission or any other governmental entity, domestically or internationally, nor any other supervisory or regulatory body. The Securities offering being made by the Company is offered only to a select group of specific persons, which persons may be part of such offering on account of their own representations to the Company regarding their personal income and/or net worth. If this Memorandum has not been given to you specifically in a communication addressed to you by name or by the name of a business entity through which you conduct business or investment affairs, you may not participate in the offering memorialized by this Memorandum. The Company is not offering any of its securities to the public at large. You (the "Investor") may not rely on any registration statements to the Securities and Exchange Commission or any other governmental entity, which the Company has not made and will not make absent a substantial change in the structure or nature of the Company. This Memorandum does not constitute an offer for the Securities. Your signature or initials on any page of this Memorandum do not create any contracts with the Company or otherwise bind the Company to any obligations or duties. Your initials where provided indicate only that you have received and read this Memorandum.

### For residents of all states:

The Securities offered hereby have not been registered under the Act or the securities laws of certain states and are being offered and sold in reliance on exemptions from the registration requirements of said acts and laws. The securities are subject to registration on transferability and resale and may not be transferred or resold except as permitted under said acts and laws pursuant to registration or exemption therefrom. The securities have not been approved or disapproved by the Securities and

A-175

Exchange Commission or any state securities commission or other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of the Memorandum. Any representation to the contrary is unlawful.

Other than to Accredited Investors, neither this Memorandum nor any other related documents will be distributed in or into the United States or any jurisdiction pursuant to which such distribution is prohibited by law, and neither this Memorandum nor any other related documents constitutes an offer of the Securities of the Company to any individual with a registered address in, or who is a resident located in, the United States, other than any Accredited Investor, or any of the other jurisdictions pursuant to which such distribution is prohibited by law. This Memorandum does not constitute an invitation or offer to issue or the solicitation of an invitation to offer to acquire the securities of the Company in any jurisdiction in which such offer or solicitation is unlawful.

### For residents of the state of California:

These securities have not been registered under the California Corporations Code by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities may not be sold, transferred or otherwise disposed of to any person or entity unless subsequently registered under the California Corporations Code, if such registration is required.

### For residents of the states of Connecticut, Illinois and Utah:

The Securities offered hereby have not been registered under the Act or the securities laws of certain states and are being offered and sold in reliance on exemptions from the registration requirements of said acts and laws. The Securities are subject to registration on transferability and resale and may not be transferred or resold except as permitted under said acts and laws pursuant to registration or exemption therefrom. The securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission or other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of the Memorandum. Any representation to the contrary is unlawful.

### For residents of the state of Florida:

Each Florida resident who subscribed for the purchase therein has the right, pursuant to Section 517.061(12)(a)(5) of the Florida Securities Act, to withdraw his subscription and receive a full refund of all monies paid, within three (3) business days after the execution of the Subscription Agreement

or payment for his investment has been made, whichever is later. Withdrawal will be without any further liability to any person. To accomplish this withdrawal, a subscriber need only send a letter or telegram to us at the Company's address set forth in the Memorandum indicating his intention to withdraw. Such letter or telegram shall be sent and postmarked prior to the end of the aforementioned third business day. It is prudent to send such letter by certified mail, return receipt requested, to ensure that it is received and also to evidence the time when it was mailed.

### For residents of the state of Maryland:

These securities represented by this certificate (or other document) have been issued pursuant to a claim or exemption from the registration or qualification provisions of federal and state securities laws and may not be sold or transferred without compliance with the registration or qualification provisions of applicable federal and state securities laws or applicable exemption therefrom.

### For residents of the state of New York:

The attorney general prior to its issuance and use has not reviewed this private placement Memorandum. The attorney general of the state of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful. This private offering Memorandum does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made in light of the circumstances under which they were made, not misleading. It contains a fair summary of the material terms and documents purported to be summarized herein.

### For residents of the states of Oregon and Washington:

In making an investment decision, Investors must rely on their own examination of the person or entity creating the securities and the terms of the Offering, including the merits and risks involved. These Securities have not been recommended by any federal or state securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offense. These Securities are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act of 1933, as amended, pursuant to registration or exemption therefrom. Investors should be aware that they would be required to bear the financial risks of this investment for an indefinite period of time.

A-177

**For residents of the state of Texas:**

These securities have not been registered under the Texas Securities Act and are being sold in reliance
upon the exemption contained in Section 5-581-5(i)(a) of such act. These Securities may not be sold
without registration under such act or exemption therefrom.

<u>No public market</u>

Because none of the Securities are (i) offered to the public at large, (ii) offered for purchase or sale
on any exchange, or (iii) transferable between the Investor and any other person (see below), there is
no public or secondary market for the Securities. Investors will not be able to realize any gains or
returns from the transfer or sale of their Securities. The value of the Securities will be fixed by the
Company upon their issue and not appreciate. The Investor's sole gain or return from the Company
shall come from dividends that the Company may issue from time to time. The future disposition of
any of the Securities is at the discretion of the Company absent a separate, written, mutually executed
agreement to the contrary.

<u>High degree of risk</u>

Any investment into any business enterprise involves a substantial degree of risk. New ventures may
not succeed, and the factors that determine the success or failure of a capital investment are impossible
to predict, hedge, or mitigate entirely. No person should invest in the Company or the Securities who
is not willing to expose their entire investment to the risk of total loss. The Company cannot provide
any guarantee or promise of any returns, including the return of the Investor's initial investment, nor
may the Investor rely on any statements, written or otherwise, to the contrary. The Company does not
insure or reimburse any money invested in it. No owner or holder of the Securities is thereby granted
or entitled to any rights to the assets, tangible or otherwise, of the Company.

Furthermore, as detailed below, the Company is principally engaged in lines of business that do not
guarantee any returns on any money invested by or through the Company. The Company does not
invest in fixed-income securities or other low-risk financial products.

There are other risk factors involved in any decision to invest in the Company as detailed further
below.

