# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEBORAH S. SKEANS, Executrix of the ESTATE OF FRANK E. PAVLIS, <br><br> Plaintiff, <br><br> v. <br><br> KEY COMMERCIAL FINANCE, LLC, KEY COMMERCIAL FINANCE PROPERTIES, LLC, EQUITY PROS, LLC, and MOBILE AGENCY, LLC <br><br> Defendants. <br><br> JUSTIN BILLINGSLEY and KEY COMMERCIAL FINANCE, LLC, <br><br> Third-Party Plaintiffs, <br> v. <br> DEBORAH S. SKEANS and DARBIN SKEANS, <br><br> Third-Party Defendants. | No. 1:18-cv-01516-CFC |

## OPENING BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Joelle E. Polesky (ID No. 3694)
Stradley Ronon Stevens & Young, LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19810
Tel: (302) 295-4856
Fax: (302) 295-4801
Email: jpolesky@stradley.com

Dated: August 17, 2020                    *Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

I.      NATURE AND STAGE OF THE PROCEEDINGS .................................1

II.     SUMMARY OF THE ARGUMENT ...........................................2

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ..........................4

        A.     Between January and May 2014, Pavlis invested $7,000,000
               in Allwest  .................................................................4

        B.     Billingsley Concocts a Scheme to Transfer
               Pavlis' Allwest Investments to KCF ..................................7

        C.     Billingsley Fabricates KCF Notes to Pavlis to
               Paper Over KCF's Misappropriation of Pavlis' Funds  ..................9

IV.     LEGAL ARGUMENT ..........................................................11

        A.     Legal Standard for Motion for Summary Judgment .........................11

        B.     The Pavlis Estate is Entitled to Summary Judgment
               Because the KCF Notes are *Void Ab Initio* .........................12

        C.     The Pavlis Estate is Entitled to Summary Judgment Because
               KCF was Unjustly Enriched by Pavlis' Investment .........................18

        CONCLUSION ...................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B.A.S.S. Group, LLC v. Coastal Supply Co., Inc.*,
   2009 WL 1743730 (Del. Ch. 2009) ......................................................18, 19, 20

*Big Apple BMW, Inc. v. BMW of N. America In*c.,
   974 F.2d 1358 (3d Cir. 1992) .............................................................11

*Big Valley Associates v. DiAntonio*,
   1995 WL 339072 (Del. Super. Ct. 1995).....................................................14, 15

*Caudill v. Sinex Pools, Inc.*,
   2006 WL 258302 (Del. Super. Ct. 2006)........................................................14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................11, 12

*Cleary v. North Del. A-Ok Campground, Inc.*,
   1987 WL 28317 (Del. Super. Ct. 1987)..........................................................12

*Fleischhauer v. Feltner*,
   879 F.2d 1290 (6th Cir. 1989) .............................................................16

*Gray v. York Newspapers, Inc.*,
   957 F.2d 1070 (3d Cir. 1992) .............................................................11

*Henderson v. Apartment Venture v. Miller*,
   2012 WL 2780058 (D. Nev. 2012).............................................................13, 16

*Ioengine LLC v. Interactive Media Corp.*,
   2017 WL 39563 (D. Del. 2017)......................................................12, 13, 14, 15

*Leber Assocs., LLC v. Entm't Group Fund, Inc.*,
   2003 WL 21750211 (S.D.N.Y. 2003).........................................................15, 16

*LVI Group Investments, LLC v. NCM Group Holdings, LLC*,
   2018 WL 1559936 (Del. Ch. 2018).............................................................18, 19

*Matsushita Elec. Indus. Co., Ltd. v. Senith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................. 11

*Schock v. Nash*,
    732 A.2d 217 (Del. 1999) .................................................................................. 18

*Trustees of the Peninsula Annual Conference of the Methodist*
    *Church, Inc. v. Spencer*,
    183 A.2d 588 (Del. Ch. 1962) ................................................................. 13, 15

**Statutes**

6 *Del C.* § 18-201 ...................................................................................................... 12

Delaware Limited Liability Act .......................................................................... 16

**Other Authorities**

Fed. R. Civ. P. 56 ...................................................................................................... 11

I.        **NATURE AND STAGE OF THE PROCEEDINGS**

Plaintiff filed this action against Defendants on October 1, 2018.  (D.I. 1).   On November 20, 2018, the Defendants filed their Motion to Dismiss the Complaint.  (D.I. 23.)   On September 24, 2019, this Court denied the Motion to Dismiss Plaintiff's claims for declaratory judgment, common law fraud, fraudulent concealment, and unjust enrichment.  (D.I. 30).  Defendants filed their Answer on October 8, 2019.  (D.I. 31).

