## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DEBORAH S. SKEANS, Executrix of
the ESTATE OF FRANK E. PAVLIS,

          Plaintiff,

    v.

KEY COMMERCIAL FINANCE,
LLC, KEY COMMERCIAL
FINANCE PROPERTIES, LLC,
EQUITY PROS, LLC, and MOBILE
AGENCY, LLC

          Defendants.

No. 1:18-cv-01516-CFC

_____

JUSTIN BILLINGSLEY and KEY
COMMERCIAL FINANCE, LLC,

          Third-Party
          Plaintiffs,

    v.

DEBORAH S. SKEANS and
DARBIN SKEANS,

          Third-Party
          Defendants.

## APPENDIX TO
## PLAINTIFF'S OPENING BRIEF IN SUPPORT
## OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
## AND PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS

OF COUNSEL:

William E. Mahoney, Jr. (*pro hac vice*)
Spencer R. Short (*pro hac vice*
Stradley Ronon Stevens & Young LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Tel: (215) 564-8059
Fax: (215) 564-8120

Dated: August 17, 2020

Joelle E. Polesky (ID No. 3694)
STRADLEY RONON STEVENS
& YOUNG, LLP
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Tel: (302) 295-4856
Fax: (302) 295-4801
Email: jpolesky@stradley.com
*Attorneys for Third-Party*
*Defendants*

## **TABLE OF CONTENTS**

| | | |
|---|---|---|
| Exhibit 1 | Transcript of Deborah S. Skeans' April 29, 2020 Deposition | A1 |
| Exhibit 2 | Frank E. Pavlis Obituary | A11 |
| Exhibit 3 | Justin Billingsley's Resume | A17 |
| Exhibit 4 | Transcript of Justin Billingsley's April 27, 2020 Deposition | A18 |
| Exhibit 5 | Transcript of Gary Miller's April 24, 2020  Deposition | A35 |
| Exhibit 6 | January 28, 2014 Allwest Subscription Agreement and Investor Questionnaire | A52 |
| Exhibit 7 | May 20, 2014 Allwest Subscription Agreement and Investor Questionnaire | A65 |
| Exhibit 8 | May 30, 2014 Email from J. Billingsley to G. Miller | A78 |
| Exhibit 9 | December 1, 2014 from J. Billingsley to G. Miller | A79 |
| Exhibit 10 | Allwest Note | A83 |
| Exhibit 11 | Key Commercial Finance Certificate of Formation | A86 |
| Exhibit 12 | Key Commercial Finance Operating Agreement | A88 |
| Exhibit 13 | Transcript of George Chadwick Self's April 20, 2020 Deposition | A95 |
| Exhibit 14 | IRS Employer Identification Number Notice | A117 |
| Exhibit 15 | December 29, 2014 Email between J. Billingsley and G. Miller | A119 |
| Exhibit 16 | Allwest Transaction Exhibit Report | A122 |
| Exhibit 17 | Wire Transfer Confirmations | A124 |
| Exhibit 18 | September 1, 2014 Note | A130 |
| Exhibit 19 | November 1, 2014 Note | A148 |
| Exhibit 20 | September 10, 2014 Email from M. Silberman to J. Beecher | A166 |

# Exhibit 1



Deposition of:
# Deborah S. Skeans

*April 29, 2020*

In the Matter of:

# Skeans v. Key Commercial Fnance, LLC et al.

Veritext Legal Solutions
800-462-2233 | calendar-de@veritext.com  |

A1

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
2
                              - - -
3
        DEBORAH S. SKEANS,           :   CIVIL ACTION
4       Executrix of the ESTATE      :   NUMBER
        OF FRANK E. PAVLIS,          :   1:18-cv-01516-
5                    Plaintiff,      :   CFC
                       v.            :
6       KEY COMMERCIAL FINANCE,      :
        LLC, KEY COMMERCIAL          :
7       FINANCE PROPERTIES, LLC,     :
        EQUITY PROS, LLC, and        :
8       MOBILE AGENCY, LLC,          :
                     Defendants.     :
9
                              - - -
10
                  Wednesday, April 29, 2020
11
                              - - -
12
13              Oral deposition of DEBORAH S.
14     SKEANS, taken remotely via Zoom, at 222 North
15     28th Street, Allentown, Pennsylvania  18104,
16     beginning at 9:32 a.m., reported
17     stenographically by Cheryl L. Goldfarb, a
18     Registered Professional Reporter, Notary
19     Public, and an approved reporter of the United
20     States District Court.
21                            - - -
22
                  VERITEXT LEGAL SOLUTIONS
23                  MID-ATLANTIC REGION
             1801 Market Street - Suite 1800
24         Philadelphia, Pennsylvania  19103

Page 2

```
 1   A P P E A R A N C E S :
 2
 3          STRADLEY RONON STEVENS & YOUNG, LLP
            BY:  WILLIAM E. MAHONEY, JR., ESQUIRE
 4               CAMERON REDFERN, ESQUIRE
            2005 Market Street, Suite 2600
 5          Philadelphia, Pennsylvania  19103
            215.564.8000
 6          wmahoney@stradley.com
            credfern@stradley.com
 7          Representing the Plaintiff
            (Via Zoom)
 8
 9
            HALLORAN FARKAS & KITTILA, LLP
10          BY:  WILLIAM E. GREEN, JR., ESQUIRE
                 THEODORE A. KITTILA, ESQUIRE
11          5801 Kennett Pike, Suite C
            Wilmington, Delaware  19807
12          302.257.2011
            wg@hfk.law
13          tk@hfk.law
            Representing the Defendants
14          (Via Zoom)
15
                          - - -
16
17   A L S O   P R E S E N T :
18
            DARBIN SKEANS (Via Zoom)
19
            JUSTIN BILLINGSLEY (Via Zoom)
20
21                        - - -
22
23
24
```

**A4**

DEBORAH S. SKEANS

```
                                              Page 6

 1                        -  -  -

 2              DEBORAH S. SKEANS, after having

 3        been first duly sworn, was examined and

 4        testified as follows:

 5                        -  -  -

 6              THE WITNESS:  I do.

 7              THE COURT REPORTER:  Thank you

 8        very much.

 9                        -  -  -

10                    EXAMINATION

11                        -  -  -

12  BY MR. GREEN:

13        Q.      Good morning, Ms. Skeans.

14        A.      Good morning.

15        Q.      I'm going to go over the general

16  ground rules.  I know you have watched at least

17  three depositions.

18              Have you ever been deposed

19  before?

20        A.      Yes.

21        Q.      When was that?

22        A.      I think about ten years ago,

23  there was a -- a matter in our office and there

24  was a deposition.  And then about a year ago,
```

A5

DEBORAH S. SKEANS

Page 7

1   there was a commission dispute in our office

2   with one of our agents, and I believe I spoke

3   at that deposition.  I was certainly there.

4          Q.       So was that two different

5   depositions?

6          A.       Two different ones.  One was ten

7   years ago.  One was last year.

8          Q.       Ten years ago, what was the case

9   about?

10          A.       We had an agent in our office,

11   in our real estate office, that was a partner.

12   And he and another agent left our office.  And

13   there was a dispute about files.  And so there

14   was a deposition.  It never went to trial.  It

15   was resolved.  But there was a deposition in

16   that matter.

17          Q.       Got it.  Okay.  So you've done

18   this before and you know the general ground

19   rules?

20          A.       I believe so.

21          Q.       You're under oath.

22          A.       Yes.

23          Q.       You have to answer verbally.  We

24   have to try not to speak over each other.  The

**A6**

DEBORAH S. SKEANS

                                                        Page 8

1    court reporter has to take down everything you

2    say.

3                   If I ask a question and you

4    don't understand it, please let me know.  If

5    you answer, I will assume you understand the

6    question.

7                   Do you understand so far?

8         A.        Yes, I do.

9         Q.        We can take breaks when you

10   want.  But if I've asked a question, I need to

11   you answer it before we take a break.

12                  Is there anything that would

13   prevent you from testifying truthfully today?

14        A.        No.

15        Q.        Are you on any medications that

16   could affect your ability to testify?

17        A.        No.

18        Q.        Did you do anything in

19   preparation for this deposition?

20        A.        I looked over a couple of pages

21   of my notes.

22        Q.        What notes are these?

23        A.        They were my original note when

24   I met -- when I was made power of attorney.  I

**A7**

DEBORAH S. SKEANS

Page 25

```
 1   Jehovah's Witnesses do not have vast amounts of
 2   money and were worried about those that would
 3   come that would run out of funds or that would
 4   need charitable care.
 5              England's provision for their
 6   elderly is a little more ample in that category
 7   than in Pennsylvania.
 8        Q.      Now, at this time, I guess Frank
 9   Pavlis is essentially a friend of the family to
10   you?
11        A.      He -- my husband actually knew
12   Frank much better, because he was in a
13   congregation with Ethel Pavlis when he was
14   growing up.
15        Q.      Got it.  What was Mr. Pavlis'
16   lifestyle like?
17        A.      Extremely modest.  He was a very
18   private man.  He did not speak about his
19   wealth.  He did not show his wealth.
20        Q.      Do you know what he did for a
21   living --
22        A.      Oh, yes.
23        Q.      -- where he worked?
24        A.      Everybody in Lehigh Valley knew
```

DEBORAH S. SKEANS

Page 26

1    that he had been an early employee at Air

2    Products.

3         Q.        And there came a point when you

4    found out that he had a lot of money; is that

5    true?

6         A.        We never knew how much money

7    Frank had.  We assumed he had considerable

8    money, because he was an early employee at Air

9    Products.  Air Products had done very well.  He

10   had no children.  And he lived modestly.  So

11   most of us came to the conclusion that he had

12   money.

13        Q.        Understood.  Are you aware if he

14   was generous with his money?  Did he give to

15   charity?

16        A.        I had no idea in 2010 what he

17   had specifically or who he gave to.

18        Q.        Okay.

19        A.        Excuse me.

20        Q.        There was --

21        A.        Excuse me, with one caveat.

22   When the wife -- when the Allentown

23   congregation wanted to build a new Kingdom

24   Hall -- I'm trying to think of the year.  I

DEBORAH S. SKEANS

Page 66

1   Justin Billingsley?

2         A.        It was recommended by Judah

3   Schroder, a friend of ours, that Justin might

4   be a good person to meet.

5         Q.        Who is Judah Schroder?

6         A.        Judah Schroder is a longtime

7   friend of my husband's.  He lived in New York.

8   He also worked for Watchtower as a volunteer

9   during portions of his life.

10        Q.        So Mr. Skeans knew Mr. Schroder

11  when they worked at or volunteered at

12  Watchtower in New York?

13        A.        He knew -- he knew Judah for

14  many years, even when he was a child.  Judah's

15  father was a long time, full-time volunteer for

16  Watchtower.  And Judah actually kind of was

17  raised in an environment near the headquarters.

18  And so I had even met Judah as a child, when he

19  was a child.  I knew his mother and father.

20  And Darbin knew his mother and father.

21        Q.        Did Judah Schroder facilitate

22  the introduction to Justin Billingsley?

23        A.        Yes.

24        Q.        Around when was that, ballpark?

# A10

DEBORAH S. SKEANS

Page 67

1      A.        I think that was in late 2012.

2   Excuse me.   Excuse me.   '11.

3      Q.        Eleven?

4      A.        I would say that was -- let me

5   think a minute.   Sometime late '11, late '11,

6   early -- yeah, late '11, early -- yeah, late

7   '11.   I think that's correct.

8      Q.        Were you introduced to

9   Mr. Billingsley in person or did you first meet

10  him online or telephone?

11     A.        In person.   Judah arranged for a

12  meeting up in New York City.   And the four of

13  us met.   I mean, the four of us were there,

14  Judah, Justin, Darbin and I.

15     Q.        What was the purpose of you

16  meeting Mr. Billingsley in New York?

17     A.        Judah was aware that we were

18  developing the non-profit Legacy Place project.

19  And we were talking to many Brothers and

20  Sisters that would be interested in assisting

21  in that project as volunteers, as we were.   And

22  we also had Frank Pavlis in mind, because we

23  knew that he was a potential major donor and --

24  and wanted to reside there.

# Exhibit 2

# Frank Edward Pavlis

## 1916 - 2018





EXHIBIT

D-2

4|29|2020 CG

PENGAD 800-631-6989

Send Flowers



➤ Share

Frank Edward Pavlis, 101 yrs., died August 24, 2018 at Legacy Place
Cottages. He was born October 29, 1916 on a wooded farm in Grand
Traverse County, Michigan. His father was born in Chicago, Illinois and
his mother on a wheat farm in northern Minnesota. In 1947, Frank
married Ethel Piehl who died in 2002 after a long illness. The couple had
no children. He earned a B.S. degree in chemical engineering in 1938 at
Michigan Technological University, a M.S. degree in 1939 at the
University of Michigan and completed the Advanced Management
Program in 1957 at the Harvard Business School. In 2014 the Michigan
Technological University awarded Pavlis with an honorary Doctor of
Philosophy degree for his accomplishments. In the spring of 1939 Pavlis
was employed by Leonard P. Pool, a young Detroit executive, to design

and construct a prototype process plant to separate 99.5% pure oxygen from atmospheric air. When the challenging project was successfully completed a year later, the young entrepreneurs decided to found a new company to manufacture and to sell or lease air separation plants to large users of oxygen and nitrogen gases. On October 1, 1940, a new company named Air Products, Incorporated, was founded in Detroit, Michigan. Pavlis was the first employee, the Chief Engineer. The new company made an important contribution to the success of World War II. In 1943, it moved its operations to Chattanooga, Tennessee, in 1946 to Emmaus, PA, and in 1957 to Trexlertown, PA, a suburb of Allentown, PA. Currently, the company called Air Products and Chemicals, Inc. has annual revenues of approximately ten billion dollars and operations in fifty countries. Pavlis retired from Air Products in 1980 after forty years of service. He had various positions including Chief Engineer, Treasurer, Vice President Engineering, Vice President Finance and Vice President International/World Trade. He also served on the Board of Directors for 28 years. He traveled around the world five times during his lifetime. Pavlis was a member of the Allentown Central congregation of Jehovah's Witnesses. He will be buried in the small Michigan cemetery where his wife, parents, grandparents, brother and sister are buried. The Memorial talk will be on Sept 10, Monday at 4 pm at the Kingdom Hall of Jehovah's Witnesses, 4571 Indian Creek Rd., Macungie PA 18062-9766 Contributions to Jah Jireh Homes of America-Allentown, 2051 Bevin Dr, Allentown, PA 18103. They will be used to fund charitable care at Legacy Place Cottages. The Robert C. Weir Funeral Home is in charge of arrangements. www.WeirFuneral.com

To Plant Memorial Trees in memory, please visit our Sympathy Store.

Published in Morning Call from Aug. 30 to Sep. 1, 2018.

A12

## MEMORIAL EVENTS

**SEP 10**    **Service**

4:00 PM

[Kingdom Hall of Jehovah's Witnesses](#)

 **Send Flowers**

Funeral services provided by

Robert C Weir Funeral Home

[1802 W Turner St](#)
[Allentown, PA 18104](#)

[610-433-7936](#)

Send Flowers

📞 **Order by phone:** (866) 764-7853

## MEMORIES & CONDOLENCES

What would you like to say about Frank?

Not sure what to say? ⌄

Your Name

> Your Email Address

> Your Relationship        ⌄

☑ Get email updates for this page

### Add Memory

Posting Guidelines | FAQ

**4 entries**

Frank and Ethel were our neighbors at 36th & Congress Sts. in South
Whitehall Township. They visited us even after we moved from there.
They were down-to-earth. You couldn't ask for nicer neighbors. Frank was
a genuine "Mensch."
Richard & Darlene (Tami) Ochs

**Richard & Darlene Ochs**

We offer our condolences. We pray in your behalf, and we offer the hope
of welcoming back our loved ones on a Paradise earth. Psm 37:29

Mr. Pavlis was a generous benefactor of Circle of Seasons Charter School.
I offer my sincere condolences to his family and friends, especially the
Skeans family.

**Stacey Prohaska**

**A14**

Case 1:18-cv-01516-CFC-SRF   Document 85   Filed 08/17/20   Page 20 of 189 PageID #: 1147

**A15**

**Amy N. Kranch**

## INVITE OTHERS TO ADD MEMORIES

Share to let others add their own memories and condolences

## ADVICE & SUPPORT

> **The Five Stages of Grief**

> **Sympathy Advice**

> **What Is a Eulogy?**

> **Funeral Flower Etiquette**

[View All Advice & Support Articles](#)

[Contact Us](#)

[FAQ](#)

[Privacy Policy](#)

[Terms of Use](#)

**A15**

# Legacy®

© 2020 Legacy.com All rights Reserved

**A16**

# Exhibit 3

www.linkedin.com/in/justinbillingsley

# Justin C. Billingsley



Justin Billingsley's professional experience includes venture capital, angel investing, risk management, corporate tax planning, and charitable planning focusing on investments in real estate and technology. His background includes advising investment firms, startups, medium to large companies and charitable institutions. Some of the organizations he has advised include Cherif Medawar Real Estate and Investments, Diversified Funding Group, Starshine Academy, Watchtower Bible and Tract Society, 5Q Group, Summit Hotel Properties, Sperry Van Ness, ING, Allianz, Gilford Securities and HomeVestors of America. Previous to his work in venture capital, Mr. Billingsley worked in complex corporate tax planning, and risk management. Justin Billingsley has experience in the financial and accounting fields specializing in sophisticated insurance, business and commercial transactions.

**Compass Estate Planning / Guardmymoney.com**                    May 2002 – Present

- Financial product sales: $20,000,000 to $30,000,000 per year
- Financial product design for ING & Allianz
- PPM placements in technology and banking
- Extensive experience with revocable living trusts, irrevocable living trusts, ILIT, family limited partnerships, corporation formation, LLC's, LLP's
- Formation and management of 501(C)(3) entities
- Marketing, sales, formation and management of private placement life insurance

**KB Investments**                    Nov 2000 – Present

- PPM placements in real estate

**Risk Management Advisors**                    June 2009 – July 2012

- Marketing, sales, formation and management of 831(b) privately held insurance companies

**J.Billingsley Venture Capital**                    Feb 2009 – Present

- HomeVestors
- Mobile.pro
- CMREI
- Summit Hotel Properties
- Diversified Funding Group
- Gilford Securities
- Sperry Van Ness

CONFIDENTIAL                    KCF000333

# Exhibit 4

**A18**



Deposition of:

**Justin C. Billingsley**

*April 27, 2020*

In the Matter of:

**Skeans Vs. Key Commercial Fnance, LLC Et Al.**

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

**A18**

**A19**

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2

                          - - -

3

    DEBORAH S. SKEANS,              :   CIVIL ACTION
4   Executrix of the ESTATE        :   NUMBER
    OF FRANK E. PAVLIS,             :   1:18-cv-01516-
5                  Plaintiff,       :   CFC
                  v.                :
6   KEY COMMERCIAL FINANCE,         :
    LLC, KEY COMMERCIAL             :
7   FINANCE PROPERTIES, LLC,        :
    EQUITY PROS, LLC, and           :
8   MOBILE AGENCY, LLC,             :
                  Defendants.       :

9

                          - - -

10

                 Monday, April 27, 2020

11

                          - - -

12

13          Oral deposition of JUSTIN C.
14  BILLINGSLEY, taken remotely via Zoom, at
15  122 Sherwood Hill Road, Brewster, New York
16  10509, beginning at 9:30 a.m., reported
17  stenographically by Cheryl L. Goldfarb, a
18  Registered Professional Reporter, Notary
19  Public, and an approved reporter of the United
20  States District Court.
21                         - - -
22

                 VERITEXT LEGAL SOLUTIONS
23                 MID-ATLANTIC REGION
              1801 Market Street - Suite 1800
24          Philadelphia, Pennsylvania  19103

Page 2

```
 1   A P P E A R A N C E S :
 2
 3          STRADLEY RONON STEVENS & YOUNG, LLP
            BY:   WILLIAM E. MAHONEY, JR., ESQUIRE
 4                CAMERON REDFERN, ESQUIRE
            2005 Market Street, Suite 2600
 5          Philadelphia, Pennsylvania  19103
            215.564.8000
 6          wmahoney@stradley.com
            credfern@stradley.com
 7          Representing the Plaintiff
            (Via Zoom)
 8
 9
            HALLORAN FARKAS & KITTILA, LLP
10          BY:   WILLIAM E. GREEN, JR., ESQUIRE
                  THEODORE A. KITTILA, ESQUIRE
11          5801 Kennett Pike, Suite C
            Wilmington, Delaware  19807
12          302.257.2011
            wg@hfk.law
13          tk@hfk.law
            Representing the Defendants
14          (Via Zoom)
15
                            - - -
16
17   A L S O   P R E S E N T :
18
            DEBORAH S. SKEANS (Via Zoom)
19
            DARBIN SKEANS (Via Zoom)
20
21                          - - -
22
23
24
```

**A21**

JUSTIN C. BILLINGSLEY

Page 8

1            THE COURT REPORTER:  Counsel, if

2       you wish, I won't read my statement with

3       regard to swearing in the witness

4       remotely into the record.

5            MR. MAHONEY:  I'm happy to

6       consent on behalf of the plaintiff.

7            MR. GREEN:  We consent on behalf

8       of the defendant.

9            THE COURT REPORTER:  Mr.

10       Billingsley, will you please raise your

11       right hand.

