# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEBORAH S. SKEANS, Executrix of the ESTATE OF FRANK E. PAVLIS, *Plaintiff*, v. KEY COMMERCIAL FINANCE, LLC, KEY COMMERCIAL FINANCE PROPERTIES, LLC, EQUITY PROS, LLC, and MOBILE AGENCY, LLC *Defendants*. | C.A. No. 1:18-cv-01516-CFC |

## DEFENDANTS' CONCISE STATEMENT ADMITTING AND DISPUTING PLAINTIFF'S ASSERTED FACTS

**HALLORAN FARKAS + KITTILA LLP**

Theodore A. Kittila (No. 3963)
James G. McMillan, III (No. 3979)
William E. Green, Jr. (No. 4864)
5801 Kennett Pike, Suite C
Wilmington, Delaware  19807
Phone:  (302) 257-2025
Fax:  (302) 257-2019
Email:  tk@hfk.law / jm@hfk.law / wg@hfk.law

Dated:  August 31, 2020            *Counsel for Defendants*

In accordance with Paragraph 11(b) of the Court's October 31, 2019 Scheduling Order [D.I. 37], Defendants submit the following concise statement that admits or disputes the facts set forth in Plaintiff's Concise Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment, filed August 17, 2020 [D.I. 84] ("Plaintiff's CSMF"), and sets forth the material facts as to which Defendants contend there exists a genuine issue necessary to be litigated.[1]

**Plaintiff's CSMF ¶A:** Between January and May 2014, Pavlis invested $7,000,000 in Allwest.

**Response:** Admitted. However, Mr. Pavlis understood that his investment in Allwest was ultimately intended to fund a startup company to develop a technology platform to facilitate real estate transactions, and negotiated and revised the terms of his investment in KCF over a period of months. *See* DCSF ¶13-15.

**Plaintiff's CSMF ¶1:** Frank E. Pavlis ("Pavlis") was first introduced to Justin Billingsley ("Billingsley") in 2012. (A9-10.) At that time, Pavlis was a 95-year old widower living in Allentown, Pennsylvania. Although Pavlis had accumulated significant wealth, he lived an extremely modest lifestyle. (A7-8).

---

[1] References to Defendants' Concise Statement of Facts, filed August 17, 2020 [D.I. 80] ("DCSF") appear in the format "DCSF ¶__." References to the Appendix to Defendant's Concise Statement of Facts [D.I. 81-1] appear as "DA-__." and Defendant's Supplemental Appendix ("DSA"), filed contemporaneously herewith, appear in the format "DSA-__." For ease of reference, the facts asserted in Plaintiff's CSMF are set forth herein. The quoted facts asserted in Plaintiff's CSMF are not included in the word count calculated for the Certificate of Compliance.

**Response:** Admitted. However, Plaintiff and her husband introduced Billingsley to Mr. Pavlis. DCSF ¶¶ 6, 8.

> **Plaintiff's CSMF ¶2:** Billingsley held himself out as a financial professional with extensive experience in estate planning and finance, among other areas. (See A17).

**Response:** Defendants dispute the characterization of Billingsley's professional experience set forth in Paragraph 2. Defendants admit that Plaintiff's Appendix A17 is Billingsley's resume as it appears on LinkedIn.

> **Plaintiff's CSMF ¶3:** Throughout 2012 and 2013, Billingsley befriended Pavlis, and he became familiar with Pavlis' financial situation. (A22-25). Having cultivated Pavlis' friendship and trust over the course of almost two years, Billingsley solicited Pavlis to invest in an entity known as Allwest Investments, LLC ("Allwest").

**Response:** Admitted; however, Plaintiff and her husband introduced Billingsley to Mr. Pavlis, and Plaintiff was present at various meetings between Billingsley and Mr. Pavlis where Mr. Pavlis' investments were discussed. DCSF ¶¶ 6, 8.

> **Plaintiff's CSMF ¶4:** Allwest was formed in 2011 by Gary Miller, whom Billingsley had met through their shared religious affiliation. (A42). Allwest was a real estate venture that purchased distressed residential properties, rehabilitated them, and either sold or rented the renovated properties for a profit. (A44). In early 2014, Billingsley approached Miller about working with investors. (A43).

