# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEBORAH S. SKEANS, Executrix of the ESTATE OF FRANK E. PAVLIS, *Plaintiff*, v. KEY COMMERCIAL FINANCE, LLC, KEY COMMERCIAL FINANCE PROPERTIES, LLC, EQUITY PROS, LLC, and MOBILE AGENCY, LLC *Defendants*. | C.A. No. 1:18-cv-01516-CFC |

## SUPPLEMENTAL APPENDIX TO DEFENDANTS' CONCISE STATEMENT ADMITTING AND DISPUTING PLAINTIFF'S ASSERTED FACTS

**HALLORAN FARKAS + KITTILA LLP**

Theodore A. Kittila (No. 3963)
James G. McMillan, III (No. 3979)
William E. Green, Jr. (No. 4864)
5801 Kennett Pike, Suite C
Wilmington, Delaware 19807
Phone: (302) 257-2025
Fax: (302) 257-2019
Email: tk@hfk.law / jm@hfk.law / wg@hfk.law

Dated: August 31, 2020                    *Counsel for Defendants*

| Description | Date | Bates No. | Tab | Page |
|---|---|---|---|---|
| Deposition of George Chadwick Self (excerpts) | NA | NA | DA-22 | A-220 |

# DA-22

```
                                                        Page 1

 1         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 2
                          - - -
 3
     DEBORAH S. SKEANS,           :   CIVIL ACTION
 4   Executrix of the ESTATE      :   NUMBER
     OF FRANK E. PAVLIS,          :   1:18-cv-01516-
 5              Plaintiff,        :   CFC
               v.                 :
 6   KEY COMMERCIAL FINANCE,      :
     LLC, KEY COMMERCIAL          :
 7   FINANCE PROPERTIES, LLC,     :
     EQUITY PROS, LLC, and        :
 8   MOBILE AGENCY, LLC,          :
                Defendants.       :
 9
                          - - -
10
                 Monday, April 20, 2020
11
                          - - -
12
13         Oral deposition of GEORGE CHADWICK
14   SELF, taken remotely via Zoom, at 260 McManus
15   Road North, Patterson, New York 12563,
16   beginning at 9:31 a.m., reported
17   stenographically by Cheryl L. Goldfarb, a
18   Registered Professional Reporter, Notary
19   Public, and an approved reporter of the United
20   States District Court.
21                        - - -
22
              VERITEXT LEGAL SOLUTIONS
23               MID-ATLANTIC REGION
           1801 Market Street - Suite 1800
24        Philadelphia, Pennsylvania  19103
```

GEORGE CHADWICK SELF

Page 42

1  Q.   Thank you.
2       What is Key Commercial Finance
3  or Key?
4  A.   It's an LLC.
5  Q.   Do you recall when it was
6  formed?
7  A.   I want to say around 2014 or so.
8  Q.   I'll represent to you --
9       MR. MAHONEY:  In fact, Cam, can
10      we throw up CHRON001.
11          - - -
12      (Whereupon, Exhibit P-1 is
13      marked for identification.)
14          - - -
15 BY MR. MAHONEY:
16 Q.   And Mr. Self, because this is
17 video, it's all a little bit different.  I'll
18 confess, this is the first time that I've used
19 this technology in a deposition.  So hopefully
20 it will go smoothly, but I can't guarantee it.
21 But on the screen should be a document.  There
22 it is.
23      Can you see that?
24 A.   It's small.  Let me see if I can

Page 43

1  blow it up a little bit.
2       (Pause)
3       Okay.  I can see it.
4  Q.   I'll represent to you that's a
5  document that was produced by the defendants in
6  this litigation.  And there are two pages to
7  this document.  The first page is the
8  Certificate of Formation of Key Commercial
9  Finance, LLC on December 10th of 2014.
10      You don't have any reason to
11 doubt that, do you?
12 A.   No.  I mean, that looks correct.
13 Q.   Again, I'm just trying to get
14 the timing down.
15 A.   Okay.
16 Q.   So when Key was formed, were you
17 living in New York at that time?
18 A.   Yes.
19 Q.   Okay.
20 A.   Yes, I would have been.  So --
21 so, again, that -- that may put my arrival in
22 New York at November of 2014.
23 Q.   Okay.  Understood.
24      MR. MAHONEY:  And, Cam, if we

Page 44

1  can -- or maybe I can do it.
2       Cam, you know what?  Can you
3  just scroll to the next --
4       MS. REDFERN:  (Complies.)
5       MR. MAHONEY:  There we go.
6  Thank you.
7  BY MR. MAHONEY:
8  Q.   Mr. Self, this is the
9  Certificate of Formation for Key.  And you'll
10 see at the bottom where it's your signature, at
11 least your electronic signature, as the
12 authorized person.
13      Is it your understanding that
14 you were the one who actually filled it out or
15 at least signed off on this Certificate of
16 Formation for Key?
17 A.   Yeah, I think that -- I think
18 that is correct, yes.
19 Q.   Okay.  Now, tell me, prior to
20 December 10th of 2014, when you submitted this
21 Certificate of Formation, when is the first
22 time you heard of an entity called Key
23 Commercial Finance or at least discussed the
24 creation of that entity?

