## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DEBORAH S. SKEANS, Executrix of
the ESTATE OF FRANK E. PAVLIS,

               Plaintiff,

      v.

KEY COMMERCIAL FINANCE,
LLC, KEY COMMERCIAL
FINANCE PROPERTIES, LLC,
EQUITY PROS, LLC, and MOBILE
AGENCY, LLC

               Defendants.

—————————————————

JUSTIN BILLINGSLEY and KEY
COMMERCIAL FINANCE, LLC,

               Third-Party
               Plaintiffs,

      v.

DEBORAH S. SKEANS and
DARBIN SKEANS,

               Third-Party
               Defendants.

No. 1:18-cv-01516-CFC

## APPENDIX TO
## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:
William E. Mahoney, Jr. (*pro hac vice*)
Spencer R. Short (*pro hac vice*
Stradley Ronon Stevens & Young LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Tel: (215) 564-8059
Fax: (215) 564-8120

Dated: August 31, 2020

Joelle E. Polesky (ID No. 3694)
STRADLEY RONON STEVENS
& YOUNG, LLP
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Tel: (302) 295-4856
Fax: (302) 295-4801
Email: jpolesky@stradley.com
*Attorneys for Third-Party
Defendants*

# TABLE OF CONTENTS

| Exhibit 1 | Mobile Agency, LLC and Equity Pros, LLC Formation Documents | A1 |
|---|---|---|
| **Exhibit 2** | May 7, 2020 Deposition of David Scott Wyllie | **A3** |
| **Exhibit 3** | December 14, 2017 Arizona Republic Article | **A21** |
| **Exhibit 4** | April 27, 2020 Deposition of Justin C. Billingsley | **A30** |
| **Exhibit 5** | September 1, 2014 and November 1, Key Commercial Financial Promissory Notes and Note Purchase Agreements | **A43** |
| **Exhibit 6** | April 20, 2020 Deposition of George Chadwick Self | **A89** |
| **Exhibit 7** | April 27, 2018 Email from Dennis Burke to William Mahoney | **A94** |
| **Exhibit 8** | August 31, 2020 Declaration of Deborah S. Skeans | **A97** |
| **Exhibit 9** | April 29, 2020 Deposition of Deborah S. Skeans | **A150** |
| **Exhibit 10** | Key Commercial Finance Operating Agreement | **A161** |
| **Exhibit 11** | Key Commercial Finance August 18, 2014 Subscription Agreement | **A168** |
| **Exhibit 12** | Allwest January 28, 2014 Subscription Agreement and Investor Questionnaire | **A180** |
| **Exhibit 13** | June 19, 2018 Email from Adrienne Dean to Justin Billingsley | **A193** |
| **Exhibit 14** | June 29, 2018 Email from Justin Billingsley to William Mahoney | **A206** |
| **Exhibit 15** | November 19, 2016 Fax from Christine LaChapelle to Deborah S. Skeans | **A209** |
| **Exhibit 16** | January 17, 2017 Email from Justin Billingsley to Deborah Skeans | **A228** |

# Exhibit 1

**A1**

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 09:13 AM 07/08/2015*
*FILED 08:40 AM 07/08/2015*
*SRV 151021200 - 5780827 FILE*

Certificate of Formation
of
Mobile Agency, LLC

1.  The name of the limited liability company is Mobile Agency, LLC.

2.  The address of its registered office in the State of Delaware is 1675 S. State Street, Suite B, City of Dover, County of Kent, DE 19901. The name of its registered agent at such address is Capitol Services, Inc.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation this __7th day of July 2015.

Name: G Chadwick Self
Authorized Person

226013713.1

**A1**

KCF012487

**A2**

<div align="center">

Articles of Organization
Of
**Equity Pros, LLC**

</div>

The undersigned organizer hereby forms a limited liability company under the Connecticut Limited Liability Company Act:

1.     The name of the limited liability company is Equity Pros, LLC.

2.     The nature of the business to be transacted, or the purposes to be promoted or carried out, by the Company is to accomplish any lawful business whatsoever, or which shall at any time appear conducive to or expedient for the protection or promotion of the Company and its assets; to engage in any lawful act or activity for which limited liability companies may be formed under the Connecticut Limited Liability Company Act; and to engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

3.     The principal office address of the limited liability company is 11 Luis Allen Drive, Danbury, CT 06811.

4.     The name of the statutory agent for service of process is Hillel Goldman. The statutory agent's business and residence addresses are:

| Residence Address: | Business Address: |
| --- | --- |
| 1 Caldwell Terrace | 57 North Street, Suite 214 |
| Danbury, CT 06810 | Danbury, CT 06810 |

5.     Management of the limited liability company is vested in a manager or managers. The name of one Manager for the Limited Liability Company is: Chadwick Self whose principal business address is 11 Luis Allen Drive, Danbury, CT 06811 and whose residence address is 505 East Branch Road, Patterson, NY 12563.

6.     The e-mail address of the limited liability company is chadwick@equitypros.co.

Dated: August 25, 2015

Hillel Goldman
Organizer

Acceptance of Appointed
Statutory Agent:

Hillel Goldman

CONFIDENTIAL

KCF013400

# Exhibit 2

**A3**



Deposition of:
# David Scott Wyllie

*May 7, 2020*

In the Matter of:

# Skeans v. Key Commercial Fnance, LLC et al.

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

**A3**

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
2
                        - - -
3
     DEBORAH S. SKEANS,          :   CIVIL ACTION
4    Executrix of the ESTATE     :   NUMBER
     OF FRANK E. PAVLIS,         :   1:18-cv-01516-
5              Plaintiff,        :   CFC
                 v.              :
6    KEY COMMERCIAL FINANCE,     :
     LLC, KEY COMMERCIAL         :
7    FINANCE PROPERTIES, LLC,    :
     EQUITY PROS, LLC, and       :
8    MOBILE AGENCY, LLC,         :
               Defendants.       :
9
                        - - -
10
              Thursday, May 7, 2020
11
                        - - -
12
13          Oral deposition of DAVID SCOTT
14   WYLLIE, taken remotely via Zoom, at the law
15   offices of Henderson, Brandt & Vieth, P.A.,
16   360 East Henry Street, Suite 101, Spartanburg,
17   South Carolina  29302, beginning at 1:15 p.m.,
18   reported stenographically by Cheryl L.
19   Goldfarb, a Registered Professional Reporter,
20   Notary Public, and an approved reporter of the
21   United States District Court.
22                      - - -
              VERITEXT LEGAL SOLUTIONS
23               MID-ATLANTIC REGION
            1801 Market Street - Suite 1800
24          Philadelphia, Pennsylvania  19103

```
                                                    Page 2

 1        A P P E A R A N C E S :
 2
 3             STRADLEY RONON STEVENS & YOUNG, LLP
               BY:   WILLIAM E. MAHONEY, JR., ESQUIRE
 4                   CAMERON REDFERN, ESQUIRE
               2005 Market Street, Suite 2600
 5             Philadelphia, Pennsylvania  19103
               215.564.8000
 6             wmahoney@stradley.com
               credfern@stradley.com
 7             Representing the Plaintiff
               (Via Zoom)
 8
 9
               HALLORAN FARKAS & KITTILA, LLP
10             BY:   WILLIAM E. GREEN, JR., ESQUIRE
               5801 Kennett Pike, Suite C
11             Wilmington, Delaware  19807
               302.257.2011
12             wg@hfk.law
               Representing the Defendants
13             (Via Zoom)
14
15             HENDERSON, BRANDT & VIETH, P.A.
               BY:   GEORGE "BUCK" BRANDT, III, ESQUIRE
16             360 East Henry Street, Suite 101
               Spartanburg, South Carolina  29302
17             864.582.2962
               gbrandt@hbvlaw.com
18             Representing the Witness
               (Via Zoom)
19
                            - - -
20
21        A L S O   P R E S E N T :
22             DEBORAH S. SKEANS (Via Zoom)
23             DARBIN SKEANS (Via Zoom)
24             JUSTIN BILLINGSLEY (Via Zoom)
```

**A6**

                                                              Page 3

1                        I N D E X
2                          - - -
3      WITNESS:  DAVID SCOTT WYLLIE
4      QUESTIONED BY:                              PAGE:
5           MR. MAHONEY                              6
6                          - - -
7                     E X H I B I T S
8      NUMBER   DESCRIPTION              MARKED FOR ID
9
        P-91     E-mail dated May 21, 2015          21
10               and Durable General Power of
                 Attorney, KCF002793 through
11               002802
12      P-92     Document entitled, "Frank's Time   84
                 Sheets," P-000100 through 000103
13
        P-93     Correspondence from Flamm         101
14               Walton, KCF003866 through
                 003871
15
16                         - - -
17
                   PREVIOUSLY MARKED DOCUMENTS
18
                   NUMBER................PAGE
19
20                 P-75.....................54
21                 P-76.....................92
22                 P-77.....................76
23
                           - - -
24

**A6**

**A7**

```
                                                    Page 4

 1                    DEPOSITION  SUPPORT  INDEX

 2

 3        DIRECTION  TO  WITNESS  NOT  TO  ANSWER

 4        Page    Line

 5        (None)

 6

 7

 8        REQUEST  FOR  PRODUCTION  OF  DOCUMENTS

 9        Page    Line    Description

10        (None)

11

12

13        STIPULATIONS

14        Page    Line

15        (Pursuant  to  Federal  Rules  of  Civil  Procedure)

16

17

18        QUESTIONS  MARKED

19        Page    Line

20        (None)

21

22

23

24
```

**A7**

Page 5

1              THE COURT REPORTER:  The

2       attorneys participating in this

3       deposition acknowledge that I am not

4       physically present in the deposition room

5       and that I will be reporting this

6       deposition remotely.

7              They further acknowledge that in

8       lieu of an oath administered in person, I

9       will administer the oath remotely.  The

10      parties and their counsel consent to this

11      arrangement and waive any objections to

12      this manner of reporting.

13             Please indicate your agreement

14      by stating your name and your agreement

15      on the record.

16             MR. GREEN:  William Green, on

17      behalf of defendants.  We consent.

18             MR. MAHONEY:  Bill Mahoney, on

19      behalf of plaintiff.  We consent.

20             MR. BRANDT:  George Brandt, III,

21      on behalf of the deponent.  We consent.

22             THE COURT REPORTER:  Will you

23      please raise your right hand.

24                    - - -

**A9**

DAVID SCOTT WYLLIE

Page 6

```
 1              DAVID SCOTT WYLLIE, after having
 2         been first duly sworn/affirmed, was
 3         examined and testified as follows:
 4                    - - -
 5              THE COURT REPORTER:  Thank you.
 6                    - - -
 7                  EXAMINATION
 8                    - - -
 9   BY MR. MAHONEY:
10         Q.       Good afternoon, Mr. Wyllie.  My
11   name is Bill Mahoney, as you may know.  I
12   represent the plaintiff in connection with
13   litigation.
14              We served a subpoena upon you.
15   And am I correct that you are appearing for
16   this video deposition pursuant to that
17   subpoena?
18         A.       Yes.
19         Q.       Okay.  Can I just ask you a
20   question.  At least as I look at the computer
21   screen ahead of me, you look like you're
22   looking at a different screen.
23              There we go, okay.
24              MR. BRANDT:  You'll just have to
```

**A10**

DAVID SCOTT WYLLIE

```
                                        Page 7

 1          look out of the corner of your eye.  It's

 2          not appearing on both screens.  It's

 3          appearing on one.

 4                     MR. MAHONEY:  Okay, terrific.

 5     BY MR. MAHONEY:

 6          Q.        Mr. Wyllie, have you ever been

 7     deposed before?

 8          A.        No.

 9          Q.        Your lawyer may have told you

10     this, but it's essentially a

11     question-and-answer series.  I'll be asking you

12     questions.  Your job is to answer to the best

13     of your recollection and ability.  If you have

14     any questions regarding my questions, if you

15     don't understand something, if it's not clear,

16     just let me know.  I will do my level best to

17     rephrase the question so you can answer it.

18                     Is there any reason why you

19     think you may not be able to testify truthfully

20     today?

21          A.        I don't understand your

22     question.

23          Q.        Are you taking any medication

24     that you believe --
```

**A11**

DAVID SCOTT WYLLIE

Page 8

```
 1          A.      Oh.
 2          Q.      -- would interfere with your
 3    ability to testify truthfully?
 4          A.      Oh, I see.  No.
 5          Q.      There are a number of people who
 6    are participating in this.  It's largely going
 7    to be you and I speaking.  But if at any point
 8    in time, you or they want to take a break, just
 9    let us know.  The only thing I would ask is
10    that if I have a question pending, you answer
11    that question before we take a break.
12               Is that fair enough?
13               MR. BRANDT:  All answers need to
14          be oral so that she can hear it.  So not
15          only speak orally, but speak loudly so
16          that she can hear.  She's taking down --
17               THE WITNESS:  My apologies.
18               MR. BRANDT:  -- everything that
19          you're saying.
20          A.      Yes.
21               MR. MAHONEY:  That's okay.
22          Thank you, Buck.
23    BY MR. MAHONEY:
24          Q.      And you're represented by
```

**A12**

DAVID SCOTT WYLLIE

Page 9

1     counsel here today, Mr. Wyllie?

2          A.     Yes.

3          Q.     I'm going to begin by asking you

4     some general background questions.

5                 But first, have you done

6     anything, other than speaking with your

7     counsel, to prepare for this deposition?

8          A.     I -- what do you mean "prepare"?

9     I don't understand.

10         Q.     Well, have you reviewed any

11    documents?

12         A.     The -- there's something

13    published online, like the court document.

14         Q.     Okay.  So you reviewed that?

15         A.     I looked at it.

16         Q.     Anything else?

17         A.     Hmm.  I think it's just the

18    online documents that I read over.

19         Q.     Okay.

20         A.     Yeah.

21         Q.     Apart from speaking --

22         A.     Nothing -- nothing was sent to

23    me.

24         Q.     Okay.  Apart from speaking with

**A13**

DAVID SCOTT WYLLIE

Page 10

```
 1      your counsel, which I don't want to know what
 2      you discussed, have you discussed this
 3      deposition with anyone else?
 4              A.      My wife is aware that I'm doing
 5      it, if that's . . .
 6              Q.      But substantively --
 7              A.      No.
 8              Q.      -- did you have any discussions
 9      with anyone about what you thought your
10      testimony might be?
11              A.      Oh, no.
12              Q.      All right.  Can you give me your
13      professional background, where you've worked?
14                      I don't know if you're currently
15      working now or not.  But could you walk me
16      through that at a high level?
17              A.      Explain what "high level" means.
18              Q.      I don't need exact dates, for
19      example.  I know that you used to work, I
20      believe, up in the Quakertown area?
21              A.      Uh-hum.
22              Q.      You used to live up in that
23      area.
24                      So why don't we start this way:
```

**A14**

DAVID SCOTT WYLLIE

Page 35

1          A.        That he was a millionaire.  I

2     don't know if he put a dollar figure on,

3     but . . .

4          Q.        Was that before or after you

5     became power of attorney?

6          A.        I think after.  I'm not sure.

7          Q.        Do you recall why you and

8     Mr. Skeans were discussing Mr. Pavlis?

9          A.        Because I became aware that he

10    was -- he became a victim of phone -- phone

11    scams.

12         Q.        "He" being Mr. Pavlis?

13         A.        Mr. Pavlis, yeah.

14         Q.        What was your recollection of

15    the nature of those phone scams?

16         A.        So that all happened before --

17    before I met him.  I think it was still going

18    on.

19                    It was still going on, but the

20    past history, he -- evidently, he would

21    reply -- or I shouldn't say "reply."  Anything

22    that he got in the mail with an opportunity to

23    win money, he would reply to like Publishers

24    Clearinghouse.  And evidently, they sell that

**A15**

DAVID SCOTT WYLLIE

Page 36

```
 1      information or share that information.

 2                      So he was -- people were calling

 3      him on the phone and letting him know that he

 4      won money.

 5              Q.      And it's your understanding that

 6      that was a scam, fraudulent?

 7              A.      At -- well, I know now it was.

 8      At the time, I assumed it was.  Because he

 9      was -- I don't know each instance or how many

10      times that happened.  But it always went

11      something like he would get a phone call, you

12      won -- I don't know -- $10 million.  Don't

13      quote me on that.  I'm just -- you won this.

14      Before we can send you the money, you have to

15      pay the government taxes.  And then we will

16      meet you at your home with a news crew and with

17      a giant check and that sort of thing.

18              Q.      And --

19              A.      Something like that.

20              Q.      -- in terms of time frame,

21      Mr. Wyllie, do you recall this happening while

22      you were Mr. Pavlis' power of attorney or did

23      it happen before you became power of attorney?

24              A.      Those happened -- actually
```

DAVID SCOTT WYLLIE

Page 37

1    getting money from him happened before.

2              Q.        Okay.   Was there any, to your

3    knowledge, further contact between Mr. Pavlis

4    and these scam artists, if you will, while you

5    were acting as his power of attorney?

6              A.        Oh, yeah, all the time.   It was

7    so frustrating.   Because he would answer the

8    phone where he lived there.   And I mean, every

9    time he picked up the phone, it was -- it just

10   led to -- and I understood that they threatened

11   him and all, you know.

12                        And so I tried to get in place

13   something that would protect him to not be

14   vulnerable to those.

15             Q.        What did you try to put in place

16   to protect Mr. Pavlis?

17             A.        Well, emphasizing many times

18   over, you know, please don't answer the phone.

19   If it's a number that you don't recognize,

20   there's not a name to it, let them leave a

21   message.   You know, don't talk to them.

22                        And the person who was -- I

23   don't know if he was -- I don't think he was

24   the administrator yet, but he was kind of

DAVID SCOTT WYLLIE

Page 38

1    serving in that role, because he was there

2    full-time.   You know, be aware of this

3    happening, which I think he already had

4    knowledge of.   Just try to put a fence around

5    it.

6         Q.        When you say "administrator,"

7    you're talking about Mr. Killgore?

8         A.        Yes.

9         Q.        Okay.  Did there come a time

10   when either you or Mr. Killgore or somebody

11   else got Mr. Pavlis a new phone or took some

12   action to change his phone number?

13        A.        I don't think he got a new

14   phone.  I think -- hmm.  I don't know if he got

15   a new phone number.

16             What would -- what would happen

17   is, it would -- any calls coming in would go to

18   the main like switchboard.  And then who is

19   this?  You know, what's the nature?  Just kind

20   of filtering -- filtering those.

21             MR. MAHONEY:  Okay.  Cam, would

22        you mind putting that power of attorney

23        back up on the screen, please.  And I

24        want to go to the first page of the

DAVID SCOTT WYLLIE

Page 47

1    questions about, you know, because I didn't

2    understand something, and, you know, would

3    cross them off or . . .

4                    And, you know, once I felt

5    that -- they were kind of like reminders for

6    me.  And I just discarded them.

7          Q.          Did Mr. Pavlis have any

8    particular habit in terms of note-taking?

9                    For example, do you recall him

10   taking notes at meetings between him, you and

11   Mr. Billingsley?

12         A.          So to answer your first

13   question, he was -- he was remarkably

14   fastidious with like his ledger for checks.  I

15   think it was all in pencil.

16                    Like he -- he wrote -- well, he

17   wrote himself a lot of reminders.  I know that.

18   But he was -- he was pretty sharp, I'll tell

19   you, for an older guy.

20                    But I don't recall him taking

21   notes during those meetings with

22   Mr. Billingsley.

23         Q.          Okay.  Do you ever --

24         A.          He just sat there and listened.

**A19**

DAVID SCOTT WYLLIE

Page 73

1        Q.        Okay.  Do you ever recall either

2    seeing or learning after the fact that

3    Mr. Billingsley provided Mr. Pavlis with any

4    documentation relating to his investments?

5        A.        I remember one item that he

6    provided to Mr. Pavlis.  It was a -- a

7    binder-type, soft cover binder, like spiral,

8    with -- it was some sort of financial

9    portfolio, something like that.  Frank showed

10   it to me and asked me to explain it to him.

11       Q.        I take it that you did not

12   explain it to him?

13       A.        Uh-hum.  Yes, I looked at it.

14   And I said, I have -- I don't know.

15       Q.        Do you know where Mr. Pavlis

16   kept that spiral-bound document that he showed

17   you?  Did he keep it in his apartment

18   somewhere?

19       A.        He kept everything in his

20   apartment.

21       Q.        What do you mean by that?

22       A.        And it was --

23       Q.        Go ahead.  Continue.  I'm sorry.

24       A.        It -- he handed it to me.  And,

DAVID SCOTT WYLLIE

Page 74

1    yeah, he -- I don't know where it was.  He

2    handed it to me, so.

3            Q.        Do you recall Mr. Pavlis having

4    a safe in his apartment at Legacy Place?

5            A.        Yes.

6            Q.        And do you recall whether he

7    would keep financial documents in that safe?

8            A.        He -- I think all his financial

9    documents were in his desk.  He had like file

10   folder drawers.

11                     MR. MAHONEY:  Give me a second.

12           I'm just jotting down some notes.

13                     MR. BRANDT:  While you're

14           jotting, how much longer do you

15           anticipate this deposition being?

16                     MR. MAHONEY:  Buck, it's

17           probably going to be another hour or so.

18                     MR. BRANDT:  Okay.  I've got an

19           appointment at 4:00 that I've got to

20           take.  I'm not trying to rush, but we've

21           got to adjourn the deposition.

22                     MR. MAHONEY:  No, I understand.

23           Let's see what progress we make.

24   BY MR. MAHONEY:

# Exhibit 3

 

Up to 70% off!
www.wayfair.com

▷ ✕

VISIT SITE

# Once-high-flying Quepasa chief Jeff Peterson under fire as $9M gone in online startups

Craig Harris, The Republic | azcentral.com    Published 6:00 a.m. MT Dec. 14, 2017 | Updated 4:55 p.m. MT Dec. 15, 2017



*(Photo: The Republic)*

When internet entrepreneur Jeff Peterson was looking to reboot his career in Arizona a few years ago, the high-school dropout turned to prominent Mesa businessman Ross Farnsworth Jr.

Peterson had founded Quespasa, an online sensation that once reached a market value of $400 million during the go-go dot-com era. Now, he wanted guidance on what to do next.

Farnsworth, whose surname is well known throughout the East Valley and in Mormon circles, agreed to mentor Peterson, who was in need of a confidence boost, according to Farnsworth's son.

As the older Farnsworth was providing business guidance to Peterson, the student asked the teacher a favor: Would Farnsworth put money into a new internet startup called Mobile that he had founded?

The idea seemed revolutionary.

Mobile, launched in March 2013, would connect workers around the world with employers who could buy their services. A graphic artist in Phoenix, for example, could sell his skills to someone in Paris.



Jeffrey Peterson, founder of Quepasa.com, poses for a portrait in 2001 at his home in north-central Phoenix. *(Photo: The Republic)*

Peterson, a Santa Barbara, California, native who made his name in the Valley, pitched Mobile as the next Quepasa.

Early Quepasa investors had struck it rich on the bilingual, Latino-focused social media website he'd created in 1997 in Phoenix.

And Peterson had a track record of getting big names to back him.

**A21**

At Quepasa, Phoenix sports mogul Jerry Colangelo and Denver Broncos John Elway had been investors. He had had a marketing deal with pop sensation Gloria Estefan, and the company's logo was peppered throughout the inside of Phoenix's downtown baseball stadium.

Former Arizona Gov. Janet Napolitano later appointed him to the Arizona-Mexico Commission's board. Former state Attorney General Terry Goddard put him on a business advisory committee.

Peterson brought that experience to the table when he asked his mentor for new funding.

Farnsworth provided $400,000 in capital for Mobile.

He wasn't alone.

An elderly Pennsylvania millionaire invested $2 million. Bob Ramsey, a Tempe businessman, kicked in a quarter-million dollars.

▷ ✕

Up to 70% off!


✦wayfair.com

 www.wayfair.com                                        VISIT SITE

Peterson, meanwhile, assembled an all-star board and group of advisers who could introduce him to more deep-pocketed investors.

Mobile's board included former U.S. Attorney for Arizona Dennis Burke, who had been Napolitano's chief of staff when she was governor; Marco Lopez, a former director of the Arizona-Mexico Commission and an adviser to Mexican billionaire Carlos Slim; and Ramsey, who founded Southwest Ambulance Co.

According to Mobile financial documents provided by a board member, advisers and consultants included Democratic National Committee chairman and presidential candidate Howard Dean; ex-Phoenix Mayor Phil Gordon; Mexican-American Grammy Award winner Pepe Aguilar; and Hollywood moviemaker Howard "Hawk" Koch.

Peterson, who used his Quepasa wealth to become a major donor to Democrats, sought out Republicans, too.



Ross Farnsworth Jr. *(Photo: The Republic)*

A relative of 2012 Republican presidential candidate Mitt Romney and a relative of the Marriott hotel chain owners were put on Mobile's payroll and were paid at least $151,000 combined, company records show.

With Peterson and other company fundraisers bringing in cash, some Mobile investors parted ways with their individual retirement accounts or 401(k) funds in hopes of making it big with the latest online business sensation.

Along with the storied reputations of Mobile's board and advisers, investors were assured those handling the money were blue chip.

Peterson hired Wilson, Sonsini, Goodrich & Rosati, a Palo Alto, California, law firm that represented Facebook, as the conduit for transferring funds to Mobile. The firm, which monthly transferred tens of thousands of dollars to Mobile, declined numerous requests to comment.

Peterson, who speaks fluent Spanish, also forged a friendship with Silicon Valley businessman David Lopez, father of actress and musician Jennifer Lopez. He persuaded David Lopez to become an adviser, investor and pitch man. And Peterson regularly dropped Jennifer Lopez's name with potential clients to gain their trust, investors said.

In total, Mobile from 2013 to 2016 raised at least $8.6 million from 83 investors, according to company and U.S. Securities and Exchange Commission records.

Today, however, all the money is gone. By September 2016, the corporation had a zero balance, according to Chase Bank records produced for Burke this year by the company's chief financial officer.

And like Quepasa, which ultimately had a meteoric crash, Mobile has essentially busted.

There is little to show for the investments except a Mobile.co website that includes a handful of blog posts.

**A22**

A23

"I didn't raise any money for him, but I introduced him to some people," said David Lopez, who invested $12,000. "Jeffrey can be pretty persuasive. ... All I wanted to do was find a venue to help Latinos. So I followed that as long as I thought I could help. After a while, I realized we were being snookered."

Todd "Ross" Farnsworth III said his dad, who died from brain cancer in September 2015, also wanted to help Peterson. Yet, the younger Farnsworth contends Peterson took advantage of his father's generosity in summer 2014, just before he was diagnosed with cancer.

"The truth is, he was of diminished capacity of some level going into it," Ross Farnsworth said of his dad's $200,000 loan and $200,000 investment. "He typically would not have parted with that amount of money."

Family and friends of the Pennsylvania millionaire, who just turned 101, said he's had memory loss for at least a decade, including during the time he heavily invested in Mobile.

Marco Lopez, no longer a Mobile board member, said Peterson has a lot of explaining to do.



Marco Lopez (right) eats dinner in Phoenix with Jeff Peterson (left) and others in November 2005. *(Photo: Michael Chow/The Republic)*

"He is now at a point where he has to answer to the investors who believed in him, and he now has nothing to show for it," Marco Lopez said.

Peterson, an Arizona resident from the mid-1990s through 2013, could not be located to be interviewed for this story. Phone messages left on his cellphone and at his last known address in Boston went unanswered. Attempts to reach him through associates and four of his attorneys also failed.

Don Bivens, who has represented Peterson, defended Mobile's business transactions and, while not speaking for Peterson, said the company made a good-faith effort to succeed.

## Where's the money?

In August 2014, with investor money flowing in, Peterson's excitement was obvious from an email to company insiders.

Peterson wrote that Mobile would become famous and join the ranks of Twitter and Facebook, adding that Facebook co-founder Mark Zuckerberg "would pay a healthy premium" to acquire Mobile and such a transaction would cause shares of Facebook stock to "move up on the news."

Facebook never acquired Mobile.

But Mobile bank records provided to *The Arizona Republic* show Peterson and other employees spent a fortune trying to play in the same league.

"It seemed in the beginning to have great promise and a lot of good people around it," Ramsey recalled recently. "But as the onion unfolded, it wasn't what I thought it was."

The question Ramsey and others have: Where did all the money go?

**A23**

**A24**



Burke, a Mobile board member and a former U.S. Attorney for Arizona, had been asking that question for months. He repeatedly pressed the company's CFO to turn over financial records, which he began reviewing in late summer. Burke then provided *The Republic* copies of many of those records, including internal bank documents for a three-year period.

Those bank records show at least $2.3 million was transferred to Inter123, a Las Vegas company privately controlled by Peterson. Peterson is listed in Nevada Secretary of State records as Inter123's president, secretary, treasurer and director. The company's website says it specializes in information technology, and it lists Mobile as being part of its portfolio of companies.

Board member Marco Lopez alleges Peterson transferred Mobile money to Inter123 without board authorization. That company had a licensing agreement to handle Mobile's internet domains.

**Dennis Burke, pictured here shortly after being named U.S. Attorney for Arizona in 2009.** *(Photo: The Republic)*

"There was never any mention of money," Marco Lopez said. He added that he quit the board because Peterson would not share financial records with board members.

However, Bivens said the board approved contracts between the two firms. He recently provided *The Republic* copies of a series of contracts from 2013 to 2016 that authorized payments from Mobile to Inter123.

Michael Silberman, Mobile's chief financial officer who worked for Peterson at Quepasa, signed those deals on behalf of Mobile. Peterson or company attorneys Eric Jeide and Ashley Grimes signed on behalf of Inter123.

In any event, Peterson last year put Inter123 into Chapter 11 bankruptcy protection in Las Vegas after two former attorneys who were owed $158,190 sued him for nonpayment and won court judgments against his company.

## Spending details

*The Republic* reviewed Mobile bank records spanning a period from March 2013 to September 2016. They also show:

- President Justin Billingsley and Silberman were paid $269,107 and $236,744, respectively. Billingsley said all financial decisions were approved by the board. Silberman declined to comment.
- At least $770,759 was paid to Inmuebles Carso, a real-estate company controlled by Mexican billionaire Slim, for what board member Burke said was a Mexican office. He said to his knowledge no Mobile employees ever worked in that building and the rent payment was designed to gain favor with Slim and have him invest in Mobile. Slim never did.
- At least $564,430 was used to pay the debt on two Chase credit cards. The records do not indicate who controlled those cards.
- At least $140,000 was spent on corporate housing for three executives, including Peterson and attorney Grimes.
- At least $120,639 was spent on airline travel, including trips to the Philippines, where one of Mobile's subsidiaries was located. At least $67,087 was spent on lodging, including luxury hotels; and at least $40,921 was spent on Expedia, an internet travel service. The total: $228,647.
- Mobile employees, including Billingsley, used company credit cards to make $6,210 in ATM withdrawals.
- At least $3,400 was spent on limousine, town car and Lexus rentals.
- At least $20,200 was given to the Arizona-Mexico Commission and another $12,500 to the the U.S.-Philippines Society. Peterson had served on both boards.

