## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DEBORAH S. SKEANS,          :
Executrix of the ESTATE OF FRANK :
E. PAVLIS,                  :
                            :
      Plaintiff           :
                            :
     v.                :    C.A. No. 1:18-cv-01516-CFC-MPT
                            :
KEY COMMERCIAL FINANCE   :    **JURY DEMANDED**
LLC, KEY COMMERCIAL        :
FINANCE PROPERTIES, LLC,   :
EQUITY PROS, LLC,         :
and MOBILE AGENCY, LLC,    :
                            :
      Defendants.

## <u>SUPPLEMENTAL COMPLAINT</u>

Plaintiff Deborah S. Skeans, Executrix of the Estate of Frank E. Pavlis ("Mr. Pavlis"), by and through undersigned counsel, brings this action seeking declaratory and compensatory relief, in connection with certain promissory notes purportedly issued by Defendant Key Commercial Finance LLC ("KCF") to Mr. Pavlis in 2014. Specifically, Plaintiff seeks a declaration by this Court that, to the extent the notes were, in fact, issued to Mr. Pavlis, they are *void ab initio* because (i) KCF was not a legal entity at the time KCF purported to issue them, and (ii) the notes were fraudulently executed. Once voided, Mr. Pavlis' $7,000,000 "investment" should be ordered returned. In the alternative, if those notes are not declared *void ab initio*,

Plaintiff asserts common law causes of action for fraud, fraudulent concealment, breach of contract, and unjust enrichment, and seeks general damages, punitive damages, and any other relief as this Court deems fit and proper.

## **INTRODUCTION**

1.      This case is borne of the worst sort of financial elder abuse.  In 2013 and 2014, when he was in his late-nineties, Mr. Pavlis unknowingly fell victim to a serial fraudster named Justin Billingsley ("Billingsley").  Billingsley and Mr. Pavlis were both members of the same religious community, and Billingsley held himself out as a savvy businessman and financial advisor. Exploiting their shared faith and Mr. Pavlis' advanced age, Billingsley befriended Mr. Pavlis, gained his trust and confidence, and then persuaded him to "invest" millions of dollars in various entities in which Billingsley had ownership and/or financial interests.

2.      Billingsley, both individually and on behalf of one or more of the named Defendant entities, solicited Mr. Pavlis' investment through a repeated pattern of misrepresentation, deception, and fraud.  In perpetrating this scheme, Billingsley conspired with a third party, Allwest Investments, LLC ("Allwest") to (i) persuade Mr. Pavlis to invest $7,000,000 in Allwest as a "real estate investment," and then, (ii) almost immediately divert those funds to KCF, which Billingsley controlled.  KCF then used Mr. Pavlis' ill-gotten

funds to finance Allwest's business endeavors, at significant financial benefit to KCF. While KCF, Allwest, and Billingsley all profited handsomely from their use of Mr. Pavlis' money, Mr. Pavlis received nothing.

3.    Worse still, Billingsley and KCF have gone to extraordinary lengths to deceive Mr. Pavlis and his representatives into believing that his "real estate investment" was, and continues to be, secure, while at the same time manufacturing documents to fit this fraudulent narrative. Perhaps the most blatant of these after-the-fact fabrications occurred in late 2014 (or, as appears more likely, years later), when Billingsley and KCF re-cast Mr. Pavlis' $7,000,000 investment in Allwest *as an investment in KCF itself!*

4.    In September and November 2014, KCF purportedly issued two Convertible Promissory Notes (the "Notes") to Mr. Pavlis in the amount of $3,000,000 and $4,000,000, respectively. Both Notes represented that KCF was a Delaware limited liability company. Both Notes purportedly were accompanied by "Note Purchase Agreements," which also represented that KCF was "duly organized, validly existing and in good standing" under Delaware law.

5.    However, KCF did not even exist as a corporate entity at the times the Notes were "issued." Rather, KCF was not formed until December 2014.

6.      Assuming that these Notes were, in fact, created and issued to Mr. Pavlis in 2014,[1] both Notes were facially invalid and/or fraudulent.  Both represented that KCF was an existing Delaware limited liability company when, in fact, KCF was not formed until December 2014.  Thus, at the time KCF was purporting to issue securities, it lacked both legal capacity and a legally-recognized form.  Moreover, both Notes and their accompanying Note Purchase Agreements were signed by a KCF "Executive Vice President" who, upon information and belief, never even worked for KCF.

7.      Put differently, after conspiring with Allwest to funnel Mr. Pavlis' $7,000,000 investment from Allwest's bank account to its own, KCF and Billingsley literally papered over their illicit conduct by purporting to issue convertible promissory notes (from a non-existent entity) that would not come due for another five years, when Mr. Pavlis would be 103 years old.

8.      Given Mr. Pavlis' advanced age and implicit trust, Billingsley was easily able to manipulate Mr. Pavlis into believing that his $7,000,000 investment was safe and would be repaid.  Billingsley and KCF were able to perpetrate their

---

[1]   As further explained below, there is considerable reason to believe that Billingsley, acting on behalf of KCF, may have fabricated these notes in or around 2017, when Mr. Pavlis' duly appointed representative began asking Billingsley to provide documentation relating to Mr. Pavlis' investment in Allwest.

fraud by creating documents that Mr. Pavlis would reasonably have believed were legitimate (assuming he saw them at all), when in fact they were nothing more than mere fabrications.

9.  When Mr. Pavlis' representatives began to seek information regarding his investments vis-à-vis Billingsley, Billingsley continued his assurances that Mr. Pavlis' investments were secure and that KCF was a vibrant company.  It turns out, however, that KCF and Billingsley created three KCF subsidiaries – Defendants Key Commercial Finance Properties, LLC, Equity Pros LLC, and Mobile Agency, LLC – to which KCF funneled Mr. Pavlis' funds with no corresponding obligation to repay those funds.

10. Again, assuming that the KCF Notes were validly issued, Mr. Pavlis was never told that his funds would be diverted to entirely different entities, and he certainly never authorized any such use of his funds.  Indeed, none of KCF's subsidiaries existed in 2014; they were not formed until 2016.

11. Finally, if the KCF Notes were validly issued, KCF was required to return Mr. Pavlis' investments and corresponding interest pursuant to the terms of the Notes and Note Purchase Agreements.  Yet, to date, KCF has failed to do so.

12. Sadly, Mr. Pavlis passed away on August 24, 2018, never having seen a penny of the $7,000,000 that KCF misappropriated from him through the actions of its agent, Billingsley.  To date, neither Billingsley nor the Defendant entities

have provided any explanation or documentation to show how Mr. Pavlis'
Allwest investment ended up in KCF's bank account, how those funds have
been deployed since, and where they are now.  Rather, they have continued to
stonewall attempts at any sort of accounting.

13.     Plainly, Mr. Pavlis' funds have been unlawfully solicited, misappropriated,
and withheld.  At best, KCF, acting by and through Billingsley, issued
convertible notes to Mr. Pavlis that were facially deficient and *void ab initio*.
At worst, they perpetrated an unconscionable fraud on Mr. Pavlis.  In either
event, the Defendants have unlawfully taken possession of $7,000,0000 of
Mr. Pavlis' money, and they are obligated to return those funds immediately.

14.     Whether through declaratory judgment and restitution, or an award of
damages, Mr. Pavlis is entitled to the immediate return of the ill-gotten
$7,000,000 with which Defendants have enriched themselves at Mr. Pavlis'
expense.

## PARTIES

15.     Plaintiff, Deborah S. Skeans, is the duly appointed Executrix of the Estate of
Frank E. Pavlis.  At all relevant times, and until his death on August 24, 2018,
Mr. Pavlis was a resident of Allentown, Pennsylvania.  Mr. Pavlis' Estate is
in the process of being probated in Lehigh County, Pennsylvania.

16.     Defendant Key Commercial Finance LLC, is a limited liability company organized under the laws of Delaware in December 2014, with a principal place of business located at 1511 Route 22, Suite 152, Brewster, New York, 10509.    Upon information and belief, its registered agent for service of process is United Corporate Services, Inc., located at 874 Walker Rd., Suite C, Dover, Delaware, 19904.

17.     Defendant Key Commercial Finance Properties, LLC is a wholly-owned subsidiary of KCF and a limited liability company formed under the laws of Delaware, with a principal place of business located at 1511 Route 22, Suite 152, Brewster, New York, 10509. Upon information and belief, its registered agent for service of process is Northwest Registered Agent Service, Inc., 8 The Green, Dover, Delaware 19901.

18.     Defendant Equity Pros, LLC is a wholly-owned subsidiary of KCF and a limited liability company formed under the laws of Connecticut, with a principal place of business located at 1511 Route 22, Suite 152, Brewster, New York, 10509.  Upon information and belief, its registered agent for service of process is Hillel Goldman, 57 North Street, Suite 214, Danbury, Connecticut 16810.

19.     Defendant Mobile Agency, LLC is a subsidiary of KCF and a limited liability company formed under the laws of Delaware, with a principal place of

business located at 1511 Route 22, Suite 152, Brewster, New York, 10509. Upon information and belief, its registered agent for service of process is Northwest Registered Agent Service, Inc., 8 The Green, Dover, Delaware 19901.

## JURISDICTION

20.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

21.   This Court also has jurisdiction over Plaintiff's request for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, the Declaratory Judgment Act.

## FACTUAL ALLEGATIONS

22.   At the time of his death, Mr. Pavlis was 101 years old.  He was a widower, with no children, who resided in a senior personal care facility located in Allentown, Pennsylvania.

23.   Born in 1916, Mr. Pavlis put himself through college, and he graduated from Michigan Technological University in 1938.  He graduated at the top of his class with a BS in Chemical Engineering.  After graduating from Michigan Tech, Mr. Pavlis went on to earn a Master's Degree from the University of Michigan.

24.   When he entered the workforce, Mr. Pavlis became the first employee at Air Products & Chemical Co. ("Air Products"), then a fledgling company located in Detroit, Michigan. Earning $3 a day as chief engineer, Mr. Pavlis helped design an affordable oxygen generator that became the foundation of the company's product line. In 1961, Air Products became a publicly-traded company, and moved its headquarters to Allentown, Pennsylvania.

25.   During his 40 years with the company, Mr. Pavlis rose through the ranks, joining the Board of Directors in 1952 and serving as vice president for engineering and finance before retiring in 1980 as vice president for international/world trade.

26.   Over the course of his career, Mr. Pavlis accumulated a substantial amount of Air Products' stock.  However, both while he was employed and throughout his retirement, Mr. Pavlis led a modest lifestyle.  As a result, he amassed a sizeable estate.

27.   Mr. Pavlis, then in his late-nineties, was introduced to Billingsley in 2012. Due to his wealth, his age, and his trusting nature, Mr. Pavlis had been targeted by prior scams and deceptions.  Because Billingsley and Mr. Pavlis were members of the same religious community, those close to Mr. Pavlis believed he could be trusted to provide objective financial advice.

28.    They were wrong. Instead, Billingsley relied on their common faith to befriend Mr. Pavlis and gain his trust and confidence, only to almost immediately betray that trust and confidence.  Billingsley quickly began to extract money from Mr. Pavlis through a series of "investments" in start-up companies in which Billingsley had financial interests.

29.    Over the course of roughly two years, Billingsley convinced Mr. Pavlis to give him almost $10,000,000 for a variety of purported "investments." [2]   As described below, each of these investments was the product of fraud, deception, and a concerted effort by Billingsley and the Defendants to hide from Mr. Pavlis the scope and nature of their conduct.  At the time of his death, Mr. Pavlis had not received a penny of the millions he entrusted to Billingsley and the Defendants.

30.    Put bluntly, Billingsley was a serial fraudster, and Mr. Pavlis was an easy and trusting mark.

---

[2]    Although this Complaint and the relief sought herein focus on Mr. Pavlis' $7,000,000 investment in Allwest, which somehow made its way into KCF's possession and control, Billingsley solicited Mr. Pavlis to invest an additional $2,500,000 in a separate entity known as Mobile Corp.  As explained herein, every penny of that investment was spent within days or weeks of hitting Mobile Corp's bank account, with over $100,000 going to Billingsley himself.  That money is long gone, and Mobile Corp is defunct.

### *LoanGo: Billingsley's First Fraud*

31.   By the time Billingsley met Mr. Pavlis in 2012, Billingsley had already begun his fraudulent scheming.

32.   On information and belief, these schemes began with the online payday loan start-up "LoanGo"—which Billingsley created with his recurring partner in fraudulent enterprises, Jeffrey Peterson ("Peterson"), and a third party, John Keith Ayers ("Ayers").

33.   LoanGo established a pattern that would become familiar: it targeted the savings of naïve and/or financially unsophisticated retirees through the sale of high-risk, low-return "securities" that, invariably, proved worthless.

34.   LoanGo was registered in Utah in 2011.  At all relevant times, Billingsley was Vice President and a Director of LoanGo.  At all relevant times, Peterson was CEO and Chairman of the Board of Directors of LoanGo. Ayers served as President and a Director. The three men were the only directors of LoanGo and owned equal shares of the company.

35.   Beginning in September 2011, Billingsley and Peterson began soliciting investments in LoanGo by selling promissory notes. Although both Billingsley and Peterson resided in Arizona, neither registered with the state as securities salespersons or dealers. Nor did they register their promissory notes with the state of Arizona.

36.   Many of LoanGo's investors were first introduced to Billingsley through insurance seminars Billingsley held at a recreational vehicle park in Casa Grande, Arizona.   When attendees solicited his independent investment advice, Billingsley pumped up LoanGo.   Although Billingsley relentlessly pushed LoanGo on the unsuspecting retirees, he never provided *any* documentation about the company before taking their money.

37.   Even though LoanGo was a start-up, with no holdings and no track record of success, Billingsley marketed LoanGo to investors as a low-risk, high-reward investment.   Often, investors gave their money to Billingsley based on nothing more than their personal trust that he was acting in their best interests.

38.   Even after LoanGo began defaulting on its promissory notes, Billingsley continued to solicit and accept investments from new investors.

39.   The investors never received any interest payments or a refund of their principal investments.

40.   In June 2015, the Securities Division of the Arizona Corporation Commission ("Division") filed a regulatory action against Billingsley and his spouse. Included in that action were Peterson, Ayers, and Ayers' spouse.

41.   The Division alleged numerous violations of Arizona securities laws, including failure to register as a securities salesperson or dealer, the offer of

sale of unregistered securities, misrepresentation, and fraud in the sale of securities.

42.  Specifically, the Division alleged that Billingsley misrepresented LoanGo and the individuals' investments in a variety of ways, both affirmatively and through omission. Those misrepresentations included, but were not limited to (i) describing the investment as being low-risk and high-reward when, in reality, it was speculative and high-risk, (ii) failing to disclose that Billingsley would receive a commission from his investments, and (iii) failing to disclose that LoanGo had defaulted on investments while soliciting new investors.

43.  The Division also alleged that Peterson and Billingsley cashed out their own investments with new investor money, swapping investors' risk for their own.

44.  The Division further alleged that Billingsley engaged in fraudulent behavior by falsifying subscription agreements to create the appearance that investors were accredited and therefore qualified to invest. Testifying to the Division, investors alleged that the agreements included forged statements of consent.

45.  In a unanimous opinion, the Arizona Corporation Commission ("Commission") upheld the charges against Billingsley, Peterson, and Ayers, ordering restitution of $250,000 to the defrauded investors and imposing fines on Billingsley and others.  The Commission's findings confirm that Billingsley and his co-conspirators committed numerous securities violations

and that Billingsley, specifically, committed securities fraud through misrepresentations and failures to disclose material information.

46.    Although the Commission did not issue its damning decision until October 2017, the fraudulent conduct at issue took place in 2011 and 2012. And it was in 2012, fresh off of his LoanGo scam, that Billingsley first met and befriended Mr. Pavlis.

47.    In much the same way that he beguiled and then fleeced retirees in Arizona, Billingsley saw in Mr. Pavlis an opportunity to relieve a trusting and elderly man of considerable wealth.    Over the next two years, Billingsley systematically defrauded Mr. Pavlis by soliciting his investment in start-up ventures that no disinterested person would ever think appropriate for someone in his late nineties. But Billingsley had no such qualms, because he stood to benefit handsomely at the expense of his "Brother" in fellowship.

### *Mobile Corp: Billingsley's Schemes Become More Ambitious*

48.    Shortly after they were introduced, Billingsley began cultivating Mr. Pavlis' friendship and trust. Aware of Mr. Pavlis' wealth, Billingsley began soliciting Mr. Pavlis to invest in an Arizona-based company called Mobile Pro Corporation, later renamed Mobile Corporation ("Mobile Corp.").

49.    Formed in early 2013, Mobile Corp. was a social media start-up that purported to connect vendors with potential employers who may want the retain their

services.  Initially, Billingsley served as the head of Mobile Corp.'s New York "marketing office," an office that, upon information and belief, existed in name only.  Sometime in 2014 and continuing through roughly June 2015, Billingsley was Mobile Corp.'s President.

50.   In April 2013, at Billingsley's solicitation and direction, Mr. Pavlis wired $500,000 from his bank account to an account maintained on behalf of Mobile Corp. by Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini"), a California-based law firm.  Investors like Mr. Pavlis would wire funds into a "transaction account" at Wilson Sonsini, and then Wilson Sonsini would wire the funds into Mobile Corp.'s bank account.

51.   Notably, apart from bank records reflecting the wire transfer out of his account to Wilson Sonsini, Mr. Pavlis had no other documents in his possession relating to this investment.  Upon information and belief, neither Billingsley nor Mobile Corp. provided him with any such documents.

52.   Within weeks of Mr. Pavlis' original $500,000 investment, all of that money was gone.  Mobile Corp. did not invest that money in its business.  Rather, it wired almost half of it to Inter123, a separate company controlled by Peterson, Mobile Corp's Chairman and CEO – and Billingsley's cohort in the LoanGo fraud.  An additional $250,000 was wired to other entities and individuals, including Billingsley.  On May 17, 2013, Mobile Corp. transferred $50,000 to

Billingsley, which amount plainly was a "commission" that Mobile Corp. paid him for soliciting Mr. Pavlis' investment.

53.    Although the convertible promissory note Mobile Corp. purportedly issued to Mr. Pavlis became due in or around October 2014, none of Mr. Pavlis' initial $500,000 investment was ever repaid.

54.    Meanwhile, in September, 2014, even as Mobile Corp. was reneging on its promise to Mr. Pavlis and others like him, Billingsley again solicited Mr. Pavlis to invest in the company.  Relying on Billingsley's representations, Mr. Pavlis again wired funds to Wilson Sonsini.  On September 16, 2014, Mr. Pavlis wired $1,000,000 to the firm.  Ten days later, on September 26, 2014, Mr. Pavlis wired an additional $1,000,000 to the same account.

55.    Neither Billingsley nor Mobile Corp. has ever provided any documentation to Mr. Pavlis corresponding with either of these additional investments. Mr. Pavlis was never given any convertible notes, subscription agreements, private placement memoranda, accredited investor questionnaires, or any of the other documents that typically come along with an investment in a private company.

56.    The only documents that Mr. Pavlis had in his possession were several hand-written notes that he appears to have made in connection with his September 2014 investments.  One note appears to be Mr. Pavlis' written authorization

to his bank to wire transfer $1,000,000 to a Wilson Sonsini "Transactions Trust."  At the bottom of this note, Mr. Pavlis wrote:  "If you have questions, call Justin Billingsley," with Billingsley's phone number.

57.    The other note purports to memorialize Mr. Pavlis' two $1,000,000 transfers to the Wilson Sonsini "Transaction Trust" and the dates of those transfer. Notably, at the top of that note, there is a notation, again in Mr. Pavlis' hand, that reads, "Real Estate Investments."

58.    These notes are instructive.  They confirm that Mr. Pavlis relied on Billingsley as more than a trusted advisor; he looked to him to handle the details of his investments, authorizing Billingsley to deal directly with others regarding those transactions.  By taking on this role of trusted advisor and confidante, Billingsley was able to shield Mr. Pavlis from any information that might have warned him of the on-going fraud.

59.    Further, these notes also confirm that Mr. Pavlis believed that his $2,000,000 was going into "real estate investments."  Mobile Corp. was *not* a real estate company, however.  It was a social media platform.  Plainly, Billingsley misled Mr. Pavlis into believing he was investing in something related to real estate, when in fact those funds were going to Mobile Corp., an entity that had nothing whatsoever to do with real estate.

60. Worse still, at the time Billingsley orchestrated Mr. Pavlis' $2,000,000 investment in Mobile Corp. (i.e., September 2014), Mobile Corp.'s bank account actually had a negative balance.

61. Rather than telling Mr. Pavlis that Mobile Corp. was close to insolvency, or confessing to Mr. Pavlis that his initial investment was already gone, never to be seen again, Billingsley doubled down by manipulating Mr. Pavlis to invest an additional $2,000,000 into the company.

62. Mr. Pavlis' September 2014 investments were quickly spent as well.  On September 19, 2014, Mobile Corp. received the first $1,000,000 wire from Mr. Pavlis.  Over the next three days, Mobile Corp. made the following wire transfers out of its bank account:

- September, 19, 2014: $250,000 to Inter123 (a company controlled by                      Peterson)

- September 19, 2014: $200,000 to Morgan Stanley Smith Barney, f/b/o Charlie & Rita Gardner.

- September 22, 2014: $50,000 to "Movilpro de Mexico."

- September 22, 2014: $77,455 to Immuebles Carso, Mexico.

- September 23, 2014: $79,430 to Mobile Corp.'s payroll service firm.

63. As a result of these payments, Mobile Corp.'s bank account balance dipped to approximately $170,000 by September 29, 2014, less than a week after Mr. Pavlis' $1,000,000 investment.  Put differently, within 10 days of receiving

Mr. Pavlis' supposed investment in the company, Mobile Corp. spent almost all of it.

64.    With Mobile Corp.'s funds bottoming out and Billingsley's urgency rising, Billingsley returned to Mr. Pavlis and extracted a *second* $1,000,000 investment, which was deposited in Mobile Corp's account on September 29, 2014. The second $1,000,000 disappeared with similar speed, through outgoing payments that followed a familiar pattern:

- September 29, 2014: $150,000 to Inter 123.

- September 29, 2014: $76,247 to Immuebles Carso, Mexico.