Restrictions on transfer of the securities

The operating agreement of the Company, which governs the internal affairs of the Company including its Securities, provides that the Securities may not be bought, sold, transferred, gifted, pledged as collateral or otherwise encumbered or hypothecated, or alienated by the Investor named on such Securities (if certificated) and on the books of the Company whether or not certificated. In the event of the death, divorce, bankruptcy, or other action tending to cause the alienation of the Securities by operation of law (an "Alienation Event"), all such Securities are immediately canceled and returned to the ownership and control of the Company by operation of law, even if such Alienation Event is not made known to the Company until a later date. No person may represent that the Securities are available for sale, nor attempt to sell or actually sell or otherwise transfer the same, or otherwise alienate their ownership of the same absent the express written consent of the Company. Investors should be aware that they will be required to bear the risks of their investment for an indefinite period of time. These restrictions on transfer operate to prevent the emergence of any secondary market for the Securities of the Company.

No one is authorized to make representations outside the offering materials

The Investor may not rely on any other representations, written or oral, apart from this Memorandum and apart from representations made more or less contemporaneously with this Memorandum by the Company in its agreements with the Investor regarding the Company's own products (such agreements, including agreements of non-disclosure, collectively, the "Subscription Agreements"). This Memorandum and the Subscription Agreements shall constitute the sole and entire source of representations regarding the Securities. No such representations are offers the acceptance of which creates a binding contract between the Company and any other person.

Descriptions and summaries of documents in the Memorandum are qualified by the actual documents

Any documents that are referred to by way of summary, or otherwise described without being fully recapitulated herein, including the Company's own marketing materials or the marketing materials of third parties, should be read as qualified by the underlying or referenced documents themselves. Investors should carefully read all source material described herein and should become independently familiar with the markets and general economic environment in which the Company operates. This Memorandum describes the state of the Company and its business operations at the time it was drafted, and is necessarily forward-looking and uncertain, and the economic and business-related representations made herein are subject to change at any time without notice.

## No legal, business, or tax advice

Nothing in this Memorandum or in the Subscription Agreements shall constitute legal or tax advice to any person. The Company does not make any representations regarding legal or tax consequences that may arise regarding the Investor's own tax liabilities or those of any other person. Investors should retain qualified independent tax and legal counsel regarding any transactions with the Company before making any investment or purchasing decisions. The Company cannot provide individualized tax or legal advice to any person except insofar as the Investor may be entitled to receive Forms 1099, K-1, or other forms from the Company reasonably necessary for the Investor to prepare accurate, complete federal income tax returns shall be provided by the Company.

## Right of the Company to modify or withdraw the Offering

The Company may revise, rescind, cancel, or otherwise adjust, revoke, affirm, or amend the Offering of any of its products or services, including the Securities, at any time and for any or no reason, with or without notice.

## Opportunity of the Investor to ask questions and receive information

The Company hereby extends to the Investor the opportunity to ask questions and to receive any relevant information in the Company's possession that may help the Investor to better understand the risks associated with their investment. Please direct such questions to:

Justin Billingsley – 203.240.7160 – jcb1111@aol.com

## Cautionary Statement Regarding Forward-Looking Statements

Certain statements in this Memorandum constitute forward-looking statements. When used in this Memorandum, words like "may," "will," "should," "shall," "project," "anticipate," "believe," "estimate," "trend," "intend," "expect," and similar expressions and the negative forms thereof involve known and unknown risks, uncertainties, and other factors that could cause anticipated outcomes not to ultimately occur. The Company expressly disclaims all obligation to undertake updates or revisions to forward-looking statements, just as the Company expressly disclaims any

reliance on a forward-looking statement as though it were an assertion of fact or a promise. The Company further expressly disclaims the accuracy or completeness of any forward-looking statements, including financial projections.

The Company's actual results, performance, or achievements could vary from those expressed in, or implied by, any forward-looking statements in this Memorandum. The Investor understands that no assurance can be given that any of the events anticipated by the forward-looking statements contained herein will transpire. Even if such events occur, the Company cannot guarantee that the Company will realize any gains, anticipated or not, from such events.

All forward-looking statements contained in this document are expressly qualified by this cautionary statement. Any written or oral forward-looking statements made after the date of this Memorandum by persons authorized to act on behalf of the Company are qualified in their entirety by the foregoing cautionary statements. The Company disclaims any obligation to update any forward-looking statements contained in this Memorandum or to announce the results of any event occurring after the date of this Memorandum that might materially and adversely affect any of the forward-looking statements contained in this Memorandum.

## Executive Summary

The Company is engaged primarily in the development of an online platform for facilitating real estate transactions between the Company's customers and sellers of residential real estate. The Company focuses on discounted, off-market, unlisted, and other properties likely to be had at an opportunistic rate. The Company does not facilitate or engage in substantial transactions involving commercial real estate. The Company does not generally perform real estate closings and is not a real estate transactions law firm.

The Company engages in all or virtually all business activities that face third parties, including customers and vendors, through subsidiaries as described in greater detail below. The Company provides operating capital to each of its subsidiaries as necessary to fund their activities. Neither the Company nor any of its subsidiaries are bound or restrained by operating agreements or other internal corporate governance documents to only engage in a single line or narrow range of lines of business.

The Company's focus on discounted, off-market, unlisted, and other properties likely to be had at an opportunistic rate has provided substantial returns on capital invested into each subsidiary.

The core business functions of the Company, operating through its subsidiaries, may be developed with an eye towards an ultimate acquisition of the Company by a larger established player in the real

estate transaction space. The Investor should expect that the bulk of the total returns that the Company may generate could come in the form of a final acquisitive sale of the Company or all or substantially all of its business functions.

The Company does not sell real estate directly to consumers and does not engage in real estate sales for the purpose of selling a primary residence to a person intending to inhabit the acquired property. The Company facilitates such sales on an investment basis. The Company does not assist any person in acquiring a declaration of homestead or any other legal protections for such properties.