On October 22, 2019, KCF and Justin Billingsley, a non-party to the underlying action, filed a Third-Party Complaint against Deborah Skeans and her husband, Darbin Skeans, (together, the "Skeanses") in their individual capacities. (D.I. 35).  On December 6, 2019, the Skeanses filed a Motion to Dismiss the Third-Party Complaint. (D.I. 48).   On July 15, 2020, this Court granted the Skeanses motion and dismissed the Third-Party Complaint in its entirety. (D.I. 77).  Discovery closed on April 30, 2020.  Plaintiff now files this Motion for Partial Summary Judgment.

## II.   <u>**SUMMARY OF THE ARGUMENT**</u>

This case arises out a $7,000,000 investment that Frank E. Pavlis ("Pavlis") made in one company – Allwest Investments, LLC ("Allwest") – only to have an entirely different company – Defendant Key Commercial Finance, LLC ("KCF") – misappropriate those funds.  In February and May 2014, Pavlis invested a combined $7,000,000 in Allwest, at the solicitation of Justin Billingsley ("Billingsley"), who had befriended the then 97-year-old Pavlis and was acting as his financial advisor.  Billinglsey was also a consultant to Allwest, whose job was to help it raise capital from investors.

Pavlis signed Allwest Subscription Agreements and Investor Questionnaires in connection with his investments, and Allwest issued a Promissory Note under which Allwest was obligated to repay Pavlis' investment.  Between January and December 2014, Allwest and Billinglsey understood that Pavlis had invested directly in Allwest.  However, in late 2014, Billingsley concocted a scheme by which Allwest would transfer Pavlis' $7,000,000 investment to KCF.  Billingsley told Allwest that Pavlis had all along intended to invest in KCF, and that Pavlis had merely advanced funds to Allwest on KCF's behalf.  Beginning in late December 2014 and continuing for the next several years, Allwest transferred Pavlis' investment funds to KCF.

2

In order to paper over Billingsley's scheme, KCF purported to issue two promissory notes (and corresponding note purchase agreements) to Pavlis. The first note was dated September 1, 2014, had a five-year term, and purported to confirm KCF's obligation to repay Pavlis $3,000,000 with interest. The second note, dated November 1, 2014, had a six-year term and purported to reflect a $4,000,000 investment. The absurdity of soliciting a 97 year-old man to make investments that would not be repaid, if at all, until he would be 102 and 103 years old, respectively, is palpable. More to the point, *KCF did not even exist at the time it allegedly issued the Notes to Pavlis*. Indeed, KCF was not formed as a Delaware LLC until December 10, 2014. The evidence or record also confirms that KCF's sole member – Billingsley's cousin – made no efforts whatsoever to form KCF before it allegedly issued its notes to Pavlis. He did not conceive of KCF until late November 2014, and he had no knowledge of the notes.

Plaintiff seeks partial summary judgment on two of four remaining counts set forth in her Complaint. This Court should grant judgment on Count I of the Complaint, which seeks a declaration that the KCF notes are *void ab initio.* Under Delaware law, an LLC does not exist and lacks the power to enter into any agreements until it files its Certificate of Formation. KCF did not file its Certificate until well after the notes purportedly issued. While Delaware courts recognize that an LLC may enjoy *de facto* status, they only do so where there is evidence of a good

faith, *bona fide* attempt to create and operate the entity.  Here, there is no such evidence.  KCF also seeks a declaration that the notes are *void ab initio* because the Notes were signed by an individual who was not a member, officer, or employee of KCF.  He had no affiliation whatsoever with KCF.  For similar reasons, the Court should grant Plaintiff summary judgment on Count V of her Complaint, on the grounds that KCF has been unjustly enriched through its usurpation of Pavlis' Allwest investment funds.

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Between January and May 2014, Pavlis invested $7,000,000 in Allwest

Frank E. Pavlis was first introduced to Justin Billingsley in 2012.  (A9-10.)[1]   At that time, Pavlis was a 95-year-old widower living in Allentown, Pennsylvania.[2]   Although Pavlis had accumulated significant wealth, he lived an extremely modest lifestyle.  (A7-8).