12                    - - -

13            JUSTIN C. BILLINGSLEY, after

14       having been first duly sworn/affirmed,

15       was examined and testified as follows:

16                    - - -

17            THE WITNESS:  I do.

18                    - - -

19                EXAMINATION

20                    - - -

21   BY MR. MAHONEY:

22       Q.      Good morning, Mr. Billingsley.

23       A.      Good morning.

24       Q.      Please tell me how you first

**A22**

JUSTIN C. BILLINGSLEY

Page 9

1   came to know Frank Pavlis.

2       A.        I was introduced to Frank by

3   Debby and Darbin Skeans.

4       Q.        Under what circumstances?

5       A.        Debby and Darbin Skeans wanted

6   me to meet Frank to talk about his finances,

7   talk about a project that they were considering

8   with Legacy Place.

9       Q.        When do you recall first

10  speaking with Mr. Pavlis?

11      A.        When do I recall?  I don't

12  remember the date.  It would have to be late

13  2011, perhaps early 2012.

14      Q.        Tell me generally what you did

15  in terms of either assisting Mr. Pavlis or

16  speaking with Mr. Pavlis about his finances.

17      A.        We talked about everything.  I

18  don't remember in detail.  We talked about many

19  things related to his finances.

20      Q.        At a high level, tell me what

21  you recall, the topics.

22      A.        I -- outside of talking about

23  his finances, I don't recall specific topics.

24  It was too long ago.

**A23**

JUSTIN C. BILLINGSLEY

Page 10

```
 1        Q.        No.  I'm talking about with

 2   regard to finances, what did you discuss?

 3        A.        In what respect, Mr. Mahoney --

 4        Q.        Any.

 5        A.        -- are you talking about?

 6        Q.        In any respect.  Tell me what

 7   you recall discussing with him about his

 8   finances.

 9        A.        Over the course -- are you

10   asking in this particular first meeting that I

11   interacted with him?

12        Q.        Initially, yes.  I don't know

13   how many meetings you had with him, but

14   presumably you spent some measure of time

15   getting to know Mr. Pavlis and his finances.

16                  Is that a fair statement?

17        A.        It is.  There were many

18   meetings.

19        Q.        So let's talk about -- I'm going

20   to try and do it this way:  Let's try to pin it

21   between the time you first met with him and the

22   time that he first invested money in Mobile

23   Corp., which I'll represent to you was in or

24   around April of 2013.
```

JUSTIN C. BILLINGSLEY

Page 11

1          During that time period, what do

2     you recall discussing with Mr. Billingsley --

3     I'm sorry, Mr. Pavlis?

4               MR. GREEN:  Object to form.

5               You can answer.

6        A.       Yeah, I believe I answered it.

7     We talked about all things related to his

8     finances.

9     BY MR. MAHONEY:

10       Q.       Such as what?

11       A.       We talked about his -- we talked

12    a lot about how he accumulated his wealth.  He

13    told many stories about the days of founding

14    Air Products, the days of his travels.  We

15    talked at length about his loving of stocks.

16    We talked at length about his methods for

17    analyzing stocks, his methods for analyzing

18    investments.  We talked at length about his

19    thoughts on economy, his thoughts on ability to

20    be involved in the market, how he would analyze

21    different investment opportunities, companies

22    that would be doing good, companies that he

23    thought were potential buy opportunities.

24               We -- over the course of two

# A25
JUSTIN C. BILLINGSLEY

Page 12

1  years, we talked about many, many things.

2       Q.        I think you mentioned one of the

3  things was his method for analyzing stocks or

4  analyzing companies.

5                 What do you recall him telling

6  you about those methods?

7       A.        He had many, many different

8  ways.  I don't recall anything in specific.

9       Q.        You don't recall a single one?

10      A.        No.  I'm --

11                MR. GREEN:  Object to form.

12      A.        (Continuing)  No, I'm -- I don't

13  recall.  It was too long ago.  He had many,

14  many ways.

15  BY MR. MAHONEY:

16      Q.        Okay.  What was your involvement

17  in 2013 with a company called Mobile Pro?

18      A.        My involvement?  In what

19  respect?

20      Q.        In any respect, Mr. Billingsley.

21      A.        I was involved in --

22      Q.        Were you an employee of Mobile

23  Pro?

24      A.        I was.

## A26

JUSTIN C. BILLINGSLEY

Page 13

1          Q.          And what was your title?

2          A.          It's several titles.  I believe

3      two that come to mind, vice president of

4      operations.  I believe at one time, I was

5      executive vice president.  One time, I was

6      president.  And then I believe another time,

7      operations manager or something to that

8      respect.

9          Q.          Was part of your

10     responsibilities soliciting investment into the

11     company?

12         A.          Part of my responsibility?  No.

13         Q.          Did you solicit people to invest

14     in Mobile?

15         A.          Did I solicit people?  Could you

16     explain "solicit"?

17                 MR. MAHONEY:  Yes.  Cam, why

18         don't you put up 149 to 151.  We'll start

19         with 149.  Actually, just start with 149.

20                 MS. REDFERN:  So this will be

21         P-59.

22                      - - -

23                 (Whereupon, Exhibit P-59 is

24         marked for identification.)

JUSTIN C. BILLINGSLEY

```
                                              Page 46

 1                    MS. REDFERN:  All right.  It's

 2        set.

 3    BY MR. MAHONEY:

 4        Q.         Mr. Billingsley, this is what

 5    purports to be an Allwest RE Partners

 6    Subscription Agreement.

 7                    MR. MAHONEY:  And, Cam, if you

 8        flip to the next page.

 9    BY MR. MAHONEY:

10        Q.         You'll see that this is the

11    first page of the agreement with some account

12    information blacked out.

13                    Do you recall presenting an

14    Allwest subscription agreement to Mr. Pavlis?

15        A.         Yes, I believe I did.

16        Q.         And do you recall when that was?

17        A.         No.  No, I don't recall when.

18                    MR. MAHONEY:  Cam, flip through,

19        please, a couple pages.  You'll get to a

20        page with a date on it.

21                    MS. REDFERN:  (Scrolling through

22        document.)

23                    MR. MAHONEY:  Okay.

24    BY MR. MAHONEY:
```

**A28**

JUSTIN C. BILLINGSLEY

Page 47

1      Q.       Mr. Billingsley, do you
2  recognize the writing on that page?
3      A.       Do I recognize the writing?  No,
4  I don't recognize the writing.
5      Q.       So that's not your writing?
6      A.       I don't have any reason to
7  believe that's my writing, no.
8      Q.       This indicates that on the 28th
9  day of January 2014, that Mr. Pavlis was
10  investing a million dollars in a two-year note.
11           Do you recall having a
12  discussion with Mr. Pavlis about him investing
13  a million dollars for a two-year note from
14  Allwest?
15      A.       Well, he sure could have.  We
16  talked about many different documents.  We
17  looked at many different versions of these
18  documents.  This could have easily been one of
19  the ones that he and I discussed at length.
20      Q.       My question is, do you recall
21  discussing it with him?
22      A.       I believe I've answered that it
23  could have been one of the many that we
24  discussed easily.

**A29**

JUSTIN C. BILLINGSLEY

Page 48

```
 1        Q.       Well, "could have been" implies
 2    that it may not have been.
 3                  I'm asking you, do you
 4    specifically have a recollection of discussing
 5    with Mr. Pavlis a million dollar investment for
 6    a two-year note from Allwest?
 7        A.       I'm sure we discussed this
 8    document with many others, yes.
 9        Q.       And do you recall telling
10    Mr. Pavlis anything about, for example, the
11    terms of this two-year note?  What was he
12    getting in return for his million dollar
13    investment?
14        A.       Yeah.  These were the topics
15    constantly in discussion with Mr. --
16    Mr. Pavlis.  He -- this was one of the parts
17    of -- of the work that was so fluid with Frank.
18    It was constantly in development.
19        Q.       Well, how could something be
20    constantly in development when it appears that
21    he's actually agreeing to spend a million
22    dollars to get a two-year note?
23                  MR. GREEN:  Object to form.
24    BY MR. MAHONEY:
```

**A30**

JUSTIN C. BILLINGSLEY

Page 49

```
 1        Q.         Wasn't the note already
 2   prepared?
 3                   MR. GREEN:  Object to form.
 4        A.         We prepared many different
 5   documents, and then he wanted them changed.
 6   BY MR. MAHONEY:
 7        Q.         Okay.  Stick with me.  I'm
 8   talking about this one.
 9                   Was the note already prepared at
10   the time that you presented this to Mr. Pavlis
11   for his signature?
12                   MR. GREEN:  Object to form.
13                   THE WITNESS:  I don't understand
14       the question.
15                   MR. MAHONEY:  Okay.  Turn to the
16       next page, please, Cam.
17                   Thank you.
18   BY MR. MAHONEY:
19        Q.         Mr. Billingsley, do you
20   recognize the writing on this page?
21        A.         Not particularly, no.
22        Q.         When you sat down -- and
23   presumably that's Mr. Pavlis' signature.
24                   Is that your understanding?
```

# A31
## JUSTIN C. BILLINGSLEY

Page 50

1      A.       It sure looks like it.

2      Q.       Did he sign this document in

3   your presence?

4      A.       It sure looks like it.  He

5   signed many documents in my presence.

6      Q.       I'm not talking about many

7   documents.  You keep saying that.  I'm talking

8   about this document.

9           Did he sign it in your presence?

10     A.       Well, now you're conflating

11  many, many different issues into one issue,

12  that this was a very fluid circumstance and

13  fluid development process.  He signed many

14  different documents.

15     Q.       Okay.  You've said that multiple

16  times.  I'm going to ask it one more time.

17          Did he sign this document in

18  your presence?

19     A.       He certainly could have.

20     Q.       All right.  And --

21     A.       I apologize.  I don't mean to be

22  difficult.  My point is, he and I worked

23  through many, many different documents.  This

24  sure looks like one of them that he and I would

JUSTIN C. BILLINGSLEY

Page 51

1    have sat down and developed and he would have

2    signed, yes.

3        Q.        Okay.  And that's all you need

4    to say.  All right?  And by the way, if you

5    don't remember, say you don't remember.  That's

6    fine, too.  But if you remember, I expect you

7    to tell me.

8        A.        Well, I'm not -- what's most

9    important here is that I tell the truth and

10   that the truth be served.  So that's why I'm

11   approaching this my way.

12       Q.        Okay.  Well, I'd like you to

13   approach it my way and answer my questions.

14       A.        To the best of my ability, based

15   upon my oath, yes.

16       Q.        Okay, good.  Do you see where it

17   says, "Accepted this 28th day of January 2014"?

18       A.        I see that.

19       Q.        Again, do you recognize that

20   writing?

21       A.        I don't particularly recognize

22   that writing, no.

23       Q.        Did you retain a copy of this

24   document, either the original or a copy of this

## A33
JUSTIN C. BILLINGSLEY

Page 52

```
 1   signed subscription agreement?
 2                   MR. GREEN:  Object to form.
 3        A.        Did I retain a copy of it?
 4   BY MR. MAHONEY:
 5        Q.        Yes.
 6        A.        I could have.  Again, there were
 7   many documents.  We retained many copies.
 8        Q.        So you don't remember one way or
 9   the other?
10        A.        I don't.  I'm not trying to be
11   coy.  This really looks like a document that we
12   would have worked on and developed together.
13   Could it have been precisely that one?  I -- if
14   this was part of our document production, I
15   would be confident that, yes, it was.
16                   MR. MAHONEY:  Okay.  Cam, let's
17        go to the next page, please.
18   BY MR. MAHONEY:
19        Q.        Now, this is an investor
20   questionnaire that goes along with the
21   subscription agreement.
22                   Do you recall presenting this
23   investor questionnaire to Mr. Pavlis?
24        A.        Yes, I presented many investor
```

JUSTIN C. BILLINGSLEY

Page 53

1    questionnaires.  This looks like one of them.
2                        MR. MAHONEY:  Okay.  Next page,
3        Cam.
4    BY MR. MAHONEY:
5        Q.      And you'll recognize Mr. Pavlis'
6    signature again; is that right?
7        A.      That's what it looks like.
8        Q.      To your knowledge, was anybody
9    else besides you involved in discussing this
10   Allwest investment -- strike that -- in
11   presenting these documents to Mr. Pavlis for
12   signature?
13                       MR. GREEN:  Object to form.
14                       THE WITNESS:  Would you restate
15       the question?
16   BY MR. MAHONEY:
17       Q.      Yes.  Was anyone else besides
18   you involved in presenting the subscription
19   agreement and this investor questionnaire to
20   Mr. Pavlis in January of 2014?
21       A.      What do you mean by "involved
22   in"?
23       Q.      I mean in any way, shape or
24   form, did anyone else play a role in Mr. Pavlis

# **Exhibit 5**



Deposition of:
# Gary W Miller

*April 24, 2020*

In the Matter of:

# Skeans v. Key Commercial Fnance, LLC et al.

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

2
                         - - -

3

DEBORAH S. SKEANS,            :   CIVIL ACTION
4    Executrix of the ESTATE    :   NUMBER
OF FRANK E. PAVLIS,          :   1:18-cv-01516-
5              Plaintiff,     :   CFC
              v.             :
6    KEY COMMERCIAL FINANCE,     :
LLC, KEY COMMERCIAL          :
7    FINANCE PROPERTIES, LLC,    :
EQUITY PROS, LLC, and        :
8    MOBILE AGENCY, LLC,         :
              Defendants.    :

9
                         - - -

10

11          Friday, April 24, 2020

12          C O N F I D E N T I A L

13                       - - -

14          Oral deposition of GARY W. MILLER,
15   taken remotely via Zoom, at 65 Shoreline,
16   Freeport, Grand Bahama, beginning at 12:04 p.m.
17   EDT, reported stenographically by Cheryl L.
18   Goldfarb, a Registered Professional Reporter,
19   Notary Public, and an approved reporter of the
20   United States District Court.
21                       - - -

22

          VERITEXT LEGAL SOLUTIONS
23            MID-ATLANTIC REGION
       1801 Market Street - Suite 1800
24       Philadelphia, Pennsylvania  19103

```
                                          Page 2

 1   A P P E A R A N C E S :
 2
            STRADLEY RONON STEVENS & YOUNG, LLP
 3          BY:  WILLIAM E. MAHONEY, JR., ESQUIRE
                 CAMERON REDFERN, ESQUIRE
 4          2005 Market Street, Suite 2600
            Philadelphia, Pennsylvania  19103
 5          215.564.8000
            wmahoney@stradley.com
 6          credfern@stradley.com
            Representing the Plaintiff
 7          (Via Zoom)
 8
            HALLORAN FARKAS & KITTILA, LLP
 9          BY:  WILLIAM E. GREEN, JR., ESQUIRE
                 THEODORE A. KITTILA, ESQUIRE
10          5801 Kennett Pike, Suite C
            Wilmington, Delaware  19807
11          302.257.2011
            wg@hfk.law
12          tk@hfk.law
            Representing the Defendants
13          (Via Zoom)
14
            GRIFFITH HORN & SHEEHAN, LLP
15          BY:  DAVID R. GRIFFITH, ESQUIRE
                 JAMES SHEEHAN, ESQUIRE
16          1530 Humboldt Road, Suite 3
            Chico, California  95928
17          530.812.1000
            david@davidgriffithlaw.com
18          jameson@griffithandhorn.com
            Representing the Witness
19          (Via Zoom)
20                          - - -
21   A L S O   P R E S E N T :
22          DEBORAH S. SKEANS (Via Zoom)
23          DARBIN SKEANS (Via Zoom)
24          JUSTIN BILLINGSLEY (Via Zoom)
```

**A38**

GARY W. MILLER

```
                                              Page 7

 1              THE COURT REPORTER:  The

 2       attorneys participating in this

 3       deposition acknowledge that I am not

 4       physically present in the deposition room

 5       and that I will be reporting this

 6       deposition remotely.

 7                    They further acknowledge that in

 8       lieu of an oath administered in person, I

 9       will administer the oath remotely.  The

10       parties and their counsel consent to this

11       arrangement and waive any objections to

12       this manner of reporting.

13                    Please indicate your agreement

14       by stating your name and your agreement

15       on the record.

16              MR. MAHONEY:  This is Bill

17       Mahoney, on behalf of the plaintiff.  We

18       agree.

19              MR. GREEN:  Bill Green, on

20       behalf of defendants.  We agree.

21              MR. GRIFFITH:  David Griffith,

22       on behalf of Gary Miller.  We agree.

23              THE COURT REPORTER:  Thank you.

24              Mr. Miller, will you please
```

GARY W. MILLER

```
                                          Page 8

 1        raise your right hand.

 2                    - - -

 3              GARY W. MILLER, after having

 4        been first duly sworn/affirmed, was

 5        examined and testified as follows:

 6                    - - -

 7              THE WITNESS:  I do.

 8              THE COURT REPORTER:  Thank you

 9        very much.

10                    - - -

11                  EXAMINATION

12                    - - -

13   BY MR. MAHONEY:

14        Q.        Good morning, Mr. Miller.  My

15   name is Bill Mahoney, and I represent the

16   plaintiff in this litigation.  Thank you very

17   much for taking time to submit to deposition

18   here.

19              Let me begin by asking, have you

20   ever been deposed before?

21        A.        No.

22        Q.        Okay.  Hopefully, it will be a

23   painless process.  It's basic a Q and A.  I ask

24   the questions, you answer to the best of your
```

**A40**

GARY W. MILLER

Page 9

1   ability truthfully and honestly, as you just

2   took the oath.

3                  If at any point you don't

4   understand a question that I put to you, please

5   let me know.

6                  This is not an endurance test.

7   If you want to take a break, totally fine.  The

8   only thing I would ask is that if I have a

9   question pending, that you answer the question

10  before we take a break.

11                 And typically -- we did another

12  deposition earlier in the week -- we took

13  breaks anywhere between, you know, every hour,

14  hour and a half, so it's not too difficult

15  making you sit there.  But if you want to get

16  up sooner, just say so, and we'll accommodate

17  you.

18                 MR. MAHONEY:  There's also an

19         opportunity -- and, David, I don't know

20         if you've done this before.  Monday was

21         the first time I did.  But when we take

22         our first break, if you want to have a

23         separate virtual conference room or

24         breakout room with you and Mr. Miller,

**A41**

GARY W. MILLER

Page 10

1          just let the court reporter know and

2          she'll set that up for you.

3                    MR. GRIFFITH:  All right.

4          Great.

5    BY MR. MAHONEY:

6          Q.        Mr. Miller, is there any reason

7    why you can't testify truthfully today?

8          A.        No.

9          Q.        If you don't mind, could you

10   give me just a very high-level summary of your

11   work history.

12                    I take it you're retired now?

13         A.        Well, I don't know if I ever

14   retired, but I'm trying to.

15         Q.        Well, you can either start, you

16   know, from the beginning or work backwards.

17   But just give me a sense of your work history,

18   please.

19         A.        Been in real estate and

20   development and construction for over 30 years

21   in different capacities, mostly from the

22   development side.

23         Q.        I know that you, I believe, own

24   a company, Allwest.

**A42**

GARY W. MILLER

Page 14

```
1        A.      Okay.
2        Q.      But no direct communication with
3  you; is that correct?
4        A.      Correct.
5        Q.      When did you first meet
6  Mr. Billingsley?
7        A.      I was in Arizona.  Probably
8  2005.
9        Q.      And how did you come to meet
10  him?
11        A.      We're in the same religion.  I
12  met him at our -- our church, our kingdom hall.
13        Q.      Did there come a time where you
14  began discussing potential business dealings
15  with Mr. Billingsley?
16        A.      Yes.
17        Q.      And when was that?
18        A.      It was probably around 2014.
19        Q.      Do you recall the nature of
20  those discussions?  At the beginning, at least.
21        A.      Yes.  He wanted to know what I
22  was doing.
23        Q.      So presumably you told him,
24  right?
```

**A43**

GARY W. MILLER

Page 15

1          A.          Correct.

2          Q.          And how did it develop from

3     there into some form of business relationship?

4          A.          He was intrigued by what we were

5     doing and wanted to know, you know, if I would

6     work with investors.

7          Q.          Did he explain what he meant by

8     that?

9          A.          Not really.  He just said that

10     he had some investors that were looking to put

11     some money to work.  And he had been managing

12     money for some of them, and wanted to know if I

13     had an interest in deploying some of the

14     capital.

15          Q.          Was this before or after you

16     began at Allwest?

17          A.          After.

18          Q.          And I think you indicated you

19     began at Allwest either 2013 or 2014; is that

20     about right?

21          A.          No.  That's when I left

22     Landsmith.  But Allwest, I think, was brought

23     online around 2011.

24          Q.          What type of company was

GARY W. MILLER

Page 16

1   Allwest?  Was it an LLC?

2          A.        Correct.

3          Q.        Who were the members?

4          A.        Me and my wife.

5          Q.        Generally speaking, what

6   business was Allwest in?

7          A.        We were basically rehabbing

8   homes and renting some of them out, keeping

9   some of them.  So it was real estate

10  investments.

11         Q.        And when you spoke with

12  Mr. Billingsley about potential investors, did

13  you understand that the investment would be to

14  provide capital so you could continue to rehab

15  and flip houses; is that right?

16         A.        In a general sense, yes, because

17  I -- I had a franchise that was doing that.

18         Q.        What was the name of the -- I'm

19  sorry, go ahead.

20         A.        It was HomeVestors of America,

21  is how we were doing our rehabbing or flipping

22  our properties.