**Response:** Admitted.

> **Plaintiff's CSMF ¶5:** Pavlis was one of those investors. On January 28, 2014, at Billingsley's solicitation, Pavlis signed an Allwest Subscription Agreement, under which Pavlis agreed to invest $1,000,000 in a two-year Note issued by Allwest.

**Response:** Admitted.

**Plaintiff's CSMF ¶6:**  Pavlis invested an additional $6,000,000 in Allwest several months later.  On May 20, 2014, Pavlis signed another Allwest Subscription Agreement, confirming his intent to invest $6,000,000 in Allwest two-year Notes.  (*See* A65-77).  Three days later, on May 23, 2014, Pavlis wrote a personal check made payable to "Allwest Investments" and Miller deposited the check in Allwest's bank account.

**Response:**  Admitted.

**Plaintiff's CSMF ¶7:**  Notably, Allwest received these funds without issuing a corresponding Note.  Indeed, it appears that neither Miller nor Billingsley even knew what the terms of the Note were or would be.  When Billingsley e-mailed Pavlis' signed Subscription Agreement and Investor Questionnaire to Miller on May 30, 2014, he wrote:

> Please see the attached sub agreement for Frank's $6m.  This is 100% of what we need Frank to sign.  *Once we are together we will need to work out the terms of the note*.  The note is never signed by him though as he is already subscribed to it.  You are the one that signs the note and then we give Frank all the docs for his keeping.

(*See* A78) (Emphasis added.)  Billingsley undertook to draft the Note on behalf of Allwest.  (A48-49).

**Response:**  Defendants dispute the last sentence of Paragraph 7, on the grounds that it mischaracterizes Gary Miller's testimony, which indicates his understanding that Mr. Billingsley's legal team was preparing an Allwest note that would be acceptable to Mr. Pavlis.  (A48-49).  The remainder of Paragraph 7 is admitted.

**Plaintiff's CSMF ¶8:**  On December 1, 2014, Billingsley sent Miller a draft Allwest Promissory Note in favor of Pavlis.  (*See* A79).  Following revisions, Miller signed the Allwest Promissory Note on December 16, 2014.  (*See* A83-85).  Notably, the Note itself was dated May 20, 2014, to correspond with the $6,000,000 investment Pavlis made in May 2014.  (*Id.*)

**Response:**  Admitted.

4

**Plaintiff's CSMF ¶B:** Billingsley Concocts A Scheme to Transfer Pavlis' Allwest Investments to KCF.

**Response:** Disputed. Mr. Pavlis understood that the return on his investment in Allwest was ultimately intended to fund a startup company to develop a technology platform to facilitate real estate transactions, and Mr. Pavlis negotiated the terms of his investment in KCF over a period of months. DCSF ¶¶ 13-15.

**Plaintiff's CSMF ¶9:** At the same time he and Miller were finalizing the $6,000,000 Allwest Note to Pavlis, Billingsley conceived of a scheme to transfer the $7,000,000 that Pavlis had previously invested in Allwest to KCF, an entity which Billingsley effectively – albeit not legally – controlled.

**Response:** Disputed. Mr. Pavlis understood that his investment in Allwest was ultimately intended to fund a startup company to develop a technology platform to facilitate real estate transactions, and amended the terms of his participation in KCF at various times as the arrangement evolved. DCSF ¶¶ 13-15.

**Plaintiff's CSMF ¶10:** KCF was formed on December 10, 2014, as a limited liability company under Delaware law. (*See* A86-87). KCF was a "Single Member Managed Limited Liability Company" formed by George Chadwick Self ("Self"), Billingsley's cousin. (*See* A88-94).

**Response:** Defendants admit that KCF was formed on December 10, 2014, as a "Single Member-Managed Limited Liability Company" under Delaware law by George Chadwick Self ("Self"). Defendants deny that Self is Billingsley's cousin. Self is Billingsley's brother-in-law.

**Plaintiff's CSMF ¶11:** Self and Billingsley first discussed forming KCF *after* Self moved from North Carolina to New York in late November 2014. (A102-03). Self also prepared KCF's formation documents after he arrived in New York. (A110-12).