Page 45

1  A.   It would have -- it would have
2  been sometime before that, for sure.
3  Q.   I assume that's the case.  I'm
4  just trying to get a sense of how long before
5  that.
6  A.   I'm not sure I can -- I mean,
7  I'm not sure I can really answer that question.
8  We had talked about forming an entity.  I think
9  Key Commercial is the name that we settled on.
10 Q.   Who is "we"?
11 A.   Justin and I.
12 Q.   And what was the purpose of
13 forming this entity?
14 A.   Key was going to be the -- the
15 funding body for the platform that -- yeah.
16 Q.   At the time that you had
17 submitted the Certificate of Formation in
18 December of 2014, did you have an understanding
19 as to where Key was going to get its funding?
20 A.   No.  No, I don't -- I think the
21 idea was that we would use some of our own
22 money and we would have investors.  But I
23 don't -- I don't know that we -- or that I knew
24 exactly who they were going to be at that

Page 46

1 moment.
2    Q.    Did you even know, as of
3 December of 2014, whether anyone had lined up
4 any funding or any investors for Key?
5    A.    No, I didn't. I don't think so,
6 no.
7    Q.    Did Mr. Billingsley indicate to
8 you that he had lined up any investors as of
9 December of 2014?
10   A.    No. I think that was part of
11 our -- you know, that was part of our, what I
12 would say -- our partnership agreement, at
13 least, in my head was that Justin had those
14 connections, and so he would be providing them.
15   Q.    At the time Key was formed in
16 December of 2014, apart from you as the
17 member -- and I'll represent to you that you're
18 the sole member of Key.
19         Do you understand that?
20   A.    Yes.
21   Q.    Okay.
22   A.    Well, yeah.
23   Q.    Pardon me?
24   A.    Yes.

Page 47

1    Q.    Apart from you as a member and
2 Mr. Billingsley playing some role, as of
3 December of 2014, did Key have any other
4 employees?
5         MR. GREEN: Object to the form.
6 BY MR. MAHONEY:
7    Q.    You can answer.
8    A.    I don't believe it did.
9    Q.    Do you recall who the first
10 employee or employees were of Key?
11   A.    I don't -- it's not my
12 recollection that Key had employees.
13   Q.    Ever?
14   A.    I think Key -- I think Equity
15 Pros had employees.
16   Q.    Okay. We'll get to this later
17 in the day, because we're going to go through
18 some of the financial documents that were
19 provided to us in this case. It certainly
20 appears that Equity Pros had regular payroll,
21 et cetera. So that makes perfect sense.
22        But sitting here today, you
23 don't have any recollection or belief that Key
24 Commercial ever had an employee; is that

Page 48

1 correct?
2    A.    I don't remember setting up an
3 employee payroll for Key.
4    Q.    Is it fair to say that as the
5 sole member of Key, if it had employees, you
6 would have known about it?
7    A.    No, not necessarily.
8    Q.    Why do you say "not
9 necessarily"?
10   A.    Because -- well, I mean, again,
11 employees require payroll, right? And I don't
12 remember setting up a payroll. I know Key paid
13 people, so perhaps as contractors or 1099s.
14        Again, my, I guess, lane, if you
15 want to call it a lane, for Key, at least in my
16 mind, was that Key was going to help with the
17 funding for the platform and the things related
18 to the platform, particularly by finding
19 investors for the platform. It was always our
20 goal to make Key a 50/50 partnership.
21   Q.    You mean 50/50 between or among
22 whom?
23   A.    Between Justin and I. It was
24 initially -- I think it was initially set up

Page 49

1 the way it was simply because I filled out the
2 forms, you know, myself. And it was not -- I
3 don't think it was my -- our intention to have
4 a solely owned, you know, one person in charge
5 of everything, making imperious decisions kind
6 of -- kind of stuff.
7    Q.    Okay. So put aside whether it
8 was documented or not.
9    A.    Okay.
10   Q.    In your mind, at least, you
11 viewed Key as a partnership -- I don't mean in
12 a legal sense, but in a practical working
13 sense -- between you and Mr. Billingsley; is
14 that fair?
15   A.    Yeah.
16   Q.    Okay. By the way, you said that
17 you're the one who prepared the documentation?
18   A.    I think I -- I used a -- go
19 ahead. I'm sorry, finish the question. I
20 didn't hear that last part.
21   Q.    Yes, okay. I think you said
22 that you're the one who actually prepared the
23 paperwork necessary to create Key as a
24 corporate entity; is that right?

Page 50

```
 1        MR. GREEN:  Objection.  I think
 2   that mischaracterizes his testimony.
 3        MR. MAHONEY:  Okay.  Well, he
 4   can tell me.
 5        MR. GREEN:  You can answer.
 6        A.   There's a company called UCI, I
 7   believe, out of Delaware.  They assist with
 8   forming Delaware LLCs.  It's called a
 9   registered agent.  So I was in contact with
10   them.
11   BY MR. MAHONEY:
12        Q.   Do you recall when you first
13   reached out to them?
14        A.   No.  It would have been in 2014,
15   I'm sure, but I don't know.
16        Q.   But in relation to when you
17   actually got the Certificate of Formation on
18   December 10th of 2014, was it a month before
19   that?  Weeks before that?  Longer?  Shorter?
20        A.   I couldn't tell you.  It was a
21   little while before we got the certificate for
22   sure.  I mean, in internet speed, it was pretty
23   slow.
24        Q.   What does that mean?  Does that
```

Page 51

```
 1   mean from the time you submitted the paperwork
 2   to them until you got the certificate, was
 3   it --
 4        A.   It felt like a while.  But I
 5   don't know what -- how much time.  I mean,
 6   when -- when you expect Amazon deliveries, you
 7   know, the next day --
 8        Q.   Yeah.
 9        A.   -- the LLC formations feel slow.
10        Q.   Okay.  Again, are we talking
11   that you felt you waited a month or was it --
12        A.   You know, I wouldn't --- sorry,
13   I don't remember.
14        Q.   That's all right.  During the
15   time from when you submitted the paperwork --
16   was it to UCI?
17        A.   I believe so.
18        Q.   Okay.  -- until you received the
19   Certificate of Formation, did Key conduct any
20   business, to your knowledge?
21        A.   Well, I mean, I don't know, no,
22   because I would have to know how long it took.
23   So, I'm sorry, I don't know.
24             I know we were setting up Key.
```