Board member Burke cried foul.

"The bank statements are what I anticipated — massive spending void of any business sense, with little to none directed to the actual platform and quite a windfall for you, personally," Burke wrote in an Aug. 20 email to Peterson. "You took Mobile investors' money and gave it to your own company with zero accounting of how it would be spent."

Michael Malloy, a former SEC enforcement lawyer, said the financial transfers and spending at Mobile could constitute fraud or theft.

But Malloy, now a law professor at the University of the Pacific in California, said company executives could argue that there was simply mismanagement, leaving investors little chance of being repaid if they sue.

"We are basically talking about stupidity, sneakiness and greed — and you get a different legal response depending on whether it's sneakiness or greed," he said. "If it's stupidity, there's not a lot you can do."

**A24**

                                                                                           P-000163

However, Burke accused Peterson in his email of corporate theft, noting investors' money was spent at Men's Wearhouse, Nordstrom Rack, on designer luggage and at $600-a-night hotels.

Burke recently told *The Republic* that Mobile also loaned Billingsley $150,000 that was not repaid.

## Billingsley responds

Billingsley defended the expenses and said board members never raised issues about them during meetings. Bivens provided documents that he claimed showed Silberman forgave the $150,000 loan on behalf of Mobile. Burke disputed that claim.

"Board members hold more accountability than I do. They approved every decision," Billingsley said. "I can't imagine how board members can come out and start complaining when they are so damn accountable."



Don Bivens, partner at Snell & Wilmer in Phoenix, said Mobile made a good-faith effort to succeed. *(Photo: Snell & Wilmer)*

Billingsley told *The Republic* he never witnessed any extravagant spending by Peterson or other Mobile employees.

"Let me be clear, I never spent a penny. I never had a company card," Billingsley said.

Mobile bank records show a credit card designated to "Justin Billingsley" was used for $12,709 in charges from October 2014 to March 2016, including limousine service and sushi dinners in Danbury, Conn., where Billingsley lives.

Other charges included $381 at a New York wine store, a $500 cash withdrawal, and $713 for a stay at a Phoenix boutique hotel.

Bivens, who also represents Billingsley, was given a copy of credit-card bills. He said his client had no recollection of having access to a company credit card and did not recognize expenses attributed to the card in his name. Bivens added that $12,000 in business expenses "are hardly a significant event" for a company with Mobile's capitalization.

## Keeping Mobile afloat

Peterson's gushing August 2014 email about his company's fundraising success was, in many respects, a sigh of relief: That summer, his company nearly ran out of money, documents show.

Mobile financial records provided by Burke show Farnsworth made his investments at this point. They also indicate Billingsley found an infusion of at least $2 million from a then-97-year-old Pennsylvania millionaire named Frank Pavlis.

Billingsley and Pavlis were introduced by mutual friends after Pavlis had lost money in financial scams. Billingsley was supposed to make sure Pavlis wouldn't get ripped off again, said Debby Skeans, who has Pavlis' power of attorney.

Mobile records show Pavlis made a $1 million investment in the company around mid-September 2014, and another $1 million investment at the end of that month.

Shortly after Pavlis' investment, Mobile paid Billingsley $50,000 and Peterson's Inter123 $500,000, records show.

Pavlis also invested more than $2 million in Key Commercial, an online real-estate investment company that until recently listed its leadership team of Billingsley, Peterson, Silberman and Bivens, a partner at Snell & Wilmer and ex-Arizona Democratic Party chairman. Key also invested in Mobile, records show.

Billingsley said he's still involved with Key, but that the others are "advisers."

Pavlis, now 101, said in a recent telephone interview that he remembered Billingsley visiting him a few years ago in his home and that Billingsley persuaded him to invest, "but I don't remember how much it was."

"I hope you can unravel this for me," Pavlis said.

Billingsley declined to answer questions about Pavlis.

**A25**

**A26**

About a year after Pavlis' investment, Mobile again needed money.

Mobile sought new investors through a July 21, 2015, fundraising letter to specific private investors known as a confidential private placement.

In that prospectus, Mobile disclosed that Billingsley was a defendant in an Arizona Corporation Commission case involving LoanGo, co-owned by Billingsley and Peterson. That failed company was designed to provide payday loan services via the Internet.

The commission in late October found that Peterson and LoanGo had sold unregistered securities (/story/money/business/consumers/2017/10/23/state-orders-failed-internet-payday-loan-venture-pay-250-k-defrauded-investors/791422001/). Billingsley was found to have committed fraud as the chief fundraiser.

Though Billingsley disputes the commission's findings, it has ordered him, Peterson and a third officer to repay five elderly investors a combined $250,000 in restitution, and each faces fines of up to $15,000.

Neither Mobile nor its attorneys disclosed in the prospectus that Peterson had been part of that case.

Burke, who has previously served as chief deputy in the Arizona Attorney General's Office, said the failure to disclose to potential investors Peterson's involvement in LoanGo could constitute securities fraud.

"Citing the matter doesn't fix the omission," said Burke, adding he was unaware of the private placement offering until October 2017. "It's like mentioning Bonnie but not Clyde."

## Reviving Quepasa

As Mobile's problems deepened and significant new money did not materialize, Peterson in 2014 hatched another business: a new Quepasa.

He would use the iconic name to focus on Hispanic businesses in the United States and Latin America. A rebooted Quepasa would provide networking, crowdfunding and business development opportunities.

Investments in this venture were much smaller. Its board included Jennifer Lopez's father, David Lopez, and Mario Diaz, a Phoenix political consultant.

David Lopez said Peterson recruited him after offering a $50,000 "sponsorship" in February 2014 to Manos Accelerator, a San Jose venture begun by Lopez to promote Latino-led tech startups.

Though David Lopez said he was led to believe Peterson was personally the sponsor, records provided by Burke show the payment came from Mobile's bank account.

Nick Promponas of Chandler said he invested in Quepasa after attending an evening function with wine and hors d'oeuvres that included Peterson and Lopez.

"I'm not a star-struck guy," Promponas said, referring to JLo's father. "What I cared about was if someone who is relatively famous, and he (Lopez) was famous by default, would he put money out there and embarrass his daughter with a scandal?"

Investors in both Mobile and Quepasa said they were told their payments could be used as short-term debt repaid with high interest payments or equity that later would be converted to company stock. Once the companies went public on stock exchanges, investors expected to get their money back and potentially more.

However, as with other start-ups and many kinds of investments, investors likely may have known they could lose all their money.

Quepasa attracted more than $100,000 in investments, according to SEC records.

But bank records and interviews indicate the finances of Mobile and Quepasa also became intertwined.

From September to December 2015, at least $67,000 was transferred from Quepasa Corp. to Mobile when the latter was having financial problems.

Gordon, the former mayor, said he raised questions. So did Diaz, who says he was kicked off the Quepasa board after only four months for asking Peterson about how investors' money in Quepasa was being spent.

Peterson "is playing catch-me-if-you-can. A lot of the stuff he (Peterson) did was to open up doors to others ... but he burned us all," Diaz said.

**A26**

P-000165

Gordon also didn't last long as an adviser.



**Former Phoenix Mayor Phil Gordon.** *(Photo: Nick Oza/The Republic)*

He said he raised issues with Peterson about intertwining business arrangements between Mobile and Quepasa, but was denied financial records.

Gordon said Peterson wouldn't listen to his advice, and quit after being pressured to raise money.

Shortly after he resigned, Gordon alleges, Billingsley offered to have Mobile cover an all-expense-paid trip for him and a guest to California's Bay Area. Gordon said he never took the trip. Billingsley said he never made such an offer.

David Lopez said he too eventually became wary because Peterson refused to release Quepasa's financial records.

Lopez finally cut ties with Peterson earlier this year. He said he was annoyed that Peterson kept wanting to use his celebrity daughter's name even though she had no involvement.

## Closing up shop

In total, Peterson and his associates raised at least $9 million from U.S. investors for the three failed businesses: Mobile, a reincarnated Quepasa and LoanGo.

Mobile quit operating in early 2016. Bank records suggest its account ran out of money in September 2016.

Quepasa's business license was revoked this year after failing to file proper public annual reports.

While this fall's Corporation Commission vote is intended to force restitution (/story/money/business/consumers/2017/10/23/state-orders-failed-internet-payday-loan-venture-pay-250-k-defrauded-investors/791422001/) for LoanGo's investors, that won't help Mobile and Quepasa investors.

Farnsworth III said he's appealed to Peterson to get his father's money back to help his widowed mother. He said Peterson refused and even threatened legal action.

"My dad met Jeff Peterson when he was at a low point professionally, and my dad mentored him to give him a boost of confidence," Farnsworth said. "At the end of the day, this is an ugly story about a business venture my dad got into."

And it may be difficult getting money from Billingsley.

Billingsley, who filed for Chapter 7 bankruptcy protection in 2001, owed the Internal Revenue Service at least $440,372 for unpaid federal taxes from 2007 to 2011, according to liens filed against him in Connecticut. Property records show he has been living there in a 5,300-square-foot home worth nearly $881,000.

Billingsley said the tax liens are from a prior failed business, and he has a repayment arrangement with the government. An IRS spokesman declined comment.

Investors and some board members plan to turn over the various companies' internal documents, including bank records, to law enforcement, the Corporation Commission, Peterson's Las Vegas bankruptcy trustee and the IRS in hopes of bringing additional investigations and forcing investors' repayment, one board member told *The Republic.*

Peterson has hired Chris Rapp, a Phoenix criminal defense attorney. Rapp declined to comment.

*Reach the reporter at craig.harris@arizonarepublic.com or 602-444-8478 or on Twitter at @charrisazrep.*

**READ MORE:**

Prescott mayoral candidate receives settlement after suing Phoenix 'dark money' operative (/story/news/local/arizona-investigations/2017/12/04/prescott-woman-receives-settlement-dark-money-defamation-case-with-max-fose/913982001/)

Big raises, bonuses at one Arizona agency, as state social workers get $1-a-day bump (/story/news/local/arizona-investigations/2017/11/28/big-raises-bonuses-handed-out-arizona-department-administration/898144001/)

CONFIDENTIAL

**A28**

Discover something new in 2018!
## $9.99/month

Subscribe
(http://fullaccess.azcentral.com/newstart/specialoffer?
gps-
source=BENBjan&utm_medium=nanobar&utm_source=bounce-
exchange&utm_campaign=WINTER18)

# State orders failed internet payday loan venture to pay $250K to defrauded investors

**Craig Harris, The Republic | azcentral.com**   Published 5:56 p.m. MT Oct. 23, 2017



*(Photo: Tom Tingle/The Republic)*

The Arizona Corporation Commission on Monday ordered three co-owners of LoanGo, a failed Chandler-based internet payday-loan company, to repay five older investors who were defrauded of a combined $250,000.

The commission, in a 5-0 vote, also ordered LoanGo Chief Executive Jeff Peterson, former Valley insurance agent Justin Billingsley and businessman John Keith Ayers to pay fines of up to $15,000 each.

Peterson is a former Arizona-Mexico Commission member, major donor to Arizona Democratic candidates, and founder of Quepasa, a now-defunct Latino online social-media outlet.

The commission upheld the findings of its Securities Division and an administrative law judge who concluded the investors were defrauded after making investments in 2011 and 2012.

Regulators also found that Billingsley and LoanGo committed securities fraud by making misrepresentations to investors and failing to disclose key information. Peterson was accused of selling unregistered securities while not being a registered securities dealer. Ayers was named because of his ownership stake in the company.

Ad closed by Google

The investors were snowbirds staying at the Desert Shadows RV Resort in Casa Grande, where they also attended financial planning seminars, records show.

Peterson, who has denied the allegations, did not attend the hearing.

Ayers told the commission that he made a good-faith effort to make the company succeed, did not have access to bank accounts and how the company spent investors' money, and had nothing to do with raising funds. He also noted that he cooperated with securities regulators.

He asked the commission to remove him from the order.

The commission, however, refused to do so.

Commissioner Andy Tobin, in responding to Ayers, noted that Ayers was the company president and a director who had the responsibility to protect investors' funds. Ayers quickly left the hearing after the vote.

Tim Sabo and Don Bivens, newly hired attorneys for Billingsley, asked the commission to delay its ruling for a few months. The lawyers argued about the accuracy of the findings against Billingsley.

Commissioners, however, noted that the case has gone on since June 2015, and former attorneys for Billingsley had numerous opportunities to present a defense for him.

**A28**

The three men can seek a rehearing or appeal to Maricopa County Superior Court. No decision was made on whether to appeal.

The order requires the men to pay restitution within 90 days. The commission can seek assistance from the Attorney General's Office to obtain the money for investors.

Administrative Law Judge Scott M. Hesla on Oct. 10 noted that Billingsley failed to inform investors that their money would be used to repay business startup loans of $10,000 each to himself and Peterson. The judge also wrote that investors were not told Billingsley received a $15,000 commission for obtaining their investments.

The judge noted that Billingsley was repaid his startup loan the same day one person invested $45,000 in LoanGo, and that Peterson was repaid the same day a different person invested $25,000 in the company.

The judge wrote that "a reasonable investor would expect his or her investment to be used for the benefit of the company, not to repay obligations owed to the co-founders." Hesla added: "Failing to disclose that investor funds would be used to repay obligations owed to the company founders is significant and constitutes a material omission."

*Reach the reporter at craig.harris@arizonarepublic.com (https://mail.google.com/mail/?view=cm&fs=1&tf=1&to=craig.harris@arizonarepublic.com) or 602-444-8478 or on Twitter @charrisazrep (https://twitter.com/charrisazrep?lang=en).*

**READ MORE:**

'Mass exodus' after Scottsdale nightclub shooting (/story/news/local/scottsdale/2017/10/22/scottsdale-police-shooting-nightclub-leaves-1-injured/788522001/)

Records: Chandler mom intoxicated, had toddler in backseat during fatal crash on I-10 (/story/news/local/chandler/2017/10/23/records-chandler-mom-intoxicated-toddler-backseat-during-fatal-crash-10/792593001/)

# azcentral.

## Get updates and special offers right in your inbox

Your Email

Unlock Top Offers

Read or Share this story: http://azc.cc/2yF0xB0



**A29**

# Exhibit 4



Deposition of:
# Justin C. Billingsley

*April 27, 2020*

In the Matter of:

# Skeans Vs. Key Commercial Fnance, LLC Et Al.

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

**A31**

Page 1

1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
2
                         - - -
3
   DEBORAH S. SKEANS,              :   CIVIL ACTION
4  Executrix of the ESTATE         :   NUMBER
   OF FRANK E. PAVLIS,             :   1:18-cv-01516-
5               Plaintiff,         :   CFC
               v.                  :
6  KEY COMMERCIAL FINANCE,         :
   LLC, KEY COMMERCIAL             :
7  FINANCE PROPERTIES, LLC,        :
   EQUITY PROS, LLC, and           :
8  MOBILE AGENCY, LLC,             :
               Defendants.         :
9
                         - - -
10
                 Monday, April 27, 2020
11
                         - - -
12
13          Oral deposition of JUSTIN C.
14  BILLINGSLEY, taken remotely via Zoom, at
15  122 Sherwood Hill Road, Brewster, New York
16  10509, beginning at 9:30 a.m., reported
17  stenographically by Cheryl L. Goldfarb, a
18  Registered Professional Reporter, Notary
19  Public, and an approved reporter of the United
20  States District Court.
21                       - - -
22
                 VERITEXT LEGAL SOLUTIONS
23                 MID-ATLANTIC REGION
             1801 Market Street - Suite 1800
24           Philadelphia, Pennsylvania  19103

```
                                             Page 2

 1   A P P E A R A N C E S :
 2
 3           STRADLEY RONON STEVENS & YOUNG, LLP
             BY:   WILLIAM E. MAHONEY, JR., ESQUIRE
 4                 CAMERON REDFERN, ESQUIRE
             2005 Market Street, Suite 2600
 5           Philadelphia, Pennsylvania  19103
             215.564.8000
 6           wmahoney@stradley.com
             credfern@stradley.com
 7           Representing the Plaintiff
             (Via Zoom)
 8
 9
             HALLORAN FARKAS & KITTILA, LLP
10           BY:   WILLIAM E. GREEN, JR., ESQUIRE
                   THEODORE A. KITTILA, ESQUIRE
11           5801 Kennett Pike, Suite C
             Wilmington, Delaware  19807
12           302.257.2011
             wg@hfk.law
13           tk@hfk.law
             Representing the Defendants
14           (Via Zoom)
15
                           - - -
16
17   A L S O   P R E S E N T :
18
             DEBORAH S. SKEANS (Via Zoom)
19
             DARBIN SKEANS (Via Zoom)
20
21                         - - -
22
23
24
```

Page 3

1                    I N D E X
2    WITNESS:  JUSTIN C. BILLINGSLEY
3    QUESTIONED BY:                        PAGE:
4         MR. MAHONEY                        7
5                    - - -
6               E X H I B I T S
7    NUMBER   DESCRIPTION           MARKED FOR ID
8

     P-59     E-mail dated April 15, 2013      13
9             P-000435
10   P-60     E-mail chain dated April 21      18
              through April 23, 2013
11            KCF000110 through 000112
12   P-61     E-mail dated January 11, 2014,   29
              KCF000498
13

     P-62     E-mail dated April 29, 2014      68
14            KCF000752
15   P-63     E-mails dated May 6, 2014        75
              KCF000898 and 000899
16

     P-64     E-mails dated May 2 and 7,       78
17            2014, KCF000906 and 000907
18   P-65     E-mail dated May 30, 2014        84
              and attachment, KCF000936
19            through 000949
20   P-66     E-mail dated September 26,       151
              2014, KCF001325
21

     P-67     E-mail dated September 26,       153
22            2014, KCF001331
23   P-68     Mobile Corporation Note          156
              Purchase Agreement, KCF012339
24            through 012348

```
                                                   Page 4

 1              E X H I B I T S  (Continued)
 2    NUMBER    DESCRIPTION              MARKED FOR ID
 3
      P-69      Documents relating to wire          163
 4              transfers, P-000067 through
                000079
 5
      P-70      E-mail dated November 4, 2014       175
 6              and NPL Purchase and Services
                Agreement Template, KCF001380
 7              through 001401
 8    P-71      E-mail dated November 7, 2014       181
                and $6 million Promissory Note
 9              dated May 20, 2014, KCF001455
                through 001457
10
      P-72      E-mails dated December 1,           187
11              2014, KCF001509
12    P-73      E-mail dated April 15, 2015         225
                P-001719
13
      P-74      E-mail dated May 11, 2015           231
14              KCF002792
15    P-75      E-mails dated July 13 and 14,       233
                2015, KCF003289 and 003290
16
      P-76      E-mail dated August 24, 2015        237
17              and Durable Power of Attorney
                KCF003336 through 003345
18
      P-77      Two-page handwritten document       239
19              dated July 23, 2015 and letter
                dated March 6, 2015, P-000084
20              through 000086
21    P-78      E-mail dated May 11, 2016           249
                P-001800 and 001801
22
      P-79      Fax dated 11/19/2016 from           256
23              Christine Lachapelle
                P-000104 through 000122
24
```

```
                                                     Page 5

 1               E X H I B I T S  (Continued)
 2    NUMBER    DESCRIPTION              MARKED FOR ID
 3
      P-80      E-mails dated December 7,       261
 4              2016 and January 17, 2017
                KCF004442 and 004443
 5
      P-81      E-mails dated December 7,       267
 6              2016 and January 15, 2017
                P-001904 and 001905
 7
      P-82      E-mails dated December 7,       268
 8              2016 and January 15, 2017
                KCF005867 through 005869
 9
      P-83      E-mail dated May 21, 2018       274
10              P-003460 through 003463
11    P-84      E-mail dated June 25, 2018      278
                P-003488
12
      P-85      E-mails dated June 25, 26 and   282
13              29, 2018, P-003493 through
                003495
14
      P-86      Key Commerical Finance, LLC     285
15              Confidential Private Placement
                Memorandum, fax dated June 29,
16              2018, P-003497 through 003541
17    P-87      Subscription Agreement of Key   287
                Commercial Finance, LLC,
18              KCF009281 through 009292
19    P-88      E-mail dated December 18,       307
                2018, KCF013194
20
      P-89      E-mail dated September 30,      337
21              2017, P-001973
22    P-90      Article entitled, "Once-high-   344
                flying Quepasa chief Jeff
23              Peterson under fire as $9M
                gone in online startups"
24              P-000160 through 000168
```

Page 6

1                         - - -

2

            PREVIOUSLY MARKED DOCUMENTS

3

            NUMBER.................PAGE

4

5           P-2.....................97

6           P-3....................100

7           P-4....................124

8           P-5....................167

9           P-7....................212

10          P-8....................213

11          P-9....................214

12          P-10...................220

13          P-38....................43

14          P-40...................116

15          P-47...................191

16          P-52...................202

17          P-53...................199

18          P-57...................228

19                         - - -

20

21

22

23

24

Page 7

1                 DEPOSITION  SUPPORT  INDEX

2

3    DIRECTION  TO  WITNESS  NOT  TO  ANSWER

4    Page    Line

5    (None)

6

7

8    REQUEST  FOR  PRODUCTION  OF  DOCUMENTS

9    Page    Line    Description

10   (None)

11

12

13   STIPULATIONS

14   Page    Line

15   (Pursuant  to  Federal  Rules  of  Civil  Procedure)

16

17

18   QUESTIONS  MARKED

19   Page    Line

20   (None)

21

22

23

24

**A38**

JUSTIN C. BILLINGSLEY

                                                        Page 8

 1                     THE COURT REPORTER:  Counsel, if

 2          you wish, I won't read my statement with

 3          regard to swearing in the witness

 4          remotely into the record.

 5                     MR. MAHONEY:  I'm happy to

 6          consent on behalf of the plaintiff.

 7                     MR. GREEN:  We consent on behalf

 8          of the defendant.

 9                     THE COURT REPORTER:  Mr.

10          Billingsley, will you please raise your

11          right hand.

12                             - - -

13                     JUSTIN C. BILLINGSLEY, after

14          having been first duly sworn/affirmed,

15          was examined and testified as follows:

16                             - - -

17                     THE WITNESS:  I do.

18                             - - -

19                        EXAMINATION

20                             - - -

21     BY MR. MAHONEY:

22          Q.      Good morning, Mr. Billingsley.

23          A.      Good morning.

24          Q.      Please tell me how you first

**A39**

JUSTIN C. BILLINGSLEY

Page 36

```
 1              MR. MAHONEY:   Cheryl, can you
 2         read it back, please.
 3                    - - -
 4              (Whereupon, the court reporter
 5         read back the following:
 6                 "QUESTION:   I'm only interested
 7         in what you know.   So he invests a
 8         million dollars with Allwest.
 9                 "Are you suggesting that when he
10         made that investment, he thought it was
11         for or in connection with some other
12         project that you were going to be
13         leading?")
14                    - - -
15      A.         Yes.
16   BY MR. MAHONEY:
17      Q.         Okay.   And what project was
18   that?
19      A.         That's the project that
20   eventually became Key Commercial Finance.
21      Q.         When did you first start
22   discussing the project that eventually became
23   Key Commercial Finance with Mr. Pavlis?
24      A.         It's hard to remember.   We had
```

**A40**

JUSTIN C. BILLINGSLEY

Page 125

```
 1        Q.        All right.  Mr. Billingsley,
 2   this is a copy of what purports to be a
 3   $3 million convertible promissory note dated
 4   September 1, 2014 from Key Commercial Finance,
 5   LLC to Mr. Pavlis.
 6                   Tell me when this document was
 7   created, please.
 8        A.        I don't recall.
 9        Q.        Was it created on or before
10   September 1 of 2014?
11        A.        I would believe it was.  We were
12   working on these documents months before that.
13        Q.        Months before.  So you started
14   the process of drafting a promissory note
15   months before September of 2014; is that right?
16        A.        Correct.
17        Q.        Do you recall presenting this to
18   Mr. Pavlis for signature?
19                   I take that back.  In fairness,
20   the note is not signed by Mr. Pavlis.  The
21   corresponding note purchase agreement is.
22                   Do you recall having or
23   presenting Mr. Pavlis with a copy of the note
24   and the note purchase agreement for his
```

# A41

JUSTIN C. BILLINGSLEY

Page 126

1   signature?

2        A.      Many times.

3        Q.      Well, I'm only aware that this

4   is the one he signed.  So when you say "Many

5   times," what are you talking about?

6        A.      We would sit down many times to

7   look at the documents.  I've said that before.

8        Q.      I'm only talking about this one,

9   okay, the final one.

10              Are you aware of a promissory

11  note that in any way supersedes this one?

12       A.      I -- as I mentioned, there were

13  many versions.

14       Q.      Can you answer my question,

15  please?  Because I'll represent to you that

16  this has been identified as one of the two

17  notes that Key Commercial actually issued to

18  Mr. Pavlis.

19       A.      What's the question?

20       Q.      Yes.  If this is the note that

21  was issued, then I'm not interested in other

22  version of it.  I'm talking about this one.

23       A.      Okay.

24       Q.      My question is, did you provide

JUSTIN C. BILLINGSLEY

Page 132

1    Why wasn't this note made for

2    $7 million?

3       A.       I forget all the details that

4    were -- we were working with Frank.   Frank was

5    very particular about all of these details.   I

6    could have answered that question very well

7    maybe five or six years ago.   I don't remember

8    all the details that influenced that decision

9    now.

10       Q.       This purports to be a note that

11   would pay Mr. Pavlis eight percent annually for

12   a period of five years.   But the interest would

13   not be paid until the end of the five-year

14   period.

15              Is that your understanding?

16       A.       I -- I don't recall.   If you

17   would like me to work through the document, I

18   can verify that.

19       Q.       No.   I'm going to ask you to

20   accept the representation that I made that

21   that's what it says.

22              And my question is this:   How

23   did you come up with eight percent interest

24   annually, but payable at the end of five years?

# Exhibit 5

**A43**

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

## KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$3,000,000                                                September 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **THREE MILLION AND 00/100** Dollars ($3,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) September 1, 2019 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof. This Note is one of the "**Notes**" issued pursuant to the Note Purchase Agreement dated as of September 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement). Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      *Definitions*. As used in this Note, the following capitalized terms have the following meanings:

(a)      "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

(b)      "**Event of Default**" has the meaning given in **Section 4** hereof.

(c)      "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

**A43**

**A44**

      (d)    "**Lien**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

      (e)    "**Majority in Interest**" shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

      (f)    "**Note Purchase Agreement**" has the meaning given in the introductory paragraph hereof.

      (g)    "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term "**Obligations**" shall not include any obligations of Company.

      (h)    "**Person**" shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

      (i)    "**Securities Act**" shall mean the Securities Act of 1933, as amended.

      (j)    "**Transaction Documents**" shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

    2.    *Interest*. Accrued interest on this Note shall be payable at maturity.

    3.    *Prepayment*. Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

    4.    *Events of Default*. The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

      (a)    *Failure to Pay*. The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note.docx

**A44**

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

(b)   *Voluntary Bankruptcy or Insolvency Proceedings.*  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(c)   *Involuntary Bankruptcy or Insolvency Proceedings.*  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

5.   ***Rights of Investor upon Default.***  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

6.   ***Conversion.***

(a)   *Automatic Conversion.*  In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $3,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

(b)   *Automatic Conversion on Change of Control.*  In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note.docx

CONFIDENTIAL

KCF005807

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis.  The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions.  Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.  The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

(c)     *Conversion Procedure.*  Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests.  The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)     *Fractional Membership Interests; Interest; Effect of Conversion.*  No fractional Membership Interests shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence.  In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence.  Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

7.     ***Change of Control.***  Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full.  The term "**Change of Control**" means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note.docx

**A46**

                                                                                    KCF005808

Company is cancelled or converted or a combination thereof occurs. The term "**Change of Control Payment**" means an amount equal to one (1) times the outstanding principal amount of such Note.

8.      *Successors and Assigns*. Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.      *Waiver and Amendment*. Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.      *Transfer of this Note or Securities Issuable on Conversion Hereof*. With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.      *Assignment by the Company*. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.      *Notices*. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.      *Pari Passu Notes*. Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note.docx

**A47**

**A48**

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

       14.    *Usury*. In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

       15.    *Waivers*. The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

       16.    *Governing Law*. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

kcf Form of Convertible Note.docx

**A48**

CONFIDENTIAL

KCF005810

**A49**

The Company has caused this Note to be issued as of the date first written above.

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name:  Michael Silberman
Title:  Executive Vice President

**A49**

CONFIDENTIAL

KCF005811

**A50**

## KEY COMMERCIAL FINANCE LLC

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of September 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

### RECITALS

A.    On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000.  This Agreement and the Note shall be collectively referred to below as (the "**Transaction Documents**").

B.    Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.    Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

### AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    *The Notes.*

(a)    *The Notes.*  Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

(b)    *Delivery.*  The sale and purchase of the Notes shall take place at a closing to be held on September 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 1511 Route 22 Suite 152 Brewster NY 10509 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**").  At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note. Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**").  At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price.  Each of the Notes will be registered in such Investor's name in the Company's records.

**A50**

# A51

(c)     *Investor's Commitment to Fund the Closing; Binding Obligation.*  Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I**.  Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

(d)     *Use of Proceeds.*  The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

(e)     *Payments.*  The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

2.      ***Representations and Warranties of the Company.***  The Company represents and warrants to each Investor that:

(a)     *Due Incorporation, Qualification, etc.*  The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(b)     *Authority.*  The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

(c)     *Enforceability.*  Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)     *Non-Contravention.*  The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws ("**Charter Documents**") or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

(e)     *Approvals.*  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

# A51

                                                                 KCF005813

**A52**

stockholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby.

(f)     *No Violation or Default.* The Company is not in violation of or in default with respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(g)     *Intellectual Property.* To the best of its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights of, others.

3.     ***Representations and Warranties of Investors***. Each Investor, for that Investor alone, represents and warrants to the Company upon the acquisition of the Note as follows:

(a)     *Binding Obligation.* Such Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Each of this Agreement and the Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)     *Securities Law Compliance.* Such Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act of 1933 (the **"Securities Act"**), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Such Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration. Such Investor has not been formed solely for the purpose of making this investment and is purchasing the Note to be acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. Such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time. Such Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act.

(c)     *Access to Information.* Such Investor acknowledges that the Company has given such Investor access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by such Investor, and has furnished such Investor with all documents and other information required for such Investor to make an informed decision with respect to the purchase of the Note.

4.     ***Conditions to Closing of the Investors***. Each Investor's obligations at the Closing or Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

**A52**

**A53**

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

(a)     *Representations and Warranties.*  The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)     *Governmental Approvals and Filings.*  Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)     *Legal Requirements.*  At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)     *Proceedings and Documents.*  All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

(e)     *Transaction Documents.*  The Company shall have duly executed and delivered to the Investors the following documents:

(i)     This Agreement; and

(ii)     Each Note issued hereunder.