- September 29, 2014: $100,000 to Morgan Stanley Smith Barney f/b/o Charlie and Rita Gardner.

- October 6, 2014: $100,000 to Inter 123.

- October 6, 2014: $76,307 to Immuebles Carso, Mexico.

- October 9, 2014: $55,489 to Internet Escrow Services, Rancho San Margarita, California.

- October 17, 2014: $18,748 to Mobile Corp.'s payroll service firm.

- October 23, 2014: $25,214 to Internet Escrow Services, Rancho San Margarita, California.

- October 31, 2014: $23,743 to Mobile Corp.'s payroll service firm.

65.    On information and belief, Charlie and Rita Gardner, who received $300,000 of the funds Mr. Pavlis invested, were prior investors in Mobile Corp. Thus,

by October 2014, the start-up was essentially operating as a Ponzi scheme, soliciting new investments to pay off prior investors.

66. Whenever Mr. Pavlis invested money in Mobile Corp., Billingsley profited. On October 1, 2014, shortly after Mr. Pavlis' funds were deposited with Mobile Corp., Billingsley received $50,000 via wire transfer.

67. Similar wire transfers out of Mobile Corp.'s account continued through November 2014. By the end of that month, its account balance totaled less than $14,000. With astonishing quickness, Mr. Pavlis' $2,000,000 investment in Mobile Corp. was squandered within ten (10) short weeks of his investment.

68. Launched in March 2013, Mobile Corp. effectively ceased to exist by 2016.

69. During its short lifespan, Mobile Corp. never generated *any* revenue from any commercial activity. Instead, every penny in its accounts was the product of third-party investors: over a period of two years, Mobile Corp. banked over $9,000,000 from an untold number of investors. Of those investors, Mr. Pavlis was far and away the most lucrative for Mobile Corp., having invested – and lost – $2,500,000, all as a result of Billingsley's solicitations and misrepresentations.

70. Clearly, Mr. Pavlis' investment in Mobile Corp. was the product of fraudulent and deceptive actions. Even viewed generously, as a legitimate investment, the modest 8% per annum on Mr. Pavlis' (purported) Mobile Corp.

promissory note suggests that Billingsley misrepresented the risk posed by even a *healthy* social media start-up.  Moreover, even if Billingsley initially, and properly, disclosed Mobile Corp.'s risks to Mr. Pavlis in April 2013, he plainly knew by September 2014 that the company was effectively insolvent, devoid of any means of generating revenue, and in rapid decline.

71.   Billingsley also knew that Mobile Corp. was in no position to repay Mr. Pavlis on his original investment which, according its term sheet, was to have been repaid (with interest) by October 2014.

72.   Nonetheless, Billingsley persuaded Mr. Pavlis to invest another $2,000,000 and did so by misrepresenting that the investment was related to real estate, a subject the elderly Mr. Pavlis was comfortable with, as opposed to social media, of which he knew nothing—Mr. Pavlis has never possessed a social media account of any kind.

73.   Billingsley provided Mr. Pavlis with no documentation related to his September 2014 investments, further suggesting that he actively misled Mr. Pavlis about the nature of his investments.

74.   Billingsley profited off of Mr. Pavlis in numerous ways.  For instance, Billingsley served as President of the company, and as such he received an annual salary of $100,000, all derived from investments from people like Mr.

Pavlis. Although labeled "President," Billingsley's sole function at Mobile Corp. was soliciting investments.

75.     During this period, Billingsley also received almost $275,000 in "loan advances" from Mobile Corp. Upon information and belief, these "loans," which Billingsley never repaid, were in fact commissions Billingsley received for convincing investors like Mr. Pavlis to turn over their savings.

### *Key Commercial Finance LLC: Billingsley Goes All In on Frank Pavlis*

76.     At the same time he was fleecing Mr. Pavlis on behalf of Mobile Corp., Billingsley conceived a scheme to defraud Mr. Pavlis on a much larger scale, a scheme under which Billingsley would re-route $7,000,000 of Mr. Pavlis money to KCF, an entity over which Billingsley exercised sole control.

77.     In or around January 2014, Billingsley solicited Mr. Pavlis to invest in Allwest, a California-based company that bought distressed residential properties, rehabilitated them, and then re-sold them. In order to lend an air of legitimacy to this solicitation, Billingsley presented Mr. Pavlis with a 67-page Allwest "Investor Overview" booklet and Subscription Agreement for an investment in Allwest promissory notes.

78.     Based upon Billingsley's solicitations, Mr. Pavlis made what he reasonably believed were two investments in Allwest. On January 28, 2014, Billingsley had Mr. Pavlis sign the Allwest Subscription Agreement, under which Mr.

Pavlis agreed to invest $1,000,000 in Allwest in exchange for a promissory note to be issued by Allwest.

79.   That same day, again at Billingsley's direction, Mr. Pavlis wired $1,000,000 from his brokerage account into his banking account.  Several weeks later, Billingsley took Mr. Pavlis to his local bank, where Mr. Pavlis obtained a cashier's check for $1,000,000.  Mr. Pavlis gave that check to Billingsley in connection with his Allwest investment.  Upon information and belief, Billingsley arranged to have that check deposited, but it remains a mystery as to whether it ever made its way to Allwest or not.

80.   Several months later, in May 2014, Billingsley persuaded Mr. Pavlis to make a much larger investment in Allwest.  On May 23, 2014, Mr. Pavlis wrote a personal check for $6,000,000, made payable to Allwest Investments.   Mr. Pavlis made it clear that he understood that money to be a "real estate investment," as that is what he wrote on the face of the check.

81.   Mr. Pavlis again gave the check to Billingsley, who forwarded it to Allwest. The check was endorsed by Gary Miller, Allwest's President, and presumably deposited into Allwest's bank account.  (Copies of Mr. Pavlis' 2/19/14 withdrawal slip fir $1,000,000 and his 5/23/14 personal check to Allwest, as endorsed, are attached hereto as Exhibit "A.")

82.   Thus, by May 2014, Mr. Pavlis was under the reasonable belief that he had invested $7,000,000 in Allwest, a real estate development company, at the direction and solicitation of his trusted friend and financial advisor, Billingsley.

83.   In fact, Billingsley had entirely different designs for that money.  Shortly after Mr. Pavlis invested in Allwest, Billingsley orchestrated the wholesale transfer of Mr. Pavlis' $7,00,000 from Allwest to KCF.  Billingsley, acting by and through KCF, then used Mr. Pavlis' $7,000,000 as he wished.

84.   Upon information and belief, KCF principally used Mr. Pavlis money to provide funding to Allwest for various projects between 2014 and 2018.[3] Although the terms of these loans were exceptionally favorable to KCF and Billingsley, and, on information and belief, have been paid back in full, Mr. Pavlis' received no compensation for funding the deal or assuming the entirety of the deal's risk.

85.   Thus, KCF and Billingsley not only misappropriated the money that Mr. Pavlis intended to be invested in Allwest, but they also profited substantially from their illicit use of his funds.

---

[3]   Upon information and belief, KCF, through Billingsley, "invested" over $500,0000 of Mr. Pavlis' Allwest's money in Mobile Corp. between February and May 2015.

86.    At no time did Mr. Pavlis authorize the transfer or re-direction of his Allwest investment to KCF or any other entity.  Nor was Mr. Pavlis made aware that his Allwest investment had been commandeered by KCF and Billingsley. Upon information and belief, whenever Mr. Pavlis asked Billingsley about his investment, Billingsley assured him that his Allwest investment was performing well and that he had nothing to worry about.

87.    Apart from the Allwest Subscription Agreement relating to Mr. Pavlis' initial $1,000,000 investment in early 2014, upon information and belief, neither Allwest, KCF, nor  Billingsley has ever provided Mr. Pavlis with any documentation reflecting his investments in Allwest – no promissory notes, no Subscription Agreement relating to Mr. Pavlis' $6,000,000 investment, and certainly no document indicating that his Allwest investment was being re-routed to KCF, an entity that he had never heard of and which did not even exist at the time.

### *KCF Purported to Issue Promissory Notes to Mr. Pavlis in Late 2014*

88.    In what appears to have been an attempt to legitimize (or at least paper over) this unauthorized transfer of Mr. Pavlis' Allwest investment to KCF, in late 2014 KCF purportedly issued two convertible promissory notes (the "Notes") to Mr. Pavlis, the combined nominal face value of which was $7,000,000, the exact amount that Mr. Pavlis invested in Allwest.

89.   The first Note is dated September 1, 2014, and purports to reflect a $3,000,000 investment by Mr. Pavlis.  The Note states that both the principal and interest in the amount of 8% per annum is payable on September 1, 2019 – when Mr. Pavlis would have been 102 years old.  The Note also clearly identifies KCF as a "Delaware limited liability company."  (A copy of the putative 9/1/ 14 Note is attached hereto as Exhibit "B.")

90.   The Note was purportedly accompanied by a Note Purchase Agreement, also dated September 1, 2014.  (A copy of the putative 9/1/14 Note Purchase Agreement is attached hereto as Exhibit "C".)  The Note Purchase Agreement purports to memorialize Mr. Pavlis' $3,000,000 investment in KCF in exchange for the Note.

91.   Like the Note itself, the Note Purchase Agreement confirms that KCF is a Delaware limited liability company.  Indeed, the Note Purchase Agreement contains the following language, under the heading "***Representations and Warranties of the Company***":

> The Company represents and warrants to each Investor that:
>
> (a)   The Due Incorporation, Qualification, etc.  Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so

qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(*Id.* at ¶ 2 (a).)

92.   The Note Purchase Agreement also states that the "sale and purchase of the Notes shall take place at a closing to be held on September 30, 2014 . . . . At the Closing, the Company will deliver to each of the investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note." (*Id.* at ¶ 1 (b).)

93.   Assuming *arguendo* that the September 1, 2014 Note is valid, it became due on September 1, 2019.  Yet, to date, KCF has neither returned Mr. Pavlis' $3,000,000 investment nor the corresponding interest.

94.   The second Note, dated November 1, 2014, is substantively identical to the first Note, except that it purports to relate to a $4,000,000 investment and has a maturity date of November 1, 2020, when Mr. Pavlis would have been 103 years old.  It, too, names its issuer as "Key Commercial Finance LLC, a Delaware limited liability company."  (A copy of the 11/1/14 Note is attached hereto as Exhibit "D").

95.   The November 1, 2014 Note sets forth the terms pursuant to which KCF must return Mr. Pavlis' investment and corresponding interest.  To this effect, the Note contains the following language:

> All unpaid principal, together with any unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on . . . November 1, 2020.

(*Id*. at pg. 1.)

96. The November 1, 2014 Note is also accompanied by a Note Purchase Agreement, dated November 1, 2014.  (A copy of the putative 11/1/14 Note Purchase Agreement is attached hereto as Exhibit "E".)  Apart from dates, this second Note Purchase Agreement is identical to its September 2014 counterpart.

97. The Note Purchase Agreement states:

> (e) *Payments*. The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due . . .

(*See* Exhibit E at ¶ 1(e).)

98. Assuming *arguendo* that the November 1, 2014 Note is valid, it became due on November 1, 2020 at 10:00 a.m.   Yet, to date, KCF has neither returned Mr. Pavlis' $4,000,000 investment nor the corresponding interest.

99. As noted above, at the time the Notes were issued and the Note Purchase Agreements ostensibly signed, KCF was *not* a registered Delaware limited liability company.  It did not become a Delaware limited liability company until December 10, 2014.  Thus, KCF did not have the legal capacity or form to enter into the Note Purchase Agreement, much less issue the Notes.

100. The provenance and validity of the Notes and corresponding Note Purchase Agreements, are suspect, at best, separate and apart from KCF's legal non-existence.

101. First, Mr. Pavlis never invested a penny in KCF, in 2014 or at any other time. Nor was there was ever any "closing" at which Mr. Pavlis received the Notes in exchange for the "corresponding purchase price for the Note," as set forth in the Note Purchase Agreements.

102. Second, both documents are signed by Michael Silberman ("Silberman"), as "Executive Vice President" of KCF.  However, upon information and belief, Silberman was never employed by KCF, as its Executive Vice President or in any other capacity.[4]  In fact, Silberman has explicitly denied having any affiliation with KCF, confirming in a June 2017 email exchange that he "had nothing to do with this Billingsley venture . . . ." (*See* 6/27/17 email exchange between Silberman and others, attached hereto as Exhibit "F".)

103. Third, and perhaps most suspiciously, the Note Purchase Agreements both purport to have Mr. Pavlis' signature attached to them.  However, the signature page for each documents stand alone, on separate pages that makes

---

[4] It bears noting that Silberman was the Chief Financial Officer of Mobile Corp. throughout its short existence.

no reference whatsoever to KCF, the Note Purchase Agreement, or any other identifying information.

104. Rather, the pre-printed signature page, entitled "Investors," has just three lines: a "Date" line, a "Name" line, and a "Title" line. The documents do not support any conclusion that Mr. Pavlis actually signed the pages. Moreover, even if he did, they do not support that Mr. Pavlis knew what he was signing or that the signature page would be attached to the Note Purchase Agreements.

105. Even if the KCF Notes and Note Purchase Agreements were legitimate (they are not), Billingsley never disclosed to Mr. Pavlis—a prudent man his entire life—the outsized risks associated with investing in KCF, nor did he divulge his own personal pecuniary gain from Mr. Pavlis' investments.

106. Billingsley never explained to Mr. Pavlis what business KCF was in, what risks were associated with investing in KCF, or why any investment in a start-up commercial finance entity like KCF–much less a $7,000,000 investment– was appropriate or suitable for Mr. Pavlis.

107. In "selling" Mr. Pavlis these notes, Billingsley provided no private placement memoranda or other documentation that would normally accompany high-risk investments like KCF.

108. The terms of the Notes were also astonishingly unfavorable. Mr. Pavlis' purported investment of $7,000,000 promised only an 8% annual return, to be

repaid (if ever) five and six years later, when Mr. Pavlis would be 102 and 103 years old, respectively.

109.   Not only were the notes' 8% annual return far below what Mr. Pavlis could have earned in the stock market, they were purportedly issued by a start-up entity, and they were wholly unsecured—even when it was finally formed in December 2014, months after "issuing" the notes, KCF lacked any assets, receivables or other collateral by which to secure the Notes.

110.   In other words, assuming *arguendo* that Pavlis knowingly (i) authorized the transfer of his $7,000,000 Allwest investment to KCF, and (ii) agreed to accept the Notes as  after-the-fact evidence of his investment in KCF, this simple "fact" remains:   Billingsley, on behalf of KCF, solicited the nonagenarian Mr. Pavlis to part with $7,000,000 in exchange for unsecured Notes issued by a start-up company whose chances of failure were, like all start-up companies, significant, and whose modest returns Mr. Pavlis would receive (if he received it at all) when he was 103 years old.

111.   No reasonable investor with his wits about him would ever agree to such an unfavorable, lop-sided deal, and no honest person would ever advise or encourage him to do so.  There are only two possible narratives here.  Either Billingsley and KCF preyed upon Mr. Pavlis' trusting nature and advanced age to persuade him to invest $7,000,000 in KCF with which KCF and

Billingsley could do what they pleased for at least five years; or the Notes and Note Purchase Agreements are complete fabrications, created long after KCF and Billingsley commandeered Mr. Pavlis' Allwest investment in an effort to cover up an appalling fraud.

112.   In light of recent events, there is little question that after orchestrating the unauthorized transfer of Mr. Pavlis' Allwest investment to KCF, all of KCF and Billingsley's efforts have been singularly focused on covering up their fraudulent conduct and diverting Mr. Pavlis funds to other entities over which KCF and Billingsley have control.

### *KCF and Billingsley Fabricate Documents To Hide Their Scheme*

113. Upon information and belief, KCF never provided Mr. Pavlis with the above-mentioned Notes or Note Subscription Agreements, nor did it provide him with any other documents relating to any purported investments in KCF.

114. It was not until 2016, after Plaintiff, then acting in her capacity as Mr. Pavlis' duly-appointed Power of Attorney, requested that Billingsley provide her with information relating to Mr. Pavlis' possible "real estate" investments that any documents relating to KCF surfaced.

115. After a lengthy delay, on November 11, 2016, Billingsley provided Plaintiff a copy of the September 1, 2014, KCF Note purporting to reflect a $3,000,000

investment.  Notably, he did not provide a copy of the November 1, 2014, Note that purported to reflect an additional $4,000,000 investment.

116.   At the time, Plaintiff reasonably believed that the $3,000,000 Note was, in fact, a legitimate investment.  It was not until late 2017, when she first became aware that Mr. Pavlis had apparently invested $2,000,000 in Mobile Corp., that Plaintiff pressed Billingsley to provide additional information about both Mobile Corp. and KCF.

117.   Billingsley refused to provide any information for months.  Finally, in or around February 2018, Billingsley produced a copy of the second, $4,000,000 KCF Note, dated November 1, 2014.[5]  This was the first time that Plaintiff had ever seen or known of a second Note.

118.   Over the next several months, as Plaintiff, through counsel, sought additional information, Billingsley continued to dissemble and delay, even as he insisted that Mr. Pavlis' "investments" were legitimate and properly documented.

119.   When Billingsley finally produced additional documents on June 29, 2018, they all but confirmed that he, on behalf of KCF, had perpetrated an unconscionable fraud on Mr. Pavlis and was fabricating documents to cover their tracks.

---

[5]   In addition to the second Note, Billingsley also provided a copy of the corresponding Note Purchase Agreement.

120.   Billingsley first produced what purports to be a KCF "Confidential Private Placement Memorandum" ("PPM"), dated August 1, 2014, together with a "Subscription Agreement" dated August 18, 2014, and purporting to bear Mr. Pavlis' signature.   (Copies of the PPM and Subscription Agreement are attached hereto as Exhibits "G" and "H", respectively.)

121.   Billingsley produced these documents as further "evidence" that Mr. Pavlis had, in fact, knowingly and voluntarily agreed to purchase the KCF Notes. However, to the extent the PPM even existed in 2014, it refers to KCF's offering of Class A shares in the company; it makes no mention whatsoever of convertible promissory notes, which are entirely distinct from, and have characteristics and terms entirely different from equity shares.

122.   Moreover, the PPM purports to relate to an offering of 10,000,000 shares at $.10 per share, for a total amount of $1,000,000.   Given that KCF and Billingsley contend that Mr. Pavlis invested $7,000,000 in KCF, this PPM plainly had nothing to do with Mr. Pavlis' supposed purchase of the KCF Notes.

123.   Similarly, the August 18, 2014, Subscription Agreement relates solely to the same Class A shares identified in the PPM.  Indeed, the document specifically states that it relates to "ownership of the Units offered for sale as further

described in the attached Private Placement Memorandum dated as of August 1, 2014 . . . ."

124.    More suspicious still is the signature page attached to the Subscription Agreement.  The signature page reads as follows:  "The undersigned hereby represents and warrants that all of its answers to ***this Investor Questionnaire*** are true as of the date of its execution of the ***Subscription Agreement pursuant to which it purchased Notes of the Company***."  (Emphasis added.) This language is followed by what purports to be Mr. Pavlis' signature. Beneath Mr. Pavlis' signature, Billingsley appears to have signed his name above a line that reads simply (and cryptically), "Name of Signatory (Entities only)."

125.    This document bears all of the hallmarks of an after-the-fact fabrication.  First, its plain language confirms that this signature page is from an "Investor Questionnaire," not the Subscription Agreement itself.[6]  Moreover, even though the Subscription Agreement, by definition, is limited to the Class A shares described in the PPM, the language of this signature page references the purchase of "Notes of the Company."  There is no reference whatsoever to "Notes" in the Subscription Agreement.

---

[6]    It bears noting that neither Billingsley nor KCF has ever produced an Investor Questionnaire purporting to bear Mr. Pavlis' signature.

126.   Finally, the signature line above which Billingsley signed does not even mention KCF; the "Signatory" is Billingsley himself.  This is in stark contrast to the September 1, 2014, Note and corresponding Note Purchase Agreement – issued just two weeks later – which was purportedly signed by Silberman, as KCF's Executive Vice President.

127.   Upon information and belief, the PPM and Subscription Agreement are fabrications that KCF and Billingsley slapped together in recent months in an attempt to continue the fiction that Mr. Pavlis agreed to invest in KCF in any way, at any time.

128.   On June 29, 2018, Billingsley also provided Mr. Pavlis' counsel with three Joint Venture Agreements ("JVAs") between KCF and three of its subsidiary limited liability companies, the other Defendants in this action.  Copies of the JVAs are attached hereto at Exhibit "I".)  As with every other document produced by Billingsley and KCF, these JVAs are likely fraudulent, or at least created to abet KCF and Billingsley's fraud.

129.   KCF's joint venture agreement with "Key Commercial Finance Properties LLC,"  a Delaware limited liability company, is dated December 9, 2016. This subsidiary was not formed until December 12, 2016.

130. KCF's joint venture agreement with "Mobile Agency LLC," a Delaware limited liability company, is dated July 10, 2015.  Mobile Agency LLC was not formed until November 7, 2016.

131. KCF's joint venture agreement with "Equity Pros, LLC," a Connecticut limited liability company, is dated August 28, 2015.  Equity Pros was not formed until September 11, 2015.

132. More troubling still is the fact that each of the JVAs provide that KCF "may, at its sole discretion, contribute funds to SUBSIDIARY for the purpose of ensuring that SUBSIDIARY is able to meet its operating expense obligations; provided, however, that under no circumstances shall such fund transfers be construed as a loan from PARENT to SUBSIDIARY."

133. Put differently, KCF has permitted itself to funnel assets – which consist principally (if not exclusively) of Mr. Pavlis' ill-gotten investment funds – to subsidiaries that have no obligation to repay the funds or provide collateral to secure the transfers.

134. There is no evidence that Mr. Pavlis ever agreed to invest his funds in KCF, much less have his funds diverted to its subsidiaries. In much the same way that KCF and Billingsley redirected and commandeered Mr. Pavlis' Allwest investments, they have now created vehicles by which they can redirect what

remains of Mr. Pavlis' funds to entities with which he has no conceivable connection, even in the fictional narrative spun by KCF and Billingsley.

135.   As if the foregoing were not damning enough, Billingsley withheld perhaps the most offensive and telling document for last.  On July 13, 2018, Billingsley produced, for the first, time, a putative "Funding Agreement" between KCF and Allwest.  (A copy of the Funding Agreement is Attached hereto as Exhibit "J".)