### Intangible Business Assets

The Company has a high degree of reliance upon on-the-ground working real estate professionals who help to identify homes, including reconditioned and remodeled homes, that are available for sale at a discounted price. The Company's rich network of professionals grants it privileged access to off-market, under-advertised home listings, detailed and accurate information about each property, access to a further network of real estate agents and brokers, and direct access to the customers of the Company's network of professionals.

The Company has also secured favorable, mutually beneficial strategic partnerships with third parties. The Company has been able to build these partnerships on favorable terms, resulting in considerable gains to the brand and marketing assets of the Company, further details about which are available upon reasonable request from the Investor sent to the contact information provided elsewhere in this Memorandum.

### Risk Factors

The Investor should carefully consider and evaluate all applicable risks and the other information provided in this Memorandum before making any investment in the Company. The Investor should further understand that there are risks that cannot be anticipated that may substantially impact the value of any investment in the Company. No representations are made by the Company regarding its ability to account for unknown or unforeseen risks, or risks that are inherently impossible to predict or hedge. Certain risks attending the Company's ordinary business functions relate to the specific verticals in which the Company operates. The Investor should therefore undertake reasonable efforts to understand real estate investment, including but not limited to the process of identifying, closing, purchasing, renovating, remodeling, and conveying real estate. The Investor should consult qualified counsel on any matters relating to tax or legal risks that may ultimately

inure to the detriment of the Investor for any investments in the Company.

The following summary of applicable risks is not intended as a complete accounting of all possible risks the Company and the Investor may face. All risks discussed below constitute forward-looking statements.

*The Company faces substantial competition in its primary vertical and must continue to innovate in order to succeed.*

Both real estate for investment purposes and online marketplaces for real estate deals allowing prospective investors to buy into all or part of a given real estate transaction are lines of business in which the Company faces substantial competition.

The online marketplace for real estate investment products is becoming increasingly crowded as platforms become easier to build or cheaper to buy and customize, as tools for building user interfaces improve, and as the real estate market itself continues to strengthen and consistently deliver significant returns.

Providers of any form of online content are always in competition with other websites for the attention and dollars of its users. The relatively small size of the Company's target audience of high net-worth individuals hoping to invest in real estate that is to be had at an opportunistic price means that there is fierce competition for the clicks, views, and actual investments from (sales to) users.

As the internet and the Company's competitors continue to develop and adopt the latest tools for marketing, sales, and other ordinary business functions, the Company must continue to innovate just to maintain its position in the marketplace against increasing competition. There can be no assurance that the Company is or will be able to compete with any of its competitors. Substantial and ongoing platform development is necessary to maintain the Company's current position in the market.

*The Company may not be successful in its goal of continuous innovation, and may be replaced by better or cheaper technology from a competitor.*

To succeed in a constantly evolving industry, the Company must adapt to change by continually developing new technology and adding new services to address its customers' evolving expectations. The Company could incur substantial costs if it needs to modify its services or infrastructure to adapt to these changes. The Company could be adversely affected if it were to incur significant costs without generating new revenues or if it cannot adapt rapidly to these changes.

The Company could also be adversely affected if it experiences difficulties in introducing new or enhanced services or if these services are not favorably received by users. The Company may experience technical or other difficulties that could delay or prevent it from introducing new or enhanced services. Furthermore, after these services are introduced, the Company may discover errors in these services which may require it to significantly modify its software or hardware infrastructure to correct.

### *The Company faces the natural risks of relying on the internet, including the risk of new regulations.*

Doing business entirely or primarily online incurs certain systemic risks that are native to the internet as a sales channel regardless of the applicable vertical.

Even a small oversight in maintaining the Company's right to possess and use its domain name could result in disastrous consequences for the Company's core business functions. In such an event, migration to a new domain in conjunction with negotiations with any "cyber-squatters" who may come to possess and/or use these domains would substantially impair the ability of the Company to conduct any of its ordinary business functions.

The internet itself is potentially subject to macro-scale destabilizing events such as new regulation, disruption by bad actors, and new technology for accessing the internet.

Businesses that are heavily reliant on the internet are also subject to security breaches, either by mistake or by bad actors. A significant breach of the Company's data could permanently harm its reputation. Even a small or inadvertent breach could rapidly erode its brand in the eyes of actual and potential customers and would likely incur legal and regulatory harms as well. While the Company endeavors to use industry-standard systems and software to prevent data breaches, such risks cannot be fully mitigated by any prophylactic measures.

### *The Company is subject to fluctuations in the US real estate market.*

The real estate market in the United States has experienced substantial volatility in the past. The Company is subject to volatility in housing prices, new construction rates, consumer spending habits and other macroeconomic factors over which the Company has little control. The real estate market has suffered a substantial downturn erasing enormous amounts of invested wealth within recent memory. The Company cannot provide any assurance that such prolonged large-scale declines in the US housing market will not happen again in the future. The Company may see unpredictable losses in both the short and long term from investments in real estate.

The ultimate performance and value of the Company's real estate products will depend in large part upon the Company's ability to provide its customers access to any given property at a profitable rate.

Natural disasters, acts of terrorism or other deliberate actions, changes in local ordinances or state-regulations, changes in federal law, forfeiture or seizure by state or local governments or actions of eminent domain, or other unpredictable events over which the Company has little control that could suddenly reduce its inventories. Conversely, improvement in the market for residential real estate may imperil the Company's ability to secure price-competitive inventories. A stronger housing market overall may motivate its competitors to more aggressively build their own inventories, constricting supply of residential real estate and increasing prices.

### *The Company is subject to payment processing risk.*

Errors made by software tools that handle electronic payments may cause transaction errors, may cause the Company to divert scarce technical resources to address glitches or malfunctions, may cause the Company to lose trust and credibility in the eyes of actual and potential consumers, and may expose the company to lawsuits.