Billingsley held himself out as a financial professional with extensive experience in estate planning and finance, among other areas.   (*See* A17).  Throughout 2012 and 2013, Billingsley befriended Pavlis, and he became familiar

---

[1]   All "A" citations are references to the pages of the Plaintiff's Appendix, filed contemporaneously with this brief.

[2]   Pavlis, born on October 29, 1916, passed away in August 2018, at the age of 101.  (A11-16).

with Pavlis' financial situation.  (A22-25).  Having cultivated Pavlis' friendship and trust over the course of almost two years, Billinglsey solicited Pavlis to invest in an entity known as Allwest Investments, LLC.

Allwest was formed in 2011 by Gary Miller ("Miller"), whom Billingsley had met through their shared religious affiliation.  (A42).  Allwest was a real estate venture that purchased distressed residential properties, rehabilitated them, and either sold or rented the renovated properties for a profit.  (A44). In early 2014, Billingsley approached Miller about working with investors.  (A43).

Pavlis was one of those investors.  On January 28, 2014, at Billingsley's solicitation, Pavlis signed an Allwest Subscription Agreement, under which Pavlis agreed to invest $1,000,000 in a two-year Note issued by Allwest.[3]   (A52-64). Pavlis sent Miller a check for $1,000,000, and Miller understood that Allwest was obligated to repay Pavlis' investment two years later, in 2016.  (A45).  Upon depositing Pavlis' check into Allwest's bank account, Miller began deploying those funds into different Allwest real estate projects.  (A46-47).

Pavlis invested an additional $6,000,000 in Allwest several months later.  On May 20, 2014, Pavlis signed another Allwest Subscription Agreement,

---

[3]  Billinglsey presented the Subscription Agreement and Investor Questionnaire to Pavlis for his signature.  (A27, A33-34).

5

confirming his intent to invest $6,000,000 in Allwest two-year Notes.  (*See* A65-77).

Three days later, on May 23, 2014, Pavlis wrote a personal check made payable to

"Allwest Investments" and Miller deposited the check in Allwest's bank account.

Notably, Allwest received these funds without issuing a corresponding

Note.  Indeed, it appears that neither Miller nor Billingsley even knew what the terms

of the Note were or would be.   When Billinglsey e-mailed Pavlis' signed

Subscription Agreement and Investor Questionnaire to Miller on May 30, 2014, he

wrote:

> Please see the attached sub agreement for Frank's $6m.
> This is 100% of what we need Frank to sign. *Once we are
> together we will need to work out the terms of the note.*  The
> note is never signed by him though as he is already
> subscribed to it.  You are the one that signs the note and
> then we give Frank all the docs for his keeping.

(*See* A78)  (Emphasis added.)   Billingsley undertook to draft the Note on behalf of

Allwest.  (A48-49).

On December 1, 2014, Billingsley sent Miller a draft Allwest

Promissory Note in favor of Pavlis.  (*See* A79).  Following revisions, Miller signed

the Allwest Promissory Note on December 16, 2014.  (*See* A83-85).  Notably, the

Note itself was dated May 20, 2014, to correspond with the $6,000,000 investment

Pavlis made in May 2014.  (*Id.*)

6

### B.   Billingsley Concocts A Scheme to Transfer Pavlis' Allwest Investments to KCF

At the same time he and Miller were finalizing the $6,000,000 Allwest Note to Pavlis, Billinglsey conceived of a scheme to transfer the $7,000,000 that Pavlis had previously invested in Allwest to KCF, an entity which Billingsley effectively – albeit not legally – controlled.

KCF was formed on December 10, 2014, as a limited liability company under Delaware law.  (*See* A86-87).  KCF was a "Single Member-Managed Limited Liability Company" formed by George Chadwick Self ("Self"), Billingsley's cousin.  (*See* A88-94).  Self and Billingsley first discussed forming KCF *after* Self moved from North Carolina to New York in late November 2014.[4]  (A102-03).   Self also prepared KCF's formation documents after he arrived in New York.  (A110-12).