23         Q.        Who owned that franchise?

24         A.        I owned several of them.

**A45**

GARY W. MILLER

Page 37

```
 1       one more time?
 2                 MR. MAHONEY:  Yes.
 3  BY MR. MAHONEY:
 4       Q.       Is it your understanding that in
 5  early 2014, Mr. Pavlis, in exchange for a
 6  $1 million investment in Allwest Investments,
 7  LLC, received a two-year note from Allwest
 8  Investments?
 9       A.       Yes.
10       Q.       Do you know, generally speaking,
11  what the terms of that note were?
12       A.       No, I don't, other than the
13  term.
14       Q.       Okay, so two years.
15                Did you understand that after
16  two years, that Allwest Investments would have
17  to repay the million dollars to Mr. Pavlis,
18  presumably with some amount of interest that
19  would be spelled out in the note?
20                MR. GREEN:  Object to the form.
21       A.       Well, that would -- yeah, that
22  obviously is an actual assumption.  He's
23  investing.  He's going to expect some kind of
24  return.
```

**A46**

GARY W. MILLER

Page 44

1   today?

2          A.          Yes.

3          Q.          Does it have the same office or

4   has the home office moved to a new home or some

5   other place?

6          A.          Yeah.  It's not really operating

7   in its original place, obviously.

8          Q.          But how about the records, did

9   you maintain the records for Allwest?

10         A.          Only for the last three years.

11         Q.          Is there a reason why you don't

12   maintain or you haven't retained records for

13   longer than the past three years?

14         A.          That's what I've always done, I

15   guess.  I mean, I didn't think I needed them

16   longer than that.

17         Q.          Has anyone ever indicated to you

18   that the IRS expects people to maintain records

19   for seven years?

20         A.          Not according to my CPA.

21         Q.          All right.  Fair enough.

22                      Now, when you received that

23   million dollars, presumably you deposited it

24   into some Allwest account.

GARY W. MILLER

Page 45

```
 1                    What did you do with that money?
 2                    MR. GREEN:  Object to the form.
 3         A.      We started deploying it into
 4    different investments.
 5    BY MR. MAHONEY:
 6         Q.      When you say "investments," do
 7    you mean like you'd buy a residential property.
 8    You'd have to invest some money to rehab it.
 9    And then you would sell it off?
10         A.      That or we -- or create a rental
11    pool.
12         Q.      Oh, okay.  How did the rental
13    pool work?
14         A.      Well, we'd buy distressed
15    properties, rehab them, put renters in them and
16    then rent them out.  Have a property manager.
17         Q.      But Allwest would retain title
18    to those properties?
19         A.      Yes.
20         Q.      After you received the initial
21    million dollar investment from Mr. Pavlis, do
22    you recall having discussions with
23    Mr. Billingsley about a possible additional
24    investment by Mr. Pavlis in Allwest?
```

**A48**

GARY W. MILLER

Page 62

1    Commercial Finance, but he's just advancing

2    this money to Allwest on behalf of that

3    company?

4         A.        At some point, that was brought

5    up, but that was afterwards.

6         Q.        So at the time that this money

7    came in, is it fair to say that Mr. Billingsley

8    never said that to you or anything along those

9    lines to you?

10        A.        Correct.

11                  MR. GREEN:  Object to the form.

12   BY MR. MAHONEY:

13        Q.        I'm sorry, the answer is?

14        A.        Correct.

15        Q.        And when you say at some point

16   later, something like that was discussed, can

17   you give me a sense of when later was?

18        A.        Probably six months to -- or so

19   later.

20        Q.        And is it fair to say that

21   during that entire time, through the six months

22   or so later, you understood that both the first

23   million dollar investment and the second

24   $6 million investment was an investment by

**A49**

GARY W. MILLER

Page 63

1    Mr. Pavlis in Allwest, and Allwest had the

2    obligation to repay that investment consistent

3    with the terms of the note?

4              A.         I didn't have --

5                        MR. GREEN:  Object to the form.

6              A.         (Continuing)  I didn't have a

7    note for the -- the other money.  I only had

8    one note.

9    BY MR. MAHONEY:

10             Q.         Why is it that you didn't have a

11   note or a note wasn't prepared for the

12   $6 million?

13             A.         I don't know.

14             Q.         Did you ask Mr. Billingsley

15   about that?

16             A.         He said he had his legal team

17   working on it, his lawyer, and would get it to

18   us when it was completed.

19             Q.         Again, prior to the six months,

20   when he said that to you, you understood that

21   he was having his legal team prepare a note on

22   behalf of Allwest Investments; is that correct?

23             A.         No.  It was going to be a

24   funding agreement.  That's what we -- that's

**A50**

GARY W. MILLER

Page 120

 1          MR. MAHONEY:  Okay.  Scroll down
 2      to the bottom, Cam.  We'll work our way
 3      up.
 4  BY MR. MAHONEY:
 5      Q.        Now, Mr. Miller, this is an
 6  e-mail from Mr. Billingsley to you, dated
 7  December 29th, 2014.  The subject is, "Going
 8  Forward."
 9              He writes, "Dear Gary, I see a
10  few possible options going forward."  And then
11  Paragraph Number 1, he writes, "You keep the
12  remaining funds and continue to pay me as
13  previously arranged.  The past loans would need
14  to be taken from profits and considered part of
15  the Allwest allowable costs after the pref is
16  paid and before Allwest profits are taken or
17  profits splits are managed."
18              Number 2, it says, "You decide
19  that splitting profits in the manner that the
20  note stipulates cuts too deep into your profit
21  appetite and you transfer all capital to the
22  Key entity.  This would enable you to finance
23  assets with cheaper money and only keep capital
24  that you need to seed financing and for

GARY W. MILLER

Page 121

1    operations until profits begin to yield."

2              Mr. Miller, my question is, do

3    you have an understanding as to why in late

4    2014, Mr. Billingsley is providing you with two

5    options in terms of going forward, one appears

6    to be continuing with along the terms of the

7    note, and then two appears to be transferring

8    capital from Allwest to Key Commercial?

9              Do you know why he was providing

10   two options?

11             MR. GREEN:  Object to the form.

12        A.    Well, because that was previous

13   discussions.  He was --

14   BY MR. MAHONEY:

15        Q.    I'm sorry, what's that?

16        A.    At per previous discussions,

17   that's what he was -- you know, that's what we

18   had been discussing.

19        Q.    But it sounds like he was giving

20   you two options; that as of December 29, 2014,

21   you and Mr. Billingsley had not come to any

22   agreement as to how you were going to proceed

23   moving forward; is that a fair statement?

24             MR. GREEN:  Object to the form.

# Exhibit 6

# Allwest RE Partners
## Subscription Agreement

Allwest is a limited liability company that partners with
accredited individuals for real estate transactions.

CONFIDENTIAL

KCF000662

**A53**

## ALLWEST INVESTMENTS, LLC

### SUBSCRIPTION DOCUMENTS AND INSTRUCTIONS

### INSTRUCTIONS

The following documents must be completed in accordance with the instructions set forth below and must be executed in order to determine whether you are an accredited investor and, if accredited, in order to subscribe for the purchase of promissory notes (the "Notes") of Allwest Investments, LLC  (the "Company").

### PLEASE PRINT THE ANSWERS TO ALL QUESTIONS.

    1.    <u>Enclosed are the Following Documents</u>:

        (a)    **Subscription Agreement.**  Be sure to carefully and fully read the Subscription Agreement, and execute the signature page which is applicable to you.  On the appropriate signature page of the Subscription Agreement, the Subscriber must sign, print his, her or its name, address and social security or tax identification number where indicated, and indicate the number of Notes subscribed for, the date of execution and the manner in which title to the Notes will be held.

        (b)    **Investor Questionnaire.**  Be sure to carefully and fully read the Investor Questionnaire, which can be found after the Subscription Agreement.  On the signature page of the Investor Questionnaire, the Subscriber must sign and print his, her or its name where indicated.

        (c)    **Verification of Investment Advisor/Broker.**  The investment advisor or broker must complete this item and sign to verify that this is a suitable investment, as well as for recordkeeping purposes.

    2.    <u>Payment</u>.  Payment of the purchase price may be made by bank wire transfer to the Company, as indicated below, or by check payable to the Company and mailed to the Company at 1615 South 52nd Street, Tempe, Arizona 85281.

| | |
|---|---|
| Bank Name: | Wells Fargo |
| Routing Number: | 121000248 |
| Account Number: | 232 568 0318 |
| Account Name: | Allwest Investments, LLC |
| Bank Address: | |

    3.    <u>Return of Documents</u>.  Copies of the signed Subscription Agreement, Investor Questionnaire and other subscription-related documents should be delivered to Allwest at:

Allwest Investments, LLC
1034 Darms Lane
Napa CA 94558

ii

**A53**

 KCF000663

## A54

NAME OF SUBSCRIBER: Frank Pavlis   SUBSCRIPTION AMOUNT: $ 1,000,000

To:    Allwest Investments, LLC
1034 Darms Lane Napa, CA945

### SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement") is being delivered to you in connection with your investment in the Notes of Allwest Investments, LLC  (the "Company").  No funds received in the Offering will be escrowed.

1.    **Subscription and Purchase Price**

(a)    <u>Subscription</u>.  Subject to the conditions set forth in Section 2 hereof, the undersigned hereby subscribes for and agrees to purchase $ 1,000,000 face amount of one-year two-year (circle one) Notes.

(b)    <u>Purchase of Notes</u>.  The undersigned understands and acknowledges that the purchase price shall be remitted in exchange for the Notes, simultaneous with the delivery of this Subscription Agreement, as set forth below (the "Aggregate Purchase Price").  The undersigned understands and agrees that, subject to Section 2 and applicable laws, by executing this Agreement, he, she or it is entering into a binding agreement.

2.    **Acceptance, Offering Term and Closing Procedures**

<u>Acceptance or Rejection</u>.  The obligation of the undersigned to purchase the Notes shall be irrevocable, and the undersigned shall be legally bound to purchase the Notes subject to the terms set forth in this Agreement.  The undersigned understands and agrees that the Company reserves the right to reject this subscription for the Notes in whole or part in any order at any time prior to the closing (the "Closing") of the purchase and sale of the Notes. If, in the event of rejection of this subscription by the Company in accordance with this Section 2, or the sale of the Notes is not consummated for any reason, this Agreement and any other agreement entered into between the undersigned and the Company relating to this subscription shall thereafter have no force or effect, and the Company shall promptly return the purchase price without interest thereon or deduction there from.

3.    **Investor's Representations and Warranties**

The undersigned hereby acknowledges, agrees with and represents and warrants to the Company and its affiliates, as follows:

(a)    The undersigned has full power and authority to enter into this Agreement, the execution and delivery of which has been duly authorized, if applicable, and this Agreement constitutes a valid and legally binding obligation of the undersigned.

(b)    The undersigned acknowledges his, her or its understanding that the Offering and sale of the Notes is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the provisions of Regulation D promulgated thereunder ("Regulation D").  In furtherance thereof, the undersigned represents and warrants to the Company and its affiliates as follows:

(i)    The undersigned realizes that the basis for the exemption from registration may not be available if, notwithstanding the undersigned's representations contained herein, the undersigned is merely acquiring the Notes for resale rather than investment.

## A54

 KCF000664

**A55**

(ii)     The undersigned is acquiring the Notes solely for the undersigned's own beneficial account, for investment purposes, and not with view to, or resale in connection with, any distribution of the Notes.

(iii)     The undersigned (i) has the financial ability to bear the economic risk of his, her or its investment, has adequate means for providing for current needs and contingencies, (ii) has no need for liquidity with respect to the investment in the Company, and (iii) understands that interest will not be paid on the Note for 60 days from the date of purchase;

(iv)     The undersigned and the undersigned's attorney, accountant, purchaser representative and/or tax advisor, if any (collectively, "Advisors"), have received the Memorandum, together with all appendices thereto (as such documents may be amended or supplemented, the "Memorandum"), relating to the private placement by the Company of the Notes, and all other documents requested by the undersigned or Advisors, if any, have carefully reviewed them and understand the information contained therein, prior to the execution of this Agreement; and

(v)     The undersigned (together with his, her or its Advisors, if any) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the prospective investment in the Notes. If other than an individual, the undersigned also represents it has not been organized solely for the purpose of acquiring the Notes.

(c)     The information in the Investor Questionnaire (attached) completed and executed by the undersigned (the "Investor Questionnaire") is true and accurate in all respects, and the undersigned is an "accredited investor," as that term is defined in Rule 501(a) of Regulation D.

(d)     The undersigned (and his, her or its Advisors, if any) has been furnished with a copy of the Memorandum.

(e)     The undersigned has relied on the advice of, or has consulted with, only his, her or its Advisors. Each Advisor, if any, is capable of evaluating the merits and risks of an investment in the Notes as such are described in the Memorandum, and each Advisor, if any, has disclosed to the undersigned in writing (a copy of which is annexed to this Agreement) the specific details of any and all past, present or future relationships, actual or contemplated, between the Advisor and the Company or any affiliate thereof.

(f)     The undersigned represents, warrants and agrees that he, she or it will not sell or otherwise transfer the Notes without registration under the Securities Act or an exemption therefrom, and fully understands and agrees that the undersigned must bear the economic risk of his, her or its purchase because, among other reasons, the Notes have not been registered under the Securities Act or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under the applicable securities laws of such states, or an exemption from such registration is available. In particular, the undersigned is aware that the Notes are "restricted securities," as such term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"), and they may not be sold pursuant to Rule 144 unless all of the conditions of Rule 144 are met. The undersigned also understands that, except as otherwise provided in Section 5 hereof, the Company is under no obligation to register the Notes on his, her or its behalf or to assist them in complying with any exemption from registration under the Securities Act or applicable state securities laws. The undersigned understands that any sales or transfers of the Notes are further restricted by state securities laws.

2

**A55**

 KCF000665

(g)      No representations or warranties have been made to the undersigned by the Company, other than any representations of the Company contained herein and in the Memorandum, and in subscribing for the Notes the undersigned is not relying upon any representations other than those contained herein or in the Memorandum.

(h)      The undersigned understands and acknowledges that his, her or its purchase of the Notes is a speculative investment that involves a high degree of risk and the potential loss of their entire investment and has carefully read and considered the matters set forth in the Memorandum and in particular the matters under the caption "Special Note Regarding Forward-Looking Statements" and "Risk Factors" therein.

(i)      The undersigned's overall commitment to investments that are not readily marketable is not disproportionate to the undersigned's net worth, and an investment in the Notes will not cause such overall commitment to become excessive.

(j)      The undersigned understands and agrees that the certificates for the Notes shall bear substantially the following legend until (i) such Notes shall have been registered under the Securities Act and effectively disposed of in accordance with a registration statement that has been declared effective or (ii) in the opinion of counsel for the Company such Notes may be sold without registration under the Securities Act, as well as any applicable "blue sky" or state securities laws:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS. SUCH SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES AND MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FILED BY THE ISSUER WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION COVERING SUCH SECURITIES UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED.

(k)      Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved the Notes or passed upon or endorsed the merits of the Offering or confirmed the accuracy or determined the adequacy of the Memorandum. The Memorandum has not been reviewed by any Federal, state or other regulatory authority.

(l)      The undersigned and his, her or its Advisors, if any, have had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the Offering of the Notes and the business, financial condition, results of operations and prospects of the Company, and all such questions have been answered to the full satisfaction of the undersigned and his, her or its Advisors, if any.

(m)      The undersigned is unaware of, is in no way relying on, and did not become aware of the Offering of the Notes through or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or electronic mail over the Internet, in connection with the Offering and sale of the Notes and is not subscribing for Notes and did not become aware of the Offering of the Notes through or as a result of any seminar or meeting to which the undersigned was invited by, or any solicitation of a subscription by, a person not previously known to the undersigned in connection with investments in securities generally.

3

**A56**

CONFIDENTIAL

KCF000666

(n)      The undersigned has taken no action which would give rise to any claim by any person for brokerage commissions, finders' fees or the like relating to this Agreement or the transactions contemplated hereby (other than commissions to be paid by the Company or as otherwise described in the Memorandum).

(o)      The undersigned is not relying on the Company with respect to the legal, tax, economic and related considerations of an investment in the Notes, and the undersigned has relied on the advice of, or has consulted with, only his, her or its own Advisors.

(p)      The undersigned acknowledges that any estimates or forward-looking statements or projections provided to the undersigned were prepared by the management of the Company in good faith, but that the attainment of any such projections, estimates or forward-looking statements cannot be guaranteed by the Company or its management and should not be relied upon.

(q)      No oral or written representations have been made, or oral or written information furnished, to the undersigned or his, her or its Advisors, if any, in connection with the Offering of the Notes which are in any way inconsistent with the information contained in the Memorandum.

(r)      (For ERISA plans only) The fiduciary of the ERISA plan (the "Plan") represents that such fiduciary has been informed of an understands the Company's investment objectives, policies and strategies, and that the decision to invest "plan assets" (as such term is defined in ERISA) in the Company is consistent with the provisions of ERISA that require diversification of plan assets and impose other fiduciary responsibilities.  The Subscriber or Plan fiduciary (a) is responsible for the decision to invest in the Company; (b) is independent of the Company and any of its affiliates; (c) is qualified to make such investment decision; and (d) in making such decision, the Subscriber or Plan fiduciary has not relied primarily on any advice or recommendation of the Company or any of its affiliates.

(s)      The foregoing representations, warranties and agreements shall survive the Closing.

**4.      The Company's Representations and Warranties**

The Company hereby acknowledges, agrees with and represents and warrants to each of the undersigned, as follows:

(a)      The Company has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement has been duly authorized, executed and delivered by the Company and is valid, binding and enforceable against the Company in accordance with its terms.

(b)      The Notes to be issued to the undersigned pursuant to this Agreement, when issued and delivered in accordance with the terms of this Agreement, will be duly and validly issued.

(c)      Neither the execution and delivery nor the performance of this Agreement by the Company will conflict with the Company's Articles of Incorporation or By-laws, as amended to date, or result in a breach of any terms or provisions of, or constitute a default under, any material contract, agreement or instrument to which the Company is a party or by which the Company is bound.

4

**A57**

                                                                                          KCF000667

5. **Conditions to Acceptance of Subscription**

The Company's right to accept the subscription of the undersigned is conditioned upon satisfaction of the following conditions precedent on or before the date the Company accepts such subscription (any or all of which may be waived by the undersigned in his, her or its sole discretion):

(a)     No legal action, suit or proceeding shall be pending which seeks to restrain or prohibit the transactions contemplated by this Agreement.

(b)     The representations and warranties of the Company contained in this Agreement shall have been true and correct on the date of this Agreement.

6. **Notices to Subscribers**

(a)     THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  THE NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(b)     THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  SUBSCRIBERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

7. **Miscellaneous Provisions**

(a)     <u>Modification</u>.  Neither this Agreement, nor any provisions hereof, shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, discharge or termination is sought.

(b)     <u>Survival</u>.  The undersigned's representations and warranties made in this Subscription Agreement shall survive the execution and delivery of this Agreement and the delivery of the Notes.

(c)     <u>Notices</u>.  Any party may send any notice, request, demand, claim or other communication hereunder to the undersigned at the address set forth on the signature page of this Agreement or to the Company at the address set forth above using any means (including personal delivery, expedited courier, messenger service, fax, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication will be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties written notice in the manner herein set forth.

(d)     <u>Binding Effect</u>.  Except as otherwise provided herein, this Agreement shall be binding upon, and inure to the benefit of, the parties to this Agreement and their heirs, executors, administrators, successors, legal representatives and assigns.  If the undersigned is more than one person or entity, the obligation of the undersigned shall be joint and several and the agreements, representations, warranties and acknowledgments contained herein shall be deemed to be made by, and be binding upon, each such

5

**A58**

CONFIDENTIAL                                                                                          KCF000668

**A59**

person or entity and his or its heirs, executors, administrators, successors, legal representatives and assigns. This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter thereof and merges and supersedes all prior discussions, agreements and understandings of any and every nature among them.

(e)    <u>Assignability</u>.  This Agreement is not transferable or assignable by the undersigned.  This Agreement shall be transferable or assignable by the Company to a proposed publicly-traded successor company.

(f)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflicts of law principles.

(g)    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6

**A59**

KCF000669

**A60**

<u>ALL SUBSCRIBERS MUST COMPLETE THIS PAGE</u>

IN WITNESS WHEREOF, the undersigned has executed this Agreement on the 28th day of January 2014.

**Face amount of Notes subscribed for:** $ 1,000,000

Check Box:        One-Year Notes: ☐        Two-Year Notes: ☒

Manner in which Title is to be held (Please Check <u>One</u>):

1. ☒   Individual

2. ☐   Joint Tenants with Right of Survivorship

3. ☐   Community Property

4. ☐   Tenants in Common

5. ☐   Corporation/Partnership/ Limited Liability Company

6. ☐   IRA

7. ☐   Trust/Estate/Pension or Profit sharing Plan Date Opened:_____

8. ☐   As a Custodian for _____ Under the Uniform Gift to Minors Act of the State of _____

9. ☐   Married with Separate Property

10. ☐   Keogh

11. ☐   Tenants by the Entirety

### ALTERNATIVE DISTRIBUTION INFORMATION

To direct distribution to a party other than the registered owner, complete the information below. YOU MUST COMPLETE THIS SECTION IF THIS IS AN IRA INVESTMENT.

Name of Firm (Bank, Brokerage, Custodian): _____

Account Name: _____

Account Number: _____

Representative Name: _____

Representative Phone Number: _____

Address: _____

City, State, Zip: _____

**A60**

**A61**

IF MORE THAN ONE SUBSCRIBER, EACH SUBSCRIBER MUST SIGN.
INDIVIDUAL SUBSCRIBERS MUST COMPLETE THE NEXT PAGE.
SUBSCRIBERS WHICH ARE ENTITIES MUST COMPLETE THE PAGE THEREAFTER.