5

**Response:** Disputed. Mr. Self's testimony is inconclusive with respect to when in 2014 he initiated the process of forming KCF. DSA-1 (Self 44:19-45:7; 50:6-52:10). When asked about the disparity in dates between August 18, 2014 Subscription Agreement and the December 10, 2014 Certificate of Formation, Self explained that filing the Certificate of Formation "did seem like it took a while" and that it was not surprising to him that KCF was seeking funding in August 2014. DSA-1 (Self 76:3-16.) Self testified that it was his understanding that Pavlis invested after KCF was formed. DSA-1 (Self 79:12-22; 108:5-7.)

> **Plaintiff's CSMF ¶12:** KCF was formed on December 10, 2014, as a limited liability company under KCF's Operating Agreement made clear that the "management of the business is invested in the Member." (A90 at ¶ 4.1). Self was KCF's sole Member. (A94). As such, only Self had the authority to make management decisions on KCF's behalf.

**Response:** Defendants admit the quoted passage is an accurate excerpt of KCF's Operating Agreement, dated December 10, 2014, and that Self was KCF's sole Member. Defendants dispute the legal conclusion asserted in the last sentence of Paragraph 12, because under Delaware law, "a member or manager of a limited liability company has the power and authority to delegate to one or more other persons any or all of the member's or manager's ... rights, powers and duties to manage and control the business and affairs of the limited liability company." 6 *Del. C.* § 18-407.

> **Plaintiff's CSMF ¶13:** The Operating Agreement also authorized Self, as its sole Member, "*to execute and deliver . . . (c) all promissory notes, loans,*

6

> *security agreements, and other similar documents, and (d) all other instruments of any other kind relating to the Company's affairs, whether like or unlike the foregoing.*" (*Id.*) (Emphasis added.) Self also applied for and received an Employer Identification Number ("EIN") from the Internal Revenue Service ("IRS") on December 10, 2014. (*See* A 117-18). Thus, only Self had the authority to execute promissory notes on behalf of KCF.

**Response:** Defendants admit the quoted passage is an accurate excerpt of KCF's Operating Agreement, and admit that Self applied for and received an Employer Identification Number from the Internal Revenue Service on December 10, 2014. Defendants dispute the legal conclusion asserted in the third sentence of Paragraph 13, because under Delaware law, "a member or manager of a limited liability company has the power and authority to delegate to one or more other persons any or all of the member's or manager's ... rights, powers and duties to manage and control the business and affairs of the limited liability company" and further provides that the delegation "shall not ... cause the person to whom any such rights, powers and duties have been delegated to be a member or manager." 6 *Del. C.* § 18-407.

> **Plaintiff's CSMF ¶14:** At the time he formed KCF, Self was unaware of any funding that had been secured for the entity, and Billingsley did not indicate that he had lined up any funding for KCF. (A108-09). However, within days of KCF's formation, Billingsley approached Miller with a proposition. Despite having just signed the Allwest Note confirming its $6,000,000 indebtedness to Pavlis, Miller and Billingsley engaged in a discussion regarding an alternative scheme. Billinglsey presented Miller with two options for moving forward with their relationship — either honor the Notes Allwest issued to Pavlis (and continue to pay Billingsley his consulting fee) or transfer Pavlis' investment funds to KCF. (A50-51; *see also* A119-21).

7

**Response**:  The first sentence of Paragraph 14 is admitted.  Defendants dispute Plaintiff's characterization of the email exchange excerpted at A50-51 and A119-21, but admit that the contents of the email exchange excerpted at A119-21 are accurate.

> **Plaintiff's CSMF ¶15:**  Miller responded: "The funds we are holding will only be sent to [KCF] once a [joint venture] is in place and we complete the operating agreement with Frank and provide [sic] sign by all parties." (*Id*.) Inexplicably, Miller began transferring Pavlis' Allwest investment funds to KCF by late December 2014, without any "operating agreement" with Pavlis – indeed, without any documentation indicating that Pavlis was aware of or approved the transfer of his Allwest investment to KCF.

**Response**:  The first sentence of Paragraph 15 is admitted.  The second sentence of Paragraph 15 is disputed, as Mr. Pavlis was aware that his Allwest investment was ultimately intended to fund a start-up technology company, and had negotiated and revised the terms of his investment in KCF over a period of months.  DCSF ¶13-15; DSA-1 (Self 331:10-15).