Page 52

```
 1   I just remember that there was this time period
 2   where we were trying to get Key set up.
 3        Q.   What does that mean, trying to
 4   get set up?  What do you recall being involved
 5   in that?
 6        A.   Mailing address, you know,
 7   formation.  We were just trying to get our sort
 8   of organization done, and, you know, while at
 9   the same time planning for the -- the platform
10   and, you know, all those other things.
11        Q.   Apart from Mr. Billingsley, did
12   anyone else assist you in preparing for the
13   platform or doing anything in connection with
14   Key prior to December 10th of 2014?
15        A.   We might have had some -- some
16   like business coach style stuff with some --
17   with some folks, but nothing -- and probably
18   some legal help, like Wilson Sonsini.  What's
19   the name of that group?  There was some other
20   lawyers out of Phoenix.
21        Q.   Snell & Wilmer?
22        A.   That sounds familiar.
23        Q.   What do you recall Wilson
24   Sonsini doing on behalf of Key?
```

Page 53

```
 1        MR. GREEN:  I'm going to just
 2   jump in.  This isn't really an objection,
 3   but to the extent that this is
 4   attorney-client privileged, don't
 5   disclose it.  But you can disclose the
 6   nature of the work.
 7        You can answer.
 8        THE WITNESS:  I'm sorry.
 9        A.   So are you asking me how I knew
10   Wilson Sonsini?
11   BY MR. MAHONEY:
12        Q.   Yes.  Well, I didn't ask that,
13   but let's start there.
14             How did you know Wilson Sonsini?
15        A.   I never met anyone there.  I
16   knew the name from the Mobile Co.  I think they
17   did a lot of the fund-raising side of
18   Mobile Co.
19        Q.   Now, in connection with Key,
20   what's your understanding of the nature of the
21   work that Wilson Sonsini did for Key?
22        A.   Well, I don't -- I don't know
23   that they did anything offhand.  I mean, I'm
24   not trying to be -- I don't know that they did
```

14 (Pages 50 - 53)

Page 54

1  anything.  That's just a name that popped into
2  my head as I was doing it.
3           We would have probably talked to
4  those guys about how to set up ourselves for a
5  raise.  But that's kind of out of my depth.
6  That's really not what -- what I was brought in
7  for.
8      Q.     What's your understanding of
9  what your role was at Key?
10     A.     ==As far as the platform==
11 ==development, my job was to transfer what the==
12 ==expectations of a user would be, whether it's==
13 ==the homeowner or a buyer, and then translate==
14 ==that into design and code, managing programming==
15 ==teams and design teams.==
16     Q.     Do you know whether Key had any
17 sort of written business plan or business model
18 when it began?
19     A.     I'm sure it would have, but I --
20 I don't -- I don't know offhand.  I mean, we
21 wouldn't have started it without something.
22     Q.     If I wanted to find that, where
23 would I find it?
24            MR. GREEN:  Objection.  I think

Page 55

1     that mischaracterizes what he was talking
2     about.
3  BY MR. MAHONEY:
4      Q.     You can answer the question,
5  Mr. Self.
6      A.     Justin has a Dropbox.  We would
7  have had kind of workflow diagrams, perhaps, of
8  how things would work for, you know,
9  partnerships and that kind of stuff going
10 forward.
11            It's my understanding that you
12 guys have that Dropbox, correct?
13     Q.     I have no idea if we have it or
14 not.
15            Do you recall seeing such
16 documents or flow diagrams, et cetera, that you
17 mentioned?
18     A.     I saw one -- one of the ones
19 that -- we went over one on our meeting.
20            MR. GREEN:  I'm going to ask you
21     to not go into too deeply about what we
22     talked about.
23 BY MR. MAHONEY:
24     Q.     Well, having seen that document,

Page 56

1  did that refresh your recollection that there
2  was at least one such diagram?
3      A.     Yes.
4      Q.     Do you recall other documents
5  that you would consider to be, in sum or
6  substance, a business plan for Key?
7      A.     Not that -- not that I recall.
8  But we -- I'm sure -- it would seem that there
9  would be, just because of how we typically
10 operate.
11     Q.     Okay.
12            MR. KITTILA:  Bill, just for the
13     record, in the preparation, he was
14     prepped with documents that were produced
15     to you, only documents that were produced
16     to you.
17            MR. MAHONEY:  Okay.  I
18     appreciate that, Ted.  Thank you.
19 BY MR. MAHONEY:
20     Q.     Key is formed as a Delaware LLC
21 December of 2014.
22            At that point, did Key have
23 office space?
24            And you know what?  I don't want

Page 57

1  to be coy with you.  I'm looking at another
2  document here.  It's actually the articles --
3  I'm sorry, the operating agreement for Key
4  Commercial.  And it indicates that the
5  principal place of business was 1511 Route 22,
6  Suite 152 in Brewster, New York.
7            Mr. Self, are you familiar with
8  that address?
9      A.     Yes.
10     Q.     What is it?
11     A.     It's a mailbox.
12     Q.     At the time that Key was formed,
13 did it have any physical office space?
14     A.     My deal with Mobile Co. was that
15 I had a home office.  So that home office
16 existed.  We didn't have like a real estate
17 storefront at that time, I don't believe.
18     Q.     Okay.  Did there come a time
19 when Key did have -- you say "real estate
20 storefront" -- but some physical office space,
21 separate and apart from somebody's home office?
22     A.     I don't believe it would be
23 under Key.  I think Equity Pros had an office.
24 I mean, I know Equity Pros had an office in

15 (Pages 54 - 57)