5.     ***Conditions to Obligations of the Company.***  The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

(a)     *Representations and Warranties.*  The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)     *Governmental Approvals and Filings.*  Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)     *Legal Requirements.*  At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)     *Purchase Price.*  Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I**.

**A53**

**A54**

6.   *Miscellaneous*.

(a)   *Waivers and Amendments*.  Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent.  Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto.  Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterparty signature page to this Agreement, together with a supplement to **Schedule I** hereto.  Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

(b)   *Governing Law*.  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(c)   *Survival*.  The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d)   *Successors and Assigns*.  Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(e)   *Registration, Transfer and Replacement of the Notes*.  The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes.  Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary.  Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered.  Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f)   *Assignment by the Company*.  The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

**A54**

**A55**

(g)     *Entire Agreement.*  This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(h)     *Notices.*  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I,** or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(i)     *Payment of Fees and Expenses.*  Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

(j)     *Separability of Agreements; Severability of this Agreement.*  The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale.  Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors.  Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors.  If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(k)     *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.  Facsimile copies of signed signature pages will be deemed binding originals.

**A55**

KCF005817

**A56**

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

COMPANY:

KEY COMMERCIAL FINANCE LLC
A Delaware Limited Liability Company

By: _____
Name: Michael Silberman
Title: Executive Vice President

**A56**

CONFIDENTIAL

KCF005818

**A57**

**INVESTORS**

DATE: 8-21-19

NAME: Frank E Pavlis

TITLE: FRANK E PAVLIS

**A57**

CONFIDENTIAL

KCF005819

A58

## SCHEDULE I

| Name and Address | Closing Note Principal Amount |
|---|---|
| **Closing: September 30, 2014** | |
| **Frank Pavlis**<br>1500 Hamilton St.<br>Allentown, PA 18102 | $3,000,000 |

I-1

A58

KCF005820

**A59**

<u>**Exhibit A**</u>

**FORM OF NOTE**

**A59**

CONFIDENTIAL

KCF005821

**A60**

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

### KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$4,000,000                                                                                            November 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **FOUR MILLION AND 00/100** Dollars ($4,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) November 1, 2020 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof.  This Note is one of the "**Notes**" issued pursuant to the Note Purchase Agreement dated as of November 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement).  Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      *Definitions*.  As used in this Note, the following capitalized terms have the following meanings:

(a)      "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

(b)      "**Event of Default**" has the meaning given in **Section 4** hereof.

(c)      "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

**A60**

                                                                                            KCF008323

**A61**

(d)      "**Lien**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e)      "**Majority in Interest**" shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f)      "**Note Purchase Agreement**" has the meaning given in the introductory paragraph hereof.

(g)      "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term "**Obligations**" shall not include any obligations of Company.

(h)      "**Person**" shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i)      "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(j)      "**Transaction Documents**" shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2.      *Interest*.  Accrued interest on this Note shall be payable at maturity.

3.      *Prepayment*.  Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4.      *Events of Default*.  The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a)      *Failure to Pay*.  The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note Pavlis 11:14.docx   -2-

**A61**

KCF008324

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

(b)   *Voluntary Bankruptcy or Insolvency Proceedings*.  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(c)   *Involuntary Bankruptcy or Insolvency Proceedings*.  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

5.   ***Rights of Investor upon Default***.  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

6.   *Conversion*.

(a)   *Automatic Conversion*.  In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $4,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

(b)   *Automatic Conversion on Change of Control*.  In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note Pavlis 11:14.docx    -3-

CONFIDENTIAL                                                                                                    KCF008325

**A63**

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis.  The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions.  Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.  The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

       (c)    *Conversion Procedure.*  Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests.  The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however,* that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

       (d)    *Fractional Membership Interests; Interest; Effect of Conversion.*  No fractional Membership Interests shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence.  In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence.  Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

    7.    ***Change of Control.***  Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full.  The term "**Change of Control**" means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note Pavlis 11:14.docx   -4-

**A63**

                                     KCF008326

**A64**

Company is cancelled or converted or a combination thereof occurs.  The term "**Change of Control Payment**" means an amount equal to one (1) times the outstanding principal amount of such Note.

8.      *Successors and Assigns*.  Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.      *Waiver and Amendment*.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.     *Transfer of this Note or Securities Issuable on Conversion Hereof*.  With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect).  Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company.  If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made.  Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act.  The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions.  Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company.  Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.     *Assignment by the Company*.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.     *Notices*.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing.  All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.     *Pari Passu Notes*.  Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes.  In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note Pavlis 11:14.docx     -5-

**A64**

KCF008327

**A65**

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

      14.    *Usury*.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

      15.    *Waivers*.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

      16.    *Governing Law*.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

kcf Form of Convertible Note Pavlis 11:14.docx    -6-

**A65**

CONFIDENTIAL

KCF008328

**A66**

The Company has caused this Note to be issued as of the date first written above.

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name:  Michael Silberman
Title:  Executive Vice President

**A66**

CONFIDENTIAL

KCF008329

**A67**

## KEY COMMERCIAL FINANCE LLC

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of November 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

## RECITALS

A.        On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000.  This Agreement and the Note shall be collectively referred to below as (the **"Transaction Documents"**).

B.        Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.        Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.        *The Notes*.

(a)        *The Notes*.  Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

(b)        *Delivery*.  The sale and purchase of the Notes shall take place at a closing to be held on November 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 51 Bedford Rd., Katonah, NY 10536 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**").  At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note.  Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**").  At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price.  Each of the Notes will be registered in such Investor's name in the Company's records.

**A67**

**A68**

       (c)     *Investor's Commitment to Fund the Closing; Binding Obligation.* Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I**. Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

       (d)     *Use of Proceeds.* The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

       (e)     *Payments.* The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

     2.     ***Representations and Warranties of the Company.*** The Company represents and warrants to each Investor that:

       (a)     *Due Incorporation, Qualification, etc.* The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

       (b)     *Authority.* The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

       (c)     *Enforceability.* Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

       (d)     *Non-Contravention.* The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws (**"Charter Documents"**) or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

       (e)     *Approvals.* No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

-2-

**A68**

KCF008331

**A69**

stockholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby.

(f) *No Violation or Default*. The Company is not in violation of or in default with respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(g) *Intellectual Property*. To the best of its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights of, others.

3. ***Representations and Warranties of Investors***. Each Investor, for that Investor alone, represents and warrants to the Company upon the acquisition of the Note as follows:

(a) *Binding Obligation*. Such Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Each of this Agreement and the Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) *Securities Law Compliance*. Such Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act of 1933 (the **"Securities Act"**), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Such Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration. Such Investor has not been formed solely for the purpose of making this investment and is purchasing the Note to be acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. Such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time. Such Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act.

(c) *Access to Information*. Such Investor acknowledges that the Company has given such Investor access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by such Investor, and has furnished such Investor with all documents and other information required for such Investor to make an informed decision with respect to the purchase of the Note.

4. ***Conditions to Closing of the Investors***. Each Investor's obligations at the Closing or Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

-3-

**A69**

 KCF008332

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

(a)      *Representations and Warranties.*  The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)      *Governmental Approvals and Filings.*  Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)      *Legal Requirements.*  At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)      *Proceedings and Documents.*  All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

(e)      *Transaction Documents.*  The Company shall have duly executed and delivered to the Investors the following documents:

(i)      This Agreement; and

(ii)      Each Note issued hereunder.

5.      ***Conditions to Obligations of the Company.***  The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

(a)      *Representations and Warranties.*  The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)      *Governmental Approvals and Filings.*  Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)      *Legal Requirements.*  At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)      *Purchase Price.*  Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I**.

-4-

**A70**

                                                                                                 KCF008333

**A71**

6.    *Miscellaneous*.

(a)    *Waivers and Amendments*.  Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent.  Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto.  Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterparty signature page to this Agreement, together with a supplement to **Schedule I** hereto.  Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

(b)    *Governing Law*.  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(c)    *Survival*.  The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d)    *Successors and Assigns*.  Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(e)    *Registration, Transfer and Replacement of the Notes*.  The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes.  Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary.  Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered.  Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f)    *Assignment by the Company*.  The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

**A71**

CONFIDENTIAL

KCF008334

**A72**

(g)     *Entire Agreement.*  This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(h)     *Notices.*  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I**, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(i)     *Payment of Fees and Expenses.*  Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

(j)     *Separability of Agreements; Severability of this Agreement.*  The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale.  Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors.  Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors.  If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(k)     *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.  Facsimile copies of signed signature pages will be deemed binding originals.

**A72**

CONFIDENTIAL                                                                      KCF008335

**A73**

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

COMPANY:

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name: Michael Silberman
Title: Executive Vice President

**A73**

CONFIDENTIAL

KCF008336

**INVESTORS**

DATE: 11-21-14

NAME: Frank E. Pavlis

TITLE: Frank E. Pavlis

**A74**

**KCF008337**

**A75**

**SCHEDULE I**

| Name and Address | Closing<br>Note Principal Amount |
|---|---|
| **Closing: November 30, 2014** | |
| **Frank Pavlis**<br>1500 Hamilton St.<br>Allentown, PA 18102 | $4,000,000 |

I-1

**A75**

CONFIDENTIAL                                                                                                      KCF008338

**A76**

**Exhibit A**

**FORM OF NOTE**

**A76**

CONFIDENTIAL
KCF008339

**A77**

**Exhibit B**

**DISCLOSURE SCHEDULE**

None.

**CONFIDENTIAL**

**KCF008340**

**A78**

**<u>Exhibit B</u>**

**DISCLOSURE SCHEDULE**

None.

**A78**

CONFIDENTIAL

KCF005822

# Exhibit 6



Deposition of:

# George Chadwick Self

*April 20, 2020*

In the Matter of:

# Deborah S.  Skeans Vs. Key Commercial Fnance, LLC Et Al.

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

```
                                                    Page 1

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
2
                            - - -
3

     DEBORAH S. SKEANS,            :   CIVIL ACTION
4    Executrix of the ESTATE       :   NUMBER
     OF FRANK E. PAVLIS,           :   1:18-cv-01516-
5              Plaintiff,          :   CFC
                    v.             :
6    KEY COMMERCIAL FINANCE,       :
     LLC, KEY COMMERCIAL           :
7    FINANCE PROPERTIES, LLC,      :
     EQUITY PROS, LLC, and         :
8    MOBILE AGENCY, LLC,           :
               Defendants.         :
9
                            - - -
10
                   Monday, April 20, 2020
11
                            - - -
12
13           Oral deposition of GEORGE CHADWICK
14   SELF, taken remotely via Zoom, at 260 McManus
15   Road North, Patterson, New York 12563,
16   beginning at 9:31 a.m., reported
17   stenographically by Cheryl L. Goldfarb, a
18   Registered Professional Reporter, Notary
19   Public, and an approved reporter of the United
20   States District Court.
21                          - - -
22
                 VERITEXT LEGAL SOLUTIONS
23                 MID-ATLANTIC REGION
           1801 Market Street - Suite 1800
24         Philadelphia, Pennsylvania  19103
```

```
                                                       Page 2

 1   A P P E A R A N C E S :
 2
 3           STRADLEY RONON STEVENS & YOUNG, LLP
             BY:   WILLIAM E. MAHONEY, JR., ESQUIRE
 4                 CAMERON REDFERN, ESQUIRE
             2005 Market Street, Suite 2600
 5           Philadelphia, Pennsylvania  19103
             215.564.8000
 6           wmahoney@stradley.com
             credfern@stradley.com
 7           Representing the Plaintiff
             (Via Zoom)
 8
 9
             HALLORAN FARKAS & KITTILA, LLP
10           BY:   WILLIAM E. GREEN, JR., ESQUIRE
                   THEODORE A. KITTILA, ESQUIRE
11           5801 Kennett Pike, Suite C
             Wilmington, Delaware  19807
12           302.257.2011
             wg@hfk.law
13           tk@hfk.law
             Representing the Defendants
14           (Via Zoom)
15
                           - - -
16
17   A L S O   P R E S E N T :
18
             DEBORAH S. SKEANS (Via Zoom)
19
             JUSTIN BILLINGSLEY (Via Zoom)
20
21                         - - -
22
23
24
```

Page 3

```
 1                    I N D E X
 2                      - - -
 3  WITNESS:  GEORGE CHADWICK SELF
 4  QUESTIONED BY:                          PAGE:
 5       MR. MAHONEY                           9
 6                      - - -
 7                  E X H I B I T S
 8  NUMBER    DESCRIPTION               MARKED FOR ID
 9
    P-1       Certificate of Formation of        42
10            Key Commercial Finance, LLC
              KCF012481 and 012482
11
    P-2       Key Commercial Finance, LLC        64
12            Confidential Private Placement
              Memorandum, KCF013117 through
13            013134
14  P-3       Subscription Agreement of Key      74
              Commercial Finance, LLC
15            Effective as of August 18, 2014
              KCF013105 through 013116
16
    P-4       Key Commercial Finance            80
17            Convertible Promissory Note
              for $3,000,000 dated
18            September 1, 2014, KCF005805
              through 005822
19
    P-5       Key Commercial Finance            91
20            Convertible Promissory Note
              for $4,000,000 dated
21            November 1, 2014, KCF008323
              through 008340
22
    P-6       E-mail dated December 16,        100
23            2014, KCF001642
24
```

Page 4

1             E X H I B I T S  (Continued)
2    NUMBER    DESCRIPTION              MARKED FOR ID
3
     P-7       E-mail dated April 2, 2015          111
4              KCF002493 through 002495
5    P-8       E-mail dated April 2, 2015          115
               KCF002499 through 002501
6
     P-9       E-mails dated April 3, 2015         120
7              KCF002512 and 002513
8    P-10      E-mail dated April 6, 2015          124
               and attachment, KCF002514
9              through 002516
10   P-11      E-mails dated April 7, 2015         126
               KCF002524
11
     P-12      E-mail dated April 7, 2015          130
12             and Webster Bank Wire
               Instructions, KCF002526 and
13             002527
14   P-13      E-mails dated April 2 and 10,       136
               2015, KCF002547 through 002549
15
     P-14      E-mail dated April 22, 2015         141
16             and Wells Fargo Account Summary
               KCF002760 and 002761
17
     P-15      E-mails dated June 5, 2015          144
18             KCF002833 and 002834
19   P-16      Certificate of Formation of         151
               Mobile Agency, LLC, KCF012487
20
     P-17      Articles of Organization of         162
21             Equity Pros, LLC, KCF013400
22   P-18      E-mail dated September 25,          175
               2013 and attachment, KCF003425
23             through 003427
24

Page 5

```
1                E X H I B I T S  (Continued)
2     NUMBER    DESCRIPTION                MARKED FOR ID
3
      P-19      E-mail dated October 5, 2015         178
4               KCF003525
5     P-20      E-mail dated November 2, 2015        181
                with attachment, KCF003560
6               through 003583
7     P-21      E-mails dated November 30,           186
                2015 with attachments
8               KCF003624 through 003637
9     P-22      E-mails dated November 30            188
                and December 2, 2015
10              KCF003638 through 003640
11    P-23      E-mail dated December 31,            191
                2015, KCF003697
12
      P-24      Document entitled, "Frank            203
13              Pavlis CA, IL, GA Inventory"
                KCF005866
14
      P-25      Statement of Return of              207
15              Capital dated May 16, 2016
                KCF003840
16
      P-26      Amended and Restated                213
17              Limited Liability Company
                Agreement of Mobile GP, LLC
18              dated November 7, 2017
                KCF013725 through 013738
19
      P-27      E-mail dated December 6,             219
20              2016, KCF012790 and 012791
21    P-28      E-mail dated August 14, 2017         222
                and attachment, KCF004995
22              through 004997
23    P-29      Operating Agreement of Mobile        226
                Agency California, LLC
24              KCF012843 through 012856
```

Page 6

```
1            E X H I B I T S  (Continued)
2    NUMBER   DESCRIPTION              MARKED FOR ID
3
     P-30    Mobile Agency California,          227
4            LLC Contract for the Sale and
             Purchase of Real Estate
5            KCF012969 through 012974
6    P-31    Consent of the Majority in        231
             Interest Member Equity Pros
7            Southeast, LLC dated
             November 28, 2018, KCF013192
8            and 013193
9    P-32    Document entitled, "Sky           267
             Lending Appraisal Kit Order Form"
10           KCF013171 through 013173
11   P-33    Key Commercial Finance, LLC       276
             Balance Sheet as of December 31,
12           2019
13   P-34    Key Commercial Finance, LLC       317
             General Ledger, January 2015 -
14           December 2019
15
                         - - -
16
17
18
19
20
21
22
23
24
```

**A86**

Page 7

1                    DEPOSITION SUPPORT INDEX

2

3   DIRECTION TO WITNESS NOT TO ANSWER

4   Page    Line

5   (None)

6

7

8   REQUEST FOR PRODUCTION OF DOCUMENTS

9   Page    Line    Description

10  (None)

11

12

13  STIPULATIONS

14  Page    Line

15  (Pursuant to Federal Rules of Civil Procedure)

16

17

18  QUESTIONS MARKED

19  Page    Line

20  (None)

21

22

23

24

Page 8

1          THE COURT REPORTER:  The

2      attorneys participating in this

3      deposition acknowledge that I am not

4      physically present in the deposition room

5      and that I will be reporting this

6      deposition remotely.

7              They further acknowledge that in

8      lieu of an oath administered in person, I

9      will administer the oath remotely.  The

10     parties and their counsel consent to this

11     arrangement and waive any objections to

12     this manner of reporting.

13              Please indicate your agreement

14     by stating your name and your agreement

15     on the record.

16              MR. MAHONEY:  This is Bill

17     Mahoney, on behalf of the plaintiff, and

18     we agree.

19              MR. GREEN:  Bill Green, on

20     behalf of defendants, we agree.

21              THE COURT REPORTER:  Mr. Self,

22     will you please raise your right hand.

23                      - - -

24              GEORGE CHADWICK SELF, after

**A88**

```
                                            Page 9
 1          having been first duly sworn/affirmed,

 2          was examined and testified as follows:

 3                        - - -

 4                  THE WITNESS:  Yes, ma'am, I do.

 5                  THE COURT REPORTER:  Thank you.

 6                        - - -

 7                  EXAMINATION

 8                        - - -

 9   BY MR. MAHONEY:

10        Q.        Good morning, Mr. Self.

11        A.        Good morning.

12        Q.        My name is Bill Mahoney, and I

13   represent the plaintiff in this matter.  Thank

14   you for taking time today.  I'll be asking you

15   some questions.  Your job is, to best of your

16   ability, to answer them truthfully.

17                  Is there any reason why you

18   think you may not be able to give truthful

19   answers to my questions?

20        A.        No, sir.

21        Q.        And I assume you are at your

22   house right now?

23        A.        Yes, sir.

24        Q.        Is anybody there with you in
```

**A89**

GEORGE CHADWICK SELF

Page 83

1    know, again, it's been -- it's been a while

2    since -- since I've talked to Michael.

3         Q.        When was the last time you spoke

4    with him?

5         A.        I don't have a date on it.  His

6    son died tragically.  And I know I reached out

7    to him after that happened.  But I don't -- I

8    couldn't put a date on it.

9         Q.        Okay.

10        A.        It was sometime after the

11   Mobile Co. implosion.

12        Q.        Okay.  Are you aware if Key had

13   any officers; for example, a president, vice

14   president, secretary, anything?

15        A.        No, I'm not.

16        Q.        Fair to say that if that

17   actually existed, you would know as the sole

18   member and at least one of the two people

19   running Key?

20                  MR. GREEN:  Object to the form.

21                  You can answer.

22                  THE WITNESS:  Okay.  I'm sorry.

23        Can you restate that?

24   BY MR. MAHONEY:

**A90**

GEORGE CHADWICK SELF

Page 168

```
 1   brand, for example, and then maybe Key or
 2   another entity would actually be engaged in the
 3   paperwork for buying or selling?
 4        A.        I'm trying to remember how
 5   the -- the paperwork was.  I believe -- and,
 6   again, you know, I believe that Equity Pros
 7   became the funding partner for Gary and
 8   Mr. Dowdle and Deborah Billingsley's Atlanta
 9   efforts, so.  And in that sense, Equity Pros
10   owned real estate, yes.
11        Q.        I'm sorry.  What organization
12   was going to be the funding source for Equity
13   Pros?
14        A.        Equity Pros -- I think the name
15   of the joint venture in -- if you want to call
16   it a joint venture, again, I'm not sure what
17   the legal term is -- but for the Atlanta
18   venture was Equity Pros Southeast.  And that
19   was its own entity that had, I believe, Gary as
20   a member, Mr. Dowdle, Tom Dowdle, who is a
21   local Atlanta guy, and Ms. Billingsley.
22        Q.        Okay.  And, again, if I missed
23   this, forgive me for being obtuse.  But how was
24   Equity Pros or Equity Pros Southeast funded?
```

**A91**

GEORGE CHADWICK SELF

Page 169

```
 1          A.          Via Key.

 2          Q.          So Key provided the funding to

 3     Equity Pros.  And at the moment, if we can

 4     agree, we can say Equity Pros to include Equity

 5     Pros, LLC, and I believe Equity Pros Southeast

 6     was a separate LLC, but I'll confirm that in a

 7     minute.

 8          A.          It was a separate LLC.  The

 9     reason for that at the time was, Gary had the

10     HomeVestors relationship.  And HomeVestors

11     insisted on 100 percent exclusivity.

12                      And that's not -- that's not

13     what we were looking -- we were looking to go

14     more national.  So -- so they -- Equity Pros

15     Southeast, that venture taught us a lot about

16     how house flipping worked, that sort of stuff.

17                      So the -- my impression is that

18     the -- the -- and I got these confused myself

19     often, because it was sort of dumb to name then

20     the same thing, only Southeast, in the sense of

21     it was just hard to keep track of what was

22     what.  But it was my impression that Equity

23     Pros funded the Southeast venture, yes.

24          Q.          Do you have a sense of how many
```

**A92**

GEORGE CHADWICK SELF

Page 173

1   manager of Equity Pros, LLC, right?

2        A.        Yeah.  I guess so, yes.

3        Q.        Do you know who were the members

4   of Equity Pros Southeast, LLC?

5        A.        Yeah.  Like I just said, I think

6   those members were Mr. -- Allwest, so Gary,

7   Deborah, and Tom Dowdle.

8        Q.        Neither of those people had any

9   formal relationship with Key, correct?  They

10  weren't members?  They weren't managers?

11       A.        No, I don't believe so.

12       Q.        So it was a totally separate

13  entity from Key, correct?

14       A.        Yes.

15       Q.        So in order for Key to give what

16  turns out to be, I think, about $2.7 million or

17  so of its money to a separate corporate entity,

18  one would think that there would be some

19  documentation of that.  That's what I'm asking

20  about.

21       A.        Oh.  Oh, okay.  I see what

22  you're --

23                 MR. GREEN:  Well, I'll object to

24       the form.

**A93**

GEORGE CHADWICK SELF

Page 174

```
 1              You can answer that.

 2      A.         (Continuing) Yeah, I can see

 3  why -- why that's not ideal.  But I don't think

 4  that there is like a letter that says I, Chad

 5  Self, am sending this money to this other

 6  entity for this purpose.

 7  BY MR. MAHONEY:

 8      Q.         Okay.  You're not aware of any

 9  other document, letter or something more

10  formal, in terms of an agreement, right, on

11  that issue?

12      A.         Yes.

13      Q.         Okay.  All right.  I'm going to

14  ask you something a little bit different, only

15  because chronologically, it comes in in that

16  order.

17      A.         Okay.

18              MR. MAHONEY:  Cam, would you

19      throw up 070 and 071.

20              THE WITNESS:  I'm going to plug

21      in my power supply here.  One second.

22              MS. REDFERN:  Okay.  And these

23      will be marked together as P-18.

24              MR. MAHONEY:  P-18, thank you.
```

# Exhibit 7

**From:** Burke, Dennis K <BurkeD@ballardspahr.com>
**Sent:** Friday, April 27, 2018 9:52 PM
**To:** Mahoney, William <WMahoney@STRADLEY.COM>
**Subject:** FW: Board Call Additional Material

**A94**

---

**External Email - Think Before You Click**

Have a nice weekend.  Talk to you next week.

**From:** Michael Silberman <michael.silberman@corp.mobile.co>
**Sent:** Tuesday, June 27, 2017 2:44 PM
**To:** DKB Law <dkburkelawoffices@gmail.com>; Jeffrey Peterson <jp@corp.mobile.co>
**Cc:** Bivens, Don <dbivens@swlaw.com>; Cesar Sanvicente <cesar@corp.mobile.co>; Jeffrey Peterson <ceo@mobile.co>; Lucy Lu <kaiyee4268@gmail.com>; Michael Silberman <silberman1@earthlink.net>
**Subject:** Re: Board Call Additional Material

Jeff speaks for me same here. Probably just wanted to beef up Team section of his company website.

On Tue, Jun 27, 2017 at 2:41 PM Jeffrey Peterson <jp@corp.mobile.co> wrote:

I do not want to speak definitively for Michael Silberman (MDS) but based on what I know as someone generally familiar with MDS's business history, business judgment, and other factors, I am quite certain MDS had nothing to do with this Billingsley venture as well.

Michael?

Jeffrey Peterson
Chief Executive Officer
Chairman of the Board of Directors
Mobile Corporation (USA)
25 Mt. Auburn Street
Cambridge, MA 02138
phone: +1-617-221-8272
email: ceo@mobile.co
website: mobile.co

On Tue, Jun 27, 2017 at 5:36 PM, DKB Law <dkburkelawoffices@gmail.com> wrote:
 Bizarre.    Same for Michael?

**A94**

**A95**

**From:** Jeffrey Peterson [mailto:jp@corp.mobile.co]
**Sent:** Tuesday, June 27, 2017 2:17 PM
**To:** DKB <dkburkelawoffices@gmail.com>
**Cc:** Cesar Sanvicente <cesar@corp.mobile.co>; Jeffrey Peterson <ceo@mobile.co>; Michael Silberman <michael.silberman@corp.mobile.co>; Lucy Lu <kaiyee4268@gmail.com>; Bivens, Don <dbivens@swlaw.com>; Michael Silberman <silberman1@earthlink.net>
**Subject:** RE: Board Call Additional Material

Correct.

Thanks

Jeff

On Jun 27, 2017 5:15 PM, "DKB Law" <dkburkelawoffices@gmail.com> wrote:
 Hmm.   Interesting.

Your bio was added without your permission and you had no role whatsoever with this enterprise?


**From:** Jeffrey Peterson [mailto:jp@corp.mobile.co]
**Sent:** Tuesday, June 27, 2017 2:12 PM
**To:** DKB Law <dkburkelawoffices@gmail.com>
**Cc:** Cesar Sanvicente <cesar@corp.mobile.co>; Michael Silberman <michael.silberman@corp.mobile.co>; Lucy Lu <kaiyee4268@gmail.com>; Jeffrey Peterson <ceo@mobile.co>; Bivens, Don <dbivens@swlaw.com>; Michael Silberman <silberman1@earthlink.net>
**Subject:** RE: Board Call Additional Material

I have no idea. I have nothing to do with that company and had nothing to do with it in the past.

Thanks

Jeff


On Jun 27, 2017 5:10 PM, "DKB Law" <dkburkelawoffices@gmail.com> wrote:
 When did that company exist and for how long?    Is it completely defunct?    If so, on what date did it cease operating?

 The date on the website is 2016.  So, it existed while you were CEO of Mobile.co and after Justin left Mobile.co with his $150k promissory note.   Right?

 Can you shed some light on this beyond just a "No."

 Thanks


**From:** Jeffrey Peterson [mailto:jp@corp.mobile.co]
**Sent:** Tuesday, June 27, 2017 2:05 PM
**To:** DKB Law <dkburkelawoffices@gmail.com>
**Cc:** Cesar Sanvicente <cesar@corp.mobile.co>; Lucy Lu <kaiyee4268@gmail.com>; Jeffrey Peterson <ceo@mobile.co>; Michael Silberman <michael.silberman@corp.mobile.co>; Bivens, Don <dbivens@swlaw.com>; Michael Silberman

**A95**

<silberman1@earthlink.net>
**Subject:** RE: Board Call Additional Material **A96**

No. As previously stated, I have no business dealings with Justin Billingsley any more.

Jeff


On Jun 27, 2017 4:24 PM, "DKB Law" <dkburkelawoffices@gmail.com> wrote:
 Is this a new company you started with Justin?


http://kcfpartners.com/#Leadership

# Exhibit 8

**A97**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEBORAH S. SKEANS, Executrix of the ESTATE OF FRANK E. PAVLIS, <br><br> Plaintiff, <br> v. <br> KEY COMMERCIAL FINANCE, LLC, KEY COMMERCIAL FINANCE PROPERTIES, LLC, EQUITY PROS, LLC, and MOBILE AGENCY, LLC <br><br> Defendants. <br> <hr> JUSTIN BILLINGSLEY and KEY COMMERCIAL FINANCE, LLC, <br><br> Third-Party Plaintiffs, <br> v. <br> DEBORAH S. SKEANS and DARBIN SKEANS, <br><br> Third-Party Defendants. | No. 1:18-cv-01516-CFC |

## DECLARATION OF DEBORAH S. SKEANS IN SUPPORT OF PLAINTIFF'S ANSWERING BREIF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1.    I, Deborah S. Skeans, am the duly appointed Executrix of the Estate of Frank E. Pavlis.  Prior to Mr. Pavlis death, I was his duly appointed Power of Attorney ("POA") from March 2016 through in September 2018, when Mr. Pavlis

**A97**

**A98**

passed.

2.      After I became Mr. Pavlis' POA, I attempted to gain an understanding of his financial condition and any investments he may have had.  To that end, I reviewed the financial documents in Mr. Pavlis' possession.  I found no documents reflecting any investment that Mr. Pavlis allegedly made in or through Defendant Key Commercial Finance, LLC ("KCF").

3.      Apart from documents relating to his investments with Glenmede Trust, the only document I found relating to any other investment was a an Allwest Investments, LLC ("Allwest") Subscription Agreement, under which Mr. Pavlis agreed to purchase a $1,000,000 Note to be issued by Allwest, together with an Investor Questionnaire signed by Mr. Pavlis, copies of which is attached as Exhibit "A."

4.      The signature page of Investor Questionnaire is identical to the "signature page" purportedly attached to a document entitled "Subscription Agreement of key Commercial Finance LLC," with a purported effective date of August 18, 2014, attached hereto as Exhibit "B").

5.      I found no documents among Mr. Pavlis' papers that made any reference to KCF or any Notes or Note Purchase Agreements allegedly issued by KCF to Mr. Pavlis.

**A98**

**A99**

6.      The first time I saw or learned of any purported KCF Note and Note Purchase Agreement was November 19, 2016, when Justin Billingsley first provided me with a copy of the September 2014 Note.  He never provided me with a copy of the November 2014 Note or corresponding note Purchase Agreement, nor did he ever indicate to me that a second KCF Note for $4,000,000 existed, despite my repeated requests for any documentation relating to Mr. Pavlis' investments.[1]

7.      When I asked Mr. Billingsley to explain what happened to Mr. Pavlis' Allwest investment, as reflected in the Allwest Subscription Agreement referenced above, he responded in January 2017 with an e-mail stating that  Mr. Pavlis never invested with Allwest and that the Allwest documents were never signed.  (*See* 1/17/17 email from Mr. Billingsley, attached as Exhibit "D.")