136.   The Funding Agreement is dated September 20, 2016, two years after Mr. Pavlis' investment.  Not coincidentally, the funding agreement between KCF and Allwest was entered into shortly after Mr. Pavlis' representatives began inquiring into his investments.

137.   Among other things, the Funding Agreement states that "KCF has provided funding to Allwest under loan arrangements that have been subject either to verbal agreement terms or only loose written documentation."   The irony of this statement is palpable – while KCF wants us to believe that it prepared Notes, Note Purchase Agreements, and other documents "confirming" Mr. Pavlis' 2014 "investment" in KCF, it was happy to fund Allwest's business ventures without any documentation whatsoever.

138.    The Funding Agreement is instructive for another reason: a heavily redacted

section titled "KCF Indemnification for Secondary Investor Claims" that

plainly refers to Mr. Pavlis.  It states that:

> The parties hereto acknowledge and agree that (i) KCF investor
> [REDACTED], despite documenting his investment as an investment
> in KCF (and not Allwest) advanced an aggregate of [REDACTED] of
> such invested funds directly to Allwest at the request of KCF and on
> KCF's behalf to expedite KCF's further investment of such funds in
> Allwest, (ii) [REDACTED] is not an investor in Allwest with respect
> to such invested funds (including any interest or other return thereon),
> and Allwest has no direct liability to [REDACTED] with respect to
> such invested funds, and (iii) KCF is solely liable to [REDACTED] for
> repayment of such invested funds in accordance with the provisions of
> the written investment agreement entered into by KCF and
> [REDACTED].

139.    It further states that KCF "shall defend, indemnify, and hold harmless"

Allwest from any claim by the [REDACTED] secondary investor.

140.    This provision begs several obvious questions.  For instance, why would KCF

request Mr. Pavlis to advance investment funds to Allwest, if everyone

understood that Mr. Pavlis was really investing in KCF?  And why would any

investor assume the risk of giving $7,000,000 to Allwest, when that alleged

transaction was never documented and presumably provided no financial

benefit at all to Mr. Pavlis?  Finally, what sense does it make that Mr. Pavlis

would do this solely to "expedite KCF's further investment of such funds in

Allwest," when Mr. Pavlis could (and in fact did) invest directly in Allwest himself?

141.   The Funding Agreement is nothing more than a post-hoc attempt by KCF, through Billingsley, to create a veneer of legitimacy to obscure his highly-lucrative defrauding of Mr. Pavlis.

## COUNT I

## DECLARATORY JUDGMENT

142.   Plaintiff incorporates the averments in the proceeding paragraphs as if set forth in their entirety here.

143.   As the detailed factual background demonstrates, the interests of the parties here are adverse, the controversy is ripe for determination, and Mr. Pavlis has no adequate remedy at law.

144.   On February 20, 2014, Mr. Pavlis gave Billingsley a cashier's check for $1,000,000 that Billingsley sent to Allwest Investments, in California. Billingsley represented at the time that the payment was for a promissory note.

145.   Allwest never repaid Mr. Pavlis on the note, and Billingsley has never provided any documentation as to the disposition of those funds.

146.   On May 23, 2014, Mr. Pavlis, on Billingsley's recommendation, wrote a personal check in the amount of $6,000,000, made payable to Allwest.  The

only notation is the memo on the check, which states simply "Real Estate Investment."

147.    Subsequently, KCF purports to have issued two Notes to Mr. Pavlis, which Notes Mr. Pavlis ostensibly purchased pursuant to corresponding Note Purchase Agreements.

148.    Mr. Pavlis' "signature" on both Note Purchase Agreements stands alone, on a separate sheet of paper that makes no reference to the promissory note.  Upon information and belief, Mr. Pavlis did not knowingly sign the Note Purchase Agreements and did not intend to commit himself to any investment in or with KCF.

149.    Mr. Pavlis intended to invest $7,000,000 in Allwest, not KCF, as evidenced by the fact that his checks were made payable to Allwest, not KCF.  No contemporaneous documentation suggests in any way that any portion of Mr. Pavlis' investment in Allwest was intended for KCF.

150.    Further, at the time The Notes were issued and the Note Purchase Agreements "signed", KCF was *not* a validly organized and existing Delaware limited liability company.  It was not registered as a Delaware limited liability company until December 10, 2014 and there is no evidence suggesting it intended to organize and exist before that date

151. Because KCF was *not* a recognized entity under Delaware law at the time it issued the promissory notes, it did not have the *capacity* to enter into valid contracts.

152. Absent legal capacity, the promissory notes issued by KCF, totaling $7,000,000 of Mr. Pavlis' funds, are *void ab initio*.

153. Further, to the extent *any* legitimate investment occurred, Mr. Pavlis invested in Allwest, not KCF, and Defendants' attempt to retrospectively revise that investment months later is patently fraudulent.

154. Moreover, the promissory notes issued by KCF to Mr. Pavlis are signed by Silberman who, on information and belief, was never affiliated with KCF.

155. Because KCF did not have the legal capacity to enter into a contract at the time the KCF notes were issued, and because the KCF were fraudulently executed, Mr. Pavlis respectfully requests that this Court declare the notes void and order Defendants to repay, as restitution, Mr. Pavlis' full $7,000,000.

## COUNT II

## COMMON LAW FRAUD

156. Plaintiff incorporates the averments contained in all the preceding paragraphs as if set forth in their entirety here.

157. Defendants, individually and/or  together, defrauded Mr. Pavlis out of $7,000,000.   They did so by gaining his trust and confidence, by

misrepresenting their intentions, by misrepresenting the risk and reward of the investments they were recommending, by failing to disclose their own individual interest in the investments being recommended, by misrepresenting where the funds from his investment would actually go, and by creating multiple fake documents in an attempt to cover up these actions.

158.   Defendants' affirmative acts include, but are not limited to:

   a.   On or around January 28, 2014, misrepresenting, through Billingsley, that Mr. Pavlis was investing in Allwest Investments when in reality his funds were going to KCF.

   b.   Orchestrating and implementing the transfer of Mr. Pavlis' $7,000,000 Allwest to KCF.

   c.   On October 1, 2014, issuing a fraudulent promissory note for $3,000,000 on behalf of KCF, which was not yet a legal entity.

   d.   On November 1, 2014, issuing a fraudulent promissory note for $4,000,000 on behalf of KCF, which was not yet a legal entity.

   e.   On September 20, 2016, creating a fraudulent Funding Agreement between KCF and Allwest Investments which purports to legitimize KCF's misappropriation of Mr. Pavlis' Allwest investment in January 2014.

159. As a result of Defendants' fraudulent acts, as more fully set forth above, Mr. Pavlis has suffered damages, including, but not limited to the loss of his $7 million investment in Allwest.

## COUNT III

## FRAUDULENT CONCEALMENT

160. Plaintiff incorporates the averments in the proceeding paragraphs as if set forth in their entirety here.

161. Defendants have engaged in an on-going pattern of deception specifically intended to obscure their misrepresentations, fraud, and self-dealing.

162. First, by placing Billingsley in the position of Mr. Pavlis' trusted advisor, Defendants allowed Billingsley to personally shield Mr. Pavlis from any information that might have warned him of the fraudulent nature of Defendants' investment schemes.

163. By disguising their frauds as multi-year or long-term investments, Defendants delayed any immediate or short-term inquiry into their fraudulent schemes.

164. For instance, Mr. Pavlis is purported to have entered into multiple investments with Defendants, in a number of forms. His purported promissory notes from KCF were not due to be repaid until 2019 and 2020, respectively.

165. When Mr. Pavlis' representatives began to inquire into his investments in 2016, Defendants engaged in a pattern of deception intended to obscure the

fraudulent nature of their scheme, which pattern is more fully detailed at paragraphs 109-137 above.

166.   For instance, on September 20, 2016, shortly after Mr. Pavlis' representatives first contacted Billingsley, Allwest and KCF entered into a fraudulent "Funding Agreement" purporting to memorialize Mr. Pavlis' knowledge of the underlying nature of their relationship.

167.   This pattern of deception continued through 2017, as Billingsley repeatedly refused to turn over any documentation of Mr. Pavlis' investments.   On numerous occasions, Billingsley delayed providing, or outright refused to provide, necessary information and documentation of Mr. Pavlis' investments.

168.   In June 2018, Billingsley produced several documents purporting to memorialize Mr. Pavlis' investments; these documents are, on information and belief, fake and/or fraudulent and an attempt to create a veneer of legitimacy for Defendants' scheme.

169.   This on-going course of conduct was such that a reasonable person would have no knowledge of any injury from the Defendants' actions.

170.   As a result of Defendants' fraudulent concealment, Mr. Pavlis has suffered damages, including, but not limited to the loss of his $7 million investment in Allwest.

## COUNT IV

## BREACH OF CONTRACT

171.   Plaintiff incorporates the averments in the proceeding paragraphs as if set forth itheir entirety here.

172.   KCF issued the second Note, dated November 1, 2014, to Mr. Pavlis related to a $4,000,000 investment by Mr. Pavlis.  (A copy of the 11/1/14 Note is attached hereto as Exhibit "D").

173.   Michael Silberman, as "Executive Vice President" of KCF, purportedly executed the Note on behalf of KCF.

174.   The Note Purchase Agreement, also dated November 1, 2014, accompanied the Note and was purportedly executed by Michael Silberman on behalf of KCF and by Mr. Pavlis.  (A copy of the 11/1/14 Note Purchase Agreement is attached as Exhibit "E").

175.   Under the terms of the Note and the Note Purchase Agreement KCF agreed to return both the $4,000,000 principal and interest in the amount of 8% per annum by November 1, 2020.  To this effect, the Note contains the following language:

> All unpaid principal, together with any unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on . . . November 1, 2020.

(*See* Exhibit "D" at pg. 1.)

176.   190. Further, the Note Purchase Agreement contains the following language under the "Agreement" heading:

> (e) *Payments*. The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due . . .

(*See* Exhibit "E" at ¶ 1(e).)

177.   KCF further agreed that the terms of the Note and the Note Purchase Agreement were enforceable against it in the event of KCF's breach.  In regard to this agreement, the Note Purchase Agreement contains the following language under the "Representations and Warranties of the Company" heading:

> (c) *Enforceability*. Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the company, enforceable against the Company in accordance with its terms…

(*Id*. at ¶ 2(c).)

178.   Pursuant to the Notes, Mr. Pavlis' $7,000,000 investment in Allwest was purportedly transferred to KCF, $4,000,000 of which was allegedly provided as consideration for the November 1, 2014 Note.

179.   Plaintiff has at all times performed each of the terms and conditions specified in the Note and Note Purchase Agreement required to be performed by Plaintiff in the manner specified therein.

180.   KCF failed to return Mr. Pavlis' $4,000,000 investment and corresponding interest by 10:00 a.m. on November 1, 2020 as is expressly required by the terms of the Note and Note Purchase Agreement.

181.   To date, KCF continues to ignore its obligation under the Note and Note Purchase Agreement and has failed to return a single dollar of Mr. Pavlis' $4,000,000 investment.

182.   KCF has breached the Note and Note Purchase Agreement by failing to return Mr. Pavlis' $4,000,000 investment along with the corresponding interest.

183.   KCF's breach of its obligations has been the direct cause of reasonably foreseeable damages in the amount of $4,000,000 plus interest to be calculated pursuant to the terms of the Note and Note Purchase Agreement.

## COUNT V

## UNJUST ENRICHMENT

184.   Plaintiff incorporates the averments in the proceeding paragraphs as if set forth in their entirety here.

185.   Defendants retain control over Mr. Pavlis' funds and continue to use them for their own purposes, at Mr. Pavlis' expense.

186.   In 2014, Mr. Pavlis wrote two checks, totaling $7,000,000 to Allwest Investments, a California real estate company.  That money was intended as a real estate investment in the recipient of Mr. Pavlis' checks.  Without Mr.

Pavlis' knowledge or consent, however, that money was transferred to KCF. As such, to the extent KCF currently retains any of that investment, it does so wrongfully, inequitably, and at Mr. Pavlis' expense.

187.   Similarly, to the extent that Mr. Pavlis' funds are in the possession of KCF's subsidiaries, that possession is not contemplated by any contract (to the extent *any* of the various contracts produced by Defendants are deemed valid) to which Mr. Pavlis is a party, nor was it the intention of Mr. Pavlis that these entities benefit from his investment in Allwest.

188.   Mr. Pavlis lacked any knowledge that his funds would be used to enrich KCF and/or its subsidiaries and did not consent to the transfer of funds to any Defendant.  As a result, Defendants' continued possession and dissipation of Mr. Pavlis' funds for their own ends is wrongful, inequitable, and at Mr. Pavlis' expense.

189.   Through the structure of the Defendant entities and contracts between the Defendant entities, Defendants have sought to shield themselves from liability and any obligation to return Mr. Pavlis' funds.

190.   In the absence of any commercial or contractual relationship with KCF's subsidiaries, Mr. Pavlis lacks any adequate remedy at law.

191.  As a result of Defendants' unjust enrichment at Mr. Pavlis' expense, Mr. Pavlis has suffered damages, including, but not limited to the loss of his $7 million investment in Allwest.

WHEREFORE, Plaintiff Deborah S. Skeans, Executrix of the Estate of Frank E. Pavlis, respectfully requests the Court enter an order against Defendants Key Commercial Finance LLC, Key Commercial Finance Properties, LLC, Equity Pros, LLC, and Mobile Agency, LLC:

  a.  Declaring the promissory notes void;

  b.  Ordering Defendants pay damages in the amount of at least $7 million, plus interest;

  c.  Awarding punitive damages;

  d.  Ordering Defendants pay Mr. Pavlis' reasonable attorneys' fees and costs; and

e.      Awarding such other and further relief as the Court deems just

and proper.

STRADLEY RONON
STEVENS & YOUNG, LLP

_____*/s/ Joelle E. Polesky*_____
Joelle E. Polesky (ID No. 3694)
1000 N. West Street, Suite 1200
Wilmington, DE  19801
Tel: (302) 295-4856
Fax: (302) 295-4801
Email: jpolesky@stradley.com

*Attorneys for Plaintiff,*
*Deborah S. Skeans, Executrix of*
*the Estate of Frank E. Pavlis*

OF COUNSEL:

William E. Mahoney, Jr.
Spencer R. Short
Stradley Ronon Stevens & Young LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Tel: (215) 564-8059
Fax: (215) 564-8120

Dated: January 20, 2020

# EXHIBIT A

| Site VIEWPOINTE | Paid Date 20140219 | Serial 2536 | Routing 3100050 | Account Redacted3208 | PC 000069 | Amount 1,000,000.00 | Sequence # 3087592055 | Ca |
|---|---|---|---|---|---|---|---|---|

**Withdrawal**                                                                    2536     WELLS FARGO

(Check One)  ☑ Checking   ☐ Savings   ☐ Money Market Access   ☐ Command

Account Number

✱ Redacted 3 2 0 8          Date   2/19/14

Please print. Name

Frank E Pavlis

Please print  Street Address, City, State, Zip Code

1500 Hamilton St   Allentown PA  18102

I authorize this withdrawal and acknowledge receipt of the amount indicated below.
Please sign in teller's presence  Two forms of ID may be required.

x  Frank E Pavlis

One Million and °°/100                                    $ 1,000,000.00

                                                          Dollars

Bank Use Only (Attach BVF is not Available)

⑈ 2536⑈  ⑆500000069⑆⑉

Redacted 2054

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

Print Images

| Routing | Sequence # | Paid Date | Amount | Account | Serial | Capture Source |
|---------|-----------|-----------|--------|---------|--------|----------------|
| 3100050 | 7443634812 | 05272014 | $6000000.00 | Redacted3208 | 1142 | 00010004 |



FRANK E PAVLIS
1500 HAMILTON ST APT 1M
ALLENTOWN, PA 18102-4269

1142

3-500/310 7451
3065/073208

may 23, 2014

PAY TO THE
ORDER OF   Allwest Investments     $6,000,000

SIX MILLION AND No/100 — DOLLARS

Wells Fargo Bank, N.A.
Pennsylvania
wellsfargo.com

FOR Real Estate Investment   Frank E Pavlis

⑈031000503⑈ Redacted 3208⑈ 01142

# EXHIBIT B

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF
HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS
AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR
HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION
STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF
COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH
REGISTRATION IS NOT REQUIRED.

## KEY COMMERCIAL FINANCE LLC

## CONVERTIBLE PROMISSORY NOTE

$3,000,000                                                                September 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability
company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in
lawful money of the United States of America the principal sum of **THREE MILLION AND 00/100** Dollars
($3,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with
simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum,
computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal,
together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and
payable on the earlier of: (i) September 1, 2019 or, in the event that a Majority in Interest of the holders make
a written election to extend the term of the Notes, at any time following such date upon 10 days prior written
notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined
below), such amounts are declared due and payable by the Investor or made automatically due and payable in
accordance with the terms hereof. This Note is one of the "**Notes**" issued pursuant to the Note Purchase
Agreement dated as of September 1, 2014 (as amended, modified or supplemented, the "**Note Purchase
Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement).
Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject,
and to which Investor, by the acceptance of this Note, agrees:

1.      *Definitions*. As used in this Note, the following capitalized terms have the following
meanings:

        (a)     "**Company**" includes the limited liability company initially executing this Note and
any Person which shall succeed to or assume the obligations of the Company under this Note.

        (b)     "**Event of Default**" has the meaning given in **Section 4** hereof.

        (c)     "**Investor**" shall mean the Person specified in the introductory paragraph of this Note
or any Person who shall at the time be the registered holder of this Note.

(d)    "**Lien**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e)    "**Majority in Interest**" shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f)    "**Note Purchase Agreement**" has the meaning given in the introductory paragraph hereof.

(g)    "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term "**Obligations**" shall not include any obligations of Company.

(h)    "**Person**" shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i)    "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(j)    "**Transaction Documents**" shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2.    *Interest*.  Accrued interest on this Note shall be payable at maturity.

3.    *Prepayment*.  Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4.    *Events of Default*.  The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a)    *Failure to Pay*.  The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kcf Form of Convertible Note.docx

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

(b)    *Voluntary Bankruptcy or Insolvency Proceedings.*  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(c)    *Involuntary Bankruptcy or Insolvency Proceedings.*  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

5.    **Rights of Investor upon Default.**  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

6.    *Conversion.*

(a)    *Automatic Conversion.*  In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $3,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

(b)    *Automatic Conversion on Change of Control.*  In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

kcf Form of Convertible Note.docx

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis. The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions. Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6,** this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

(c)     *Conversion Procedure*. Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests. The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)     *Fractional Membership Interests; Interest; Effect of Conversion*. No fractional Membership Interests shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence. In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

7.     *Change of Control*. Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full. The term **"Change of Control"** means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note.docx

Company is cancelled or converted or a combination thereof occurs. The term **"Change of Control Payment"** means an amount equal to one (1) times the outstanding principal amount of such Note.

8.    *Successors and Assigns.* Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.    *Waiver and Amendment.* Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.    *Transfer of this Note or Securities Issuable on Conversion Hereof.* With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.    *Assignment by the Company.* Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.    *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.    *Pari Passu Notes.* Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note.docx

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

14.    *Usury.* In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

15.    *Waivers.* The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

16.    *Governing Law.* This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

kcf Form of Convertible Note.docx

The Company has caused this Note to be issued as of the date first written above.

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: 

Name:  Michael Silberman
Title:  Executive Vice President

# EXHIBIT C

## KEY COMMERCIAL FINANCE LLC

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of September 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

## RECITALS

A.      On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000. This Agreement and the Note shall be collectively referred to below as (the "**Transaction Documents**").

B.      Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.      Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      *The Notes.*

(a)      *The Notes.*  Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

(b)      *Delivery.*  The sale and purchase of the Notes shall take place at a closing to be held on September 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 1511 Route 22 Suite 152 Brewster NY 10509 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**"). At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note. Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**"). At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price. Each of the Notes will be registered in such Investor's name in the Company's records.

(c)      *Investor's Commitment to Fund the Closing; Binding Obligation.*  Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I.** Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

(d)      *Use of Proceeds.*  The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

(e)      *Payments.*  The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

2.      **Representations and Warranties of the Company.**  The Company represents and warrants to each Investor that:

(a)      *Due Incorporation, Qualification, etc.*  The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(b)      *Authority.*  The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

(c)      *Enforceability.*  Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)      *Non-Contravention.*  The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws ("**Charter Documents**") or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

(e)      *Approvals.*  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

stockholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby.

(f)    *No Violation or Default.* The Company is not in violation of or in default with respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(g)    *Intellectual Property.* To the best of its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights of, others.

3.    **Representations and Warranties of Investors.** Each Investor, for that Investor alone, represents and warrants to the Company upon the acquisition of the Note as follows:

(a)    *Binding Obligation.* Such Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Each of this Agreement and the Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)    *Securities Law Compliance.* Such Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act of 1933 (the **"Securities Act"**), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Such Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration. Such Investor has not been formed solely for the purpose of making this investment and is purchasing the Note to be acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. Such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time. Such Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act.

(c)    *Access to Information.* Such Investor acknowledges that the Company has given such Investor access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by such Investor, and has furnished such Investor with all documents and other information required for such Investor to make an informed decision with respect to the purchase of the Note.

4.    **Conditions to Closing of the Investors.** Each Investor's obligations at the Closing or Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

     (a)    *Representations and Warranties.* The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

     (b)    *Governmental Approvals and Filings.* Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

     (c)    *Legal Requirements.* At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

     (d)    *Proceedings and Documents.* All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

     (e)    *Transaction Documents.* The Company shall have duly executed and delivered to the Investors the following documents:

          (i)    This Agreement; and

          (ii)    Each Note issued hereunder.