### *The Company may face liability for intellectual property rights infringement and other risks associated with the content it produces.*

The Company may be subject to claims for breach of contract, defamation, libel, copyright or trademark infringement, fraud or negligence, or based on other theories of liability, in each case relating to the data, articles, commentary, ratings, information or other content published on the Company's Web Properties. If such data or other content or information that the Company distributes has errors, is delayed or has design defects, the Company could be subject to liability or the Company's reputation could suffer. The Company could also be subject to claims based upon the content that is accessible from the Company's website or those websites that the Company owns and operates through links to other websites. Use of the Company's products and services as part of the investment process creates the risk that clients, or the parties whose assets are managed by the Company's clients, may pursue claims against the Company for significant amounts. Any such claim, even if the outcome were to be ultimately favorable to the Company, could involve a significant commitment of the Company's management, personnel, financial and other resources and could have a negative impact on the Company's reputation. Such claims and lawsuits could have a material adverse effect on the Company's business, financial condition or results of

**A-185**

operations.

Software updates and/or revisions to the Company's systems involve risks that may result in business disruption. The Company, subsidiaries, affiliates and its licensors will routinely update its technology to implement improvements and efficiencies as part of its business operations. Software updates are prone to unforeseen complications and errors which may result in disruption to the Company's business operations. While most system conversions result in temporary inefficiencies during the period of transition, in the event the Company experiences an extended or pervasive interruption of operations, its business could be adversely affected.

*A failure of the Company's subsidiaries, affiliates or licensors to protect their intellectual property rights, allegations that the Company, subsidiaries or such licensors have infringed the intellectual property rights of others, or breach of certain intellectual property license agreements could adversely affect the Company's business.*

The Company's business is dependent on proprietary technology and other intellectual property that the Company, its subsidiaries or affiliates, own or license from certain parties, including trademarks, service marks, trade names, trade secrets, copyrights and patents. The Company cannot assure the Investor of the success of the steps that the Company, its subsidiaries, affiliates and licensors have taken or will take in the future will prevent misappropriation of such proprietary technology or intellectual property. Additionally, the Company, its subsidiaries, affiliates and licensors may be unable to detect the misappropriation or unauthorized use of proprietary technology and intellectual property that it relies on. The Company, its subsidiaries, affiliates and licensors' failure to protect the proprietary technology and intellectual property adequately could harm the Company's reputation and affect the Company ability to compete effectively. Further, the Company, its subsidiaries and affiliates may need to resort to litigation to enforce their intellectual property rights, which may require significant financial and managerial resources. As a result, the Company, its subsidiaries and affiliates may choose not to enforce their infringed intellectual property rights, depending on their strategic evaluation and judgment regarding the best use of resources, the relative strength of intellectual property portfolio and the resources available.

In addition, the Company's competitors, as well as other companies and individuals, may have obtained, and may be expected to obtain in the future, patent rights related to the types of products and services the Company offers or plans to offer. The Company cannot assure the Investor that it is or will be aware of all patents that may pose a risk of infringement by the Company's and subsidiary's trading-related products and services. As a result, the Company may face allegations that the Company has infringed the intellectual property rights of third parties which may be costly

**A-186**

for the Company to defend. If one or more of the Company's trading-related products or services is found to infringe patents held by others, the Company may be required to stop developing or marketing the products or services, obtain licenses to develop and market the products or services from the holders of the patents or redesign the products or services in such a way as to avoid infringing the patents. The Company could also be required to pay damages if the Company were found to infringe patents held by others, which could materially adversely affect the Company's business, financial condition and operating results. The Company cannot assess the extent to which the Company may be required in the future to obtain licenses with respect to patents held by others, whether such licenses would be available or, if available, whether the Company would be able to obtain such licenses on commercially reasonable terms. If the Company were unable to obtain such licenses, the Company may not be able to redesign the Company' products or services at a reasonable cost to avoid infringement, which could materially adversely affect the Company's business, financial condition and operating results.

The Company relies on third-party providers and other suppliers for a number of services that are important to the Company's business, an interruption or cessation of an important service, data or content supplied by any third party, or the loss of an exclusive license, could have a material adverse effect on the Company's business.

The Company depends on a number of suppliers, such as online service providers, hosting services and software providers, data processors, software and hardware vendors, banks, local and regional utility providers, and telecommunications companies and broker dealers, for elements of the Company's platform, trading, clearing, data services and other systems. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company. Accordingly, there can be no assurance that the Company's existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

*The Company is subject to no diversification standards, and therefore is subject to risks that attend concentration.*

Subject to the Company's corporate bylaws and other internal corporate governance documents, the Company is not subject to any legal or self-imposed requirement to diversify its portfolio.

A-187

*The Company may be subject to losses that are not insured.*

None of the Investor's investments nor any of its other moneys are insured against loss. The Company makes no guarantee of any level of return on any investment, nor that any investment is loss-protected by any insurance policy or any funds set aside from the Company's revenues for the purpose of preventing Investors from realizing losses.

*The Company may find that its proprietary technology and methods are ineligible for formal intellectual property protections.*

The Company has made a considerable investment in developing software, digital tools, a network of professionals in various aspects of the real estate industry, brands, logos, marketing materials, digital properties, and other proprietary intellectual property that may, in part or in whole, be ultimately ineligible for formal intellectual property protections such as registration with the United States Patent & Trademark Office. The Company cannot promise that any state or federal body with the authority to grant or recognize formal intellectual property protections would accept petitions from the Company for such protections, for reasons that may include failure to timely register, a lack of originality or novelty in its intellectual property, infringement or alleged infringement on the intellectual property of another, disputes over proper title to, licensure of, royalty in, or confidentiality of any of the Company's intellectual property, improperly prepared filings, or any of several other grounds, meritorious or not, upon which such registrations may be denied or delayed. Such denial or delay may substantially imperil the Company's ability to realize returns on its investment in its own intellectual property.

*There is no secondary market for any of the Securities.*

The Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell any of the Securities. In such event, the Investor may be precluded from selling the Securities under Rule 144, even if the other applicable requirements of Rule 144 have been satisfied. With or without such compliance, registration under the Securities Act or an exemption from registration will be required for any disposition of the Shares or the underlying Common Stock. The Company must approve any future sale or transfer of any Securities absent a substantial revision to the nature and structure of the Company's internal governance documents.