KCF's Operating Agreement made clear that the "management of the business is invested in the Member."  (A90 at ¶ 4.1).  Self was KCF's sole Member.  (A94).  As such, only Self had the authority to make management decisions on KCF's behalf.  The Operating Agreement also authorized Self, as its sole Member, *"to execute and deliver . . . (c) all promissory notes, loans, security agreements, and other similar documents, and (d) all other instruments of any other kind relating to*

---

[4]   Self moved to New York from North Carolina on November 27, 2014.  (A105, 107).

the Company's affairs, whether like or unlike the foregoing." (*Id.*)  (Emphasis added.)   Self also applied for and received an Employer Identification Number ("EIN") from the Internal Revenue Service ("IRS") on December 10, 2014.  (*See* A117-18).  Thus, only Self had the authority to execute promissory notes on behalf of KCF.

At the time he formed KCF, Self was unaware of any funding that had been secured for the entity, and Billinglsey did not indicate that he had lined up any funding for KCF.[5]  (A108-09).   However, within days of KCF's formation, Billingsley approached Miller with a proposition.   Despite having just signed the Allwest Note confirming its $6,000,000 indebtedness to Pavlis, Miller and Billingsley engaged in a discussion regarding an alternative scheme.   Billinglsey presented Miller with two options for moving forward with their relationship — either honor the Notes Allwest issued to Pavlis (and continue to pay Billingsley his consulting fee) or transfer Pavlis' investment funds to KCF.  (A50-51; *see also* A119-21).

Miller responded:  "The funds we are holding will only be sent to [KCF] once a [joint venture] is in place and we complete the operating agreement with

---

[5]   Self never met, spoke with, or corresponded with Pavlis.  (A101).  Self also knew nothing about Pavlis' investments with Allwest until Allwest began transferring Pavlis' funds to KCF in late December 2014.  (A105-06).

Frank and provide [sic] sign by all parties." (*Id.*) Inexplicably, Miller began transferring Pavlis' Allwest investment funds to KCF by late December 2014, without any "operating agreement" with Pavlis – indeed, without any documentation indicating that Pavlis was aware of or approved the transfer of his Allwest investment to KCF.

Between December 2014 and May 2018, Allwest transferred $6,000,000 of Pavlis' investment funds to KCF. (*See* A122-23; *see also* A124-29.) Allwest also transferred to KCF title to six properties, valued at roughly $1,000,000, that Allwest had purchased with Pavlis' funds. (*See* A122-23.)

### C. Billingsley Fabricates KCF Notes to Pavlis to Paper Over KCF's Misappropriation of Pavlis' Funds

KCF has produced two Convertible Promissory Notes (together with corresponding Note Purchase Agreements) that KCF allegedly issued to Pavlis in September and November 2014.

The first Note purports to have been issued by KCF on September 1, 2014 (the "September Note"). (*See* A130-47.) On its face, the September Note relates to a $3,000,000 investment that Pavlis allegedly made in KCF. (*Id.*) The term of the Note is five years – meaning that Pavlis would not be repaid until he was almost 102 years old – and it was to pay eight percent (8%) interest annually. (*Id.*) However, the interest was not payable until the Note matured in 2018. (*Id.*)

The second KCF Note purports to have been issued on November 1, 2014. (the "November Note"). (*See* A148-65). The November Note is identical to the September Note, except (i) it relates to an alleged $4,000,000 investment that Pavlis made in KCF, and (ii) its term is *six years*, meaning that KCF did not have to repay Pavlis any principal or interest until November 2020, when Pavlis would have been 103 years old. (*Id.*)

Both the KCF Notes and their corresponding Note Purchase Agreements purport to be signed on behalf of KCF by Michael Silberman[6] ("Silberman") as its "Executive Vice President." Silberman was never an employee of KCF, and he was never authorized to sign any Notes on its behalf. Self, KCF's sole member, never made Silberman Executive Vice President of KCF, and he never heard of anyone referring to him as such. (A115-16.) Silberman had no role whatsoever at KCF. (A114).

It is unclear how Silberman's name came to be on the KCF Notes and Note Purchase Agreements. What is clear, however, is that Silberman never had authority to sign anything on behalf of KCF.

---

[6]   In 2014, Silberman was a co-founder and Executive Vice President of Mobile Corp. ("Mobile"). (*See* A166 (Silberman's signature block identifies him as Mobile's Co-Founder and "Executive VP/CFO); *see also* A113-14). Billingsley knew Silberman because he worked for Mobile, and he held several positions during his tenure there, including serving as its President. (A24-25).