2

**A61**

KCF000671

## EXECUTION BY NATURAL PERSONS

_____
Exact Name in Which Title is to be Held

Frank Pavlis

_____
Name (Please Print)

Apt. 1 in 1500 Hamilton St.

_____
Residence: Number and Street

Allentown PA

_____
City, State and Zip Code

_____
Social Security Number

_____
Telephone Number

_____
Fax Number (if available)

_____
E-Mail (if available)

Frank E Pavlis

_____
(Signature)

ACCEPTED this 28th day of January, 2011, on behalf of the Company.
2014

_____
Name of Additional Purchaser

_____
Address of Additional Purchaser

_____
City, State and Zip Code

_____
Social Security Number

_____
Telephone Number

_____
Fax Number (if available)

_____
E-Mail (if available)

_____
(Signature of Additional Purchaser)

By: _____
        Gary Miller
        President

**A62**

                                                                        KCF000672

**A63**

## INVESTOR QUESTIONNAIRE

*Instructions:  Check all boxes below which correctly describe you.*



☐      You are (i) a bank, as defined in Section 3(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"), (ii) a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in an individual or fiduciary capacity, (iii) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (iv) an insurance company as defined in Section 2(13) of the Securities Act, (v) an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"), (vi) a business development company as defined in Section 2(a)(48) of the Investment Company Act, (vii) a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958, as amended, (viii) a plan established and maintained by a state, its political subdivisions, or an agency or instrumentality of a state or its political subdivisions, for the benefit of its employees and you have total assets in excess of $5,000,000, or (ix) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and (1) the decision that you shall subscribe for and purchase the Notes, is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, (2) you have total assets in excess of $5,000,000 and the decision that you shall subscribe for and purchase the Notes is made solely by persons or entities that are accredited investors, as defined in Rule 501 of Regulation D promulgated under the Securities Act ("Regulation D") or (3) you are a self-directed plan and the decision that you shall subscribe for and purchase the Notes is made solely by persons or entities that are accredited investors.

☐      You are a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended.

☐      You are an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), a corporation, Massachusetts or similar business trust or a partnership, in each case not formed for the specific purpose of making an investment in the Notes and with total assets in excess of $5,000,000.

☐      You are a director or executive officer of the Company.

☒      You are a natural person whose individual net worth, or joint net worth with your spouse, exceeds $1,000,000 (excluding the value of your primary residence) at the time of your subscription for and purchase of the Notes.

☐      You are a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with your spouse in excess of $300,000 in each of the two most recent years, and who has a reasonable expectation of reaching the same income level in the current year.

☐      You are a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Notes, whose subscription for and purchase of the Notes is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D.

☐      You are an entity in which all of the equity owners are persons or entities described in one of the preceding paragraphs.

**A63**

KCF000673

**A64**

The undersigned hereby represents and warrants that all of its answers to this Investor Questionnaire are true as of the date of its execution of the Subscription Agreement pursuant to which it purchased Notes of the Company.

_____        _____
Name of Purchaser  [please print]              Name of Co-Purchaser  [please print]

_____        _____
Signature of Purchaser (Entities please          Signature of Co-Purchaser
provide signature of Purchaser's duly
authorized signatory.)

_____
Name of Signatory (Entities only)

_____
Title of Signatory (Entities only)

**A64**

# Exhibit 7

**A65**

# Allwest RE Partners
## Subscription Agreement

Allwest is a limited liability company that partners with
accredited individuals for real estate transactions.

**A65**

KCF000937

**A66**

**ALLWEST INVESTMENTS, LLC**

<u>**SUBSCRIPTION DOCUMENTS AND INSTRUCTIONS**</u>

**INSTRUCTIONS**

      The following documents must be completed in accordance with the instructions set forth below and must be executed in order to determine whether you are an accredited investor and, if accredited, in order to subscribe for the purchase of promissory notes (the "Notes") of Allwest Investments, LLC (the "Company").

<u>**PLEASE PRINT THE ANSWERS TO ALL QUESTIONS.**</u>

    1.   <u>Enclosed are the Following Documents</u>:

        (a)   **Subscription Agreement.** Be sure to carefully and fully read the Subscription Agreement, and execute the signature page which is applicable to you. On the appropriate signature page of the Subscription Agreement, the Subscriber must sign, print his, her or its name, address and social security or tax identification number where indicated, and indicate the number of Notes subscribed for, the date of execution and the manner in which title to the Notes will be held.

        (b)   **Investor Questionnaire.** Be sure to carefully and fully read the Investor Questionnaire, which can be found after the Subscription Agreement. On the signature page of the Investor Questionnaire, the Subscriber must sign and print his, her or its name where indicated.

        (c)   **Verification of Investment Advisor/Broker.** The investment advisor or broker must complete this item and sign to verify that this is a suitable investment, as well as for recordkeeping purposes.

    2.   <u>Payment</u>. Payment of the purchase price may be made by bank wire transfer to the Company, as indicated below, or by check payable to the Company and mailed to the Company at 1615 South 52nd Street, Tempe, Arizona 85281.

| | |
|---|---|
| Bank Name: | Wells Fargo |
| Routing Number: | 121000248 |
| Account Number: | 232 568 0318 |
| Account Name: | Allwest Investments, LLC |
| Bank Address: | |

    3.   <u>Return of Documents</u>. Copies of the signed Subscription Agreement, Investor Questionnaire and other subscription-related documents should be delivered to Allwest at:

Allwest Investments, LLC
1034 Darms Lane
Napa CA 94558

ii

**A66**

CONFIDENTIAL            KCF000938

**NAME OF SUBSCRIBER:** Frank Pavlis    **SUBSCRIPTION AMOUNT: $** 6,000,000.

To:    Allwest Investments, LLC
       1034 Darms Lane Napa, CA945

### SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement") is being delivered to you in connection with your investment in the Notes of Allwest Investments, LLC  (the "Company").  No funds received in the Offering will be escrowed.

**1.    Subscription and Purchase Price**

(a)    Subscription.  Subject to the conditions set forth in Section 2 hereof, the undersigned hereby subscribes for and agrees to purchase $6,000,000  face amount of one-year/two-year (circle one) Notes.

(b)    Purchase of Notes.  The undersigned understands and acknowledges that the purchase price shall be remitted in exchange for the Notes, simultaneously with the delivery of this Subscription Agreement, as set forth below (the "Aggregate Purchase Price").  The undersigned understands and agrees that, subject to Section 2 and applicable laws, by executing this Agreement, he, she or it is entering into a binding agreement.

**2.    Acceptance, Offering Term and Closing Procedures**

Acceptance or Rejection.  The obligation of the undersigned to purchase the Notes shall be irrevocable, and the undersigned shall be legally bound to purchase the Notes subject to the terms set forth in this Agreement.  The undersigned understands and agrees that the Company reserves the right to reject this subscription for the Notes in whole or part in any order at any time prior to the closing (the "Closing") of the purchase and sale of the Notes. If, in the event of rejection of this subscription by the Company in accordance with this Section 2, or the sale of the Notes is not consummated for any reason, this Agreement and any other agreement entered into between the undersigned and the Company relating to this subscription shall thereafter have no force or effect, and the Company shall promptly return the purchase price without interest thereon or deduction there from.

**3.    Investor's Representations and Warranties**

The undersigned hereby acknowledges, agrees with and represents and warrants to the Company and its affiliates, as follows:

(a)    The undersigned has full power and authority to enter into this Agreement, the execution and delivery of which has been duly authorized, if applicable, and this Agreement constitutes a valid and legally binding obligation of the undersigned.

(b)    The undersigned acknowledges his, her or its understanding that the Offering and sale of the Notes is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the provisions of Regulation D promulgated thereunder ("Regulation D").  In furtherance thereof, the undersigned represents and warrants to the Company and its affiliates as follows:

(i)    The undersigned realizes that the basis for the exemption from registration may not be available if, notwithstanding the undersigned's representations

**A67**

contained herein, the undersigned is merely acquiring the Notes for resale rather than investment.

(ii) The undersigned is acquiring the Notes solely for the undersigned's own beneficial account, for investment purposes, and not with view to, or resale in connection with, any distribution of the Notes.

(iii) The undersigned (i) has the financial ability to bear the economic risk of his, her or its investment, has adequate means for providing for current needs and contingencies, (ii) has no need for liquidity with respect to the investment in the Company, and (iii) understands that interest will not be paid on the Note for 60 days from the date of purchase;

(iv) The undersigned and the undersigned's attorney, accountant, purchaser representative and/or tax advisor, if any (collectively, "Advisors"), have received the Memorandum, together with all appendices thereto (as such documents may be amended or supplemented, the "Memorandum"), relating to the private placement by the Company of the Notes, and all other documents requested by the undersigned or Advisors, if any, have carefully reviewed them and understand the information contained therein, prior to the execution of this Agreement; and

(v) The undersigned (together with his, her or its Advisors, if any) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the prospective investment in the Notes. If other than an individual, the undersigned also represents it has not been organized solely for the purpose of acquiring the Notes.

(c) The information in the Investor Questionnaire (attached) completed and executed by the undersigned (the "Investor Questionnaire") is true and accurate in all respects, and the undersigned is an "accredited investor," as that term is defined in Rule 501(a) of Regulation D.

(d) The undersigned (and his, her or its Advisors, if any) has been furnished with a copy of the Memorandum.

(e) The undersigned has relied on the advice of, or has consulted with, only his, her or its Advisors. Each Advisor, if any, is capable of evaluating the merits and risks of an investment in the Notes as such are described in the Memorandum, and each Advisor, if any, has disclosed to the undersigned in writing (a copy of which is annexed to this Agreement) the specific details of any and all past, present or future relationships, actual or contemplated, between the Advisor and the Company or any affiliate thereof.

(f) The undersigned represents, warrants and agrees that he, she or it will not sell or otherwise transfer the Notes without registration under the Securities Act or an exemption therefrom, and fully understands and agrees that the undersigned must bear the economic risk of his, her or its purchase because, among other reasons, the Notes have not been registered under the Securities Act or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under the applicable securities laws of such states, or an exemption from such registration is available. In particular, the undersigned is aware that the Notes are "restricted securities," as such term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"), and they may not be sold pursuant to Rule 144 unless all of the conditions of Rule 144 are met. The undersigned also understands that, except as otherwise provided in Section 5 hereof, the Company is under no obligation to register the Notes on his, her or its behalf or to assist them in complying with any exemption from registration under the Securities Act or applicable state securities

CONFIDENTIAL                                                                                     KCF000940

**A69**

laws. The undersigned understands that any sales or transfers of the Notes are further restricted by state securities laws.

(g)　No representations or warranties have been made to the undersigned by the Company, other than any representations of the Company contained herein and in the Memorandum, and in subscribing for the Notes the undersigned is not relying upon any representations other than those contained herein or in the Memorandum.

(h)　The undersigned understands and acknowledges that his, her or its purchase of the Notes is a speculative investment that involves a high degree of risk and the potential loss of their entire investment and has carefully read and considered the matters set forth in the Memorandum and in particular the matters under the caption "Special Note Regarding Forward-Looking Statements" and "Risk Factors" therein.

(i)　The undersigned's overall commitment to investments that are not readily marketable is not disproportionate to the undersigned's net worth, and an investment in the Notes will not cause such overall commitment to become excessive.

(j)　The undersigned understands and agrees that the certificates for the Notes shall bear substantially the following legend until (i) such Notes shall have been registered under the Securities Act and effectively disposed of in accordance with a registration statement that has been declared effective or (ii) in the opinion of counsel for the Company such Notes may be sold without registration under the Securities Act, as well as any applicable "blue sky" or state securities laws:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS. SUCH SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES AND MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FILED BY THE ISSUER WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION COVERING SUCH SECURITIES UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED.

(k)　Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved the Notes or passed upon or endorsed the merits of the Offering or confirmed the accuracy or determined the adequacy of the Memorandum.  The Memorandum has not been reviewed by any Federal, state or other regulatory authority.

(l)　The undersigned and his, her or its Advisors, if any, have had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the Offering of the Notes and the business, financial condition, results of operations and prospects of the Company, and all such questions have been answered to the full satisfaction of the undersigned and his, her or its Advisors, if any.

(m)　The undersigned is unaware of, is in no way relying on, and did not become aware of the Offering of the Notes through or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or electronic mail over the Internet, in connection with the Offering and sale of the Notes and is not subscribing for Notes and did not become aware of the Offering of the Notes through or as a result of any seminar or

3

**A69**

**A70**

meeting to which the undersigned was invited by, or any solicitation of a subscription by, a person not previously known to the undersigned in connection with investments in securities generally.

(n)     The undersigned has taken no action which would give rise to any claim by any person for brokerage commissions, finders' fees or the like relating to this Agreement or the transactions contemplated hereby (other than commissions to be paid by the Company or as otherwise described in the Memorandum).

(o)     The undersigned is not relying on the Company with respect to the legal, tax, economic and related considerations of an investment in the Notes, and the undersigned has relied on the advice of, or has consulted with, only his, her or its own Advisors.

(p)     The undersigned acknowledges that any estimates or forward-looking statements or projections provided to the undersigned were prepared by the management of the Company in good faith, but that the attainment of any such projections, estimates or forward-looking statements cannot be guaranteed by the Company or its management and should not be relied upon.

(q)     No oral or written representations have been made, or oral or written information furnished, to the undersigned or his, her or its Advisors, if any, in connection with the Offering of the Notes which are in any way inconsistent with the information contained in the Memorandum.

(r)     (For ERISA plans only) The fiduciary of the ERISA plan (the "Plan") represents that such fiduciary has been informed of an understands the Company's investment objectives, policies and strategies, and that the decision to invest "plan assets" (as such term is defined in ERISA) in the Company is consistent with the provisions of ERISA that require diversification of plan assets and impose other fiduciary responsibilities. The Subscriber or Plan fiduciary (a) is responsible for the decision to invest in the Company; (b) is independent of the Company and any of its affiliates; (c) is qualified to make such investment decision; and (d) in making such decision, the Subscriber or Plan fiduciary has not relied primarily on any advice or recommendation of the Company or any of its affiliates.

(s)     The foregoing representations, warranties and agreements shall survive the Closing.

**4.     The Company's Representations and Warranties**

The Company hereby acknowledges, agrees with and represents and warrants to each of the undersigned, as follows:

(a)     The Company has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly authorized, executed and delivered by the Company and is valid, binding and enforceable against the Company in accordance with its terms.

(b)     The Notes to be issued to the undersigned pursuant to this Agreement, when issued and delivered in accordance with the terms of this Agreement, will be duly and validly issued.

(c)     Neither the execution and delivery nor the performance of this Agreement by the Company will conflict with the Company's Articles of Incorporation or By-laws, as amended to date, or result in a breach of any terms or provisions of, or constitute a default under, any material contract, agreement or instrument to which the Company is a party or by which the Company is bound.

4

**A70**

KCF000942

**A71**

5. **Conditions to Acceptance of Subscription**

The Company's right to accept the subscription of the undersigned is conditioned upon satisfaction of the following conditions precedent on or before the date the Company accepts such subscription (any or all of which may be waived by the undersigned in his, her or its sole discretion):

(a) No legal action, suit or proceeding shall be pending which seeks to restrain or prohibit the transactions contemplated by this Agreement.

(b) The representations and warranties of the Company contained in this Agreement shall have been true and correct on the date of this Agreement.

6. **Notices to Subscribers**

(a) THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(b) THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

7. **Miscellaneous Provisions**

(a) Modification. Neither this Agreement, nor any provisions hereof, shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, discharge or termination is sought.

(b) Survival. The undersigned's representations and warranties made in this Subscription Agreement shall survive the execution and delivery of this Agreement and the delivery of the Notes.

(c) Notices. Any party may send any notice, request, demand, claim or other communication hereunder to the undersigned at the address set forth on the signature page of this Agreement or to the Company at the address set forth above using any means (including personal delivery, expedited courier, messenger service, fax, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication will be deemed to have been duly given unless and until it actually is received by the intended recipient. Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties written notice in the manner herein set forth.

(d) Binding Effect. Except as otherwise provided herein, this Agreement shall be binding upon, and inure to the benefit of, the parties to this Agreement and their heirs, executors, administrators, successors, legal representatives and assigns. If the undersigned is more than one person or entity, the obligation of the undersigned shall be joint and several and the agreements, representations, warranties and acknowledgments contained herein shall be deemed to be made by, and be binding upon, each such

5

**A71**

 KCF000943

**A72**

person or entity and his or its heirs, executors, administrators, successors, legal representatives and assigns. This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter thereof and merges and supersedes all prior discussions, agreements and understandings of any and every nature among them.

(e)     Assignability. This Agreement is not transferable or assignable by the undersigned. This Agreement shall be transferable or assignable by the Company to a proposed publicly-traded successor company.

(f)     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflicts of law principles.

(g)     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6

**A72**

CONFIDENTIAL

**A73**

<u>ALL SUBSCRIBERS MUST COMPLETE THIS PAGE</u>

IN WITNESS WHEREOF, the undersigned has executed this Agreement on the **20th** day of **May** 2014.

Face amount of Notes subscribed for: **$ 6,000,000.—**

Check Box:        One-Year Notes: ☐        Two-Year Notes: ☒

Manner in which Title is to be held (Please Check <u>One</u>):

1. ☐   Individual                              7. ☒   Trust/Estate/Pension or Profit sharing Plan
                                                          Date Opened:_____

2. ☐   Joint Tenants with Right of            8. ☐   As a Custodian for
        Survivorship                                   _____
                                                       Under the Uniform Gift to Minors Act of
                                                       the State of
                                                       _____

3. ☐   Community Property                      9. ☐   Married with Separate Property

4. ☐   Tenants in Common                      10. ☐   Keogh

5. ☐   Corporation/Partnership/              11. ☐   Tenants by the Entirety
        Limited Liability Company

6. ☐   IRA

### ALTERNATIVE DISTRIBUTION INFORMATION

To direct distribution to a party other than the registered owner, complete the information below.
YOU MUST COMPLETE THIS SECTION IF THIS IS AN IRA INVESTMENT.

Name of Firm (Bank, Brokerage, Custodian): _____

Account Name: _____

Account Number: _____

Representative Name: _____

Representative Phone Number: _____

Address: _____

City, State, Zip: _____

**A73**

A74

IF MORE THAN ONE SUBSCRIBER, EACH SUBSCRIBER MUST SIGN.
INDIVIDUAL SUBSCRIBERS MUST COMPLETE THE NEXT PAGE.
SUBSCRIBERS WHICH ARE ENTITIES MUST COMPLETE THE PAGE THEREAFTER.

A74

CONFIDENTIAL

KCF000946

EXECUTION BY NATURAL PERSONS

*Frank E. Pavlis Revocable Living Trust*

Exact Name in Which Title is to be Held

**Frank E. Pavlis**

Name (Please Print)

**1500 Hamilton St**

Residence: Number and Street

**Allentown PA 18102**

City, State and Zip Code

_____
Social Security Number

_____
Telephone Number

_____
Fax Number (if available)

_____
E-Mail (if available)

(X) **Frank E Pavlis**

(Signature)

_____
Name of Additional Purchaser

_____
Address of Additional Purchaser

_____
City, State and Zip Code

_____
Social Security Number

_____
Telephone Number

_____
Fax Number (if available)

_____
E-Mail (if available)

_____
(Signature of Additional Purchaser)

ACCEPTED this **20th** day of **May** ~~2014~~ on behalf of the Company.

**2014**

By: _____
Gary Miller
President

**A75**

**A76**

## INVESTOR QUESTIONNAIRE

*Instructions:  Check all boxes below which correctly describe you.*

☐ You are (i) a bank, as defined in Section 3(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"), (ii) a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in an individual or fiduciary capacity, (iii) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (iv) an insurance company as defined in Section 2(13) of the Securities Act, (v) an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"), (vi) a business development company as defined in Section 2(a)(48) of the Investment Company Act, (vii) a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958, as amended, (viii) a plan established and maintained by a state, its political subdivisions, or an agency or instrumentality of a state or its political subdivisions, for the benefit of its employees and you have total assets in excess of $5,000,000, or (ix) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and (1) the decision that you shall subscribe for and purchase the Notes, is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, (2) you have total assets in excess of $5,000,000 and the decision that you shall subscribe for and purchase the Notes is made solely by persons or entities that are accredited investors, as defined in Rule 501 of Regulation D promulgated under the Securities Act ("Regulation D") or (3) you are a self-directed plan and the decision that you shall subscribe for and purchase the Notes is made solely by persons or entities that are accredited investors.

☐ You are a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended.

☐ You are an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), a corporation, Massachusetts or similar business trust or a partnership, in each case not formed for the specific purpose of making an investment in the Notes and with total assets in excess of $5,000,000.

☐ You are a director or executive officer of the Company.

☒ You are a natural person whose individual net worth, or joint net worth with your spouse, exceeds $1,000,000 (excluding the value of your primary residence) at the time of your subscription for and purchase of the Notes.

☐ You are a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with your spouse in excess of $300,000 in each of the two most recent years, and who has a reasonable expectation of reaching the same income level in the current year.

☐ You are a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Notes, whose subscription for and purchase of the Notes is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D.

☐ You are an entity in which all of the equity owners are persons or entities described in one of the preceding paragraphs.

**A76**

KCF000948

**A77**

The undersigned hereby represents and warrants that all of its answers to this Investor Questionnaire are true as of the date of its execution of the Subscription Agreement pursuant to which it purchased Notes of the Company.