> **Plaintiff's CSMF ¶16:**  Between December 2014 and May 2018, Allwest transferred $6,000,000 of Pavlis' investment funds to KCF. (*See* A122-23; *see also* A124-29.)  Allwest also transferred to KCF title to six properties, valued at roughly $1,000,000, that Allwest had purchased with Pavlis' funds. (*See* A122-23.)

**Response**:  Admitted.

> **Plaintiff's CSMF ¶C:**  Billingsley Fabricates KCF Notes to Pavlis to Paper Over KCF's Misappropriation of Pavlis' Funds.

**Response**:  Disputed.  Plaintiff's CSMF sets forth no factual support for the contention that the KCF Notes were "fabricated" or that KCF misappropriated

8

Pavlis' funds. Rather, deposition testimony and discovery show that KCF deployed the funds, developed the technology platform, and was in talks to sell the platform to a player in the real estate industry. *See, e.g.,* DSA-1 (Self 54:11-15; 94:17-97:13; 102:24-103:7; 152:22-153:9; 156:6-157:7); DA-6 (Billingsley 211:5-7; 274:15-19; 282:5-9; 310:7-14).

> **Plaintiff's CSMF ¶17:** KCF has produced two Convertible Promissory Notes (together with corresponding Note Purchase Agreements) that KCF allegedly issued to Pavlis in September and November 2014.

**Response:** Admitted.

> **Plaintiff's CSMF ¶18:** The first Note purports to have been issued by KCF on September 1, 2014 (the "September Note"). (*See* A130-47.) On its face, the September Note relates to a $3,000,000 investment that Pavlis allegedly made in KCF. (*Id.*) The term of the Note is five years – meaning that Pavlis would not be repaid until he was almost 102 years old – and it was to pay eight percent (8%) interest annually. (*Id.*) However, the interest was not payable until the Note matured in 2018. (*Id.*)

**Response:** Admitted.

> **Plaintiff's CSMF ¶19:** The second KCF Note purports to have been issued on November 1, 2014. (the "November Note"). (*See* A148-65). The November Note is identical to the September Note, except (i) it relates to an alleged $4,000,000 investment that Pavlis made in KCF, and (ii) its term is six years, meaning that KCF did not have to repay Pavlis any principal or interest until November 2020, when Pavlis would have been 103 years old. (*Id.*)

**Response:** Admitted.

> **Plaintiff's CSMF ¶20:** Both the KCF Notes and their corresponding Note Purchase Agreements purport to be signed on behalf of KCF by Michael Silberman ("Silberman") as its "Executive Vice President." Silberman was never an employee of KCF, and he was never authorized to sign any Notes on its behalf. Self, KCF's sole member, never made Silberman Executive Vice

> President of KCF, and he never heard of anyone referring to him as such. (A115-16.) Silberman had no role whatsoever at KCF. (A114).

**Response:** The first sentence of Paragraph 20 is admitted. The second sentence of Paragraph 20 is disputed, because under Delaware law, "a member or manager of a limited liability company has the power and authority to delegate to one or more other persons any or all of the member's or manager's ... rights, powers and duties to manage and control the business and affairs of the limited liability company." 6 *Del. C.* § 18-407. The third sentence of Paragraph 20 is admitted. The fourth sentence of Paragraph 20 is disputed. Self's testimony, relied on by Plaintiff, is inconclusive on this point, as Self states "not to my knowledge, no." *See* A114.

> **Plaintiff's CSMF ¶21:** It is unclear how Silberman's name came to be on the KCF Notes and Note Purchase Agreements. What is clear, however, is that Silberman never had authority to sign anything on behalf of KCF.

**Response:** Disputed. Under Delaware law, "a member or manager of a limited liability company has the power and authority to delegate to one or more other persons any or all of the member's or manager's ... rights, powers and duties to manage and control the business and affairs of the limited liability company" and further provides that the delegation "shall not ... cause the person to whom any such rights, powers and duties have been delegated to be a member or manager." 6 *Del. C.* § 18-407.

10

Dated:  August 31, 2020                             **HALLORAN FARKAS + KITTILA LLP**

*/s/ Theodore A. Kittila*
Theodore A. Kittila (Nol. 3963)
James G. McMillan, III (No. 3979)
William E. Green, Jr. (No. 4864)
5801 Kennett Pike, Suite C/D
Wilmington, DE  19807
Phone: (302) 257-2025
Email:  tk@hfk.law / jm@hfk.law / wg@hfk.law