Page 74

1  MR. KITTILA:  Bill, can you
2  clean up the record a little bit on that,
3  then?
4     I think P-1 was the Certificate
5  of Formation.  Am I right, Cam, on that
6  one?
7     MS. REDFERN:  Yes.
8     MR. KITTILA:  And then P-2 was
9  just the private placement memo that we
10 just saw?
11    MS. REDFERN:  Yes.
12    MR. KITTILA:  And then I guess,
13 Bill, I don't want to steal your thunder,
14 but this looks like P-3 coming up?
15    MR. MAHONEY:  Yes.
16    MR. KITTILA:  All right.
17        - - -
18    (Whereupon, Exhibit P-3 is
19 marked for identification.)
20        - - -
21    MR. MAHONEY:  Okay.  Terrific.
22 Thank you.
23 BY MR. MAHONEY:
24    Q.   Mr. Self, P-3 is what purports

Page 75

1  to be a Subscription Agreement of Key
2  Commercial Finance, LLC.  It's effective as of
3  August 18th of 2014.
4     Have you ever seen this document
5  before?
6     A.   I don't -- I don't believe I
7  have.
8     Q.   Are you surprised to see that
9  this is now the second document relating to
10 some form of offering to raise money for Key
11 that you haven't seen before?
12    MR. GREEN:  Objection to form.
13    But you can answer.
14    A.   Well, again, Justin and I agreed
15 that he was going to be out raising money for
16 Key.  How -- you know, the -- the form of the
17 raise, we didn't -- I didn't speculate -- it's
18 really not my area of expertise, so.
19 BY MR. MAHONEY:
20    Q.   I understand that.  That's not
21 quite what I'm asking, though.
22    Are you surprised that there are
23 documents relating to a potential capital raise
24 for Key that you had not seen before today?

Page 76

1  A.   No, I'm not overly surprised;
2  no.
3     Q.   Are you surprised that these
4  documents are dated in August, well before Key
5  was even formed?
6     MR. GREEN:  Object to the form.
7     You can answer.
8     A.   It's puzzling.  But, again, I
9  mean, we were going to be raising money.  So,
10 yeah, I don't -- I don't -- I can't explain the
11 dates, per se.  But it may have been a
12 negligence on my part in the filing.  I don't
13 know.  It did seem like it took a while.
14    But, you know, it's not
15 surprising to me that there are these documents
16 that we were collecting funding for sure.
17 BY MR. MAHONEY:
18    Q.   Okay.  And do you have any idea
19 where these documents were maintained at Key?
20    A.   I felt like -- well, again, I
21 don't -- I don't know -- they were not
22 maintained in my control.  I guess I assumed
23 that the loan agreement, whatever, would be
24 with the law firms that -- that Justin was

Page 77

1  using, like if it was Sonsini or if it was
2  Snell.
3     MR. MAHONEY:  Cam, I'm sorry,
4  you can take that down.
5     THE WITNESS:  Can I just -- I
6  just need to get a tissue.  I'll be right
7  back.
8     MR. MAHONEY:  Sure.
9     THE WITNESS:  Okay.  Sorry about
10 that.  My allergies are playing up a
11 little today.
12    MR. MAHONEY:  No, that's fine.
13 BY MR. MAHONEY:
14    Q.   Mr. Self, when did you first
15 become aware that Mr. Pavlis either had or was
16 contemplating making any investment in Key?
17    A.   I don't -- I don't know that I
18 could put a date on it.  It is something
19 that -- that Justin and I talked about.
20    Q.   Okay.
21    A.   But I don't -- I couldn't put a
22 date on it.
23    Q.   To the best of your
24 recollection, what did you and Mr. Billingsley

Page 78

1  discuss?
2     A.     That Mr. Pavlis was going to
3  invest in Key and help us build that platform.
4     Q.     Did he tell you anything else
5  about it?
6     A.     Like -- like what?
7     Q.     Like anything.
8     A.     I'm not sure -- all right.  So
9  that there was going to be an investment, yes.
10 That it was going to help us build our
11 platform, yeah.  And I think it was -- it was
12 going to be -- there's a lot of money.  But,
13 yeah, that's kind of what we had talked about.
14    Q.     Did you get any understanding
15 from Mr. Billingsley as to when or under what
16 circumstances he had discussed this with
17 Mr. Pavlis?
18    A.     When you say "under what
19 circumstances" --
20    Q.     I'm sorry, I missed you there.
21    A.     When you're saying, "under what
22 circumstances," what's the --
23    Q.     Yes.  Did Mr. Billingsley
24 indicate to you what he discussed with

Page 79

1  Mr. Pavlis and, for example, when did the
2  discussions take place, how was it that
3  Mr. Pavlis came to agree to invest money?
4  Anything along those lines?
5     A.     No, not per se.  My -- my
6  intuition was that Mr. Pavlis and Justin had
7  regular conversations.  But I wasn't -- I
8  wasn't part of them.  I think he was -- he went
9  to see Mr. Pavlis a few times.  I think he had
10 phone conversations with Mr. Pavlis, but I
11 don't -- I wasn't there for the details.
12    Q.     Okay.  And I know you said that
13 you don't recall when Mr. Billingsley told you
14 that Mr. Pavlis was going to invest.  But I'm
15 going to try to pin it down somehow.
16           Was it before or after Key had
17 already been formed?
18           MR. GREEN:  Object to the form.
19           You can answer.
20    A.     I -- I would say it was -- I
21 would say it was -- I would say it was after.
22 But, yeah, that would be my . . .
23           MR. MAHONEY:  Cam, if you would
24    throw up CHRON101.