8.      Throughout 2017, as I continued to request additional information from Mr. Billingsley, he failed to provide any additional documents.

9.      It was not until September 2017, when I first learned that Mr. Billingsley had apparently solicited Mr. Pavlis to invest an additional $2,000,000 in a company called Mobile Corp., as well as Mr.  Billingsley's alleged involvement in

---

[1]     Shortly before he sent me the 2014 Note and Note Purchase Agreement, Mr. Billingsley asked me to be "just a bit more patient" with him, stating that "I thought I had all of the docs but found las night that they failed to send me a few needed pages . . . . They are pushing very hard to get this done quickly."  (*See* 11/11/16 text message, attached as Exhibit "C.")  I understood his reference to "they" to mean Allwest.

**A99**

**A100**

involvement in securities fraud involving elderly investors in a company called Loan Go, that I first suspected that Mr. Billingsley was hiding information relating to Mr. Pavlis' investments.  Mr. Billingsley's conduct was subsequently reported on in a December 14, 2017, article in the Arizona Republic, attached hereto as Exhibit "E".

10.     After Mr. Pavlis passed away on September 28, 2018, I again went through all of the documents he maintained.  I found numerous notes, including several notes reflecting Mr. Pavlis' meetings and/or discussions with Mr. Billingsley.  (*See* Pavlis notes, attached as Exhibit "F".)   However, there were no references to KCF among any of Mr. Pavlis' papers or files, and there were no documents purporting to be (or relate to) any KCF Notes.

11.     When I spoke with Mr. Pavlis about his investment, he only mentioned an investment he had with Allwest.  He had no recollection of KCF or any entity identified as "Key".

I declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated:  August 31, 2020

Deborah S. Skeans

**A100**

# **Exhibit A**



# Allwest RE Partners
## Subscription Agreement

Allwest is a limited liability company that partners with accredited individuals for real estate transactions.

CONFIDENTIAL

**A103**

## ALLWEST INVESTMENTS, LLC

### SUBSCRIPTION DOCUMENTS AND INSTRUCTIONS

### INSTRUCTIONS

The following documents must be completed in accordance with the instructions set forth below and must be executed in order to determine whether you are an accredited investor and, if accredited, in order to subscribe for the purchase of promissory notes (the "Notes") of Allwest Investments, LLC (the "Company").

### PLEASE PRINT THE ANSWERS TO ALL QUESTIONS.

1.    Enclosed are the Following Documents:

(a)    **Subscription Agreement.** Be sure to carefully and fully read the Subscription Agreement, and execute the signature page which is applicable to you. On the appropriate signature page of the Subscription Agreement, the Subscriber must sign, print his, her or its name, address and social security or tax identification number where indicated, and indicate the number of Notes subscribed for, the date of execution and the manner in which title to the Notes will be held.

(b)    **Investor Questionnaire.** Be sure to carefully and fully read the Investor Questionnaire, which can be found after the Subscription Agreement. On the signature page of the Investor Questionnaire, the Subscriber must sign and print his, her or its name where indicated.

(c)    **Verification of Investment Advisor/Broker.** The investment advisor or broker must complete this item and sign to verify that this is a suitable investment, as well as for recordkeeping purposes.

2.    Payment. Payment of the purchase price may be made by bank wire transfer to the Company, as indicated below, or by check payable to the Company and mailed to the Company at 1615 South 52nd Street, Tempe, Arizona 85281.

|  |  |
|---|---|
| Bank Name: | Wells Fargo |
| Routing Number: | |
| Account Number: | ███ 0318 |
| Account Name: | Allwest Investments, LLC |
| Bank Address: | |

3.    Return of Documents. Copies of the signed Subscription Agreement, Investor Questionnaire and other subscription-related documents should be delivered to Allwest at:

Allwest Investments, LLC
1034 Darms Lane
Napa CA 94558

ii

**A103**

CONFIDENTIAL

**A104**

NAME OF SUBSCRIBER: Frank Pawlis   SUBSCRIPTION AMOUNT: $ 1,000,000

To:   Allwest Investments, LLC
      1034 Darms Lane Napa,CA945
## SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement") is being delivered to you in connection with your investment in the Notes of Allwest Investments, LLC  (the "Company"). No funds received in the Offering will be escrowed.

1.    **Subscription and Purchase Price**

(a)    Subscription. Subject to the conditions set forth in Section 2 hereof, the undersigned hereby subscribes for and agrees to purchase $ 1,000,000 face amount of one-year/two-year (circle one) Notes.

(b)    Purchase of Notes. The undersigned understands and acknowledges that the purchase price shall be remitted in exchange for the Notes, simultaneous with the delivery of this Subscription Agreement, as set forth below (the "Aggregate Purchase Price"). The undersigned understands and agrees that, subject to Section 2 and applicable laws, by executing this Agreement, he, she or it is entering into a binding agreement.

2.    **Acceptance, Offering Term and Closing Procedures**

Acceptance or Rejection. The obligation of the undersigned to purchase the Notes shall be irrevocable, and the undersigned shall be legally bound to purchase the Notes subject to the terms set forth in this Agreement. The undersigned understands and agrees that the Company reserves the right to reject this subscription for the Notes in whole or part in any order at any time prior to the closing (the "Closing") of the purchase and sale of the Notes. If, in the event of rejection of this subscription by the Company in accordance with this Section 2, or the sale of the Notes is not consummated for any reason, this Agreement and any other agreement entered into between the undersigned and the Company relating to this subscription shall thereafter have no force or effect, and the Company shall promptly return the purchase price without interest thereon or deduction there from.

3.    **Investor's Representations and Warranties**

The undersigned hereby acknowledges, agrees with and represents and warrants to the Company and its affiliates, as follows:

(a)    The undersigned has full power and authority to enter into this Agreement, the execution and delivery of which has been duly authorized, if applicable, and this Agreement constitutes a valid and legally binding obligation of the undersigned.

(b)    The undersigned acknowledges his, her or its understanding that the Offering and sale of the Notes is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the provisions of Regulation D promulgated thereunder ("Regulation D"). In furtherance thereof, the undersigned represents and warrants to the Company and its affiliates as follows:

(i)    The undersigned realizes that the basis for the exemption from registration may not be available if, notwithstanding the undersigned's representations contained herein, the undersigned is merely acquiring the Notes for resale rather than investment.

**A104**

P-000054

(ii)     The undersigned is acquiring the Notes solely for the undersigned's own beneficial account, for investment purposes, and not with view to, or resale in connection with, any distribution of the Notes.

(iii)     The undersigned (i) has the financial ability to bear the economic risk of his, her or its investment, has adequate means for providing for current needs and contingencies, (ii) has no need for liquidity with respect to the investment in the Company, and (iii) understands that interest will not be paid on the Note for 60 days from the date of purchase;

(iv)     The undersigned and the undersigned's attorney, accountant, purchaser representative and/or tax advisor, if any (collectively, "Advisors"), have received the Memorandum, together with all appendices thereto (as such documents may be amended or supplemented, the "Memorandum"), relating to the private placement by the Company of the Notes, and all other documents requested by the undersigned or Advisors, if any, have carefully reviewed them and understand the information contained therein, prior to the execution of this Agreement; and

(v)     The undersigned (together with his, her or its Advisors, if any) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the prospective investment in the Notes. If other than an individual, the undersigned also represents it has not been organized solely for the purpose of acquiring the Notes.

(c)     The information in the Investor Questionnaire (attached) completed and executed by the undersigned (the "Investor Questionnaire") is true and accurate in all respects, and the undersigned is an "accredited investor," as that term is defined in Rule 501(a) of Regulation D.

(d)     The undersigned (and his, her or its Advisors, if any) has been furnished with a copy of the Memorandum.

(e)     The undersigned has relied on the advice of, or has consulted with, only his, her or its Advisors. Each Advisor, if any, is capable of evaluating the merits and risks of an investment in the Notes as such are described in the Memorandum, and each Advisor, if any, has disclosed to the undersigned in writing (a copy of which is annexed to this Agreement) the specific details of any and all past, present or future relationships, actual or contemplated, between the Advisor and the Company or any affiliate thereof.

(f)     The undersigned represents, warrants and agrees that he, she or it will not sell or otherwise transfer the Notes without registration under the Securities Act or an exemption therefrom, and fully understands and agrees that the undersigned must bear the economic risk of his, her or its purchase because, among other reasons, the Notes have not been registered under the Securities Act or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under the applicable securities laws of such states, or an exemption from such registration is available. In particular, the undersigned is aware that the Notes are "restricted securities," as such term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"), and they may not be sold pursuant to Rule 144 unless all of the conditions of Rule 144 are met. The undersigned also understands that, except as otherwise provided in Section 5 hereof, the Company is under no obligation to register the Notes on his, her or its behalf or to assist them in complying with any exemption from registration under the Securities Act or applicable state securities laws. The undersigned understands that any sales or transfers of the Notes are further restricted by state securities laws.

2

**A105**

**A106**

(g)    No representations or warranties have been made to the undersigned by the Company, other than any representations of the Company contained herein and in the Memorandum, and in subscribing for the Notes the undersigned is not relying upon any representations other than those contained herein or in the Memorandum.

(h)    The undersigned understands and acknowledges that his, her or its purchase of the Notes is a speculative investment that involves a high degree of risk and the potential loss of their entire investment and has carefully read and considered the matters set forth in the Memorandum and in particular the matters under the caption "Special Note Regarding Forward-Looking Statements" and "Risk Factors" therein.

(i)    The undersigned's overall commitment to investments that are not readily marketable is not disproportionate to the undersigned's net worth, and an investment in the Notes will not cause such overall commitment to become excessive.

(j)    The undersigned understands and agrees that the certificates for the Notes shall bear substantially the following legend until (i) such Notes shall have been registered under the Securities Act and effectively disposed of in accordance with a registration statement that has been declared effective or (ii) in the opinion of counsel for the Company such Notes may be sold without registration under the Securities Act, as well as any applicable "blue sky" or state securities laws:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS. SUCH SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES AND MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FILED BY THE ISSUER WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION COVERING SUCH SECURITIES UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED.

(k)    Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved the Notes or passed upon or endorsed the merits of the Offering or confirmed the accuracy or determined the adequacy of the Memorandum. The Memorandum has not been reviewed by any Federal, state or other regulatory authority.

(l)    The undersigned and his, her or its Advisors, if any, have had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the Offering of the Notes and the business, financial condition, results of operations and prospects of the Company, and all such questions have been answered to the full satisfaction of the undersigned and his, her or its Advisors, if any.

(m)    The undersigned is unaware of, is in no way relying on, and did not become aware of the Offering of the Notes through or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or electronic mail over the Internet, in connection with the Offering and sale of the Notes and is not subscribing for Notes and did not become aware of the Offering of the Notes through or as a result of any seminar or meeting to which the undersigned was invited by, or any solicitation of a subscription by, a person not previously known to the undersigned in connection with investments in securities generally.

3

**A106**

(n)    The undersigned has taken no action which would give rise to any claim by any person for brokerage commissions, finders' fees or the like relating to this Agreement or the transactions contemplated hereby (other than commissions to be paid by the Company or as otherwise described in the Memorandum).

(o)    The undersigned is not relying on the Company with respect to the legal, tax, economic and related considerations of an investment in the Notes, and the undersigned has relied on the advice of, or has consulted with, only his, her or its own Advisors.

(p)    The undersigned acknowledges that any estimates or forward-looking statements or projections provided to the undersigned were prepared by the management of the Company in good faith, but that the attainment of any such projections, estimates or forward-looking statements cannot be guaranteed by the Company or its management and should not be relied upon.

(q)    No oral or written representations have been made, or oral or written information furnished, to the undersigned or his, her or its Advisors, if any, in connection with the Offering of the Notes which are in any way inconsistent with the information contained in the Memorandum.

(r)    (For ERISA plans only) The fiduciary of the ERISA plan (the "Plan") represents that such fiduciary has been informed of an understands the Company's investment objectives, policies and strategies, and that the decision to invest "plan assets" (as such term is defined in ERISA) in the Company is consistent with the provisions of ERISA that require diversification of plan assets and impose other fiduciary responsibilities. The Subscriber or Plan fiduciary (a) is responsible for the decision to invest in the Company; (b) is independent of the Company and any of its affiliates; (c) is qualified to make such investment decision; and (d) in making such decision, the Subscriber or Plan fiduciary has not relied primarily on any advice or recommendation of the Company or any of its affiliates.

(s)    The foregoing representations, warranties and agreements shall survive the Closing.

**4.    The Company's Representations and Warranties**

The Company hereby acknowledges, agrees with and represents and warrants to each of the undersigned, as follows:

(a)    The Company has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly authorized, executed and delivered by the Company and is valid, binding and enforceable against the Company in accordance with its terms.

(b)    The Notes to be issued to the undersigned pursuant to this Agreement, when issued and delivered in accordance with the terms of this Agreement, will be duly and validly issued.

(c)    Neither the execution and delivery nor the performance of this Agreement by the Company will conflict with the Company's Articles of Incorporation or By-laws, as amended to date, or result in a breach of any terms or provisions of, or constitute a default under, any material contract, agreement or instrument to which the Company is a party or by which the Company is bound.

4

**A107**

CONFIDENTIAL

**A108**

5.      **Conditions to Acceptance of Subscription**

The Company's right to accept the subscription of the undersigned is conditioned upon satisfaction of the following conditions precedent on or before the date the Company accepts such subscription (any or all of which may be waived by the undersigned in his, her or its sole discretion):

(a)      No legal action, suit or proceeding shall be pending which seeks to restrain or prohibit the transactions contemplated by this Agreement.

(b)      The representations and warranties of the Company contained in this Agreement shall have been true and correct on the date of this Agreement.

6.      **Notices to Subscribers**

(a)      THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.   THE NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(b)      THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

7.      **Miscellaneous Provisions**

(a)      Modification.  Neither this Agreement, nor any provisions hereof, shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, discharge or termination is sought.

(b)      Survival.  The undersigned's representations and warranties made in this Subscription Agreement shall survive the execution and delivery of this Agreement and the delivery of the Notes.

(c)      Notices.  Any party may send any notice, request, demand, claim or other communication hereunder to the undersigned at the address set forth on the signature page of this Agreement or to the Company at the address set forth above using any means (including personal delivery, expedited courier, messenger service, fax, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication will be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties written notice in the manner herein set forth.

(d)      Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon, and inure to the benefit of, the parties to this Agreement and their heirs, executors, administrators, successors, legal representatives and assigns.  If the undersigned is more than one person or entity, the obligation of the undersigned shall be joint and several and the agreements, representations, warranties and acknowledgments contained herein shall be deemed to be made by, and be binding upon, each such

5

**A108**

**A109**

person or entity and his or its heirs, executors, administrators, successors, legal representatives and assigns. This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter thereof and merges and supersedes all prior discussions, agreements and understandings of any and every nature among them.

(e)     Assignability.  This Agreement is not transferable or assignable by the undersigned.  This Agreement shall be transferable or assignable by the Company to a proposed publicly-traded successor company.

(f)     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflicts of law principles.

(g)     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6

**A109**

**A110**

## ALL SUBSCRIBERS MUST COMPLETE THIS PAGE

    IN WITNESS WHEREOF, the undersigned has executed this Agreement on the _28th_ day of _January_ 2014.

Face amount of Notes subscribed for: _$ 1,000,000_

Check Box:      One-Year Notes:  ☐      Two-Year Notes:  ☒

Manner in which Title is to be held (Please Check Once):

| | | | | | |
|---|---|---|---|---|---|
| 1. | ☒ | Individual | 7. | ☐ | Trust/Estate/Pension or Profit sharing Plan Date Opened:_____ |
| 2. | ☐ | Joint Tenants with Right of Survivorship | 8. | ☐ | As a Custodian for _____ Under the Uniform Gift to Minors Act of the State of _____ |
| 3. | ☐ | Community Property | 9. | ☐ | Married with Separate Property |
| 4. | ☐ | Tenants in Common | 10. | ☐ | Keogh |
| 5. | ☐ | Corporation/Partnership/ Limited Liability Company | 11. | ☐ | Tenants by the Entirety |
| 6. | ☐ | IRA | | | |

### ALTERNATIVE DISTRIBUTION INFORMATION

    To direct distribution to a party other than the registered owner, complete the information below. YOU MUST COMPLETE THIS SECTION IF THIS IS AN IRA INVESTMENT.

Name of Firm (Bank, Brokerage, Custodian): _____

Account Name: _____

Account Number: _____

Representative Name: _____

Representative Phone Number: _____

Address: _____

City, State, Zip: _____

**A110**

IF MORE THAN ONE SUBSCRIBER, EACH SUBSCRIBER MUST SIGN.
INDIVIDUAL SUBSCRIBERS MUST COMPLETE THE NEXT PAGE.
SUBSCRIBERS WHICH ARE ENTITIES MUST COMPLETE THE PAGE THEREAFTER.

2

**A111**

CONFIDENTIAL

**A112**

## EXECUTION BY NATURAL PERSONS

Exact Name in Which Title is to be Held

Frank Pavlis

Name (Please Print)                                    Name of Additional Purchaser

Apt. 1 ~ 1500 Hamilton St.

Residence: Number and Street                           Address of Additional Purchaser

Allentown PA

City, State and Zip Code                               City, State and Zip Code

Social Security Number                                 Social Security Number

Telephone Number                                       Telephone Number

Fax Number (if available)                              Fax Number (if available)

E-Mail (if available)                                  E-Mail (if available)

Frank E Pavlis

(Signature)                                            (Signature of Additional Purchaser)

ACCEPTED this 28th day of January ~~2011,~~ on behalf of the Company.
2014

By: _____

Gary Miller
President

**A112**

## INVESTOR QUESTIONNAIRE

*Instructions: Check all boxes below which correctly describe you.*

☐     You are (i) a bank, as defined in Section 3(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"), (ii) a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in an individual or fiduciary capacity, (iii) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (iv) an insurance company as defined in Section 2(13) of the Securities Act, (v) an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"), (vi) a business development company as defined in Section 2(a)(48) of the Investment Company Act, (vii) a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958, as amended, (viii) a plan established and maintained by a state, its political subdivisions, or an agency or instrumentality of a state or its political subdivisions, for the benefit of its employees and you have total assets in excess of $5,000,000, or (ix) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and (1) the decision that you shall subscribe for and purchase the Notes, is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, (2) you have total assets in excess of $5,000,000 and the decision that you shall subscribe for and purchase the Notes is made solely by persons or entities that are accredited investors, as defined in Rule 501 of Regulation D promulgated under the Securities Act ("Regulation D") or (3) you are a self-directed plan and the decision that you shall subscribe for and purchase the Notes is made solely by persons or entities that are accredited investors.

☐     You are a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended.

☐     You are an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), a corporation, Massachusetts or similar business trust or a partnership, in each case not formed for the specific purpose of making an investment in the Notes and with total assets in excess of $5,000,000.

☐     You are a director or executive officer of the Company.

☒     You are a natural person whose individual net worth, or joint net worth with your spouse, exceeds $1,000,000 (excluding the value of your primary residence) at the time of your subscription for and purchase of the Notes.

☐     You are a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with your spouse in excess of $300,000 in each of the two most recent years, and who has a reasonable expectation of reaching the same income level in the current year.

☐     You are a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Notes, whose subscription for and purchase of the Notes is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D.

☐     You are an entity in which all of the equity owners are persons or entities described in one of the preceding paragraphs.

**A113**

P-000063

The undersigned hereby represents and warrants that all of its answers to this Investor Questionnaire are true as of the date of its execution of the Subscription Agreement pursuant to which it purchased Notes of the Company.

_Frank Pavlis_

Name of Purchaser [please print]

Name of Co-Purchaser [please print]

Ⓧ _Frank E Pavlis_

Signature of Purchaser (Entities please
provide signature of Purchaser's duly
authorized signatory.)

Signature of Co-Purchaser

Name of Signatory (Entities only)

Title of Signatory (Entities only)

**A114**

P-000064

A115

# **Exhibit B**

**A116**

# SUBSCRIPTION AGREEMENT

## OF

## KEY COMMERCIAL FINANCE, LLC

(a Delaware Limited Liability Company)

**Effective as of August 18, 2014**

THE UNITS REPRESENTED BY THIS SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.   SUCH UNITS MAY NOT BE OFFERED, OFFERED FOR SALE, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

**A116**

KCF013105

**A117**

## SUBSCRIPTION AGREEMENT
### OF

**A117**

CONFIDENTIAL

KCF013106

**A118**

## KEY COMMERCIAL FINANCE, LLC
(a Delaware Limited Liability Company)

This SUBSCRIPTION AGREEMENT (this "*Agreement*") of Key Commercial Finance, LLC, a limited liability company organized under the laws of Delaware (the "*Company*"), is entered into and made effective as of August 18, 2014 by and among Frank Pavlis, individually, at 1500 Hamilton St, Allentown, PA 18102, and all other persons or entities who shall execute and deliver this Agreement or authorized counterparts or facsimiles of the same pursuant to the provisions hereof.

WHEREAS, the Company was organized by the filing of the Articles of Organization of the Company with the Secretary of the State of Delaware (hereafter, "the Articles of Organization");

WHEREAS, the parties intend that this Agreement shall set forth the understanding between them with respect to certain rights and obligations regarding ownership of the Units offered for sale as further described in the attached Private Placement Memorandum dated as of August 1, 2014, including restrictions on transfer and buy-sell provisions; and

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, agree as follows:

### GENERAL

Definitions. Certain capitalized terms used in this Agreement shall have the respective meanings set forth on **Schedule B** attached hereto and made a part hereof, unless otherwise expressly provided herein or unless the context otherwise requires. Certain capitalized terms not defined herein may be defined by the provisions of the Delaware Limited Liability Company Act.

Overview. This Agreement sets forth the terms and conditions of certain rights and obligations regarding ownership of the Units which are further described in the attached Private Placement Memorandum, including restrictions on transfer and buy-sell provisions.

Purposes. The purposes of the Company shall be to provide financing or other capital-related investment advice, to engage in any business that is not prohibited by the Act or any other law and to enter into any lawful transactions and engage in any lawful activities in furtherance of the foregoing purposes as may be necessary, incidental or convenient to carry out the business of the Company as contemplated by this Agreement.

Names and Addresses of Members. The names and addresses of the Members, along with the number of Units owned by such Members and their respective Percentage Interests, are as set forth on **Schedule A**, attached hereto and made a part hereof. The Members shall cause **Schedule A** to be updated as necessary from time to time.

### TRANSFER OF UNITS

**A118**

**A119**

Restrictions on Transfer. No Member shall transfer, give, donate, bequeath, pledge, deposit or in any way alienate, encumber, hypothecate, or dispose of (collectively, "*Transfer*") all or any portion of such Member's Units now owned or hereafter acquired by such Member, except for a Transfer (i) pursuant to a Bona Fide Offer, subject to the options to purchase as provided below, (ii) upon an involuntary transfer, subject to the options to purchase as provided below, or (iii) pursuant to a mandatory purchase as provided below. Transfer by Members owning a majority of the Units is subject to the provisions of the subsection Tag-Along and Drag-Along Rights.

Notwithstanding anything to the contrary set forth herein, any purported Transfer or other disposition of Units of the Company that violates the terms of this Agreement shall be void and ineffectual and shall not operate to transfer any interest or title to the purported transferee.

Options to Purchase. Upon the occurrence of any of the following Triggering Events, all of that Member's Units shall be subject to the options to purchase set out below for the purchase price and upon the payment terms provided in this Agreement.

For purposes of this subsection, "Triggering Events" shall mean any of the following: (i) a Member desires to sell any portion or all of his or her Units upon receipt of a Bona Fide Offer, or (ii) a Member's Units are subject to an involuntary Transfer by operation of law by reason of (A) bankruptcy or insolvency proceedings, whether voluntary or involuntary, (B) distribution of marital property following divorce, or (C) distraint, levy, execution or other involuntary Transfer.

The Member desiring to sell all or part of his Units pursuant to a Bona Fide Offer (hereinafter referred to as "Transferring Member") shall notify all other Members and shall provide them with a copy of the Bona Fide Offer ("Notice"). If the Transfer is an involuntary transfer, "Notice" shall be deemed received on the date any other Member or one or more members of the Board receives actual notice that an involuntary Transfer of Units has or will take place, and that person shall in turn promptly send notice of such to the other parties to this Agreement.

Option Periods. The Company shall have an option for a period of 90 days from the Company's receipt of Notice to purchase all, but not less than all, of the Units proposed to be Transferred. The Company shall exercise such option by giving written notice of such exercise to both the Transferring Member and the other Members within such 90 day period. Should the Company fail to give written notice within such 90 day period, the Company shall be deemed to have waived such option. If the Company does not elect to purchase all of the Units to be transferred, the other Members shall have an option for a period of 90 days from the Company's receipt of such Notice to purchase all, but not less than all, of the remaining Units proposed to be transferred. The other Members shall exercise this option by sending written notice of such exercise to the Transferring Member and the Company within such 90 day period. Should the other Members fail to give written notice within such 90 day period, the other Members shall be deemed to have waived such option.

**A119**

 KCF013108

**A120**

Failure to Exercise Options. In the event the other Members and the Company shall fail to exercise their options to purchase all, but not less than all, of the Units proposed to be Transferred, the Transferring Member may sell the Units in accordance with the Bona Fide Offer if the closing on that purchase occurs within 90 days of the expiration of the option periods. Any transferee takes the Units subject to the provisions of this Agreement.

Mandatory Purchases. Upon the occurrence of the death of a Member or termination of a Member's employment, whether voluntary or involuntary, all of the Units of such Member shall be purchased by the Company or other Members for the purchase price and upon the payment terms provided in this Agreement.

Tag-Along and Drag-Along Rights. No Member or group of Members (collectively, the "Transfer Group") shall transfer any Units, directly or indirectly, in a single transaction or series of related transactions, to any person (the "Offeror"), if as a result of such transfer(s) more than 50% of the outstanding Units would be owned by the Offeror, unless such Offeror gives the parties to this Agreement who are not included in the Transfer Group (the "Minority Members") the option to sell to the Offeror, at the same price and on the same terms and conditions as offered to the Transfer Group, all or any portion of the Units held by the Minority Members.

At the option of the Transfer Group, all Members who have not tendered their Units pursuant to the prior paragraph shall be required to transfer their Units to the Offeror at the same price and on the same terms and conditions as offered to the Transfer Group.

Purchase Price. The price for any Units subject to a Transfer pursuant to a Bona Fide Offer shall be the fair market value of any Units at issue as determined by the terms of such Bona Fide Offer. In the event of any other type of Transfer of Units permitted under this Agreement, the price for any such Units shall be determined in the following manner:

Each party will obtain its own appraiser to conduct an appraisal, the cost of which will be borne by such party. If the two appraisals are within 10% of each other, the average of those appraisals will be the fair market value. If the two appraisals are more than 10% apart, then the two appraisers will hire a third appraiser, the cost of which will be split equally between the two parties, to obtain a third appraisal and the average of the two appraisals that are closest in amount will be the fair market value. Any appraisal will be based upon the value of the entire Company sold to a single buyer in a single transaction for cash and shall include applicable discounts for illiquidity or lack of control as well as any premium for control.

Restrictions Applicable to All Transfers. Except as may be otherwise set forth herein, all Transfers of Units will be subject to the following conditions:

Prior to any Transfer, the Transferor will cause the prospective transferee, if not already a Member, to execute and deliver to the Company and the other Members the Joinder Agreement to this Agreement attached as Schedule C hereto.

Exception for Estate Planning. A Transfer to an Affiliate of a Member or the Family of

**A120**

**A121**

such Member of the right to receive distributions with respect to such Member's Units shall be permitted and shall not constitute a Transfer subject to the right of first refusal provisions of herein. Further, the assignee of financial rights with respect to Units shall not become a Member or be treated as a holder of such Units, and the Company shall continue to treat the Member making such assignment as a Member and holder of such Units for all purposes under this Agreement.

## ISSUANCE OF UNITS

Issuance of Additional Units. The Company may not sell or issue additional Units in the Company ("*New Units*") without the unanimous affirmative vote, consent, or approval of a majority of the Members. A majority of the Members shall determine any economic or management rights of the New Units at the time of such sale or issuance.

Notwithstanding anything to the contrary set forth herein, any sale or issuance of New Units by the Company in violation of the terms of this Agreement shall be void and ineffectual.

Preemptive Rights of Members. Any sale and issuance of New Units shall be subject to the following preemptive rights of the Members (the "*Preemptive Rights*"):

The Company must first offer each Member the opportunity to purchase up to a percentage of the New Units equal to such Member's Percentage Interest of Units at the time of the proposed offering, so that, after the issuance of all such proposed New Units, such Member's Percentage Interest of Units will be the same as the Percentage Interest of Units maintained by such Member immediately prior to the issuance of any such New Units.

The Company shall give written notice (the "*Offer Notice*") to each Member of the proposed offer to sell and issue any New Units, which Offer Notice shall contain the terms of such proposed sale and issuance in reasonable detail. Each Member may exercise its Preemptive Rights by (i) giving written notice to the Company specifying the amount of New Units that such Member desires to purchase (the "*Preemptive Units*"), (ii) executing such reasonable documentation as may be provided by the Company to effect the issuance of the New Units and (iii) delivering to the Company, pursuant to instructions provided by the Company in the Offer Notice, the full purchase price for the Preemptive Units. If a Member does not pay the full purchase price for the Preemptive Units, then such Member's Preemptive Rights with respect to such Preemptive Units shall, at the option of the Company, be deemed to not have been exercised by such Member and such Preemptive Units shall be subject to issuance and sale by the Company.

## MISCELLANEOUS PROVISIONS

Notices. All notices and communications required or permitted to be given hereunder (a) shall be in writing; (b) shall be sent by messenger, certified or registered U.S. mail, a reliable express delivery service, or electronic mail, charges prepaid as applicable, to the appropriate

**A121**

KCF013110

**A122**

address(es) or number(s) set forth on **Schedule A** to this Agreement (or such other address as such party may designate by notice to all other parties hereto); and (c) shall be deemed to have been given on the date of receipt by the addressee (or, if the date of receipt is not a business day, on the first business day after the date of receipt), as evidenced by (A) a receipt executed by the addressee (or a responsible person in his or her office or member of his or her household) or a notice to the effect that such addressee refused to accept such communication, if sent by messenger, U.S. mail or express delivery service, (B) confirmation of a facsimile transmission (either orally or by written confirmation) or (C) a receipt of such e-mail confirmed by reply message or read receipt. All parties shall act in good faith to promptly confirm receipt of communications where confirmation of receipt is required to effect notice pursuant to this subsection and is requested by the notifying party.