     5.    *Conditions to Obligations of the Company.* The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

     (a)    *Representations and Warranties.* The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

     (b)    *Governmental Approvals and Filings.* Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

     (c)    *Legal Requirements.* At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

     (d)    *Purchase Price.* Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I.**

6.      *Miscellaneous.*

(a)      *Waivers and Amendments.*  Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent. Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto. Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterparty signature page to this Agreement, together with a supplement to **Schedule I** hereto. Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

(b)      *Governing Law.*  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(c)      *Survival.*  The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d)      *Successors and Assigns.*  Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

(e)      *Registration, Transfer and Replacement of the Notes.*  The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes. Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary. Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered. Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f)      *Assignment by the Company.*  The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

(g)     *Entire Agreement.* This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(h)     *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I**, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(i)     *Payment of Fees and Expenses.* Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

(j)     *Separability of Agreements; Severability of this Agreement.* The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale. Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors. Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors. If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(k)     *Counterparts.* This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

**COMPANY:**

**KEY COMMERCIAL FINANCE LLC**
A Delaware Limited Liability Company

By: _____

Name: Michael Silberman
Title: Executive Vice President

**INVESTORS**

DATE: 8-21-19

NAME: Frank E Parlia

TITLE: FRANK E. PANLIS

## SCHEDULE I

| Name and Address | Closing Note Principal Amount |
| --- | --- |
|  |  |

**Closing: September 30, 2014**

**Frank Pavlis**
1500 Hamilton St.
Allentown, PA 18102                **$3,000,000**

I-1

**Exhibit A**

**FORM OF NOTE**

**Exhibit B**

**DISCLOSURE SCHEDULE**

None.

# EXHIBIT D

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

### KEY COMMERCIAL FINANCE LLC

### CONVERTIBLE PROMISSORY NOTE

$4,000,000                                                                                    November 1, 2014

FOR VALUE RECEIVED, **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**") promises to pay to **Frank E. Pavlis** ("**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of **FOUR MILLION AND 00/100** Dollars ($4,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Note on the unpaid principal balance at a rate equal to 8.0% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) November 1, 2020 or, in the event that a Majority in Interest of the holders make a written election to extend the term of the Notes, at any time following such date upon 10 days prior written notice (the "**Maturity Date**"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof. This Note is one of the "**Notes**" issued pursuant to the Note Purchase Agreement dated as of November 1, 2014 (as amended, modified or supplemented, the "**Note Purchase Agreement**") between the Company and the Investors (as defined in the Note Purchase Agreement). Capitalized terms not defined herein shall have the meaning contained in the Note Purchase Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.        *Definitions.* As used in this Note, the following capitalized terms have the following meanings:

(a)        "**Company**" includes the limited liability company initially executing this Note and any Person which shall succeed to or assume the obligations of the Company under this Note.

(b)        "**Event of Default**" has the meaning given in **Section 4** hereof.

(c)        "**Investor**" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

(d)      "**Lien**" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement, or any agreement to provide any of the foregoing, and the filing of any financing statement or similar instrument under the Uniform Commercial Code or comparable law of any jurisdiction.

(e)      "**Majority in Interest**" shall mean, more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Note Purchase Agreement.

(f)      "**Note Purchase Agreement**" has the meaning given in the introductory paragraph hereof.

(g)      "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note and the Note Purchase Agreement, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding. Notwithstanding the foregoing, the term "**Obligations**" shall not include any obligations of Company.

(h)      "**Person**" shall mean and include an individual, a partnership, a limited liability company (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(i)      "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(j)      "**Transaction Documents**" shall mean this Note, each of the other Notes issued under the Note Purchase Agreement, and the Note Purchase Agreement.

2.      *Interest.* Accrued interest on this Note shall be payable at maturity.

3.      *Prepayment.* Upon written consent of the holders of a Majority in Interest of the Notes and with five (5) days prior written notice to Investor, the Company may prepay this Note in whole or in part; provided that: (i) any prepayment of this Note may only be made in connection with the prepayment of all Notes issued under the Note Purchase Agreement on a pro rata basis, based on the respective aggregate outstanding principal amounts of each such Note, and (ii) any such prepayment will be applied first to the payment of expenses due under this Note, second to interest accrued on this Note and third, if the amount of prepayment exceeds the amount of all such expenses and accrued interest, to the payment of principal of this Note.

4.      *Events of Default.* The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a)      *Failure to Pay.* The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any

kef Form of Convertible Note Pavlis 11:14.docx    -2-

other Transaction Document on the date due and such payment shall not have been made within five (5) days of the Company's receipt of Investor's written notice to the Company of such failure to pay; or

      (b)    *Voluntary Bankruptcy or Insolvency Proceedings*. The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

      (c)    *Involuntary Bankruptcy or Insolvency Proceedings*. Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement.

      5.    **Rights of Investor upon Default**. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(b)** or **4(c)**) and at any time thereafter during the continuance of such Event of Default, Investor may, with the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, by written notice to the Company declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in **Sections 4(b)** and **4(c)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default and subject to the consent of a Majority in Interest of the holders of the Notes issued under the Note Purchase Agreement, Investor may exercise any other right power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

      6.    *Conversion*.

      (a)    *Automatic Conversion*. In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells membership interests (the "**Membership Interests**") with an aggregate sales price of not less than $4,000,000, with the principal purpose of raising capital (a "**Qualified Equity Financing**"), then the outstanding principal amount of this Note and all accrued interest shall automatically convert into Membership and/or Ownership Interests equal to the percentage membership amount of the Membership Interests sold in the Qualified Equity Financing *times* 1.25, with any fractional membership percentage rounded down on a percentage basis, and otherwise upon the same terms as the purchasers that purchase of the series of Membership Interests in the Qualified Equity Financing.

      (b)    *Automatic Conversion on Change of Control*. In the event the Company consummates by the Maturity Date and prior to a Qualified Equity Financing a Change of Control transaction, then all principal and accrued interest then owing under this Note (and any other Notes issued pursuant to the

Note Purchase Agreement) shall be converted into Membership Interests equal to a percentage of ownership as is determined by dividing the principal amount and accrued interest then owing under this Note by one hundred thousand, with any fractional membership percentage rounded down on a percentage basis. The Investor agrees to execute the Company's standard form Membership Interests purchase agreement containing customary representations and warranties and transfer restrictions. Further, the Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Investor agrees to indemnify the Company from any loss incurred by it in connection with this Note) to the Company for cancellation; provided, however, that upon satisfaction of the conditions set forth in this **Section 6**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. The Company shall, as soon as practicable thereafter, issue and deliver to Investor a certificate or certificates for the percentage of Membership Interests to which Investor was entitled upon conversion (bearing such legends as are required by the Membership Interests purchase agreement, the Subscription Agreements and applicable state and federal securities laws in the opinion of counsel to the Company) and a check payable to Investor for any cash amounts payable as described in **Section 6(d)**.

(c)    *Conversion Procedure.* Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, as applicable, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions, and having the same terms as those agreements entered into by the other purchasers of the Membership Interests. The Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the Qualified Equity Financing for cancellation; *provided, however,* that upon satisfaction of the conditions set forth in **Section 6(a)**, as applicable, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)    *Fractional Membership Interests; Interest; Effect of Conversion.* No fractional Membership Interests shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional Membership Interests to Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the conversion price by the fraction of a Membership Interest not issued pursuant to the previous sentence. In addition, the Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(d)**, the Company shall be forever released from all its obligations and liabilities under this Note.

7.    *Change of Control.* Notwithstanding anything to the contrary, while the Note remains outstanding, the Investor shall receive a payment, in addition to the principal amount of the Note and any accrued interest thereon, equal to the Change of Control Payment upon the closing of a Change of Control, after which the Note shall be deemed repaid in full. The term "**Change of Control**" means a sale, lease, exchange, exclusive license, transfer or other disposition of all or substantially all of the property, assets or business of the Company, or a merger or consolidation with or into any other limited liability company or other business transaction or series of transactions as a result of which owners of the Company immediately prior to the transaction would hold less than a majority of the voting interests of the Company (or successor) after the transaction; provided that a Change of Control shall not include any transaction or series of related transactions principally for bona fide equity financing purposes (including, but not limited to, the Qualified Equity Financing) in which cash is received by the Company or any successor or indebtedness of the

kcf Form of Convertible Note Pavlis 11:14.docx   -4-

Company is cancelled or converted or a combination thereof occurs. The term "**Change of Control Payment**" means an amount equal to one (1) times the outstanding principal amount of such Note.

8.      *Successors and Assigns.* Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

9.      *Waiver and Amendment.* Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the holders of a Majority in Interest of the Notes.

10.     *Transfer of this Note or Securities Issuable on Conversion Hereof.* With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of Investor's counsel, or other evidence if reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect). Upon receiving such written notice and reasonably satisfactory opinion, if so requested, or other evidence, the Company, as promptly as practicable, shall notify Investor that Investor may sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify Investor promptly after such determination has been made. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary.

11.     *Assignment by the Company.* Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the holders of a Majority in Interest of the Notes.

12.     *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the Note Purchase Agreement, or at such other address or facsimile number as the Company shall have furnished to Investor in writing. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

13.     *Pari Passu Notes.* Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be *pari passu* in right of payment and in all other respects to the other Notes issued pursuant to the Note Purchase Agreement or pursuant to the terms of such Notes. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes, then Investor shall hold in trust all such excess payments for the

kcf Form of Convertible Note Pavlis 11:14.docx    -5-

benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

14.    *Usury*. In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

15.    *Waivers*. The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

16.    *Governing Law*. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

*(Signature Page Follows)*

The Company has caused this Note to be issued as of the date first written above.

KEY COMMERCIAL FINANCE LLC
A Delaware Limited Liability Company

By: _____

Name:  Michael Silberman
Title:  Executive Vice President

# EXHIBIT E

## KEY COMMERCIAL FINANCE LLC

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement, dated as of November 1, 2014 (the "**Agreement**") is entered into by and among **KEY COMMERCIAL FINANCE LLC**, a Delaware limited liability company (the "**Company**"), and the persons and entities listed on the schedule of investors attached hereto as **Schedule I** (each an "**Investor**" and, collectively, the "**Investors**").

## RECITALS

A.    On the terms and subject to the conditions set forth herein, each Investor is willing to purchase from the Company, and the Company is willing to sell to such Investor a convertible promissory note in the form attached hereto as **Exhibit A** (each, a "**Note**" and, collectively, the "**Notes**") in an aggregate principal amount of up to $10,000,000. This Agreement and the Note shall be collectively referred to below as (the "**Transaction Documents**").

B.    Each Investor has committed to purchase a Note carrying an aggregate principal balance equal to the amount set forth opposite such Investor's name on **Schedule I** hereto.

C.    Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    *The Notes.*

    (a)    *The Notes.* Subject to all of the terms and conditions hereof, the Company shall issue and each of the Investors severally agrees to purchase at the Closing (as defined below) a Note in the principal amount set forth opposite the respective Investor's name on **Schedule I** hereto.

    (b)    *Delivery.* The sale and purchase of the Notes shall take place at a closing to be held on November 30, 2014 or as soon thereafter as is practicable (the "**Closing Date**") at the offices of Key Commercial Finance LLC, 51 Bedford Rd., Katonah, NY 10536 or such other place and time as the Company and the Investors may determine, subject to the terms and conditions of this Agreement (the "**Closing**"). At the Closing, the Company will deliver to each of the Investors the respective Note to be purchased by such Investor, against receipt by the Company of the corresponding purchase price for the Note. Each of the Notes will be registered in the name of the Investors in the Company's records. The Company may conduct one or more additional closings following the Closing Date (each, an "**Additional Closing**") to be held at such place and time as the Company and the Investors participating in such Additional Closing may determine (each, an "**Additional Closing Date**"). At each Additional Closing, the Company will deliver to each of the Investors participating in such Additional Closing the Note to be purchased by such Investor, against receipt by the Company of the corresponding Purchase Price. Each of the Notes will be registered in such Investor's name in the Company's records.

(c)     *Investor's Commitment to Fund the Closing; Binding Obligation.*  Subject to the terms and conditions of this Agreement, each Investor severally agrees to purchase at the Closing or Additional Closing, as applicable, a Note carrying the aggregate principal amount set forth opposite such Investor's name on **Schedule I**.  Any failure of the Investor to purchase the Note at the Closing shall constitute a material breach of this Agreement and the Company shall be able to take any and all reasonable measures to enforce the provisions of this Agreement.

(d)     *Use of Proceeds.*  The proceeds of the sale and issuance of the Notes shall be used for general corporate purposes.

(e)     *Payments.*  The Company will make all cash payments due under the Notes in immediately available funds by 10:00 a.m. on the date such payment is due in the manner and at the address for such purpose specified below each Investor's name on **Schedule I** hereto, or at such other address as an Investor or other registered holder of a Note may from time to time direct in writing.

2.     *Representations and Warranties of the Company.*  The Company represents and warrants to each Investor that:

(a)     *Due Incorporation, Qualification, etc.*  The Company (i) is a corporation duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(b)     *Authority.*  The execution, delivery and performance by the Company of the Transaction Documents to be executed by the Company and the consummation of the transactions contemplated thereby (i) are within the power of the Company and (ii) have been duly authorized by all necessary actions on the part of the Company, the Company's directors, and the Company's stockholders.

(c)     *Enforceability.*  Each of the Transaction Documents executed, or to be executed, by the Company has been, or will be, duly executed and delivered by the Company and constitutes, or will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)     *Non-Contravention.*  The execution and delivery by the Company of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby do not and will not (i) violate the Company's Articles of Incorporation or Bylaws (**"Charter Documents"**) or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any Lien upon any property, asset or revenue of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations, or any of its assets or properties.

(e)     *Approvals.*  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the

stockholders of any Person) is required in connection with the execution and delivery of the Transaction Documents executed by the Company and the performance and consummation of the transactions contemplated thereby.

(f)      *No Violation or Default.* The Company is not in violation of or in default with respect to (i) its Charter Documents or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; or (ii) any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound (nor is there any waiver in effect which, if not in effect, would result in such a violation or default), where in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(g)      *Intellectual Property.* To the best of its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted without any conflict with, or infringement of the rights of, others.

3.      **Representations and Warranties of Investors.** Each Investor, for that Investor alone, represents and warrants to the Company upon the acquisition of the Note as follows:

(a)      *Binding Obligation.* Such Investor has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Each of this Agreement and the Note issued to such Investor is a valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)      *Securities Law Compliance.* Such Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act of 1933 (the **"Securities Act"**), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Such Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration. Such Investor has not been formed solely for the purpose of making this investment and is purchasing the Note to be acquired by such Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. Such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time. Such Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act.

(c)      *Access to Information.* Such Investor acknowledges that the Company has given such Investor access to the corporate records and accounts of the Company and to all information in its possession relating to the Company, has made its officers and representatives available for interview by such Investor, and has furnished such Investor with all documents and other information required for such Investor to make an informed decision with respect to the purchase of the Note.

4.      *Conditions to Closing of the Investors.* Each Investor's obligations at the Closing or Additional Closing, as applicable, are subject to the fulfillment, on or prior to the Closing Date or Additional

-3-

Closing Date, as applicable, of all of the following conditions, any of which may be waived in whole or in part by all of the Investors:

(a)     *Representations and Warranties.* The representations and warranties made by the Company in **Section 2** hereof, as modified by the Disclosure Schedule (as modified at the Closing or Additional Closing, as applicable), shall have been true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)     *Governmental Approvals and Filings.* Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)     *Legal Requirements.* At the Closing or Additional Closing, as applicable, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)     *Proceedings and Documents.* All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to the Investors.

(e)     *Transaction Documents.* The Company shall have duly executed and delivered to the Investors the following documents:

              (i)     This Agreement; and

              (ii)    Each Note issued hereunder.

5.     *Conditions to Obligations of the Company.* The Company's obligation to issue and sell the Notes at the Closing or Additional Closing, as applicable, is subject to the fulfillment, on or prior to the Closing Date or Additional Closing Date, as applicable, of the following conditions, any of which may be waived in whole or in part by the Company:

(a)     *Representations and Warranties.* The representations and warranties made by the Investors in **Section 3** hereof, as modified by the Disclosure Schedule, shall be true and correct when made, and shall be true and correct on the Closing Date or Additional Closing Date, as applicable.

(b)     *Governmental Approvals and Filings.* Except for any notices required or permitted to be filed after the Closing Date or Additional Closing Date, as applicable, with certain federal and state securities commissions, the Company shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Notes.

(c)     *Legal Requirements.* At the Closing and at each Additional Closing, the sale and issuance by the Company, and the purchase by the Investors, of the Notes shall be legally permitted by all laws and regulations to which the Investors or the Company are subject.

(d)     *Purchase Price.* Each Investor shall have delivered to the Company the purchase price in respect of the Note being purchased by such Investor in accordance with **Schedule I.**

-4-

6.    *Miscellaneous.*

        (a)    *Waivers and Amendments.*  Any provision of this Agreement, and the Notes may be amended, waived or modified only upon the written consent of the Company and a Majority in Interest of Investors of the Notes; provided however, that no such amendment, waiver or consent shall: (i) reduce the principal amount of any Note without the affected Investor's written consent, or (ii) reduce the rate of interest of any Note without the affected Investor's written consent.  Any amendment or waiver effected in accordance with this paragraph shall be binding upon all of the parties hereto.  Notwithstanding the foregoing, this Agreement may be amended to add a party as an Investor hereunder in connection with Additional Closings without the consent of any other Investor, by delivery to the Company of a counterpart signature page to this Agreement, together with a supplement to **Schedule I** hereto.  Such amendment shall take effect at the Additional Closing and such party shall thereafter be deemed an "Investor" for all purposes hereunder and **Schedule I** hereto shall be updated to reflect the addition of such Investor.

        (b)    *Governing Law.*  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

        (c)    *Survival.*  The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

        (d)    *Successors and Assigns.*  Subject to the restrictions on transfer described in this **Section 6(d)** and **Section 6(e)** below, the rights and obligations of the Company and the Investors shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

        (e)    *Registration, Transfer and Replacement of the Notes.*  The Company will keep, at its principal executive office, books for the registration and registration of transfer of the Notes.  Prior to presentation of any Note for registration of transfer, the Company shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Company shall not be affected by notice to the contrary.  Subject to any restrictions on or conditions to transfer set forth in any Note, the holder of any Note, at its option, may in person or by duly authorized attorney surrender the same for exchange at the Company's chief executive office, and promptly thereafter and at the Company's expense, except as provided below, receive in exchange therefor one or more new Note(s), each in the principal amount requested by such holder, dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney for the same principal amount as the then unpaid principal amount of the Note so surrendered.  Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (b) in the case of mutilation, upon surrender thereof, the Company, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

        (f)    *Assignment by the Company.*  The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Investors holding a Majority in Interest of the Notes.

    (g)    *Entire Agreement.* This Agreement together with the other Transaction Documents constitute and contain the entire agreement among the Company and Investors and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

    (h)    *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to an Investor, at such Investor's address or facsimile number set forth in the Schedule of Investors attached as **Schedule I**, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, mailed to 51 Bedford Rd., Katonah, NY 10536, or faxed to such other address or facsimile number as the Company shall have furnished to the Investors in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

    (i)    *Payment of Fees and Expenses.* Each party to this Agreement shall be responsible for the expenses it incurs hereunder.

    (j)    *Separability of Agreements; Severability of this Agreement.* The Company's agreement with each of the Investors is a separate agreement and the sale of the Notes to each of the Investors is a separate sale. Unless otherwise expressly provided herein, the rights of each Investor hereunder are several rights, not rights jointly held with any of the other Investors. Any invalidity, illegality or limitation on the enforceability of the Agreement or any part thereof, by any Investor whether arising by reason of the law of the respective Investor's domicile or otherwise, shall in no way affect or impair the validity, legality or enforceability of this Agreement with respect to other Investors. If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

    (k)    *Counterparts.* This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

-6-

The parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

COMPANY:

KEY COMMERCIAL FINANCE LLC
A Delaware Limited Liability Company

By:

Name: Michael Silberman
Title: Executive Vice President

**INVESTORS**

DATE: 11-21-14

NAME: Frank E Pavlis

TITLE: Frank E Pavlis

**SCHEDULE I**

| Name and Address | Closing<br>Note Principal Amount |
|---|---|

**Closing: November 30, 2014**

**Frank Pavlis**
1500 Hamilton St.
Allentown, PA 18102

$4,000,000

**Exhibit A**

**FORM OF NOTE**

**Exhibit B**

**DISCLOSURE SCHEDULE**

None.

# EXHIBIT F

**From:** Michael Silberman <michael.silberman@corp.mobile.co>
**Sent:** Tuesday, June 27, 2017 2:44 PM
**To:** DKB Law <dkburkelawoffices@gmail.com>; Jeffrey Peterson <jp@corp.mobile.co>
**Cc:** Bivens, Don <dbivens@swlaw.com>; Cesar Sanvicente <cesar@corp.mobile.co>; Jeffrey Peterson <ceo@mobile.co>;
Lucy Lu <kaiyee4268@gmail.com>; Michael Silberman <silberman1@earthlink.net>
**Subject:** Re: Board Call Additional Material

Jeff speaks for me same here. Probably just wanted to beef up Team section of his company website.


On Tue, Jun 27, 2017 at 2:41 PM Jeffrey Peterson <jp@corp.mobile.co> wrote:


I do not want to speak definitively for Michael Silberman (MDS) but based on what I know as someone generally
familiar with MDS's business history, business judgment, and other factors, I am quite certain MDS had nothing to do
with this Billingsley venture as well.

Michael?


Jeffrey Peterson
Chief Executive Officer
Chairman of the Board of Directors
Mobile Corporation (USA)
25 Mt. Auburn Street
Cambridge, MA 02138
phone: +1-617-221-8272
email: ceo@mobile.co
website: mobile.co


On Tue, Jun 27, 2017 at 5:36 PM, DKB Law <dkburkelawoffices@gmail.com> wrote:

Bizarre.   Same for Michael?




**From:** Jeffrey Peterson [mailto:jp@corp.mobile.co]
**Sent:** Tuesday, June 27, 2017 2:17 PM
**To:** DKB Law <dkburkelawoffices@gmail.com>
**Cc:** Cesar Sanvicente <cesar@corp.mobile.co>; Jeffrey Peterson <ceo@mobile.co>; Michael Silberman
<michael.silberman@corp.mobile.co>; Lucy Lu <kaiyee4268@gmail.com>; Bivens, Don <dbivens@swlaw.com>;

Michael Silberman <silberman1@earthlink.net>
**Subject:** RE: Board Call Additional Material

Correct.

Thanks

Jeff

On Jun 27, 2017 5:15 PM, "DKB Law" <dkburkelawoffices@gmail.com> wrote:

Hmm. Interesting.