*There are no dividends payable on any of the Securities.*

We do not intend to pay any cash dividends on our Common Stock or Preferred Stock in the foreseeable future. Earnings, if any, will be retained to finance growth.

*We may invest or spend the proceeds of this offering in ways with which the Investor may not agree or in ways which may not yield a return.*

The net proceeds from the sale of shares by us in the offering may be used for general corporate purposes, including working capital. The Investor will have no authority to make decisions as to how any investment in the Company is spent. As our Risk of Proceeds section below further clarifies, no money invested into the Company is earmarked for any particular purpose, and there is no guarantee that such money will be used in ways that ultimately generate any returns.

*Our future capital needs are uncertain, and we may need to raise additional funds in the future. If we require additional funds in the future, those funds may not be available on acceptable terms, or at all.*

We may need to raise substantial additional capital in the future to fund our operations, including sustaining current lines of business, developing new lines of business, continuing to develop our technology or other proprietary intellectual property, capitalize on new opportunities, remediate debt, or for any other purpose the Company deems reasonably necessary. There is no guaranty that such capital will come without debt, interest, or other fees associated with it, nor is there a guaranty that any Investor will be protected from dilution in the event of a new capital raise. If we are not able to obtain sufficient new working capital, we may have to eliminate or reduce lines of business, delay or cancel new development, or liquidate. We also may have to reduce marketing, customer support or other resources devoted to our solutions or cease operations. Any of these actions could harm our operating results.

*Use of Proceeds*

Any proceeds to the Company raised under this Memorandum or the Offering will be used to fund the ongoing operational expenses and general capital needs of the Company. No investment funds are earmarked or designated as being for allocation to any specific or particular purpose other than the general business functions of the Company. Management will have broad discretion in the application

of the net proceeds and investors will be relying on the judgment of our management regarding the application of the net proceeds.

### *Failure to thoroughly read and understand this Memorandum.*

The Company has prepared this Memorandum in order to educate potential investors about the potential risks and rewards of investing in the Company. Failure of the Investor to thoroughly read and understand this document, and to exercise the Investor's right to ask questions and seek clarification of any or all of its terms, may jeopardize the Investor's power or ability to realize any gains from any of their investments.

# DA-17

| | |
|---|---|
| From: | JB |
| Sent: | Friday, September 15, 2017 2:12 PM EDT |
| To: | debby.skeans@svn.com |
| Subject: | Re: Frank Pavlis |

Dear Debby,

Hello and thank you for the email. I am also eager to catch up with you and hope all is going well. ==As we have discussed a few times, Franks investment is with Key Commercial Finance and always has been.== Do you remember all of the documents that I sent you on KCF earlier in the year?

Also, no I have no idea who would have called Frank…whatsoever. Very sorry that he is still getting harassed that way. I had hoped that he could be protected by being there at Legacy Place.

Please stay in touch. Please let me know if there is anything else at all that you need.

Thank you.
Justin

On Sep 15, 2017, at 1:46 PM, Debby Skeans <debby.skeans@svn.com> wrote:

Justin
I've been hoping to discuss the possible AllWest investment with you.  Your last communication indicated it perhaps was not completed but I did find in our files this paperwork that seems to indicate All West investments in Frank's name.  Please review and let me know how to reconcile.
Frank also received a call last week (he said it was a woman, from Arizona) related to some investments.  I cannot call her back since he did not get her number...
Frank is concerned about the call....can you shed some light on it?
Deb

On Tue, Jan 17, 2017 at 12:41 PM, JB <jcb1114@aol.com> wrote:
Darbin and Debby,

I apologize for the late follow up. Thank you for your patience. Your correct that there is nothing to report for taxes. In connection with your question about the note, it does not commit Frank to invest more. Key is doing well with growth, keeping stable in the churning markets and consistently delivering as planned. In respects the Allwest doc, if I remember right, it was simply a mistaken doc due to it never being executed. Don't remember all of the details but think it was just discarded and never completed. Does that makes sense?

CONFIDENTIAL                                                                                   KCF005867

Thank you

Justin

On Dec 7, 2016, at 3:42 PM, Debby Skeans <debby.skeans@svn.com> wrote:

Justin

I have an appointment with Ed Lentz next Wednesday to go over a few things....I have
sent him the Key Finance Note and Note Purchase Agreement.   Since interest accrues, I
assume there is nothing to report for taxes.  Does the Note Purchase Agreement,
however, commit Frank to invest more....up to $10 million?  I do not think that is desired.
Ed would like to be sure the Note is TOD Watchtower (or JJHA-A, if Frank wants).
I'd appreciate a bit more info on the company and whether Key will be there to repay.

I also sent Ed a copy of the January 2014 AllWest subscription agreement.  Due earlier
this year, some interest must probably be accounted recognized......Was this reinvested?
If so, please provide the paperwork.  Apparently, this cannot be assigned. I believe there
is strong preference is for this money to be repaid.

Finally, Frank has requested a visit.....

Look forward to hearing from you,
Deb

--
░░░ ░░ ░░ ░░ CIM, MAI | Senior Advisor
░░ ░ ░
░ ░ ░ ░ ░ ░ ░ ░ 'A 18104
Phone ░░
debby.skeans@svn.com | www.svnimperial.com

All SVN® Offices Independently Owned and Operated.



<AllWest.pdf>

**A-193**

KCF005868

--
**Deborah S. Skeans, CCIM, MAI** | Senior Advisor
SVN | Imperial Realty
1611 Pond Road, Suite 200 | Allentown, PA 18104
Phone 484.245.1002 | Fax 610.266.9268
debby.skeans@svn.com | www.svnimperial.com

All SVN® Offices Independently Owned and Operated.