## IV.   LEGAL ARGUMENT

### A.   Legal Standard for Motion for Summary Judgment

Under Rule 56, summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment has the initial burden of informing the Court of the basis for the motion and identifying portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  An issue of fact is "genuine" if a reasonable finder of fact could resolve the dispute in favor of either party.  "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents 'specific facts showing that there is a genuine issue for trial.' " Fed. R. Civ. P. 56; *see also Big Apple BMW, Inc. v. BMW of N. America In*c., 974 F.2d 1358, 1362-63 (3d Cir. 1992).  The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Senith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-moving party must present specific evidence

11

in support of its contention that there is a genuine dispute as to the material facts. *Celotex*, 477 U.S. at 324.

**B.    The Pavlis Estate is Entitled to Summary Judgment
Because the KCF Notes are *Void Ab Initio***

Under Delaware law, an LLC is created only where there is technical compliance with all mandatory conditions precedent to formation.  *See Ioengine LLC v. Interactive Media Corp.*, 2017 WL 39563, at *3-4 (D. Del. 2017).  Prior to the satisfaction of all formation requirements, an LLC does not exist in a *de jure* sense. *Id.*; *see also Cleary v. North Del. A-Ok Campground, Inc.*, 1987 WL 28317, at *4 (Del. Super. Ct. 1987).

The requirements for creation of a limited liability company are controlled by the state of formation.  *See Ioengine*, 2017 WL 39563, at *3.  Delaware law provides that "a limited liability company is formed at the time of the filing of the initial certificate of formation in the office of the Secretary of State."  6 *Del C.* § 18-201.  The actual filing of a certificate of formation with the Secretary – not the mere intent or effort to file such a certificate – creates a legally existing Delaware LLC.  *See Ioengine*, 2017 WL 39563, at *4 (holding that LLC did not exist in a "*de jure* sense" despite "subjective intent or belief" because entity failed to file a certificate of formation); *see also Cleary*, 1987 WL 28317, at *4 (holding that there was no *de jure* corporate existence despite principal's efforts to incorporate because

12

the certificate of incorporation was not duly filed).  Where an LLC executes a contract prior to its legal existence, the contract is deemed *void ab initio*. *See Henderson v. Apartment Venture v. Miller,* 2012 WL 2780058, at *8 (D. Nev. 2012) (applying Delaware law and holding that contract was void because entity had not achieved formal status as an LLC prior to execution of the contract).

Here, there is no dispute that the September and November Notes, by their own terms, were "issued" to Pavlis before KCF was formed as an LLC.  KCF did not file its certificate of formation until December 10, 2014.  Given that KCF purportedly entered into the September and November Note Purchase Agreements and allegedly provided Pavlis with the corresponding Notes before KCF existed as a legal entity, those documents are *void ab initio* and KCF has no right to retain Pavlis' $7,000,000 investment.

It bears noting that where an LLC fails to qualify as *de jure* due to technical noncompliance with the formation rules, it may nonetheless assume *de facto* LLC status if it establishes the requisite elements.  *See Ioengine*, 2017 WL 39563, at *4 (stating "Delaware law does recognize the common law doctrine of *de facto* incorporation" and applying it to LLC formation).  The existence of a *de facto* LLC requires (1) a special act or general law under which the LLC may lawfully exist; (2) a *bona fide* attempt to organize under the law and colorable compliance with the statutory requirements; and (3) actual use or exercise of corporate powers

in pursuance of such law or attempted organization. *See Trustees of the Peninsula Annual Conference of the Methodist Church, Inc. v. Spencer*, 183 A.2d 588, 592 (Del. Ch. 1962).

Courts do not apply a bright line standard to determine *de facto* LLC status. *See Ioengine*, 2017 WL 39563, at *4 (citing *Caudill v. Sinex Pools, Inc.*, 2006 WL 258302, at *2 (Del. Super. Ct. 2006)). Rather, courts scrutinize the relevant facts to determine whether the entity made a *bona fide* attempt to create and operate as an LLC and whether procedural or technical shortcomings preventing legal formation are sufficiently minor such that recognition of entity status is warranted. *Id*.