Frank E. Pavlis
_____
Name of Purchaser  [please print]

_____
Name of Co-Purchaser  [please print]

Frank E Pavlis
_____
Signature of Purchaser (Entities please
provide signature of Purchaser's duly
authorized signatory.)

_____
Signature of Co-Purchaser

_____
Name of Signatory (Entities only)

_____
Title of Signatory (Entities only)

**A77**

                                    KCF000949

# **Exhibit 8**

**A78**

| | |
|---|---|
| **From:** | Justin Billingsley |
| **Sent:** | Friday, May 30, 2014 9:40 AM EDT |
| **To:** | gwmiller_1957@yahoo.com |
| **Subject:** | Pavlis Sub Agreement - $6m |
| **Attachments:** | Pavlis_Subscription_Agreement_6m.pdf |

Dear Gary,

Please see the attached sub agreement for Frank's $6m. This is 100% of what we need Frank to sign. Once we are together we will need to work out the terms of the note. The note is never signed by him though as he is already subscribed to it. You are the one that signs the note and then we give Frank all the docs for his keeping.

Also please wire me $15k by 11am your time so that it posts in my account before the 2pm cut off time. Please ask Dave to set up @allwestre.com email accounts for us. Please go out and get yourself a Samsung Note 3 phone as you will need a much stronger device than you have to keep control of all these moving parts (e.g. video conf, doc management, etc...).

We need skype later today. When is a good time?

I would like to discuss the following:

1. How we are organized?
2. Engage law firm for our operating agreement and to review how we are organized to bring in money?
3. Who will regularly do our Quickbooks Online management?
4. How do we get started buying?
5. Do we need an office? Can we do this with home office arrangement?
6. Hiring my mom and Melissa.
7. Will we offer health insurance for Dave, Melissa and Mom? Office equipment?
8. Do we need to set up a company meeting in CA for all involved?
9. My monthly income? Staff monthly income?
10. Branding, card design, website, pres deck? Budget of $15k to $20k approved.
11. Cap raise process and expenses?
12. Reporting system and update system? (Basecamp? Asana? Podio? Evernote?) This will allow us to share information very easily as work closely with the information as a team.
13. Rehab management systems...set up site cameras that are all networked online?

Justin Billingsley
203 240 7160

**A78**

KCF000936

# **<u>Exhibit 9</u>**

**A79**

| | |
|---|---|
| **From:** | jcb1114 |
| **Sent:** | Monday, December 1, 2014 5:56 PM EST |
| **To:** | Gary Miller |
| **Subject:** | Fwd: Pavlis Note |
| **Attachments:** | Untitled attachment 80866.txt, Untitled attachment 80869.txt, Untitled attachment 80872.htm, Pavlis Note.doc |

Dear Gary

Please see attched. When may we discuss?

Thank you
Justin

**A79**

CONFIDENTIAL

KCF001501

**A80**

*Allwest Investments LLC*

### The Frank E Pavlis Revocable Living Trust

# PROMISSORY NOTE

$ 6,000,000                                             May 20, 2014

1.    <u>Promise to Pay.</u>  FOR VALUE RECEIVED, Allwest Investments LLC ("**Maker**"), a California LLC, promises to pay to the order of The Frank E Pavlis Revocable Living Trust, and trustees and assigns ("**Holder**") the sum of Six Million Dollars ($6,000,000.00), together with all other amounts added thereto pursuant to this Note or otherwise payable to Holder (the "**Loan**") (or so much therefore as may from time to time be outstanding), together with interest thereon as hereinafter set forth, payable in lawful money of the United States of America.

2.    <u>Interest.</u>  8% (Eight) Preference (First and before any expenses are paid) of Annual Earnings will be paid to Note Holder and will be no less than 8% face amount of Note.

3.    <u>Earnings.</u> 40% (Forty) of Annual Net Retained Earnings (Annual earnings less sum of Applicable Costs and Allwest Investment Share) shall be paid to the Note Holder annually.

4.    <u>Line of Credit; Payment.</u>  This Note is a line of credit note.  Maker may pay to Holder the actual outstanding balance from time to time under this Note.  However, in no event may the maximum principal amount of this Note exceed the amount set forth in Paragraph 1 above.  The entire principal shall be fully and payable UPON DEMAND of any Holder hereof within 180 days after written notice.

5.    <u>Term:</u>  Note purchased for principal sum of $6,000,000. Note will be three (3) one–year Notes.  This term will cover the period commencing on May 20, 2014 and extending three years to end on May 20, 2017.

6.    <u>Default.</u>  This Note shall take effect and be enforced in accordance with the laws of the State of California. All parties to this Note waive presentment, notice of non-payment, protest and notice of protest, and agree to remain fully bound notwithstanding the release of any party, extension or modification of terms, or discharge of any collateral for this Note.

1

**A80**

**A81**

*Allwest Investments LLC*

7. <u>Liquidation</u>:  In the event of default in the payment of any of the said installments when due as herein provided, time being of the essence hereof, the holder of this note, Frank E Pavlis Revocable Living Trust, may, without notice or demand, declare the entire principal sum then unpaid immediately due and payable.

   a.  It is agreed that if the parties hereto, or any of them at any time fail in business or become insolvent, or commit an act of bankruptcy, or if any deposit account or other property of the parties hereto, or any of them, be attempted to be obtained or held by writ of execution, garnishment, attachment, or other legal process, or if any assessment for taxes against the parties hereto, or any of them, other than taxes on real property, is made by the federal or state government, or any department thereof, or if the parties hereto fail to notify you of any material change in their financial condition, then, and in such case all of the obligations of the parties hereto to you, or held by you, shall at your option immediately become due and payable without demand or notice.

   b.  In the event of death of either party to this Note, the entire principal sum then unpaid will be immediately due and payable to the Pavlis Revocable Living Trust.

8. <u>Governing Law; Severability.</u> This Note shall be governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of laws principles.  The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality, or enforceability of the remainder of this Note, and to this end, the provisions of the Note or declared to be severable.

9. <u>Miscellaneous.</u> The Note may not be terminated or amended orally, but only by a termination or amendment in writing signed by both Holder and Maker.

   a.  The captions of the Paragraphs of this Note are for convenience of reference only and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof.

2

**A81**

**A82**

*Allwest Investments LLC*

IN WITNESS WHEREOF, Maker has executed this Note or has caused the same to be executed by its duly authorized representatives as of the date set forth above.

**Maker:  Allwest Investments LLC**

**By:** _____

**Name:**  Gary W. Miller

**Its:**  Member

**Date:** _____

IN WITNESS WHEREOF, Holder has executed this Note or has caused the same to be executed by its duly authorized representatives as of the date set forth above.

**Trustee:** _____

**Name:** _____

**Trustee:** _____

**Name:** _____

**Date:** _____

3

**A82**

KCF001504

# Exhibit 10

**A83**

The Frank E Pavlis Revocable Living Trust

# PROMISSORY NOTE

$ 6,000,000                                                        May 20, 2014

1.   Promise to Pay.  FOR VALUE RECEIVED, Allwest Investments LLC ("**Maker**"), a California LLC, promises to pay to the order of The Frank E Pavlis Revocable Living Trust, and trustees and assigns ("**Holder**") the sum of Six Million Dollars ($6,000,000.00), together with all other amounts added thereto pursuant to this Note or otherwise payable to Holder (the "**Loan**") (or so much therefore as may from time to time be outstanding), together with interest thereon as hereinafter set forth, payable in lawful money of the United States of America.

2.   Interest.  8% (Eight) Preference (First and before any expenses are paid) of Annual Earnings will be paid to Note Holder and will be no less than 8% face amount of Note.

3.   Earnings. 40% (Forty) of Annual Net Retained Earnings (Annual earnings less sum of Applicable Costs and Allwest Investment Share) shall be paid to the Note Holder annually.

4.   Line of Credit; Payment.  This Note is a line of credit note.  Maker may pay to Holder the actual outstanding balance from time to time under this Note.  However, in no event may the maximum principal amount of this Note exceed the amount set forth in Paragraph 1 above.  The entire principal shall be fully and payable UPON DEMAND of any Holder hereof within 180 days after written notice.

5.   Term:  Note purchased for principal sum of $6,000,000. Note will be three (3) one–year Notes.  This term will cover the period commencing on May 20, 2014 and extending three years to end on May 20, 2017.

6.   Default.  This Note shall take effect and be enforced in accordance with the laws of the State of California. All parties to this Note waive presentment, notice of non-payment, protest and notice of protest, and agree to remain fully bound notwithstanding the release of any party, extension or modification of terms, or discharge of any collateral for this Note.

**A83**

7. <u>Liquidation</u>:  In the event of default in the payment of any of the said installments when due as herein provided, time being of the essence hereof, the holder of this note, Frank E Pavlis Revocable Living Trust, may, without notice or demand, declare the entire principal sum then unpaid immediately due and payable.

   a.  It is agreed that if the parties hereto, or any of them at any time fail in business or become insolvent, or commit an act of bankruptcy, or if any deposit account or other property of the parties hereto, or any of them, be attempted to be obtained or held by writ of execution, garnishment, attachment, or other legal process, or if any assessment for taxes against the parties hereto, or any of them, other than taxes on real property, is made by the federal or state government, or any department thereof, or if the parties hereto fail to notify you of any material change in their financial condition, then, and in such case all of the obligations of the parties hereto to you, or held by you, shall at your option immediately become due and payable without demand or notice.

   b.  In the event of death of either party to this Note, the entire principal sum then unpaid will be due and payable to the Pavlis Revocable Living Trust as soon as assets may be liquidated in an organized and equitable fashion.

8. <u>Governing Law; Severability.</u> This Note shall be governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of laws principles.  The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality, or enforceability of the remainder of this Note, and to this end, the provisions of the Note or declared to be severable.

9. <u>Miscellaneous.</u> The Note may not be terminated or amended orally, but only by a termination or amendment in writing signed by both Holder and Maker.

   a.  The captions of the Paragraphs of this Note are for convenience of reference only and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof.

CONFIDENTIAL

KCF001646

EXECUTION BY NATURAL PERSONS

Allwest Investment, LLC

Exact Name in Which Title is to be Held

Frank Pavlis
Name (Please Print)

Name of Additional Purchaser

1560 Hamilton St
Residence: Number and Street

Address of Additional Purchaser

Allentown  PA
City, State and Zip Code

1034 Downs Ln, Napa
City, State and Zip Code  94558

383 18 2929
Social Security Number

Social Security Number

610 628 2022
Telephone Number

480-628-8120
Telephone Number

Fax Number (if available)

Fax Number (if available)

E-Mail (if available)

gary@allwestre.coM
E-Mail (if available)

Frank E Pavlis
(Signature)

(Signature of Additional Purchaser)

ACCEPTED this 16th day of Dec 2014, on behalf of the Company.

By: Gary W. Miller
Gary Miller
President

CONFIDENTIAL                                    KCF001647

# **Exhibit 11**



**A86**

PAGE  1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "KEY COMMERCIAL FINANCE LLC", FILED IN THIS OFFICE ON THE TENTH DAY OF DECEMBER, A.D. 2014, AT 12:43 O'CLOCK P.M.

5654769  8100

141514507

You may verify this certificate online at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 1943111

DATE: 12-10-14

**A86**

**A87**

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:43 PM 12/10/2014*
*FILED 12:43 PM 12/10/2014*
*SRV 141514507 – 5654769 FILE*

## CERTIFICATE OF FORMATION

### OF

### KEY COMMERCIAL FINANCE LLC

The undersigned authorized person, for the purpose of forming a limited liability company pursuant to the provisions of the Limited Liability Company Act of the State of Delaware (the "LLCA"), hereby certifies as follows:

1. The name of the limited liability company is: Key Commercial Finance LLC

2. The registered office of the company in the State of Delaware is c/o United Corporate Services, Inc., 874 Walker Road, Suite C, in the City of Dover, County of Kent in the State of Delaware, 19904. The name of the company's registered agent at that address is United Corporate Services, Inc.

3. The nature of the business to be conducted by, and the purposes of, the company are to engage in any lawful act or activity for which a limited liability company may be organized under the LLCA.

4. The company reserves the right to amend, alter, change or repeal any provision contained in this Certificate in the manner now or hereafter prescribed by law, and all rights and powers conferred in this Certificate are subject to this reserved power.

5. The company may indemnify and advance expenses to any of its managers, officers and members, any person who has ceased to be a manager, officer or member, and the heirs, executors, administrators, successors and assigns of such a person or entity to the fullest extent permitted by the LLCA as the same exists now or may hereafter be amended.

**IN WITNESS WHEREOF,** the undersigned has executed this Certificate of Formation of this 10th day of December, 2014.

*G Chadwick Self*, Authorized Person

G Chadwick Self

**A87**

KCF012482

# **Exhibit 12**

**A88**

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR

# KEY COMMERCIAL FINANCE, LLC

## A Single Member-Managed Limited Liability Company

## ARTICLE I Company Formation

**1.1 FORMATION.** The Member hereby does form a Limited Liability Company ("Company") subject to the provisions of the Limited Liability Company Act as currently in effect as of this date. Articles of Organization shall be filed with the Secretary of State.

**1.2 NAME.** The name of the Company shall be: KEY COMMERCIAL FINANCE, LLC

**1.3 REGISTERED AGENT.** The name and location of the registered agent of the Company shall be:

UNITED CORPORATE SERVICES

874 Walker Road, Suite C

Dover, DE 19904

**1.4 TERM.** The Company shall continue for a perpetual period unless,

(a) The Member votes for dissolution; or

(b) Any event which makes it unlawful for the business of the Company to be carried on by the Member; or

(c) Any other event causing dissolution of this Limited Liability Company under the laws of the State of Delaware.

**1.5 CONTINUANCE OF COMPANY.** Notwithstanding the provisions of ARTICLE 1.4, in the event of an occurrence described in ARTICLE 1.4(c), if there is at least one remaining Member, said remaining Member shall have the right to continue the business of the Company. Such right can be exercised by the written vote of the remaining Member within ninety (90) days after the occurrence of an event described in ARTICLE 1.4(c). If not so exercised, the right of the Member to continue the business of the Company may expire if that member desires.

**1.6 BUSINESS PURPOSE.** The purpose of the Company is to provide financing or other capital-related investment advice whether by assisting homeowners with capitalizing on equity through sale /equity brokering or other investing opportunities and offers

**A88**

CONFIDENTIAL

**A89**

1.7 PRINCIPAL PLACE OF BUSINESS. The location of the principal place of business of the Company shall be:

1511 ROUTE 22 STE 152
BREWSTER, NY 10509

The principal place of business may be changed to a location the Member may select. The Member may also choose to store company documents at any address the Member chooses.

1.8 **MEMBER.** The name and place of residence of the member are contained in Exhibit 1 attached to this Agreement.

1.9 **ADMISSION OF ADDITIONAL MEMBERS.** Except as otherwise expressly provided in the Agreement, additional members may be admitted to the Company through issuance by the company of a new interest in the Company or a sale of current a percent of current Member's interest.

## ARTICLE II Capital Contributions

2.1 **INITIAL CONTRIBUTIONS.** The Member initially shall contribute to the Company capital needed to legally create the entity and as described in Exhibit 2 attached to this Agreement. The total value of such property, not including time and intellectual property and cash is estimated to be $725.

2.2 **ADDITIONAL CONTRIBUTIONS.** Except as provided in ARTICLE 6.2, no Member shall be obligated to make any additional contribution to the Company's capital.

## ARTICLE III Profits, Losses and Distributions

3.1 **PROFITS/LOSSES.** For financial accounting and tax purposes the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Exhibit 2 as amended from time to time in accordance with Treasury Regulation 1.704-1.

3.2 **DISTRIBUTIONS.** The Member shall determine and distribute available funds annually or at more frequent intervals as the Member sees fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Member. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to Treasury Regulation 1.704-l(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in Treasury Regulation 1.704-l(b)(2)(ii)(d).

**A89**

**A90**

3.3 **C CORPORATION ELECTION.** The Member may elect to be treated as a C corporation at any time to keep the profits of the LLC at the company level and not be forced to distribute profits to the Member.

# ARTICLE IV Management

4.1 **MANAGEMENT OF THE BUSINESS.** The management of the business is invested in the Member.

4.2 **MEMBER.** The liability of the Member shall be limited as provided pursuant to applicable law. The Member is in control, management, direction, and operation of the Company's affairs and shall have powers to bind the Company with any legally binding agreement, including setting up and operating a LLC company bank account.

4.3 **POWERS OF THE MEMBER.** The Member is authorized on the Company's behalf to make all decisions in accordance with ARTICLE 4.2 as to (a) the sale, development lease or other disposition of the Company's assets; (b) the purchase or other acquisition of other assets of all kinds; (c) the management of all or any part of the Company's assets; (d) the borrowing of money and the granting of security interests in the Company's assets; (e) the pre-payment, refinancing or extension of any loan affecting the Company's assets; (f ) the compromise or release of any of the Company's claims or debts; and, (g) the employment of persons, firms or corporations for the operation and management of the company's business. In the exercise of its management powers, the Member is authorized to execute and deliver (a) all contracts, conveyances, assignments leases, sub-leases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets; (b) all checks, drafts and other orders for the payment of the Company's funds; (c) all promissory notes, loans, security agreements and other similar documents; and, (d) all other instruments of any other kind relating to the Company's affairs, whether like or unlike the foregoing.

4.7 **NOMINEE.** Title to the Company's assets shall be held in the Company's name or in the name of any nominee that the Member may designate. The Member shall have power to enter into a nominee agreement with any such person, and such agreement may contain provisions indemnifying the nominee, except for his willful misconduct.

4.8 **COMPANY INFORMATION.** Upon request, the Chief Executive Member shall supply to any member information regarding the Company or its activities. Each Member or his authorized representative shall have access to and may inspect and copy all books, records and materials in the Chief Executive Member's possession regarding the Company or its activities.

KEY COMMERCIAL FINANCE, LLC OPERATING DOCUMENT                3

**A90**

DocuSign Envelope ID: 088E611B-04FD-4C53-B848-EB8B5986BCABB

**A91**

4.9 **EXCULPATION.** Any act or omission of the Member, the effect of which may cause or result in loss or damage to the Company or the Member if done in good faith to promote the best interests of the Company, shall not subject the Member to any liability to the Member.

4.10 **INDEMNIFICATION.** The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Member acted in good faith and in a manner he/she reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he/she reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful.

4.11 **RECORDS.** The Member shall cause the Company to keep at its principal place of business or other location the following:

(a) A copy of the Certificate of Formation and the Company Operating Agreement and all amendments;

(b) Copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years;

(c) Copies of any financial statements of the limited liability company for the three most recent years.

# ARTICLE V Compensation

5.1 MEMBER **MANAGEMENT FEE.** Any Member rendering services to the Company shall be entitled to compensation commensurate with the value of such services.

5.2 **REIMBURSEMENT.** The Company shall reimburse the Member for all direct out-of-pocket expenses incurred by the Member in managing the Company.

**A91**

CONFIDENTIAL                                                                 KCF013157

# A92

## ARTICLE VI Bookkeeping

6.1 **BOOKS.** The Member shall maintain complete and accurate books of account of the Company's affairs at the Company's principal place of business or other agreed location. Such books shall be kept on such method of accounting as the Member shall select. The company's accounting period shall be the calendar year.

6.2 **MEMBER'S ACCOUNTS.** The Member shall maintain separate capital and distribution accounts for each member. Each member's capital account shall be determined and maintained in the manner set forth in Treasury Regulation 1.704-l(b)(2)(iv) and shall consist of his initial capital contribution increased by:

(a) Any additional capital contribution made by him/her;

(b) Credit balances transferred from his distribution account to his capital account;

and decreased by:

(a) Distributions to him/her in reduction of Company capital;

(b) The Member's share of Company losses if charged to his/her capital account.

6.3 **REPORTS.** The Member shall close the books of account after the close of each calendar year, and shall prepare and send to each member a statement of such Member's distributive share of income and expense for income tax reporting purposes.

## ARTICLE VII Transfers

7.1 **ASSIGNMENT.** According to the appropriate Court, should the Member have a creditor with a judgment that was issued an assignment of the membership interest, the creditor shall only obtain an assignment of the membership interest, not the actual transfer of Membership in the LLC. The new assignee does not have any rights of the Member or have the ability to be involved in management of the LLC or the right to dissolve the LLC. The new assignee is only granted rights of the distributions of the Member's interests, if the Member decides to distribute at all, not the rights of membership. The assignee must release the Member's interests back to Member upon payment of the judgment in accordance with the appropriate Court.

# A92

CONFIDENTIAL                                                                                          KCF013158

# A93

## ARTICLE VIII Dissolution

**8.1 DISSOLUTION.** The Member may dissolve the LLC at any time. The Member may NOT dissolve the LLC for a loss of membership interests. Upon dissolution the LLC must pay its debts first before distributing cash, assets, and/or initial capital to the Member or the Members interests. The dissolution may only be ordered by the Member, not by the owner of the Members interests.

## CERTIFICATE OF FORMATION

This Company Operating Agreement is entered into and shall become effective as of the Effective Date by and among the Company and the person executing this Agreement as Member. It is the Member's express intention to create a limited liability company in accordance with applicable law, as currently written or subsequently amended or redrafted.

The undersigned hereby agree, acknowledge, and certify that the foregoing operating agreement is adopted and approved by each member, the agreement consisting of **7** pages, constitutes, together with Exhibit 1, Exhibit 2 and Exhibit 3 (if any), the Operating Agreement of KEY COMMERCIAL FINANCE LLC, adopted by the member as of DECEMBER 10, 2014.