Page 80

1           - - -
2           (Whereupon, Exhibit P-4 is
3     marked for identification.)
4           - - -
5  BY MR. MAHONEY:
6     Q.     Mr. Self --
7     A.     Yes.
8     Q.     -- I'll represent to you that
9  this is a document again produced in this
10 matter, and it reports to be a convertible
11 promissory note issued by Key Commercial in the
12 amount of $3 million to Frank Pavlis.
13           Have you ever seen this document
14 before today?  And just to be clear, this is
15 the first page of a multiple-page document.
16    A.     Okay, sorry.  I do not recall
17 this document, no.
18    Q.     So sitting here today, you don't
19 recall seeing it before right now?
20    A.     It might have been one that I
21 reviewed as -- you know, as -- you know,
22 leading up to this con -- to this deposition,
23 perhaps.
24    Q.     Let me ask it this way:  Prior

Page 81

1  to you preparing for this deposition, is it
2  right that you have no recollection of seeing
3  this document?
4     A.     That would -- that would be
5  correct.
6           MR. MAHONEY:  Cam, if you can
7     flip through a few pages in.  The Bates
8     label ends 811.
9  BY MR. MAHONEY:
10    Q.     Now, Mr. Self, this is the
11 signature page for the note, and it purports to
12 be signed on behalf of Key by Michael
13 Silberman, and whose title was executive vice
14 president.
15           Was Mr. Silberman ever executive
16 vice president of Key?
17    A.     I did not make him an executive
18 vice president.
19    Q.     Before today, have you ever
20 heard anyone refer to Mr. Silberman as being
21 the executive vice president or having any
22 title or employment with Key?
23           MR. GREEN:  Object to the form.
24           But you can answer.

GEORGE CHADWICK SELF

Page 94

1  Q.    Okay. I'm going to break that
2  down.
3        As I heard it -- and if I get
4  this wrong, please correct me -- you mentioned
5  four specific items or areas. One was the
6  nature of the characterizations that we made?
7  A.    Uh-hum.
8  Q.    What are you referring to there?
9  What did you and he discuss about that?
10 A.    Your Complaint makes multiple
11 references to Justin's character that I
12 fundamentally disagree with based on my
13 experience with Justin.
14 Q.    Anything else that would fall
15 under the category of the nature of the
16 characterizations?
17 A.    Your Complaint also indicates
18 that Key is a wholly fraudulent enterprise, a
19 characterization that I personally know to be
20 false.
21 Q.    What else?
22 A.    Those are the two major
23 characterizations.
24 Q.    The next topic or the next

Page 95

1  category was the impact of this lawsuit on the
2  ability to sell the platform.
3        What do you mean by that?
4  A.    Let's back that up. Not simply
5  the lawsuit, the characterizations made.
6  Q.    Explain that. What do you mean
7  specifically?
8  A.    The interview that Ms. Skeans
9  gave to the newspaper in Arizona, her
10 characterizations within that interview, its
11 subsequent publication, and the devastating
12 impact that it had on our ability to find
13 partners and -- and monetize this platform that
14 we built.
15 Q.    Okay. I'm going to circle back
16 to that one later in the day.
17        The third one was, if my notes
18 are correct, mischaracterization how the money
19 was -- I'm sorry, I can't even make out my own
20 writing.
21        Do you recall what your third
22 item that you said you and Mr. Billingsley
23 discussed?
24 A.    I didn't write them down either.

Page 96

1  But I believe I would have indicated --
2  Q.    I'm sorry. Mischaracterization
3  of how the money was invested and used?
4  A.    Yes. There again, I don't have
5  your Complaint in front of me. But several
6  times in that Complaint it either directly
7  stated or implied that the sole use of the
8  investment was for self-dealing and
9  self-enrichment, both of which I know from
10 personal experience, because I lived it, are
11 untrue.
12 Q.    Any other mischaracterizations
13 that you and Mr. Billingsley discussed, other
14 than what you've already mentioned?
15 A.    We -- some of the
16 characterizations about how the money was
17 obtained we disagree with and deny. But that
18 is in the -- I believe the reply, the rebuttal
19 to the Complaint.
20        Much of that I do not have
21 personal knowledge of because I was working on
22 building the platform, not on -- on procuring
23 the investment and, you know, all the details
24 that go into that.

Page 97

1  Q.    Okay. And then the final item
2  was, quote, our means of defense.
3        What do you mean by that?
4  A.    How we were going to defend
5  ourselves against this slandering lawsuit.
6  Q.    Anything more specific that you
7  discussed with Mr. Billingsley?
8  A.    Like we were going to have to
9  hire a lawyer. You know, we were going to have
10 to find counsel. We were going to have to
11 spend money doing that instead of, you know,
12 fleshing out the platform and finding partners,
13 because now we have this dart in us.
14        MR. MAHONEY: Give me one
15 second.
16        (Pause)
17        Hey, Cam, I'm sorry, you can
18 take that down.
19        Are you okay? Do you need to
20 take a break, Mr. Self?
21        THE WITNESS: No, I'm good.
22 Itchy nose.
23 BY MR. MAHONEY:
24 Q.    From the time that you began at

25 (Pages 94 - 97)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**A-228**

Page 102

1  are excited to get our joint venture with you
2  going"?
3      A.   This was -- again, I'm not -- I
4  don't have a hundred percent recall, but I'm
5  imagining -- not imagining.  I feel like this
6  is the Atlanta enterprise.
7      Q.   What specifically does the, as
8  you put it, Atlanta enterprise have to do with
9  a joint venture?
10     A.   Well, Gary was the HomeVestors
11 guy.  He had the connections at HomeVestors.
12 His connections with HomeVestors are what were
13 kind of used to set up that house flipping
14 entity, whatever, in Atlanta.
15     Q.   Okay.  I thought you indicated
16 that at least your understanding was, Key was
17 going to be used to fund the building of the
18 platform?
19     A.   Yeah.
20     Q.   Am I right that whatever was
21 being done in Atlanta had nothing to do with
22 building a platform, correct?
23          MR. GREEN:  Object to the form.
24     A.   ==I would argue it had a lot to do==