Further Assurances. Each of the Members shall hereafter execute and deliver such further instruments and do such further acts and things consistent with the provisions of this Agreement as may be required or useful to carry out the full intent and purpose of this Agreement or as may be necessary to comply with any laws, rules or regulations, including carefully reviewing the attached Private Placement Memorandum dated as of August 1, 2014 and executing such applicable and necessary revisions to the operating agreement of the Company.

Waivers. No party's undertakings or agreements contained in this Agreement shall be deemed to have been waived unless such waiver is made by an instrument in writing signed by an authorized representative of such Member. Failure of a party to insist on strict compliance with the provisions of this Agreement shall not constitute waiver of that party's right to demand later compliance with the same or other provisions of this Agreement. A waiver of a breach of this Agreement will not constitute a waiver of the provision itself or of any subsequent breach, or of any other provision of this Agreement.

Rights and Remedies Cumulative; Creditors. The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or of the Members.

Construction. The headings in this Agreement are inserted solely for convenience of reference and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof. When the context in which words are used in this Agreement indicates that such is the intent, singular words shall include the plural and vice versa and masculine words shall include the feminine and the neuter genders and vice versa.

Amendment. This Agreement may be altered or amended only by the unanimous consent of the Members.

Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**A122**

KCF013111

**A123**

Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

Governing Law. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its rules on conflicts of laws, and specifically the Act.

Dispute Resolution. The parties hereto agree that any suit or proceeding arising out of this Agreement shall be brought only in the courts of the State of Delaware; *provided, however*, that no party waives its right to request removal of such action or proceeding from the state court to a federal court. Each party hereto consents to the personal jurisdiction of such courts and agrees that service of process in any such suit or proceeding will be sufficiently accomplished if accomplished in accordance with the notice provisions set forth in the Agreement.

Code and Treasury Regulation References. Any reference to a section of the Code or a Treasury Regulation in this Agreement shall be deemed to refer to corresponding provisions of subsequent superseding federal revenue laws and regulations in the event that the section of the Code or Treasury Regulation so referenced has been so superseded.

Counterparts. This Agreement may be executed in any number of counterparts and may be executed and delivered by facsimile or other electronic transmission. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

[Signature Page Follows]

**A123**

**A124**

The undersigned hereby represents and warrants that all of its answers to this Investor Questionnaire are true as of the date of its execution of the Subscription Agreement pursuant to which it purchased Notes of the Company.

_Frank Pavlis_
_____          _____
Name of Purchaser  [please print]          Name of Co-Purchaser  [please print]

_____          _____
Signature of Purchaser (Entities please          Signature of Co-Purchaser
provide signature of Purchaser's duly
authorized signatory)

_____
Name of Signatory (Entities only)

_____
Title of Signatory (Entities only)

**A124**

KCF013113

**A125**

**SCHEDULE A**

**SUBSCRIPTION AGREEMENT**
**OF**
**KEY COMMERCIAL FINANCE, LLC**

**CAPITALIZATION TABLE**

| Name | Number of Units | % Management Interest | % Economic Interest |
|------|-----------------|------------------------|----------------------|
| Frank Pavlis | 0 | 0% | 0% |

The addresses of the above-listed Unit holder(s) are:

1500 Hamilton St

Allentown, PA 18102

**A125**

CONFIDENTIAL

KCF013114

**A126**

**SCHEDULE B**

## SUBSCRIPTION AGREEMENT
### OF
### KEY COMMERCIAL FINANCE, LLC

**DEFINITIONS**

The following terms shall have the following meanings when used in this Agreement:

"*Act*" means the applicable law of the State of Delaware governing corporations organized in Delaware, the Delaware Limited Liability Company Act, *et seq*, and any successor statute, as it may be amended from time to time.

"*Affiliate*" shall mean any other Person which directly or indirectly Controls or is Controlled by or is under common Control with such Person, or any Person that is an employee of or an officer of or partner in or serves in a similar capacity or relationship with respect to a Person.

"*Articles of Organization*" shall mean the Articles of Organization of the Company as filed with the Delaware Secretary of the State and as further amended from time to time.

"*Bona Fide Offer*" shall mean a legally binding written agreement with a non-Member to purchase all or a portion of the Units owned by a Member, which written agreement must be contingent upon the options to purchase or participate in a sale as provided herein.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

"*Control*" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract or otherwise.

"*Entity*" shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, company, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

"*Family*", as applied to any individual, shall mean (a) the children of such individual (by birth or adoption), (b) the parents, spouse and siblings of such individual, (c) the children of the siblings of such individual, (d) any trust solely for the benefit of, or any partnership, limited liability company or other entity owned solely by, any one or more of such aforementioned individuals (so long as such individuals have the exclusive right to Control such trust or other entity) and (e) the estate of such individual.

"*Member*" shall mean each of the parties who executes a counterpart of this Agreement as a Member, and each of the parties who may hereafter become a Member pursuant to the terms and conditions of this Agreement.

CONFIDENTIAL                                                                 KCF013115

**A127**

"*Percentage Interest*" of Units shall mean the number of Units of a given class held at a particular time by such Member, divided by the total number of all Units of the same class then held by all Members, expressed as a percentage.

"*Person*" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person, where the context so permits.

"*Units*" shall mean equity interests in the Company that shall have (a) economic value and rights in or to the profits, gains, losses, distributions and other economic interests of the Company and (b) voting membership rights in the Company.

"*Transferring Member*" is the Member desiring to sell or, in the case of an involuntary Transfer, is the Member whose Units are subject to an involuntary Transfer and also the potential transferee if that person has provided information to the Company and other Members of his/her name, address, and potential claim to the Units.

New Member

**A127**

KCF013116

# **Exhibit C**

**A129**

## Chat with Justin & darbin.skeans@icloud.com

11/11/2016 8:31:46 AM - 12/26/2016 12:50:21 PM

### Export Details:

Device Phone Number  +1 (610) 972-1489

Device Name   iPhone

Device ID      bc49d3133a35c3ca27dd0537effa21ea6b885a64

Backup Date    Tuesday, January 7, 2020 1:34 PM

Backup Directory  C:\Users\bc1-ls\AppData\Roaming\Apple Computer\MobileSync\Backup\bc49d3133a35c3ca27dd0537effa21ea6b8

iOS            13.3

Current Time Zone  (UTC-05:00) Eastern Time (US & Canada)

Created with   iExplorer v4.3.4.0

### Participants:

    +1 203-240-7160, Justin Billingsley

    darbin.skeans@icloud.com

# A130

Friday, November 11, 2016

Justin Billingsley

Darbin and Debbie. Please quit being so short and fragile with me. We have been through way too much together. This is unneeded. I have made arrangements to come to Allentown more than a few times to present and discuss Franks paperwork. Please remember, your travel schedule interrupted for, literally, months. Now you are behaving as if that time has been spent waiting on me. Please be just a bit more patient with me. The note and note agreement that Frank signed are healthy and VERY real. I thought I had all of the docs but found last night that they failed to send me a few needed pages. They are pushing HARD to get this done quickly. I am hoping to have a doc package to you today, tomorrow or at the VERY latest Monday. I would also offer a phone call with Franks advisors and myself and one of the company principals Don Bivens next week. As you recall Don was the Chairman of the American Bar Association, Litigation Section and is one of the nations most premier attorneys. Don will be happy to discuss all of Franks investments with anyone interested.  Thank you for bearing with me. Sorry your upset. I am doing my best. Talk to you soon.

8:31 AM

darbin.skeans@icloud.com

Justin, not trying to be short and fragile.  Deb is under a lot of pressure.  Advisors don't understand why they can't get the backup docs, that's all.

8:41 AM

Justin Billingsley

Ok. Makes me very upset to think I am upsetting Debbie. U both mean a lot to me. Kind of her more though. 😉 I will get this done as quickly as possible. There are some things I can't control but doing my very best.

8:43 AM

darbin.skeans@icloud.com

FYI, Deb is POA and health care rep for 4 - 90 or plus year olds and I am for 1.  The last two weeks she has been back and forth with them to numerous doctors concerning their health issues.  Very emotional time.  I was just trying to help her in contacting you.  Hope you understand.

8:45 AM

Justin Billingsley

Yes of course!!! Not bothered at all! I know she is under a lot. This has all been waaaaaaay too much for her!!! Waaaaaay tooooo much. Hate that I'm not helping. I will make her very happy though. Just need a bit more time

8:46 AM

Wednesday, November 16, 2016

Justin Billingsley

As an update, Veterans Day slowed us down. Should have everything to you by end of day or end of morning tomorrow.

10:57 AM

Debby Skeans

Thanks; I look forward to it

2:42 PM

Saturday, November 19, 2016

Justin Billingsley

Dear Debby. I faxed Franks docs to your fax. Very sorry for the delay. Everything seemed to come up but very happy to have it to you. Thank you sincerely for your patience.

11:47 AM

Debby Skeans



6:53 PM

Tuesday, November 22, 2016

Debby Skeans

Got the paperwork; please let me know when we can discuss. Thanks

2:03 PM

Friday, December 2, 2016

Debby Skeans

Justin: when can we talk?

10:26 PM

Sunday, December 11, 2016

Debby Skeans

Justin: I sent you an email last week...please check to confirm you got it...hope to talk to you before Wednesday. Thanks!

9:16 PM

Monday, December 26, 2016

Debby Skeans

Justin: can we please schedule a time to talk?

12:50 PM

# **<u>Exhibit D</u>**

**A133**

| | |
|---|---|
| From: | JB |
| Sent: | Tuesday, January 17, 2017 12:41 PM EST |
| To: | debby.skeans@svn.com; darbin.skeans@svn.com |
| Subject: | Re: Frank Pavlis |

Darbin and Debby,

I apologize for the late follow up. Thank you for your patience. Your correct that there is nothing to report for taxes. In connection with your question about the note, it does not commit Frank to invest more. Key is doing well with growth, keeping stable in the churning markets and consistently delivering as planned. In respects the Allwest doc, if I remember right, it was simply a mistaken doc due to it never being executed. Don't remember all of the details but think it was just discarded and never completed. Does that makes sense?

Thank you

Justin

On Dec 7, 2016, at 3:42 PM, Debby Skeans <debby.skeans@svn.com> wrote:

Justin

I have an appointment with Ed Lentz next Wednesday to go over a few things....I have sent him the Key Finance Note and Note Purchase Agreement.   Since interest accrues, I assume there is nothing to report for taxes.  Does the Note Purchase Agreement, however, commit Frank to invest more....up to $10 million?  I do not think that is desired.
Ed would like to be sure the Note is TOD Watchtower (or JJHA-A, if Frank wants).
I'd appreciate a bit more info on the company and whether Key will be there to repay.

I also sent Ed a copy of the January 2014 AllWest subscription agreement.  Due earlier this year, some interest must probably be accounted recognized......Was this reinvested? If so, please provide the paperwork.  Apparently, this cannot be assigned. I believe there is strong preference is for this money to be repaid.

Finally, Frank has requested a visit.....

Look forward to hearing from you,
Deb

--
**Deborah S. Skeans, CCIM, MAI** | Senior Advisor

**A133**

KCF004442

**A134**

SVN | Imperial Realty
1611 Pond Road, Suite 200 | Allentown, PA 18104
Phone 484.245.1002 | Fax 610.266.9268
debby.skeans@svn.com | www.svnimperial.com

All SVN® Offices Independently Owned and Operated.



<AllWest.pdf>

**A134**

CONFIDENTIAL

KCF004443

**A135**

# **Exhibit E**

**A136**




Ad

Up to 70% off!
www.wayfair.com

▷ ✕

VISIT SITE

# Once-high-flying Quepasa chief Jeff Peterson under fire as $9M gone in online startups

Craig Harris, The Republic | azcentral.com    Published 6:00 a.m. MT Dec. 14, 2017 | Updated 4:55 p.m. MT Dec. 15, 2017



*(Photo: The Republic)*

When internet entrepreneur Jeff Peterson was looking to reboot his career in Arizona a few years ago, the high-school dropout turned to prominent Mesa businessman Ross Farnsworth Jr.

Peterson had founded Quespasa, an online sensation that once reached a market value of $400 million during the go-go dot-com era. Now, he wanted guidance on what to do next.

Farnsworth, whose surname is well known throughout the East Valley and in Mormon circles, agreed to mentor Peterson, who was in need of a confidence boost, according to Farnsworth's son.

As the older Farnsworth was providing business guidance to Peterson, the student asked the teacher a favor: Would Farnsworth put money into a new internet startup called Mobile that he had founded?

The idea seemed revolutionary.

Mobile, launched in March 2013, would connect workers around the world with employers who could buy their services. A graphic artist in Phoenix, for example, could sell his skills to someone in Paris.



Jeffrey Peterson, founder of Quepasa.com, poses for a portrait in 2001 at his home in north-central Phoenix. *(Photo: The Republic)*

Peterson, a Santa Barbara, California, native who made his name in the Valley, pitched Mobile as the next Quepasa.

Early Quepasa investors had struck it rich on the bilingual, Latino-focused social media website he'd created in 1997 in Phoenix.

And Peterson had a track record of getting big names to back him.

**A136**

At Quepasa, Phoenix sports mogul Jerry Colangelo and Denver Broncos' John Elway had been investors. He had had a marketing deal with pop sensation Gloria Estefan, and the company's logo was peppered throughout the inside of Phoenix's downtown baseball stadium.

Former Arizona Gov. Janet Napolitano later appointed him to the Arizona-Mexico Commission's board. Former state Attorney General Terry Goddard put him on a business advisory committee.

Peterson brought that experience to the table when he asked his mentor for new funding.

Farnsworth provided $400,000 in capital for Mobile.

He wasn't alone.

An elderly Pennsylvania millionaire invested $2 million. Bob Ramsey, a Tempe businessman, kicked in a quarter-million dollars.

▷ ✕

Up to 70% off!


✦wayfair.com

  www.wayfair.com

VISIT SITE

Peterson, meanwhile, assembled an all-star board and group of advisers who could introduce him to more deep-pocketed investors.

Mobile's board included former U.S. Attorney for Arizona Dennis Burke, who had been Napolitano's chief of staff when she was governor; Marco Lopez, a former director of the Arizona-Mexico Commission and an adviser to Mexican billionaire Carlos Slim; and Ramsey, who founded Southwest Ambulance Co.

According to Mobile financial documents provided by a board member, advisers and consultants included Democratic National Committee chairman and presidential candidate Howard Dean; ex-Phoenix Mayor Phil Gordon; Mexican-American Grammy Award winner Pepe Aguilar; and Hollywood moviemaker Howard "Hawk" Koch.

Peterson, who used his Quepasa wealth to become a major donor to Democrats, sought out Republicans, too.



**Ross Farnsworth Jr.** *(Photo: The Republic)*

A relative of 2012 Republican presidential candidate Mitt Romney and a relative of the Marriott hotel chain owners were put on Mobile's payroll and were paid at least $151,000 combined, company records show.

With Peterson and other company fundraisers bringing in cash, some Mobile investors parted ways with their individual retirement accounts or 401(k) funds in hopes of making it big with the latest online business sensation.

Along with the storied reputations of Mobile's board and advisers, investors were assured those handling the money were blue chip.

Peterson hired Wilson, Sonsini, Goodrich & Rosati, a Palo Alto, California, law firm that represented Facebook, as the conduit for transferring funds to Mobile. The firm, which monthly transferred tens of thousands of dollars to Mobile, declined numerous requests to comment.

Peterson, who speaks fluent Spanish, also forged a friendship with Silicon Valley businessman David Lopez, father of actress and musician Jennifer Lopez. He persuaded David Lopez to become an adviser, investor and pitch man. And Peterson regularly dropped Jennifer Lopez's name with potential clients to gain their trust, investors said.

In total, Mobile from 2013 to 2016 raised at least $8.6 million from 83 investors, according to company and U.S. Securities and Exchange Commission records.

Today, however, all the money is gone. By September 2016, the corporation had a zero balance, according to Chase Bank records produced for Burke this year by the company's chief financial officer.

And like Quepasa, which ultimately had a meteoric crash, Mobile has essentially busted.

There is little to show for the investments except a Mobile.co website that includes a handful of blog posts.

**A137**

"I didn't raise any money for him, but I introduced him to some people," said Lopez, who invested $12,000. "Jeffrey can be pretty persuasive. ... All I wanted to do was find a venue to help Latinos. So I followed that as long as I thought I could help. After a while, I realized we were being snookered."

Todd "Ross" Farnsworth III said his dad, who died from brain cancer in September 2015, also wanted to help Peterson. Yet, the younger Farnsworth contends Peterson took advantage of his father's generosity in summer 2014, just before he was diagnosed with cancer.

"The truth is, he was of diminished capacity of some level going into it," Ross Farnsworth said of his dad's $200,000 loan and $200,000 investment. "He typically would not have parted with that amount of money."

Family and friends of the Pennsylvania millionaire, who just turned 101, said he's had memory loss for at least a decade, including during the time he heavily invested in Mobile.

Marco Lopez, no longer a Mobile board member, said Peterson has a lot of explaining to do.



Marco Lopez (right) eats dinner in Phoenix with Jeff Peterson (left) and others in November 2005. *(Photo: Michael Chow/The Republic)*

"He is now at a point where he has to answer to the investors who believed in him, and he now has nothing to show for it," Marco Lopez said.

Peterson, an Arizona resident from the mid-1990s through 2013, could not be located to be interviewed for this story. Phone messages left on his cellphone and at his last known address in Boston went unanswered. Attempts to reach him through associates and four of his attorneys also failed.

Don Bivens, who has represented Peterson, defended Mobile's business transactions and, while not speaking for Peterson, said the company made a good-faith effort to succeed.

## Where's the money?

In August 2014, with investor money flowing in, Peterson's excitement was obvious from an email to company insiders.

Peterson wrote that Mobile would become famous and join the ranks of Twitter and Facebook, adding that Facebook co-founder Mark Zuckerberg "would pay a healthy premium" to acquire Mobile and such a transaction would cause shares of Facebook stock to "move up on the news."

Facebook never acquired Mobile.

But Mobile bank records provided to *The Arizona Republic* show Peterson and other employees spent a fortune trying to play in the same league.

"It seemed in the beginning to have great promise and a lot of good people around it," Ramsey recalled recently. "But as the onion unfolded, it wasn't what I thought it was."

The question Ramsey and others have: Where did all the money go?

**A138**

P-000162

**A139**



**Dennis Burke, pictured here shortly after being named U.S. Attorney for Arizona in 2009.** *(Photo: The Republic)*

Burke, a Mobile board member and a former U.S. Attorney for Arizona, had been asking that question for months. He repeatedly pressed the company's CFO to turn over financial records, which he began reviewing in late summer. Burke then provided *The Republic* copies of many of those records, including internal bank documents for a three-year period.

Those bank records show at least $2.3 million was transferred to Inter123, a Las Vegas company privately controlled by Peterson. Peterson is listed in Nevada Secretary of State records as Inter123's president, secretary, treasurer and director. The company's website says it specializes in information technology, and it lists Mobile as being part of its portfolio of companies.

Board member Marco Lopez alleges Peterson transferred Mobile money to Inter123 without board authorization. That company had a licensing agreement to handle Mobile's internet domains.

"There was never any mention of money," Marco Lopez said. He added that he quit the board because Peterson would not share financial records with board members.

However, Bivens said the board approved contracts between the two firms. He recently provided *The Republic* copies of a series of contracts from 2013 to 2016 that authorized payments from Mobile to Inter123.

Michael Silberman, Mobile's chief financial officer who worked for Peterson at Quepasa, signed those deals on behalf of Mobile. Peterson or company attorneys Eric Jeide and Ashley Grimes signed on behalf of Inter123.

In any event, Peterson last year put Inter123 into Chapter 11 bankruptcy protection in Las Vegas after two former attorneys who were owed $158,190 sued him for nonpayment and won court judgments against his company.

## Spending details

*The Republic* reviewed Mobile bank records spanning a period from March 2013 to September 2016. They also show:

- President Justin Billingsley and Silberman were paid $269,107 and $236,744, respectively. Billingsley said all financial decisions were approved by the board. Silberman declined to comment.
- At least $770,759 was paid to Inmuebles Carso, a real-estate company controlled by Mexican billionaire Slim, for what board member Burke said was a Mexican office. He said to his knowledge no Mobile employees ever worked in that building and the rent payment was designed to gain favor with Slim and have him invest in Mobile. Slim never did.
- At least $564,430 was used to pay the debt on two Chase credit cards. The records do not indicate who controlled those cards.
- At least $140,000 was spent on corporate housing for three executives, including Peterson and attorney Grimes.
- At least $120,639 was spent on airline travel, including trips to the Philippines, where one of Mobile's subsidiaries was located. At least $67,087 was spent on lodging, including luxury hotels; and at least $40,921 was spent on Expedia, an internet travel service. The total: $228,647.
- Mobile employees, including Billingsley, used company credit cards to make $6,210 in ATM withdrawals.
- At least $3,400 was spent on limousine, town car and Lexus rentals.
- At least $20,200 was given to the Arizona-Mexico Commission and another $12,500 to the the U.S.-Philippines Society. Peterson had served on both boards.

Board member Burke cried foul.

"The bank statements are what I anticipated — massive spending void of any business sense, with little to none directed to the actual platform and quite a windfall for you, personally," Burke wrote in an Aug. 20 email to Peterson. "You took Mobile investors' money and gave it to your own company with zero accounting of how it would be spent."

Michael Malloy, a former SEC enforcement lawyer, said the financial transfers and spending at Mobile could constitute fraud or theft.

But Malloy, now a law professor at the University of the Pacific in California, said company executives could argue that there was simply mismanagement, leaving investors little chance of being repaid if they sue.

"We are basically talking about stupidity, sneakiness and greed — and you get a different legal response depending on whether it's sneakiness or greed," he said. "If it's stupidity, there's not a lot you can do."

**A139**

However, Burke accused Peterson in his email of corporate theft, noting investors' money was spent at Men's Wearhouse, Nordstrom Rack, on designer luggage and at $600-a-night hotels.

Burke recently told *The Republic* that Mobile also loaned Billingsley $150,000 that was not repaid.

## Billingsley responds

Billingsley defended the expenses and said board members never raised issues about them during meetings. Bivens provided documents that he claimed showed Silberman forgave the $150,000 loan on behalf of Mobile. Burke disputed that claim.

"Board members hold more accountability than I do. They approved every decision," Billingsley said. "I can't imagine how board members can come out and start complaining when they are so damn accountable."



Don Bivens, partner at Snell & Wilmer in Phoenix, said Mobile made a good-faith effort to succeed. *(Photo: Snell & Wilmer)*

Billingsley told *The Republic* he never witnessed any extravagant spending by Peterson or other Mobile employees.

"Let me be clear, I never spent a penny. I never had a company card," Billingsley said.

Mobile bank records show a credit card designated to "Justin Billingsley" was used for $12,709 in charges from October 2014 to March 2016, including limousine service and sushi dinners in Danbury, Conn., where Billingsley lives.

Other charges included $381 at a New York wine store, a $500 cash withdrawal, and $713 for a stay at a Phoenix boutique hotel.

Bivens, who also represents Billingsley, was given a copy of credit-card bills. He said his client had no recollection of having access to a company credit card and did not recognize expenses attributed to the card in his name. Bivens added that $12,000 in business expenses "are hardly a significant event" for a company with Mobile's capitalization.

## Keeping Mobile afloat

Peterson's gushing August 2014 email about his company's fundraising success was, in many respects, a sigh of relief: That summer, his company nearly ran out of money, documents show.

Mobile financial records provided by Burke show Farnsworth made his investments at this point. They also indicate Billingsley found an infusion of at least $2 million from a then-97-year-old Pennsylvania millionaire named Frank Pavlis.

Billingsley and Pavlis were introduced by mutual friends after Pavlis had lost money in financial scams. Billingsley was supposed to make sure Pavlis wouldn't get ripped off again, said Debby Skeans, who has Pavlis' power of attorney.

Mobile records show Pavlis made a $1 million investment in the company around mid-September 2014, and another $1 million investment at the end of that month.

Shortly after Pavlis' investment, Mobile paid Billingsley $50,000 and Peterson's Inter123 $500,000, records show.

Pavlis also invested more than $2 million in Key Commercial, an online real-estate investment company that until recently listed its leadership team of Billingsley, Peterson, Silberman and Bivens, a partner at Snell & Wilmer and ex-Arizona Democratic Party chairman. Key also invested in Mobile, records show.

Billingsley said he's still involved with Key, but that the others are "advisers."

Pavlis, now 101, said in a recent telephone interview that he remembered Billingsley visiting him a few years ago in his home and that Billingsley persuaded him to invest, "but I don't remember how much it was."

"I hope you can unravel this for me," Pavlis said.

Billingsley declined to answer questions about Pavlis.

CONFIDENTIAL

P-000164

About a year after Pavlis' investment, Mobile again needed money.

Mobile sought new investors through a July 21, 2015, fundraising letter to specific private investors known as a confidential private placement.

In that prospectus, Mobile disclosed that Billingsley was a defendant in an Arizona Corporation Commission case involving LoanGo, co-owned by Billingsley and Peterson. That failed company was designed to provide payday loan services via the Internet.

The commission in late October found that Peterson and LoanGo had sold unregistered securities (/story/money/business/consumers/2017/10/23/state-orders-failed-internet-payday-loan-venture-pay-250-k-defrauded-investors/791422001/). Billingsley was found to have committed fraud as the chief fundraiser.

Though Billingsley disputes the commission's findings, it has ordered him, Peterson and a third officer to repay five elderly investors a combined $250,000 in restitution, and each faces fines of up to $15,000.

Neither Mobile nor its attorneys disclosed in the prospectus that Peterson had been part of that case.

Burke, who has previously served as chief deputy in the Arizona Attorney General's Office, said the failure to disclose to potential investors Peterson's involvement in LoanGo could constitute securities fraud.

"Citing the matter doesn't fix the omission," said Burke, adding he was unaware of the private placement offering until October 2017. "It's like mentioning Bonnie but not Clyde."

## Reviving Quepasa

As Mobile's problems deepened and significant new money did not materialize, Peterson in 2014 hatched another business: a new Quepasa.

He would use the iconic name to focus on Hispanic businesses in the United States and Latin America. A rebooted Quepasa would provide networking, crowdfunding and business development opportunities.

Investments in this venture were much smaller. Its board included Jennifer Lopez's father, David Lopez, and Mario Diaz, a Phoenix political consultant.

David Lopez said Peterson recruited him after offering a $50,000 "sponsorship" in February 2014 to Manos Accelerator, a San Jose venture begun by Lopez to promote Latino-led tech startups.

Though David Lopez said he was led to believe Peterson was personally the sponsor, records provided by Burke show the payment came from Mobile's bank account.

Nick Promponas of Chandler said he invested in Quepasa after attending an evening function with wine and hors d'oeuvres that included Peterson and Lopez.

"I'm not a star-struck guy," Promponas said, referring to JLo's father. "What I cared about was if someone who is relatively famous, and he (Lopez) was famous by default, would he put money out there and embarrass his daughter with a scandal?"

Investors in both Mobile and Quepasa said they were told their payments could be used as short-term debt repaid with high interest payments or equity that later would be converted to company stock. Once the companies went public on stock exchanges, investors expected to get their money back and potentially more.

However, as with other start-ups and many kinds of investments, investors likely may have known they could lose all their money.

Quepasa attracted more than $100,000 in investments, according to SEC records.

But bank records and interviews indicate the finances of Mobile and Quepasa also became intertwined.

From September to December 2015, at least $87,000 was transferred from Quepasa Corp. to Mobile when the latter was having financial problems.

Gordon, the former mayor, said he raised questions. So did Diaz, who says he was kicked off the Quepasa board after only four months for asking Peterson about how investors' money in Quepasa was being spent.

Peterson "is playing catch-me-if-you-can. A lot of the stuff he (Peterson) did was to open up doors to others ... but he burned us all," Diaz said.

**A141**

                                                         P-000165

**A142**

Gordon also didn't last long as an adviser.



**Former Phoenix Mayor Phil Gordon.** *(Photo: Nick Oza/The Republic)*

He said he raised issues with Peterson about intertwining business arrangements between Mobile and Quepasa, but was denied financial records.

Gordon said Peterson wouldn't listen to his advice, and quit after being pressured to raise money.

Shortly after he resigned, Gordon alleges, Billingsley offered to have Mobile cover an all-expense-paid trip for him and a guest to California's Bay Area. Gordon said he never took the trip. Billingsley said he never made such an offer.

David Lopez said he too eventually became wary because Peterson refused to release Quepasa's financial records.

Lopez finally cut ties with Peterson earlier this year. He said he was annoyed that Peterson kept wanting to use his celebrity daughter's name even though she had no involvement.

## Closing up shop

In total, Peterson and his associates raised at least $9 million from U.S. investors for the three failed businesses: Mobile, a reincarnated Quepasa and LoanGo.

Mobile quit operating in early 2016. Bank records suggest its account ran out of money in September 2016.

Quepasa's business license was revoked this year after failing to file proper public annual reports.

While this fall's Corporation Commission vote is intended to force restitution (/story/money/business/consumers/2017/10/23/state-orders-failed-internet-payday-loan-venture-pay-250-k-defrauded-investors/791422001/) for LoanGo's investors, that won't help Mobile and Quepasa investors.

Farnsworth III said he's appealed to Peterson to get his father's money back to help his widowed mother. He said Peterson refused and even threatened legal action.

"My dad met Jeff Peterson when he was at a low point professionally, and my dad mentored him to give him a boost of confidence," Farnsworth said. "At the end of the day, this is an ugly story about a business venture my dad got into."

And it may be difficult getting money from Billingsley.

Billingsley, who filed for Chapter 7 bankruptcy protection in 2001, owed the Internal Revenue Service at least $440,372 for unpaid federal taxes from 2007 to 2011, according to liens filed against him in Connecticut. Property records show he has been living there in a 5,300-square-foot home worth nearly $881,000.

Billingsley said the tax liens are from a prior failed business, and he has a repayment arrangement with the government. An IRS spokesman declined comment.

Investors and some board members plan to turn over the various companies' internal documents, including bank records, to law enforcement, the Corporation Commission, Peterson's Las Vegas bankruptcy trustee and the IRS in hopes of bringing additional investigations and forcing investors' repayment, one board member told *The Republic*.

Peterson has hired Chris Rapp, a Phoenix criminal defense attorney. Rapp declined to comment.