Your bio was added without your permission and you had no role whatsoever with this enterprise?

**From:** Jeffrey Peterson [mailto:jp@corp.mobile.co]
**Sent:** Tuesday, June 27, 2017 2:12 PM
**To:** DKB Law <dkburkelawoffices@gmail.com>
**Cc:** Cesar Sanvicente <cesar@corp.mobile.co>; Michael Silberman <michael.silberman@corp.mobile.co>; Lucy Lu <kaiyee4268@gmail.com>; Jeffrey Peterson <ceo@mobile.co>; Bivens, Don <dbivens@swlaw.com>; Michael Silberman <silberman1@earthlink.net>
**Subject:** RE: Board Call Additional Material

I have no idea. I have nothing to do with that company and had nothing to do with it in the past.

Thanks

Jeff

On Jun 27, 2017 5:10 PM, "DKB Law" <dkburkelawoffices@gmail.com> wrote:

When did that company exist and for how long? Is it completely defunct? If so, on what date did it cease operating?

The date on the website is 2016. So, it existed while you were CEO of Mobile.co and after Justin left Mobile.co with his $150k promissory note. Right?

Can you shed some light on this beyond just a "No."

Thanks

**From:** Jeffrey Peterson [mailto:jp@corp.mobile.co]
**Sent:** Tuesday, June 27, 2017 2:05 PM
**To:** DKB Law <dkburkelawoffices@gmail.com>
**Cc:** Cesar Sanvicente <cesar@corp.mobile.co>; Lucy Lu <kaiyee4268@gmail.com>; Jeffrey Peterson

3

<ceo@mobile.co>; Michael Silberman <michael.silberman@corp.mobile.co>; Bivens, Don <dbivens@swlaw.com>; Michael Silberman <silberman1@earthlink.net>
**Subject:** RE: Board Call Additional Material

No. As previously stated, I have no business dealings with Justin Billingsley any more.

Jeff

On Jun 27, 2017 4:24 PM, "DKB Law" <dkburkelawoffices@gmail.com> wrote:

Is this a new company you started with Justin?

http://kcfpartners.com/#Leadership

# EXHIBIT G

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# KEY COMMERCIAL FINANCE, LLC

**Minimum Offering Amount:**    $3,000,000

**Maximum Offering Amount:**    $10,000,000

### August 1, 2014

### *Confidential – Not for General Release – For Accredited Investors Only*

This document has been prepared for and offered to certain specific persons based on factors that are not of general applicability. This Private Placement Memorandum of Key Commercial Finance LLC (such document this "Memorandum;" Key Commercial Finance LLC, together with its subsidiaries, the "Company") is not intended for use or consumption by any person other than the one to whom it has been delivered.

The Company is offering from a minimum of 10,000,000 and a maximum of 10,000,000 of Class A Shares of the Company (such offering altogether, the "Offering"). The Offering is only extended to accredited investors, as that term is used in the applicable securities laws of the United States, in reliance upon certain exemptions from registration under the Securities and Exchange Act of 1933, as amended (the "Act"). Such exemption includes Regulation D promulgated under the Act and the regulations authorized thereunder and promulgated by the Securities and Exchange Commission (the "SEC"), including Sections 4(2) and 4(6) of the Act. Applicable state laws are discussed further below. By way of summary:

|  | Shares offered | Price per share | Commissions | Proceeds to the Company |
|---|---|---|---|---|
| **Class A Shares** | 10,000,000 | $.10 | $0.00 | $1,000,000 |

The Securities are highly speculative. Investment in the Company involves a substantial degree of risk. This Memorandum explains some of these risks. The Company cannot fully hedge or mitigate all applicable risks. No Investor is guaranteed any level of return and should not make any investment in the Company that the Investor is not willing and able to lose entirely.

The Offering does not constitute an offer. The Investor's initials on this document do not constitute the acceptance of an offer nor create a contract. The Investor's initials shall evidence only that the Investor has read, understood, and has had reasonable opportunity to ask and have answered

questions about the representations made on the initialed page. Pursuant to the corporate
governance documents of the Company including its operating agreement, none of the Securities
are transferable. There is no secondary market for the Securities. The Securities may be subject to
dilution, diminution in value, or other losses up to the entire amount of any investment in the
Company. No broker or broker-dealer has been retained by the Company for purposes of the
Offering or for any other sale or transfer of any of its Securities.

This Memorandum is not a stock certificate.

## Key Terms – Summary of Offering

Type of Security:            Class A Shares

Offering Size:               10,000,000 to 10,000,000 Shares.

Offering Price per Share:    $.10

Minimum Purchase Size:       $250,000

Dividends:                   Dividends are not guaranteed, cumulative, or pro-rated. Dividends are
                             issued only upon an affirmative vote of all of the shares of the
                             Company entitled to so vote.

Liquidation Preference:      In the event of the liquidation, winding-up, or dissolution of the
                             Company, the Investor is not entitled to any preferential access to the
                             assets or business functions of the Company.

Conversion Rights:           There is no conversion right in the Securities unless so authorized by a
                             vote of all of the shares in the Company entitled to so vote.

Voting Rights:               Unless so authorized to the contrary by a vote of all shares in the
                             Company entitled to so vote, none of the Securities shall be entitled to
                             a vote.

Information Rights:          Owners of Shares shall have a right, upon reasonable notice and
                             demand, to inspect the books of the Company in a format of
                             reasonable accessibility. The Company may determine in its sole
                             discretion the time, location, format, and frequency that such
                             inspections are permitted, which discretion shall not be exercised
                             unreasonably, capriciously, or categorically.

Further Agreements:          No Securities shall be deemed transferred except subject to separate

written Subscription Agreements. This Memorandum is not an agreement.

Closing:                    Securities may be transferred in one or several closings according to the terms of separate written Subscription Agreements between the Company and individual Investors.

**Notices to Investors**

## No Registration

None of the Securities of the Company are registered with the Securities and Exchange Commission or any other governmental entity, domestically or internationally, nor any other supervisory or regulatory body. The Securities offering being made by the Company is offered only to a select group of specific persons, which persons may be part of such offering on account of their own representations to the Company regarding their personal income and/or net worth. If this Memorandum has not been given to you specifically in a communication addressed to you by name or by the name of a business entity through which you conduct business or investment affairs, you may not participate in the offering memorialized by this Memorandum. The Company is not offering any of its securities to the public at large. You (the "Investor") may not rely on any registration statements to the Securities and Exchange Commission or any other governmental entity, which the Company has not made and will not make absent a substantial change in the structure or nature of the Company. This Memorandum does not constitute an offer for the Securities. Your signature or initials on any page of this Memorandum do not create any contracts with the Company or otherwise bind the Company to any obligations or duties. Your initials where provided indicate only that you have received and read this Memorandum.

## For residents of all states:

The Securities offered hereby have not been registered under the Act or the securities laws of certain states and are being offered and sold in reliance on exemptions from the registration requirements of said acts and laws. The securities are subject to registration on transferability and resale and may not be transferred or resold except as permitted under said acts and laws pursuant to registration or exemption therefrom. The securities have not been approved or disapproved by the Securities and

Exchange Commission or any state securities commission or other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of the Memorandum. Any representation to the contrary is unlawful.

Other than to Accredited Investors, neither this Memorandum nor any other related documents will be distributed in or into the United States or any jurisdiction pursuant to which such distribution is prohibited by law, and neither this Memorandum nor any other related documents constitutes an offer of the Securities of the Company to any individual with a registered address in, or who is a resident located in, the United States, other than any Accredited Investor, or any of the other jurisdictions pursuant to which such distribution is prohibited by law. This Memorandum does not constitute an invitation or offer to issue or the solicitation of an invitation to offer to acquire the securities of the Company in any jurisdiction in which such offer or solicitation is unlawful.

### For residents of the state of California:

These securities have not been registered under the California Corporations Code by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities may not be sold, transferred or otherwise disposed of to any person or entity unless subsequently registered under the California Corporations Code, if such registration is required.

### For residents of the states of Connecticut, Illinois and Utah:

The Securities offered hereby have not been registered under the Act or the securities laws of certain states and are being offered and sold in reliance on exemptions from the registration requirements of said acts and laws. The Securities are subject to registration on transferability and resale and may not be transferred or resold except as permitted under said acts and laws pursuant to registration or exemption therefrom. The securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission or other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of the Memorandum. Any representation to the contrary is unlawful.

### For residents of the state of Florida:

Each Florida resident who subscribed for the purchase therein has the right, pursuant to Section 517.061(12)(a)(5) of the Florida Securities Act, to withdraw his subscription and receive a full refund of all monies paid, within three (3) business days after the execution of the Subscription Agreement

or payment for his investment has been made, whichever is later. Withdrawal will be without any further liability to any person. To accomplish this withdrawal, a subscriber need only send a letter or telegram to us at the Company's address set forth in the Memorandum indicating his intention to withdraw. Such letter or telegram shall be sent and postmarked prior to the end of the aforementioned third business day. It is prudent to send such letter by certified mail, return receipt requested, to ensure that it is received and also to evidence the time when it was mailed.

### For residents of the state of Maryland:

These securities represented by this certificate (or other document) have been issued pursuant to a claim or exemption from the registration or qualification provisions of federal and state securities laws and may not be sold or transferred without compliance with the registration or qualification provisions of applicable federal and state securities laws or applicable exemption therefrom.

### For residents of the state of New York:

The attorney general prior to its issuance and use has not reviewed this private placement Memorandum. The attorney general of the state of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful. This private offering Memorandum does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made in light of the circumstances under which they were made, not misleading. It contains a fair summary of the material terms and documents purported to be summarized herein.

### For residents of the states of Oregon and Washington:

In making an investment decision, Investors must rely on their own examination of the person or entity creating the securities and the terms of the Offering, including the merits and risks involved. These Securities have not been recommended by any federal or state securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offense. These Securities are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act of 1933, as amended, pursuant to registration or exemption therefrom. Investors should be aware that they would be required to bear the financial risks of this investment for an indefinite period of time.

### For residents of the state of Texas:

These securities have not been registered under the Texas Securities Act and are being sold in reliance upon the exemption contained in Section 5-581-5(i)(a) of such act. These Securities may not be sold without registration under such act or exemption therefrom.

### No public market

Because none of the Securities are (i) offered to the public at large, (ii) offered for purchase or sale on any exchange, or (iii) transferable between the Investor and any other person (see below), there is no public or secondary market for the Securities. Investors will not be able to realize any gains or returns from the transfer or sale of their Securities. The value of the Securities will be fixed by the Company upon their issue and not appreciate. The Investor's sole gain or return from the Company shall come from dividends that the Company may issue from time to time. The future disposition of any of the Securities is at the discretion of the Company absent a separate, written, mutually executed agreement to the contrary.

### High degree of risk

Any investment into any business enterprise involves a substantial degree of risk. New ventures may not succeed, and the factors that determine the success or failure of a capital investment are impossible to predict, hedge, or mitigate entirely. No person should invest in the Company or the Securities who is not willing to expose their entire investment to the risk of total loss. The Company cannot provide any guarantee or promise of any returns, including the return of the Investor's initial investment, nor may the Investor rely on any statements, written or otherwise, to the contrary. The Company does not insure or reimburse any money invested in it. No owner or holder of the Securities is thereby granted or entitled to any rights to the assets, tangible or otherwise, of the Company.

Furthermore, as detailed below, the Company is principally engaged in lines of business that do not guarantee any returns on any money invested by or through the Company. The Company does not invest in fixed-income securities or other low-risk financial products.

There are other risk factors involved in any decision to invest in the Company as detailed further below.

## Restrictions on transfer of the securities

The operating agreement of the Company, which governs the internal affairs of the Company including its Securities, provides that the Securities may not be bought, sold, transferred, gifted, pledged as collateral or otherwise encumbered or hypothecated, or alienated by the Investor named on such Securities (if certificated) and on the books of the Company whether or not certificated. In the event of the death, divorce, bankruptcy, or other action tending to cause the alienation of the Securities by operation of law (an "Alienation Event"), all such Securities are immediately canceled and returned to the ownership and control of the Company by operation of law, even if such Alienation Event is not made known to the Company until a later date. No person may represent that the Securities are available for sale, nor attempt to sell or actually sell or otherwise transfer the same, or otherwise alienate their ownership of the same absent the express written consent of the Company. Investors should be aware that they will be required to bear the risks of their investment for an indefinite period of time. These restrictions on transfer operate to prevent the emergence of any secondary market for the Securities of the Company.

## No one is authorized to make representations outside the offering materials

The Investor may not rely on any other representations, written or oral, apart from this Memorandum and apart from representations made more or less contemporaneously with this Memorandum by the Company in its agreements with the Investor regarding the Company's own products (such agreements, including agreements of non-disclosure, collectively, the "Subscription Agreements"). This Memorandum and the Subscription Agreements shall constitute the sole and entire source of representations regarding the Securities. No such representations are offers the acceptance of which creates a binding contract between the Company and any other person.

## Descriptions and summaries of documents in the Memorandum are qualified by the actual documents

Any documents that are referred to by way of summary, or otherwise described without being fully recapitulated herein, including the Company's own marketing materials or the marketing materials of third parties, should be read as qualified by the underlying or referenced documents themselves. Investors should carefully read all source material described herein and should become independently familiar with the markets and general economic environment in which the Company operates. This Memorandum describes the state of the Company and its business operations at the time it was drafted, and is necessarily forward-looking and uncertain, and the economic and business-related representations made herein are subject to change at any time without notice.

## No legal, business, or tax advice

Nothing in this Memorandum or in the Subscription Agreements shall constitute legal or tax advice to any person. The Company does not make any representations regarding legal or tax consequences that may arise regarding the Investor's own tax liabilities or those of any other person. Investors should retain qualified independent tax and legal counsel regarding any transactions with the Company before making any investment or purchasing decisions. The Company cannot provide individualized tax or legal advice to any person except insofar as the Investor may be entitled to receive Forms 1099, K-1, or other forms from the Company reasonably necessary for the Investor to prepare accurate, complete federal income tax returns shall be provided by the Company.

## Right of the Company to modify or withdraw the Offering

The Company may revise, rescind, cancel, or otherwise adjust, revoke, affirm, or amend the Offering of any of its products or services, including the Securities, at any time and for any or no reason, with or without notice.

## Opportunity of the Investor to ask questions and receive information

The Company hereby extends to the Investor the opportunity to ask questions and to receive any relevant information in the Company's possession that may help the Investor to better understand the risks associated with their investment. Please direct such questions to:

Justin Billingsley – 203.240.7160 – jebillit e aol.com

## **Cautionary Statement Regarding Forward-Looking Statements**

Certain statements in this Memorandum constitute forward-looking statements. When used in this Memorandum, words like "may," "will," "should," "shall," "project," "anticipate," "believe," "estimate," "trend," "intend," "expect," and similar expressions and the negative forms thereof involve known and unknown risks, uncertainties, and other factors that could cause anticipated outcomes not to ultimately occur. The Company expressly disclaims all obligation to undertake updates or revisions to forward-looking statements, just as the Company expressly disclaims any

reliance on a forward-looking statement as though it were an assertion of fact or a promise. The Company further expressly disclaims the accuracy or completeness of any forward-looking statements, including financial projections.

The Company's actual results, performance, or achievements could vary from those expressed in, or implied by, any forward-looking statements in this Memorandum. The Investor understands that no assurance can be given that any of the events anticipated by the forward-looking statements contained herein will transpire. Even if such events occur, the Company cannot guarantee that the Company will realize any gains, anticipated or not, from such events.

All forward-looking statements contained in this document are expressly qualified by this cautionary statement. Any written or oral forward-looking statements made after the date of this Memorandum by persons authorized to act on behalf of the Company are qualified in their entirety by the foregoing cautionary statements. The Company disclaims any obligation to update any forward-looking statements contained in this Memorandum or to announce the results of any event occurring after the date of this Memorandum that might materially and adversely affect any of the forward-looking statements contained in this Memorandum.

## Executive Summary

The Company is engaged primarily in the development of an online platform for facilitating real estate transactions between the Company's customers and sellers of residential real estate. The Company focuses on discounted, off-market, unlisted, and other properties likely to be had at an opportunistic rate. The Company does not facilitate or engage in substantial transactions involving commercial real estate. The Company does not generally perform real estate closings and is not a real estate transactions law firm.

The Company engages in all or virtually all business activities that face third parties, including customers and vendors, through subsidiaries as described in greater detail below. The Company provides operating capital to each of its subsidiaries as necessary to fund their activities. Neither the Company nor any of its subsidiaries are bound or restrained by operating agreements or other internal corporate governance documents to only engage in a single line or narrow range of lines of business.

The Company's focus on discounted, off-market, unlisted, and other properties likely to be had at an opportunistic rate has provided substantial returns on capital invested into each subsidiary.

The core business functions of the Company, operating through its subsidiaries, may be developed with an eye towards an ultimate acquisition of the Company by a larger established player in the real

estate transaction space. The Investor should expect that the bulk of the total returns that the Company may generate could come in the form of a final acquisitive sale of the Company or all or substantially all of its business functions.

The Company does not sell real estate directly to consumers and does not engage in real estate sales for the purpose of selling a primary residence to a person intending to inhabit the acquired property. The Company facilitates such sales on an investment basis. The Company does not assist any person in acquiring a declaration of homestead or any other legal protections for such properties.

## Intangible Business Assets

The Company has a high degree of reliance upon on-the-ground working real estate professionals who help to identify homes, including reconditioned and remodeled homes, that are available for sale at a discounted price. The Company's rich network of professionals grants it privileged access to off-market, under-advertised home listings, detailed and accurate information about each property, access to a further network of real estate agents and brokers, and direct access to the customers of the Company's network of professionals.

The Company has also secured favorable, mutually beneficial strategic partnerships with third parties. The Company has been able to build these partnerships on favorable terms, resulting in considerable gains to the brand and marketing assets of the Company, further details about which are available upon reasonable request from the Investor sent to the contact information provided elsewhere in this Memorandum.

## Risk Factors

The Investor should carefully consider and evaluate all applicable risks and the other information provided in this Memorandum before making any investment in the Company. The Investor should further understand that there are risks that cannot be anticipated that may substantially impact the value of any investment in the Company. No representations are made by the Company regarding its ability to account for unknown or unforeseen risks, or risks that are inherently impossible to predict or hedge. Certain risks attending the Company's ordinary business functions relate to the specific verticals in which the Company operates. The Investor should therefore undertake reasonable efforts to understand real estate investment, including but not limited to the process of identifying, closing, purchasing, renovating, remodeling, and conveying real estate. The Investor should consult qualified counsel on any matters relating to tax or legal risks that may ultimately

inure to the detriment of the Investor for any investments in the Company.

The following summary of applicable risks is not intended as a complete accounting of all possible risks the Company and the Investor may face. All risks discussed below constitute forward-looking statements.

*The Company faces substantial competition in its primary vertical and must continue to innovate in order to succeed.*

Both real estate for investment purposes and online marketplaces for real estate deals allowing prospective investors to buy into all or part of a given real estate transaction are lines of business in which the Company faces substantial competition.

The online marketplace for real estate investment products is becoming increasingly crowded as platforms become easier to build or cheaper to buy and customize, as tools for building user interfaces improve, and as the real estate market itself continues to strengthen and consistently deliver significant returns.

Providers of any form of online content are always in competition with other websites for the attention and dollars of its users. The relatively small size of the Company's target audience of high net-worth individuals hoping to invest in real estate that is to be had at an opportunistic price means that there is fierce competition for the clicks, views, and actual investments from (sales to) users.

As the internet and the Company's competitors continue to develop and adopt the latest tools for marketing, sales, and other ordinary business functions, the Company must continue to innovate just to maintain its position in the marketplace against increasing competition. There can be no assurance that the Company is or will be able to compete with any of its competitors. Substantial and ongoing platform development is necessary to maintain the Company's current position in the market.

*The Company may not be successful in its goal of continuous innovation, and may be replaced by better or cheaper technology from a competitor.*

To succeed in a constantly evolving industry, the Company must adapt to change by continually developing new technology and adding new services to address its customers' evolving expectations. The Company could incur substantial costs if it needs to modify its services or infrastructure to adapt to these changes. The Company could be adversely affected if it were to incur significant costs without generating new revenues or if it cannot adapt rapidly to these changes.

The Company could also be adversely affected if it experiences difficulties in introducing new or enhanced services or if these services are not favorably received by users. The Company may experience technical or other difficulties that could delay or prevent it from introducing new or enhanced services. Furthermore, after these services are introduced, the Company may discover errors in these services which may require it to significantly modify its software or hardware infrastructure to correct.

### *The Company faces the natural risks of relying on the internet, including the risk of new regulations.*

Doing business entirely or primarily online incurs certain systemic risks that are native to the internet as a sales channel regardless of the applicable vertical.

Even a small oversight in maintaining the Company's right to possess and use its domain name could result in disastrous consequences for the Company's core business functions. In such an event, migration to a new domain in conjunction with negotiations with any "cyber-squatters" who may come to possess and/or use these domains would substantially impair the ability of the Company to conduct any of its ordinary business functions.

The internet itself is potentially subject to macro-scale destabilizing events such as new regulation, disruption by bad actors, and new technology for accessing the internet.

Businesses that are heavily reliant on the internet are also subject to security breaches, either by mistake or by bad actors. A significant breach of the Company's data could permanently harm its reputation. Even a small or inadvertent breach could rapidly erode its brand in the eyes of actual and potential customers and would likely incur legal and regulatory harms as well. While the Company endeavors to use industry-standard systems and software to prevent data breaches, such risks cannot be fully mitigated by any prophylactic measures.

### *The Company is subject to fluctuations in the US real estate market.*

The real estate market in the United States has experienced substantial volatility in the past. The Company is subject to volatility in housing prices, new construction rates, consumer spending habits and other macroeconomic factors over which the Company has little control. The real estate market has suffered a substantial downturn erasing enormous amounts of invested wealth within recent memory. The Company cannot provide any assurance that such prolonged large-scale declines in the US housing market will not happen again in the future. The Company may see unpredictable losses in both the short and long term from investments in real estate.

The ultimate performance and value of the Company's real estate products will depend in large part upon the Company's ability to provide its customers access to any given property at a profitable rate.