\<PavlisEquityPros.pdf\>

A-194

DA-18



## ASSIGNMENT OF NOTE

For and in consideration of One Dollar ($1.00), and other valuable consideration, the adequacy and receipt of which is hereby acknowledged, Frank E. Pavlis ("Assignor") hereby, sells, transfers, assigns, conveys, grants and delivers to Frank E. Pavlis TOD the Watchtower Bible and Tract Society of New York, Inc. c/o Charitable Planning Office, 100 Watchtower Drive, Patterson, NY 12563-9204 ("Assignee") all of Assignor's right, title and interest in and to that certain Convertible Promissory Note dated September 1, 2014 from Key Commercial Finance LLC, a Delaware limited liability company, to Assignor ("Note"). A copy of the Note is attached hereto as Exhibit A.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of September 19, 2017.

*Frank E Pavlis*

Frank E. Pavlis



**EXHIBIT**

D-5

4|29|2020 CG

**A-196**

EXHIBIT   A

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

## KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$3,000,000                                                                                             September 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **THREE MILLION AND 00/100** Dollars ($3,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) September 1, 2019 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof.  This Note is one of the "Notes" issued pursuant to the Note Purchase Agreement dated as of September 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement). Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.        *Definitions*.  As used in this Note, the following capitalized terms have the following meanings:

(a)        "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

(b)        "**Event of Default**" has the meaning given in **Section 4** hereof.

(c)        "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

**A-197**

(d)    **"Lien"** shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e)    **"Majority in Interest"** shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f)    **"Note Purchase Agreement"** has the meaning given in the introductory paragraph hereof.

(g)    **"Obligations"** shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term **"Obligations"** shall not include any obligations of Company.

(h)    **"Person"** shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i)    **"Securities Act"** shall mean the Securities Act of 1933, as amended.

(j)    **"Transaction Documents"** shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2.    *Interest.* Accrued interest on this Note shall be payable at maturity.

3.    *Prepayment.* Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4.    *Events of Default.* The occurrence of any of the following shall constitute an "Event of Default" under this Note and the other Transaction Documents:

(a)    *Failure to Pay.* The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note.docx

**A-198**

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

(b)    *Voluntary Bankruptcy or Insolvency Proceedings.*  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(c)    *Involuntary Bankruptcy or Insolvency Proceedings.*  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

5.    ***Rights of Investor upon Default.***  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

6.    *Conversion.*

(a)    *Automatic Conversion.*  In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $3,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

(b)    *Automatic Conversion on Change of Control.*  In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note.docx

CONFIDENTIAL

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis. The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions. Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this Section 6, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in Section 6(d).

(c)     *Conversion Procedure.* Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests. The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however,* that upon satisfaction of the conditions set forth in Section 6(a), as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)     *Fractional Membership Interests; Interest; Effect of Conversion.* No fractional Membership Interests shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence. In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. Upon conversion of this Note in full and the payment of any amounts specified in this Section 6(d), the Company shall be forever released from all its obligations and liabilities under this Note.

7.     *Change of Control.* Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full. The term **"Change of Control"** means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note.docx

**A-200**

Company is cancelled or converted or a combination thereof occurs. The term "Change of Control Payment" means an amount equal to one (1) times the outstanding principal amount of such Note.

8.     **Successors and Assigns.**  Subject to the restrictions on transfer described in Sections 11 and 12 below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.     **Waiver and Amendment.**  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.     **Transfer of this Note or Securities Issuable on Conversion Hereof.**  With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this Section 11 that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.     **Assignment by the Company.**  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.     **Notices.**  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.     **Pari Passu Notes.**  Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note.docx

CONFIDENTIAL

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

14.    *Usury*.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

15.    *Waivers*.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

16.    *Governing Law*.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

**A-202**

P-000098

The Company has caused this Note to be issued as of the date first written above.

KEY COMMERCIAL FINANCE LLC
A Delaware Limited Liability Company

By: _____

Name:  Michael Silberman
Title:  Executive Vice President

**A-203**

P-000099

DA-19

# LAST WILL AND TESTAMENT

I, FRANK E. PAVLIS, of Lehigh County, Pennsylvania, declare this to be my Will and revoke all prior Wills and Codicils.

Paragraph FIRST:     Cremation; Tangible Personal Property; Confirmation of Beneficiary Designations.

(a)     I have selected and prepaid the Robert C. Weir Funeral Home to supply certain funeral goods and services including the local cremation of my remains, and I desire that a portion thereof be buried in the Michigan Cemetery -- Pavlis Family Plot.

(b)     I give all tangible personal property (including automobiles but not including any such property held in the Trust referred to in Paragraph SECOND) owned by me at my death and all insurance policies on such property to JAH-JIREH HOMES OF AMERICA ("JJHA" -- or its successor), if it is then in existence, for its Small House Project in Salisbury Township, Allentown, Pennsylvania.

(c)     I confirm that all of my beneficiaried financial or other assets passing to the various charitable institutions at my death shall pass to the beneficiary so designated.

Paragraph SECOND:     Residue.

I give the residue of my estate to whoever is Trustee of my Revocable Agreement of Trust dated December 2, 2002, as amended, to be held and distributed under the terms of said Agreement and all valid future amendments thereto.

EXHIBIT

D-3

4/29/2020  CG

A-205

CONFIDENTIAL

P-003904

Paragraph THIRD:          Spendthrift Provision.

Until distributed, no gift or beneficial interest shall be subject to anticipation or to voluntary or involuntary alienation.

Paragraph FOURTH:          Death Taxes.

All death taxes (and interest and penalties thereon) imposed as a result of my death upon any property passing under my Will shall be paid as provided in my Revocable Trust referred to in Paragraph SECOND above.

Paragraph FIFTH:          Administrative Powers.

My Executor shall have the following powers in addition to those conferred by law until all property is distributed:

(a)     To retain any personal property in the form in which it is received.

(b)     To sell at public or private sale for cash and/or credit, to exchange, and to lease for any period of time, any personal property and to give options for such sales, exchanges or leases.

(c)     To hold property unregistered or in the name of a nominee.