Where there is a substantial good faith effort to form and the procedural defects are minor, courts recognize *de facto* status. *See Ioengine*, 2017 WL 39563, at *5 (recognizing *de facto* LLC, despite fact that certificate was not filed at time of patent assignment, because formation documents were signed and notarized the same day as the challenged contract and mailed to Secretary one day later); *see also Caudill*, 2006 WL 258302, at *2 (recognizing *de facto* status despite failure to mail incorporation documents, because completion of appropriate documentation, election for Subchapter S status, establishment of entity bank accounts, obtaining employer ID from IRS, taking out insurance on behalf of company, and filing tax returns in the company's name demonstrated a *bona fide*

14

effort to create and operate a legal corporation); *Big Valley Associates v. DiAntonio*, 1995 WL 339072, at *3 (Del. Super. Ct. 1995) (recognizing *de facto* status where there was only a one month delay in filing certificate, and entity made a *bona fide* effort by beginning business operations, obtaining an IRS corporate identification number, and making an election for Subchapter S status); *Trustees*, 183 A.2d at 592 (recognizing *de facto* status where business was operating for thirty years and the only defect to incorporation was lack of all trustees' signatures on certificate of incorporation).

By contrast, a mere intention to form an LLC, without substantial action to that effect, does not warrant *de facto* LLC status. *See Big Valley Associates*, 1995 WL 339072, at *2 ("[W]here there is merely an intention existing in the minds of certain parties to form a corporation but they have not put their purpose into operation, no *de facto* corporation exists.") (citing *Gallant v. Fashion Piece Dye Works,* 174 A. 248, 249 (N.J. Ch. 1934)).

Further, "merely giving instructions to an attorney is insufficient as a matter of law to establish *de facto* status." *Ioengine*, 2017 WL 39563, at *5 (quoting *Leber Assocs., LLC v. Entm't Group Fund, Inc.*, 2003 WL 21750211, at *10 (S.D.N.Y. 2003)). Thus, where a party merely directs legal counsel to form an LLC, the party has not made a *bona fide* effort and courts will not recognize the entity as a *de facto* LLC. *See Leber,* 2003 WL 21750211, at *10 (applying Delaware law and

15

refusing to recognize *de facto* LLC where sole evidence of an intent to legally form was that entity engaged legal counsel to organize LLC and believed that counsel had done so); *see also Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989) ("The testimony of a party that he thought he told his lawyer to incorporate…fall[s] far short of any good faith attempt to incorporate.").

Where there is no evidence that an LLC made a *bona fide* attempt comply with the requisite Delaware formation requirements *prior* to execution of a contract, no *de facto* LLC exists and any contract the LLC purportedly signed before its legal creation is void. *See Henderson,* 2012 WL 2780058, at *8 (holding that contract executed by entity purporting to be an LLC was void because the entity made no efforts to legally form prior to execution); *see also Leber,* 2003 WL 21750211, at *10 (determining that an entity that failed to file, or even draw up formation documents, prior to execution of agreement was not a *de facto* LLC).

There is no evidence that Self, as KCF's sole member, made any effort, much less a *bona fide* attempt, to organize under the Delaware Limited Liability Act before KCF purportedly issued the September and November Notes to Pavlis. Self did not even conceive of KCF until late November 2014, after he arrived in New York from North Carolina. Prior to its December 10, 2014, formation, KCF did not operate in any way, it conducted no business, it had no employees, no bank account, and no EIN issued by the IRS. It simply did not exist in any *de facto* sense, and there

is nothing in the record to suggest that Self made any effort to organize KCF before the KCF Notes were allegedly drafted or signed.  Given there is no basis to suggest that Self made a good faith or *bona fide* attempt to create KCF until December 2014, KCF did not enjoy *de facto* status as of the time the KCF Notes and Note Purchase Agreements allegedly issued, and those documents are *void ab initio*.

Finally, the KCF Notes and Note Purchase Agreements are facially void because they were signed by an individual who had no authority to contract on behalf of KCF.  Self was KCF's sole member, and pursuant to KCF's Operating Agreement the "management of the business is invested in the Member." (A94.)  Specifically, the Operating Agreement authorized Self, as its sole Member, *"to execute and deliver . . . (c) all promissory notes, loans, security agreements, and other similar documents, and (d) all other instruments of any other kind relating to the Company's affairs, whether like or unlike the foregoing."*  (A90 at ¶ 4.1).  (Emphasis added.)  Thus, only Self had the legal authority to execute and deliver the KCF Notes and Note Purchase Agreements to Pavlis.  However, Self never signed those documents.