Member:

_____ GEORGE CHADWICK SELF

Signature

Percent: 100%

# A93

CONFIDENTIAL                                            KCF013159

# A94

## EXHIBIT 1

LISTING OF MEMBERS

As of the 10th day of December, 2014 the following is a list of Members of the Company:

**Name** George Chadwick Self  **Percent** 100%

Address 505 East Branch Rd, Patterson, NY 12563

## EXHIBIT 2 CAPITAL CONTRIBUTIONS

Pursuant to ARTICLE 2, the Member's initial contribution to the Company capital is stated to be $500. The description and each individual portion of this initial contribution are as follows:

| Description | Amount | |
|---|---|---|
| Legal Documentation of Formation, Registration Agent Fee etc | $ | 495.00 |
| Postal Setup | $ | 52.02 |
| Initial Travel and Misc Meeting costs | $ | 176.11 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

SIGNED AND AGREED this 10th day of December, 2014.

DocuSigned by:

_____
4BD92698F682483...

Member

KEY COMMERCIAL FINANCE, LLC OPERATING DOCUMENT                 7

# A94

# Exhibit 13

**A95**



Deposition of:
# George Chadwick Self

*April 20, 2020*

In the Matter of:

# Deborah S.  Skeans Vs. Key Commercial Fnance, LLC Et Al.

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

**A95**

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
2

                            - - -
3

   DEBORAH S. SKEANS,              :   CIVIL ACTION
4  Executrix of the ESTATE        :   NUMBER
   OF FRANK E. PAVLIS,             :   1:18-cv-01516-
5             Plaintiff,           :   CFC
                  v.               :
6  KEY COMMERCIAL FINANCE,         :
   LLC, KEY COMMERCIAL             :
7  FINANCE PROPERTIES, LLC,        :
   EQUITY PROS, LLC, and           :
8  MOBILE AGENCY, LLC,             :
                  Defendants.      :
9

                            - - -
10

                  Monday, April 20, 2020
11

                            - - -
12

13            Oral deposition of GEORGE CHADWICK
14  SELF, taken remotely via Zoom, at 260 McManus
15  Road North, Patterson, New York 12563,
16  beginning at 9:31 a.m., reported
17  stenographically by Cheryl L. Goldfarb, a
18  Registered Professional Reporter, Notary
19  Public, and an approved reporter of the United
20  States District Court.
21                          - - -
22

              VERITEXT LEGAL SOLUTIONS
23               MID-ATLANTIC REGION
            1801 Market Street - Suite 1800
24         Philadelphia, Pennsylvania  19103

```
                                                    Page 2
 1   A P P E A R A N C E S :
 2
 3          STRADLEY RONON STEVENS & YOUNG, LLP
            BY:  WILLIAM E. MAHONEY, JR., ESQUIRE
 4               CAMERON REDFERN, ESQUIRE
            2005 Market Street, Suite 2600
 5          Philadelphia, Pennsylvania  19103
            215.564.8000
 6          wmahoney@stradley.com
            credfern@stradley.com
 7          Representing the Plaintiff
            (Via Zoom)
 8
 9
            HALLORAN FARKAS & KITTILA, LLP
10          BY:  WILLIAM E. GREEN, JR., ESQUIRE
                 THEODORE A. KITTILA, ESQUIRE
11          5801 Kennett Pike, Suite C
            Wilmington, Delaware  19807
12          302.257.2011
            wg@hfk.law
13          tk@hfk.law
            Representing the Defendants
14          (Via Zoom)
15
                            - - -
16
17   A L S O   P R E S E N T :
18
            DEBORAH S. SKEANS (Via Zoom)
19
            JUSTIN BILLINGSLEY (Via Zoom)
20
21                          - - -
22
23
24
```

**A98**

GEORGE CHADWICK SELF

Page 9

```
 1          having been first duly sworn/affirmed,

 2          was examined and testified as follows:

 3                        - - -

 4                   THE WITNESS:  Yes, ma'am, I do.

 5                   THE COURT REPORTER:  Thank you.

 6                        - - -

 7                   EXAMINATION

 8                        - - -

 9   BY MR. MAHONEY:

10          Q.        Good morning, Mr. Self.

11          A.        Good morning.

12          Q.        My name is Bill Mahoney, and I

13   represent the plaintiff in this matter.  Thank

14   you for taking time today.  I'll be asking you

15   some questions.  Your job is, to best of your

16   ability, to answer them truthfully.

17                   Is there any reason why you

18   think you may not be able to give truthful

19   answers to my questions?

20          A.        No, sir.

21          Q.        And I assume you are at your

22   house right now?

23          A.        Yes, sir.

24          Q.        Is anybody there with you in
```

**A99**

GEORGE CHADWICK SELF

Page 10

```
 1   this room?
 2        A.      No.
 3        Q.      If anybody enters the room or
 4   attempts to communicate with you, would you
 5   please let me know?
 6        A.      (Witness nodding head.)
 7        Q.      You have to give a verbal
 8   response.
 9             MR. GREEN:  You have to answer
10        verbally.
11             THE WITNESS:  Sorry.
12        A.      Yes.
13   BY MR. MAHONEY:
14        Q.      That's all right.
15             Have you ever been deposed
16   before?
17        A.      No.
18        Q.      It should be a relatively
19   pain-free process.  I ask questions.  To the
20   best of your ability, you answer them.  Your
21   attorney, Mr. Green, may object.  If he does,
22   he and I will sort that out.  In most cases,
23   when an objection is lodged, you're still
24   required to answer, but it depends on the
```

GEORGE CHADWICK SELF

Page 11

1   objection.  So if he objects, you should not

2   say anything until he instructs you to answer

3   the question.

4                   Does that make sense?

5        A.         Okay.  Yes.

6        Q.         All right.  We'll take breaks

7   throughout.  This is not an endurance test.

8   There are a number of people here.  So anybody

9   who wants to take a break, you know, that is

10  totally fine with me, as long as we're not

11  interrupting a particular question.  In

12  particular, if I ask a question, I expect that

13  you're going to answer before we take any

14  breaks.  Okay?

15       A.         Okay.

16       Q.         All right.  Why don't we get

17  started then.

18                  What is your relation to Justin

19  Billingsley?

20       A.         My wife and his wife are

21  sisters.

22       Q.         So he's your brother-in-law?

23       A.         Is that -- are you taking about

24  relationships?

Page 26

1   Allwest, I believe.

2          Q.          Did you recall what it was that

3   you learned or the substance of the

4   conversation in which you heard his name for

5   the first time?

6          A.          Not the substance of the

7   conversation.  I just remember the name and

8   that he was -- yeah, that -- I just kind of

9   remember the name.  It's an interesting name.

10         Q.          Did you ever speak with

11  Mr. Pavlis, by the way?

12         A.          No.

13         Q.          Did you ever correspond with

14  him?

15         A.          No.

16         Q.          Did he ever correspond with you?

17         A.          Nope.

18         Q.          Do you know whether

19  Mr. Billingsley interacted with Mr. Pavlis?

20         A.          Yes.  Well, I think -- I assume

21  they did.  Justin indicated that they were

22  talking.

23         Q.          To the best of your

24  recollection, tell me what Mr. Billingsley told

**A102**

GEORGE CHADWICK SELF

Page 28

```
1         Q.        How did you become familiar with
2    them?
3         A.        Well, Allwest is run by a guy
4    named Gary, whose name -- last name has just
5    flown out of my head, but I have met Gary.
6         Q.        Is it Gary Miller?
7         A.        Gary Miller, thank you, yes.
8         Q.        All right.  How many times have
9    you met Mr. Miller?
10        A.        At least twice.
11        Q.        Do you recall when?
12        A.        I want to say 2016, '17, around
13   in there.  While we were building up our
14   platform, Gary was among the people we were
15   looking at as partners.
16        Q.        When you say, "While we were
17   building up our platform," what are you
18   referring to?
19        A.        The -- the platform or the "we"?
20        Q.        Both, actually.  But thank you
21   for splitting them up.
22        A.        So the platform that we were
23   building is what became Buy Every Home.  Again,
24   it was that national approach to house
```

GEORGE CHADWICK SELF

Page 29

1    flipping.  The "we" is Justin and I.

2        Q.        When did you and Mr. Billingsley

3    begin discussing creating what became the Buy

4    Every Home platform?

5        A.        I would say shortly after

6    Mobile Co. failed.

7        Q.        Were you living in New York at

8    the time that you and Mr. Billingsley first

9    began discussing this platform?

10       A.        Yes.

11       Q.        And do you have a sense of how

12   long you had been living in New York prior to

13   having this discussion or these discussions

14   with Mr. Billingsley?

15       A.        I would time it to pretty close

16   after Mobile Co. imploded.  But I don't -- I

17   don't have a date in mind.

18       Q.        In your mind, because you

19   mentioned it a couple times, Mobile Co.

20   imploded or Mobile Co. failed, is there any

21   particular reference point that you can point

22   to that would let you know when at least you

23   felt that was the case?

24                 For example, was it, you know,

GEORGE CHADWICK SELF

Page 30

1   one particular season of the year?  Was it near

2   a particular newsworthy event?  I'm just trying

3   to get a sense of the timing.

4          A.        Yeah.  I wish I -- I wish I

5   could give you one.  The -- the -- I don't --

6   see, I moved up in November, I think, of 2015.

7   That spring, we were still cutting videos for

8   Mobile Co., and summer, I think.  But it kind

9   of -- it kind of runs together a little bit.

10                  When I stopped getting paid is

11  when I kind of viewed Mobile Co. as being done.

12         Q.        Right.  Do you recall when that

13  was?

14         A.        No.  That -- no.

15         Q.        Your recollection is, you moved

16  to New York sometime in November or so of 2015,

17  right?

18         A.        Yeah.  Thanksgiving Day was

19  our -- was the day I moved in.  That I can put

20  a date on.

21         Q.        So Thanksgiving Day of 2015, you

22  moved to New York, or at least moved in to

23  wherever you were staying in New York.  And

24  then you continued to work for Mobile Co.

GEORGE CHADWICK SELF

Page 39

1      Q.      So when you say the "timeline by

2   a year," what about that information makes you

3   reconsider anything?

4      A.      Well, if -- it just -- if you're

5   saying that all of the investments started in

6   2014, then maybe -- maybe it was 20 -- maybe it

7   was November of 2014 that I moved up instead of

8   November of 2015.  So that just slides

9   everything back.

10      Q.      Okay.

11      A.      I don't remember what year, for

12   example, Mobile -- Mobile Co. -- I just don't

13   have that in my head.  Sorry.

14      Q.      Okay.  That's fine.  That's

15   fine.

16          Do you think you might have

17   moved up to New York in 2013?

18      A.      I don't think so.  I think 2014

19   would have been as early.

20      Q.      All right.  Were you aware that

21   in May of 2014, Mr. Pavlis invested an

22   additional $6 million in or with Allwest?

23      A.      No.  I read that in the

24   documents.  I wasn't aware of it at the time,

GEORGE CHADWICK SELF

Page 40

1   no.

2        Q.        When you say "the documents,"

3   you mean something that was filed in connection

4   with this lawsuit?

5        A.        Yes.

6        Q.        This lawsuit commenced in, I

7   believe it was the beginning of October of

8   2018, by way of reference.

9               So prior to that point, no one

10  had ever told you that Mr. Pavlis had invested

11  a total of $7 million in Allwest; is that

12  correct?

13       A.        I'm sorry.  No.  What I'm saying

14  is, you told me in 2014, he invested

15  $7 million?

16       Q.        Correct.

17       A.        And in 2014, I wouldn't -- I did

18  not know that, no.

19       Q.        When did you first learn that

20  Mr. Pavlis had invested any money, quite

21  frankly, in Allwest?

22       A.        I would -- I would say around

23  the time that we started -- or around the time

24  that Mr. Miller began making hints at

**A107**

GEORGE CHADWICK SELF

Page 43

```
 1    blow it up a little bit.
 2                   (Pause)
 3                   Okay.  I can see it.
 4         Q.        I'll represent to you that's a
 5    document that was produced by the defendants in
 6    this litigation.  And there are two pages to
 7    this document.  The first page is the
 8    Certificate of Formation of Key Commercial
 9    Finance, LLC on December 10th of 2014.
10                   You don't have any reason to
11    doubt that, do you?
12         A.        No.  I mean, that looks correct.
13         Q.        Again, I'm just trying to get
14    the timing down.
15         A.        Okay.
16         Q.        So when Key was formed, were you
17    living in New York at that time?
18         A.        Yes.
19         Q.        Okay.
20         A.        Yes, I would have been.  So --
21    so, again, that -- that may put my arrival in
22    New York at November of 2014.
23         Q.        Okay.  Understood.
24                   MR. MAHONEY:  And, Cam, if we
```

**A108**

GEORGE CHADWICK SELF

Page 45

1      A.      It would have -- it would have
2   been sometime before that, for sure.
3      Q.      I assume that's the case.  I'm
4   just trying to get a sense of how long before
5   that.
6      A.      I'm not sure I can -- I mean,
7   I'm not sure I can really answer that question.
8   We had talked about forming an entity.  I think
9   Key Commercial is the name that we settled on.
10      Q.      Who is "we"?
11      A.      Justin and I.
12      Q.      And what was the purpose of
13   forming this entity?
14      A.      Key was going to be the -- the
15   funding body for the platform that -- yeah.
16      Q.      At the time that you had
17   submitted the Certificate of Formation in
18   December of 2014, did you have an understanding
19   as to where Key was going to get its funding?
20      A.      No.  No, I don't -- I think the
21   idea was that we would use some of our own
22   money and we would have investors.  But I
23   don't -- I don't know that we -- or that I knew
24   exactly who they were going to be at that

GEORGE CHADWICK SELF

Page 46

1    moment.

2        Q.        Did you even know, as of

3    December of 2014, whether anyone had lined up

4    any funding or any investors for Key?

5        A.        No, I didn't.  I don't think so,

6    no.

7        Q.        Did Mr. Billingsley indicate to

8    you that he had lined up any investors as of

9    December of 2014?

10       A.        No.  I think that was part of

11   our -- you know, that was part of our, what I

12   would say -- our partnership agreement, at

13   least, in my head was that Justin had those

14   connections, and so he would be providing them.

15       Q.        At the time Key was formed in

16   December of 2014, apart from you as the

17   member -- and I'll represent to you that you're

18   the sole member of Key.

19                 Do you understand that?

20       A.        Yes.

21       Q.        Okay.

22       A.        Well, yeah.

23       Q.        Pardon me?

24       A.        Yes.

GEORGE CHADWICK SELF

Page 48

1    correct?

2         A.        I don't remember setting up an

3    employee payroll for Key.

4         Q.        Is it fair to say that as the

5    sole member of Key, if it had employees, you

6    would have known about it?

7         A.        No, not necessarily.

8         Q.        Why do you say "not

9    necessarily"?

10        A.        Because -- well, I mean, again,

11   employees require payroll, right?  And I don't

12   remember setting up a payroll.  I know Key paid

13   people, so perhaps as contractors or 1099s.

14                  Again, my, I guess, lane, if you

15   want to call it a lane, for Key, at least in my

16   mind, was that Key was going to help with the

17   funding for the platform and the things related

18   to the platform, particularly by finding

19   investors for the platform.  It was always our

20   goal to make Key a 50/50 partnership.

21        Q.        You mean 50/50 between or among

22   whom?

23        A.        Between Justin and I.  It was

24   initially -- I think it was initially set up

**A111**

GEORGE CHADWICK SELF

Page 49

1   the way it was simply because I filled out the

2   forms, you know, myself.   And it was not -- I

3   don't think it was my -- our intention to have

4   a solely owned, you know, one person in charge

5   of everything, making imperious decisions kind

6   of -- kind of stuff.

7           Q.        Okay.  So put aside whether it

8   was documented or not.

9           A.        Okay.

10          Q.        In your mind, at least, you

11   viewed Key as a partnership -- I don't mean in

12   a legal sense, but in a practical working

13   sense -- between you and Mr. Billingsley; is

14   that fair?

15          A.        Yeah.

16          Q.        Okay.  By the way, you said that

17   you're the one who prepared the documentation?

18          A.        I think I -- I used a -- go

19   ahead.  I'm sorry, finish the question.  I

20   didn't hear that last part.

21          Q.        Yes, okay.  I think you said

22   that you're the one who actually prepared the

23   paperwork necessary to create Key as a

24   corporate entity; is that right?

GEORGE CHADWICK SELF

Page 50

1               MR. GREEN:  Objection.  I think
2       that mischaracterizes his testimony.
3               MR. MAHONEY:  Okay.  Well, he
4       can tell me.
5               MR. GREEN:  You can answer.
6       A.      There's a company called UCI, I
7   believe, out of Delaware.  They assist with
8   forming Delaware LLCs.  It's called a
9   registered agent.  So I was in contact with
10  them.
11  BY MR. MAHONEY:
12      Q.      Do you recall when you first
13  reached out to them?
14      A.      No.  It would have been in 2014,
15  I'm sure, but I don't know.
16      Q.      But in relation to when you
17  actually got the Certificate of Formation on
18  December 10th of 2014, was it a month before
19  that?  Weeks before that?  Longer?  Shorter?
20      A.      I couldn't tell you.  It was a
21  little while before we got the certificate for
22  sure.  I mean, in internet speed, it was pretty
23  slow.
24      Q.      What does that mean?  Does that

GEORGE CHADWICK SELF

Page 59

1      Q.      Did Key maintain any hard copy

2  documents?

3      A.      No.  Well, I didn't, so.

4      Q.      So you're not aware of that

5  being the case?

6      A.      Correct.

7      Q.      How did you and Mr. Billingsley

8  communicate in the ordinary course?

9      A.      Phones.  E-mail.

10      Q.      In-person meetings?

11      A.      Yes.

12      Q.      How often would you communicate

13  with Mr. Billingsley in the typical week?  And

14  this is after Key was formed in December of

15  2014.

16      A.      At least once a day, maybe

17  twice.

18      Q.      Do you know a gentleman named

19  Michael Silberman?

20      A.      I do.

21      Q.      Who is he?

22      A.      Oh, boy.  Michael was the

23  co-founder of Mobile Co.

24      Q.      Along with Mr. Peterson?

GEORGE CHADWICK SELF

Page 60

1      A.      Yeah.  Yes.

2      Q.      And what interaction did you

3  have with Mr. Silberman?

4      A.      Michael is the guy who cut my

5  paycheck.  So that was important to me.

6  Michael and I also coordinated some of the

7  teamwork as -- as the Mobile Co. platform was

8  being developed.

9      Q.      To your knowledge, did

10  Mr. Silberman have any role with Key?

11      A.      Not to my knowledge.  It

12  wouldn't -- it wouldn't necessarily surprise

13  me.  But not to my knowledge, no.

14      Q.      Explain that to me.

15      A.      Because as Key was being set up,

16  Mobile Co. was kind of on its way down.  And

17  Michael was a -- a CFO of a -- of a pretty big

18  company.  So we would have been talking to

19  Michael about, you know, how to go forward, how

20  to -- how to start the platform that we were

21  working on, yeah.

22      Q.      To your knowledge, did

23  Mr. Silberman ever have any employment

24  agreement or other employment relationship with

**A115**

GEORGE CHADWICK SELF

Page 81

1    to you preparing for this deposition, is it

2    right that you have no recollection of seeing

3    this document?

4           A.        That would -- that would be

5    correct.

6                     MR. MAHONEY:  Cam, if you can

7           flip through a few pages in.  The Bates

8           label ends 811.

9    BY MR. MAHONEY:

10          Q.        Now, Mr. Self, this is the

11   signature page for the note, and it purports to

12   be signed on behalf of Key by Michael

13   Silberman, and whose title was executive vice

14   president.

15                    Was Mr. Silberman ever executive

16   vice president of Key?

17          A.        I did not make him an executive

18   vice president.

19          Q.        Before today, have you ever

20   heard anyone refer to Mr. Silberman as being

21   the executive vice president or having any

22   title or employment with Key?

23                    MR. GREEN:  Object to the form.

24                    But you can answer.

GEORGE CHADWICK SELF

Page 82

1      A.        Well, again, I mean, we -- we

2   did a lot of work with Michael.  So I'm not

3   overly surprised to see his name there.  But I

4   didn't -- I mean, I don't think I gave him that

5   title.

6   BY MR. MAHONEY:

7      Q.        Yes, I understand you didn't

8   give him that title.

9                My question is, prior to today,

10  were you aware that anyone had ever referred to

11  him as an executive vice president of Key?

12     A.        I have not heard anyone refer to

13  him that way, no.

14     Q.        Did Mr. Billingsley ever

15  indicate to you that he had conferred that

16  title on Mr. Silberman?

17     A.        Not -- not to my recollection,

18  no.

19     Q.        Are you aware of Key -- I know

20  there wasn't a payroll.  But are you aware of

21  Key making any payment to Mr. Silberman in

22  connection with any role that he played with

23  Key?

24     A.        I don't recall one.  But, you

# **Exhibit 14**

**A117**

 DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH   45999-0023

Date of this notice:  12-10-2014

Employer Identification Number:
47-2506989

Form:  SS-4

Number of this notice:  CP 575 A

KEY COMMERCIAL FINANCE LLC
GEORGE CHADWICK SELF SOLE MBR
1511 ROUTE 22 STE 152
BREWSTER, NY  10509

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.


               WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

     Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN 47-2506989.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

     When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

     Based on the information received from you or your representative, you must file
the following form(s) by the date(s) shown.