Page 103

1  ==with building a platform, because not only were==
2  ==we learning about different markets,==
3  ==particularly Atlanta, which was a hot market,==
4  ==we were learning about how marketing to --==
5  ==directly to homeowners was done by HomeVestors.==
6  ==We were establishing relationships with buyers.==
7  ==Yeah, I think this is all part of it.==
8  BY MR. MAHONEY:
9      Q.   Is it your understanding, by the
10 way, that either Key or other related entities
11 actually purchased real estate and flipped it?
12          MR. GREEN:  Object to the form.
13          You can answer.
14          THE WITNESS:  Okay.
15     A.   Yes, I believe that's -- that is
16 definitely my -- actually, state your question
17 again.
18 BY MR. MAHONEY:
19     Q.   Yes.  Is it your understanding
20 that Key or related entities, Equity Pros, for
21 example, that they were investing in real
22 estate to flip those, and residential real
23 estate properties, right?
24          MR. GREEN:  Object to the form.

Page 104

1           You can answer.
2      A.   Yes.  Yes.
3  BY MR. MAHONEY:
4      Q.   Any sense how many properties
5  either Key or any related entity actually
6  purchased?
7      A.   I don't have that count in my
8  head.  It would have been between ten and 20
9  for sure.
10     Q.   Okay.  You don't think more than
11 20, though, right?
12     A.   We might have been tangentially
13 involved in more than 20 deals.  But as far as
14 having, you know, deeds and sales, I don't -- I
15 don't think so.
16     Q.   Who was responsible within Key
17 or Equity Pros, or whatever other entity
18 purchased the properties, who was actually
19 responsible for the day-to-day operations of
20 that part of it?
21          Because you said you were
22 working on the platform.
23     A.   Yes.  So the admin for that
24 side, I think, it was Debbie Billingsley.

Page 105

1      Q.   Okay.
2      A.   There was a rep -- well, I call
3  him a rep.  He was a 1099 in Atlanta who
4  actually made contact with the homeowners, made
5  negotiations with them.
6           I also was involved in the sense
7  of we ran meetings where we would track
8  progress on the funnel, how it was doing, et
9  cetera.
10     Q.   What do you mean by "the
11 funnel"?
12     A.   Like homeowner contacts.  You
13 know, they start at the top of the funnel,
14 right?  So it's the wide mouth there, as many
15 people as you can get in.  And then you take
16 them down the funnel.  And then at the bottom
17 of the funnel, hopefully there's a sale, a
18 purchase.
19     Q.   And in that process, did you use
20 your platform at all?
21     A.   No, we didn't use the platform
22 for that process.  That process informed how
23 the platform would be built.
24          MR. MAHONEY:  All right, Cam,

27 (Pages 102 - 105)

Page 106

1   that's fine. Thank you.
2   BY MR. MAHONEY:
3       Q.   Were you aware of any
4   negotiations between Mr. Miller and
5   Mr. Billingsley relating to the transfer of
6   funds that Mr. Pavlis had invested in Allwest,
7   from Allwest to Key?
8           MR. GREEN: Object to the form.
9           You can answer.
10          THE WITNESS: Okay.
11      A.   I know that there were talks
12  back and forth between Gary and Justin, yes.
13  BY MR. MAHONEY:
14      Q.   Before today, did you understand
15  that what they were discussing is, Mr. Miller,
16  rather than repaying Mr. Pavlis funds that
17  Mr. Pavlis had invested in Allwest, that he
18  would instead transfer those funds to Key?
19          MR. GREEN: Object to the form.
20          You can answer.
21      A.   I think it's my understanding at
22  least that Allwest was a vehicle that Key used
23  for Justin as a -- as a means of -- of, you
24  know, creating more funds. So Allwest was -- I

Page 107

1   guess in my view, Allwest was a partner with
2   Justin in -- in those funds rather than the
3   ultimate investment of those funds, if that
4   makes sense.
5           Does that answer the question?
6   BY MR. MAHONEY:
7       Q.   It actually didn't make sense to
8   me.
9       A.   Okay. So I guess it was my
10  impression that the funds were actually
11  invested with Key, and that Key and Allwest --
12  or that Allwest was using those funds to flip
13  houses in California. And then that money was
14  returned to Key, which is what I thought the
15  initial investment was, I guess.
16      Q.   How did you come by that
17  understanding?
18      A.   That's just my understanding.
19      Q.   Yes. I understand that.
20      A.   Yeah, okay. I guess because Key
21  got that -- Key was paid that money.
22      Q.   Okay. So because Allwest
23  transferred Mr. Pavlis' funds to Key, you
24  believe that somehow those funds were always

Page 108

1   intended to go to Key? Is that your testimony?
2           MR. GREEN: Object to the form.
3           You can answer.
4           THE WITNESS: Okay.
5       A.   ==I guess my impression was that==
6   ==they were Key's funds, because Mr. Pavlis had==
7   ==invested in Key.==
8   BY MR. MAHONEY:
9       Q.   And my question is, what's your
10  basis for saying that Mr. Pavlis had invested
11  in Key?
12      A.   Well, I guess probably
13  conversations with Justin. Yeah. I mean, I --
14  and because Gary -- Mr. Miller, you know, paid
15  that money to Key. I guess I just thought -- I
16  thought that because that's how it ended up. I
17  don't know that I have any paperwork that says
18  that, if that's the question.
19          MR. MAHONEY: Okay. Give me one
20      second.
21          (Pause)
22  BY MR. MAHONEY:
23      Q.   Did Mr. Billingsley ever tell
24  you that that was the case?