*Reach the reporter at craig.harris@arizonarepublic.com or 602-444-8478 or on Twitter at @charrisazrep.*

**READ MORE:**

Prescott mayoral candidate receives settlement after suing Phoenix 'dark money' operative (/story/news/local/arizona-investigations/2017/12/04/prescott-woman-receives-settlement-dark-money-defamation-case-with-max-fose/913982001/)

Big raises, bonuses at one Arizona agency, as state social workers get $1-a-day bump (/story/news/local/arizona-investigations/2017/11/28/big-raises-bonuses-handed-out-arizona-department-administration/898144001/)

**A142**

CONFIDENTIAL

P-000166

Discover something new in 2018!
**$9.99/month**

Subscribe
(http://fullaccess.azcentral.com/newstart/specialoffer?
gps-
source=BENBjan&utm_medium=nanobar&utm_source=bounce-
exchange&utm_campaign=WINTER18)

# State orders failed internet payday loan venture to pay $250K to defrauded investors

<u>Craig Harris</u>, The Republic | azcentral.com    Published 5:56 p.m. MT Oct. 23, 2017



*(Photo: Tom Tingle/The Republic)*

The Arizona Corporation Commission on Monday ordered three co-owners of LoanGo, a failed Chandler-based internet payday-loan company, to repay five older investors who were defrauded of a combined $250,000.

The commission, in a 5-0 vote, also ordered LoanGo Chief Executive Jeff Peterson, former Valley insurance agent Justin Billingsley and businessman John Keith Ayers to pay fines of up to $15,000 each.

Peterson is a former Arizona-Mexico Commission member, major donor to Arizona Democratic candidates, and founder of Quepasa, a now-defunct Latino online social-media outlet.

The commission upheld the findings of its Securities Division and an administrative law judge who concluded the investors were defrauded after making investments in 2011 and 2012.

Regulators also found that Billingsley and LoanGo committed securities fraud by making misrepresentations to investors and failing to disclose key information. Peterson was accused of selling unregistered securities while not being a registered securities dealer. Ayers was named because of his ownership stake in the company.

Ad closed by Google

The investors were snowbirds staying at the Desert Shadows RV Resort in Casa Grande, where they also attended financial planning seminars, records show.

Peterson, who has denied the allegations, did not attend the hearing.

Ayers told the commission that he made a good-faith effort to make the company succeed, did not have access to bank accounts and how the company spent investors' money, and had nothing to do with raising funds. He also noted that he cooperated with securities regulators.

He asked the commission to remove him from the order.

The commission, however, refused to do so.

Commissioner Andy Tobin, in responding to Ayers, noted that Ayers was the company president and a director who had the responsibility to protect investors' funds. Ayers quickly left the hearing after the vote.

Tim Sabo and Don Bivens, newly hired attorneys for Billingsley, asked the commission to delay its ruling for a few months. The lawyers argued about the accuracy of the findings against Billingsley.

Commissioners, however, noted that the case has gone on since June 2015, and former attorneys for Billingsley had numerous opportunities to present a defense for him.

**A143**

The three men can seek a rehearing or appeal to Maricopa County Superior Court. No decision was made on whether to appeal.

The order requires the men to pay restitution within 90 days. The commission can seek assistance from the Attorney General's Office to obtain the money for investors.

Administrative Law Judge Scott M. Hesla on Oct. 10 noted that Billingsley failed to inform investors that their money would be used to repay business startup loans of $10,000 each to himself and Peterson. The judge also wrote that investors were not told Billingsley received a $15,000 commission for obtaining their investments.

The judge noted that Billingsley was repaid his startup loan the same day one person invested $45,000 in LoanGo, and that Peterson was repaid the same day a different person invested $25,000 in the company.

The judge wrote that "a reasonable investor would expect his or her investment to be used for the benefit of the company, not to repay obligations owed to the co-founders." Hesla added: "Failing to disclose that investor funds would be used to repay obligations owed to the company founders is significant and constitutes a material omission."

*Reach the reporter at craig.harris@arizonarepublic.com (https://mail.google.com/mail/?view=cm&fs=1&tf=1&to=craig.harris@arizonarepublic.com) or 602-444-8478 or on Twitter @charrisazrep (https://twitter.com/charrisazrep?lang=en).*

**READ MORE:**

'Mass exodus' after Scottsdale nightclub shooting (/story/news/local/scottsdale/2017/10/22/scottsdale-police-shooting-nightclub-leaves-1-injured/788522001/)

Records: Chandler mom intoxicated, had toddler in backseat during fatal crash on I-10 (/story/news/local/chandler/2017/10/23/records-chandler-mom-intoxicated-toddler-backseat-during-fatal-crash-10/792593001/)

# azcentral.

## Get updates and special offers right in your inbox

Your Email

Unlock Top Offers

Read or Share this story: http://azc.cc/2yF0xB0



CONFIDENTIAL

# Exhibit F

Real Estate Investments

$1,000,000 wire transfer
to Wilson Sonsini
Goodrich Rosate Transaction
Trust"

Transfer No 1 - 2/16/14
Transfer No. 2 - 2/26/14
each $1,000,000 from
my Gold checking acct -

**A146**

p-69
cg 4/27/2020

CONFIDENTIAL

P-000067

Transfer $1,000,000 today
from my acct.

████████ 5211 to
" WILSON SONSINIE
GOODRICH ROSATI
TRANSACTIONS TRUST" c/o
BANK OF AMERICA
530 LYTTON AVE
PALO ALTO, CAL, 94301

▓ ████████ 9593 ÷ acct. ████ 2842
                                   2842

Reference: 44 707.006

If have questions, call
~~Frostood~~ Justin Billingsley
203, 240, 7160

CONFIDENTIAL

**A148**

Real Estate Investments

# 1,000,000 wire transfer
to Wilson Sonsini
Goodrich Rosate formation
Trust"

Transfer #01 - 2/16/14
Transfer No. 2 - 2/26/14
each # 1,000,000 from
my Wells Checking acct.

**A148**

P-000069

**A149**

Transfer # 1,000,000 today
from my acct.
          1000 955211   to
" WILSON SONSINIE
    GOODRICH ROSATI
TRANSACTIONS TRUST " c/o
BANK OF AMERICA
   530 LYTTON AVE
   PALO ALTO. CAL. 94301
026 009593 : acct. ████ 2842
                 ████ 2842


Reference : 44 707. 00 G

If have questions, call
~~Frostood~~ Justin Billingsley
     203, 240, 7160

**A149**

CONFIDENTIAL

# Exhibit 9

**A150**



Deposition of:
# Deborah S. Skeans

*April 29, 2020*

In the Matter of:

# Skeans v. Key Commercial Fnance, LLC et al.

Veritext Legal Solutions

800-462-2233 | calendar-de@veritext.com |

```
                                          Page 1

 1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
 2
                        - - -
 3
    DEBORAH S. SKEANS,           :  CIVIL ACTION
 4  Executrix of the ESTATE      :  NUMBER
    OF FRANK E. PAVLIS,          :  1:18-cv-01516-
 5              Plaintiff,       :  CFC
                v.               :
 6  KEY COMMERCIAL FINANCE,      :
    LLC, KEY COMMERCIAL          :
 7  FINANCE PROPERTIES, LLC,     :
    EQUITY PROS, LLC, and        :
 8  MOBILE AGENCY, LLC,          :
                Defendants.      :
 9
                        - - -
10
              Wednesday, April 29, 2020
11
                        - - -
12
13           Oral deposition of DEBORAH S.
14  SKEANS, taken remotely via Zoom, at 222 North
15  28th Street, Allentown, Pennsylvania  18104,
16  beginning at 9:32 a.m., reported
17  stenographically by Cheryl L. Goldfarb, a
18  Registered Professional Reporter, Notary
19  Public, and an approved reporter of the United
20  States District Court.
21                      - - -
22
              VERITEXT LEGAL SOLUTIONS
23              MID-ATLANTIC REGION
             1801 Market Street - Suite 1800
24           Philadelphia, Pennsylvania  19103
```

```
                                              Page 2
 1   A P P E A R A N C E S :
 2
 3           STRADLEY RONON STEVENS & YOUNG, LLP
             BY:  WILLIAM E. MAHONEY, JR., ESQUIRE
 4                CAMERON REDFERN, ESQUIRE
             2005 Market Street, Suite 2600
 5           Philadelphia, Pennsylvania  19103
             215.564.8000
 6           wmahoney@stradley.com
             credfern@stradley.com
 7           Representing the Plaintiff
             (Via Zoom)
 8
 9
             HALLORAN FARKAS & KITTILA, LLP
10           BY:  WILLIAM E. GREEN, JR., ESQUIRE
                  THEODORE A. KITTILA, ESQUIRE
11           5801 Kennett Pike, Suite C
             Wilmington, Delaware  19807
12           302.257.2011
             wg@hfk.law
13           tk@hfk.law
             Representing the Defendants
14           (Via Zoom)
15
                          - - -
16
17   A L S O   P R E S E N T :
18
             DARBIN SKEANS (Via Zoom)
19
             JUSTIN BILLINGSLEY (Via Zoom)
20
21                        - - -
22
23
24
```

**A153**

Page 3

```
1                    I N D E X
2                      - - -
3    WITNESS:  DEBORAH S. SKEANS
4    QUESTIONED BY:                        PAGE:
5         MR. GREEN
6                      - - -
7                  E X H I B I T S
8    NUMBER    DESCRIPTION          MARKED FOR ID
9
     D-1       Deborah Skeans, CCIM, MAI        16
10             Biography
11   D-2       Frank Edward Pavlis obituary     29
               in Morning Call
12
     D-3       Last Will and Testament          40
13             P-003904 through 003909
14   D-4       E-mail dated November 5, 2012    73
               P-000266
15
     D-5       Assignment of Note and           82
16             Convertible Promissory Note
               for $3 million, P-000092
17             through 000099
18   D-6       Two-page handwritten document    86
               P-000065 and 000066
19
     D-7       Letter dated March 6, 2015       88
20             P-000086
21   D-8       E-mails dated from September 26  92
               through October 1, 2017
22             P-001975 through 001977
23   D-9       E-mail dated July 14, 2016      112
               and attachment, KCF003845
24             through 003849
```

Page 4

1                    E X H I B I T S

2    NUMBER    DESCRIPTION              MARKED FOR ID

3

     D-10     E-mails dated July 14 and 18,     122

4              2016 with attachment,
               KCF003872 through 003876

5

     D-11     E-mail dated September 17,     134

6              2013, P-000561 through 000563

7    D-12     E-mail dated June 8, 2014     139

               P-000843

8

     D-13     E-mail dated March 27, 2018     149

9              P-002617 and 002618

10                         - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                                  Page 5
 1                DEPOSITION SUPPORT INDEX

 2

 3    DIRECTION TO WITNESS NOT TO ANSWER

 4    Page    Line       Page    Line

 5      51   20-23       131     4-9

 6     132    4-7        145   22-23

 7

 8

 9    REQUEST FOR PRODUCTION OF DOCUMENTS

10    Page    Line   Description

11    (None)

12

13

14    STIPULATIONS

15    Page    Line

16    (Pursuant to Federal Rules of Civil Procedure)

17

18

19    QUESTIONS MARKED

20    Page    Line   Question

21     130   17-19    "Well, sure.  Now, this is a

22                     member of the board that you

23                     don't want to talk about?"