Natural disasters, acts of terrorism or other deliberate actions, changes in local ordinances or state-regulations, changes in federal law, forfeiture or seizure by state or local governments or actions of eminent domain, or other unpredictable events over which the Company has little control that could suddenly reduce its inventories. Conversely, improvement in the market for residential real estate may imperil the Company's ability to secure price-competitive inventories. A stronger housing market overall may motivate its competitors to more aggressively build their own inventories, constricting supply of residential real estate and increasing prices.

### The Company is subject to payment processing risk.

Errors made by software tools that handle electronic payments may cause transaction errors, may cause the Company to divert scarce technical resources to address glitches or malfunctions, may cause the Company to lose trust and credibility in the eyes of actual and potential consumers, and may expose the company to lawsuits.

### The Company may face liability for intellectual property rights infringement and other risks associated with the content it produces.

The Company may be subject to claims for breach of contract, defamation, libel, copyright or trademark infringement, fraud or negligence, or based on other theories of liability, in each case relating to the data, articles, commentary, ratings, information or other content published on the Company's Web Properties. If such data or other content or information that the Company distributes has errors, is delayed or has design defects, the Company could be subject to liability or the Company's reputation could suffer. The Company could also be subject to claims based upon the content that is accessible from the Company's website or those websites that the Company owns and operates through links to other websites. Use of the Company's products and services as part of the investment process creates the risk that clients, or the parties whose assets are managed by the Company's clients, may pursue claims against the Company for significant amounts. Any such claim, even if the outcome were to be ultimately favorable to the Company, could involve a significant commitment of the Company's management, personnel, financial and other resources and could have a negative impact on the Company's reputation. Such claims and lawsuits could have a material adverse effect on the Company's business, financial condition or results of

operations.

Software updates and/or revisions to the Company's systems involve risks that may result in business disruption. The Company, subsidiaries, affiliates and its licensors will routinely update its technology to implement improvements and efficiencies as part of its business operations. Software updates are prone to unforeseen complications and errors which may result in disruption to the Company's business operations. While most system conversions result in temporary inefficiencies during the period of transition, in the event the Company experiences an extended or pervasive interruption of operations, its business could be adversely affected.

*A failure of the Company's subsidiaries, affiliates or licensors to protect their intellectual property rights, allegations that the Company, subsidiaries or such licensors have infringed the intellectual property rights of others, or breach of certain intellectual property license agreements could adversely affect the Company's business.*

The Company's business is dependent on proprietary technology and other intellectual property that the Company, its subsidiaries or affiliates, own or license from certain parties, including trademarks, service marks, trade names, trade secrets, copyrights and patents. The Company cannot assure the Investor of the success of the steps that the Company, its subsidiaries, affiliates and licensors have taken or will take in the future will prevent misappropriation of such proprietary technology or intellectual property. Additionally, the Company, its subsidiaries, affiliates and licensors may be unable to detect the misappropriation or unauthorized use of proprietary technology and intellectual property that it relies on. The Company, its subsidiaries, affiliates and licensors' failure to protect the proprietary technology and intellectual property adequately could harm the Company's reputation and affect the Company ability to compete effectively. Further, the Company, its subsidiaries and affiliates may need to resort to litigation to enforce their intellectual property rights, which may require significant financial and managerial resources. As a result, the Company, its subsidiaries and affiliates may choose not to enforce their infringed intellectual property rights, depending on their strategic evaluation and judgment regarding the best use of resources, the relative strength of intellectual property portfolio and the resources available.

In addition, the Company's competitors, as well as other companies and individuals, may have obtained, and may be expected to obtain in the future, patent rights related to the types of products and services the Company offers or plans to offer. The Company cannot assure the Investor that it is or will be aware of all patents that may pose a risk of infringement by the Company's and subsidiary's trading-related products and services. As a result, the Company may face allegations that the Company has infringed the intellectual property rights of third parties which may be costly

for the Company to defend. If one or more of the Company's trading-related products or services is found to infringe patents held by others, the Company may be required to stop developing or marketing the products or services, obtain licenses to develop and market the products or services from the holders of the patents or redesign the products or services in such a way as to avoid infringing the patents. The Company could also be required to pay damages if the Company were found to infringe patents held by others, which could materially adversely affect the Company's business, financial condition and operating results. The Company cannot assess the extent to which the Company may be required in the future to obtain licenses with respect to patents held by others, whether such licenses would be available or, if available, whether the Company would be able to obtain such licenses on commercially reasonable terms. If the Company were unable to obtain such licenses, the Company may not be able to redesign the Company' products or services at a reasonable cost to avoid infringement, which could materially adversely affect the Company's business, financial condition and operating results.

The Company relies on third-party providers and other suppliers for a number of services that are important to the Company's business, an interruption or cessation of an important service, data or content supplied by any third party, or the loss of an exclusive license, could have a material adverse effect on the Company's business.

The Company depends on a number of suppliers, such as online service providers, hosting services and software providers, data processors, software and hardware vendors, banks, local and regional utility providers, and telecommunications companies and broker dealers, for elements of the Company's platform, trading, clearing, data services and other systems. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company. Accordingly, there can be no assurance that the Company's existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

*The Company is subject to no diversification standards, and therefore is subject to risks that attend concentration.*

Subject to the Company's corporate bylaws and other internal corporate governance documents, the Company is not subject to any legal or self-imposed requirement to diversify its portfolio.

### *The Company may be subject to losses that are not insured.*

None of the Investor's investments nor any of its other moneys are insured against loss. The
Company makes no guarantee of any level of return on any investment, nor that any investment is
loss-protected by any insurance policy or any funds set aside from the Company's revenues for the
purpose of preventing Investors from realizing losses.

### *The Company may find that its proprietary technology and methods are ineligible for formal intellectual property protections.*

The Company has made a considerable investment in developing software, digital tools, a network
of professionals in various aspects of the real estate industry, brands, logos, marketing materials,
digital properties, and other proprietary intellectual property that may, in part or in whole, be
ultimately ineligible for formal intellectual property protections such as registration with the United
States Patent & Trademark Office. The Company cannot promise that any state or federal body with
the authority to grant or recognize formal intellectual property protections would accept petitions
from the Company for such protections, for reasons that may include failure to timely register, a
lack of originality or novelty in its intellectual property, infringement or alleged infringement on the
intellectual property of another, disputes over proper title to, licensure of, royalty in, or
confidentiality of any of the Company's intellectual property, improperly prepared filings, or any of
several other grounds, meritorious or not, upon which such registrations may be denied or delayed.
Such denial or delay may substantially imperil the Company's ability to realize returns on its
investment in its own intellectual property.

### *There is no secondary market for any of the Securities.*

The Company may not be satisfying the current public information requirement of Rule 144 at the
time the Investor wishes to sell any of the Securities. In such event, the Investor may be precluded
from selling the Securities under Rule 144, even if the other applicable requirements of Rule 144
have been satisfied. With or without such compliance, registration under the Securities Act or an
exemption from registration will be required for any disposition of the Shares or the underlying
Common Stock. The Company must approve any future sale or transfer of any Securities absent a
substantial revision to the nature and structure of the Company's internal governance documents.

*There are no dividends payable on any of the Securities.*

We do not intend to pay any cash dividends on our Common Stock or Preferred Stock in the foreseeable future. Earnings, if any, will be retained to finance growth.

*We may invest or spend the proceeds of this offering in ways with which the Investor may not agree or in ways which may not yield a return.*

The net proceeds from the sale of shares by us in the offering may be used for general corporate purposes, including working capital. The Investor will have no authority to make decisions as to how any investment in the Company is spent. As our Risk of Proceeds section below further clarifies, no money invested into the Company is earmarked for any particular purpose, and there is no guarantee that such money will be used in ways that ultimately generate any returns.

*Our future capital needs are uncertain, and we may need to raise additional funds in the future. If we require additional funds in the future, those funds may not be available on acceptable terms, or at all.*

We may need to raise substantial additional capital in the future to fund our operations, including sustaining current lines of business, developing new lines of business, continuing to develop our technology or other proprietary intellectual property, capitalize on new opportunities, remediate debt, or for any other purpose the Company deems reasonably necessary. There is no guaranty that such capital will come without debt, interest, or other fees associated with it, nor is there a guaranty that any Investor will be protected from dilution in the event of a new capital raise. If we are not able to obtain sufficient new working capital, we may have to eliminate or reduce lines of business, delay or cancel new development, or liquidate. We also may have to reduce marketing, customer support or other resources devoted to our solutions or cease operations. Any of these actions could harm our operating results.

### Use of Proceeds

Any proceeds to the Company raised under this Memorandum or the Offering will be used to fund the ongoing operational expenses and general capital needs of the Company. No investment funds are earmarked or designated as being for allocation to any specific or particular purpose other than the general business functions of the Company. Management will have broad discretion in the application

of the net proceeds and investors will be relying on the judgment of our management regarding the
application of the net proceeds.

*Failure to thoroughly read and understand this Memorandum.*

The Company has prepared this Memorandum in order to educate potential investors about the
potential risks and rewards of investing in the Company. Failure of the Investor to thoroughly read
and understand this document, and to exercise the Investor's right to ask questions and seek
clarification of any or all of its terms, may jeopardize the Investor's power or ability to realize any
gains from any of their investments.

# EXHIBIT H

# SUBSCRIPTION AGREEMENT

## OF

## KEY COMMERCIAL FINANCE, LLC

(a Delaware Limited Liability Company)

**Effective as of August 18, 2014**

THE UNITS REPRESENTED BY THIS SUBSCRIPTION AGREEMENT HAVE NOT BEEN
REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED,
OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT
BE OFFERED, OFFERED FOR SALE, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED
OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND
LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER
SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

## SUBSCRIPTION AGREEMENT
### OF

## KEY COMMERCIAL FINANCE, LLC
(a Delaware Limited Liability Company)

This SUBSCRIPTION AGREEMENT (this "*Agreement*") of Key Commercial Finance, LLC, a limited liability company organized under the laws of Delaware (the "*Company*"), is entered into and made effective as of August 18, 2014 by and among Frank Pavlis, individually, at 1500 Hamilton St, Allentown, PA 18102, and all other persons or entities who shall execute and deliver this Agreement or authorized counterparts or facsimiles of the same pursuant to the provisions hereof.

WHEREAS, the Company was organized by the filing of the Articles of Organization of the Company with the Secretary of the State of Delaware (hereafter, "the Articles of Organization");

WHEREAS, the parties intend that this Agreement shall set forth the understanding between them with respect to certain rights and obligations regarding ownership of the Units offered for sale as further described in the attached Private Placement Memorandum dated as of August 1, 2014, including restrictions on transfer and buy-sell provisions; and

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, agree as follows:

### GENERAL

Definitions. Certain capitalized terms used in this Agreement shall have the respective meanings set forth on **Schedule B** attached hereto and made a part hereof, unless otherwise expressly provided herein or unless the context otherwise requires. Certain capitalized terms not defined herein may be defined by the provisions of the Delaware Limited Liability Company Act.

Overview. This Agreement sets forth the terms and conditions of certain rights and obligations regarding ownership of the Units which are further described in the attached Private Placement Memorandum, including restrictions on transfer and buy-sell provisions.

Purposes. The purposes of the Company shall be to provide financing or other capital-related investment advice, to engage in any business that is not prohibited by the Act or any other law and to enter into any lawful transactions and engage in any lawful activities in furtherance of the foregoing purposes as may be necessary, incidental or convenient to carry out the business of the Company as contemplated by this Agreement.

Names and Addresses of Members. The names and addresses of the Members, along with the number of Units owned by such Members and their respective Percentage Interests, are as set forth on **Schedule A**, attached hereto and made a part hereof. The Members shall cause **Schedule A** to be updated as necessary from time to time.

### TRANSFER OF UNITS

Restrictions on Transfer. No Member shall transfer, give, donate, bequeath, pledge, deposit or in any way alienate, encumber, hypothecate, or dispose of (collectively, *"Transfer"*) all or any portion of such Member's Units now owned or hereafter acquired by such Member, except for a Transfer (i) pursuant to a Bona Fide Offer, subject to the options to purchase as provided below, (ii) upon an involuntary transfer, subject to the options to purchase as provided below, or (iii) pursuant to a mandatory purchase as provided below. Transfer by Members owning a majority of the Units is subject to the provisions of the subsection Tag-Along and Drag-Along Rights.

Notwithstanding anything to the contrary set forth herein, any purported Transfer or other disposition of Units of the Company that violates the terms of this Agreement shall be void and ineffectual and shall not operate to transfer any interest or title to the purported transferee.

Options to Purchase. Upon the occurrence of any of the following Triggering Events, all of that Member's Units shall be subject to the options to purchase set out below for the purchase price and upon the payment terms provided in this Agreement.

For purposes of this subsection, "Triggering Events" shall mean any of the following: (i) a Member desires to sell any portion or all of his or her Units upon receipt of a Bona Fide Offer, or (ii) a Member's Units are subject to an involuntary Transfer by operation of law by reason of (A) bankruptcy or insolvency proceedings, whether voluntary or involuntary, (B) distribution of marital property following divorce, or (C) distraint, levy, execution or other involuntary Transfer.

The Member desiring to sell all or part of his Units pursuant to a Bona Fide Offer (hereinafter referred to as "Transferring Member") shall notify all other Members and shall provide them with a copy of the Bona Fide Offer ("Notice"). If the Transfer is an involuntary transfer, "Notice" shall be deemed received on the date any other Member or one or more members of the Board receives actual notice that an involuntary Transfer of Units has or will take place, and that person shall in turn promptly send notice of such to the other parties to this Agreement.

Option Periods. The Company shall have an option for a period of 90 days from the Company's receipt of Notice to purchase all, but not less than all, of the Units proposed to be Transferred. The Company shall exercise such option by giving written notice of such exercise to both the Transferring Member and the other Members within such 90 day period. Should the Company fail to give written notice within such 90 day period, the Company shall be deemed to have waived such option. If the Company does not elect to purchase all of the Units to be transferred, the other Members shall have an option for a period of 90 days from the Company's receipt of such Notice to purchase all, but not less than all, of the remaining Units proposed to be transferred. The other Members shall exercise this option by sending written notice of such exercise to the Transferring Member and the Company within such 90 day period. Should the other Members fail to give written notice within such 90 day period, the other Members shall be deemed to have waived such option.

Failure to Exercise Options. In the event the other Members and the Company shall fail to exercise their options to purchase all, but not less than all, of the Units proposed to be Transferred, the Transferring Member may sell the Units in accordance with the Bona Fide Offer if the closing on that purchase occurs within 90 days of the expiration of the option periods. Any transferee takes the Units subject to the provisions of this Agreement.

Mandatory Purchases. Upon the occurrence of the death of a Member or termination of a Member's employment, whether voluntary or involuntary, all of the Units of such Member shall be purchased by the Company or other Members for the purchase price and upon the payment terms provided in this Agreement.

Tag-Along and Drag-Along Rights. No Member or group of Members (collectively, the "Transfer Group") shall transfer any Units, directly or indirectly, in a single transaction or series of related transactions, to any person (the "Offeror"), if as a result of such transfer(s) more than 50% of the outstanding Units would be owned by the Offeror, unless such Offeror gives the parties to this Agreement who are not included in the Transfer Group (the "Minority Members") the option to sell to the Offeror, at the same price and on the same terms and conditions as offered to the Transfer Group, all or any portion of the Units held by the Minority Members.

At the option of the Transfer Group, all Members who have not tendered their Units pursuant to the prior paragraph shall be required to transfer their Units to the Offeror at the same price and on the same terms and conditions as offered to the Transfer Group.

Purchase Price. The price for any Units subject to a Transfer pursuant to a Bona Fide Offer shall be the fair market value of any Units at issue as determined by the terms of such Bona Fide Offer. In the event of any other type of Transfer of Units permitted under this Agreement, the price for any such Units shall be determined in the following manner:

Each party will obtain its own appraiser to conduct an appraisal, the cost of which will be borne by such party. If the two appraisals are within 10% of each other, the average of those appraisals will be the fair market value. If the two appraisals are more than 10% apart, then the two appraisers will hire a third appraiser, the cost of which will be split equally between the two parties, to obtain a third appraisal and the average of the two appraisals that are closest in amount will be the fair market value. Any appraisal will be based upon the value of the entire Company sold to a single buyer in a single transaction for cash and shall include applicable discounts for illiquidity or lack of control as well as any premium for control.

Restrictions Applicable to All Transfers. Except as may be otherwise set forth herein, all Transfers of Units will be subject to the following conditions:

Prior to any Transfer, the Transferor will cause the prospective transferee, if not already a Member, to execute and deliver to the Company and the other Members the Joinder Agreement to this Agreement attached as Schedule C hereto.

Exception for Estate Planning. A Transfer to an Affiliate of a Member or the Family of

such Member of the right to receive distributions with respect to such Member's Units shall be permitted and shall not constitute a Transfer subject to the right of first refusal provisions of herein. Further, the assignee of financial rights with respect to Units shall not become a Member or be treated as a holder of such Units, and the Company shall continue to treat the Member making such assignment as a Member and holder of such Units for all purposes under this Agreement.

## ISSUANCE OF UNITS

Issuance of Additional Units. The Company may not sell or issue additional Units in the Company ("*New Units*") without the unanimous affirmative vote, consent, or approval of a majority of the Members. A majority of the Members shall determine any economic or management rights of the New Units at the time of such sale or issuance.

Notwithstanding anything to the contrary set forth herein, any sale or issuance of New Units by the Company in violation of the terms of this Agreement shall be void and ineffectual.

Preemptive Rights of Members. Any sale and issuance of New Units shall be subject to the following preemptive rights of the Members (the "*Preemptive Rights*"):

The Company must first offer each Member the opportunity to purchase up to a percentage of the New Units equal to such Member's Percentage Interest of Units at the time of the proposed offering, so that, after the issuance of all such proposed New Units, such Member's Percentage Interest of Units will be the same as the Percentage Interest of Units maintained by such Member immediately prior to the issuance of any such New Units.

The Company shall give written notice (the "*Offer Notice*") to each Member of the proposed offer to sell and issue any New Units, which Offer Notice shall contain the terms of such proposed sale and issuance in reasonable detail. Each Member may exercise its Preemptive Rights by (i) giving written notice to the Company specifying the amount of New Units that such Member desires to purchase (the "*Preemptive Units*"), (ii) executing such reasonable documentation as may be provided by the Company to effect the issuance of the New Units and (iii) delivering to the Company, pursuant to instructions provided by the Company in the Offer Notice, the full purchase price for the Preemptive Units. If a Member does not pay the full purchase price for the Preemptive Units, then such Member's Preemptive Rights with respect to such Preemptive Units shall, at the option of the Company, be deemed to not have been exercised by such Member and such Preemptive Units shall be subject to issuance and sale by the Company.

## MISCELLANEOUS PROVISIONS

Notices. All notices and communications required or permitted to be given hereunder (a) shall be in writing; (b) shall be sent by messenger, certified or registered U.S. mail, a reliable express delivery service, or electronic mail, charges prepaid as applicable, to the appropriate

address(es) or number(s) set forth on **Schedule A** to this Agreement (or such other address as such party may designate by notice to all other parties hereto); and (c) shall be deemed to have been given on the date of receipt by the addressee (or, if the date of receipt is not a business day, on the first business day after the date of receipt), as evidenced by (A) a receipt executed by the addressee (or a responsible person in his or her office or member of his or her household) or a notice to the effect that such addressee refused to accept such communication, if sent by messenger, U.S. mail or express delivery service, (B) confirmation of a facsimile transmission (either orally or by written confirmation) or (C) a receipt of such e-mail confirmed by reply message or read receipt. All parties shall act in good faith to promptly confirm receipt of communications where confirmation of receipt is required to effect notice pursuant to this subsection and is requested by the notifying party.

Further Assurances. Each of the Members shall hereafter execute and deliver such further instruments and do such further acts and things consistent with the provisions of this Agreement as may be required or useful to carry out the full intent and purpose of this Agreement or as may be necessary to comply with any laws, rules or regulations, including carefully reviewing the attached Private Placement Memorandum dated as of August 1, 2014 and executing such applicable and necessary revisions to the operating agreement of the Company.

Waivers. No party's undertakings or agreements contained in this Agreement shall be deemed to have been waived unless such waiver is made by an instrument in writing signed by an authorized representative of such Member. Failure of a party to insist on strict compliance with the provisions of this Agreement shall not constitute waiver of that party's right to demand later compliance with the same or other provisions of this Agreement. A waiver of a breach of this Agreement will not constitute a waiver of the provision itself or of any subsequent breach, or of any other provision of this Agreement.

Rights and Remedies Cumulative; Creditors. The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or of the Members.

Construction. The headings in this Agreement are inserted solely for convenience of reference and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof. When the context in which words are used in this Agreement indicates that such is the intent, singular words shall include the plural and vice versa and masculine words shall include the feminine and the neuter genders and vice versa.

Amendment. This Agreement may be altered or amended only by the unanimous consent of the Members.

Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

Governing Law. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its rules on conflicts of laws, and specifically the Act.

Dispute Resolution. The parties hereto agree that any suit or proceeding arising out of this Agreement shall be brought only in the courts of the State of Delaware; *provided, however*, that no party waives its right to request removal of such action or proceeding from the state court to a federal court. Each party hereto consents to the personal jurisdiction of such courts and agrees that service of process in any such suit or proceeding will be sufficiently accomplished if accomplished in accordance with the notice provisions set forth in the Agreement.

Code and Treasury Regulation References. Any reference to a section of the Code or a Treasury Regulation in this Agreement shall be deemed to refer to corresponding provisions of subsequent superseding federal revenue laws and regulations in the event that the section of the Code or Treasury Regulation so referenced has been so superseded.

Counterparts. This Agreement may be executed in any number of counterparts and may be executed and delivered by facsimile or other electronic transmission. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

[Signature Page Follows]

The undersigned hereby represents and warrants that all of its answers to this Investor Questionnaire are true as of the date of its execution of the Subscription Agreement pursuant to which it purchased Notes of the Company.