(d)     To distribute in cash, in kind, or partly in each, and to cause any share to be composed of cash, property, or undivided fractional shares in property different in kind from any other share.

(e)     To sell personal property to the Trustee of the Agreement of Trust referred to in Paragraph SECOND (or any other trust of which I am a grantor) and to borrow from any such Trustee upon terms and conditions deemed advisable, even if an Executor hereunder is also a Trustee of any such Trust.

(f)     To compromise claims by or against my estate, including but not limited to tax issues and disputes, without order of court or consent of any legatee.

-2-

**A-206**

CONFIDENTIAL

(g)     To apply expenses of my estate permitted as income tax or estate tax deductions and to value my estate for estate tax purposes by any method permitted without adjusting between income and principal for any effect thereon.

(h)     To disclaim any interest in property without court approval.

(i)     If a corporate Executor is not then providing the applicable service, to employ accountants, agents, investment counsel (with, if deemed advisable by my Executor, discretionary authority), brokers, or a bank or trust company to perform services for and at the expense of my estate and to carry or register investments in the name of the nominee of such agent, broker, bank or trust company.  The expenses and charges for such services shall be charged against principal or income or partly against each as my Executor may reasonably determine.  My Executor is expressly relieved of any liability or responsibility whatsoever for any act or failure to act by, or for following the advice of, such accountants, agents, investment counsel, brokers, bank or trust company, so long as my Executor exercises due care in their selection.  The fact that an Executor may be a member, shareholder or employee of any accounting, investment or brokerage firm, agent, or bank or trust company so employed shall not be deemed a conflict of interest.  Any compensation paid pursuant to this subparagraph shall not affect in any manner the amount of or the right of my Executor to receive commissions as my fiduciary.

Paragraph SIXTH:          Definitions.

(a)     The words "Executor" and "Trustee" when used in this Will shall include all genders and the singular and plural as the context may require.

(b)     Paragraph headings of this Will are for reference only and shall not affect the meaning, construction or effect of this Will.

Paragraph SEVENTH:          Executor.

(a)     I appoint DEBORAH S. SKEANS and THE GLENMEDE TRUST COMPANY Executors.

(b)     My Executor shall not be required to post security in any jurisdiction.

-3-

**A-207**

(c)    Any Executor serving hereunder shall be compensated solely on an hourly basis (and in accordance with any writing relating thereto executed during my lifetime if such a writing exists).

Executed        *August 17*                    , 2016.


_____ (SEAL)
FRANK E. PAVLIS

SIGNED by FRANK E. PAVLIS as his Will, in our presence, who at his request, in his presence and in the presence of each other have signed as witnesses:


_____


-4-

A-208

P-003907

COMMONWEALTH OF PENNSYLVANIA   :

                                                                   :  SS

COUNTY OF LEHIGH                              :


      I, FRANK E. PAVLIS, Testator, whose name is signed to the attached or foregoing instrument, having been duly qualified according to law, do hereby acknowledge that I signed and executed the instrument as my Last Will; that I signed it willingly; and that I signed it as my free and voluntary act for the purposes therein expressed.


_____
/FRANK E. PAVLIS

Sworn to and acknowledged before me this 17ᵗʰ day of August            , 2016.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Kathleen Piccolo, Notary Public
Upper Saucon Twp., Lehigh County
My Commission Expires June 16, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

-5-

A-209

CONFIDENTIAL

P-003908

COMMONWEALTH OF PENNSYLVANIA

:

: SS

COUNTY OF LEHIGH

:

We, Edward J. Lentz and Lisa M Mallimaci , the

witnesses whose names are signed to the attached or foregoing instrument, being duly qualified

according to law, do depose and say that we were present and saw FRANK E. PAVLIS, the

Testator, sign and execute the instrument as his Last Will and Testament; that he signed

willingly and that he executed it as his free and voluntary act for the purposes therein expressed;

that each of us in the hearing and sight of the Testator signed the Will as witnesses; and that to

the best of our knowledge the Testator was at that time eighteen (18) or more years of age, of

sound mind and under no constraint or undue influence.

Sworn to and acknowledged before me this 17th day of August , 2016.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Kathleen Piccolo, Notary Public
Upper Saucon Twp., Lehigh County
My Commission Expires June 16, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

–6–

**A-210**

CONFIDENTIAL

P-003909

DA-20

| | |
|---|---|
| **From:** | Debby Skeans |
| **Sent:** | Monday, July 18, 2016 4:30 PM EDT |
| **To:** | Justin Billingsley |
| **Subject:** | Fwd: confidential |
| **Attachments:** | Board change reasons.docx |

Justin
Here is the "change needed" summary....still a work in progress....that went to David Wilson with my recent thoughts...

If you have read the proposed codicil, it is worse than even I believed possible...

--
Deborah S. Skeans, CCIM, MAI | Senior Advisor
SVN | Imperial Realty
1611 Pond Road, Suite 200 | Allentown, PA 18104
Phone 484.245.1002 | Fax 610.266.9268
debby.skeans@svn.com | www.svnimperial.com

All SVN® Offices Independently Owned and Operated.

From: Debby Skeans <debby.skeans@svn.com>
Sent: Thursday, July 14, 2016 6:09 PM
Subject: confidential
To: David Wilson <drwilson@email.com>


David
Much has transpired within JJHA/Legacy Place that you have been protected from.  No changes to the Board have occurred despite agreement to do so early in June.
Here is a summary of the reasons why the three donor families (Pavlis, Banko and Skeans) demand that the Board change (and Darbin regain control)....in addition to the months of slander that :Darb and i have endured.  Wyllie attempted to defraud Frank Pavlis....it is documented and Darbin had to report it to the Board because Rob and Larry and Greg (the executive committee) did not.  Financially, we are almost out of money and ready to close. The donors have expressed that they will not give more money if the current Board stays in place.  That challenges their very homes.
I am so disillusioned with so many, David.
Let's talk.
Deb

--
**Deborah Skeans, CCIM, MAI** | Senior Advisor
SVN |Imperial Realty
1611 Pond Road, Suite 200 | Allentown, PA 18104
Phone 484.245.1002 | Fax610.266.9268



EXHIBIT
D-10
4/29/2020 CG

**CONFIDENTIAL**

A-212KCF003872

debby.skeans@svn.com | www.svn.com

"All SVN® OfficesIndependently Owned and Operated."