The person whose signature appears in the KCF Notes and Note Purchase Agreements – Michael Silberman – had no legal authority to execute the Notes.   Silberman was not a member of KCF.  He never had any affiliation with KCF at all.  Notwithstanding his title in the Notes and related agreements, Silberman was never KCF's Executive Vice President or an employee of any kind.

17

In sum, there is nothing legitimate about the KCF Notes and Note Purchase Agreements, and there is no colorable argument that KCF was a de facto LLC at the time those documents were purportedly executed. Each of those documents is *void ab initio*, if not outright fraudulent. The Court should grant the Pavlis Estate declaratory judgment and order KCF to return the $7,000,000 that Pavlis allegedly invested in those invalid Notes.

**C.      The Pavlis Estate is Entitled to Summary Judgment
          <u>Because KCF was Unjustly Enriched by Pavlis' Investment</u>**

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *B.A.S.S. Group, LLC v. Coastal Supply Co., Inc.*, 2009 WL 1743730, at *6 (Del. Ch. 2009) (quoting *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999)). The elements of unjust enrichment include: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id*. (granting summary judgment in favor of defendant based on counterclaim for unjust enrichment).

In assessing an unjust enrichment claim, courts first determine "whether a contract already governs the relevant relationship between the parties." *LVI Group Investments, LLC v. NCM Group Holdings, LLC*, 2018 WL 1559936, at

*16 (Del. Ch. 2018) (citing *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. 2009)). "If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiffs' rights and any claim of unjust enrichment will be denied." *Id*.

But when a plaintiff alleges that "it is the [contract] itself, that is the unjust enrichment, the existence of the contract does not bar the unjust enrichment claim." *Id*. (citing *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008)). In other words, "[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract." *Id*. (determining that unjust enrichment claim need not be dismissed, despite existence of contract controlling the parties relationship, because "the [contract] itself enabled the [ ] Defendants to obtain benefits to which they were not entitled" and the plaintiff showed "it would never have entered into the agreement but for the Defendants' falsification of [ ] financial statements.") Thus, where a contract arises from "Defendants' fraud, the existence of the contract does not bar the unjust enrichment claim." *Id*.

19

The "typical remedy for unjust enrichment is restitution." *B.A.S.S. Group*, 2009 WL 1743730, at *7. A constructive trust may be imposed "upon specific property or identifiable proceeds of specific property, and even money so long as it resides in an identifiable fund to which the plaintiff can trace equitable ownership." *Id*.

Here, there is no doubt that KCF has been enriched and the Pavlis Estate has been impoverished as a result of Billingsley's scheme and KCF's misappropriation of Pavlis' $7,000,000 investment in Allwest. There is also no legal justification for KCF's taking of those funds. As noted above, KCF did not exist as a legal entity at the time the KCF Notes allegedly issued. Thus, the Notes are *void ab initio*. And because the Notes themselves are invalid, the Pavlis Estate has no adequate remedy at law.

It is difficult to imagine a set of facts more offensive to fundamental principles of justice, equity, and good conscience. This Court should remedy this outrage by entering judgment on behalf of the Pavlis Estate on its unjust enrichment count and order KCF to pay restitution in the amount of $7,000,000, together with interest and costs.

## V.   <u>CONCLUSION</u>

For all the foregoing reasons, the Pavlis Estate is entitled to judgment as a matter of law with respect to Counts I and V of its Complaint.  Accordingly, the Pavlis Estate respectfully requests that the Court award summary judgment in its favor and against Defendant Key Commercial Finance, LLC in the amount of $,7000,000, together with applicable interest and costs.

<table>
<tr><td></td><td>

STRADLEY RONON<br>
STEVENS & YOUNG, LLP<br><br>

<u>/s/ Joelle E. Polesky</u><br>
Joelle E. Polesky (ID No. 3694)<br>
1000 N. West Street, Suite 1200<br>
Wilmington, DE  19801<br>
Tel: (302) 295-4856<br>
Fax: (302) 295-4801<br>
Email: jpolesky@stradley.com<br><br>

*Attorneys for Plaintiff, Deborah*<br>
*S. Skeans, Executrix of the*<br>
*Estate of Frank E. Pavlis*
</td></tr>
</table>

OF COUNSEL:

William E. Mahoney, Jr. (*pro hac vice*)
Spencer R. Short (*pro hac vice*)
Stradley Ronon Stevens & Young LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Tel: (215) 564-8059
Fax: (215) 564-8120

Dated: August 17, 2020

21