               Form 941                          01/31/2015
               Form 940                          01/31/2015

     If you have questions about the form(s) or the due date(s) shown, you can call us at
the phone number or write to us at the address shown at the top of this notice.  If you
need help in determining your annual accounting period (tax year), see Publication 538,
*Accounting Periods and Methods*.

     We assigned you a tax classification based on information obtained from you or your
representative.  It is not a legal determination of your tax classification, and is not
binding on the IRS.  If you want a legal determination of your tax classification, you may
request a private letter ruling from the IRS under the guidelines in Revenue Procedure
2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue).  Note:
Certain tax classification elections can be requested by filing Form 8832, *Entity
Classification Election*.  See Form 8832 and its instructions for additional information.

     If you are required to deposit for employment taxes (Forms 941, 943, 940, 944, 945,
CT-1, or 1042), excise taxes (Form 720), or income taxes (Form 1120), you will receive a
Welcome Package shortly, which includes instructions for making your deposits
electronically through the Electronic Federal Tax Payment System (EFTPS).  A Personal
Identification Number (PIN) for EFTPS will also be sent to you under separate cover.
Please activate the PIN once you receive it, even if you have requested the services of a
tax professional or representative.  For more information about EFTPS, refer to
Publication 966, *Electronic Choices to Pay All Your Federal Taxes*.  If you need to
make a deposit immediately, you will need to make arrangements with your Financial
Institution to complete a wire transfer.

**A117**

CONFIDENTIAL                                                                KCF013188

**A118**

(IRS USE ONLY)     575A          12-10-2014   KEYC  B  9999999999  SS-4

The IRS is committed to helping all taxpayers comply with their tax filing obligations.  If you need help completing your returns or meeting your tax obligations, Authorized e-file Providers, such as Reporting Agents (payroll service providers) are available to assist you.  Visit the IRS Web site at www.irs.gov for a list of companies that offer IRS e-file for business products and services.  The list provides addresses, telephone numbers, and links to their Web sites.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov.  If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

**IMPORTANT REMINDERS:**

  * Keep a copy of this notice in your permanent records.  **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.**  You may give a copy of this document to anyone asking for proof of your EIN.

  * Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

  * Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice.  If you write, please tear off the stub at the bottom of this notice and send it along with your letter.  If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is KEYC.  You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.

Keep this part for your records.          CP 575 A (Rev. 7-2007)

--------------------------------------------------------------------------------

Return this part with any correspondence
so we may identify your account.  Please                          CP 575 A
correct any errors in your name or address.

                                                                9999999999

Your Telephone Number  Best Time to Call  DATE OF THIS NOTICE:  12-10-2014
(     )      -                            EMPLOYER IDENTIFICATION NUMBER:  47-2506989
_____  _____    FORM:  SS-4            NOBOD


INTERNAL REVENUE SERVICE                  KEY COMMERCIAL FINANCE LLC
CINCINNATI  OH  45999-0023                GEORGE CHADWICK SELF SOLE MBR
|..|.|..|.||.|.||.|.|.||.|..||..||.|.|.|  1511 ROUTE 22 STE 152
                                          BREWSTER, NY  10509

**A118**

CONFIDENTIAL                                                      KCF013189

# **Exhibit 15**

**A119**

| From: | Justin Billingsley |
|---|---|
| Sent: | Wednesday, December 31, 2014 9:25 PM EST |
| To: | gary@allwestre.com |
| Subject: | Re: Going forward... |

So what do you think of this...

1. I get all of the docs completed by Jan 15th
   1. Pavlis - AW Operating Agreement
   2. Pavlis tax planning
   3. Pavlis annual document binder
   4. AW - KCM Operating Agreement
   5. Pavlis AW - KCF statement of understanding
2. AW continues to pay me 2% annually on a monthly basis for the $3 to $4m already funded in projects.
3. The additional $3 to $4m about to be funded we will go back to the original partnership arrangement that we first began with. I will do half of the analysis, half of the work, half of the due diligence and approval, half of the support and get half of the profits. This way we could pay back my loans from early 2014 easily and give me something to really pull for.

Also, Frank wants to get in another $2 to 3m by end of Jan.

Let me know what you think. Thanks.

Justin Billingsley
203 240 7160

-----Original Message-----
From: Gary Miller <gary@allwestre.com>
To: 'Justin Billingsley' <jcb1114@aol.com>
Sent: Mon, Dec 29, 2014 12:36 pm
Subject: RE: RE: Going forward...

Not exactly.  Funds will be sent on a project by project process.  Or AW having direct access for each project thru a joint account, also to be able to get lending we will ned to show some of the capital on a balance sheet. I have 4 mil plus committed to date and other project that are being reviewed to spend the rest with out debt.


Gary W. Miller

Allwest Investments, LLC
Napa, CA 94558
480-628-8130

**From:** Justin Billingsley [mailto:jcb1114@aol.com]
**Sent:** Monday, December 29, 2014 9:33 AM
**To:** gary@allwestre.com
**Subject:** Re: RE: Going forward...

**A119**

**A120**

So you want to send all of the capital to Key once arrangement is in place? So if I spend the monies to get it all set up you will fund monies asap?

Justin Billingsley
203 240 7160

On Monday, December 29, 2014, Gary Miller <gary@allwestre.com> wrote:

I want the capital and be able to send thru to Key once the arrangement is in place.

Gary W. Miller

Allwest Investments, LLC
Napa, CA 94558
480-628-8130

**From:** Justin Billingsley [mailto:jcb1114@aol.com]
**Sent:** Monday, December 29, 2014 9:01 AM
**To:** gary@allwestre.com
**Subject:** Re: Going forward...

Yes but before we can clarify anything we need to know where we are going. You need to decide if you want the capital or not. And the monthly fee needs to get turned back on with a wire this week.

If you decide you do not want the capital,

1. you will not need an operating agreement with Frank as all capital will be liability of Key and capital that you keep to seed financing and operations will be papered as from Key also. So all legal connections to capital will be with Key, as we discussed and all operations will be with AW.

2. I will have the following drafter to completion no later than Jan. 15h:

   o AW - Key JV agreement

   o Pavlis permissions letter of understanding

Make sense?

Justin Billingsley
203 240 7160

-----Original Message-----
From: Gary Miller <gary@allwestre.com>
To: 'Justin Billingsley' <jcb1114@aol.com>
Sent: Mon, Dec 29, 2014 11:14 am
Subject: RE: Going forward...

**A120**

KCF001715

**A121**

I will review today. Loans will need to be repaid or treated as payment of the 2% to date. The funds we are holding will only be sent to Key once a JV is in place and we complete the operating agreement with Frank and provide sign by all parties.

Hope that clarifies. If we are doing HV plan we will need to discuss the agreement and other deployment of the funds.

Gary W. Miller

Allwest Investments, LLC
Napa, CA 94558
480-628-8130

**From:** Justin Billingsley [mailto:jcb1114@aol.com]
**Sent:** Monday, December 29, 2014 8:01 AM
**To:** gary@allwestre.com
**Subject:** Going forward...

Dear Gary,

I see a few possible options going forward:

1. You keep the remaining funds and continue to pay me as previously arranged. The past loans would need to be taken from profits and considered part of the Allwest allowable costs after the pref is paid and before Allwest profits are taken or profits splits are managed.

2. You decide that splitting profits in the manner that the note stipulates cuts too deep into your profit appetite and you transfer all capital to the Key entity. This would enable you to finance assets with cheaper money and only keep capital that you need to seed financing and for operations until profits begin to yield. In this event all costs to Allwest related to my loans would be paid back to Allwest immediately and would become a financial load to Key. We would then establish an operating agreement between Key and Allwest to jv on projects together as discussed. Again this would enable you to throttle the expensive capital when you needed and how you needed it instead of the burden of the capital expense being upon Allwest full time whether deployed or not.

These seem like the cleanest and most likely resolutions given many of your comments about the cost of the capital. I am getting worried about how long so much capital has been idle as we have very serious obligations to this money.

Thoughts?

Justin Billingsley
203 240 7160

**A121**

# **Exhibit 16**

# A122

## Allwest Investments LLC

### TRANSACTION REPORT

January 1, 2014 - April 3, 2018

| DATE | TRANSACTION TYPE | NUM | NAME | MEMO/DESCRIPTION | ACCOUNT | SPLIT | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| Investor 2 Equity | | | | | | | | |
| 02/19/2014 | Deposit | | Key Commercial Finance | | Investor 2 Equity | ALLWEST CHECKING 0318 | 1,000,000.00 | 1,000,000.00 |
| 05/27/2014 | Deposit | | Key Commercial Finance | | Investor 2 Equity | ALLWEST CHECKING 0318 | 6,000,000.00 | 7,000,000.00 |
| 12/16/2014 | Expense | | Key Commercial Finance | Investor Funds Returned - WT FED#09470 WEBSTER BANK, N.A. /FTR/BNF=Key Commercial Finance SRF# 0005426350177713 TRN#141216101637 RFB# | Investor 2 Equity | ALLWEST SAVINGS 4859 | -1,000,000.00 | 6,000,000.00 |
| 04/08/2015 | Expense | | Key Commercial Finance | Investor Funds Returned - WT FED#06937 WEBSTER BANK, N.A. /FTR/BNF=Key Commercial Finance SRF# 0005426098752127 TRN#150408088199 RFB# | Investor 2 Equity | ALLWEST SAVINGS 4859 | -1,000,000.00 | 5,000,000.00 |
| 04/17/2015 | Expense | | Key Commercial Finance | Investor Funds Returned - WT FED#08486 WEBSTER BANK, N.A. /FTR/BNF=KEY COMMERCIAL FINANCE SRF# 0005426107947758 TRN#150417123162 RFB# | Investor 2 Equity | ALLWEST SAVINGS 4859 | -500,000.00 | 4,500,000.00 |
| 11/04/2015 | Journal Entry | 60 | | Investor funds returned - WT FED#00445 WEBSTER BANK, N.A. /FTR/BNF=Key Commercial Finance LLC SRF# 0005426307062764 TRN#151104097564 RFB# | Investor 2 Equity | -Split- | -500,000.00 | 4,000,000.00 |
| 12/24/2015 | Expense | | Key Commercial Finance | Investor Funds Returned - WT FED#00826 WEBSTER BANK, N.A. /FTR/BNF=Key Commercial Incoming Wire SRF# 0005426358307288 TRN#151224103643 RFB# | Investor 2 Equity | ALLWEST SAVINGS 4859 | -250,000.00 | 3,750,000.00 |
| 02/09/2016 | Expense | | Key Commercial Finance | WT FED#08609 WEBSTER BANK, N.A. /FTR/BNF=KEY COMMERCIAL FINANCE LLC SRF# 0005426040603222 TRN#160209082671 RFB# | Investor 2 Equity | ALLWEST CHECKING 0318 | -250,000.00 | 3,500,000.00 |
| 04/08/2016 | Expense | | Key Commercial Finance | Investor Funds Returned - WT FED#03620 WEBSTER BANK, N.A. /FTR/BNF=EQUITY PROS INCOMING WIRE SRF# 0005426099282017 TRN#160408122387 RFB# | Investor 2 Equity | ALLWEST CHECKING 0318 | -40,000.00 | 3,460,000.00 |
| 06/03/2016 | Expense | | Key Commercial Finance | Investor funds returned - WT FED#02702 WEBSTER BANK, N.A. /FTR/BNF=EQUITY PROS SRF# 0005426155597381 TRN#160603117495 RFB# | Investor 2 Equity | ALLWEST CHECKING 0318 | -150,000.00 | 3,310,000.00 |
| 09/23/2016 | Expense | | Key Commercial Finance | Investor principle returned  WT FED#02952 WEBSTER BANK, N.A. /FTR/BNF=Key Commercial Finance, LLC SRF# 0005426267302511 TRN#160923119811 RFB# | Investor 2 Equity | ALLWEST CHECKING 0318 | -300,000.00 | 3,010,000.00 |
| 09/26/2016 | Journal Entry | 168 | | credit to Allwest for transfer 6 Illinois properties to KCF | Investor 2 Equity | -Split- | -1,011,000.00 | 1,999,000.00 |
| 12/31/2016 | Journal Entry | 110 | | Capital return | Investor 2 Equity | -Split- | -400,000.00 | 1,599,000.00 |
| 03/16/2017 | Expense | | Key Commercial Finance | principal returned WT FED#01717 BANK OF AMERICA, N /FTR/BNF=KEY COMMERCIAL FINANCE LLC SRF# 0005426075137394 TRN#170316103149 RFB# | Investor 2 Equity | ALLWEST CHECKING 0318 | -500,000.00 | 1,099,000.00 |
| 03/29/2017 | Expense | | Key Commercial Finance | return of principal | Investor 2 Equity | ALLWEST CHECKING 0318 | -500,000.00 | 599,000.00 |
| 04/12/2017 | Journal Entry | 169 | | Allwest overhead costs | Investor 2 Equity | -Split- | -200,000.00 | 399,000.00 |
| 04/26/2017 | Expense | | Key Commercial Finance | WT FED#06730 BANK OF | Investor 2 Equity | ALLWEST CHECKING | -300,000.00 | 99,000.00 |

## A122

**A123**

| DATE | TRANSACTION TYPE | NUM | NAME | MEMO/DESCRIPTION | ACCOUNT | SPLIT | AMOUNT | BALANCE |
|------|------------------|-----|------|------------------|---------|-------|--------|---------|
| | | | | AMERICA, N /FTR/BNF=KEY COMMERCIAL FINANCE, LLC SRF# 0005426116480338 TRN#170426152675 RFB# | | 0318 | | |
| **Total for Investor 2 Equity** | | | | | | | **$99,000.00** | |
| **TOTAL** | | | | | | | **$99,000.00** | |

Cash Basis  Tuesday, April 3, 2018 08:06 AM GMT-7                                                                2/2

**A123**

Allwest0200

# Exhibit 17

**A124**

# Wire Transfer Services
Outgoing Wire Transfer Request



| Today's Date: | Wells Fargo Reference Number: |
|---|---|
| 05/07/2018 | FW0005426127806790 |

| Banker Name: | Officer/Portfolio Number: |
|---|---|
| MARICRUZ MURILLO | L2604 |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 707/948-4000 | 02604 | 0005426 | A0366-011 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC") , Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Originator Name: | Street Address: |
|---|---|
| GARY W MILLER | 2910 E CAMELBACK RD STE 190 |

| Primary ID Type: | Primary ID Description: | Address Line 2: |
|---|---|---|
| DLIC | F2033044 | |

| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: |
|---|---|---|---|
| CA | 10/07/2014 | 12/06/2019 | |

| Secondary ID Type: | Secondary ID Description: | City: | State: |
|---|---|---|---|
| PINV | PIN Validation | PHOENIX | AZ |

| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
|---|---|---|---|---|
| | | | 85016-4405 | US |

| Business, Trust, or Estate Name: | Home Phone: | Business Phone: |
|---|---|---|
| ALLWEST INVESTMENTS LLC | | 480/628-8130 |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0005426 | $200,000.00 | 2325680318 | 00038 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| KEY COMMERCIAL FINANCE LLC | 1511 RT 22 STE 152 |

| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
|---|---|
| 385022794682 | BREWSTER NY |

| Purpose of Funds: | Name/Address Line 3: |
|---|---|
| FINAL PRINCIPAL PAYMENT KEY PAVLICH | |

| | Beneficiary Phone Number: |
|---|---|
| | |

| Additional Instructions: |
|---|
| |

Page 1 of 4

WTR6603 (8-17 SVP)

**A124**

Allwest0211

**A125**

**Beneficiary Bank** (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: | | |
|---|---|---|---|---|
| 026009593 | | BANK OF AMERICA, N.A., NY | | |

| Beneficiary Bank Address: | | City: | State: | |
|---|---|---|---|---|
| | | NEW YORK | NY | |

Additional Instructions:

**Wire Fees**

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

**Customer Signature**

Originator Name

ˈGARY W MILLER

Originator Signature

█████████████████

☐ Submit manually
☐ Signature not required

Date:

05/07/2018

WTR6603 (8-17 SVP)

**A125**

Allwest0212

## Agreement For Outgoing Wire Transfer Requests ("Wire Transfer Agreement")

**Responsibility of Wells Fargo.** The wire transfer described in the Outgoing Wire Transfer Request (Page 1) ("Order") may be sent by wire telegraph, telephone, cable or whatever other transmission method Wells Fargo considers to be reasonable. The wire transfer may be transmitted directly to the Beneficiary Bank (the financial institution designated in the Request as the Beneficiary Bank), or indirectly to the Beneficiary Bank through another bank, government agency, or other third party that Wells Fargo considers to be reasonable. Wells Fargo may utilize any funds transfer system or intermediary bank reasonably selected by Wells Fargo, even if its selection differs from instructions in the request.

**Agent.** Wells Fargo may use agents of its choice to perform any of its obligations.

**Limitation of Liability.** Wells Fargo will not be liable for any loss or damage due to the failure, delay, or error of: (1) the method of transmission selected by Wells Fargo, (2) a third party selected by Wells Fargo to receive the Order, or (3) the Beneficiary Bank. IN NO EVENT WILL WELLS FARGO BE LIABLE FOR DAMAGES ARISING DIRECTLY OR INDIRECTLY IF THE ORDER IS EXECUTED BY WELLS FARGO IN GOOD FAITH AND IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT. REGARDLESS OF THE FORM OR NATURE OF ANY CLAIM OR ACTION, IN NO EVENT WILL WELLS FARGO BE LIABLE FOR PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT WELLS FARGO SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**Reliance on Information Provided.** You acknowledge that you are responsible for providing Wells Fargo with all information required by the Beneficiary's bank, including the reason for payment, if required. Sending wires without the required information can cause the wire to be delayed, returned, or assessed additional fees. If a wire transfer request describes the person to receive the wire transfer ("Beneficiary") inconsistently by name and account number, the wire transfer may be made on the basis of the account number even if the account number identifies a person different from the Beneficiary. If a wire transfer request describes a financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution.

**International Wire Transfers.** A Payment Order expressed in U.S. Dollars will be sent in U.S. Dollars. Company may request that prior to executing a Payment Order, Wells Fargo convert the amount to be transferred from U.S. Dollars to the currency of a designated foreign government or intergovernmental organization ("Foreign Currency") at Wells Fargo's sell rate for exchange in effect on the date Wells Fargo executes the Payment Order. If the financial institution designated to receive the funds does not pay the beneficiary specified in a Payment Order payable in Foreign Currency and the funds are returned to Wells Fargo, Wells Fargo will not be liable for a sum in excess of the value of the funds after they have been converted from Foreign Currency to U.S. Dollars at Wells Fargo's buy rate for exchange at the time the cancellation of the Payment Order is confirmed by Wells Fargo. Wells Fargo will not be liable for any failure or delay by any financial institution or other third party in the designated foreign country in executing or failing to execute any Payment Order Wells Fargo transmits to a foreign country.

**Refund.** If the Beneficiary Bank does not pay the Beneficiary specified on the Order, a refund will be made only after Wells Fargo has received confirmation of the effective cancellation of the Order and Wells Fargo is in free possession of the funds debited or earmarked in connection with the Order. If the order is payable in Foreign Currency, Wells Fargo will not be liable for a sum in excess of the value of the funds after it has been converted from Foreign Currency to U.S Dollars at Wells Fargo's buying rate for exchange at such time as the cancellation of the Order is confirmed by Wells Fargo.

**Failure to Transfer Proper Amount.** If Wells Fargo is notified that it did not transfer the full amount stated in the Request, Wells Fargo's sole liability will be to promptly execute a second Payment Order in the amount of the stated deficiency. If Wells Fargo executes an instruction in excess of the amount stated in the Request, to the extent that the originator does not receive the benefit of the Order, Wells Fargo will only be liable for any loss of the principal amount transferred in excess of the amount stated in the Request instructions. Additionally, Wells Fargo will be liable for the amount of interest the originator has lost due to the transfer of the excess amount, computed at the then current Federal Funds rate. However, Wells Fargo's liability for loss of interest shall be limited to twenty (20) calendar day's interest. This section sets forth Wells Fargo's complete liability for the order issued under this agreement.

**Finality of order.** The order will be final and will not be subject to stop payment or recall, except that Wells Fargo may, at the originator's request, make an effort to effect such stop payment or recall. In such case, Wells Fargo will incur no liability for its failure or inability to do so.

**Fees.** In addition to the outgoing wire transfer fee, additional fees may apply. Additional fees can include, but are not limited to: an additional fee for bank initiated transactions, amendment fees, statement fees, fees assessed by beneficiary and intermediary banks, etc. On international outgoing wires, if a SWIFT BIC, IRC, IBAN, or CLABE number is not provided the foreign banks may return the wire or assess a surcharge. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments.

**Acts of God.** Wells Fargo is excused for delays or failure to execute the Order to the extent that the delay or failure results from a cause beyond the reasonable control of Wells Fargo.

## Wire Transfer Information

**General Information: You can NOT have a bank as the final beneficiary,** unless the wire is a payment to Wells Fargo (i.e.: mortgage, auto loan, etc,). We are required to know who the money is going to, to ensure the funds are not being used to support terrorist or drug activity. We need an account number for the beneficiary OR a complete physical address. No PO Boxes may be used when no account number is provided for the Beneficiary.

**International Wires:** Wires going to foreign countries require different numbers depending on the receiving foreign country. All wire transfer payments destined for Europe should include the SWIFT Bank Identifier Code (SWIFT BIC), International Routing Code (IRC) as applicable, and for participating countries the beneficiary's International Bank Account Number (IBAN). Mexican banks may require a CLABE number in addition to the SWIFT BIC.