Page 109

1           MR. GREEN: Object to the form.
2           You can answer.
3       A.   That which was the case? That
4   the funds went to Key and that Key distributed
5   the funds?
6   BY MR. MAHONEY:
7       Q.   Well, we'll start with that one.
8   Go ahead.
9       A.   Yes. I think we've had -- we
10  had, quote, conversations about that, yeah.
11      Q.   Did Mr. Billingsley tell you
12  that Mr. Pavlis originally investigated
13  $7 million with Allwest, with the understanding
14  that it was really an investment in Key?
15          MR. GREEN: Object to the form.
16          You can answer.
17      A.   I don't know if -- if it was
18  stated specifically like that. But that's --
19  that's the -- the inference I had, yes.
20  BY MR. MAHONEY:
21      Q.   Are you aware of any
22  documentation that reflects that?
23      A.   No.
24      Q.   Is it fair to say that you were

GEORGE CHADWICK SELF

Page 150

1  ever asking you for information because he
2  wanted to provide some report to Mr. Pavlis?
3      A.   You're asking if he mentioned
4  Mr. Pavlis in connection with was there some
5  kind of a report or did he ask for a reporting
6  about -- I'm not -- I'm not clear on -- are you
7  asking if he asked in relation to a report he
8  was providing for Mr. Pavlis --
9      Q.   Yes.
10     A.   -- or if, in general, he wanted
11 information on how things were going in Atlanta
12 or anywhere else?
13     Q.   Let's start with the first one,
14 and then I'll ask you to answer the second one.
15     A.   The first one is no.
16     Q.   Okay.  How about the second
17 question?
18     A.   Yes.
19     Q.   Walk me through that.  How often
20 would you provide information to
21 Mr. Billingsley relating to different
22 properties that Key owned or perhaps, you know,
23 one of the other related entities owned?
24     A.   He maintained a spreadsheet that

Page 151

1  showed, for example, the Atlanta properties,
2  price bought, rehab money spent, likely sell
3  sorts of things.
4      Q.   I take it you've actually seen
5  this spreadsheet?
6      A.   Yes.
7      Q.   And is it your understanding
8  that the spreadsheet was also maintained in a
9  Dropbox?
10     A.   I believe so.
11          MR. GREEN:  Object to form.
12          You can answer.
13     A.   (Continuing) yeah, I believe it
14 was.
15 BY MR. MAHONEY:
16     Q.   When is the last time you saw
17 the spreadsheet?
18     A.   More than a year, possibly two.
19          MR. MAHONEY:  We can put that
20     aside, Cam.  Thank you.
21          Next one, Cam, is 003 and 004.
22          MS. REDFERN:  003 will be P-16.
23           - - -
24          (Whereupon, Exhibit P-16 is

Page 152

1  marked for identification.)
2           - - -
3  BY MR. MAHONEY:
4      Q.   Mr. Self, I'll represent to you
5  that this is a Certificate of Formation of an
6  entity called Mobile Agency, LLC, and it is
7  dated July 7th of 2015.  And you are the person
8  who signs it as the authorized person.
9          Why did you create Mobile
10 Agency, LLC?
11          MR. GREEN:  Object to form.
12          You can answer.
13     A.   We were still casting around for
14 a brand to a great extent.  And the -- we came
15 from Mobile Co., right?  We liked the idea of
16 Mobile, helping people work remotely.  So
17 Mobile Agency was one of those brands we
18 considered.
19 BY MR. MAHONEY:
20     Q.   And presumably, you decided that
21 that was the name that you would use, correct?
22     A.   Yeah, we -- we created a website
23 for it.  ==We created a little platform sort of==
24 ==step for it, yeah.==

Page 153

1      Q.   And what business was Mobile
2  Agency, LLC supposed to be in?
3      A.   ==It was in the -- again, we were==
4  ==still trying -- we were still looking to get==
5  ==homeowner direct purchases.==
6      ==Q.   Is this related to or a==
7  ==continuation of the platform that you mentioned==
8  ==earlier?==
9      ==A.   Yes.==
10     Q.   So fair to say that as of July
11 of 2015, you were still working on the
12 platform, but you did not have a finished
13 product?
14     A.   I'm not -- I'm not sure about
15 that date range.
16          THE WITNESS:  Go ahead, Bill.
17     I'm sorry.
18          MR. GREEN:  I was just objecting
19     to the form.
20          You can answer.
21          THE WITNESS:  Okay.
22     A.   (Continuing) Not having, you
23 know, all the dates in front of me, I mean, the
24 platform is ongoing, in my view, so yeah.

39 (Pages 150 - 153)

Page 154

BY MR. MAHONEY:
Q. Okay. But certainly Mobile Agency -- and I'll represent to you that it looks like you formed Mobile Agency, LLC in July of 2015 and you also formed a limited partnership called Mobile Agency, LP the same day, July 7th, 2015, indicating that it was a limited partnership, and the general partner was Mobile Agency, LLC. Does that all sound right to you?
A. Yes.
Q. Okay. Do you know why you set it up as a limited partnership?
A. Well, the -- one of the partners in that limited partnership was a Canadian resident. Part of the -- his expertise was in search engine marketing.
Q. And that would be Mr. Padden, if I have his name right?
A. Correct.
Q. Tell me what the relationship was between Mr. Padden and Mobile Agency.
A. Mr. Padden had created a company in Canada that did search engine marketing. He

Page 155

offered to sell it to us and provide technical expertise so that we could springboard the launch of the platform using Mobile -- using the search engine marketing.
Q. Is Mr. Padden still a limited partner?
A. No.
Q. I'm sorry?
A. No.
Q. When did that relationship end?
A. I don't know about what the date would be. But Mr. Padden did not live up to his side of the bargain, and so was -- was -- we terminated that partnership.
Q. Do you know, was it within a year? Two years? Any idea?
A. Feels like a year, but I don't have a great --
Q. Okay.
A. -- great timeline on that.
Q. Is Mobile Agency, Limited Partnership still operating?
A. It might be.
Q. But you can't say for certain?