24
```

**A156**

DEBORAH S. SKEANS

Page 6

```
1                        - - -
2                DEBORAH S. SKEANS, after having
3         been first duly sworn, was examined and
4         testified as follows:
5                        - - -
6                THE WITNESS:  I do.
7                THE COURT REPORTER:  Thank you
8         very much.
9                        - - -
10                    EXAMINATION
11                        - - -
12   BY MR. GREEN:
13         Q.      Good morning, Ms. Skeans.
14         A.      Good morning.
15         Q.      I'm going to go over the general
16   ground rules.  I know you have watched at least
17   three depositions.
18                Have you ever been deposed
19   before?
20         A.      Yes.
21         Q.      When was that?
22         A.      I think about ten years ago,
23   there was a -- a matter in our office and there
24   was a deposition.  And then about a year ago,
```

**A157**

DEBORAH S. SKEANS

Page 90

1    investment with Mr. Billingsley.

2                    What investment was Mr. Lentz

3    aware of with Mr. Billingsley?

4         A.        He didn't have detailed

5    knowledge of the investment.  When I became

6    power of attorney and we talked about what

7    Frank had, there was a real estate investment

8    mentioned in the amount of $3 million that I

9    needed to get information from Justin on.

10        Q.        Understood.  Your understanding

11   at the time was, that was separate from the

12   Allwest investment?

13        A.        When I became power of attorney,

14   I talked to Frank.  We opened up his safe in

15   his room.  And there was a partially signed

16   Allwest Subscription Agreement, I believe.  And

17   that's the company that I assumed Frank would

18   have invested in.

19                    When I asked Justin about the

20   unsigned -- not completely signed agreement, I

21   was led to believe that it had never been

22   finalized.

23        Q.        Understood.  Tell me about this

24   safe in Mr. Pavlis' apartment.  How large was

**A158**

DEBORAH S. SKEANS

Page 91

1    the safe?

2         A.        He had a little safe in his

3    closet that might have been 15 inches square,

4    18 inches square.

5         Q.        It was small?

6         A.        A small safe that you have on a

7    shelf.

8         Q.        Got it.  Was it one of those

9    fireproof safes?

10         A.        It looked it.

11         Q.        What else was in that safe?

12         A.        Very little.  There was some

13    silverware, some forks and spoons and knives,

14    part of a flatware set, which looked to be

15    silver.  There were a couple small pieces of

16    Ethel's jewelry, a ring or two, a necklace

17    maybe.  There was a small envelope with a few

18    hundred dollars.  Might have been as much as a

19    thousand, but not more, which was the petty

20    cash he kept.  And there was this Allwest

21    Subscription Agreement.

22                    MR. GREEN:  I'm sharing a

23         document now with you, which will become

24         Defense Exhibit 8.  It's an e-mail dated

DEBORAH S. SKEANS

Page 128

1   D-10.  And starts at Bates number 3874 and it

2   goes to 3876.  I'm going to enlarge it so it's

3   legible.

4          A.        Yes, that's easier.

5          Q.        I realize this is a long time

6   ago.

7                    Do you remember writing this

8   document?

9          A.        Yes.

10         Q.        Why were you sharing this with

11  Justin?

12         A.        Because he was my confidante at

13  that point.  He was a dear friend.  And I

14  thought he shared with me the shock at what

15  Mr. Wyllie had attempted to do.

16                   He had been a confidante on some

17  of the problems we were going through in order

18  to try to get Legacy Place back on a fiscally

19  sound basis and to try to get the board to

20  understand what was going on in Allentown,

21  while, you know, they were in other places.

22                   And so during that struggle --

23  and I was also aware that he had worked with

24  David Wyllie during 2015, when David was power

**A160**

DEBORAH S. SKEANS

Page 152

1    is the slightly revised letter."

2                    Did you draft the attachment?

3         A.    No.   Roberta did.   She had asked

4    my thoughts on it.   She spent a lot of time

5    with Frank.   She was trying -- all of us were

6    trying to get Brother Billingsley to -- to --

7    to visit Frank and explain things.   And -- and

8    Frank was very distraught that Justin wouldn't

9    come to see him and explain things.   And every

10   time we had to give him a progress report, he

11   got more concerned.

12                   And so Roberta, with him,

13   prepared a short letter to be sent to Justin on

14   Frank's behalf.

15        Q.    We're going to look at the

16   attachment now.   This is the attachment, and

17   the attachment is 2618.

18                   So just real quick, this is the

19   attachment.   Do you happen to know if this had

20   been signed and sent to Mr. Billingsley?

21        A.    I don't believe it was ever

22   signed and sent.

23                   MR. GREEN:   Okay.   Thanks.   I'm

24        towards the end of my outline.   So I'm

# Exhibit 10

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR

# KEY COMMERCIAL FINANCE, LLC

## A Single Member-Managed Limited Liability Company

## ARTICLE I Company Formation

1.1 FORMATION. The Member hereby does form a Limited Liability Company ("Company") subject to the provisions of the Limited Liability Company Act as currently in effect as of this date. Articles of Organization shall be filed with the Secretary of State.

1.2 NAME. The name of the Company shall be: KEY COMMERCIAL FINANCE, LLC

1.3 REGISTERED AGENT. The name and location of the registered agent of the Company shall be:

UNITED CORPORATE SERVICES
874 Walker Road, Suite C
Dover, DE  19904

1.4 TERM. The Company shall continue for a perpetual period unless,

(a) The Member votes for dissolution; or

(b) Any event which makes it unlawful for the business of the Company to be carried on by the Member; or

(c) Any other event causing dissolution of this Limited Liability Company under the laws of the State of Delaware.

1.5 CONTINUANCE OF COMPANY. Notwithstanding the provisions of ARTICLE 1.4, in the event of an occurrence described in ARTICLE 1.4(c), if there is at least one remaining Member, said remaining Member shall have the right to continue the business of the Company. Such right can be exercised by the written vote of the remaining Member within ninety (90) days after the occurrence of an event described in ARTICLE 1.4(c). If not so exercised, the right of the Member to continue the business of the Company may expire if that member desires.

1.6 BUSINESS PURPOSE. The purpose of the Company is to provide financing or other capital-related investment advice whether by assisting homeowners with capitalizing on equity through sale /equity brokering or other investing opportunities and offers

DocuSign Envelope ID: 088E611B-04FD-4C53-B948-EB8B986BCABB

# A162

1.7 PRINCIPAL PLACE OF BUSINESS. The location of the principal place of business of the Company shall be:

<div align="center">

1511 ROUTE 22 STE 152

BREWSTER, NY 10509

</div>

The principal place of business may be changed to a location the Member may select. The Member may also choose to store company documents at any address the Member chooses.

1.8 **MEMBER.** The name and place of residence of the member are contained in Exhibit 1 attached to this Agreement.

1.9 **ADMISSION OF ADDITIONAL MEMBERS.** Except as otherwise expressly provided in the Agreement, additional members may be admitted to the Company through issuance by the company of a new interest in the Company or a sale of current a percent of current Member's interest.

## ARTICLE II Capital Contributions

2.1 **INITIAL CONTRIBUTIONS.** The Member initially shall contribute to the Company capital needed to legally create the entity and as described in Exhibit 2 attached to this Agreement. The total value of such property, not including time and intellectual property and cash is estimated to be $725.

2.2 **ADDITIONAL CONTRIBUTIONS.** Except as provided in ARTICLE 6.2, no Member shall be obligated to make any additional contribution to the Company's capital.

## ARTICLE III Profits, Losses and Distributions

3.1 **PROFITS/LOSSES.** For financial accounting and tax purposes the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Exhibit 2 as amended from time to time in accordance with Treasury Regulation 1.704-1.

3.2 **DISTRIBUTIONS.** The Member shall determine and distribute available funds annually or at more frequent intervals as the Member sees fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Member. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to Treasury Regulation 1.704-l(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in Treasury Regulation 1.704-l(b)(2)(ii)(d).

# A162

**A163**

3.3 **C CORPORATION ELECTION.** The Member may elect to be treated as a C corporation at any time to keep the profits of the LLC at the company level and not be forced to distribute profits to the Member.

# ARTICLE IV Management

4.1 **MANAGEMENT OF THE BUSINESS.** The management of the business is invested in the Member.

4.2 **MEMBER.** The liability of the Member shall be limited as provided pursuant to applicable law. The Member is in control, management, direction, and operation of the Company's affairs and shall have powers to bind the Company with any legally binding agreement, including setting up and operating a LLC company bank account.

4.3 **POWERS OF THE MEMBER.** The Member is authorized on the Company's behalf to make all decisions in accordance with ARTICLE 4.2 as to (a) the sale, development lease or other disposition of the Company's assets; (b) the purchase or other acquisition of other assets of all kinds; (c) the management of all or any part of the Company's assets; (d) the borrowing of money and the granting of security interests in the Company's assets; (e) the pre-payment, refinancing or extension of any loan affecting the Company's assets; (f ) the compromise or release of any of the Company's claims or debts; and, (g) the employment of persons, firms or corporations for the operation and management of the company's business. In the exercise of its management powers, the Member is authorized to execute and deliver (a) all contracts, conveyances, assignments leases, sub-leases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets; (b) all checks, drafts and other orders for the payment of the Company's funds; (c) all promissory notes, loans, security agreements and other similar documents; and, (d) all other instruments of any other kind relating to the Company's affairs, whether like or unlike the foregoing.

4.7 **NOMINEE.** Title to the Company's assets shall be held in the Company's name or in the name of any nominee that the Member may designate. The Member shall have power to enter into a nominee agreement with any such person, and such agreement may contain provisions indemnifying the nominee, except for his willful misconduct.

4.8 **COMPANY INFORMATION.** Upon request, the Chief Executive Member shall supply to any member information regarding the Company or its activities. Each Member or his authorized representative shall have access to and may inspect and copy all books, records and materials in the Chief Executive Member's possession regarding the Company or its activities.

**A163**

CONFIDENTIAL                                                                     KCF013156

DocuSign Envelope ID: 088E611B-04FD-4C53-B848-EB8B986BCABB

**A164**

4.9 **EXCULPATION.** Any act or omission of the Member, the effect of which may cause or result in loss or damage to the Company or the Member if done in good faith to promote the best interests of the Company, shall not subject the Member to any liability to the Member.

4.10 **INDEMNIFICATION.** The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Member acted in good faith and in a manner he/she reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he/she reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful.

4.11 **RECORDS.** The Member shall cause the Company to keep at its principal place of business or other location the following:

(a) A copy of the Certificate of Formation and the Company Operating Agreement and all amendments;

(b) Copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years;

(c) Copies of any financial statements of the limited liability company for the three most recent years.

# ARTICLE V Compensation

5.1 MEMBER **MANAGEMENT FEE.** Any Member rendering services to the Company shall be entitled to compensation commensurate with the value of such services.

5.2 **REIMBURSEMENT.** The Company shall reimburse the Member for all direct out-of-pocket expenses incurred by the Member in managing the Company.

**A164**

CONFIDENTIAL     KCF013157

# ARTICLE VI Bookkeeping

6.1 **BOOKS.** The Member shall maintain complete and accurate books of account of the Company's affairs at the Company's principal place of business or other agreed location. Such books shall be kept on such method of accounting as the Member shall select. The company's accounting period shall be the calendar year.

6.2 **MEMBER'S ACCOUNTS.** The Member shall maintain separate capital and distribution accounts for each member. Each member's capital account shall be determined and maintained in the manner set forth in Treasury Regulation 1.704-l(b)(2)(iv) and shall consist of his initial capital contribution increased by:

(a) Any additional capital contribution made by him/her;

(b) Credit balances transferred from his distribution account to his capital account;

and decreased by:

(a) Distributions to him/her in reduction of Company capital;

(b) The Member's share of Company losses if charged to his/her capital account.

6.3 **REPORTS.** TheMember shall close the books of account after the close of each calendar year, and shall prepare and send to each member a statement of such Member's distributive share of income and expense for income tax reporting purposes.

# ARTICLE VII Transfers

7.1 **ASSIGNMENT.** According to the appropriate Court, should the Member have a creditor with a judgment that was issued an assignment of the membership interest, the creditor shall only obtain an assignment of the membership interest, not the actual transfer of Membership in the LLC. The new assignee does not have any rights of the Member or have the ability to be involved in management of the LLC or the right to dissolve the LLC. The new assignee is only granted rights of the distributions of the Member's interests, if the Member decides to distribute at all, not the rights of membership. The assignee must release the Member's interests back to Member upon payment of the judgment in accordance with the appropriate Court.

CONFIDENTIAL                                                                KCF013158

DocuSign Envelope ID: 088E611B-04FD-4C53-B848-EB9B986BCABB

# ARTICLE VIII Dissolution

**8.1 DISSOLUTION.** The Member may dissolve the LLC at any time. The Member may NOT dissolve the LLC for a loss of membership interests. Upon dissolution the LLC must pay its debts first before distributing cash, assets, and/or initial capital to the Member or the Members interests. The dissolution may only be ordered by the Member, not by the owner of the Members interests.

# CERTIFICATE OF FORMATION

This Company Operating Agreement is entered into and shall become effective as of the Effective Date by and among the Company and the person executing this Agreement as Member. It is the Member's express intention to create a limited liability company in accordance with applicable law, as currently written or subsequently amended or redrafted.

The undersigned hereby agree, acknowledge, and certify that the foregoing operating agreement is adopted and approved by each member, the agreement consisting of **7** pages, constitutes, together with Exhibit 1, Exhibit 2 and Exhibit 3 (if any), the Operating Agreement of KEY COMMERCIAL FINANCE LLC, adopted by the member as of DECEMBER 10, 2014.

Member:

_____ GEORGE CHADWICK SELF

Signature

Percent: 100%

CONFIDENTIAL                                                                                      KCF013159

DocuSign Envelope ID: 088EC11B-04FD-4C53-B848-EB85986BCABB

# A167

# EXHIBIT 1

LISTING OF MEMBERS

As of the 10th day of December, 2014 the following is a list of Members of the Company:

**Name** George Chadwick Self  **Percent** 100%

Address 505 East Branch Rd, Patterson, NY 12563

# EXHIBIT 2 CAPITAL CONTRIBUTIONS

Pursuant to ARTICLE 2, the Member's initial contribution to the Company capital is stated to be $500. The description and each individual portion of this initial contribution are as follows:

| Description | Amount | |
| --- | --- | --- |
| Legal Documentation of Formation, Registration Agent Fee etc | $ | 495.00 |
| Postal Setup | $ | 52.02 |
| Initial Travel and Misc Meeting costs | $ | 176.11 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

SIGNED AND AGREED this 10th day of December, 2014.

Member

# A167

# Exhibit 11

**A168**

## SUBSCRIPTION AGREEMENT

### OF

### KEY COMMERCIAL FINANCE, LLC

(a Delaware Limited Liability Company)

**Effective as of August 18, 2014**

THE UNITS REPRESENTED BY THIS SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.   SUCH UNITS MAY NOT BE OFFERED, OFFERED FOR SALE, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

**A168**

KCF013105

**A169**

SUBSCRIPTION AGREEMENT
OF

**A169**

CONFIDENTIAL

KCF013106

**A170**

## KEY COMMERCIAL FINANCE, LLC
(a Delaware Limited Liability Company)

This SUBSCRIPTION AGREEMENT (this "*Agreement*") of Key Commercial Finance, LLC, a limited liability company organized under the laws of Delaware (the "*Company*"), is entered into and made effective as of August 18, 2014 by and among Frank Pavlis, individually, at 1500 Hamilton St, Allentown, PA 18102, and all other persons or entities who shall execute and deliver this Agreement or authorized counterparts or facsimiles of the same pursuant to the provisions hereof.

WHEREAS, the Company was organized by the filing of the Articles of Organization of the Company with the Secretary of the State of Delaware (hereafter, "the Articles of Organization");

WHEREAS, the parties intend that this Agreement shall set forth the understanding between them with respect to certain rights and obligations regarding ownership of the Units offered for sale as further described in the attached Private Placement Memorandum dated as of August 1, 2014, including restrictions on transfer and buy-sell provisions; and

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, agree as follows:

### GENERAL

Definitions. Certain capitalized terms used in this Agreement shall have the respective meanings set forth on **Schedule B** attached hereto and made a part hereof, unless otherwise expressly provided herein or unless the context otherwise requires. Certain capitalized terms not defined herein may be defined by the provisions of the Delaware Limited Liability Company Act.

Overview. This Agreement sets forth the terms and conditions of certain rights and obligations regarding ownership of the Units which are further described in the attached Private Placement Memorandum, including restrictions on transfer and buy-sell provisions.

Purposes. The purposes of the Company shall be to provide financing or other capital-related investment advice, to engage in any business that is not prohibited by the Act or any other law and to enter into any lawful transactions and engage in any lawful activities in furtherance of the foregoing purposes as may be necessary, incidental or convenient to carry out the business of the Company as contemplated by this Agreement.

Names and Addresses of Members. The names and addresses of the Members, along with the number of Units owned by such Members and their respective Percentage Interests, are as set forth on **Schedule A**, attached hereto and made a part hereof. The Members shall cause **Schedule A** to be updated as necessary from time to time.

### TRANSFER OF UNITS

**A170**

KCF013107

**A171**

Restrictions on Transfer. No Member shall transfer, give, donate, bequeath, pledge, deposit or in any way alienate, encumber, hypothecate, or dispose of (collectively, "***Transfer***") all or any portion of such Member's Units now owned or hereafter acquired by such Member, except for a Transfer (i) pursuant to a Bona Fide Offer, subject to the options to purchase as provided below, (ii) upon an involuntary transfer, subject to the options to purchase as provided below, or (iii) pursuant to a mandatory purchase as provided below. Transfer by Members owning a majority of the Units is subject to the provisions of the subsection Tag-Along and Drag-Along Rights.

Notwithstanding anything to the contrary set forth herein, any purported Transfer or other disposition of Units of the Company that violates the terms of this Agreement shall be void and ineffectual and shall not operate to transfer any interest or title to the purported transferee.

Options to Purchase. Upon the occurrence of any of the following Triggering Events, all of that Member's Units shall be subject to the options to purchase set out below for the purchase price and upon the payment terms provided in this Agreement.

For purposes of this subsection, "Triggering Events" shall mean any of the following: (i) a Member desires to sell any portion or all of his or her Units upon receipt of a Bona Fide Offer, or (ii) a Member's Units are subject to an involuntary Transfer by operation of law by reason of (A) bankruptcy or insolvency proceedings, whether voluntary or involuntary, (B) distribution of marital property following divorce, or (C) distraint, levy, execution or other involuntary Transfer.

The Member desiring to sell all or part of his Units pursuant to a Bona Fide Offer (hereinafter referred to as "Transferring Member") shall notify all other Members and shall provide them with a copy of the Bona Fide Offer ("Notice"). If the Transfer is an involuntary transfer, "Notice" shall be deemed received on the date any other Member or one or more members of the Board receives actual notice that an involuntary Transfer of Units has or will take place, and that person shall in turn promptly send notice of such to the other parties to this Agreement.

Option Periods. The Company shall have an option for a period of 90 days from the Company's receipt of Notice to purchase all, but not less than all, of the Units proposed to be Transferred. The Company shall exercise such option by giving written notice of such exercise to both the Transferring Member and the other Members within such 90 day period. Should the Company fail to give written notice within such 90 day period, the Company shall be deemed to have waived such option. If the Company does not elect to purchase all of the Units to be transferred, the other Members shall have an option for a period of 90 days from the Company's receipt of such Notice to purchase all, but not less than all, of the remaining Units proposed to be transferred. The other Members shall exercise this option by sending written notice of such exercise to the Transferring Member and the Company within such 90 day period. Should the other Members fail to give written notice within such 90 day period, the other Members shall be deemed to have waived such option.

**A171**

KCF013108

Failure to Exercise Options. In the event the other Members and the Company shall fail to exercise their options to purchase all, but not less than all, of the Units proposed to be Transferred, the Transferring Member may sell the Units in accordance with the Bona Fide Offer if the closing on that purchase occurs within 90 days of the expiration of the option periods. Any transferee takes the Units subject to the provisions of this Agreement.

Mandatory Purchases. Upon the occurrence of the death of a Member or termination of a Member's employment, whether voluntary or involuntary, all of the Units of such Member shall be purchased by the Company or other Members for the purchase price and upon the payment terms provided in this Agreement.

Tag-Along and Drag-Along Rights. No Member or group of Members (collectively, the "Transfer Group") shall transfer any Units, directly or indirectly, in a single transaction or series of related transactions, to any person (the "Offeror"), if as a result of such transfer(s) more than 50% of the outstanding Units would be owned by the Offeror, unless such Offeror gives the parties to this Agreement who are not included in the Transfer Group (the "Minority Members") the option to sell to the Offeror, at the same price and on the same terms and conditions as offered to the Transfer Group, all or any portion of the Units held by the Minority Members.

At the option of the Transfer Group, all Members who have not tendered their Units pursuant to the prior paragraph shall be required to transfer their Units to the Offeror at the same price and on the same terms and conditions as offered to the Transfer Group.

Purchase Price. The price for any Units subject to a Transfer pursuant to a Bona Fide Offer shall be the fair market value of any Units at issue as determined by the terms of such Bona Fide Offer. In the event of any other type of Transfer of Units permitted under this Agreement, the price for any such Units shall be determined in the following manner:

Each party will obtain its own appraiser to conduct an appraisal, the cost of which will be borne by such party. If the two appraisals are within 10% of each other, the average of those appraisals will be the fair market value. If the two appraisals are more than 10% apart, then the two appraisers will hire a third appraiser, the cost of which will be split equally between the two parties, to obtain a third appraisal and the average of the two appraisals that are closest in amount will be the fair market value. Any appraisal will be based upon the value of the entire Company sold to a single buyer in a single transaction for cash and shall include applicable discounts for illiquidity or lack of control as well as any premium for control.

Restrictions Applicable to All Transfers. Except as may be otherwise set forth herein, all Transfers of Units will be subject to the following conditions:

Prior to any Transfer, the Transferor will cause the prospective transferee, if not already a Member, to execute and deliver to the Company and the other Members the Joinder Agreement to this Agreement attached as Schedule C hereto.

Exception for Estate Planning. A Transfer to an Affiliate of a Member or the Family of

**A172**

KCF013109

such Member of the right to receive distributions with respect to such Member's Units shall be permitted and shall not constitute a Transfer subject to the right of first refusal provisions of herein. Further, the assignee of financial rights with respect to Units shall not become a Member or be treated as a holder of such Units, and the Company shall continue to treat the Member making such assignment as a Member and holder of such Units for all purposes under this Agreement.

## ISSUANCE OF UNITS

Issuance of Additional Units. The Company may not sell or issue additional Units in the Company ("*New Units*") without the unanimous affirmative vote, consent, or approval of a majority of the Members. A majority of the Members shall determine any economic or management rights of the New Units at the time of such sale or issuance.

Notwithstanding anything to the contrary set forth herein, any sale or issuance of New Units by the Company in violation of the terms of this Agreement shall be void and ineffectual.

Preemptive Rights of Members. Any sale and issuance of New Units shall be subject to the following preemptive rights of the Members (the "*Preemptive Rights*"):

The Company must first offer each Member the opportunity to purchase up to a percentage of the New Units equal to such Member's Percentage Interest of Units at the time of the proposed offering, so that, after the issuance of all such proposed New Units, such Member's Percentage Interest of Units will be the same as the Percentage Interest of Units maintained by such Member immediately prior to the issuance of any such New Units.

The Company shall give written notice (the "*Offer Notice*") to each Member of the proposed offer to sell and issue any New Units, which Offer Notice shall contain the terms of such proposed sale and issuance in reasonable detail. Each Member may exercise its Preemptive Rights by (i) giving written notice to the Company specifying the amount of New Units that such Member desires to purchase (the "*Preemptive Units*"), (ii) executing such reasonable documentation as may be provided by the Company to effect the issuance of the New Units and (iii) delivering to the Company, pursuant to instructions provided by the Company in the Offer Notice, the full purchase price for the Preemptive Units. If a Member does not pay the full purchase price for the Preemptive Units, then such Member's Preemptive Rights with respect to such Preemptive Units shall, at the option of the Company, be deemed to not have been exercised by such Member and such Preemptive Units shall be subject to issuance and sale by the Company.

## MISCELLANEOUS PROVISIONS

Notices. All notices and communications required or permitted to be given hereunder (a) shall be in writing; (b) shall be sent by messenger, certified or registered U.S. mail, a reliable express delivery service, or electronic mail, charges prepaid as applicable, to the appropriate

CONFIDENTIAL                                          KCF013110

**A174**

address(es) or number(s) set forth on **Schedule A** to this Agreement (or such other address as such party may designate by notice to all other parties hereto); and (c) shall be deemed to have been given on the date of receipt by the addressee (or, if the date of receipt is not a business day, on the first business day after the date of receipt), as evidenced by (A) a receipt executed by the addressee (or a responsible person in his or her office or member of his or her household) or a notice to the effect that such addressee refused to accept such communication, if sent by messenger, U.S. mail or express delivery service, (B) confirmation of a facsimile transmission (either orally or by written confirmation) or (C) a receipt of such e-mail confirmed by reply message or read receipt. All parties shall act in good faith to promptly confirm receipt of communications where confirmation of receipt is required to effect notice pursuant to this subsection and is requested by the notifying party.

Further Assurances. Each of the Members shall hereafter execute and deliver such further instruments and do such further acts and things consistent with the provisions of this Agreement as may be required or useful to carry out the full intent and purpose of this Agreement or as may be necessary to comply with any laws, rules or regulations, including carefully reviewing the attached Private Placement Memorandum dated as of August 1, 2014 and executing such applicable and necessary revisions to the operating agreement of the Company.

Waivers. No party's undertakings or agreements contained in this Agreement shall be deemed to have been waived unless such waiver is made by an instrument in writing signed by an authorized representative of such Member. Failure of a party to insist on strict compliance with the provisions of this Agreement shall not constitute waiver of that party's right to demand later compliance with the same or other provisions of this Agreement. A waiver of a breach of this Agreement will not constitute a waiver of the provision itself or of any subsequent breach, or of any other provision of this Agreement.

Rights and Remedies Cumulative; Creditors. The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or of the Members.

Construction. The headings in this Agreement are inserted solely for convenience of reference and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof. When the context in which words are used in this Agreement indicates that such is the intent, singular words shall include the plural and vice versa and masculine words shall include the feminine and the neuter genders and vice versa.

Amendment. This Agreement may be altered or amended only by the unanimous consent of the Members.

Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**A174**

 KCF013111

Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

Governing Law. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its rules on conflicts of laws, and specifically the Act.

Dispute Resolution. The parties hereto agree that any suit or proceeding arising out of this Agreement shall be brought only in the courts of the State of Delaware; *provided, however*, that no party waives its right to request removal of such action or proceeding from the state court to a federal court. Each party hereto consents to the personal jurisdiction of such courts and agrees that service of process in any such suit or proceeding will be sufficiently accomplished if accomplished in accordance with the notice provisions set forth in the Agreement.

Code and Treasury Regulation References. Any reference to a section of the Code or a Treasury Regulation in this Agreement shall be deemed to refer to corresponding provisions of subsequent superseding federal revenue laws and regulations in the event that the section of the Code or Treasury Regulation so referenced has been so superseded.

Counterparts. This Agreement may be executed in any number of counterparts and may be executed and delivered by facsimile or other electronic transmission. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

[Signature Page Follows]

CONFIDENTIAL

KCF013112

**A176**

The undersigned hereby represents and warrants that all of its answers to this Investor Questionnaire are true as of the date of its execution of the Subscription Agreement pursuant to which it purchased Notes of the Company.

_Frank Pavlis_

———————————————————     ———————————————————
Name of Purchaser  [please print]                        Name of Co-Purchaser  [please print]

———————————————————     ———————————————————
Signature of Purchaser (Entities please                 Signature of Co-Purchaser
provide signature of Purchaser's duly
authorized signatory)

———————————————————
Name of Signatory (Entities only)

———————————————————
Title of Signatory (Entities only)

**A176**

                                                                 KCF013113

**A177**

**SCHEDULE A**

## SUBSCRIPTION AGREEMENT
## OF
## KEY COMMERCIAL FINANCE, LLC

### CAPITALIZATION TABLE

| Name | Number of Units | % Management Interest | % Economic Interest |
|------|-----------------|----------------------|---------------------|
| Frank Pavlis | 0 | 0% | 0% |

---

The addresses of the above-listed Unit holder(s) are:

1500 Hamilton St

Allentown, PA 18102

**A177**

KCF013114

**A178**

**SCHEDULE B**

## SUBSCRIPTION AGREEMENT
## OF
## KEY COMMERCIAL FINANCE, LLC

**DEFINITIONS**

The following terms shall have the following meanings when used in this Agreement:

"*Act*" means the applicable law of the State of Delaware governing corporations organized in Delaware, the Delaware Limited Liability Company Act, *et seq*, and any successor statute, as it may be amended from time to time.

"*Affiliate*" shall mean any other Person which directly or indirectly Controls or is Controlled by or is under common Control with such Person, or any Person that is an employee of or an officer of or partner in or serves in a similar capacity or relationship with respect to a Person.

"*Articles of Organization*" shall mean the Articles of Organization of the Company as filed with the Delaware Secretary of the State and as further amended from time to time.

"*Bona Fide Offer*" shall mean a legally binding written agreement with a non-Member to purchase all or a portion of the Units owned by a Member, which written agreement must be contingent upon the options to purchase or participate in a sale as provided herein.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

"*Control*" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract or otherwise.

"*Entity*" shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, company, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

"*Family*", as applied to any individual, shall mean (a) the children of such individual (by birth or adoption), (b) the parents, spouse and siblings of such individual, (c) the children of the siblings of such individual, (d) any trust solely for the benefit of, or any partnership, limited liability company or other entity owned solely by, any one or more of such aforementioned individuals (so long as such individuals have the exclusive right to Control such trust or other entity) and (e) the estate of such individual.

"*Member*" shall mean each of the parties who executes a counterpart of this Agreement as a Member, and each of the parties who may hereafter become a Member pursuant to the terms and conditions of this Agreement.

**A178**

KCF013115

**A179**

"*Percentage Interest*" of Units shall mean the number of Units of a given class held at a particular time by such Member, divided by the total number of all Units of the same class then held by all Members, expressed as a percentage.

"*Person*" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person, where the context so permits.

"*Units*" shall mean equity interests in the Company that shall have (a) economic value and rights in or to the profits, gains, losses, distributions and other economic interests of the Company and (b) voting membership rights in the Company.

"*Transferring Member*" is the Member desiring to sell or, in the case of an involuntary Transfer, is the Member whose Units are subject to an involuntary Transfer and also the potential transferee if that person has provided information to the Company and other Members of his/her name, address, and potential claim to the Units.

New Member

**A179**

CONFIDENTIAL

KCF013116

# Exhibit 12



# Allwest RE Partners
## Subscription Agreement

Allwest is a limited liability company that partners with
accredited individuals for real estate transactions.

CONFIDENTIAL

**A181**

### ALLWEST INVESTMENTS, LLC

### <u>SUBSCRIPTION DOCUMENTS AND INSTRUCTIONS</u>

### INSTRUCTIONS

The following documents must be completed in accordance with the instructions set forth below and must be executed in order to determine whether you are an accredited investor and, if accredited, in order to subscribe for the purchase of promissory notes (the "Notes") of Allwest Investments, LLC (the "Company").

### <u>PLEASE PRINT THE ANSWERS TO ALL QUESTIONS.</u>

1.      <u>Enclosed are the Following Documents:</u>

(a)      **Subscription Agreement.** Be sure to carefully and fully read the Subscription Agreement, and execute the signature page which is applicable to you. On the appropriate signature page of the Subscription Agreement, the Subscriber must sign, print his, her or its name, address and social security or tax identification number where indicated, and indicate the number of Notes subscribed for, the date of execution and the manner in which title to the Notes will be held.

(b)      **Investor Questionnaire.** Be sure to carefully and fully read the Investor Questionnaire, which can be found after the Subscription Agreement. On the signature page of the Investor Questionnaire, the Subscriber must sign and print his, her or its name where indicated.

(c)      **Verification of Investment Advisor/Broker.** The investment advisor or broker must complete this item and sign to verify that this is a suitable investment, as well as for recordkeeping purposes.

2.      <u>Payment</u>. Payment of the purchase price may be made by bank wire transfer to the Company, as indicated below, or by check payable to the Company and mailed to the Company at 1615 South 52nd Street, Tempe, Arizona 85281.

|                    |                          |
|--------------------|--------------------------|
| Bank Name:         | Wells Fargo              |
| Routing Number:    |                          |
| Account Number:    | ████ 0318                |
| Account Name:      | Allwest Investments, LLC |
| Bank Address:      |                          |

3.      <u>Return of Documents</u>. Copies of the signed Subscription Agreement, Investor Questionnaire and other subscription-related documents should be delivered to Allwest at:

<div align="center">

Allwest Investments, LLC
1034 Darms Lane
Napa CA 94558

</div>

ii

**A181**

**A182**

NAME OF SUBSCRIBER: Frank Pawlis   SUBSCRIPTION AMOUNT: $ 1,000,000

To:     Allwest Investments, LLC
        1034 Darms Lane Napa,CA945

### SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement") is being delivered to you in connection with your investment in the Notes of Allwest Investments, LLC  (the "Company").  No funds received in the Offering will be escrowed.

1.     **Subscription and Purchase Price**

(a)     Subscription.  Subject to the conditions set forth in Section 2 hereof, the undersigned hereby subscribes for and agrees to purchase $ 1,000,000 face amount of one-year/two-year (circle one) Notes.

(b)     Purchase of Notes.  The undersigned understands and acknowledges that the purchase price shall be remitted in exchange for the Notes, simultaneous with the delivery of this Subscription Agreement, as set forth below (the "Aggregate Purchase Price").  The undersigned understands and agrees that, subject to Section 2 and applicable laws, by executing this Agreement, he, she or it is entering into a binding agreement.

2.     **Acceptance, Offering Term and Closing Procedures**

Acceptance or Rejection.  The obligation of the undersigned to purchase the Notes shall be irrevocable, and the undersigned shall be legally bound to purchase the Notes subject to the terms set forth in this Agreement.  The undersigned understands and agrees that the Company reserves the right to reject this subscription for the Notes in whole or part in any order at any time prior to the closing (the "Closing") of the purchase and sale of the Notes. If, in the event of rejection of this subscription by the Company in accordance with this Section 2, or the sale of the Notes is not consummated for any reason, this Agreement and any other agreement entered into between the undersigned and the Company relating to this subscription shall thereafter have no force or effect, and the Company shall promptly return the purchase price without interest thereon or deduction there from.

3.     **Investor's Representations and Warranties**

The undersigned hereby acknowledges, agrees with and represents and warrants to the Company and its affiliates, as follows:

(a)     The undersigned has full power and authority to enter into this Agreement, the execution and delivery of which has been duly authorized, if applicable, and this Agreement constitutes a valid and legally binding obligation of the undersigned.

(b)     The undersigned acknowledges his, her or its understanding that the Offering and sale of the Notes is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the provisions of Regulation D promulgated thereunder ("Regulation D").  In furtherance thereof, the undersigned represents and warrants to the Company and its affiliates as follows:

(i)     The undersigned realizes that the basis for the exemption from registration may not be available if, notwithstanding the undersigned's representations contained herein, the undersigned is merely acquiring the Notes for resale rather than investment.

**A182**

(ii)    The undersigned is acquiring the Notes solely for the undersigned's own beneficial account, for investment purposes, and not with view to, or resale in connection with, any distribution of the Notes.

(iii)   The undersigned (i) has the financial ability to bear the economic risk of his, her or its investment, has adequate means for providing for current needs and contingencies, (ii) has no need for liquidity with respect to the investment in the Company, and (iii) understands that interest will not be paid on the Note for 60 days from the date of purchase;

(iv)    The undersigned and the undersigned's attorney, accountant, purchaser representative and/or tax advisor, if any (collectively, "Advisors"), have received the Memorandum, together with all appendices thereto (as such documents may be amended or supplemented, the "Memorandum"), relating to the private placement by the Company of the Notes, and all other documents requested by the undersigned or Advisors, if any, have carefully reviewed them and understand the information contained therein, prior to the execution of this Agreement; and

(v)    The undersigned (together with his, her or its Advisors, if any) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the prospective investment in the Notes. If other than an individual, the undersigned also represents it has not been organized solely for the purpose of acquiring the Notes.

(c)    The information in the Investor Questionnaire (attached) completed and executed by the undersigned (the "Investor Questionnaire") is true and accurate in all respects, and the undersigned is an "accredited investor," as that term is defined in Rule 501(a) of Regulation D.

(d)    The undersigned (and his, her or its Advisors, if any) has been furnished with a copy of the Memorandum.

(e)    The undersigned has relied on the advice of, or has consulted with, only his, her or its Advisors. Each Advisor, if any, is capable of evaluating the merits and risks of an investment in the Notes as such are described in the Memorandum, and each Advisor, if any, has disclosed to the undersigned in writing (a copy of which is annexed to this Agreement) the specific details of any and all past, present or future relationships, actual or contemplated, between the Advisor and the Company or any affiliate thereof.

(f)    The undersigned represents, warrants and agrees that he, she or it will not sell or otherwise transfer the Notes without registration under the Securities Act or an exemption therefrom, and fully understands and agrees that the undersigned must bear the economic risk of his, her or its purchase because, among other reasons, the Notes have not been registered under the Securities Act or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under the applicable securities laws of such states, or an exemption from such registration is available. In particular, the undersigned is aware that the Notes are "restricted securities," as such term is defined in Rule 144 promulgated under the Securities Act ("Rule 144"), and they may not be sold pursuant to Rule 144 unless all of the conditions of Rule 144 are met. The undersigned also understands that, except as otherwise provided in Section 5 hereof, the Company is under no obligation to register the Notes on his, her or its behalf or to assist them in complying with any exemption from registration under the Securities Act or applicable state securities laws. The undersigned understands that any sales or transfers of the Notes are further restricted by state securities laws.

2

**A183**

(g)  No representations or warranties have been made to the undersigned by the Company, other than any representations of the Company contained herein and in the Memorandum, and in subscribing for the Notes the undersigned is not relying upon any representations other than those contained herein or in the Memorandum.

(h)  The undersigned understands and acknowledges that his, her or its purchase of the Notes is a speculative investment that involves a high degree of risk and the potential loss of their entire investment and has carefully read and considered the matters set forth in the Memorandum and in particular the matters under the caption "Special Note Regarding Forward-Looking Statements" and "Risk Factors" therein.

(i)  The undersigned's overall commitment to investments that are not readily marketable is not disproportionate to the undersigned's net worth, and an investment in the Notes will not cause such overall commitment to become excessive.

(j)  The undersigned understands and agrees that the certificates for the Notes shall bear substantially the following legend until (i) such Notes shall have been registered under the Securities Act and effectively disposed of in accordance with a registration statement that has been declared effective or (ii) in the opinion of counsel for the Company such Notes may be sold without registration under the Securities Act, as well as any applicable "blue sky" or state securities laws:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS. SUCH SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES AND MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FILED BY THE ISSUER WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION COVERING SUCH SECURITIES UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED.

(k)  Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved the Notes or passed upon or endorsed the merits of the Offering or confirmed the accuracy or determined the adequacy of the Memorandum. The Memorandum has not been reviewed by any Federal, state or other regulatory authority.

(l)  The undersigned and his, her or its Advisors, if any, have had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the Offering of the Notes and the business, financial condition, results of operations and prospects of the Company, and all such questions have been answered to the full satisfaction of the undersigned and his, her or its Advisors, if any.

(m)  The undersigned is unaware of, is in no way relying on, and did not become aware of the Offering of the Notes through or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or electronic mail over the Internet, in connection with the Offering and sale of the Notes and is not subscribing for Notes and did not become aware of the Offering of the Notes through or as a result of any seminar or meeting to which the undersigned was invited by, or any solicitation of a subscription by, a person not previously known to the undersigned in connection with investments in securities generally.

3

**A184**

P-000056

**A185**

(n)     The undersigned has taken no action which would give rise to any claim by any person for brokerage commissions, finders' fees or the like relating to this Agreement or the transactions contemplated hereby (other than commissions to be paid by the Company or as otherwise described in the Memorandum).

(o)     The undersigned is not relying on the Company with respect to the legal, tax, economic and related considerations of an investment in the Notes, and the undersigned has relied on the advice of, or has consulted with, only his, her or its own Advisors.

(p)     The undersigned acknowledges that any estimates or forward-looking statements or projections provided to the undersigned were prepared by the management of the Company in good faith, but that the attainment of any such projections, estimates or forward-looking statements cannot be guaranteed by the Company or its management and should not be relied upon.

(q)     No oral or written representations have been made, or oral or written information furnished, to the undersigned or his, her or its Advisors, if any, in connection with the Offering of the Notes which are in any way inconsistent with the information contained in the Memorandum.

(r)     (For ERISA plans only) The fiduciary of the ERISA plan (the "Plan") represents that such fiduciary has been informed of an understands the Company's investment objectives, policies and strategies, and that the decision to invest "plan assets" (as such term is defined in ERISA) in the Company is consistent with the provisions of ERISA that require diversification of plan assets and impose other fiduciary responsibilities. The Subscriber or Plan fiduciary (a) is responsible for the decision to invest in the Company; (b) is independent of the Company and any of its affiliates; (c) is qualified to make such investment decision; and (d) in making such decision, the Subscriber or Plan fiduciary has not relied primarily on any advice or recommendation of the Company or any of its affiliates.

(s)     The foregoing representations, warranties and agreements shall survive the Closing.

## 4.     The Company's Representations and Warranties

The Company hereby acknowledges, agrees with and represents and warrants to each of the undersigned, as follows:

(a)     The Company has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly authorized, executed and delivered by the Company and is valid, binding and enforceable against the Company in accordance with its terms.

(b)     The Notes to be issued to the undersigned pursuant to this Agreement, when issued and delivered in accordance with the terms of this Agreement, will be duly and validly issued.

(c)     Neither the execution and delivery nor the performance of this Agreement by the Company will conflict with the Company's Articles of Incorporation or By-laws, as amended to date, or result in a breach of any terms or provisions of, or constitute a default under, any material contract, agreement or instrument to which the Company is a party or by which the Company is bound.

4

**A185**

**A186**

**5.     Conditions to Acceptance of Subscription**

The Company's right to accept the subscription of the undersigned is conditioned upon satisfaction of the following conditions precedent on or before the date the Company accepts such subscription (any or all of which may be waived by the undersigned in his, her or its sole discretion):

(a)     No legal action, suit or proceeding shall be pending which seeks to restrain or prohibit the transactions contemplated by this Agreement.

(b)     The representations and warranties of the Company contained in this Agreement shall have been true and correct on the date of this Agreement.

**6.     Notices to Subscribers**

(a)     THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.   THE NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(b)     THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**7.     Miscellaneous Provisions**

(a)     Modification.  Neither this Agreement, nor any provisions hereof, shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, discharge or termination is sought.

(b)     Survival.  The undersigned's representations and warranties made in this Subscription Agreement shall survive the execution and delivery of this Agreement and the delivery of the Notes.

(c)     Notices.  Any party may send any notice, request, demand, claim or other communication hereunder to the undersigned at the address set forth on the signature page of this Agreement or to the Company at the address set forth above using any means (including personal delivery, expedited courier, messenger service, fax, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication will be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties written notice in the manner herein set forth.

(d)     Binding Effect.  Except as otherwise provided herein, this Agreement shall be binding upon, and inure to the benefit of, the parties to this Agreement and their heirs, executors, administrators, successors, legal representatives and assigns.  If the undersigned is more than one person or entity, the obligation of the undersigned shall be joint and several and the agreements, representations, warranties and acknowledgments contained herein shall be deemed to be made by, and be binding upon, each such

5

**A186**

**A187**

person or entity and his or its heirs, executors, administrators, successors, legal representatives and assigns. This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter thereof and merges and supersedes all prior discussions, agreements and understandings of any and every nature among them.

        (e)    Assignability. This Agreement is not transferable or assignable by the undersigned. This Agreement shall be transferable or assignable by the Company to a proposed publicly-traded successor company.

        (f)    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflicts of law principles.

        (g)    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**A187**

CONFIDENTIAL

**A188**

<u>ALL SUBSCRIBERS MUST COMPLETE THIS PAGE</u>

IN WITNESS WHEREOF, the undersigned has executed this Agreement on the _28th_ day of _January_ 2014.

Face amount of Notes subscribed for: _$ 1,000,000_

Check Box:     One-Year Notes:  ☐     Two-Year Notes:  ☒

Manner in which Title is to be held (Please Check <u>One</u>):

| | | | | |
|---|---|---|---|---|
| 1. ☒ | Individual | 7. ☐ | Trust/Estate/Pension or Profit sharing Plan Date Opened:_____ |
| 2. ☐ | Joint Tenants with Right of Survivorship | 8. ☐ | As a Custodian for _____ Under the Uniform Gift to Minors Act of the State of _____ |
| 3. ☐ | Community Property | 9. ☐ | Married with Separate Property |
| 4. ☐ | Tenants in Common | 10. ☐ | Keogh |
| 5. ☐ | Corporation/Partnership/ Limited Liability Company | 11. ☐ | Tenants by the Entirety |
| 6. ☐ | IRA | | |

### ALTERNATIVE DISTRIBUTION INFORMATION

To direct distribution to a party other than the registered owner, complete the information below. YOU MUST COMPLETE THIS SECTION IF THIS IS AN IRA INVESTMENT.

Name of Firm (Bank, Brokerage, Custodian): _____

Account Name: _____

Account Number: _____

Representative Name: _____

Representative Phone Number: _____

Address: _____

City, State, Zip: _____

**A188**

CONFIDENTIAL

**A189**

IF MORE THAN ONE SUBSCRIBER, EACH SUBSCRIBER MUST SIGN.
INDIVIDUAL SUBSCRIBERS MUST COMPLETE THE NEXT PAGE.
SUBSCRIBERS WHICH ARE ENTITIES MUST COMPLETE THE PAGE THEREAFTER.

2

**A189**

CONFIDENTIAL

## EXECUTION BY NATURAL PERSONS

_____
Exact Name in Which Title is to be Held

Frank Pavlis
_____
Name (Please Print)

Apt. 1 in 1500 Hamilton St.
_____
Residence: Number and Street

Allentown PA
_____
City, State and Zip Code

_____
Social Security Number

_____
Telephone Number

_____
Fax Number (if available)

_____
E-Mail (if available)

Frank E Pavlis
_____
(Signature)

_____
Name of Additional Purchaser

_____
Address of Additional Purchaser

_____
City, State and Zip Code

_____
Social Security Number

_____
Telephone Number

_____
Fax Number (if available)

_____
E-Mail (if available)

_____
(Signature of Additional Purchaser)

ACCEPTED this 28th day of January 2011, on behalf of the Company.
                                                2014

By: _____

                        Gary Miller
                        President

**A190**

CONFIDENTIAL                                                                P-000062

**INVESTOR QUESTIONNAIRE**

*Instructions: Check all boxes below which correctly describe you.*

☐    You are (i) a bank, as defined in Section 3(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"), (ii) a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in an individual or fiduciary capacity, (iii) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (iv) an insurance company as defined in Section 2(13) of the Securities Act, (v) an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"), (vi) a business development company as defined in Section 2(a)(48) of the Investment Company Act, (vii) a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301 (c) or (d) of the Small Business Investment Act of 1958, as amended, (viii) a plan established and maintained by a state, its political subdivisions, or an agency or instrumentality of a state or its political subdivisions, for the benefit of its employees and you have total assets in excess of $5,000,000, or (ix) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and (1) the decision that you shall subscribe for and purchase the Notes, is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, (2) you have total assets in excess of $5,000,000 and the decision that you shall subscribe for and purchase the Notes is made solely by persons or entities that are accredited investors, as defined in Rule 501 of Regulation D promulgated under the Securities Act ("Regulation D") or (3) you are a self-directed plan and the decision that you shall subscribe for and purchase the Notes is made solely by persons or entities that are accredited investors.

☐    You are a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended.

☐    You are an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), a corporation, Massachusetts or similar business trust or a partnership, in each case not formed for the specific purpose of making an investment in the Notes and with total assets in excess of $5,000,000.

☐    You are a director or executive officer of the Company.

☑    You are a natural person whose individual net worth, or joint net worth with your spouse, exceeds $1,000,000 (excluding the value of your primary residence) at the time of your subscription for and purchase of the Notes.

☐    You are a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with your spouse in excess of $300,000 in each of the two most recent years, and who has a reasonable expectation of reaching the same income level in the current year.

☐    You are a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Notes, whose subscription for and purchase of the Notes is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D.

☐    You are an entity in which all of the equity owners are persons or entities described in one of the preceding paragraphs.

**A191**

P-000063

The undersigned hereby represents and warrants that all of its answers to this Investor Questionnaire are true as of the date of its execution of the Subscription Agreement pursuant to which it purchased Notes of the Company.

Frank Pavlis
_____           _____
Name of Purchaser [please print]         Name of Co-Purchaser [please print]

_____           _____
Signature of Purchaser (Entities please     Signature of Co-Purchaser
provide signature of Purchaser's duly
authorized signatory.)

_____
Name of Signatory (Entities only)

_____
Title of Signatory (Entities only)

**A192**

CONFIDENTIAL

# **<u>Exhibit 13</u>**

**A193**

| | |
|---|---|
| **From:** | Adrienne Dean |
| **Sent:** | Tuesday, June 19, 2018 10:43 PM EDT |
| **To:** | Justin |
| **CC:** | cray@c2groupllc.com |
| **Subject:** | Follow up - Subscription Agreement |
| **Attachments:** | 6.12.18 Key Comm Fin Subscription Agr v2.pdf |

Hi Justin,

I just wanted to follow up with you regarding the Subscription Agreement (attached). The attachments referenced in the Agreement can be found on pages 9-12 of the Agreement, except for the PPM. (The PPM is kept in a separate document for organization purposes.) An Investor will receive both the Subscription Agreement and the PPM at the same time. In order to purchase the securities described in the PPM, the Investor will sign page 8 of the Subscription Agreement. The Company will keep track of all of the Investors and their respective investments in the Company by keeping up-to-date the Capitalization Table (page 8). The Joinder Agreement (page 12) exists for investors that join at a time later than the initial investors, allowing them to "join" the already existing agreement.

I have a revised version of the Subscription Agreement in the works that matches its terminology to that usedin the PPM more closely, making it clearer that the two documents go together. Let me know if you have any additional questions or comments.

Kind Regards,

Adrienne Dean

**A193**

KCF009280

**A194**

**SUBSCRIPTION AGREEMENT**

**OF**

**KEY COMMERCIAL FINANCE, LLC**

(a Delaware Limited Liability Company)

**Effective as of June [__], 2018**

THE UNITS REPRESENTED BY THIS SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH UNITS MAY NOT BE OFFERED, OFFERED FOR SALE, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

**A194**

KCF009281

**A195**

<div align="center">

**SUBSCRIPTION AGREEMENT**
**OF**
**KEY COMMERCIAL FINANCE, LLC**
(a Delaware Limited Liability Company)

</div>

This SUBSCRIPTION AGREEMENT (this "*Agreement*") of Key Commercial Finance, LLC, a limited liability company organized under the laws of Delaware (the "*Company*"), is entered into and made effective as of June [__], 2018 by and among the Company, _____, a domiciliary of the state of _____, _____, a domiciliary of the state of _____, and all other persons or entities who shall execute and deliver this Agreement or the Joinder Agreement attached as Schedule C hereto or authorized counterparts or facsimiles of the same pursuant to the provisions hereof.

WHEREAS, the Company was organized by the filing of the Articles of Organization of the Company with the Secretary of the State of Delaware on December 10, 2014 (hereafter, "the Articles of Organization");

WHEREAS, the parties intend that this Agreement shall set forth the understanding between them with respect to certain rights and obligations regarding ownership of the Units offered for sale as further described in the attached Private Placement Memorandum dated as of June [__], 2018, including restrictions on transfer and buy-sell provisions; and

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, agree as follows:

<div align="center">

**GENERAL**

</div>

Definitions. Certain capitalized terms used in this Agreement shall have the respective meanings set forth on **Schedule B** attached hereto and made a part hereof, unless otherwise expressly provided herein or unless the context otherwise requires. Certain capitalized terms not defined herein may be defined by the provisions of the Delaware Limited Liability Company Act.

Overview. This Agreement sets forth the terms and conditions of certain rights and obligations regarding ownership of the Units which are further described in the attached Private Placement Memorandum, including restrictions on transfer and buy-sell provisions.

Purposes. The purposes of the Company shall be to provide financing or other capital-related investment advice, to engage in any business that is not prohibited by the Act or any other law and to enter into any lawful transactions and engage in any lawful activities in furtherance of the foregoing purposes as may be necessary, incidental or convenient to carry out the business of the Company as contemplated by this Agreement.

Names and Addresses of Members. The names and addresses of the Members, along with the number of Units owned by such Members and their respective Percentage Interests, are as set forth on **Schedule A**, attached hereto and made a part hereof. The Members shall cause **Schedule A** to be updated as necessary from time to time.

2

<div align="center">

**A195**

</div>

**A196**

## TRANSFER OF UNITS

Restrictions on Transfer. No Member shall transfer, give, donate, bequeath, pledge, deposit or in any way alienate, encumber, hypothecate, or dispose of (collectively, "**Transfer**") all or any portion of such Member's Units now owned or hereafter acquired by such Member, except for a Transfer (i) pursuant to a Bona Fide Offer, subject to the options to purchase as provided below, (ii) upon an involuntary transfer, subject to the options to purchase as provided below, or (iii) pursuant to a mandatory purchase as provided below. Transfer by Members owning a majority of the Units is subject to the provisions of the subsection Tag-Along and Drag-Along Rights.

Notwithstanding anything to the contrary set forth herein, any purported Transfer or other disposition of Units of the Company that violates the terms of this Agreement shall be void and ineffectual and shall not operate to transfer any interest or title to the purported transferee.

Options to Purchase. Upon the occurrence of any of the following Triggering Events, all of that Member's Units shall be subject to the options to purchase set out below for the purchase price and upon the payment terms provided in this Agreement.

For purposes of this subsection, "Triggering Events" shall mean any of the following: (i) a Member desires to sell any portion or all of his or her Units upon receipt of a Bona Fide Offer, or (ii) a Member's Units are subject to an involuntary Transfer by operation of law by reason of (A) bankruptcy or insolvency proceedings, whether voluntary or involuntary, (B) distribution of marital property following divorce, or (C) distraint, levy, execution or other involuntary Transfer.

The Member desiring to sell all or part of his Units pursuant to a Bona Fide Offer (hereinafter referred to as "Transferring Member") shall notify all other Members and shall provide them with a copy of the Bona Fide Offer ("Notice"). If the Transfer is an involuntary transfer, "Notice" shall be deemed received on the date any other Member or one or more members of the Board receives actual notice that an involuntary Transfer of Units has or will take place, and that person shall in turn promptly send notice of such to the other parties to this Agreement.

Option Periods. The Company shall have an option for a period of [__] days from the Company's receipt of Notice to purchase all, but not less than all, of the Units proposed to be Transferred. The Company shall exercise such option by giving written notice of such exercise to both the Transferring Member and the other Members within such [__] day period. Should the Company fail to give written notice within such [__] day period, the Company shall be deemed to have waived such option. If the Company does not elect to purchase all of the Units to be transferred, the other Members shall have an option for a period of [__] days from the Company's receipt of such Notice to purchase all, but not less than all, of the remaining Units proposed to be transferred. The other Members shall exercise this option by sending written notice of such exercise to the Transferring Member and the Company within such [__] day period. Should the other Members fail to give written notice within such [__] day period, the other Members shall be deemed to have waived such option.

3

**A196**

**A197**

<u>Failure to Exercise Options</u>. In the event the other Members and the Company shall fail to exercise their options to purchase all, but not less than all, of the Units proposed to be Transferred, the Transferring Member may sell the Units in accordance with the Bona Fide Offer if the closing on that purchase occurs within [___] days of the expiration of the option periods. Any transferee takes the Units subject to the provisions of this Agreement.

<u>Mandatory Purchases</u>. Upon the occurrence of the death of a Member or termination of a Member's employment, whether voluntary or involuntary, all of the Units of such Member shall be purchased by the Company or other Members for the purchase price and upon the payment terms provided in this Agreement.

<u>Tag-Along and Drag-Along Rights</u>. No Member or group of Members (collectively, the "Transfer Group") shall transfer any Units, directly or indirectly, in a single transaction or series of related transactions, to any person (the "Offeror"), if as a result of such transfer(s) more than 50% of the outstanding Units would be owned by the Offeror, unless such Offeror gives the parties to this Agreement who are not included in the Transfer Group (the "Minority Members") the option to sell to the Offeror, at the same price and on the same terms and conditions as offered to the Transfer Group, all or any portion of the Units held by the Minority Members.

At the option of the Transfer Group, all Members who have not tendered their Units pursuant to the prior paragraph shall be required to transfer their Units to the Offeror at the same price and on the same terms and conditions as offered to the Transfer Group.

<u>Purchase Price</u>. The price for any Units subject to a Transfer pursuant to a Bona Fide Offer shall be the fair market value of any Units at issue as determined by the terms of such Bona Fide Offer. In the event of any other type of Transfer of Units permitted under this Agreement, the price for any such Units shall be determined in the following manner:

Each party will obtain its own appraiser to conduct an appraisal, the cost of which will be borne by such party. If the two appraisals are within 10% of each other, the average of those appraisals will be the fair market value. If the two appraisals are more than 10% apart, then the two appraisers will hire a third appraiser, the cost of which will be split equally between the two parties, to obtain a third appraisal and the average of the two appraisals that are closest in amount will be the fair market value. Any appraisal will be based upon the value of the entire Company sold to a single buyer in a single transaction for cash and shall include applicable discounts for illiquidity or lack of control as well as any premium for control.

<u>Restrictions Applicable to All Transfers</u>. Except as may be otherwise set forth herein, all Transfers of Units will be subject to the following conditions:

Prior to any Transfer, the Transferor will cause the prospective transferee, if not already a Member, to execute and deliver to the Company and the other Members the Joinder Agreement to this Agreement attached as Schedule C hereto.

<u>Exception for Estate Planning</u>. A Transfer to an Affiliate of a Member or the Family of such Member of the right to receive distributions with respect to such Member's Units shall be

4

**A197**

**A198**

permitted and shall not constitute a Transfer subject to the right of first refusal provisions of herein. Further, the assignee of financial rights with respect to Units shall not become a Member or be treated as a holder of such Units, and the Company shall continue to treat the Member making such assignment as a Member and holder of such Units for all purposes under this Agreement.

## ISSUANCE OF UNITS

Issuance of Additional Units. The Company may not sell or issue additional Units in the Company ("*New Units*") without the unanimous affirmative vote, consent, or approval of a majority of the Members. A majority of the Members shall determine any economic or management rights of the New Units at the time of such sale or issuance.

Notwithstanding anything to the contrary set forth herein, any sale or issuance of New Units by the Company in violation of the terms of this Agreement shall be void and ineffectual.

Preemptive Rights of Members. Any sale and issuance of New Units shall be subject to the following preemptive rights of the Members (the "*Preemptive Rights*"):

The Company must first offer each Member the opportunity to purchase up to a percentage of the New Units equal to such Member's Percentage Interest of Units at the time of the proposed offering, so that, after the issuance of all such proposed New Units, such Member's Percentage Interest of Units will be the same as the Percentage Interest of Units maintained by such Member immediately prior to the issuance of any such New Units.

The Company shall give written notice (the "*Offer Notice*") to each Member of the proposed offer to sell and issue any New Units, which Offer Notice shall contain the terms of such proposed sale and issuance in reasonable detail. Each Member may exercise its Preemptive Rights by (i) giving written notice to the Company specifying the amount of New Units that such Member desires to purchase (the "*Preemptive Units*"), (ii) executing such reasonable documentation as may be provided by the Company to effect the issuance of the New Units and (iii) delivering to the Company, pursuant to instructions provided by the Company in the Offer Notice, the full purchase price for the Preemptive Units. If a Member does not pay the full purchase price for the Preemptive Units, then such Member's Preemptive Rights with respect to such Preemptive Units shall, at the option of the Company, be deemed to not have been exercised by such Member and such Preemptive Units shall be subject to issuance and sale by the Company.

## MISCELLANEOUS PROVISIONS

Notices. All notices and communications required or permitted to be given hereunder (a) shall be in writing; (b) shall be sent by messenger, certified or registered U.S. mail, a reliable express delivery service, or electronic mail, charges prepaid as applicable, to the appropriate address(es) or number(s) set forth on **Schedule A** to this Agreement (or such other address as such party may designate by notice to all other parties hereto); and (c) shall be deemed to have been given on the date of receipt by the addressee (or, if the date of receipt is not a business day, on the

5

**A198**

**A199**

first business day after the date of receipt), as evidenced by (A) a receipt executed by the addressee (or a responsible person in his or her office or member of his or her household) or a notice to the effect that such addressee refused to accept such communication, if sent by messenger, U.S. mail or express delivery service, (B) confirmation of a facsimile transmission (either orally or by written confirmation) or (C) a receipt of such e-mail confirmed by reply message or read receipt. All parties shall act in good faith to promptly confirm receipt of communications where confirmation of receipt is required to effect notice pursuant to this subsection and is requested by the notifying party.

Further Assurances. Each of the Members shall hereafter execute and deliver such further instruments and do such further acts and things consistent with the provisions of this Agreement as may be required or useful to carry out the full intent and purpose of this Agreement or as may be necessary to comply with any laws, rules or regulations, including carefully reviewing the attached Private Placement Memorandum dated as of June [__], 2018 and executing such applicable and necessary revisions to the operating agreement of the Company.

Waivers. No party's undertakings or agreements contained in this Agreement shall be deemed to have been waived unless such waiver is made by an instrument in writing signed by an authorized representative of such Member. Failure of a party to insist on strict compliance with the provisions of this Agreement shall not constitute waiver of that party's right to demand later compliance with the same or other provisions of this Agreement. A waiver of a breach of this Agreement will not constitute a waiver of the provision itself or of any subsequent breach, or of any other provision of this Agreement.

Rights and Remedies Cumulative; Creditors. The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or of the Members.

Construction. The headings in this Agreement are inserted solely for convenience of reference and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof. When the context in which words are used in this Agreement indicates that such is the intent, singular words shall include the plural and vice versa and masculine words shall include the feminine and the neuter genders and vice versa.

Amendment. This Agreement may be altered or amended only by the unanimous consent of the Members.

Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto

6

**A199**

**A200**

and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

Governing Law. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its rules on conflicts of laws, and specifically the Act.

Dispute Resolution. The parties hereto agree that any suit or proceeding arising out of this Agreement shall be brought only in the courts of the State of Delaware; *provided, however*, that no party waives its right to request removal of such action or proceeding from the state court to a federal court. Each party hereto consents to the personal jurisdiction of such courts and agrees that service of process in any such suit or proceeding will be sufficiently accomplished if accomplished in accordance with the notice provisions set forth in the Agreement.

Code and Treasury Regulation References. Any reference to a section of the Code or a Treasury Regulation in this Agreement shall be deemed to refer to corresponding provisions of subsequent superseding federal revenue laws and regulations in the event that the section of the Code or Treasury Regulation so referenced has been so superseded.

Counterparts. This Agreement may be executed in any number of counterparts and may be executed and delivered by facsimile or other electronic transmission. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

[Signature Page Follows]

7

**A200**

KCF009287

**A201**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

KEY COMMERCIAL FINANCE, LLC

_____
By:
[Name of Sole Member]
Member

_____
By:
[Name of Member]
Member

_____
By:
[Name of Member]
Member

8

**A201**

CONFIDENTIAL

KCF009288

**A202**

**SCHEDULE A**

<div align="center">

**SUBSCRIPTION AGREEMENT**
**OF**
**KEY COMMERCIAL FINANCE, LLC**

**CAPITALIZATION TABLE**

</div>

| Name | Number of Units | % Management Interest | % Economic Interest |
|------|-----------------|-----------------------|---------------------|
| [Name of Sole Member] | 1,000,000 | 100% | 100% |

The addresses of the above-listed Unit holder(s) are: [insert address]

9

**A202**

KCF009289

**A203**

**SCHEDULE B**

## SUBSCRIPTION AGREEMENT
## OF
## KEY COMMERCIAL FINANCE, LLC

## DEFINITIONS

The following terms shall have the following meanings when used in this Agreement:

"*Act*" means the applicable law of the State of Delaware governing corporations organized in Delaware, the Delaware Limited Liability Company Act, *et seq*, and any successor statute, as it may be amended from time to time.

"*Affiliate*" shall mean any other Person which directly or indirectly Controls or is Controlled by or is under common Control with such Person, or any Person that is an employee of or an officer of or partner in or serves in a similar capacity or relationship with respect to a Person.

"*Articles of Organization*" shall mean the Articles of Organization of the Company as filed with the Delaware Secretary of the State on December 10, 2014 and as further amended from time to time.

"*Bona Fide Offer*" shall mean a legally binding written agreement with a non-Member to purchase all or a portion of the Units owned by a Member, which written agreement must be contingent upon the options to purchase or participate in a sale as provided herein.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

"*Control*" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract or otherwise.

"*Entity*" shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, company, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

"*Family*", as applied to any individual, shall mean (a) the children of such individual (by birth or adoption), (b) the parents, spouse and siblings of such individual, (c) the children of the siblings of such individual, (d) any trust solely for the benefit of, or any partnership, limited liability company or other entity owned solely by, any one or more of such aforementioned individuals (so long as such individuals have the exclusive right to Control such trust or other entity) and (e) the estate of such individual.

"*Member*" shall mean each of the parties who executes a counterpart of this Agreement as a Member, and each of the parties who may hereafter become a Member pursuant to the terms and conditions of this Agreement.

10

**A203**

KCF009290

**A204**

"***Percentage Interest***" of Units shall mean the number of Units of a given class held at a particular time by such Member, divided by the total number of all Units of the same class then held by all Members, expressed as a percentage.

"***Person***" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person, where the context so permits.

"***Units***" shall mean equity interests in the Company that shall have (a) economic value and rights in or to the profits, gains, losses, distributions and other economic interests of the Company and (b) voting membership rights in the Company.

"***Transferring Member***" is the Member desiring to sell or, in the case of an involuntary Transfer, is the Member whose Units are subject to an involuntary Transfer and also the potential transferee if that person has provided information to the Company and other Members of his/her name, address, and potential claim to the Units.

11

**A204**

CONFIDENTIAL

KCF009291

**A205**

**SCHEDULE C**

<div align="center">

**SUBSCRIPTION AGREEMENT**
**OF**
**KEY COMMERCIAL FINANCE, LLC**

JOINDER AGREEMENT TO SUBSCRIPTION AGREEMENT OF
KEY COMMERCIAL FINANCE, LLC

</div>

This JOINDER AGREEMENT of Key Commercial Finance, LLC, a limited liability company organized under the laws of Delaware (the "*Company*"), is entered into and made effective as of _____, 2018 between Key Commercial Finance, LLC, a limited liability company organized under the laws of Delaware (the "*Company*"), and _____, a domiciliary of the state of _____, _____ (the "*New Member*").

By executing said Joinder Agreement, each party agrees to be bound by the terms of the Subscription Agreement of Key Commercial Finance, LLC dated as of June [__], 2018 (the "*Agreement*"). Each New Member further agrees to update the Capitalization Table attached as Schedule A to the Agreement and to distribute such updated Table to the Company and all existing Members pursuant to the notice provisions of the Agreement. In addition, each New Member agrees to be further bound by each and every term of any applicable agreements between Key Commercial Finance, LLC and its subsidiaries, including Mobile Agency, LLC, EquityPros, LLC and Key Commercial Finance Properties LLC. All capitalized terms used but not defined herein are defined in the Agreement.

This Joinder Agreement may be executed in any number of counterparts and may be executed and delivered by facsimile or other electronic transmission. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

**KEY COMMERCIAL FINANCE, LLC**

_____

By:
[Name of Sole Member]
Member

_____

By:
[Name of New Member]
New Member

12

**A205**

KCF009292

# Exhibit 14

**A206**

| | |
|---|---|
| **From:** | Justin Billingsley <jcbillin9@gmail.com> |
| **Sent:** | Friday, June 29, 2018 9:21 AM |
| **To:** | Mahoney, William <WMahoney@STRADLEY.COM> |
| **Cc:** | dbivens@swlaw.com |
| **Subject:** | Re: Documents you have requested from Justin Billingsley |

Bill,

I have faxed the original PPM, Sub Agreement, and JV Agreements to the fax number listed in your email sig. I am sorry this has taken longer than expected but these documents were not easy to find as I was not expecting to have to provide them.

I continue to work on our bigger Investor Report and expect to have it done soon.

You will see that I worked very hard to make sure that this project was thoroughly documented and Frank understood every possible risk. I included everyone involved in Frank's estate at the time and made sure that they understood also. The Skeans attended most of my monthly meetings with Frank over the span of two years.

I have also continued to work my very hardest and I have done a good job.

Thank you for your time and consideration.

Justin

On Jun 28, 2018, at 6:41 PM, Mahoney, William <WMahoney@STRADLEY.COM> wrote:

Don:  When can I expect to receive the documents referenced in your below email?   Regards.  Bill

bio | vcard | email | map | website

**William E. Mahoney, Jr.**
Stradley Ronon Stevens & Young,
LLP
p: 215.564.8059 | c: 484.802.4358
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

<image001.gif>

This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

**From:** Mahoney, William
**Sent:** Tuesday, June 26, 2018 11:12 AM
**To:** 'Bivens, Don'
**Cc:** Justin Billingsley

**A206**

P-003493

**A207**

**Subject:** RE: Documents you have requested from Justin Billingsley

Don:  I have and will continue to abide by the agreement we reached, as confirmed in your email to me of May 15<sup>th</sup>.  Kindly have Justin send me the documents he's gathered as soon as possible.  Regards.  Bill

bio | vcard | email | map | website

**William E. Mahoney, Jr.**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8059 | c: 484.802.4358
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

&lt;image001.gif&gt;

This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

**From:** Bivens, Don [mailto:dbivens@swlaw.com]
**Sent:** Monday, June 25, 2018 5:45 PM
**To:** Mahoney, William
**Cc:** Justin Billingsley; Bivens, Don
**Subject:** Documents you have requested from Justin Billingsley

**External Email - Think Before You Click**

Bill

Justin informs me that he has now tracked down and is immediately ready to produce to you the PPM and Sub Agreement for Key Commercial Finance given to Frank Pavlis, which was also reviewed and discussed with Frank's attorney Ed Lentz, and with the Skeans, before Frank made his investments.   Justin has also collected the relevant agreements between Key Commercial Finance and its subsidiary entities, and the agreement between Allwest and Key Commercial Finance.  He has also copied many screen recordings to demonstrate the design and functionality of the online real estate investment platform and its functionality that Key Commercial Finance has developed with Frank's investment, among others.   Justin has also engaged an attorney, not our law firm, to produce a comprehensive Investors Report, that is nearly completed.  The expectation is that the Investors Report will be ready to distribute next week.

We just want to reconfirm that neither you nor anyone in your firm has communicated, nor has plans to communicate, to third parties any information you gather about Justin or the materials he is about to provide you.  With your affirmation "yes" to that effect by "reply all", Justin will send you the materials I have described.

If you have questions, give me a call.


DON



Don Bivens
SNELL & WILMER, L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004
602-382-6549 office

**A207**

CONFIDENTIAL

**A208**

602-708-1450 cell
dbivens@swlaw.com
http://www.swlaw.com/attorneys/don_bivens
<image002.png>
Denver, Las Vegas,  Los Angeles,  Los Cabos, Orange County, Phoenix ,  Reno, Salt Lake City, Tucson

**A208**

CONFIDENTIAL

# Exhibit 15

**A209**

# FAX COVER SHEET

| TO | Debby Skeans |
| --- | --- |
| COMPANY | |
| FAX NUMBER | 16102669268 |
| FROM | Christine Lachapelle |
| DATE | 2016-11-19 16:45:40 GMT |
| RE | Frank Pavlis |

## COVER MESSAGE

Dear Debby,


Please note Franks docs.


*acknow*

*"Investor" to be*
*changed to*
*Frank E Pavlis,*
*TOD Watch-*
*tower Bible +*

CONFIDENTIAL

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

### KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$3,000,000                                                                                      September 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to Frank E. Pavlis ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **THREE MILLION AND 00/100** Dollars ($3,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) September 1, 2019 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof. This Note is one of the "**Notes**" issued pursuant to the Note Purchase Agreement dated as of September 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement). Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.        *Definitions*. As used in this Note, the following capitalized terms have the following meanings:

(a)        "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

(b)        "**Event of Default**" has the meaning given in **Section 4** hereof.

(c)        "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

**A210**

(d) "**Lien**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e) "**Majority in Interest**" shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f) "**Note Purchase Agreement**" has the meaning given in the introductory paragraph hereof.

(g) "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term "**Obligations**" shall not include any obligations of Company.

(h) "**Person**" shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i) "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(j) "**Transaction Documents**" shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2. *Interest.* Accrued interest on this Note shall be payable at maturity.

3. *Prepayment.* Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4. *Events of Default.* The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a) *Failure to Pay.* The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note.docx

**A211**

P-000106

To: Debby Anderson from Barbara Carr Case 1:18-cv-01516-CFC-SRF Document 89 Filed 08/31/20 Page 230 of 248 PageID #: 1608 achapelle

**A212**

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

(b)      *Voluntary Bankruptcy or Insolvency Proceedings.* The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(c)      *Involuntary Bankruptcy or Insolvency Proceedings.* Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

5.      ***Rights of Investor upon Default.*** Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

6.      *Conversion.*

(a)      *Automatic Conversion.* In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $3,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

(b)      *Automatic Conversion on Change of Control.* In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note.docx

**A212**

To: Debby Skeans 18-cy-01516 Case 1:18-cv-01516-CFC-SRF Document 89 Filed 08/31/20 Page 231 of 248 PageID #: 1609 Lachapelle

**A213**

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis. The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions. Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

(c) *Conversion Procedure.* Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests. The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however,* that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d) *Fractional Membership Interests; Interest; Effect of Conversion.* No fractional Membership Interests shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence. In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

7. **Change of Control.** Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full. The term "**Change of Control**" means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note.docx

**A213**

CONFIDENTIAL

**A214**

Company is cancelled or converted or a combination thereof occurs. The term "**Change of Control Payment**" means an amount equal to one (1) times the outstanding principal amount of such Note.

8.    *Successors and Assigns.*  Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.    *Waiver and Amendment.*  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.    *Transfer of this Note or Securities Issuable on Conversion Hereof.*  With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.    *Assignment by the Company.*  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.    *Notices.*  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.    *Pari Passu Notes.*  Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note.docx

**A214**

To: Debby Stearns 18 Page 1 of 16    Case 1:18-cv-01516-CFC-SRF    Document 89    Filed 08/31/20    Page 233 of 248 PageID #: 1611   Chris LaChapelle

A215

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

14.     *Usury*.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

15.     *Waivers*.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

16.     *Governing Law*.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

kcf Form of Convertible Note.docx

**A215**

CONFIDENTIAL

The Company has caused this Note to be issued as of the date first written above.

KEY COMMERCIAL FINANCE LLC
A Delaware Limited Liability Company

By:

Name: Michael Silberman
Title: Executive Vice President

**A216**

## KEY COMMERCIAL FINANCE LLC

### NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of September 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

### RECITALS

A.    On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000. This Agreement and the Note shall be collectively referred to below as (the "**Transaction Documents**").

B.    Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.    Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

### AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    *The Notes.*

(a)    *The Notes.* Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

(b)    *Delivery.* The sale and purchase of the Notes shall take place at a closing to be held on September 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 1511 Route 22 Suite 152 Brewster NY 10509 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**"). At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note. Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**"). At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price. Each of the Notes will be registered in such Investor's name in the Company's records.

**A217**

(c)     *Investor's Commitment to Fund the Closing; Binding Obligation.* Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I**. Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

(d)     *Use of Proceeds.* The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

(e)     *Payments.* The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

2.     ***Representations and Warranties of the Company.*** The Company represents and warrants to each Investor that:

(a)     *Due Incorporation, Qualification, etc.* The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(b)     *Authority.* The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

(c)     *Enforceability.* Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)     *Non-Contravention.* The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws ("**Charter Documents**") or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

(e)     *Approvals.* No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

**A218**

stockholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby.

(f)     *No Violation or Default.* The Company is not in violation of or in default with respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(g)     *Intellectual Property.* To the best of its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights of, others.

3.     **Representations and Warranties of Investors.** Each Investor, for that Investor alone, represents and warrants to the Company upon the acquisition of the Note as follows:

(a)     *Binding Obligation.* Such Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Each of this Agreement and the Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)     *Securities Law Compliance.* Such Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act of 1933 (the "**Securities Act**"), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Such Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration. Such Investor has not been formed solely for the purpose of making this investment and is purchasing the Note to be acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. Such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time. Such Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act.

(c)     *Access to Information.* Such Investor acknowledges that the Company has given such Investor access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by such Investor, and has furnished such Investor with all documents and other information required for such Investor to make an informed decision with respect to the purchase of the Note.

4.     **Conditions to Closing of the Investors.** Each Investor's obligations at the Closing or Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

**A219**

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

      (a)    *Representations and Warranties.* The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

      (b)    *Governmental Approvals and Filings.* Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

      (c)    *Legal Requirements.* At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

      (d)    *Proceedings and Documents.* All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

      (e)    *Transaction Documents.* The Company shall have duly executed and delivered to the Investors the following documents:

            (i)    This Agreement; and

            (ii)    Each Note issued hereunder.

    5.    **Conditions to Obligations of the Company.** The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

      (a)    *Representations and Warranties.* The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

      (b)    *Governmental Approvals and Filings.* Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

      (c)    *Legal Requirements.* At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

      (d)    *Purchase Price.* Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I**.

**A220**

**A221**

6.     *Miscellaneous*.

(a)     *Waivers and Amendments*. Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent. Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto. Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterparty signature page to this Agreement, together with a supplement to **Schedule I** hereto. Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

(b)     *Governing Law*. This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(c)     *Survival*. The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d)     *Successors and Assigns*. Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(e)     *Registration, Transfer and Replacement of the Notes*. The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes. Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary. Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered. Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f)     *Assignment by the Company*. The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

**A221**

    (g)    *Entire Agreement.* This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

    (h)    *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I**, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

    (i)    *Payment of Fees and Expenses.* Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

    (j)    *Separability of Agreements; Severability of this Agreement.* The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale. Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors. Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors. If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

    (k)    *Counterparts.* This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

**A222**

CONFIDENTIAL

To: Debby Sabbas 18 Page 11 3316 Case 1:18-cv-01516-CFC-SRF Document 89 Filed 08/31/20 Page 241 of 248 PageID #: 1619 Lachapelle

**A223**

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

**COMPANY:**

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name: Michael Silberman
Title: Executive Vice President

**A223**

CONFIDENTIAL

To: Debby Skeans Page 13 of 13    Case 1:18-cv-01516-CFC-SRF Document 80 Filed 08/31/20 Page 242 of 248 PageID #: 1620  2018 08:01/ST. #3648 Doc: Christol Lachapelle

**A224**

## INVESTORS

DATE: 8-21-19

NAME: Frank E Parles

TITLE: FRANK E. PANLIS

CONFIDENTIAL

## SCHEDULE I

| Name and Address | Closing<br>Note Principal Amount |
|---|---|

Closing: September 30, 2014

**Frank Pavlis**
1500 Hamilton St.
Allentown, PA 18102

**$3,000,000**

I-1

**A225**

P-000120

**A226**

Exhibit A

**FORM OF NOTE**

**A226**

P-000121

Exhibit B

## DISCLOSURE SCHEDULE

None.

CONFIDENTIAL

# Exhibit 16

**A228**

| | |
|---|---|
| **From:** | JB |
| **Sent:** | Tuesday, January 17, 2017 12:41 PM EST |
| **To:** | debby.skeans@svn.com; darbin.skeans@svn.com |
| **Subject:** | Re: Frank Pavlis |

**Darbin and Debby,**

I apologize for the late follow up. Thank you for your patience. Your correct that there is nothing to report for taxes. In connection with your question about the note, it does not commit Frank to invest more. Key is doing well with growth, keeping stable in the churning markets and consistently delivering as planned. In respects the Allwest doc, if I remember right, it was simply a mistaken doc due to it never being executed. Don't remember all of the details but think it was just discarded and never completed. Does that makes sense?

Thank you

Justin

On Dec 7, 2016, at 3:42 PM, Debby Skeans <debby.skeans@svn.com> wrote:

Justin

I have an appointment with Ed Lentz next Wednesday to go over a few things....I have sent him the Key Finance Note and Note Purchase Agreement.   Since interest accrues, I assume there is nothing to report for taxes.  Does the Note Purchase Agreement, however, commit Frank to invest more....up to $10 million?  I do not think that is desired.
Ed would like to be sure the Note is TOD Watchtower (or JJHA-A, if Frank wants).
I'd appreciate a bit more info on the company and whether Key will be there to repay.

I also sent Ed a copy of the January 2014 AllWest subscription agreement.  Due earlier this year, some interest must probably be accounted recognized......Was this reinvested? If so, please provide the paperwork.  Apparently, this cannot be assigned. I believe there is strong preference is for this money to be repaid.

Finally, Frank has requested a visit.....

Look forward to hearing from you,
Deb

--
**Deborah S. Skeans, CCIM, MAI** | Senior Advisor

**A228**

CONFIDENTIAL                                                                      KCF004442

**A229**

SVN | Imperial Realty
1611 Pond Road, Suite 200 | Allentown, PA 18104
Phone 484.245.1002 | Fax 610.266.9268
debby.skeans@svn.com | www.svnimperial.com

All SVN® Offices Independently Owned and Operated.



<AllWest.pdf>

**A229**

CONFIDENTIAL

KCF004443