Frank Paulis
_____                    _____
Name of Purchaser [please print]                    Name of Co-Purchaser [please print]


_____                    _____
Signature of Purchaser (Entities please             Signature of Co-Purchaser
provide signature of Purchaser's duly
authorized signatory)


_____
Name of Signatory (Entities only)


_____
Title of Signatory (Entities only)

**SCHEDULE A**

## SUBSCRIPTION AGREEMENT
## OF
## KEY COMMERCIAL FINANCE, LLC

### CAPITALIZATION TABLE

| Name | Number of Units | % Management Interest | % Economic Interest |
|------|-----------------|-----------------------|---------------------|
| Frank Pavlis | 0 | 0% | 0% |

---

The addresses of the above-listed Unit holder(s) are:

1500 Hamilton St

Allentown, PA 18102

**SCHEDULE B**

## SUBSCRIPTION AGREEMENT
## OF
## KEY COMMERCIAL FINANCE, LLC

### DEFINITIONS

The following terms shall have the following meanings when used in this Agreement:

"*Act*" means the applicable law of the State of Delaware governing corporations organized in Delaware, the Delaware Limited Liability Company Act, *et seq*, and any successor statute, as it may be amended from time to time.

"*Affiliate*" shall mean any other Person which directly or indirectly Controls or is Controlled by or is under common Control with such Person, or any Person that is an employee of or an officer of or partner in or serves in a similar capacity or relationship with respect to a Person.

"*Articles of Organization*" shall mean the Articles of Organization of the Company as filed with the Delaware Secretary of the State and as further amended from time to time.

"*Bona Fide Offer*" shall mean a legally binding written agreement with a non-Member to purchase all or a portion of the Units owned by a Member, which written agreement must be contingent upon the options to purchase or participate in a sale as provided herein.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

"*Control*" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract or otherwise.

"*Entity*" shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, company, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

"*Family*", as applied to any individual, shall mean (a) the children of such individual (by birth or adoption), (b) the parents, spouse and siblings of such individual, (c) the children of the siblings of such individual, (d) any trust solely for the benefit of, or any partnership, limited liability company or other entity owned solely by, any one or more of such aforementioned individuals (so long as such individuals have the exclusive right to Control such trust or other entity) and (e) the estate of such individual.

"*Member*" shall mean each of the parties who executes a counterpart of this Agreement as a Member, and each of the parties who may hereafter become a Member pursuant to the terms and conditions of this Agreement.

"*Percentage Interest*" of Units shall mean the number of Units of a given class held at a particular time by such Member, divided by the total number of all Units of the same class then held by all Members, expressed as a percentage.

"*Person*" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person, where the context so permits.

"*Units*" shall mean equity interests in the Company that shall have (a) economic value and rights in or to the profits, gains, losses, distributions and other economic interests of the Company and (b) voting membership rights in the Company.

"*Transferring Member*" is the Member desiring to sell or, in the case of an involuntary Transfer, is the Member whose Units are subject to an involuntary Transfer and also the potential transferee if that person has provided information to the Company and other Members of his/her name, address, and potential claim to the Units.

New Member

# EXHIBIT I

## JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (this "Agreement") is entered into by and between **KEY COMMERCIAL FINANCE, LLC**, a Delaware limited liability company ("Parent") and **KEY COMMERCIAL FINANCE PROPERTIES LLC**, a Delaware limited liability company ("Subsidiary") effective as of the 9th day of December, 2016 (the "Effective Date"). PARENT and SUBSIDIARY are sometimes referred to herein individually as a "Party" and together, as the "Parties."

### Background Statement

SUBSIDIARY is a wholly owned subsidiary of PARENT engaged in the business of acting as a commercial real estate holding and development company.

PARENT is engaged in the business of investment in technology development.

SUBSIDIARY and PARENT wish to enter into an agreement to provide for the sharing of resources for mutual gain in a joint venture as described herein. The Parties are entering into this Agreement to set forth their rights and obligations with respect to the joint venture and to otherwise provide for the terms of their joint venture.

### Agreement

As consideration for PARENT's promise to make contributions pursuant to Section 1 below, SUBSIDIARY hereby covenants and agrees to distribute its excess revenue to PARENT pursuant to Section 2 below. The receipt and sufficiency of such consideration is hereby acknowledged, and the parties agree as follows:

1.      Contributions. PARENT may, at its sole discretion, contribute funds to SUBSIDIARY for the purpose of ensuring that SUBSIDIARY is able to meet its operating expense obligations; provided, however, that under no circumstances shall such fund transfers be construed as a loan from PARENT to SUBSIDIARY. The determination of whether SUBSIDIARY requires a contribution from PARENT shall be made in good faith and by mutual agreement of the Parties.

2.      Distributions. As consideration for PARENT's contributions, SUBSIDIARY shall agree to distribute any excess revenue to PARENT at any time upon notice or demand. "Excess revenue" shall mean the amount of funds obtained by SUBSIDIARY in excess of those required to meet SUBSIDIARY's operating expense obligations, which amount shall be determined in good faith and by mutual agreement of both Parties. SUBSIDIARY shall be obligated to provide internal accounting information to PARENT immediately upon request.

3.      Liabilities of SUBSIDIARY. PARENT shall not assume any obligations, debts, or liabilities of SUBSIDIARY, contingent or absolute. All liabilities of SUBSIDIARY shall

1

remain the sole responsibility and liability of SUBSIDIARY; and SUBSIDIARY shall indemnify and hold harmless PARENT from and against all such liabilities.

4.     Covenant to Act in Good Faith. The Parties agree to act in good faith while exercising their rights and performing their obligations in connection with carrying out the joint venture as described herein.

5.     Confidentiality. "Confidential Information" means all nonpublic information concerning or arising from PARENT's business or belonging to or created by PARENT. Confidential Information does not include any information which at the time of disclosure is generally available to the public other than as a result of improper disclosure, or that is independently developed and thereafter made public by any entity not a Party to this Agreement. SUBSIDIARY shall not use any Confidential Information for any purpose except as strictly necessary to effectuate in good-faith the terms of this Agreement or of the Operating Agreement, in furtherance of the joint venture. SUBSIDIARY shall take all practical measures to protect the secrecy and avoid the disclosure and unauthorized use of the Confidential Information. It is agreed that the foregoing obligations of SUBSIDIARY under this Section shall apply to PARENT in every respect with respect to Confidential Information of SUBSIDIARY, such that PARENT has an identical and reciprocal obligation to SUBSIDIARY.

6.     Further Assurances. PARENT and SUBSIDIARY shall hereafter execute and deliver such further instruments and do such further acts and things consistent with the provisions of this Agreement as may be required or useful to carry out the full intent and purpose of this Agreement or as may be necessary to comply with any laws, rules or regulations, including executing such applicable and necessary amendments to the operating agreement of the SUBSIDIARY. No such amendment shall be effective unless it incorporates this Agreement, as amended, by specific reference. Additionally, no addition or removal of any officer or member of either Party shall be effective unless the resolution evidencing such action incorporates this Agreement, as amended, by specific reference.

7.     Remedies. The Parties agree that upon breach or threat of imminent breach of any obligation under this Agreement by SUBSIDIARY, PARENT shall be entitled to a temporary restraining order, preliminary injunction, permanent injunction, or other injunctive relief. This section shall not be construed as an election of any remedy, or as a waiver of any right available to the Parties under this agreement or the Delaware law governing this agreement, including the right to seek damages from the Parties. The failure or refusal of a Party to enter, or seek the entry of, judgment for remedy in either law or equity, shall not be construed as a waiver of the right to do so, and the Parties agree not to oppose such entry by the other Party in dispute over the terms of this agreement.

8.     Assignment. SUBSIDIARY shall not be allowed to assign or transfer any of its rights or obligations hereunder without the prior written consent of PARENT. Any such attempted assignment without written consent will be void.

2

9.      Attorney's Fees. In the event of any controversy, claim, or dispute between the parties affecting or relating to the performance of this Agreement, the prevailing Party shall be entitled to recover all of its attorney's fees and costs from the other Party.

10.     Entire Agreement. This Agreement contains all of the terms agreed upon by the parties and supersedes all prior agreements, arrangements, and communications between the parties on this subject, whether oral or written.

11.     Severability. Should any provision of this Agreement be deemed unlawful or otherwise non-enforceable by a tribunal of competent jurisdiction, the other provisions of this Agreement shall remain unaffected thereby.

12.     Governing Law and Forum. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its rules on conflicts of laws. The parties hereto agree that any suit or proceeding arising out of this Agreement shall be brought only in the courts of the State of Delaware. Each Party hereto consents to the personal jurisdiction of such courts.

13.     Counterparts. This Agreement may be executed in any number of counterparts and may be executed and delivered by facsimile or other electronic transmission. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

[Remainder of page intentionally left blank]

3

IN WITNESS WHEREOF, the parties have executed this Agreement pursuant to authority duly given, as of the Effective Date.

KEY COMMERCIAL FINANCE, LLC

By: _____
G. Justin Billingsley
Title: Authorized Signor

KEY COMMERCIAL FINANCE PROPERTIES LLC

By its Sole Member, KEY COMMERCIAL FINANCE, LLC

By: _____
G. Justin Billingsley
Title: Authorized Signor

4

## EXHIBIT A

### Description of Relationship Between PARENT and SUBSIDIARY

Key Commercial Finance, LLC is the sole member of Key Commercial Finance Properties LLC. This Agreement further provides for an economic relationship by which the SUBSIDIARY is to transfer all or virtually all of its revenues to the PARENT without demand, and that the PARENT is the beneficial owner of the assets and business functions of SUBSIDIARY.

KEY COMMERCIAL FINANCE, LLC

By: _____
G. Justin Billingsley
Title: Authorized Signor

KEY COMMERCIAL FINANCE PROPERTIES LLC

By its Sole Member, KEY COMMERCIAL FINANCE LLC

By: _____
G. Justin Billingsley
Title: Authorized Signor

5

## JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (this "Agreement") is entered into by and between **KEY COMMERCIAL FINANCE, LLC**, a Delaware limited liability company ("Parent") and **MOBILE AGENCY, LLC**, a Delaware limited liability company ("Subsidiary") effective as of the 10th day of July, 2015 (the "Effective Date"). PARENT and SUBSIDIARY are sometimes referred to herein individually as a "Party" and together, as the "Parties."

### Background Statement

SUBSIDIARY is a wholly owned subsidiary of PARENT engaged in the business of technology development.

PARENT is engaged in the business of investment in technology development.

SUBSIDIARY and PARENT wish to enter into an agreement to provide for the sharing of resources for mutual gain in a joint venture as described herein. The Parties are entering into this Agreement to set forth their rights and obligations with respect to the joint venture and to otherwise provide for the terms of their joint venture.

### Agreement

As consideration for PARENT's promise to make contributions pursuant to Section 1 below, SUBSIDIARY hereby covenants and agrees to distribute its excess revenue to PARENT pursuant to Section 2 below. The receipt and sufficiency of such consideration is hereby acknowledged, and the parties agree as follows:

1.      Contributions. PARENT may, at its sole discretion, contribute funds to SUBSIDIARY for the purpose of ensuring that SUBSIDIARY is able to meet its operating expense obligations; provided, however, that under no circumstances shall such fund transfers be construed as a loan from PARENT to SUBSIDIARY. The determination of whether SUBSIDIARY requires a contribution from PARENT shall be made in good faith and by mutual agreement of the Parties.

2.      Distributions. As consideration for PARENT's contributions, SUBSIDIARY shall agree to distribute any excess revenue to PARENT at any time upon notice or demand. "Excess revenue" shall mean the amount of funds obtained by SUBSIDIARY in excess of those required to meet SUBSIDIARY's operating expense obligations, which amount shall be determined in good faith and by mutual agreement of both Parties. SUBSIDIARY shall be obligated to provide internal accounting information to PARENT immediately upon request.

3.      Liabilities of SUBSIDIARY. PARENT shall not assume any obligations, debts, or liabilities of SUBSIDIARY, contingent or absolute. All liabilities of SUBSIDIARY shall

1

remain the sole responsibility and liability of SUBSIDIARY; and SUBSIDIARY shall indemnify and hold harmless PARENT from and against all such liabilities.

4.    Covenant to Act in Good Faith. The Parties agree to act in good faith while exercising their rights and performing their obligations in connection with carrying out the joint venture as described herein.

5.    Confidentiality. "Confidential Information" means all nonpublic information concerning or arising from PARENT's business or belonging to or created by PARENT. Confidential Information does not include any information which at the time of disclosure is generally available to the public other than as a result of improper disclosure, or that is independently developed and thereafter made public by any entity not a Party to this Agreement. SUBSIDIARY shall not use any Confidential Information for any purpose except as strictly necessary to effectuate in good-faith the terms of this Agreement or of the Operating Agreement, in furtherance of the joint venture. SUBSIDIARY shall take all practical measures to protect the secrecy and avoid the disclosure and unauthorized use of the Confidential Information. It is agreed that the foregoing obligations of SUBSIDIARY under this Section shall apply to PARENT in every respect with respect to Confidential Information of SUBSIDIARY, such that PARENT has an identical and reciprocal obligation to SUBSIDIARY.

6.    Further Assurances. PARENT and SUBSIDIARY shall hereafter execute and deliver such further instruments and do such further acts and things consistent with the provisions of this Agreement as may be required or useful to carry out the full intent and purpose of this Agreement or as may be necessary to comply with any laws, rules or regulations, including executing such applicable and necessary amendments to the operating agreement of the SUBSIDIARY. No such amendment shall be effective unless it incorporates this Agreement, as amended, by specific reference. Additionally, no addition or removal of any officer or member of either Party shall be effective unless the resolution evidencing such action incorporates this Agreement, as amended, by specific reference.

7.    Remedies. The Parties agree that upon breach or threat of imminent breach of any obligation under this Agreement by SUBSIDIARY, PARENT shall be entitled to a temporary restraining order, preliminary injunction, permanent injunction, or other injunctive relief. This section shall not be construed as an election of any remedy, or as a waiver of any right available to the Parties under this agreement or the Delaware law governing this agreement, including the right to seek damages from the Parties. The failure or refusal of a Party to enter, or seek the entry of, judgment for remedy in either law or equity, shall not be construed as a waiver of the right to do so, and the Parties agree not to oppose such entry by the other Party in dispute over the terms of this agreement.

8.    Assignment. SUBSIDIARY shall not be allowed to assign or transfer any of its rights or obligations hereunder without the prior written consent of PARENT. Any such attempted assignment without written consent will be void.

2

9.     Attorney's Fees. In the event of any controversy, claim, or dispute between the parties affecting or relating to the performance of this Agreement, the prevailing Party shall be entitled to recover all of its attorney's fees and costs from the other Party.

10.    Entire Agreement. This Agreement contains all of the terms agreed upon by the parties and supersedes all prior agreements, arrangements, and communications between the parties on this subject, whether oral or written.

11.    Severability. Should any provision of this Agreement be deemed unlawful or otherwise non-enforceable by a tribunal of competent jurisdiction, the other provisions of this Agreement shall remain unaffected thereby.

12.    Governing Law and Forum. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its rules on conflicts of laws. The parties hereto agree that any suit or proceeding arising out of this Agreement shall be brought only in the courts of the State of Delaware. Each Party hereto consents to the personal jurisdiction of such courts.

13.    Counterparts. This Agreement may be executed in any number of counterparts and may be executed and delivered by facsimile or other electronic transmission. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

[Remainder of page intentionally left blank]

3

IN WITNESS WHEREOF, the parties have executed this Agreement pursuant to authority duly given, as of the Effective Date.

KEY COMMERCIAL FINANCE, LLC

By: _____

G. Justin Billingsley
Title: Authorized Signor

MOBILE AGENCY, LLC

By its Sole Member, KEY COMMERCIAL FINANCE, LLC

By: _____

G. Justin Billingsley
Title: Authorized Signor

4

## EXHIBIT A

### Description of Relationship Between PARENT and SUBSIDIARY

Key Commercial Finance, LLC is the sole member of Mobile Agency, LLC. This Agreement further provides for an economic relationship by which the SUBSIDIARY is to transfer all or virtually all of its revenues to the PARENT without demand, and that the PARENT is the beneficial owner of the assets and business functions of SUBSIDIARY.

KEY COMMERCIAL FINANCE, LLC

By: _____
G. Justin Billingsley
Title: Authorized Signor

MOBILE AGENCY, LLC

By: _____
G. Justin Billingsley
Title: Authorized Signor

5

# JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (this "Agreement") is entered into by and between **KEY COMMERCIAL FINANCE, LLC**, a Delaware limited liability company ("PARENT") and **EQUITY PROS, LLC**, a Connecticut limited liability company ("SUBSIDIARY") effective as of the 28th day of August, 2015 (the "Effective Date"). PARENT and SUBSIDIARY are sometimes referred to herein individually as a "Party" and together, as the "Parties."

## Background Statement

SUBSIDIARY is a wholly owned subsidiary of PARENT engaged in building and supporting an online marketplace for real estate for consumers.

PARENT is engaged in investment in technology development.

SUBSIDIARY and PARENT wish to enter into an agreement to provide for the sharing of resources for mutual gain in a joint venture as described herein. The Parties are entering into this Agreement to set forth the rights and obligations of SUBSIDIARY and PARENT with respect to the joint venture and to otherwise provide for the terms of their joint venture.

## Agreement

As consideration for PARENT's promise to make contributions pursuant to Section 1 below, SUBSIDIARY hereby covenants and agrees to distribute its excess revenue to PARENT pursuant to Section 2 below. The receipt and sufficiency of such consideration is hereby acknowledged, and the parties agree as follows:

1.    Contributions. PARENT may, at its sole discretion, contribute funds to SUBSIDIARY for the purpose of ensuring that SUBSIDIARY is able to meet its operating expense obligations; provided, however, that under no circumstances shall such fund transfers be construed as a loan from PARENT to SUBSIDIARY. The determination of whether SUBSIDIARY requires a contribution from PARENT shall be made in good faith and by mutual agreement of the Parties.

2.    Distributions. As consideration for PARENT's contributions, SUBSIDIARY shall agree to distribute any excess revenue to PARENT at any time upon notice or demand. "Excess revenue" shall mean the amount of funds obtained by SUBSIDIARY in excess of those required to meet SUBSIDIARY's operating expense obligations, which amount shall be determined in good faith and by mutual agreement of both Parties. SUBSIDIARY shall be obligated to provide internal accounting information to PARENT immediately upon request.

3.    Liabilities of SUBSIDIARY. PARENT shall not assume any obligations, debts, or liabilities of SUBSIDIARY, contingent or absolute. All liabilities of SUBSIDIARY shall

1

remain the sole responsibility and liability of SUBSIDIARY; and SUBSIDIARY shall indemnify and hold harmless PARENT from and against all such liabilities.

4.      Covenant to Act in Good Faith. The Parties agree to act in good faith while exercising their rights and performing their obligations in connection with carrying out the joint venture as described herein.

5.      Confidentiality. "Confidential Information" means all nonpublic information concerning or arising from PARENT's business or belonging to or created by PARENT. Confidential Information does not include any information which at the time of disclosure is generally available to the public other than as a result of improper disclosure, or that is independently developed and thereafter made public by any entity not a Party to this Agreement. SUBSIDIARY shall not use any Confidential Information for any purpose except as strictly necessary to effectuate in good-faith the terms of this Agreement or of the Operating Agreement, in furtherance of the joint venture. SUBSIDIARY shall take all practical measures to protect the secrecy and avoid the disclosure and unauthorized use of the Confidential Information. It is agreed that the foregoing obligations of SUBSIDIARY under this Section shall apply to PARENT in every respect with respect to Confidential Information of SUBSIDIARY, such that PARENT has an identical and reciprocal obligation to SUBSIDIARY.

6.      Further Assurances. PARENT and SUBSIDIARY shall hereafter execute and deliver such further instruments and do such further acts and things consistent with the provisions of this Agreement as may be required or useful to carry out the full intent and purpose of this Agreement or as may be necessary to comply with any laws, rules or regulations, including executing such applicable and necessary amendments to the operating agreement of the SUBSIDIARY. No such amendment shall be effective unless it incorporates this Agreement, as amended, by specific reference. Additionally, no addition or removal of any officer or member of either Party shall be effective unless the resolution evidencing such action incorporates this Agreement, as amended, by specific reference.

7.      Remedies. The Parties agree that upon breach or threat of imminent breach of any obligation under this Agreement by SUBSIDIARY, PARENT shall be entitled to a temporary restraining order, preliminary injunction, permanent injunction, or other injunctive relief. This section shall not be construed as an election of any remedy, or as a waiver of any right available to the Parties under this agreement or the Delaware law governing this agreement, including the right to seek damages from the Parties. The failure or refusal of a Party to enter, or seek the entry of, judgment for remedy in either law or equity, shall not be construed as a waiver of the right to do so, and the Parties agree not to oppose such entry by the other Party in dispute over the terms of this agreement.

8.      Assignment. SUBSIDIARY shall not be allowed to assign or transfer any of its rights or obligations hereunder without the prior written consent of PARENT. Any such attempted assignment without written consent will be void.

2

9.      Attorney's Fees. In the event of any controversy, claim, or dispute between the parties affecting or relating to the performance of this Agreement, the prevailing Party shall be entitled to recover all of its attorney's fees and costs from the other Party.

10.     Entire Agreement. This Agreement contains all of the terms agreed upon by the parties and supersedes all prior agreements, arrangements, and communications between the parties on this subject, whether oral or written.

11.     Severability. Should any provision of this Agreement be deemed unlawful or otherwise non-enforceable by a tribunal of competent jurisdiction, the other provisions of this Agreement shall remain unaffected thereby.

12.     Governing Law and Forum. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its rules on conflicts of laws. The parties hereto agree that any suit or proceeding arising out of this Agreement shall be brought only in the courts of the State of Delaware. Each Party hereto consents to the personal jurisdiction of such courts.

13.     Counterparts. This Agreement may be executed in any number of counterparts and may be executed and delivered by facsimile or other electronic transmission. Each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

[Remainder of page intentionally left blank]

3

IN WITNESS WHEREOF, the parties have executed this Agreement pursuant to authority duly given, as of the Effective Date.

KEY COMMERCIAL FINANCE, LLC

By: _____

G. Justin Billingsley
Title: Authorized Signor

EQUITY PROS, LLC

By: _____

G. Justin Billingsley
Title: Authorized Signor

4

# EXHIBIT A

## Description of Relationship Between PARENT and SUBSIDIARY

Key Commercial Finance, LLC is not a Member, partner, shareholder, unitholder, or otherwise the owner of Equity Pros, LLC. This Agreement provides for an economic relationship by which the SUBSIDIARY is to transfer all or virtually all of its revenues to the PARENT without demand, and that the PARENT is the beneficial owner of the assets and business functions of SUBSIDIARY.