CONFIDENTIAL

KCF003873

## Reasons to Change Officers/Board and Institute New Financial Policies

Inadequate reporting process established between administrator and Finance Committee and Board from commencement of operations late 2014

Inadequate supervision of in house bookkeeper (who was discharged late in 2015 due to incompetency) and Business Manager/Administrator

Concentration on change in "chart of accounts" in late 2015 instead of budget issues and financial processes

Inadequate review of provided documents

      Notice given September 2015 (letter from member of Finance Committee)

Failure to inform Board of inadequate funds in October 2015

      Recourse:  additional debt and appeal to resident donor for $1 million

Failure to establish a charitable fund with a portion of the $1 million gift that would have allowed subsidy to interested potential residents that needed help and whose residency would have stabilized occupancy at Legacy Place and made it self sufficient. Instead, $40,000 to $50,000 per month cash flow deficits were tolerated through out 2016, effectively using the funds to cover mismanagement

Failure to remove Micah Killgore in late 2015 and during 2016 after he was repeatedly characterized as not capable of doing the job by LifeCare Holdings, Inc., the operational consultant for Legacy Place.  Permanent licensure is still not in place after over 18 months of operation due to continued major violations.

Permission for Micah Kilgore to significantly increase his salary in Spring 2016 to "match" the nurse hired in March 2016 while funds were rapidly declining.

Failure to provide appropriate 2016 budget to Board or Finance Committee

      Document provided December 2015 unrealistic, did not allow for variable "fill scenarios" or contingencies to allow use as a planning document

No discussion of status of the mortgage in October 2015 or May 2016 as funds declined to the point that exhaustion was/is within months and closure inevitable

Failure of officers to inform entire Board of extreme financial distress to date, including at the June 2016 Board meeting

No discussion with Board of potential "technical default" condition

Page 2

Coercion by one member of the Executive Committee of Board president to "step down" from authority in December 2015 for the purpose of gaining control, without Board knowledge and with instruction that President not inform the Board of the discussion

Termination of operational accountant (Steve Hafner) in December/January during a period of financial concern

Replacement of accounting services by 4-5/hour per week volunteer who spent most of the time paying bills and cleaning up completely disorganized financials from the prior year so that audit could be done

Payment of full salary to the highest paid injured employee (Lois Vincent) for approximately four months following her accident in November 2015, an injury that all knew would not permit her prompt return to Legacy Place.

Premature repayment of a $50,000 loan from JJH, Inc., a not for profit organization with Mr. Grove as its president.

Documented characterization by the Secretary/Treasurer of Board member's action to inform the Board of fiscal issues as a "gimmick" and matters pertaining to potential "intent to defraud" by a Board member as a "witch hunt", reflecting an inappropriate attitude toward fiscal responsibilities and fiduciary duties of the organization

Failure by the officers to provide information to the Board about their fiduciary duties and potential exposure to liability in the event nonfeasance or malfeasance is established (warned since May 2016)

Failure of the officers to inform the Board of the actions of David Wyllie when reported to them

Repeated recommendation to the Board that governance change approved in June 2016 not occur until JJH, Inc. receives the entire jjha.org domain, and act that would leave Legacy Place without a needed archive of electronic communications that could be used in potential litigation

Refusal to accept and active opposition to the legal recommendation that four members of JJHA that also also Board member of JJH, Inc. recuse themselves from voting that involves known or potential benefit to JJH, Inc. and known or potential damage to JJHA.

Cavalier attitude toward the need for two of the major donors, who are residents at Legacy Place, to "ante up" more major donations to keep Legacy Place open and to maintain their residencies, believed to be a major violation of Pennsylvania Eldercare law.

CONFIDENTIAL

A-216 KCF003876

DA-21

| | |
|---|---|
| **From:** | Debby Skeans <debby.skeans@svn.com> |
| **Sent:** | Tuesday, March 27, 2018 6:39 PM |
| **To:** | Roberta Valerio <pastelbears57@gmail.com> |
| **Subject:** | |
| **Attach:** | pavlis request 3.27.18.docx |

Roberta

Here is the slightly revised letter.

Darb suggests that in addition you provide a short handwritten or typed note that is addressed to Brother Billingsly that says that you were instructed to copy the letter to the two people at Bethel that he knows. (Erna has visited several times and, of course, Brother Weaver was just there so is top of mind)

Thanks...and let me know if tomorrow is a good day to chat with Frank.

Deb

Deborah S. Skeans, CCIM, MAI
SVN Imperial Realty
1611 Pond Rd. Allentown, PA. 18104
direct line:
484-245-1002
debby.skeans@svn.com



**EXHIBIT**

D-13

4|29|20  CG

**A-218**

CONFIDENTIAL

Justin Billingsley


Brother Billingsly

Please immediately provide Atty. Mahoney with information on each of the investments you recommended and sold to me. I have been requesting you come to visit and report on these investments for over two years, and I do not understand why you as my advisor...my brother and an elder...will not come. It disturbs me that I have to pay for an attorney to get your attention.

My concern has intensified as I have just learned that my entire investment in Mobile Corporation has been lost. I want to know what happened and I want the original documentation. I also want an accounting of all the money you told me was invested in real estate.

My health is no longer good and I want to be sure my affairs are in order before I die.

Your brother,


Frank Pavlis

cc: Brother Leon Weaver
    Sister Erna Neufeld
    William Mahoney, Esquire



Frank Pavlis asked me, as his primary caregiver, to prepare this letter expressing his thoughts. He repeatedly asks me what is happening with his investments. After reviewing this letter with him, I personally witnessed his signature.

_____

Roberta Valerio                                                      Date


**A-219**

CONFIDENTIAL