1. **SWIFT** Bank Identifier Code (SWIFT BIC). The 8 or 11 character SWIFT BIC is a unique series of alpha numeric characters that help to identify a specific financial institution. The SWIFT BIC should be obtained from the beneficiary. To ensure timely delivery please be sure that international outgoing wires include the SWIFT BIC where applicable.

2. **International Routing Code (IRC):** Some countries throughout the international banking community have created international routing codes, which are used in combination with the SWIFT BIC to aid in routing the payment through a main office to a branch. Each country has a specific name for their routing code (i.e., Sort Code in the United Kingdom, Canadian Payments Association Routing Numbers in Canada). Your beneficiary must provide the international routing code to facilitate receipt of an international payment. Sending a wire without the IRC number can delay the wire, or the receiving bank may return the wire when this number is not included in the payment instructions, and additional fees may be assessed.

3. **International Bank Account Number (IBAN):** The IBAN varies by country/institution. Warning! Only the bank servicing an account can provide the correct IBAN of that account and must be obtained from the beneficiary of the wire. Sending a wire to a participating country without the IBAN can delay the wire, or the receiving bank may return the wire if the IBAN is not included in the payment instructions, and additional fees may be assessed.

WTR6603 (8-17 SVP)

Allwest0213

Wire Transfer Services Outgoing Wire Transfer Request

Participating Countries that require an IBAN:

| | | | | | |
|---|---|---|---|---|---|
| Albania | Denmark | Guadeloupe | Liechtenstein | Norway | Slovak Republic |
| Andorra | Dominican Republic | Guatemala | Lithuania | Pakistan | Slovenia |
| Austria | Estonia | Hungary | Luxembourg | Palestine (State of) | Spain |
| Azerbaijan (Republic of) | Faroe Islands | Iceland | Macedonia | Poland | Sweden |
| Bahrain | Finland | Ireland (Republic of) | Malta | Portugal | Switzerland |
| Belgium | France | Isle of Man | Martinique | Qatar | Timor-Leste |
| Bosnia and Herzegovina | French Guiana | Israel | Mauritania | Reunion Island | Tunisia |
| Brazil | French Polynesia | Italy | Mauritius | Romania | Turkey |
| Bulgaria | French Southern Territories | Jordan | Mayotte | Saint Barthelemy | United Arab Emirates |
| Channel Islands | Georgia | Kazakhstan | Moldova (Republic of) | Saint Martin | United Kingdom |
| Costa Rica | Germany | Kosovo (Republic of) | Monaco | Saint Pierre et Miquelon | Virgin Islands, British |
| Croatia | Gibraltar | Kuwait | Montenegro | San Marino | Wallis and Futuna Islands |
| Cyprus | Greece | Latvia | Netherlands | Saudi Arabia | |
| Czech Republic | Greenland | Lebanon | New Caledonia | Serbia | |

4. **Indian Financial System Code (IFSC):** Every Indian bank has a unique eleven (11) character alpha numeric code identifying the bank branch to receive the wire transfer. To ensure timely delivery, please be sure that international outgoing wires include the IFSC where applicable.

5. **Mexico CLABE Account Number:** Mexican banks may require an 18 digit CLABE account number be added to the Beneficiary instructions to ensure payment. The CLABE number may be required on Mexican Peso (MXN) and USD payments sent to Mexico. The CLABE account number must be obtained from the beneficiary. Wells Fargo does not provide or calculate the CLABE. Sending a wire without a CLABE account number can delay the wire, or the receiving bank may return the wire if the CLABE is not included in the payment instructions, and additional fees may be assessed.

6. **Wells Fargo recommends** that if you do not have a SWIFT BIC, IBAN, IFSC, IRC, or Mexican CLABE number, that you contact the beneficiary of the wire. If the beneficiary does not have the needed information, please have the beneficiary contact their bank to obtain the appropriate information. Sending International wires without the required information can cause the wire to be delayed, returned, or assessed additional fees. For International outgoing wires only: When sending in foreign currency, please ensure the beneficiary's account accepts the designated foreign currency. International foreign currency wires are *generally* less expensive to send as compared with International USD wires (the Wells Fargo wire fee is always less when the wire is sent in foreign currency and Wells Fargo does not charge a converting fee; we also offer competitive exchange rates.)

Page 4 of 4

WTR6603 (8-17 SVP)

Allwest0214

AllWest0219

**A128**

# Wire Transfer Services
## Outgoing Wire Transfer Request



**WELLS FARGO**

| | |
|---|---|
| Today's Date: | Wells Fargo Reference Number: |
| 04/06/2018 | FW0005426096014318 |
| Banker Name: | Officer/Portfolio Number: |
| MARICRUZ MURILLO | C9342 |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 707/948-4000 | 02604 | 0005426 | A0366-011 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC") , Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Originator Name: | Street Address: |
|---|---|
| GARY W MILLER | 2910 E CAMELBACK RD STE 190 |

| Primary ID Type: | Primary ID Description: | Address Line 2: |
|---|---|---|
| DLIC | F2033044 | |

| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: |
|---|---|---|---|
| CA | 10/07/2014 | 12/06/2019 | |

| Secondary ID Type: | Secondary ID Description: | City: | State: |
|---|---|---|---|
| PINV | PIN Validation | PHOENIX | AZ |

| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
|---|---|---|---|---|
| | | | 85016-4405 | US |

| Business, Trust, or Estate Name: | Home Phone: | Business Phone: |
|---|---|---|
| ALLWEST INVESTMENTS LLC | | 480/628-8130 |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0005426 | $100,000.00 | 2325680318 | 00038 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| key commercial finance llc | |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 385022794682 | |
| Purpose of Funds: | Name/Address Line 3: |
| full final payment | |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| investment funds principal 4 6 2018 | |

# Customer Copy

WTR6603 (8-17 SVP)

Page 1 of 4

**A128**

Allwest0220

**A129**

## Beneficiary Bank (This is the financial institution where the beneficiary maintains their account.)

| ABA/RTN | SWIFT/BIC: | Beneficiary Bank Name: |
|---|---|---|
| 026009593 | | BANK OF AMERICA, N.A., NY |

| Beneficiary Bank Address: | | City: | State: |
|---|---|---|---|
| | | NEW YORK | NY |

Additional Instructions:

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

## Customer Signature

Originator Name

GARY W MILLER

Originator Signature

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

☐ Submit manually
☐ Signature not required

Date: 04/06/2018

Customer Copy

WTR6603 (8-17 SVP)

**A129**

# **Exhibit 18**

**A130**

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

### KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$3,000,000                                                                    September 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **THREE MILLION AND 00/100** Dollars ($3,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) September 1, 2019 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof. This Note is one of the "**Notes**" issued pursuant to the Note Purchase Agreement dated as of September 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement). Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      *Definitions*. As used in this Note, the following capitalized terms have the following meanings:

(a)      "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

(b)      "**Event of Default**" has the meaning given in **Section 4** hereof.

(c)      "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

**A130**

**A131**

(d)  "**Lien**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e)  "**Majority in Interest**" shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f)  "**Note Purchase Agreement**" has the meaning given in the introductory paragraph hereof.

(g)  "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term "**Obligations**" shall not include any obligations of Company.

(h)  "**Person**" shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i)  "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(j)  "**Transaction Documents**" shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2.  *Interest*.  Accrued interest on this Note shall be payable at maturity.

3.  *Prepayment*.  Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4.  *Events of Default*.  The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a)  *Failure to Pay*.  The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note.docx

**A131**

KCF005806

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

(b)     *Voluntary Bankruptcy or Insolvency Proceedings.*  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(c)     *Involuntary Bankruptcy or Insolvency Proceedings.*  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

5.     ***Rights of Investor upon Default.***  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

6.     ***Conversion.***

(a)     *Automatic Conversion.*  In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $3,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

(b)     *Automatic Conversion on Change of Control.*  In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note.docx

CONFIDENTIAL                                                                                          KCF005807

**A133**

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis.  The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions.  Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.  The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

(c)     *Conversion Procedure*.  Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests.  The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)     *Fractional Membership Interests; Interest; Effect of Conversion*.  No fractional Membership Interests shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence.  In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence.  Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

7.     ***Change of Control***.  Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full.  The term "**Change of Control**" means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note.docx

**A133**

**A134**

Company is cancelled or converted or a combination thereof occurs.  The term **"Change of Control Payment"** means an amount equal to one (1) times the outstanding principal amount of such Note.

8.  *Successors and Assigns*.  Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.  *Waiver and Amendment*.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.  *Transfer of this Note or Securities Issuable on Conversion Hereof*.  With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect).  Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company.  If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made.  Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act.  The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions.  Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company.  Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.  *Assignment by the Company*.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.  *Notices*.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing.  All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.  *Pari Passu Notes*.  Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes.  In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note.docx

**A134**

KCF005809

**A135**

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

14.    *Usury*.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

15.    *Waivers*.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

16.    *Governing Law*.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

kcf Form of Convertible Note.docx

**A135**

CONFIDENTIAL

KCF005810

**A136**

The Company has caused this Note to be issued as of the date first written above.

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name:  Michael Silberman
Title:  Executive Vice President

**A136**

CONFIDENTIAL
KCF005811

**A137**

# KEY COMMERCIAL FINANCE LLC

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of September 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

## RECITALS

A.        On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000.  This Agreement and the Note shall be collectively referred to below as (the "**Transaction Documents**").

B.        Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.        Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.        *The Notes*.

(a)        *The Notes.*  Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

(b)        *Delivery.*  The sale and purchase of the Notes shall take place at a closing to be held on September 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 1511 Route 22 Suite 152 Brewster NY 10509 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**").  At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note.  Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**").  At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price.  Each of the Notes will be registered in such Investor's name in the Company's records.

**A137**

**A138**

(c)     *Investor's Commitment to Fund the Closing; Binding Obligation.*  Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I**.  Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

(d)     *Use of Proceeds.*  The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

(e)     *Payments.*  The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

2.     ***Representations and Warranties of the Company.***  The Company represents and warrants to each Investor that:

(a)     *Due Incorporation, Qualification, etc.*  The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(b)     *Authority.*  The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

(c)     *Enforceability.*  Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)     *Non-Contravention.*  The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws ("**Charter Documents**") or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

(e)     *Approvals.*  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

**A138**

stockholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby.

(f)     *No Violation or Default*.  The Company is not in violation of or in default with respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(g)     *Intellectual Property*.  To the best of its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights of, others.

3.     ***Representations and Warranties of Investors***.  Each Investor, for that Investor alone, represents and warrants to the Company upon the acquisition of the Note as follows:

(a)     *Binding Obligation*.  Such Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  Each of this Agreement and the Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)     *Securities Law Compliance*.  Such Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act of 1933 (the "**Securities Act**"), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available.  Such Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration.  Such Investor has not been formed solely for the purpose of making this investment and is purchasing the Note to be acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof.  Such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time.  Such Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act.

(c)     *Access to Information*.  Such Investor acknowledges that the Company has given such Investor access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by such Investor, and has furnished such Investor with all documents and other information required for such Investor to make an informed decision with respect to the purchase of the Note.

4.     ***Conditions to Closing of the Investors***.  Each Investor's obligations at the Closing or Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

A139

KCF005814

**A140**

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

(a)     *Representations and Warranties*.  The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)     *Governmental Approvals and Filings*.  Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)     *Legal Requirements*.  At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)     *Proceedings and Documents*.  All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

(e)     *Transaction Documents*.  The Company shall have duly executed and delivered to the Investors the following documents:

(i)     This Agreement; and

(ii)     Each Note issued hereunder.

5.     ***Conditions to Obligations of the Company***.  The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

(a)     *Representations and Warranties*.  The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)     *Governmental Approvals and Filings*.  Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)     *Legal Requirements*.  At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)     *Purchase Price*. Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I**.

**A140**

KCF005815

**A141**

6. *Miscellaneous*.

(a) *Waivers and Amendments*. Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent. Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto. Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterpart signature page to this Agreement, together with a supplement to **Schedule I** hereto. Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

(b) *Governing Law*. This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(c) *Survival*. The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d) *Successors and Assigns*. Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(e) *Registration, Transfer and Replacement of the Notes*. The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes. Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary. Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered. Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f) *Assignment by the Company*. The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

**A141**

 KCF005816

**A142**

(g)     *Entire Agreement.*  This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(h)     *Notices.*  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I**, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(i)     *Payment of Fees and Expenses.*  Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

(j)     *Separability of Agreements; Severability of this Agreement.*  The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale.  Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors.  Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors.  If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(k)     *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

**A142**

KCF005817

**A143**

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

COMPANY:

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name: Michael Silberman
Title: Executive Vice President

**A143**

KCF005818

**A144**

## INVESTORS

DATE: 8-21-19

NAME: Frank E Pavlis

TITLE: FRANK E PAVLIS

**A144**

CONFIDENTIAL

KCF005819

**A145**

## SCHEDULE I

| Name and Address | Closing<br>Note Principal Amount |
|---|---|
| **Closing: September 30, 2014** | |
| **Frank Pavlis**<br>1500 Hamilton St.<br>Allentown, PA 18102 | $3,000,000 |

I-1

**A145**

CONFIDENTIAL

KCF005820

**A146**

**Exhibit A**

**FORM OF NOTE**

**A146**

CONFIDENTIAL

KCF005821

**A147**

**<u>Exhibit B</u>**

**DISCLOSURE SCHEDULE**

None.

**CONFIDENTIAL**

**KCF005822**

# **Exhibit 19**

**A148**

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

## KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$4,000,000                                                        November 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **FOUR MILLION AND 00/100** Dollars ($4,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) November 1, 2020 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof.  This Note is one of the "**Notes**" issued pursuant to the Note Purchase Agreement dated as of November 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement).  Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.     *Definitions*.  As used in this Note, the following capitalized terms have the following meanings:

        (a)     "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

        (b)     "**Event of Default**" has the meaning given in **Section 4** hereof.

        (c)     "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

**A148**

(d)   "**Lien**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e)   "**Majority in Interest**" shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f)   "**Note Purchase Agreement**" has the meaning given in the introductory paragraph hereof.

(g)   "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term "**Obligations**" shall not include any obligations of Company.

(h)   "**Person**" shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i)   "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(j)   "**Transaction Documents**" shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2.   *Interest*.  Accrued interest on this Note shall be payable at maturity.

3.   *Prepayment*.  Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4.   *Events of Default*.  The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a)   *Failure to Pay*.  The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note Pavlis 11:14.docx   -2-

**A149**

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

    (b)   *Voluntary Bankruptcy or Insolvency Proceedings.*  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

    (c)   *Involuntary Bankruptcy or Insolvency Proceedings.*  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

    5.    ***Rights of Investor upon Default.***  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

    6.    *Conversion.*

    (a)   *Automatic Conversion.*  In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $4,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

    (b)   *Automatic Conversion on Change of Control.*  In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note Pavlis 11:14.docx    -3-

**A150**

    

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis. The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions. Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

      (c)    *Conversion Procedure*. Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests. The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

      (d)    *Fractional Membership Interests; Interest; Effect of Conversion*. No fractional Membership Interests shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence. In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

      7.    **Change of Control.** Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full. The term **"Change of Control"** means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note Pavlis 11:14.docx  -4-

CONFIDENTIAL          KCF008326

**A152**

Company is cancelled or converted or a combination thereof occurs.  The term "**Change of Control Payment**" means an amount equal to one (1) times the outstanding principal amount of such Note.

       8.    *Successors and Assigns*.  Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

       9.    *Waiver and Amendment*.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

       10.    *Transfer of this Note or Securities Issuable on Conversion Hereof*.  With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect).  Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company.  If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made.  Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions.  Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company.  Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

       11.    *Assignment by the Company*.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

       12.    *Notices*.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing.  All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

       13.    *Pari Passu Notes*.  Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes.  In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note Pavlis 11:14.docx   -5-

**A152**

 KCF008327

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

14.    *Usury*.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

15.    *Waivers*.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

16.    *Governing Law*.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

kcf Form of Convertible Note Pavlis 11:14.docx    -6-

**CONFIDENTIAL**                                                                                        **KCF008328**

**A154**

The Company has caused this Note to be issued as of the date first written above.

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name:  Michael Silberman
Title:  Executive Vice President

**A154**

CONFIDENTIAL

KCF008329

**A155**

# KEY COMMERCIAL FINANCE LLC

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of November 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

## RECITALS

A.      On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000. This Agreement and the Note shall be collectively referred to below as (the **"Transaction Documents"**).

B.      Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.      Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      *The Notes*.

(a)      *The Notes*.  Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

(b)      *Delivery*.  The sale and purchase of the Notes shall take place at a closing to be held on November 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 51 Bedford Rd., Katonah, NY 10536 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**").  At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note.  Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**").  At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price.  Each of the Notes will be registered in such Investor's name in the Company's records.

**A155**

    (c)    *Investor's Commitment to Fund the Closing; Binding Obligation.* Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I**. Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

    (d)    *Use of Proceeds.* The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

    (e)    *Payments.* The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

    2.    ***Representations and Warranties of the Company.*** The Company represents and warrants to each Investor that:

    (a)    *Due Incorporation, Qualification, etc.* The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

    (b)    *Authority.* The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

    (c)    *Enforceability.* Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

    (d)    *Non-Contravention.* The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws ("**Charter Documents**") or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

    (e)    *Approvals.* No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

-2-

**A156**

 KCF008331

stockholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby.

(f)     *No Violation or Default*.  The Company is not in violation of or in default with respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(g)     *Intellectual Property*.  To the best of its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights of, others.

3.     ***Representations and Warranties of Investors***.  Each Investor, for that Investor alone, represents and warrants to the Company upon the acquisition of the Note as follows:

(a)     *Binding Obligation*.  Such Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  Each of this Agreement and the Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)     *Securities Law Compliance*.  Such Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act of 1933 (the **"Securities Act"**), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available.  Such Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration.  Such Investor has not been formed solely for the purpose of making this investment and is purchasing the Note to be acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof.  Such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time.  Such Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act.

(c)     *Access to Information*.  Such Investor acknowledges that the Company has given such Investor access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by such Investor, and has furnished such Investor with all documents and other information required for such Investor to make an informed decision with respect to the purchase of the Note.

4.     ***Conditions to Closing of the Investors***.  Each Investor's obligations at the Closing or Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

-3-

**A157**

     KCF008332

**A158**

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

      (a)    *Representations and Warranties.* The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

      (b)    *Governmental Approvals and Filings.* Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

      (c)    *Legal Requirements.* At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

      (d)    *Proceedings and Documents.* All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

      (e)    *Transaction Documents.* The Company shall have duly executed and delivered to the Investors the following documents:

          (i)    This Agreement; and

          (ii)    Each Note issued hereunder.

    5.    ***Conditions to Obligations of the Company.*** The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

      (a)    *Representations and Warranties.* The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

      (b)    *Governmental Approvals and Filings.* Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

      (c)    *Legal Requirements.* At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

      (d)    *Purchase Price.* Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I**.

-4-

**A158**

CONFIDENTIAL

KCF008333

**A159**

6.    *Miscellaneous*.

(a)    *Waivers and Amendments*.  Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent.  Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto.  Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterparty signature page to this Agreement, together with a supplement to **Schedule I** hereto.  Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

(b)    *Governing Law*.  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(c)    *Survival*.  The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d)    *Successors and Assigns*.  Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(e)    *Registration, Transfer and Replacement of the Notes*.  The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes.  Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary.  Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered.  Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f)    *Assignment by the Company*.  The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

-5-

**A159**

KCF008334

**A160**

(g)      *Entire Agreement.*  This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(h)      *Notices.*  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I**, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(i)      *Payment of Fees and Expenses.*  Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

(j)      *Separability of Agreements; Severability of this Agreement.*  The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale.  Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors.  Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors.  If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(k)      *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.  Facsimile copies of signed signature pages will be deemed binding originals.

**A160**

CONFIDENTIAL                                                                                          KCF008335

**A161**

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

COMPANY:

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____
Name: Michael Silberman
Title: Executive Vice President

**A161**

**A162**

**INVESTORS**

DATE: 11-21-14

NAME: Frank E Pavlis

TITLE: Frank E Pavlis

**A162**

KCF008337

**A163**

## SCHEDULE I

| Name and Address | Closing Note Principal Amount |
|---|---|
| **Closing: November 30, 2014** | |
| **Frank Pavlis**<br>1500 Hamilton St.<br>Allentown, PA 18102 | $4,000,000 |

I-1

**A163**

CONFIDENTIAL

KCF008338

**A164**

**Exhibit A**

**FORM OF NOTE**

**A164**

CONFIDENTIAL

KCF008339

**A165**

**<u>Exhibit B</u>**

**DISCLOSURE SCHEDULE**

None.

**A165**

CONFIDENTIAL

KCF008340

# Exhibit 20

**A166**

| From: | Michael Silberman |
|---|---|
| Sent: | Wednesday, September 10, 2014 12:18 PM EDT |
| To: | Beecher, Jonathan |
| CC: | Justin Billingsley |
| Subject: | Docs |

jonathan
please prepare note docs for
Frank E. Pavlis
$1MM
interest rate for him is 17%
the distro list for this document is

cfo@mobile.co (me)
Jcb1114@aol.com
ceo@mobile.co (jeff)

he should be ready to wire $1MM
tomorrow, thursday 9/11
into the escrow account

tks

ps - i expect to convert all notes prior to end of october if not sooner
especially if frank invests another $2MM in preferred round


**Michael D. Silberman**
MBA, CPA, CGMA, CFE
**Co-Founder**
Executive VP / CFO
Mobile Corporation
m:(818) 262-0038
f:  (818) 975-5299
cfo@mobile.co
www.mobile.co



**A166**

CONFIDENTIAL