Page 156

A. I'm not sure if it's defunct in Canada or not. It hasn't done business in Canada for some time.
Q. Is it doing any business in the U.S.?
A. The website still exists. The platform that we built for uploading of, you know, derelict houses still exists. It's tied into our platform.
Q. When you say, "It's tied into our platform," explain that to me. What do you mean?
A. Part of the technology we built for Mobile Agency -- and, you know, this may be a long story, so I apologize.
Q. That's all right. I asked the question.
A. -- was that anyone with a cell phone, particularly a smartphone, could find a derelict or abandoned or what we call a high bush house, could shoot some pictures from the sidewalk of the house and upload it to the website, to the Mobile.agency -- what we call the hub.

Page 157

The hub would automatically populate the pictures of the property. It would link it to the person who uploaded it. And if we were able to find someone to buy that property, the person who took the picture would get a smaller or larger fee for having -- as a finder's fee.
Q. Okay.
A. So that was -- that's where Mobile Agency ended up. We used -- I guess it wasn't that long of a story after all.
Anyway, so Mobile Agency, that's where it kind of ended up. We did Craigslist advertising and some other advertising to get people to sign up.
Q. Mr. Self, can I interrupt you real quick, if you don't mind?
A. Yes.
MR. MAHONEY: Cam, can you just drop that document, please.
A. (Continuing) So, anyway, to get people to sign up, and we were starting to -- to get some interest, particularly in Oakland and San Fran, where we kind of ran some initial

GEORGE CHADWICK SELF

Page 330

1  Q. What is it?
2  A. It's a telephony service.
3  Q. And is it something that Key
4  Commercial subscribed to?
5  A. It is.
6  Q. What kind of service is it?
7  A. They provide phone numbers.
8  Q. What do you mean?
9  A. You can buy a phone number, pick
10 your region, assign multiple phone numbers to
11 the same person.
12 Q. Does it provide any sort of
13 online recording of messages?
14 A. I suppose it can.
15 Q. Did you ever use it for that
16 purpose?
17 A. I did not, no. I wasn't on the
18 call team.
19 Q. If I told you that Equity Pros,
20 on its P&L, had payroll for wages of over
21 $1.1 million, would that surprise you?
22 A. Is that all -- all in for the
23 programming team, et cetera?
24 Q. Yeah, that I don't know. It's

Page 331

1  just a line item for total payroll for wages
2  only for Equity Pros.
3         MR. GREEN: I object to the
4     form.
5         You can answer.
6  A. We were building a pretty beefy
7  website. We spent money on programmers for
8  sure.
9  BY MR. MAHONEY:
10 Q. Do you have any understanding as
11 to whether anyone explained to Mr. Pavlis that
12 his investment that was made in 2014 was being
13 used to develop this platform?
14 A. It's my understanding that he
15 knew all along, yes.
16 Q. And your understanding is based
17 upon what?
18 A. Conversations with Justin.
19 Q. So essentially Mr. Billingsley
20 telling you that he told or kept Mr. Pavlis
21 informed; is that a fair summary?
22         MR. GREEN: Object to form.
23         You can answer.
24 A. Yes.

Page 332

1  BY MR. MAHONEY:
2  Q. Did you ever have a discussion
3  with Mr. Billingsley as to why a 97-year-old
4  man would invest $7 million and get notes that
5  wouldn't be payable until he was 102 and
6  103 years old, respectively?
7         MR. GREEN: Objection to form.
8         You can answer.
9  A. Let me take the first part of
10 that question first.
11 BY MR. MAHONEY:
12 Q. Yes.
13 A. I didn't know that Mr. Pavlis
14 was 90 -- what did you say?
15 Q. I believe he was 97 in 2014.
16 A. So that's not something that I
17 knew. So that's not a conversation we had, no.
18 Q. I assume -- well, I shouldn't
19 assume.
20        Did you have any sense of why
21 these notes -- one was five years, one was six
22 years -- why they were so long?
23 A. Not having any real experience
24 with how notes were written, I didn't think

Page 333

1  that was weird.
2         MR. KITTILA: Bill, I'm sorry,
3     that's the end.
4         MR. MAHONEY: No problem at all.
5     I totally appreciate it.
6         And, Mr. Self, thank you very
7     much for your time. I know it was a long
8     day, but I appreciate you giving us the
9     time.
10        THE WITNESS: Thank you.
11         - - -
12        (Witness excused.)
13         - - -
14        (Whereupon, the deposition was
15     concluded at 6:08 p.m.)
16         - - -

84 (Pages 330 - 333)

Page 334

```
 1          C E R T I F I C A T E
 2
 3         I do hereby certify that I am a
 4   Notary Public in good standing, that the
 5   aforesaid testimony was taken before me,
 6   pursuant to notice, at the time and place
 7   indicated; that said deponent was by me duly
 8   sworn to tell the truth, the whole truth, and
 9   nothing but the truth; that the testimony of
10   said deponent was correctly recorded in machine
11   shorthand by me, to the best of my ability, and
12   thereafter transcribed under my supervision
13   with computer-aided transcription; that the
14   deposition is a true and correct record of the
15   testimony given by the witness; and that I am
16   neither of counsel nor kin to any party in said
17   action, nor interested in the outcome thereof.
18         WITNESS my hand and official
19   seal this 5th day of May, 2020.
20
21
22        Cheryl L. Goldfarb
23           Notary Public
24
```