KEY COMMERCIAL FINANCE, LLC

By: _____
G. Justin Billingsley
Title: Authorized Signor

EQUITY PROS, LLC

By: _____
G. Justin Billingsley
Title: Authorized Signor

5

# EXHIBIT J

██████████████████████

## FUNDING AGREEMENT

THIS FUNDING AGREEMENT (this "Agreement") is made as of September 20, 2016 by and among Key Commercial Finance, LLC ("KCF"), Allwest Property Investments, LLC ("Allwest"), and Gary W. Miller ("Miller"), the controlling member of Allwest.

## RECITALS

A.    Prior to the date hereof, in connection with multiple different single-family residential real property development projects ("Projects") undertaken by Allwest, KCF has provided funding to Allwest under loan arrangements that have been subject either to verbal agreement terms or only loose written documentation.

B.    The parties hereto recognize the need for accounting, tax and other business purposes to better document both past and current loan arrangements as agreed upon by such parties, and to provide for a modified funding structure under which KCF may fund future Projects by Allwest, Miller or any other entity controlled by Miller.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Future Project Funding.

(a)    Subject to Allwest's compliance with its obligations under Sections 5 through 7 hereof, during the Term (as defined below) KCF shall use commercially reasonable efforts through its network of investors to raise and make available to Allwest, Miller or any other entity controlled by Miller, for use in future Projects, up to ██████████ of new investment funding, with the first ██████████ intended to be raised by KCF and made available within 90 days after the date of this Agreement, the next ██████████ intended to be raised by KCF and made available within six months after the date of this Agreement, and the final ██████████ intended to be raised by KCF and made available by the first anniversary of the date of this Agreement.

(b)    In order to better satisfy KCF's accounting and tax interests and its fiduciary obligations to its investors, it is expected that such further funding shall be provided as capital contributions to Project-specific limited liability companies in which KCF would receive a proportionate ownership interest, rather than through loan funding, with KCF directing the deployment of such capital contributions, including by way of direct payment to real property sellers, title companies, contractors or other applicable third parties on behalf of such limited liability companies.

2.    Right of First Offer for Project Funding Opportunities.

(a)    During the Term, if Allwest, Miller or any other entity controlled by Miller intends to seek third-party, private investment in a Project, Allwest or Miller (as applicable) shall, before soliciting or accepting investment from any other third party, provide KCF with a written (including email) request (a "Funding Request")for such investment, which request shall include (i) reasonable details of the Project, including at a minimum Project location and description, budget, projected Project timing from property acquisition through Project completion and expected sale, projected sale price and profit, and required timing for funding by KCF, and (ii) terms of the requested investment from KCF, including principal/capital contribution, preferred return/interest (if any), and profit sharing percentage.

(b)     KCF shall have 10 days from the date of its receipt of a Funding Request delivered in accordance with Section 2(a) to either agree to provide funding under the terms of such Funding Request or to reject such Funding Request, either of which response shall be provided in writing (including email to Allwest or Miller (as applicable). If KCF fails to deliver either response within such 10-day period, it shall be deemed to have rejected such Funding Request. If KCF accepts such Funding Request within such 10-day period, a binding agreement between KCF and Allwest with respect thereto shall be deemed to have been reached between such parties, and such parties shall thereafter proceed to promptly document such agreement in a further written instrument. If KCF gives Allwest notice of rejection of such Funding Request or is deemed to have rejected such Funding Request by failing to give any response notice, then Allwest may thereafter proceed to seek funding for such Project from any other third party.

3.     Exclusivity.  During the Term, subject to (i) Allwest's compliance with its obligations under Sections 5 through 7 hereof, (ii) Allwest or Miller (either directly or through any other entity controlled by Miller) having sufficient Project flow to satisfy KCF's then current deployable investment funds, (iii) proposed Project characteristics and investment terms being reasonably acceptable to KCF based on its own investment parameters, and (iv) there being no then existing or threatened breach by Allwest, Miller or any other entity controlled by Miller of any Project-related agreement with KCF, KCF shall direct all of its available investment funds for use in residential, single-family real property development to Allwest, Miller or another entity controlled by Miller. For purposes of the foregoing clause (ii) the term "sufficient Project flow" shall mean that Allwest or Miller (either directly or through any other entity controlled by Miller) are making available to KCF sufficient Project investment opportunities to permit KCF to avoid holding available but undeployed (or uncommitted) investment funds for a period of more than 10 days at any given time.

4.     Agreement Regarding Past Project Investments and Amounts Due to KCF.

(a)     The parties hereto acknowledge and agree that, in connection with multiple Projects undertaken by Allwest prior to the date hereof, Schedule A attached hereto sets forth for each Project (i) the aggregate principal amount loaned or advanced by KCF to Allwest, (ii) the interest and/or profit-sharing percentage due to KCF based on such principal investment amount, (iii) the sale price and profit for such Project, if it has been sold (a "Completed Project"), (iv) the estimated sale price for any such Project that has not yet been sold (any of which, an "Unsold Project"), (v) the amount of KCF's principal investment in such Project repaid to date by Allwest, and (vi) the outstanding amount that remains due and payable by Allwest to KCF for any such Completed Project. All such outstanding amounts payable referred to in the foregoing clause (vi) are hereinafter referred to as the "Debt". Allwest and Miller represent and warrant that Schedule A is accurate and complete in all respects and covers all Projects in which KCF's investment funding has been deployed prior to the date of this Agreement, and that funds invested by KCF have not been deployed or otherwise used in any other project, business or other venture. Allwest does not dispute its liability for the repayment of the Debt or for any amount that accrues and becomes due to KCF in respect of any Unsold Project that becomes a Completed Project (any of which a "Future Payable"), and, except for Allwest's and Miller's rights under this Agreement, Allwest and Miller waive any right, claim, counterclaim or other defense as to Allwest's liability to KCF for repayment of the Debt and for payment of any Future Payable.

(b)     KCF affirms and agrees that, except for the Debt and any Future Payable, Allwest has paid to KCF all amounts due and owing to KCF based on prior loans or advances made by KCF to or for the account of Allwest, and KCF hereby waives any claim as to any amount, other than the Debt and any Future Payable, owed or alleged to be owed by Allwest to KCF on or prior to the date hereof.

5.     Initial Repayment of Debt.  Within Seven business days after the date of this Agreement, Allwest shall repay ▪▪▪▪▪▪ of the Debt to KCF by check or wire transfer of immediately available funds to

2

a bank account designated by KCF. Allwest acknowledges, represents and warrants that it has the liquidity to pay such funds within such time period

    6.    Secondary Repayment of Residual Debt and Future Payables.

    (a)    The parties acknowledge and agree that ▮▮▮▮ of the Debt has been invested by Allwest in an Unsold Project located at ▮▮▮▮, California (the "▮▮▮▮"), which amount represents ▮▮▮▮ of the aggregate invested capital in the ▮▮▮▮ ("KCF's ▮▮▮▮ Share"). Allwest shall complete the sale of the ▮▮▮▮ within 85 calendar days after the date of this Agreement for ▮▮▮▮ cash proceeds. Upon the date which is the earlier of (i) three business days after the date of such sale, or (ii) 90 calendar days after the date of this Agreement, Allwest shall pay KCF, by check or wire transfer of immediately available funds to a bank account designated by KCF, an amount equal to such ▮▮▮▮ Debt amount plus (A) ▮▮ of KCF's ▮▮▮▮ Share of the profits from such sale (excluding from such profit calculation Allwest's employment compensation and other internal overhead costs related to the ▮▮▮▮), and (B) ▮▮ of KCF's ▮▮▮▮ Share of the profits from such sale (after including in such profit calculation Allwest's employment compensation and other overhead costs related to the ▮▮▮▮). Allwest shall provide with such payment reasonable details of such profit calculations. To the extent Allwest fails to pay KCF the Debt and other Future Payable amounts referred to in this Section 6(a) within the applicable time period prescribed above, such Debt amount and any such Future Payable amount (to the extent determined or determinable) shall bear interest at a rate equal to the lesser of (x) ▮▮▮▮ per annum, or (y) the highest rate of interest permitted by applicable law, in either such case compounding annually until paid.

    (b)    Allwest represents and warrants that an aggregate of ▮▮▮▮ of the Debt has been invested by Allwest in ▮▮ Unsold Projects comprised of ▮▮ single family residential homes located at ▮▮▮▮▮▮▮▮ which amount represents ▮▮▮▮ of the aggregate invested capital in the ▮▮▮▮ with the breakdown of such aggregate Debt amount among the ▮▮▮▮ being as described under Schedule B attached hereto. In satisfaction and repayment of the above-noted Debt invested by Allwest in the ▮▮▮▮ within 60 calendar days after the date of this Agreement, Allwest shall sell, convey and transfer full legal and marketable title to the ▮▮▮▮ to KCF or an affiliate thereof (as applicable, the "Purchaser"), free and clear of all financial liens and encumbrances, pursuant to one or more customary real property purchase and sale contracts to be entered into between Allwest and the Purchaser. Conveyance of the ▮▮▮▮ shall be by special warranty deed (or equivalent for the State of ▮▮▮▮). In addition to all other customary terms and conditions for real estate purchase contracts, the purchase and sale of the ▮▮▮▮ shall be subject to the Purchaser's satisfaction with customary title review, third party valuation appraisal and other due diligence review of the ▮▮▮▮. If, based on such appraisal or other due diligence results, KCF determines not to have the Purchaser purchase any of the ▮▮▮▮ pursuant to this Section 6(b), such ▮▮▮▮ (an "Excluded Project") shall be excluded from the sale provisions of this Section 6(b), in which event the portion of the Debt allocated to such Excluded Project, as specified on Schedule B, shall be payable by Allwest to KCF within 60 days after KCF first notifies Allwest of such determination. To the extent such Debt amount is not paid within such 60 days, such Debt amount shall thereafter bear interest at a rate equal to the lesser of (i) ▮▮▮▮ per annum, or (ii) the highest rate of interest permitted by applicable law, in either such case compounding annually until paid.

    (c)    To the extent any ▮▮▮▮ other than any Excluded Project, is leased by Allwest to a tenant as of the closing date of the sale, conveyance and transfer thereof, Allwest shall

3

assign and transfer all of its rights as landlord under such lease to the Purchaser, and the Purchaser shall accept such assignment and assume Allwest's obligations under such lease; provided, however, that the Purchaser shall not assume, and Allwest shall remain liable for, any liability, accrued or contingent, known or unknown, based on arising from Allwest's breach or other violation (if any) of such lease prior to the date of such assignment.  In satisfaction of KFC's expected investment return on its above-noted investment in the ▌, at the time of closing of the sale, conveyance and transfer of the ▌ to the Purchaser Allwest shall pay to KCF an amount equal to (i) all rent collected by Allwest from lessees of the ▌ (including any Excluded Project) through the date of such closing, net of taxes, insurance and other operating costs (but excluding construction and development costs) related to the leasing of the ▌, less (ii) ▌, as KCF's agreed upon share of such aggregate rental income.

(d)     Allwest represents and warrants to KCF that, except for the Debt owed to KCF in respect of the ▌ and trade accounts payable in the ordinary course of business, Allwest is not indebted to any person or entity in connection with the ▌, and no part of the ▌ is encumbered by any mortgage, deed of trust, lien, charge or other security interest. Allwest further covenants and agrees that (i) Allwest shall not borrow any funds or undertake any other financial obligation, accrued or contingent, for which payment would be required to be made out of proceeds of the sale of any part of the ▌, and (ii) until such time as the ▌ is sold in accordance with Section 6(b) above, Allwest shall not cause or permit any part of the ▌ to be encumbered by any mortgage, deed of trust, lien, charge or other security interest, other than statutory liens for taxes or other assessments that are not yet due and payable.

7.     KCF Indemnification for Secondary Investor Claims.  The parties hereto acknowledge and agree that (i) KCF investor ▌, despite documenting its investment as an investment in KCF (and not Allwest), advanced an aggregate of ▌ of such invested funds directly to Allwest at the request of KCF and on KCF's behalf in order to expedite KCF's further investment of such funds in Allwest, (ii) ▌ is not an investor in Allwest with respect to such invested funds (including any interest or other return due thereon), and Allwest has no direct liability to ▌ with respect to such invested funds, and (iii) KCF is solely liable to ▌ for repayment of such invested funds in accordance with the provisions of the written investment agreement entered into by KCF and ▌.  In such regard, subject to Allwest's compliance with its obligations under Sections 5 and 6 hereof, KCF shall defend, indemnify and hold harmless Allwest from and against any claim, demand, lawsuit or other action by ▌ (or any estate, legal representative, successor or assign thereof) for repayment by Allwest for any of such invested funds (including any interest or other return due thereon).  Any current promissory notes that may have been executed by KCF and delivered to its investors will also be covered under this Section 7, and Allwest will not be held liable for any actions by any such investors with respect to such promissory notes.

8.     Non-Circumvention; Non-Solicitation of KCF Investors.

(a)     During the Term, and for a period of ▌ following the expiration or termination of the Term or this Agreement for any reason (the "Restricted Period"), without KCF's prior written consent (which consent may be given or withheld in KCF's sole discretion), each of Allwest and Miller covenants and agrees that such party shall not, nor shall such party cause or assist any other person or entity to, directly or indirectly, (i) solicit, request or encourage any person or entity that such party is aware (or becomes aware) is a member of KCF's investor network to invest directly with Allwest, Miller or any affiliated or related entity, business or project, (ii) accept any investment from any member of KCF's investor network, or (iii) otherwise interfere with the relationship between KCF and any such member of KCF's investor network.  For purposes of this Agreement a "member of KCF's investor network" means any person or entity (x) that has invested funds with or through KCF within the past three years, whether or not such funds have been deployed by KCF for investment in projects of Allwest, Miller or any affiliated or related party, or (y) to which KCF has solicited or otherwise

4

proposed a direct or indirect investment (including through KCF) in any project of Allwest, Miller or any affiliated or related party. Further, a "member of KCF's investor network" specifically includes (but is not limited to) ▮▮▮▮▮▮ (including his estate and legal representatives), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ or any entity or trust controlled by any such person.

(b)    Intentionally Omitted

(c)    If Allwest or Miller breaches any provision of Section 8 (a) hereof, then the Restricted Period shall be tolled or extended for a period of time equal to the period of time during which such breach has occurred and/or is continuing.

9.    Information Access and Audit Rights. Within 30 days after the date hereof, Allwest shall establish a Drop Box (or equivalent electronic documents) account accessible at all times by KCF and its designated representatives (the "Information Account") and populate it with any and all documents (including title company statements, invoices and purchase orders) and financial details related to the ▮▮▮▮▮▮▮▮▮▮, and other Completed Projects and Unsold Projects that have be transacted with KCF investment funds to date, as outlined in Schedule A, and shall further populate the Information Account with similar documents and financial details for any further Projects in which KCF invests pursuant to this Agreement after the date hereof. Documents and financial details for each Project shall be retained in the Information Account for at least one year after they are first placed in the Information Account. Allwest shall cooperate reasonably with KCF and its designated representatives in any audit or other review of such documents and financial details, including promptly supplying to KCF any related information in Allwest's possession or otherwise reasonably available to Allwest that has not been provided through the Information Account.

10.    Term of Agreement. The term of this Agreement (the "Term") shall commence on the date first written above and shall expire ▮▮▮▮▮▮▮▮▮▮▮ of such date, unless extended by written agreement of the parties hereto.

11.    Entire Agreement; Modification. This Agreement (including Schedule A attached hereto) constitutes the entire among the parties hereto with respect to the subject matter hereof, and supersedes and replaces all prior and contemporaneous agreements, understandings, commitments, communications and representations made among the parties, whether written or oral, with respect to the subject matter hereof. This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by each of the parties hereto.

12.    Severability. If any provision of this Agreement, or the application of any such provision to any person, entity or circumstance, is held to be unenforceable or invalid by any court of competent jurisdiction, arbitrator or other governmental authority or under any applicable law, the parties hereto shall negotiate an equitable adjustment to the provisions of this Agreement with the view to effecting, to the greatest extent possible, the original purpose and intent of this Agreement. In any event, the invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

13.    Construction. The section headings contained in this Agreement are for convenience of reference only and shall in no way define, limit, extend or describe the scope or intent of any provisions of this Agreement. Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. As used in this Agreement, unless otherwise provided to the contrary, any reference to a "Section" shall be deemed to refer to a section of this Agreement. The words "hereof", "herein", and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specifically provided for herein, the

5

language preceding such term, but rather shall be deemed to be followed by the words, "without limitation".

14.    Notices.  All notices, requests, demands, claims and other communications permitted or required to be given hereunder must be in writing and shall be deemed duly given and received (i) if personally delivered, when so delivered, (ii) if mailed, three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below, (iii) if sent by electronic facsimile, once transmitted to the fax number specified below and once the appropriate facsimile confirmation is received, or (iv) if sent through an overnight or same-day commercial delivery service in circumstances to which such service guarantees next day delivery, the first business day following being so sent, in each case to the address of the applicable party set forth below such party's signature on this Agreement.  Any Party may give any notice, request, demand, claim or other communication hereunder using any other means (including, without limitation, electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given or received unless and until it actually is received by the party for which it is intended and the notifying party can provide reasonable evidence of such actual receipt.  Any party may change its address for the receipt of notices, requests, demands, claims and other communications hereunder by giving the other parties notice of such change in the manner herein set forth.

15.    Waiver.  No waiver by any party hereto of any provision of this Agreement or any breach hereof by any other party shall be effective unless, and then only to the extent, explicitly set forth in writing and signed by the waiving party.  No failure by any party to exercise, and no delay by a party in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate, or be construed, as a waiver thereof.  No single or partial exercise of any right, remedy, power, or privilege under this Agreement shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege hereunder or arising in connection herewith.

16.    Dates and Times.  Dates and times set forth in this Agreement for the performance of the Parties' respective obligations hereunder or for the exercise of their rights hereunder shall be strictly construed, time being of the essence of this Agreement.  If the date specified or computed under this Agreement for the performance, delivery, completion or observance of a covenant, agreement, obligation or notice by any party, or for the occurrence of any event provided for herein, is a day other than a business day, then the date for such performance, delivery, completion, observance or occurrence shall automatically be extended to the next business day following such date.

17.    Governing Law.  This Agreement shall be governed by and construed under the laws of the State of Delaware, without regard to conflicts-of-laws principles that would require the application of any other law.

18.    Costs of Relief.  If any action, suit, or other proceeding is instituted to remedy, prevent, or obtain relief from a default by any party hereto in the performance of such party's obligations under this Agreement, the substantially prevailing party in such action, suit or other proceeding may recover all of its costs (including, without limitation, mediation, arbitration or court costs and reasonable attorneys' fees and expenses) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom.

19.    Assignment and Assumption; Successors and Assigns.  Neither Allwest nor Miller may assign any of its/his rights or delegate or cause to be assumed any of its/his obligations under this Agreement without the prior written consent of KCF.  Subject to the preceding sentence, this Agreement shall apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties hereto.

6

2467323011

20.    Joint Preparation.  This Agreement shall be considered for all purposes as having been prepared through the joint efforts of the parties hereto.  No presumption shall apply in favor of any party in the interpretation of this Agreement or in the resolution of any ambiguity of any provision hereof based on the preparation, substitution, submission or other event of negotiation, drafting or execution hereof.

21.    Execution of Agreement.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original copy and all of which, when taken together, shall be deemed to constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes

Remainder of Page Left Blank
Signature Page Follows

2467323011

IN WITNESS WHEREOF, the parties hereto have executed this Funding Agreement as of the date first written above.

KEY COMMERCIAL FINANCE, LLC

By: _____
Name: Justin Billingsley
Title: President

Address:    1511 Route 22, Suite 152
            Brewster, New York 10509

ALLWEST PROPERTY INVESTMENTS, LLC

By: _____
Name: Gary W. Miller
Title: Managing Member

Address: _____
1977 Waverly St
Napa, CA 94558

_____
GARY W. MILLER

Address: _____
1977 Waverly St
Napa, CA 94558

**Schedule A**

**Loan Amount and Repayment History**

See Attached

24673230 11

## Schedule B

See Attached

24673230 11

## Business Inquiry

### Business Details

| | | | |
|---|---|---|---|
| Business Name: | **EQUITY PROS, LLC** | Citizenship/State Inc: | **Domestic/CT** |
| Business ID: | **1184360** | Last Report Filed Year: | **2018** |
| Business Address: | **11 LUIS ALLEN DRIVE, DANBURY, CT, 06811** | Business Type: | **Domestic Limited Liability Company** |
| Mailing Address: | **1511 ROUTE 22, SUITE 152, BREWSTER, NY, 10509** | Business Status: | **Active** |
| Date Inc/Registration: | **Aug 26, 2015** | | |
| Annual Report Due Date: | **03/31/2019** | | |

### Principals Details

| Name/Title | Business Address | Residence Address |
|---|---|---|
| CHADWICK SELF   MANAGER | 11 LUIS ALLEN DRIVE, DANBURY, CT, 06811 | 505 EAST BRANCH ROAD, PATTERSON, NY, 12563 |

### Agent Summary

Agent Name   **HILLEL GOLDMAN**

Agent Business Address   **57 NORTH STREET, SUITE 214, DANBURY, CT, 06810**

Agent Residence Address   **1 CALDWELL TERRACE, DANBURY, CT, 06810**

Agent Mailing Address   **NONE**

JS 44 (Rev 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Deborah S. Skeans, Executrix of the Estate of Frank E. Pavlis

**DEFENDANTS**

Key Commercial Finance LLC, Key Commercial Finance Properties, LLC, Equity Pros, LLC, and Mobile Agency, LLC

**(b)** County of Residence of First Listed Plaintiff   Lehigh County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Putnam County, NY
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Joelle E. Polesky (ID No. 3694)
Stradley Ronon Stevens & Young, LLP
1000 N. West Street, S. 1200, Wilmington, DE 19801  (302) 295-4856

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U S Government Plaintiff
- ☐ 2  U S Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☒ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332, 2201, and 2202

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
7,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
10/01/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Joelle E. Polesky (ID No. 3694)

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

Print     Save As...     Reset