# **EXHIBIT A**

`01:12:40`

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
CIGNEX DATAMATICS, INC.,  )
                          )
            Plaintiff,    )
                          ) C.A. No. 17-320(MN)
v.                        )
                          )
LAM RESEARCH CORPORATION, )
                          )
            Defendant.    )
```

Thursday, December 13, 2018
2:00 p.m.
Courtroom 4A

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

HALLORAN FARKAS + KITTILA, LLP
BY:  THEODORE ALLAN KITTILA, ESQ.

Counsel for the Plaintiffs

CROSS & SIMON, LLC
BY:  CHRISTOPHER PAGE SIMON, ESQ.
BY:  DAVID GERARD HOLMES, ESQ.

Counsel for the Defendant

| | | |
|---|---|---|
| 01:52:29 | 1 | THE COURT:  Good afternoon. |
| 01:58:00 | 2 | (All said good afternoon.) |
| 01:58:05 | 3 | MR. SIMON:  Good afternoon, Your Honor.  If I |
| 01:58:07 | 4 | could introduce myself to the Court, I'm Chris Simon of |
| 01:58:11 | 5 | Cross & Simon on behalf of the defendant/counterclaim |
| 01:58:14 | 6 | plaintiffs, Lam Research Corporation.  To my left is my |
| 01:58:17 | 7 | colleague, David Holmes, of Cross & Simon.  And we're here |
| 01:58:21 | 8 | today as I understand it on two matters for the Court.  Both |
| 01:58:23 | 9 | of those were filed by Lam Research Corporation, so I will |
| 01:58:29 | 10 | defer to Your Honor on how you would like to proceed today, |
| 01:58:32 | 11 | if at all with the motions, which order. |
| 01:58:34 | 12 | THE COURT:  Let's get some other introductions |
| 01:58:36 | 13 | from the plaintiff and then we can chat. |
| 01:58:38 | 14 | MR. SIMON:  Of course.  Sorry.  Thank you.  Your |
| 01:58:41 | 15 | Honor. |
| 01:58:41 | 16 | THE COURT:  Okay. |
| 01:58:42 | 17 | MR. KITTILA:  Good afternoon, Your Honor. |
| 01:58:43 | 18 | THE COURT:  Good afternoon. |
| 01:58:44 | 19 | MR. KITTILA:  Ted Kittila on behalf of plaintiff |
| 01:58:47 | 20 | CIGNEX.  I have with me Karen Light.  She is with my office |
| 01:58:50 | 21 | of Halloran Farkas + Kittila.  She's here assisting me here |
| 01:58:55 | 22 | today. |
| 01:58:55 | 23 | THE COURT:  Good afternoon. |
| 01:58:56 | 24 | So Mr. Simon raised the issue of how we should |
| 01:58:58 | 25 | proceed.  They're both defendant motions, so do the |

01:59:02  1    defendants have a preference?  I don't have any.

01:59:07  2            MR. SIMON:  Your Honor, again for the record,

01:59:09  3    Chris Simon.  I don't have a preference at all.  I would

01:59:13  4    like to proceed as the Court sees fit.  And I guess maybe

01:59:16  5    the way to take them just for no other reason than the way

01:59:19  6    they were filed, they were filed motion for leave to offend

01:59:22  7    -- amend was filed first on July 16.  Sorry for that slip

01:59:26  8    up.

01:59:27  9            THE COURT:  Now offending, please.

01:59:31 10            MR. SIMON:  That will be the first of many today

01:59:32 11    I'm sure, Your Honor.  If we could, I'll just start with the

01:59:35 12    one motion to file first and we'll proceed that way.

01:59:39 13            So on July 16, Lam Research Corporation, our

01:59:43 14    client, filed its motion for leave to amend its counterclaim

01:59:46 15    to include a claim for precision.  And the filing followed

01:59:50 16    the completion of depositions and written discovery.  As

01:59:55 17    very brief background, Your Honor, CIGNEX filed the

01:59:57 18    complaint in this matter alleging that it delivered software

02:00:00 19    as per Lam's requirement.  CIGNEX also alleged Lam never

02:00:06 20    objected that the software did not meet the quote, agreed

02:00:10 21    material criteria.

02:00:13 22            And CIGNEX also alleged that it performed all

02:00:16 23    its obligations under the parties' agreement.  The agreement

02:00:20 24    is attached as Exhibit A to the complaint and states that

02:00:24 25    the contractor shall render such services as may be

02:00:27  1    necessary to complete in a professional manner the project

02:00:31  2    described as follows:  Software integration and POC for

02:00:36  3    MyLam PK redesign project.

02:00:39  4              In written discovery, CIGNEX repeatedly gave in

02:00:44  5    our opinion inconsistent and unclear answers to basic

02:00:47  6    questions posed by Lam regarding its understanding of the

02:00:51  7    basic terms of the parties' agreements and what obligated

02:00:54  8    Lam to pay.  Those responses are set forth in detail in our

02:00:59  9    pleadings and as exhibits.  We asked basic questions.  What

02:01:02 10    was the intent of the agreement?  What is a deliverable?

02:01:07 11    What obligates Lam to pay CIGNEX?

02:01:10 12              THE COURT:  Can you just give me one second.

02:01:13 13              MR. SIMON:  Yes.

02:01:14 14              THE COURT:  Okay.  Sorry about that.

02:01:19 15              MR. SIMON:  And the premise for those questions

02:01:24 16    I believe it's fair to say is black letter law in Delaware

02:01:26 17    that a party asserting a breach of contract claim must

02:01:32 18    articulate sufficiently definitive terms of an agreement.

02:01:34 19    And that case I believe is cited in our motion, but if not,

02:01:38 20    Sheetz versus Quality Assured, 2004 WL4941983.  And another

02:01:45 21    case cited in our agreement, in our motion is the Gallagher

02:01:50 22    case from 2010, the enforceable contract must contain all

02:01:56 23    material terms of agreement and material provisions that are

02:02:00 24    definite will be enforced.

02:02:02 25              So when we got these what I will call vague and

02:02:08   1   indefinite answers to discovery and then in depositions when

02:02:12   2   we learned that CIGNEX, CIGNEX witnesses testified that they

02:02:18   3   didn't understand what they were tasked to do, and I say

02:02:22   4   that in summary fashion, but that was the essence of their

02:02:27   5   testimony, we filed after immediately filing the

02:02:33   6   depositions, we wrote counsel for the -- for CIGNEX and

02:02:38   7   asked if they would consent to our request for leave to

02:02:42   8   amend the complaint which they refused, so we filed a motion

02:02:46   9   asking for leave to amend the counterclaim.

02:02:48  10           And the basis for that is if, in fact, there is

02:02:51  11   no definite agreement, and I take CIGNEX's claim on its face

02:02:56  12   and we look at that for purposes of this motion, they allege

02:02:59  13   there is an agreement and they allege that they're entitled

02:03:02  14   to be paid.  And they allege they performed completely under

02:03:05  15   the agreement.  If, in fact, in discovery they take the

02:03:08  16   position that they don't know what the agreement is, they

02:03:10  17   don't know what they were supposed to do and there was

02:03:13  18   misunderstanding between the parties as to what was to be

02:03:17  19   completed, to me that seems like grounds for reaching a

02:03:21  20   conclusion by the court or a jury that there was never a

02:03:24  21   meeting of the minds between the parties as to what was to

02:03:28  22   be done and, therefore, a court could order that a contract

02:03:30  23   be rescinded.  So that was the basis for the motion to leave

02:03:35  24   to amend the counterclaim.  And we filed it, as you know.

02:03:39  25           In response, CIGNEX has taken two positions.

02:03:44  1    I'll certainly let Mr. Kittila tell me if I'm wrong there.

02:03:48  2    First they say that we blew the deadline for leave to amend,

02:03:52  3    which we did file it after the court ordered deadline.

02:03:56  4           THE COURT:  Two months, or three months, three

02:03:58  5    months after the Court ordered deadline.

02:04:01  6           MR. SIMON:  That's correct.  There is no dispute

02:04:02  7    of fact on that.  And second, they will be prejudiced

02:04:07  8    because we're essentially asserting a new claim which they

02:04:10  9    will be barred from taking discovery on.

02:04:13 10           THE COURT:  But you agree that the standard here

02:04:14 11    is good cause; right?

02:04:16 12           MR. SIMON:  The cases do say if there is a

02:04:19 13    deadline in place that you need to demonstrate good cause.

02:04:22 14    And so our argument on good cause is well, we rely on your

02:04:26 15    complaint to tell us what your theories of the case are, and

02:04:29 16    when we filed an answer to the complaint we allege we think

02:04:32 17    we had an agreement, too, and we think you breached it.  And

02:04:36 18    you say -- and we did say in our counterclaim, we think you

02:04:39 19    didn't really understand what you were doing, and they say

02:04:41 20    no, no.  Their answer to our counterclaim is, we understood

02:04:45 21    fully what we were supposed to do when we completed the

02:04:48 22    contract.  That's what we're on notice.  And that's how we

02:04:51 23    are going to defend the case and respond to the complaint.

02:04:55 24           So when we get into discovery, the witnesses

02:04:57 25    take a totally different path, I think under the rules and

02:05:03 1    under the case law for Rule 15, we have a right to seek

02:05:07 2    leave to amend and I think --

02:05:08 3            THE COURT:  But Rule 16 is what applies, right,

02:05:13 4    because you blew the deadline.

02:05:14 5            MR. SIMON:  I would take umbrage to that because

02:05:18 6    I believe the Third Circuit case law on amending a

02:05:20 7    complaint, the overriding principle on amendment is whether

02:05:23 8    there is prejudice to the nonmoving party.

02:05:25 9            THE COURT:  Can you cite to me any cases where

02:05:27 10   the deadline set in the scheduling order has been passed and

02:05:35 11   the decision is made under Rule 15 rather than Rule 16.

02:05:39 12           MR. SIMON:  Not as I stand here today, Your

02:05:42 13   Honor.  I'm sorry, I can't be of help there.

02:05:44 14           But I would say this to the Court is at the time

02:05:47 15   we filed -- we entered into the scheduling order, we had no

02:05:51 16   idea that they were going to bring these theories and claims

02:05:54 17   before us and the court on their case.  None.  And had we

02:05:59 18   known that, we would have never consented to the deadline

02:06:03 19   for leave to amend occurring before the close of fact

02:06:07 20   discovery.

02:06:08 21           And I think -- you know, look, this is a

02:06:11 22   scheduling order.  I understand that the Court wants us to

02:06:14 23   abide by the scheduling order and we strive to do that in

02:06:19 24   all cases, but if a party comes into a litigation and

02:06:22 25   asserts new claims in discovery, I think the court has great

02:06:28  1   discretion to say I will modify my scheduling order if we

02:06:32  2   can demonstrate some reason why we didn't abide by the

02:06:35  3   deadline.  And I think here it's because we weren't on

02:06:38  4   notice of this theory at all.

02:06:40  5              THE COURT:  And your position is the first time

02:06:42  6   you were on notice is at the deposition of the 30(b)(6)

02:06:46  7   witness on June 6th; is that right?

02:06:49  8              MR. SIMON:  That's the first time we had

02:06:50  9   evidence of their position.  We had some intimation.  We

02:06:54 10   believe internally they didn't know what they were doing

02:06:56 11   sufficient to finish the project, otherwise none of us would

02:06:59 12   be here.  But we didn't realize that they had -- that they

02:07:03 13   -- we didn't know that they didn't agree to the contract was

02:07:07 14   what we believed it said, that they had to complete the

02:07:11 15   project.  And we didn't know that their position in the case

02:07:14 16   would be we actually didn't complete the project because we

02:07:17 17   didn't know what we were doing.

02:07:18 18              THE COURT:  I'm not sure I understand.  What is

02:07:21 19   your position on when you knew that there was what you

02:07:24 20   consider to be a change in position?

02:07:26 21              MR. SIMON:  Our position is in the depositions

02:07:29 22   for the -- well, in the responses to interrogatories, they

02:07:38 23   were not clear as to what their position was and they told

02:07:43 24   us in their interrogatory responses specifically it's too

02:07:46 25   complicated to tell you here, we'll figure this out in

02:07:50 1   depositions.  That's in their response.

02:07:52 2           THE COURT:  And you knew the depositions were

02:07:54 3   going to occur after the deadline for amending.  If fact,

02:07:58 4   you didn't even notice the deposition of the company,

02:08:00 5   CIGNEX, after -- I think you noticed it in March for May

02:08:07 6   1st, so you noticed it to occur after the deadline.

02:08:10 7           MR. SIMON:  That's correct.

02:08:10 8           THE COURT:  But you didn't ask to have that

02:08:13 9   deadline moved.

02:08:14 10          MR. SIMON:  No.  That's true.  I will take the

02:08:16 11  heat for any blown deadlines as far as the deadline being

02:08:21 12  blown, but I don't believe it was blown because we were

02:08:23 13  asleep at the switch, we just -- we didn't have a viable

02:08:27 14  claim for recision at that point.  We didn't believe -- we

02:08:32 15  still -- it's a remedy, the court or the jury could fashion

02:08:39 16  it if, in fact, the parties come into court and the

02:08:42 17  testimony is we don't believe there was a meeting of the

02:08:45 18  minds here.

02:08:45 19          We're not asking the Court to decide today the

02:08:48 20  merits of the case, we're just asking the Court to say can

02:08:52 21  we have this remedy if, in fact, this is the evidence.  And

02:08:56 22  this is what we knew when we responded to complaint.  Look,

02:09:00 23  if Your Honor wants to bar them from taking a position that

02:09:02 24  they didn't understand, that they didn't believe there was

02:09:04 25  an agreement, there was a meeting of the minds, maybe we

02:09:07  1    don't need a revision.  But if they can come into the court

02:09:11  2    and put evidence in the record that says we never had a

02:09:13  3    meeting of the minds, then I think justice and all the case

02:09:17  4    law deals with amending the claims even after a trial would

02:09:21  5    permit us leave to amend.

02:09:23  6           I can tell you, I have been doing this for quite

02:09:25  7    a while, I have never seen an early -- I have never seen an

02:09:32  8    early deadline contemplated, deadline to amend, contemplated

02:09:36  9    to cut somebody off from making a good faith claim when they

02:09:43 10    discover facts late in the ball game.

02:09:46 11           I can tell you this, since that time when I

02:09:49 12    received scheduling orders from courts that propose a

02:09:52 13    deadline for leave to amend prior to the end of fact

02:09:56 14    discovery, I have asked that it be moved because of this

02:09:59 15    experience.  But that doesn't mean that at the time I knew

02:10:03 16    that we had a claim for recision that I didn't feel like

02:10:07 17    bringing it or didn't think of bringing it.

02:10:09 18           We allege that we had an agreement.  They allege

02:10:11 19    we had an agreement.  They allege they performed under the

02:10:13 20    agreement.  We allege that they didn't perform under the

02:10:16 21    agreement.  And low and behold in these depositions they

02:10:20 22    tell us we never knew what to do.  You never signed an SRS.

02:10:25 23    We didn't know what the project scope was.  We didn't

02:10:28 24    realize that these were features that you wanted.

02:10:30 25           So I think at that point we then had evidence

02:10:33  1    of, evidence of this lack of meeting of the minds.  And at

02:10:39  2    that point, in fact they write us a letter and say as the

02:10:42  3    depositions revealed or made clear, you know, the parties,

02:10:47  4    our client didn't know what it was supposed to do.  And that

02:10:50  5    occurred after the deposition.

02:10:51  6             So I wrote Mr. Beehler, I said we have this

02:10:56  7    claim, we have a right to bring it, would you consent to it.

02:10:59  8    And he said no.  So I filed a motion.

02:11:02  9             So, Your Honor, look, I don't have a case where

02:11:07 10    distinguishing between Rule 16 and Rule 15, but I think

02:11:09 11    there are plenty of cases where the Third Circuit has said

02:11:13 12    that the primary bar to -- barring amendment would --

02:11:21 13    barring amendment would be appropriate if there is

02:11:23 14    prejudice.  Prejudice should be the focus of the court.  I'm

02:11:27 15    not looking to take new discovery.  I don't think they need

02:11:30 16    to take new discovery.  This is their evidence.  They put it

02:11:33 17    in the record.  They can live and die by it.

02:11:36 18             THE COURT:  If they told me they need new

02:11:38 19    discovery, what am I supposed to do with that?

02:11:42 20             MR. SIMON:  If they can show cause for taking a

02:11:45 21    deposition of an individual based on the fact that we have a

02:11:48 22    claim now for recision, I don't think I would oppose that,

02:11:51 23    on a limited topic.  I mean, the witness --

02:11:56 24             THE COURT:  Summary judgment motions have

02:11:58 25    already been filed; right?

02:12:00  1          MR. SIMON:  We did file summary judgment motion

02:12:02  2     on breach of contract claims.  It in some ways tracks these

02:12:08  3     same facts which are their facts, not ours.  We have made

02:12:13  4     allegations, and we have been consistent with those

02:12:16  5     allegations to this day through the summary judgment.  So,

02:12:22  6     look, again, we deal -- when you're a defendant in the case,

02:12:26  7     you deal with the theories that are brought by the

02:12:30  8     plaintiff, we deal with those theories, we responded to

02:12:33  9     these theories.  Those are not theories they're trying to

02:12:37 10     bring today, not by a long shot.  And I think there is a

02:12:41 11     reason why, it's because when we got into discovery, we got

02:12:44 12     the evidence, the documents, they had to admit that they

02:12:46 13     didn't finish the project.  We never got the chance to test

02:12:49 14     it.  It never went live.  There were defects the entire time

02:12:53 15     the project existed.  And they don't have a contractual

02:12:58 16     claim.  They only brought one claim, they brought a claim

02:13:02 17     for breach of contract.

02:13:04 18          So they have tried to shift gears in discovery

02:13:06 19     and say that they didn't understand what was going on.

02:13:09 20     Well, if you don't have a meeting of the minds, then there

02:13:13 21     is no prejudice to them.  We're willing to give them the

02:13:16 22     code back.  We said you can have the development code, we'll

02:13:20 23     give it back to you.  We made that commitment.  We will make

02:13:24 24     that commitment if we file the amended counterclaim.  And

02:13:29 25     ultimately if we have a trial in this case, if Your Honor

02:13:33 1    rules on dispositive issue then we can see the facts, the

02:13:33 2    remedy fits the facts.

02:13:40 3            THE COURT:  Okay.

02:13:44 4            MR. SIMON:  Your Honor, I don't have much more

02:13:45 5    to add than what's in our motions, so I'm happy to yield the

02:13:49 6    podium.  If Your Honor had any questions, I would be happy

02:13:52 7    to answer them or try to answer them.

02:13:54 8            THE COURT:  The one question I had, and this is

02:13:56 9    something that was in your brief, in your opening brief that

02:14:00 10   CIGNEX picked up on which was one of the things that you're

02:14:05 11   relying on in terms of them changing their position were

02:14:09 12   statements during mediation.  And I don't need to get into

02:14:14 13   discussions at mediation, but you brought it up as something

02:14:16 14   that suggested that you knew they were changing their

02:14:19 15   position.  And since that was two -- you're relying on it to

02:14:24 16   say they were changing their position.  Since that was two

02:14:27 17   months before the deadline, what am I supposed to do with

02:14:30 18   that?

02:14:31 19           MR. SIMON:  Well, look, I got to be careful

02:14:34 20   here.  We never talked to them directly in mediation.  The

02:14:38 21   story -- there was -- I got to be careful here.  We talked

02:14:50 22   about that after I filed the brief with prior counsel.

02:14:58 23           There was blame placed on our client for why it

02:15:01 24   wasn't finished.  That was essentially what they were saying

02:15:06 25   for lack --

02:15:07 1          THE COURT:  That seems clear not just from

02:15:12 2   mediation, that seems clear from the other papers I read in

02:15:15 3   this case.

02:15:16 4          MR. SIMON:  Right.  But what's different is it's

02:15:18 5   not blame -- it's not actual blame based on our breach of

02:15:23 6   the contract, it's we don't understand what our basic terms

02:15:27 7   are, and in the depositions and in the written discovery we

02:15:31 8   tried to flesh out from them what are the terms of the

02:15:33 9   agreement?  What do you believe are the terms?  You cannot

02:15:36 10  sustain a breach of contract action if you cannot articulate

02:15:42 11  definite terms.  And when they can't in discovery articulate

02:15:46 12  definite terms and then say we don't even understand -- we

02:15:50 13  never -- again, the witness says at the deposition almost

02:15:53 14  verbatim, it was a misunderstanding.  So at that point we

02:15:59 15  have actual evidence.  At that point we have actual evidence

02:16:01 16  for a recision claim.  I mean, that's our theory.  If, in

02:16:07 17  fact, you're going to take a position that a contract wasn't

02:16:10 18  formed because you can't articulate definite terms, or that

02:16:13 19  you -- that there was no understanding between the parties

02:16:17 20  that there were definite terms that can be performed under

02:16:20 21  the agreement, then that goes to the world of recision.  And

02:16:26 22  that is when we said okay, at this point if that's where

02:16:32 23  we're going, then we believe we have a claim.

02:16:35 24          Now, I think for a number of reasons we're

02:16:39 25  better off with a breach of contract claim because if we can

02:16:43 1    enforce our rights under the contract, we have other

02:16:46 2    remedies.  So this isn't the best claim that we have.  But

02:16:49 3    we don't think that we should have to defend their claim and

02:16:53 4    not -- they're bound by their burden to prove a breach of

02:16:58 5    contract in definite terms and if they're not going to do

02:17:01 6    that in discovery, then they can't enforce a contractual

02:17:04 7    claim against us.

02:17:05 8            If one of the remedies are for not articulating

02:17:09 9    definite terms are claiming you misunderstand the essential

02:17:13 10   definite terms of the contract including what obligates us

02:17:16 11   to pay you, then you have the risk of recision and this

02:17:19 12   court has the remedy of recision if necessary.  So that's

02:17:23 13   the point.  It's not this is a brand-new claim, we can go

02:17:27 14   figure something new out, this is alternative, new to the

02:17:33 15   universe.  We just want to be able to respond and have a

02:17:36 16   right to respond with a legal remedy or equitable remedy.

02:17:39 17           THE COURT:  Okay.  Let's hear from the

02:17:42 18   plaintiff.

02:17:42 19           MR. SIMON:  Thank you, Your Honor.

02:17:51 20           MR. KITTILA:  Your Honor, may it please the

02:17:53 21   court, Ted Kittila on behalf of CIGNEX.

02:17:57 22           Your Honor, on July 23rd, 2018, Lam filed a

02:18:01 23   motion to amend its counterclaim.  This was done almost

02:18:04 24   three months after the deadline to amend pleadings, which

02:18:08 25   was April 25th, 2018.  This was almost two months after the

02:18:13 1    deadline to complete the fact discovery, which was May 30th,

02:18:17 2    2018.  This was only seven weeks before the summary judgment

02:18:22 3    scheduled, as it was scheduled at that time which was set

02:18:26 4    for September 11th with the date later being moved to

02:18:30 5    December 4th.

02:18:31 6          Lam has completely ignored Rule 16.  The

02:18:35 7    schedule may be modified only for good cause and with the

02:18:40 8    judge's consent.  This is not a simple question of a Rule 15

02:18:46 9    amendment.  This is a wholesale blowing of a deadline by

02:18:49 10   several months.

02:18:50 11         THE COURT:  Is it true that they asked you about

02:18:52 12   amending the complaints on June 3rd and you didn't get back

02:18:56 13   to them until July 16th?

02:18:58 14         MR. KITTILA:  Your Honor, that would be my prior

02:19:00 15   counsel.  I do not know if that is exactly what the timing

02:19:04 16   was.  But even if it were June 3rd, that would have been at

02:19:08 17   least a couple of months after when the time period to amend

02:19:13 18   was.  What happened with my prior counsel on the request to

02:19:17 19   amend, I'm not certain.

02:19:19 20         THE COURT:  Why don't you address the argument

02:19:20 21   that they just found out some information after the

02:19:24 22   deadline, and that's what -- essentially now you have

02:19:28 23   changed your position.  You're going to be arguing that

02:19:31 24   there was no meeting of the minds here.  Is that correct?

02:19:35 25         MR. KITTILA:  I don't agree with that.  We're in

02:19:38  1    the process of briefing our motion for summary -- our

02:19:41  2    response to the motion for summary judgment, Your Honor, and

02:19:45  3    I have been meeting with my colleague, Mr. McMillan quite a

02:19:49  4    bit on this issue.  And he said this is not the argument.

02:19:52  5    It's not a question of whether or not there was a contract.

02:19:56  6    There was a contract.  It is a time and material contract,

02:19:59  7    that is what it is.  It is not a finished product contract,

02:20:04  8    fixed price contract, if you will, Your Honor, where there

02:20:07  9    is one product that is delivered at the end of this.  When

02:20:11  10   he talks about deliverables, when he talks about intent,

02:20:15  11   this is a time and material contract.

02:20:16  12         I think the arguments and the discussion that

02:20:18  13   came up during deposition came through when people were

02:20:22  14   asking what was the scope of the work that was being

02:20:25  15   performed at this point in time.  One of the statements of

02:20:28  16   work, one of the qualifications in there was that as far as

02:20:31  17   it went, if there was going to be changes, material changes

02:20:35  18   to the scope of the work that was being performed, this was

02:20:38  19   going to add more time and costs with respect to the

02:20:43  20   projects.  And that's very much a part of the argument here.

02:20:47  21         We are not looking at this thing and saying that

02:20:51  22   there wasn't an understanding on the contract.  We knew what

02:20:54  23   it was, it was time and material.  If they wanted to keep

02:20:57  24   changing the scope of the project, if they wanted to tell us

02:21:00  25   that they wanted the MyLam portal to have more bells and

02:21:05  1   whistles or different bells and whistles, that was going to

02:21:08  2   change the scope of the work that was involved and the cost

02:21:11  3   as well.  That is really the argument here.

02:21:14  4          I disagree with my friend's characterization of

02:21:17  5   their being a misunderstanding and not knowing what was

02:21:21  6   happening, and not understanding what they had to do under

02:21:25  7   this thing.  There may have been miscommunications from Lam

02:21:29  8   to my client regarding what was happening.  There may have

02:21:32  9   been misunderstandings there, but everybody knew that this

02:21:35 10   was a time and material contract.

02:21:38 11          Just like a law firm, if my client calls me up

02:21:41 12   and ask me to go and prepare a will for them, and I prepare

02:21:45 13   a trust instrument that they're not requesting, they're

02:21:50 14   going to have a good complaint that something was going on.

02:21:52 15          That said, we are under the understanding that

02:21:56 16   if you keep miscommunicating things to me it's going to add

02:22:01 17   up and add to the project cost.  That's what's happening

02:22:04 18   here.

02:22:04 19          So, Your Honor, we continue to work -- Lam

02:22:08 20   argued there must not be a meeting of the minds.  You didn't

02:22:12 21   understand the agreement.  That is a new claim.  That is not

02:22:15 22   a new claim.  Recision was something that they had in front

02:22:18 23   of them from the very beginning.  They could have brought

02:22:21 24   this.  They brought a kitchen sink of breach of contract

02:22:25 25   claims.  But in their own counterclaim, they said based on

02:22:30 1   defendant counterclaims, plaintiff's interaction with

02:22:33 2   plaintiff, it had become clear to the defendant/counterclaim

02:22:37 3   plaintiff, read it as Lam, that plaintiff was developing the

02:22:41 4   software without the full understanding of the requirement

02:22:45 5   of the project.  That's in their counterclaim.  They are

02:22:48 6   saying right there, you did not understand the project.

02:22:51 7         Now, according to my friend's new theory here is

02:22:55 8   that that would entitle them to recision.  Well, they argued

02:23:00 9   that, or they put that in their pleadings.  So from the very

02:23:04 10  beginning this could not be clearer that they were going to

02:23:07 11  be looking at this thing saying that our guys did not

02:23:10 12  understand the project.

02:23:11 13        Now, what's the harm?  I have been thinking

02:23:15 14  about this quite a bit, Your Honor.  There is a lot of harm

02:23:18 15  right now.  Blowing a deadline like this is very important

02:23:22 16  because recision itself is a very complex claim.  If you're

02:23:27 17  going to argue recision, I'm going to have to counter that

02:23:31 18  by arguing waiver.  I'm going to have to argue estoppel.

02:23:35 19  I'm going to have to counter all these things with a number

02:23:38 20  of defenses which is going to require me to say if you

02:23:41 21  didn't think there was a meeting of the mind, Mr. Lam,

02:23:45 22  witness, then why are we at the point that this time that

02:23:50 23  you're not telling them to stop work on it and stop

02:23:54 24  charging?  That's the problem that we have with this.  This

02:23:57 25  is going to require additional discovery.  Discovery that

02:24:02  1    was not focused on.

02:24:03  2              The reason why recision is at complicated as it

02:24:07  3    is, is because you're looking at quasi equitable remedies at

02:24:11  4    that point in time.  One of the cases that we cited is the

02:24:17  5    Thabbs case and I looked at that and traced that back in the

02:24:19  6    Chancery courts and some of the issues that popped up in

02:24:22  7    some in those cases were the waiver defenses, were the

02:24:25  8    estoppel defenses.

02:24:27  9              We are so far beyond the close of discovery at

02:24:30 10    this point in time, to sit down and reopen it right now when

02:24:34 11    we're facing the barrel of a summary judgment motion to me

02:24:39 12    is very hard for me to describe to my client why we are now

02:24:44 13    back be into a discovery stage.

02:24:46 14              The other thing that's really important about

02:24:48 15    this, is that if they had a recision claim, there is a

02:24:52 16    possibility I would have moved for summary judgment.  I

02:24:54 17    didn't move for summary judgment because I have known for a

02:24:58 18    long time in this court, the court does not like partial

02:25:04 19    summary judgment motions.  But there is enough issue there

02:25:08 20    with a recision claim that that would have caused me to say

02:25:11 21    we need to take care of this, otherwise this could end up in

02:25:15 22    front of a jury.  So it does cause a great deal of prejudice

02:25:18 23    to me.

02:25:19 24              I can't set the clock on summary judgment now.

02:25:22 25    We are now facing this.  We are laying our cards on the

02:25:25  1    table for Your Honor.  This thing is due on our part on

02:25:28  2    Tuesday.  So the reason I'm here by myself and I have my

02:25:31  3    assistant with me is the fact that I have Mr. McMillan at

02:25:35  4    the office working on responding to a summary judgment

02:25:38  5    brief.  Your Honor, deadlines have to mean something.  This

02:25:42  6    case has had a lot of slippage on deadlines.  I understand

02:25:47  7    everybody gets busy and everything along those lines, but

02:25:49  8    you need to know whether or not you're going to be stating

02:25:53  9    something as big as a recision claim when we're getting to

02:25:56 10    the end of discovery, and discovery is closed.

02:25:59 11             THE COURT:  Okay.

02:26:00 12             MR. KITTILA:  Thank you, Your Honor.

02:26:01 13             THE COURT:  Mr. Simon, do you want to add

02:26:05 14    anything?

02:26:08 15             MR. SIMON:  Thank you, Your Honor.  I'll try to

02:26:10 16    be brief.

02:26:11 17             First of all, just for the record, I think you

02:26:13 18    asked Mr. Kittila why we wrote him or his counsel on June

02:26:19 19    3rd.  I believe it was July 3rd.  And they responded on July

02:26:24 20    16th.

02:26:24 21             THE COURT:  Thank you for clarifying.

02:26:26 22             MR. SIMON:  I do want to give them credit for

02:26:29 23    that.

02:26:31 24             Second, something as big as a recision claim to

02:26:38 25    use Mr. Kittila's words, then their theory that they didn't

02:26:42  1    know what was going on and there was no meeting of the minds

02:26:45  2    should have been brought in the complaint.  And what they're

02:26:48  3    doing is essentially amending the complaint without an

02:26:50  4    amendment.

02:26:51  5             THE COURT:  What about Mr. Kittila's position

02:26:55  6    that in the original counterclaim you said they didn't

02:27:00  7    really understand what they were supposed to be doing under

02:27:03  8    the contract?  If he's saying look, we're just saying what

02:27:08  9    you've already said, not that there is no meeting of the

02:27:11 10    minds, but that we're saying look, apparently we didn't

02:27:15 11    understand what you wanted, and you already said they didn't

02:27:19 12    understand what they needed.  What's new here?

02:27:22 13             MR. SIMON:  Well, you can look at that two ways.

02:27:25 14    One is they're on notice of that at the time we file the

02:27:29 15    counterclaim.

02:27:30 16             THE COURT:  And so you knew at the time you

02:27:32 17    filed the counterclaim that you were saying they didn't know

02:27:34 18    what they were doing.  To the extent you're now saying they

02:27:38 19    didn't know what they were doing, that means there is no

02:27:41 20    meeting of the minds and we're not entitled to a recision.

02:27:45 21    Why isn't that something you knew back then?

02:27:47 22             MR. SIMON:  Well, two things.  One is --

02:27:47 23             THE COURT:  He's not saying as I understand it

02:27:49 24    that they are going to be arguing we did not have a meeting

02:27:52 25    of the minds such that we did not have a contract.

02:27:55  1          MR. SIMON:  First of all, let's look at it in

02:27:57  2     the context of the pleadings.  They allege that it was an

02:28:00  3     agreement.  They alleged that they delivered everything per

02:28:03  4     the agreed to criteria.  They allege we all have an

02:28:08  5     agreement and they knew exactly what we were doing.  They

02:28:09  6     allege and we counterclaim that based on what the product

02:28:11  7     was that we got which was a disaster from our perspective,

02:28:17  8     they didn't know what they were doing.  They denied that.

02:28:19  9     They expressly denied that and affirmatively stated in our

02:28:22 10     answer to our counterclaim that they did know what they were

02:28:25 11     doing.

02:28:27 12          So we're then back in the contract -- we're in

02:28:30 13     the contract realm where they've said now twice, no, we knew

02:28:35 14     exactly what we were doing.  So we're off and running on a

02:28:38 15     contract.  It's not until we get into discovery where -- I

02:28:41 16     mean, they didn't put blame on us at the mediation, you

02:28:45 17     know, they put blame on us for not potentially providing

02:28:52 18     them, I don't know, resources or what have you, I don't want

02:28:55 19     to get into the weeds on that.

02:28:56 20          But the point is that it's not clear in the

02:29:00 21     discovery where they say, and these quotes are in our reply,

02:29:05 22     they're saying we don't -- there is a misunderstanding, we

02:29:08 23     didn't know what we were supposed to do.  It's not just

02:29:11 24     based on that, it's not just based on the fact that they

02:29:14 25     didn't know what they were doing, it's based on their

02:29:16  1    failure to articulate based on the terms of the contract.

02:29:20  2    So if you don't have a contract affirmatively, you don't

02:29:22  3    have a contract and you can't articulate a contract, let's

02:29:25  4    say our counterclaim goes away, we don't have it, and

02:29:29  5    they're asking for judgment from this Court on a breach of

02:29:32  6    contract claim.  And we said what are the elements of the

02:29:36  7    contract and they can't identify or articulate the definite

02:29:40  8    terms of the contract, you didn't meet your burden on the

02:29:43  9    contract.  If we have don't have a contract, then we don't

02:29:45 10    have the parties.  The parties go back to their status quo.

02:29:49 11            So, again, I hear this argument about we need

02:29:53 12    all this discovery.  All these facts are in the record.

02:29:56 13    They asked our witnesses these very questions about what we

02:30:00 14    provided, what we knew.  These are their affirmative

02:30:03 15    statements.  If you look at the questions I asked, what do

02:30:08 16    they intend to accomplish by the agreement?  You can't get

02:30:11 17    an answer.  There is no answer to these basic questions.  So

02:30:16 18    there is nothing -- I don't think there is anything really

02:30:19 19    complex in discovery.  If there is an estoppel argument to

02:30:24 20    make, those are going to be based on facts that already

02:30:26 21    exist.  They have got those facts.  They have their

02:30:29 22    witnesses that said certain things in deposition

02:30:32 23    transcripts.  They have taken the depositions of our

02:30:34 24    witnesses.

02:30:35 25            But I don't think they can come to court on a

02:30:36  1    breach of contract claim and then amend their claim in

02:30:40  2    discovery and not bear the consequences of that.  I think

02:30:43  3    that's fundamentally what they're looking at here.  They're

02:30:47  4    running away from the contract.  They don't want a contract.

02:30:50  5    And that is set forth in our motion for summary judgment,

02:30:54  6    Your Honor, which is before the Court.  If you look at the

02:30:54  7    terms of the contract and what it says and their obligations

02:31:00  8    to do are, they don't want anything to do with that.

02:31:03  9            There are allegations, for instance, they make

02:31:04 10    the allegation we never objected to anything they did.  I

02:31:09 11    mean, look, we got a pretty thick appendix in front of the

02:31:12 12    Court, hundreds, hundreds of tickets that we lodged about

02:31:15 13    defective development.

02:31:17 14            THE COURT:  I think we're getting into the

02:31:19 15    substance of the matter here and not diligence and good

02:31:22 16    cause.

02:31:22 17            MR. SIMON:  That's fair, Your Honor.  I guess

02:31:24 18    the point of this is a lot of this has been fleshed out in

02:31:27 19    the discovery already.  I don't think there is a need to

02:31:32 20    take further discovery.

02:31:33 21            And two, they have essentially tried to amend

02:31:36 22    their theory of the case without any leave of the court and

02:31:39 23    yet when we come in and say we think there ought to be a

02:31:43 24    defense of that based on what you have done in discovery,

02:31:45 25    they're saying no way.  So, Your Honor, that's kind of the

02:31:49  1    crux of my argument.

02:31:51  2              Thank you, Your Honor.

02:31:51  3              THE COURT:  Thank you.  I think I understand

02:31:53  4    these issues.

02:31:54  5              Let's move to the second question.

02:32:09  6              And Mr. Simon, you have submitted with your

02:32:13  7    reply brief some documents and exhibits relating to

02:32:18  8    references to problems with performance and legal process

02:32:25  9    from the spring.  What I'm trying to understand or what I

02:32:29 10    would like you to focus on is why I should find that there

02:32:34 11    was a reasonable or objective indication of litigation all

02:32:41 12    the way back in August of 2015, which is I think the

02:32:45 13    position that you're taking.

02:32:47 14              MR. SIMON:  Okay.  Your Honor, if you read the

02:32:51 15    complaint, I mean that rhetorically, the complaint states

02:32:56 16    that they were doing this project, they completed the

02:32:59 17    project, and there is a couple of salient paragraphs where

02:33:03 18    they say we delivered the work and there were no complaints

02:33:07 19    and that we were doing this on a time and material basis,

02:33:11 20    and you only raised complaints when you stopped paying our

02:33:14 21    invoices as an excuse not to pay our invoices.  That all

02:33:19 22    occurred in August of 2015.

02:33:21 23              And those -- and that again, if this is their

02:33:25 24    theory of their case, that we had liability to them as early

02:33:30 25    of August of 2015, there is no protocol or protection of

1   documents that they now claim are relevant to their claims

2   that we never objected to their work, that they performed

3   the work without any errors or defects, and that we have no

4   justification for not paying them in August of 2015.

5        So if you're going to bring a complaint on legal

6   theories and your legal theories are based on facts that

7   arise in 2015, then arguably in 2015 you got a dispute and

8   you got a legal problem that you're going to foreseeably

9   resolve in court if you can't resolve it consensually.

10        THE COURT:  But are you saying that the basis

11   for you to say that they should have reasonably foreseen

12   litigation in August of 2015 is that you stopped paying

13   them?

14        MR. SIMON:  Yes, Your Honor.  And they stopped

15   -- and that's what they say in the complaint.

16        THE COURT:  But they continued working and your

17   client continued talking with them about issues that were

18   ongoing with the work?

19        MR. SIMON:  That's correct.

20        But I want the Court to understand this point is

21   that I think as early as August 2015 based on the theories

22   that they have chosen to pursue in this Court, they should

23   have been on notice that they had a duty to preserve these

24   documents.  But that's not when the document destruction

25   ended.  The document destruction continued through August of

02:35:03  1   2016.

02:35:04  2                THE COURT:  I understand.

02:35:06  3                MR. SIMON:  So you have -- and not only do you

02:35:09  4   have destruction in 2016, a year later, you have destruction

02:35:13  5   intentionally, not in accordance with the policy.  You have

02:35:17  6   a destruction potentially after there have been legal

02:35:23  7   threats back and forth.  And the person whose documents you

02:35:25  8   destroyed are the last remaining depository for every piece

02:35:29  9   of correspondence between the project architects on this

02:35:34 10   project and the project manager who is on site at our

02:35:39 11   client.

02:35:39 12                So again, and I will take -- if I can digress a

02:35:45 13   little bit.  I'll be very candid, I'm not incandid in court.

02:35:51 14   When I filed my motion for spoliation, I had the facts that

02:35:56 15   I had, and I believe they destroyed evidence as late as

02:35:59 16   March 2016 that was done pursuant to a policy that was

02:36:03 17   wrong.  And by the way, I was upset that they never

02:36:06 18   disclosed it to us even though we repeatedly them for it

02:36:09 19   including our initial document request.  But if you look at

02:36:09 20   the correspondence in the motion, you'll see initial

02:36:13 21   disclosures were not even close to adequate.  And we raised

02:36:16 22   immediately issues of document production with them early in

02:36:20 23   the case.  And we didn't get a response at all substantively

02:36:26 24   as to the location of these documents until the eve of

02:36:28 25   depositions which is kind of the way things have gone in

02:36:32  1  this case.

02:36:32  2         And so I didn't learn of the actual facts, if

02:36:35  3  they are the facts that we now know, until they filed their

02:36:39  4  answering brief in response to my motion for spoliation,

02:36:44  5  which I don't think is proper for a lot of reasons.  And

02:36:46  6  frankly, you know, that should temper some of the arguments

02:36:50  7  I made in my opening brief.  Had I had the accurate facts

02:36:55  8  when I filed my opening brief, my motion would have read a

02:36:57  9  little different.  But I was floored when I got the

02:36:58 10  answering brief and learned what happened.  It was not a

02:37:02 11  policy driven destruction of documents, but an intentional

02:37:06 12  destruction of documents by the individual who took over the

02:37:10 13  projects, not a programmer, who used the documents for his

02:37:13 14  own benefit during the project because he didn't know what

02:37:15 15  was going on, and then destroyed them after we had exchanged

02:37:22 16  legal threats.  There is a litany of actual hard threats

02:37:25 17  from our client saying if you can't get your act together,

02:37:28 18  we will sue you.

02:37:29 19         THE COURT:  And the first recordation of those I

02:37:35 20  think that's at least been submitted to me was the end of

02:37:38 21  April 2016.

02:37:39 22         MR. SIMON:  That's correct, Your Honor.  That's

02:37:41 23  correct.  That's when the first document we have.  There is

02:37:43 24  a lot of internal documents and correspondence.  If you look

02:37:48 25  at the correspondence which documents complete

02:37:51  1    dissatisfaction, refusal to pay, those documents go back

02:37:54  2    into 2015, in the fall of 2015, when we're saying we're not

02:38:00  3    paying any of their invoices, you need to get your act

02:38:04  4    together.  We're lodging complaints.  There is

02:38:06  5    correspondence in 2015 on that point.  And, you know, they

02:38:10  6    should have foreseen, if their theory is we're entitled to

02:38:15  7    be paid on net thirty terms when we issued an invoice for

02:38:17  8    our work, and we're note paying them.  If I'm their in-house

02:38:20  9    counsel I'm telling them you need to make sure you maintain

02:38:23 10    this.

02:38:24 11           What's striking is again this dovetails with the

02:38:32 12    prior motion.  I don't think they have to go the same way,

02:38:35 13    but it's this emergence of facts as the case develops that

02:38:38 14    we learn on the fly about what's going on and the positions

02:38:41 15    in this case.  And they are now trying to take the position

02:38:45 16    that there was this grand misunderstanding about what the

02:38:49 17    project was supposed to be and how it was supposed to be

02:38:53 18    built and who was responsible for that.  And yet all of the

02:38:56 19    individuals who were responsible for that very, very

02:38:58 20    important piece of the project, all of their records are

02:39:00 21    gone.  And it was never disclosed, which is --

02:39:03 22           THE COURT:  Can you help me to understand the

02:39:08 23    role of some of these people whose e-mails were destroyed.

02:39:17 24    Let's start with Omprakash Misa.  Do you know what Mr. or

02:39:24 25    Ms. Misa's role was?

02:39:27  1          MR. SIMON:  Misa, I believe, was a design,

02:39:33  2   coordinated design -- I'm trying to get the chart, Your

02:39:38  3   Honor.

02:39:38  4          THE COURT:  If you have it someplace where I can

02:39:40  5   find it, rather than -- I have a chart with dates on it.  I

02:39:46  6   just don't have it at the same place who people are.

02:39:52  7          MR. SIMON:  Your Honor, if you could bear with

02:39:53  8   me.  There is Exhibit E -- starting at exhibit D, I believe,

02:40:01  9   to our opening brief, we lay out the charts.  And so what

02:40:07 10   you have are, if you look at the first chart on Exhibit E, I

02:40:12 11   don't know if you're there, but onshore, these are people

02:40:16 12   when they say onshore, these are individuals in the United

02:40:20 13   States who are working on the project.

02:40:23 14          And Omprakash I believe was more of a management

02:40:31 15   person involved in the coordination of -- he supervised

02:40:37 16   Mr. Pillai.  Mr. Pillai is the center, he was in charge of

02:40:40 17   the project.

02:40:40 18          THE COURT:  That's the person whose e-mails were

02:40:44 19   ordered not to be kept as of August 4th, 2016?

02:40:48 20          MR. SIMON:  Yes.  And to flesh out the factual

02:40:51 21   record, they told us -- he quit in February 2015.  They told

02:40:56 22   us they deleted them as a matter of company policy in March.

02:40:59 23   That's contained in my opening brief.

02:41:04 24          THE COURT:  I read that.  That was wrong, he

02:41:07 25   actually did it in August because they wanted to keep his

02:41:10  1    e-mails around for Mr. --

02:41:13  2              MR. SIMON:  It's Srinivas Tadeparti.

02:41:18  3              THE COURT:  -- Tadeparti to get up to speed.

02:41:21  4              MR. SIMON:  So Subbu as he's known, Subbu Pillai

02:41:25  5    is the project manager.  He is the quarterback.  Offshore,

02:41:28  6    you have -- what they do is they have somebody onshore

02:41:31  7    dealing with the client and interacting with the client and

02:41:34  8    a lot of development code is written in India.

02:41:37  9              Mr. Yadav, for instance, if you look at that

02:41:39 10    top, he was a program manager, so he would be somebody who

02:41:44 11    worked on design and kind of helping scope out the project.

02:41:49 12              And then the architects to the right, so LR

02:41:55 13    Architect and Alfresco Architect, there are two components,

02:41:59 14    there are software license, the portal, that person is

02:42:04 15    tasked with designing how the website will work.  And

02:42:07 16    Alfresco is the database or the software that will manage

02:42:12 17    the documents that LifeRay will portal into.  So he's

02:42:16 18    supposed to design that aspect of the project, how the

02:42:21 19    documents go into Alfresco.

02:42:24 20              So if you look across, Nitin Yadav, he is the

02:42:27 21    program manager.  He kind of reports to management and

02:42:30 22    coordinates with Subbu.  Subbu is the project manager,

02:42:34 23    Mr. Pillai.  So he's responsible for the whole thing.

02:42:37 24              And then Nair and Joshi are the architects, the

02:42:42 25    designers for lack of a better word of those two software

02:42:46  1   components.

02:42:46  2           And then below him, Jayaprakash and Sayeed,

02:42:52  3   these are offshore.  They would report back if we need code

02:42:57  4   written.  This is what we need.

02:43:00  5           THE COURT:  Okay.

02:43:03  6           MR. SIMON:  And that changes over time, but

02:43:03  7   again, it's more startling for me because when we looked at

02:43:07  8   documents -- first of all, we got it in an e-mail

02:43:09  9   production.  So we went back and we said this is crazy.  We

02:43:13 10   have a project that this long, it's 500 documents.  I don't

02:43:13 11   know the exact number, but it's low.  And then we went back

02:43:18 12   and we got more documents and we were getting ready for

02:43:20 13   depositions and we're looking at these documents, they're

02:43:24 14   all Bates labeled, they all have our Bates labels on them.

02:43:27 15   All these e-mails from the project manager are from us.

02:43:31 16           So we go back to them and say why don't we have

02:43:33 17   any documents from Mr. Pillai, you produced no e-mails from

02:43:37 18   him.  You don't see any from any of these folks.  And they

02:43:45 19   said from even May and back of 2018, we destroyed them

02:43:47 20   according to a policy.  And then as they set forth in their

02:43:52 21   answering brief reply, that destruction was intentional.

02:43:56 22   And the problem again is --

02:43:57 23           THE COURT:  Even if it was done pursuant to

02:43:59 24   policy, it was intentional; right?

02:44:01 25           MR. SIMON:  I agree.  First of all, we haven't

02:44:04  1    seen the policy.

02:44:05  2              THE COURT:  So do you have any evidence that it

02:44:07  3    was intentional meaning in bad faith related to this

02:44:10  4    litigation?

02:44:11  5              MR. SIMON:  I sure would like to take

02:44:12  6    Mr. Tadepart's deposition again.

02:44:15  7              THE COURT:  Did you ask for that?

02:44:17  8              MR. SIMON:  I will, if Your Honor feels that's

02:44:21  9    important.  If this case goes to trial --

02:44:25 10              THE COURT:  You're the one who has the burden on

02:44:29 11    this motion; right?

02:44:30 12              MR. SIMON:  I think there is -- I mean, there is

02:44:32 13    a case law that says if they intentionally destroy evidence

02:44:36 14    at the time that they knew or should have known about

02:44:39 15    litigation, the burden shifts to them to explain why they

02:44:42 16    did it and how and why.  So I don't know that -- I don't

02:44:48 17    have the case that says that, but I know that I have read

02:44:51 18    that.  It might be the Micron case that Judge Robinson

02:44:55 19    decided.  There is a Judge Sleet case that talks about

02:44:59 20    willful destruction of evidence, and then where the burden

02:45:04 21    goes.

02:45:05 22              But I would love to take his deposition.  Again,

02:45:09 23    I wish I had these facts when I drafted my brief because in

02:45:12 24    some ways my opening brief was not totally accurate or

02:45:16 25    persuasive enough.  I do think this goes to the larger

02:45:20  1    problem in this case, which again, we have a theory of

02:45:23  2    breach of contract.  And we understand the contract.  We

02:45:25  3    performed all the terms of the contract pursuant -- we got

02:45:29  4    the agreed criteria down and we delivered it to you.  You

02:45:34  5    never objected.

02:45:35  6             THE COURT:  Yes, I get it.  We're getting back

02:45:38  7    to the substance.

02:45:40  8             MR. SIMON:  Sorry.

02:45:40  9             THE COURT:  Let's assume for a minute that I say

02:45:43 10    okay, after there was a foreseeability of litigation, they

02:45:46 11    got rid of documents that were important, or could have been

02:45:49 12    important for this case, talk to me about what an

02:45:52 13    appropriate remedy or sanction could be.

02:45:56 14             MR. SIMON:  I'll start with this.  You have

02:45:59 15    destruction.

02:45:59 16             THE COURT:  You're kind of asking that you win

02:46:01 17    the case based on this.  And I'm trying to understand what

02:46:05 18    the basis for that is and whether you think there is any

02:46:08 19    less drastic sanction that would be appropriate.

02:46:13 20             MR. SIMON:  Well, first of all, we don't win the

02:46:16 21    case because we still have the counterclaim, so we still

02:46:19 22    have to come to court and affirmatively prove our case that

02:46:22 23    they breached the agreement that we believe existed.  And we

02:46:26 24    would have -- they could have defenses to that without the

02:46:32 25    defense of we didn't understand what was going on, but we

02:46:34  1   destroyed all the evidence that we understood what was going

02:46:36  2   on.  And I think we can handle that in the motion in limine,

02:46:39  3   not to give you any ideas.  But I don't think that we win

02:46:43  4   the case, they just don't have a claim against us for breach

02:46:46  5   of contract because they have taken away from us our right

02:46:49  6   to challenge whether or not they performed under the

02:46:52  7   contract and what they believed the contract was and what

02:46:55  8   the terms of the contract were and actually whether they

02:46:59  9   were able to perform the contract because of what they were

02:47:01 10   talking about internal.

02:47:01 11        THE COURT:  But don't they have to prove that?

02:47:03 12   And if they don't have documents showing that they delivered

02:47:05 13   what they said was going to be delivered and that you were

02:47:10 14   okay with it, isn't that their problem, not yours?

02:47:13 15        MR. SIMON:  First of all --

02:47:16 16        THE COURT:  Presumably you have plenty of

02:47:18 17   documents that show that your client wasn't just fine with

02:47:21 18   what was happening, because slip in timeline and all kind of

02:47:26 19   other things that don't suggest that your client was happy

02:47:29 20   with what was going on.

02:47:30 21        MR. SIMON:  I would like to believe that we

02:47:32 22   would win, but this is a jury trial they have demanded, and

02:47:36 23   they are going to be entitled to make arguments.  And this

02:47:43 24   is we have seen in the deposition, all the witnesses that we

02:47:45 25   have been presented with, every single one of them had

02:47:48  1    nothing to do with the project of substance before February

02:47:51  2    of 2016, and yet they're telling their story through these

02:47:55  3    people that have no firsthand knowledge of the facts,

02:47:58  4    denying us the chance to cross-examine these people based on

02:48:02  5    what evidence they had and reviewed to get up to speed on

02:48:05  6    the project and then destroyed.

02:48:07  7             THE COURT:  Did you see discovery or any of the

02:48:09  8    depositions from people who left prior to that time?

02:48:12  9             MR. SIMON:  We tried.  We were told that they

02:48:14 10    were unlocatable.  We did find one person, through, our own

02:48:20 11    diligence who has refused to talk to us because they don't

02:48:24 12    want to get into the middle of it.  But we have asked for

02:48:27 13    names.

02:48:27 14             Subbu, we would love to take his deposition.  He

02:48:31 15    was on site with our client.  Our client had a good

02:48:37 16    relationship with him.  We think he would be extremely

02:48:38 17    helpful to us.

02:48:39 18             Our theory of the case, I don't want to get into

02:48:42 19    it today, but we have theories of the case and things that

02:48:44 20    were said by him to us about what was happening elsewhere

02:48:49 21    within CIGNEX that made this project a disaster, but we

02:48:54 22    can't find him.

02:48:55 23             THE COURT:  Okay.

02:48:55 24             MR. SIMON:  And those questions were asked at

02:48:58 25    deposition, as well.

02:48:59  1          THE COURT:  Did you ask Mr. Tadeparti when he

02:49:04  2   was deposed -- I understand that at that time you thought

02:49:07  3   that documents had been destroyed in March 2016, but did you

02:49:11  4   ask him about it?

02:49:15  5          MR. SIMON:  I don't want to misrepresent to the

02:49:17  6   Court, my recollection is I did ask him about the

02:49:19  7   destruction through to company policy that was represented

02:49:22  8   by counsel.

02:49:23  9          THE COURT:  But probably more general?

02:49:24 10          MR. SIMON:  Maybe this is the fault on my part.

02:49:27 11   The lawyer wrote me a letter and says here are the facts and

02:49:31 12   I have got limited time in the deposition.  It was a two-day

02:49:35 13   deposition.  I can't remember what I asked him on that

02:49:40 14   issue.  If I did, we get the transcript, I'll look.

02:49:43 15          THE COURT:  Okay.

02:49:45 16          MR. SIMON:  Thank you, Your Honor.

02:49:46 17          THE COURT:  Mr. Kittila, why is it that your

02:49:51 18   client wasn't on notice that litigation was reasonably

02:49:55 19   foreseeable at least as of the end of April when there were

02:49:58 20   comments made about the legal process and your client was

02:50:01 21   saying, no, no, no, that's not helpful, that they were not

02:50:05 22   fine?

02:50:05 23          MR. KITTILA:  You know, Your Honor, I have

02:50:08 24   talked to my client about that, and said what is going on

02:50:11 25   with this?  And honestly I think that that's probably some

02:50:21  1   cultural differences between a U.S. company versus an India

02:50:24  2   company.  They looked at the process, they didn't

02:50:26  3   necessarily -- I think they saw there what was going on with

02:50:29  4   respect to the threats.  I think they saw that.  And I don't

02:50:32  5   think that they reacted the way a U.S. based company would

02:50:36  6   probably react.

02:50:37  7           THE COURT:  But the standard I'm supposed to

02:50:41  8   apply is objective, not your subjective not familiar with

02:50:44  9   U.S. law clients; right?

02:50:47 10           MR. KITTILA:  That is correct.  And I think that

02:50:48 11   the Micron Technology case is very, very important, Your

02:50:52 12   Honor.  That's the case that I focused on with respect to

02:50:54 13   this.  Going back, you wish that somebody would receive an

02:51:00 14   e-mail that says hey, we're going to get our lawyers

02:51:03 15   involved in this and pick up the phone and call a guy like

02:51:06 16   me, but that did not happen.  It sounds to me like they were

02:51:10 17   trying to self help their way through the process and figure

02:51:14 18   this thing out.  The problem that you have, though, is that

02:51:17 19   you had a company policy which is that when you had

02:51:20 20   employees departing from the company, you had them removing

02:51:23 21   e-mail boxes off of the system.  And without a recognition

02:51:28 22   that that causes problems, especially when you have a

02:51:32 23   potential for something to blow up.

02:51:34 24           I would like to go through a couple of things on

02:51:38 25   Micron because I think it's going to be helpful for you on

02:51:41 1   your analysis, Judge.

02:51:43 2               THE COURT:  Okay.

02:51:44 3               MR. KITTILA:  So I talked to Mr. Tadeparti, and

02:51:48 4   he's willing to be asked questions about these points.

02:51:53 5   Because I wanted to make sure, too, if I'm standing in front

02:51:57 6   of you, Mr. Tadeparti, did you throw out stuff that you knew

02:52:01 7   was harmful to the company.  And he said no.  He said, I was

02:52:05 8   up to speed.

02:52:07 9               THE COURT:  But he got an e-mail from them and

02:52:10 10  two days later, on August 2nd, I saw in their papers, he got

02:52:16 11  an e-mail, or he was cc'd on an e-mail that says we're not

02:52:20 12  talking to you anymore without a lawyer.  And two days

02:52:23 13  later, he said let's get rid of Mr. Pillai's e-mails.

02:52:28 14  Doesn't that look bad?

02:52:29 15              MR. KITTILA:  It does terrible.  It looks

02:52:32 16  terrible.  I looked at that, too.  It bothered me a great

02:52:36 17  deal.

02:52:36 18              THE COURT:  And Mr. Pillai was an important

02:52:39 19  player in this case; right?

02:52:40 20              MR. KITTILA:  He was the project manager on

02:52:43 21  this.  So Mr. Pillai's e-mail was important, but

02:52:48 22  Mr. Tadeparti was taking over that role.  And so that inbox

02:52:53 23  he had I guess available to him I guess while he got up to

02:52:56 24  speed.  What happened was when Mr. Pillai left the company,

02:52:58 25  he caused the inbox to be forwarded to him so that he could

02:53:02 1    begin to take a look at everything that was going in on that

02:53:05 2    inbox, I guess so he could bring himself up to speed.

02:53:10 3            When I looked at this, I wondered why didn't you

02:53:14 4    at that point in time, you know, immediately sit down and

02:53:22 5    say let's hold on this, this is evidence.  And he said, I

02:53:25 6    have never been in a situation like this before.

02:53:27 7            And what this leads to, Your Honor, is I think

02:53:30 8    that there is lots of people that probably do as employees

02:53:34 9    of companies receive threats regarding e-mail, or threats of

02:53:40 10   suit.  I don't necessarily want employees, every employee of

02:53:45 11   a company -- and this is over a thousand person company --

02:53:49 12   making a decision regarding whether or not a litigation hold

02:53:53 13   should be put into place.

02:53:54 14           If you look, the next bit of correspondence that

02:53:56 15   you see is August 4th in there.  That's when in-house

02:54:00 16   counsel, Divya Kumat, is brought up to speed.  That's August

02:54:07 17   4th which was the day that this e-mail basically, the

02:54:11 18   decision was made by Mr. Tadeparti to discard the e-mails.

02:54:17 19           THE COURT:  Is it true thirty days after that

02:54:20 20   decision was made, within thirty days they could have

02:54:23 21   decided to try to keep those e-mails?

02:54:25 22           MR. KITTILA:  No, that's actually a

02:54:27 23   misunderstanding.  The way AppRiver works, Judge, is that if

02:54:32 24   I were to send an e-mail to Mr. Tadeparti, AppRiver will

02:54:36 25   capture that e-mail for a period of thirty days.  So in

02:54:39  1    other words, if something happens and they go into the

02:54:40  2    laptop, you have a snapshot of that e-mail for thirty days.

02:54:45  3         Mr. Pillai had left the company so he wasn't

02:54:48  4    really getting e-mails at that point in time other than the

02:54:52  5    occasional spasm e-mail that was coming across his e-mail

02:54:57  6    address, so there wasn't the thirty-day clawback.  I went to

02:54:59  7    investigate very closely with the company, and what happened

02:55:02  8    was there was an e-mail that was sent out from the company

02:55:05  9    and it looks like that there was about sixteen or so names

02:55:11 10    on there of departed employees, and Mr. Pillai's e-mail was

02:55:15 11    one of the persons on there.

02:55:17 12         Now, according to the company, what had happened

02:55:19 13    was that somebody reached out to Tadeparti, and IT said we

02:55:23 14    got approval from Tadeparti because we were just following

02:55:28 15    up at that point in time, you know, this guy is a departed

02:55:31 16    employee.  Can we discard?  And at that point, Tadeparti

02:55:37 17    said yeah, I don't need it anymore.

02:55:40 18         I think if we're going go to be making judgment

02:55:43 19    calls regarding Mr. Tadeparti, whether or not he actually

02:55:46 20    did that, I think it would probably be good to have him

02:55:49 21    sitting in the dock and asking him questions.

02:55:50 22         THE COURT:  I set this hearing, and nobody asked

02:55:53 23    me to have someone come here and testify.

02:55:55 24         MR. KITTILA:  You know, Your Honor --

02:55:56 25         THE COURT:  Nobody put in a declaration for

02:55:58 1    Mr. Tadeparti that I could look at and evaluate.

02:56:03 2          MR. KITTILA:  Right.  I get it, Your Honor.  And

02:56:04 3    we thought about having Mr. Tadeparti come in and sit for

02:56:08 4    that, but it really is their burden to show that this was an

02:56:13 5    intentional type of situation where he was discarding the

02:56:16 6    e-mails.

02:56:17 7          THE COURT:  You don't think by the dates and

02:56:19 8    lining up the dates and the misinformation that they were

02:56:22 9    given so they couldn't even ask Mr. Tadeparti about it

02:56:25 10   originally is enough for them to say look, something smells

02:56:30 11   bad here and we need to hear from them?

02:56:33 12         MR. KITTILA:  Yes.  I asked my client about why

02:56:36 13   this date.  Why did you report March and then report then

02:56:40 14   August?  Why did that happen?  And that was unfortunately my

02:56:46 15   prior counsel made an error on that.  And I spoke with him

02:56:49 16   yesterday.  And he said, "Ted, I will tell you that I looked

02:56:55 17   at it and I knew they were retaining e-mails for about

02:56:58 18   thirty days.  I didn't realize that they kept Subbu's e-mail

02:57:02 19   longer than that period of time.  And as far as it went,

02:57:07 20   suddenly I realized that Tadeparti had asked to keep it open

02:57:11 21   so he could have a transition period on there."

02:57:14 22         THE COURT:  Was the first time that they found

02:57:17 23   out about that mistake was when they got that answering

02:57:20 24   brief or were they told before then?

02:57:22 25         MR. KITTILA:  From what I could tell the first

02:57:25  1    time that we discovered that internally, that the prior

02:57:28  2    counsel discovered that internally was September right when

02:57:32  3    they were briefing this.

02:57:33  4          THE COURT:  But they didn't say hey, we got this

02:57:36  5    wrong, do you want to amend your brief, they just answered

02:57:39  6    it?

02:57:39  7          MR. KITTILA:  They just answered it, yes, Your

02:57:41  8    Honor.

02:57:41  9          THE COURT:  And he was stuck with a reply.

02:57:43 10          MR. KITTILA:  He was stuck with a reply.  And,

02:57:46 11    Your Honor --

02:57:46 12          THE COURT:  Is the policy that CIGNEX says it

02:57:51 13    was following that is outlined in the declaration that was

02:57:55 14    submitted, was that written down?

02:58:00 15          MR. KITTILA:  Your Honor, I have seen a written

02:58:02 16    policy.  I don't know if that is a policy that has been

02:58:07 17    written recently because of what has happened in this case.

02:58:12 18    So I'm not exactly certain and I'm not prepared to say

02:58:16 19    whether or not there is a written policy as of that point in

02:58:20 20    time.  And so that's the important thing.

02:58:24 21          THE COURT:  Were there privilege logs that were

02:58:27 22    exchanged in this case?

02:58:30 23          MR. SIMON:  Your Honor, they have never given us

02:58:32 24    a privilege log.

02:58:34 25          THE COURT:  I was going to ask if there was a

02:58:36  1   time when they started asserting more product, but I guess

02:58:39  2   --

02:58:39  3              MR. SIMON:  We had been told that they were

02:58:41  4   going to give us one.  We did not produce, we were not asked

02:58:44  5   to produce a privilege log.  That's not the word I was

02:58:48  6   looking for.  We asked them for a privilege log and it was

02:58:53  7   never provided.

02:58:53  8              THE COURT:  Okay.

02:58:53  9              MR. KITTILA:  Your Honor, if I could go through

02:58:55 10   the Micron factors for you, I think it would be helpful.

02:58:57 11              Your Honor, Micron is the case that I know Your

02:59:02 12   Honor is familiar with.  The standard in the case is when

02:59:08 13   litigation is reasonably foreseeable, that's a flexible

02:59:11 14   standard.  That gives you a great deal of discretion in

02:59:15 15   looking at this.

02:59:16 16              THE COURT:  Let's say I can't believe that it

02:59:17 17   wouldn't have been reasonably foreseeable after, or at least

02:59:24 18   as of April of 2016 when they started making clearly

02:59:31 19   referring to the legal process.

02:59:32 20              MR. KITTILA:  The problem I think, Your Honor,

02:59:34 21   with doing something like that is that Micron knows that

02:59:39 22   litigation is an ever present possibility in American life.

02:59:43 23              THE COURT:  But when it's actually threatened,

02:59:46 24   it's very different than saying it's possible.  I mean,

02:59:50 25   look, they want me to go back to August of 2015 when they

02:59:53  1   stopped paying, and I say look, I get it, sometimes people

02:59:57  2   don't pay their bills and you don't go sue them because

03:00:00  3   that's not a productive way to go.  I understand that.  But

03:00:04  4   by the time we get to April of 2016, they were pretty

03:00:08  5   annoyed and they were threatening legal process and your

03:00:12  6   folks knew it.  And your folks spent some time working on an

03:00:15  7   e-mail response to them including about the legal process.

03:00:19  8             MR. KITTILA:  Correct.  Correct.  And I have

03:00:20  9   seen that in there.  What we're talking about really is

03:00:25 10   Subbu's e-mail at that point in time, because Subbu's e-mail

03:00:30 11   is the one that is carrying over beyond that date.  I mean,

03:00:32 12   there were some other e-mails in --

03:00:32 13             THE COURT:  There is some other people.

03:00:33 14             MR. KITTILA:  There is some others, I agree with

03:00:35 15   that.

03:00:35 16             THE COURT:  Ashish Jain and Joshi's e-mail was

03:00:41 17   lost after that time.

03:00:42 18             MR. KITTILA:  I think that the important point

03:00:44 19   with respect to that is that I think you're going to always

03:00:46 20   see people putting in to various things.  This is a case

03:00:51 21   where when we started out, they did not identify that April

03:00:54 22   e-mail on their initial motion, that April presentation as

03:00:59 23   the litigation threat.  You can kind of see how this has

03:01:02 24   gone where suddenly now unfortunately counsel fed up to them

03:01:09 25   a new date which was the date that Subbu's e-mail was then

03:01:13  1    suddenly -- you know, there was an order to get rid of the

03:01:15  2    e-mail as of August 4th.

03:01:17  3            THE COURT:  You guys included in your papers an

03:01:21  4    answering brief, an e-mail from May, May 3rd of 2016, that

03:01:31  5    talked about the response to the legal process, so it's not

03:01:34  6    just that Mr. Simon put stuff in late, that was in your

03:01:38  7    document.

03:01:38  8            MR. KITTILA:  No doubt.  No doubt, Your Honor.

03:01:40  9    I think if we had our rathers to rebrief things along those

03:01:44 10    lines, this is the sort of thing that happens when you have

03:01:46 11    transition of counsel.

03:01:49 12            Your Honor, I think the problem that you have,

03:01:51 13    too, is take a look at Micron very closely.  In Micron you

03:01:55 14    had a date by which there was a document destruction that

03:01:59 15    had taken place, and then there was a second date by which

03:02:03 16    document destruction was taking place.

03:02:05 17            And the court looked at it and said, well, that

03:02:09 18    really, there was a reasonableness at a certain point in

03:02:13 19    time.  And what they used was the analogy of a gun being

03:02:18 20    loaded versus being cocked.  That's the point in time when

03:02:21 21    litigation was reasonably foreseeable.  So unlike in Micron,

03:02:25 22    you don't have a litigation policy which is the document

03:02:31 23    retention policy becoming the litigation retention policy.

03:02:34 24            Fourth, unlike in Micron, whether litigation was

03:02:39 25    reasonably foreseeable was largely dependent on whether Lam

03:02:44  1    chose to litigate.  Lam didn't litigate initially.  It was

03:02:47  2    us that brought this.  So ultimately Lam did not choose to

03:02:52  3    litigation.  And nineteen months later after the Subbu

03:02:57  4    e-mail was gone, CIGNEX brought suit to pursue its invoices.

03:02:57  5    I would also note, Your Honor, that fifth and finally in

03:03:07  6    Micron --

03:03:07  7             THE COURT:  Wait.  I want to make sure I'm not

03:03:10  8    misunderstanding.  So because they didn't sue you, but you

03:03:15  9    destroyed the e-mails and you sued them, that's supposed to

03:03:17 10    work in your favor?

03:03:18 11             MR. KITTILA:  That's a reasonable

03:03:21 12    foreseeability, Your Honor.  So in other words, let's take

03:03:24 13    company X.  They're sitting there working with everything,

03:03:27 14    and you're saying that a litigation hold needs to be put in

03:03:30 15    place the moment that somebody threatens a lawsuit.  At that

03:03:35 16    point in time, is it reasonably foreseeable that we were

03:03:37 17    going to sue?  Mr. Tadeparti has no idea whether or not the

03:03:44 18    company is going to sue or not.

03:03:46 19             THE COURT:  What is it that you think?  They

03:03:50 20    told you in that presentation, and you guys certainly

03:03:52 21    appreciated it because it was specifically responded to,

03:03:56 22    that they were thinking of legal proceedings, that legal

03:03:59 23    proceedings might be necessary.  So what more do you think

03:04:02 24    would be needed to make it reasonable foreseeability?

03:04:07 25             MR. KITTILA:  I think at that point in time,

03:04:09  1   Your Honor, I think what you have to have is you need to

03:04:11  2   have somebody at the company raising it to the level where

03:04:15  3   they're actually going and reaching up to --

03:04:20  4          THE COURT:  That's a subjective standard for

03:04:22  5   this particular company.  This is an objective standard I'm

03:04:25  6   supposed to be following.  Right?  And I have a company who

03:04:29  7   says things are not going well.  Everybody knew that things

03:04:33  8   weren't going perfectly.  Your client wasn't getting paid.

03:04:37  9   There were still plenty of outstanding things, whether it

03:04:40 10   was their fault, or your fault, I don't know, but nobody

03:04:45 11   thought this project was going swimmingly.  And then they

03:04:49 12   brought up legal standards.  So objectively, what more do

03:04:53 13   you think should have -- what more would you say needs to be

03:04:56 14   done to meet a standard of reasonable foreseeability,

03:05:01 15   objectively?

03:05:02 16          MR. KITTILA:  Objectively at that point in time,

03:05:04 17   Your Honor, I think that people need to be having

03:05:07 18   discussions actually with in-house counsel on whether or not

03:05:11 19   a litigation hold needs to be put in place.  At that point

03:05:16 20   in time, Your Honor, then I can look at that and say that is

03:05:19 21   when the lawyer is involved, is sitting there, is saying,

03:05:23 22   you know, it's not just somebody sitting on a telephone call

03:05:26 23   with Verizon saying I'm going to sue you guys in small

03:05:33 24   claims court.  It's somebody actually sitting there and

03:05:37 25   saying we received a threat, let's take this and analyze it.

03:05:41  1              The problem that you have with this thing is

03:05:43  2      this thing gets escalated to Ms. Kumat.  Ms. Kumat is

03:05:48  3      looking at this thing.  She needs to go out there and vet

03:05:51  4      what the law is.  She has absolutely no time to vet what the

03:05:55  5      law is under the standard that they set up.  What they said

03:05:57  6      is that the moment that somebody says litigation, suddenly

03:06:02  7      that triggers right there.

03:06:04  8              That's not what Micron said.  Micron walked

03:06:06  9      through and, in fact, they said in general when parties have

03:06:07 10      a business relationship that is mutually beneficial and that

03:06:11 11      ultimately turns sour sparking litigation, the litigation

03:06:16 12      will generally be less foreseeable than with litigation

03:06:20 13      resulting from a relationship that is not new mutually

03:06:24 14      beneficial or is naturally adversarial.

03:06:25 15              THE COURT:  That is not a situation where

03:06:27 16      someone is threatening to sue them beforehand.  They're

03:06:31 17      saying suddenly if we have a good relationship and you all

03:06:35 18      of a sudden are like, you know what, you think everything is

03:06:38 19      going okay, that you're still talking, all of a sudden they

03:06:43 20      same forget it, I'm done, and they sue you the next day.

03:06:47 21      Here there were actually threats.  What do you think a

03:06:50 22      reasonable employee -- don't you think getting that

03:06:54 23      presentation and putting together a response that a

03:06:58 24      reasonable employee should have raised that with someone in

03:07:01 25      legal?

03:07:02  1         MR. KITTILA:  I think that if you look at the

03:07:03  2    litigation threats that are happening in April, and I don't

03:07:08  3    even characterize them as litigation threats, I characterize

03:07:12  4    them as we are going to have involvement of counsel.

03:07:17  5         THE COURT:  Legal proceedings; right?

03:07:19  6         MR. KITTILA:  Legal proceedings, whatever that

03:07:20  7    may be.  But at that point in time, Your Honor --

03:07:24  8         THE COURT:  You don't think a scientist or a

03:07:28  9    computer engineering would say legal proceedings, gosh,

03:07:31 10    that's above my pay grade?

03:07:33 11         MR. KITTILA:  I think if you have somebody

03:07:35 12    sitting there and saying hey, litigation, if somebody is

03:07:38 13    sitting there and says I'm going to sue you, at that point

03:07:43 14    in time I would agree with you.  If I say litigation

03:07:46 15    proceedings, and they say I wonder what, I can look at that

03:07:50 16    sort of thing and say okay, maybe we should probably have

03:07:54 17    somebody involved.

03:07:55 18         But I think even if in-house counsel is involved

03:07:57 19    at that point in time, Judge, that's when it needs to attach

03:08:01 20    is when the in-house counsel is involved and is able to vet

03:08:06 21    things and is able to set the policy for bringing in a

03:08:12 22    litigation hold.

03:08:12 23         If I'm running a 10,000 employee company and I'm

03:08:15 24    the general counsel, I do not want employee X making a

03:08:19 25    determination on whether or not a litigation hold is going

03:08:21 1    to be put in place.

03:08:23 2              THE COURT:  That's your problem for not

03:08:25 3    instructed employees that when someone talks about legal

03:08:28 4    proceedings or legal issues that they should bring in a

03:08:31 5    lawyer.  It's not like your company didn't have in-house

03:08:35 6    counsel to talk to.  And so you can't hide behind the fact

03:08:39 7    that your employees didn't go to them, you can't tag us with

03:08:43 8    anything until the counsel was involved.  What if

03:08:45 9    Mr. Tadeparti on his own said, oh, that sounds bad, I better

03:08:49 10   get ready.  I'm not saying he did, but if he did, he said

03:08:55 11   that sounds bad, I better get rid of some of this bad

03:08:59 12   documentation so I don't look bad, you can't tell me that

03:09:03 13   that wouldn't sanctionable even if --

03:09:04 14             MR. KITTILA:  I agree.

03:09:05 15             THE COURT:  -- even if he hadn't gone to

03:09:08 16   in-house litigation counsel and said oh, now we have to set

03:09:13 17   up litigation.

03:09:13 18             MR. KITTILA:  There is no doubt about it, Your

03:09:15 19   Honor.  And you have got to have the ability as the judge

03:09:18 20   sitting here to be able to say if somebody because God

03:09:24 21   forbid, I'm usually on the plaintiff's side, if somebody is

03:09:28 22   throwing out -- this happened to me a very large bank where

03:09:31 23   my client sent in the litigation threat and they went and

03:09:35 24   shredded the documents.  I looked at that and I said okay,

03:09:38 25   come on, now, I need to be able to get that.

03:09:41  1        But I think the problem is, is that if we're

03:09:44  2   going to get to this point, I learned a lesson from then

03:09:51  3   Chancellor Strine, he said if you make statements in

03:09:52  4   pleadings and in court and you say a person intentionally

03:09:59  5   spoliated evidence, that is a serious allegation.  That

03:10:02  6   right there is a sanctionable type of situation where a

03:10:06  7   person could lose their job over this thing.  This happened

03:10:09  8   in the TR Investors case versus Genger, working with Bill

03:10:15  9   Lafferty on this case, it had that somebody made some

03:10:17 10   allegations regarding somebody, an IT professional doing

03:10:21 11   that.

03:10:22 12        I think that Mr. Tadeparti should have the

03:10:25 13   opportunity to sit there and say I didn't do it.  I didn't

03:10:28 14   know.  I had no knowledge that this was happening.

03:10:30 15        The problem is that we've lost e-mails that

03:10:33 16   would have been helpful for us.  You're right, we would be

03:10:37 17   able to show all the work that Subbu had done, all the work

03:10:42 18   that was being performed by Subbu.  I think there was

03:10:45 19   probably helpful stuff in there.  I think there was probably

03:10:47 20   harmful stuff in there.  But we lost that.  But the problem

03:10:52 21   now is we have an allegation now painted about Mr. Tadeparti

03:10:56 22   of having gone in and put on a black hat and decided to

03:11:00 23   throw things out.

03:11:01 24        THE COURT:  When you say he should have an

03:11:03 25   opportunity, he could have put in a declaration, but he

03:11:05 1    didn't.

03:11:06 2              MR. KITTILA:  He did not put in a declaration,

03:11:08 3    Your Honor.

03:11:14 4              THE COURT:  And tell me about what you think if

03:11:16 5    I were to find spoliation occurred, what is an appropriate

03:11:21 6    sanction?

03:11:21 7              MR. KITTILA:  Your Honor, one thing that is

03:11:23 8    perfectly clear from Micron is that dismissal is not the

03:11:27 9    appropriate sanction.  In fact, they referred to that as a

03:11:32 10   harsh sanction only to be imposed in particularly aggrieved

03:11:35 11   situations where a party is engaged in deliberately and

03:11:39 12   deceptive practices that undermined the integrity of the

03:11:46 13   judicial proceedings.  I think if anything we have a

03:11:49 14   situation where somebody probably made a mistake.  And if

03:11:51 15   that is the case, Your Honor, my predecessor counsel argued

03:11:56 16   that only an adverse inference be made.  I don't know if I

03:12:01 17   necessarily would have argued that an adverse inference,

03:12:05 18   because I don't know what that necessarily means, what

03:12:07 19   you're going to tell the jury.  Perhaps it means that I'm

03:12:10 20   not allowed to sit there and refer to Subbu Pillai during

03:12:16 21   the trial to try to make my case.  I think that's a fair

03:12:21 22   result on this thing.

03:12:22 23             If you're going to throw stuff out, guess what,

03:12:25 24   Subbu's work, you can't really point to that.  I think

03:12:29 25   that's probably correct.  But I'm stuck with the pleadings

03:12:32  1    that were put in before I came on to this case and it's an

03:12:36  2    adverse inference is what my prior counsel argued for.  It's

03:12:41  3    definitely not that they win in the case.  For somebody

03:12:43  4    that's trying to sit there and trying to do the right thing,

03:12:47  5    is doing something that puts -- that suddenly you can find

03:12:53  6    that got you mechanism like this, it just doesn't -- the

03:12:56  7    court has never been like that.  This is an equitable court

03:12:59  8    as well as a law court.  And this court has never reached

03:13:03  9    down and said got you, you had a policy in place.

03:13:08  10          I mean, what that does is that just says really

03:13:11  11   you should have no document discarding policy, you have to

03:13:15  12   save everything.  And I have been at companies where you had

03:13:18  13   to save absolutely every single solitary thing.

03:13:23  14          Your Honor, I would say they probably could get

03:13:26  15   the e-mails probably as late the third week of August they

03:13:32  16   would have probably been able to claw those e-mails back.

03:13:35  17   If you want to take an adverse inference from that that did

03:13:39  18   not happen at that point in time, I think that would

03:13:42  19   probably be as far as I think that would be allowed under

03:13:47  20   what Micron says, Your Honor.

03:13:49  21          THE COURT:  Okay.  Thanks.

03:13:58  22          Mr. Simon, what do we do with the -- if I'm

03:14:03  23   looking for bad faith, something more than I didn't put two

03:14:13  24   and two together and this was just the policy and I didn't

03:14:16  25   think about it.  I haven't been involved in litigation.

03:14:19  1    What is the impact on that on my decision here as to whether

03:14:25  2    there was spoliation.

03:14:30  3                MR. SIMON:  Let me make sure I understand the

03:14:31  4    question.

03:14:32  5                THE COURT:  Let's say I'm looking for something

03:14:34  6    a little bit more than the documents are gone, because

03:14:37  7    everybody acknowledges that, and that they were destroyed

03:14:42  8    after I think there should have been reasonable

03:14:47  9    foreseeability of litigation, at least from an objective

03:14:50 10    standard.  But let's say that I'm sympathetic to Mr. Kittila

03:14:55 11    saying, but look, this guy didn't know any better.  And I

03:15:00 12    realize you want to take his deposition, but this guy didn't

03:15:04 13    know any better, and so there really should be some aspect

03:15:08 14    of bad faith.  If you look at the Gold case, for example, in

03:15:12 15    the Third Circuit when they say bad faith.  How am I

03:15:16 16    supposed to find something about bad faith here?

03:15:19 17                MR. SIMON:  Let me help you with that.

03:15:21 18    Mr. Tadeparti is a high level executive at CIGNEX.  And when

03:15:27 19    this project fell apart at the end of 2015, he and

03:15:32 20    Mr. Ramachandran who is the CEO of this company were on an

03:15:39 21    e-mail dated August 2nd, 2016.  This is in my reply brief.

03:15:45 22                THE COURT:  This is the one where they're said

03:15:46 23    we're not meeting again without legal representation.

03:15:50 24                MR. SIMON:  That's right.  Everybody knew this

03:15:52 25    project was a disaster.  In fact, Mr. Tadeparti wrote, "It's

03:15:57 1   a mess."  He's not a programmer, he came in to save the job.

03:16:02 2   He's very sophisticated.  He's an interesting guy to depose,

03:16:08 3   because he's pretty sophisticated, but when you ask him

03:16:12 4   basic questions, he's all over the place, and I don't know

03:16:15 5   what's going on there.  They all knew this was a mess.  The

03:16:18 6   highest levels of this company were involved in this project

03:16:22 7   at this point.  Our legal department was involved.

03:16:27 8            This is bigger than just the deletion of

03:16:29 9   e-mails, Your Honor.  Mr. Kittila is my neighbor and friend.

03:16:34 10  After this reply was filed, counsel resigned or left the

03:16:40 11  case.  And I had a good personal relationship with that

03:16:43 12  firm.  But I would say this case happened like this motion,

03:16:47 13  from the beginning.  They gave us initial disclosures.

03:16:50 14  There was nobody on there.  We knew that half the people --

03:16:53 15  I wrote a letter saying this is not acceptable.  There is

03:16:57 16  more people that have knowledge.  They supplement --

03:17:01 17            THE COURT:  More than zero?

03:17:02 18            MR. SIMON:  I'm sorry?

03:17:03 19            THE COURT:  More than zero?

03:17:05 20            MR. SIMON:  Maybe two.  They supplemented their

03:17:07 21  initial disclosures.  I can't remember the last time I saw

03:17:11 22  supplemented initial disclosures.  We got an anemic document

03:17:11 23  production.  Nobody says a word.  We issued document

03:17:16 24  requests.  We asked them to identify lost and destroyed

03:17:18 25  documents.

03:17:18  1          Your Honor, this isn't Micron and Apple, this is

03:17:23  2     not a big case.  I'm representing my client, this is a big

03:17:26  3     case, but this isn't the kind of case that you have teams of

03:17:29  4     attorneys working on.  I'm working on this case myself with

03:17:32  5     other cases.  You start to get these documents and realize

03:17:36  6     stuff is missing.  And nobody says a word to you at all

03:17:39  7     about what's going on.

03:17:40  8          And then you get false -- what's called fake

03:17:43  9     news.  You go into a deposition for this fake news and you

03:17:46 10     accept their word for this news as gospel.  If we didn't

03:17:50 11     file this spoliation motion we would have never known when

03:17:53 12     they destroyed the documents and why, ever.

03:17:56 13          I'm embarrassed to admit this.  I have been

03:17:59 14     doing this for twenty years.  Every time I get an answering

03:18:03 15     brief for something I write, I'm always nervous to read it.

03:18:08 16     What did I mess up?  What did I step in?  There are a lot of

03:18:13 17     smart lawyers in Delaware, they got me.  This sat on my desk

03:18:17 18     for two days before I had a chance to get to it.  And then I

03:18:18 19     read it.  And I couldn't believe what I was reading.  And

03:18:20 20     nobody said a word to me.  They could have picked up the

03:18:23 21     phone or wrote me a letter and said look, we're wrong.  They

03:18:26 22     argue in their motion that they didn't do anything wrong.

03:18:29 23     How would they know August 4th when they intentionally

03:18:32 24     destroyed the documents, a high level employee came in to

03:18:36 25     work with the CEO, how would they know that there was a

03:18:41 1    legal issue?  They knew.

03:18:42 2                And they used the word in early September,

03:18:45 3    they're writing about recovery action.  I don't know if they

03:18:48 4    withheld documents on privilege.  I have asked Mr. Beehler

03:18:51 5    for privilege logs for months.  I never got a privilege log,

03:18:55 6    ever.

03:18:56 7                So I don't know if there is other privilege

03:18:59 8    documents.  But they did produce documents with their

03:19:04 9    counsel where they're talking about recovery action, they're

03:19:06 10   going to sue us.

03:19:09 11               THE COURT:  What was the date of those

03:19:11 12   documents?

03:19:11 13               MR. SIMON:  I'm sorry?

03:19:11 14               THE COURT:  What is the date of those, after the

03:19:14 15   stop work order in August?

03:19:16 16               MR. SIMON:  Yes, September 9th, where the CEO

03:19:19 17   writes about a recovery action.

03:19:20 18               Now, these are CIGNEX Datamatics, this is a big

03:19:29 19   company.  They're part of another big company.  This is an

03:19:32 20   IT company.  They know how to get e-mails.  They know how to

03:19:36 21   get documents.  Mr. Pillai's e-mail account isn't just

03:19:40 22   Mr. Pillai's e-mail account, it's the repository for

03:19:43 23   everybody else's e-mails.  Everybody else that was involved

03:19:46 24   in the building and design of this project.  Everybody they

03:19:49 25   produced for the deposition had nothing to do with the

03:19:52  1    project until late.  They told us it was a mess.  The

03:19:56  2    depositions are replete with I don't know.  I wasn't there.

03:19:59  3    I couldn't tell you.  I don't know.  I wasn't involved.  I

03:20:03  4    have no idea.  So we lost the opportunity to investigate the

03:20:11  5    internal discussions of this company's work on this project.

03:20:13  6    And then they sued us.  They chose to sue us.  We didn't sue

03:20:18  7    them.  And they can't say, you know, we ---look, we didn't

03:20:26  8    realize we were going to get sued, we made a mistake.  They

03:20:30  9    sued us, exactly when they contemplated doing in September

03:20:34 10    of 2016, for $500,000.  They wanted their money.  So they're

03:20:39 11    not a victim here.  They're not unsophisticated.  They acted

03:20:43 12    intentionally, and they lied about it, not Mr. Kittila, but

03:20:47 13    they lied about it until they filed their answering brief

03:20:50 14    and they didn't disclose it.

03:20:52 15            I mean, it doesn't get any more willful than

03:20:55 16    that.  If it's not spoliation in the sense of spoliation in

03:20:58 17    the sense of Micron or whatever case you want to pick from

03:21:01 18    the Third Circuit, it's inequitable, bad faith litigation

03:21:05 19    misconduct, this Court can order any remedies that it deems

03:21:07 20    fit.

03:21:07 21            And striking their claim doesn't get rid of the

03:21:10 22    case.  We're at zero.  We paid them almost $700,000.  We

03:21:16 23    have attorney fees on top of it.  We still have to come to

03:21:19 24    the court and they still have their defenses.  We can get an

03:21:23 25    adversary inference on their conduct.  If the court is going

03:21:28  1    to let me, I would cross-examine their witnesses at trial of

03:21:32  2    what they did and why because I want the jury to hear.

03:21:35  3              I want to be perfectly clear, I put none of this

03:21:38  4    on Mr. Kittila, none of, whatsoever.  He's been a gentleman.

03:21:42  5    I like him.  He's a friend of mine.  I think it's telling

03:21:45  6    that the counsel who handled this case up to the reply is

03:21:49  7    not here to answer for it.  It's telling that Mr. Tadeparti

03:21:53  8    is not here.  There is not a privilege log.  There is

03:21:57  9    evidence of bad faith.  They should have kept e-mails from

03:22:01 10    this project.  If their theory of the complaint, tie back to

03:22:04 11    the complaint, if their theory of the complaint is we're

03:22:07 12    supposed to be paid net 30 on time and terms, in 2015 they

03:22:12 13    had a problem.  If we sued them, I can see maybe

03:22:16 14    justification.  But they sued us for the very theory that

03:22:20 15    they -- that existed, the factual basis for that claim exist

03:22:24 16    in 2015.  They're suing to recover payment on invoices that

03:22:29 17    date from 2015.

03:22:33 18              So I'm troubled by -- I'm troubled that there is

03:22:39 19    any sort of -- I would be troubled if there wasn't some --

03:22:44 20    there is not enough evidence for wilful conduct.  This isn't

03:22:48 21    here.  And this isn't a motion that I write every day.  I

03:22:51 22    don't take these things lightly, especially dealing with

03:22:54 23    counsel.  But this relationship was sour, to use

03:22:59 24    Mr. Kittila's description of the Micron case.  It was sour

03:23:02 25    in 2015.  And it was definitely legal in 2016.

03:23:06  1          THE COURT:  Okay.

03:23:07  2          MR. SIMON:  Thank you, Your Honor.

03:23:08  3          THE COURT:  Do you want to add anything?

03:23:18  4          MR. KITTILA:  Your Honor, just to make things

03:23:21  5   clear, though, Morris, James was involved in this case, and

03:23:25  6   this wasn't a Morris, James issue.  I think it's important

03:23:28  7   to know that.  This wasn't a Delaware counsel issue.  The

03:23:32  8   mistaken things in the letter that went over to Mr. Simon

03:23:36  9   went through out-of-state counsel, over their letterhead.

03:23:42 10          The issue here is that it may be a big company.

03:23:49 11   And it may be employees that are sophisticated.  And

03:23:55 12   Mr. Tadeparti would come across as a sophisticated man.  But

03:24:01 13   in discussing this with him, he's very, very concerned.

03:24:07 14   This goes to his credibility.  It goes to him being a fall

03:24:12 15   guy for somebody.  That's what this motion is about, you

03:24:16 16   know, that somebody would go through and actually throw away

03:24:19 17   things that could have a company sanctioned.  That is so

03:24:25 18   severe.  And the idea there -- I mean, he was legitimately

03:24:31 19   scared.  And the idea that somehow, Your Honor, that they

03:24:37 20   were going to throw out -- I mean, if they were going to be

03:24:40 21   intentional about it, they would have thrown out a lot of

03:24:43 22   things.  There was enough things there to throw out, you

03:24:46 23   would have been a lot more tactical than this.

03:24:49 24          And Micron shows that.  In Micron they would go

03:24:54 25   through the e-mails and find the stuff that's good, hold on

03:24:57 1   to that.  There was a lot of good stuff that Subbu was doing

03:25:02 2   because there were reports that were coming back from

03:25:05 3   Mr. Brad Estes that says I'm plenty surprised by what is

03:25:09 4   going on.  They were turning things around.  Mr. Subbu,

03:25:13 5   unfortunately Mr. Pillai, whose nickname is Subbu,

03:25:19 6   Mr. Pillai got sick and he left because of health reasons.

03:25:26 7   There wasn't some sort of let's bury this and run.  The idea

03:25:29 8   here was that Pillai's e-mails were necessary and they

03:25:34 9   shouldn't have even been in -- been saved as long as they

03:25:38 10  were.  They shouldn't have been, but they were saved because

03:25:41 11  of the fact that Mr. Tadeparti thought he needed them to get

03:25:48 12  up to seed.  He was up to speed.

03:25:50 13          The idea that somehow these guys didn't know

03:25:53 14  what they were doing at that point in time, Tadeparti knew

03:25:57 15  where he was going with the project, even after the stop

03:26:01 16  work order on August 5th, they were working together.  The

03:26:05 17  stop work order, this was a big misnomer throughout this

03:26:09 18  whole thing, it was like suddenly everybody, pens down.  It

03:26:13 19  wasn't pens down.  It was stop work on the project.  Let's

03:26:16 20  fix these things and let's try to figure it out.

03:26:19 21          THE COURT:  I think there are some disputes

03:26:21 22  about that and I don't think we need to get into that.

03:26:24 23          MR. KITTILA:  So, Your Honor, I do want to

03:26:26 24  say -- and by the way, I echo Mr. Simon's good gestures of

03:26:31 25  friendship and good will.  There is nothing here -- I

03:26:35  1   understand why he brought this, and I understand the

03:26:40  2   concerns that it probably does raise.  I think if Tadeparti

03:26:45  3   were to come in -- we realize this was an argument to be

03:26:49  4   done on the law and that sort of thing.  If he were, I think

03:26:52  5   he could defend himself and say I didn't know.  I didn't

03:26:55  6   think about it.  I made a mistake.  There but by the grace

03:27:00  7   of God go I.  That sort of type of thing.  And I think you

03:27:04  8   need to have that opportunity before a finding of bad faith

03:27:10  9   is made.

03:27:13 10               The Bull case I think is important.

03:27:15 11               Thank you, Your Honor.

03:27:18 12               THE COURT:  It's your motion so I'll give you

03:27:20 13   the last word if you need it.

03:27:22 14               MR. SIMON:  I apologize, Your Honor.  On that

03:27:24 15   point, it's an objective standard.  Second, I forgot

03:27:28 16   something.  We did raise in our motion, we believed and we

03:27:32 17   stated that there were recordings of meetings we had with

03:27:35 18   CIGNEX and they were never produced.

03:27:38 19               THE COURT:  I actually wanted to ask about that.

03:27:40 20               MR. SIMON:  And the answering brief didn't

03:27:43 21   address it.  I don't know, under some case law I would argue

03:27:47 22   that's waiver, but we have never received any -- we are just

03:27:51 23   told they don't exist.  That's what we're told.

03:27:54 24               THE COURT:  That did catch my attention in the

03:27:56 25   papers because that's not e-mail, that was something --

03:27:59  1          MR. KITTILA:  That's right.

03:28:00  2          THE COURT:  -- nobody disputed existed, but

03:28:03  3     doesn't seem to have been produced.

03:28:05  4          MR. KITTILA:  I would have to check with prior

03:28:07  5     counsel on that, Your Honor.  I saw that mentioned in the

03:28:10  6     brief.  And I looked and of course when the briefing was all

03:28:16  7     done, I saw they hadn't addressed that.  I was more focused

03:28:20  8     on getting down to the bottom of what happened to the e-mail

03:28:23  9     and reaching out to Mr. Tadeparti and everything.  I'm happy

03:28:26 10     to look further into that, Your Honor, if you wish.  I know

03:28:29 11     that we're sort of -- we're getting to the edge of trying to

03:28:34 12     get everything done so this case stays on schedule for

03:28:37 13     trial.

03:28:37 14          THE COURT:  Okay.  So this is what we're going

03:28:39 15     to do.  We're going to take about a five-minute break while

03:28:43 16     I think about a couple of things and then we'll come back.

03:28:47 17               (A brief recess was taken.)

03:46:08 18          THE COURT:  Please be seated.

03:46:11 19          So I have the two motions in front of me.  With

03:46:15 20     respect to the motion to amend counterclaims, I'm prepared

03:46:19 21     to rule.  And I will do that now.  With respect to the

03:46:23 22     motion for spoliation, I'm going to reserve on that, but I

03:46:26 23     do have some thoughts about some additional work that should

03:46:30 24     be done on that which I'll tell you in a minute.

03:46:33 25          First with respect to the counterclaims.

03:46:36  1    Defendant seeks to amend its counterclaims to add certain

03:46:39  2    factual allegations and accounts seeking revision of the

03:46:43  3    contract at issue.  The motion was filed on July 23rd, 2018.

03:46:48  4    The scheduling order in the case as amended and agreed upon

03:46:51  5    by the parties set April 25th, 2018 as the deadline for

03:46:55  6    amendment of the pleadings.  As defendants sought leave to

03:46:59  7    amend well after that date, they must satisfy the criteria

03:47:04  8    of Rule 16(b)(4) of the Federal Rules of Civil Procedure

03:47:09  9    which provides that a schedule may be modified only for good

03:47:12 10    cause and with the judge's consent.

03:47:14 11         The primary measure of good cause is the

03:47:17 12    movant's diligence in attempting to meet the scheduling

03:47:22 13    orders requirement.  And that one I'll cite, the Harris v.

03:47:29 14    FedEx National case, 760 F3d 780, the Eighth Circuit 2014.

03:47:32 15         Consistent with that this Court has found that

03:47:34 16    good cause is present when schedules cannot be met despite

03:47:37 17    the moving party's diligence.

03:47:39 18         Here, defendant argues that good cause exist

03:47:42 19    because in its estimation plaintiff changed the positions in

03:47:46 20    depositions that occurred after the April 25th date and

03:47:49 21    point specifically to testimony of CIGNEX's designee

03:47:53 22    pursuant to Rule 30(b)(6), Mr. Tadeparti, who was deposed on

03:47:57 23    June 6th, 2016.

03:47:59 24         Plaintiff argues that defendant was not diligent

03:48:02 25    because there was no change in position.  The dispute was

03:48:06 1   evident from the original complaint and plaintiff points out

03:48:08 2   in its papers that defendant relied in its brief on

03:48:12 3   statements from the mediation in February of 2018 in

03:48:16 4   asserting that claimant changed its positions and that

03:48:19 5   mediation was well before the amendment date.

03:48:22 6          The Court agrees with plaintiff that there was

03:48:24 7   not appropriate diligence here and good cause has not been

03:48:27 8   shown.

03:48:28 9          First, I have read the cited excerpts of the

03:48:31 10   deposition and I'm not convinced that there has been a

03:48:34 11   change in position such as the one that the defendant

03:48:40 12   asserts occurred.  Moreover, the defendant knew of the

03:48:42 13   deadline for amendment, it knew the depositions would occur

03:48:45 14   after that deadline, but it did not ask to have that date

03:48:49 15   changed.

03:48:49 16          Finally, once the deposition occurred in June

03:48:51 17   where the purported change in position occurred, defendant

03:48:54 18   did not move for leave to amend for almost seven weeks.

03:48:58 19          Finally, while prejudice is not the standard

03:49:02 20   under Rule 16, even if the Court were to look at this under

03:49:06 21   Rule 15, it would deny the amendment.  There is a dispute as

03:49:09 22   to whether additional discovery would be needed and to

03:49:13 23   whether additional defenses or responses to the counterclaim

03:49:16 24   would need to be pleaded.  The Court agrees with plaintiff

03:49:19 25   that it is likely that at least some discovery would be

03:49:21  1   needed and at this stage in the case that would require

03:49:24  2   wholesale changes to the schedule and prejudice the

03:49:27  3   plaintiffs, thus defendant's motion for leave to defend its

03:49:30  4   counterclaim is denied.

03:49:30  5        With respect to the motion for spoliation, I

03:49:33  6   think that the papers that were submitted as well as the

03:49:36  7   arguments we've heard here today indicate that there are

03:49:40  8   serious questions about what happened.  But I will take into

03:49:46  9   account plaintiff's request that before I rule, I should

03:49:51 10   give Mr. Tadeparti an opportunity to be heard.  So what I

03:49:56 11   will do is I will order that Mr. Tadeparti be made available

03:50:01 12   for deposition.  That deposition I'm not going to limit the

03:50:05 13   time other than the seven-hour deadline in the rules.  But

03:50:10 14   it should be limited to issues relating to the sanctions and

03:50:15 15   the spoliation motion.

03:50:20 16        And then I would ask that by January 19th, each

03:50:26 17   party -- I'll ask defendant to submit the entire transcript

03:50:30 18   of that entire deposition to me and each party may have two

03:50:34 19   pages in which they can spell out for me what they think the

03:50:37 20   import of that deposition was with respect to the pending

03:50:42 21   motion.

03:50:42 22        Are there any questions?

03:50:45 23        MR. KITTILA:  No, Your Honor.

03:50:46 24        MR. SIMON:  None from defendant, Your Honor.

03:50:48 25        THE COURT:  Okay.  Then we will be in recess.

03:50:50  1      Thank you.

2                          (Court adjourned at 3:50 p.m.)

3

4                          I hereby certify the foregoing is a true
         and accurate transcript from my stenographic notes in the
5        proceeding.

6
                                              /s/ Dale C. Hawkins
7                                         Official Court Reporter
                                             U.S. District Court
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **<u>EXHIBIT B</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DEBORAH S. SKEANS, Executrix of the ESTATE OF FRANK E. PAVLIS, <br><br> *Plaintiff*, <br><br> v. <br><br> KEY COMMERCIAL FINANCE, LLC, KEY COMMERCIAL FINANCE PROPERTIES, LLC, EQUITY PROS, LLC, and MOBILE AGENCY, LLC, <br><br> *Defendants.* <br> *Third-Party Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     C.A. No. 1:18-cv-01516-CFC |

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO**
**DEFENDANTS' FIRST REQUESTS FOR ADMISSION**

Plaintiff, Deborah S. Skeans, Executrix of the Estate of Frank E. Pavlis ("Plaintiff"), objects and responds to Defendants' First Requests for Admission as follows:

**GENERAL OBJECTIONS**

A.      Plaintiff objects to each request for admission that seeks materials or information protected by the attorney-client privilege, work product doctrine, or any such or similar applicable privilege, protection or immunity.

B.      Plaintiff objects to each request for admission that seeks materials or information already in the requesting party's possession or equally available to the requesting party.

C.      Plaintiff objects to all instructions and definitions as imposing obligations or conditions inconsistent with, or more stringent than, those imposed by the Federal Rules of Civil Procedure.  Plaintiff will respond in accordance with the Rules and consistent with the plain meaning of the words used in each request for admission.

4543013

D.   These responses are based upon information presently known by Plaintiff.  It is anticipated that further discovery, investigation, legal research and analysis will supply additional factual conclusions and legal contentions.  Plaintiff reserves the right to rely on such additional discovery, investigation, legal research and analysis, and to make such additions, changes, and variations to these responses as warranted.

## RESPONSES TO REQUESTS FOR ADMISSION

1.   Admit that the Estate of Frank E. Pavlis is no longer the holder of the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million (attached as Ex. 1 hereto).

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around September 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  On or about September 19, 2017, Mr. Pavlis signed an "Assignment of Note," the terms of which purported to transfer Mr. Pavlis' interests in the referenced note to "Frank E. Pavlis TOD Watchtower Bible and Tract Society of New York, Inc."

2.   Admit that the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million (attached as Ex. 1 hereto) was transferred on the date of Frank E. Pavlis' death to the Watchtower Bible and Tract Society of New York, Inc., c/o Charitable Planning Office, 100 Watchtower Drive, Patterson, NY 12563-9204.

**Response**: Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around September 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  On or about September 19, 2017, Mr. Pavlis signed an "Assignment of Note," the terms of which purported to transfer Mr. Pavlis' interests in the referenced note to "Frank E. Pavlis TOD

2

Watchtower Bible and Tract Society of New York, Inc."

      3.      Admit that Frank E. Pavlis assigned the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million on September 19, 2017, the date of the "Assignment of Note" (attached as Ex. 2 hereto).

**<u>Response:</u>** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around September 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  On or about September 19, 2017, Mr. Pavlis signed an "Assignment of Note," the terms of which purported to transfer Mr. Pavlis' interests in the referenced note to "Frank E. Pavlis TOD Watchtower Bible and Tract Society of New York, Inc."

      4.      Admit that Frank E. Pavlis had capacity to assign the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million on September 19, 2017, the date of the "Assignment of Note" (attached as Ex. 2 hereto).

**<u>Response</u>**: Plaintiff objects to this request on the grounds the phrase "had capacity" is vague and ambiguous.  To the extent the request is referring to Mr. Pavlis' legal and/or mental capacity, Plaintiff objects on the grounds that it calls for a legal conclusion and/or a medical opinion, neither of which Plaintiff is obligated or able to provide.  Plaintiff further objects to this request on the grounds that it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around September 1, 2014, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  Plaintiff admits that, in her lay opinion, Mr. Pavlis had capacity to sign the "Assignment of Note."  Plaintiff is without knowledge or information as to whether Mr. Pavlis understood the contents or import of the "Assignment of Note," other than her belief that Mr. Pavlis signed the "Assignment of Note" on the recommendation and advice of his estate planning counsel.

      5.      Admit that Frank E. Pavlis was never deemed to be incompetent or to otherwise lack capacity.

4543013

**Response**: Plaintiff objects to this request on the grounds the phrase "was never deemed to be incompetent or otherwise lack capacity" is vague and ambiguous.  To the extent the request is referring to Mr. Pavlis' legal and/or mental capacity, Plaintiff objects on the grounds that it calls for a legal conclusion and/or a medical opinion, neither of which Plaintiff is obligated or able to provide.  Subject to and without waiving these objections, Plaintiff admits as follows:  Plaintiff admits that, to her knowledge, Mr. Pavlis had never been found to have been legally or mentally incompetent by any medical professional or as a result of any legal proceeding.

6.      Admit that Deborah Skeans was aware of the "Assignment of Note" (attached as Ex. 2 hereto) at the time that it was signed by Frank E. Pavlis.

**Response**: Admitted.

7.      Admit that Deborah Skeans was aware of the existence of both (a) the Key Commercial Finance, LLC Convertible Promissory Note dated September 1, 2014, in the amount of $3 million (attached as Ex. 1 hereto), and (b) the Key Commercial Finance, LLC Convertible Promissory Note dated November 1, 2014, in the amount of $4 million (attached as Ex. 3 hereto) before the date of Frank E. Pavlis' death.

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Notes were valid legal instruments and/or were actually issued to Mr. Pavlis, in or around September 1, 2014 or November 1, 2014, respectively, or at any other time.  Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014.  Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*.  Subject to and without waiving these objections, Plaintiff admits as follows:  Plaintiff admits that she was aware of the existence of copies of documents purporting to be the referenced Promissory Notes prior to the date of Mr. Pavlis' death.

8.      Admit that the Key Commercial Finance, LLC Convertible Promissory Note dated November 1, 2014, in the amount of $4 million (attached as Ex. 3 hereto) was bequeathed to the Watchtower Bible and Tract Society of New York, Inc. as part of Mr. Pavlis' estate.

4

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around November 1, 2014, or at any other time. Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014. Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*. Plaintiff further objects to this request on the grounds that the phrase "was bequeathed to the Watchtower Bible and Tract Society of New York, Inc. as part of Mr. Pavlis' estate" is vague and ambiguous and calls for a legal conclusion. Subject to and without waiving these objections, Plaintiff responds as follows: Denied.

   9.   Admit that the Estate of Frank E. Pavlis is no longer the holder of the Key Commercial Finance, LLC Convertible Promissory Note dated November 1, 2014, in the amount of $4 million (attached as Ex. 3 hereto).

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the referenced Promissory Note is a valid legal instrument and/or was actually issued to Mr. Pavlis, in or around November 1, 2014, or at any other time. Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such notes or related instruments as it did not legally exist or operate prior to December 2014. Absent legal capacity, the notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*. Subject to and without waiving these objections, Plaintiff responds as follows: Denied.

   10.   Admit that Frank E. Pavlis did not disclaim his signature on either of the Note Purchase Agreements attached as Exhibit 4 or Exhibit 5.

**Response:** Plaintiff objects to this request on the grounds it calls for a legal conclusion and assumes that the documents attached as Exhibits 4 and 5 were actually issued to and/or signed by Mr. Pavlis. Plaintiff further objects to this request on the grounds that Key Commercial Finance, LLC lacked the legal standing or capacity to issue any such documents as it did not legally exist or operate prior to December 2014. Absent legal capacity, the note purchase agreements and related notes purportedly issued by Key Commercial Finance, LLC to Mr. Pavlis are *void ab initio*. Subject to and without waiving these objections, Plaintiff responds as follows: Plaintiff lacks knowledge or information sufficient to admit or deny whether Mr. Pavlis signed either of the documents attached as Exhibits 4 and 5, and if Mr. Pavlis did sign these documents, lacks knowledge or information sufficient to admit or deny whether he ever disclaimed his signature on those documents.

   11.   Admit that Frank E. Pavlis made an investment in or a loan to a charter school known as Circle of Seasons in 2014 in excess of $390,000.

**Response**: Plaintiff objects to this request on the grounds it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, as the issues in this case relate to the fraudulent misappropriation of funds Mr. Pavlis invested, and does not relate to any loans Mr. Pavlis made to entities not named in, or otherwise involved with, this lawsuit.  Subject to and without waiving this objection, Plaintiff admits as follows:  Mr. Pavlis made a loan to Circle of Seasons in the approximate amount of $415,000.00 in 2014.

12.    Admit that Deborah Skeans assisted with the making of the loan referenced in

Request No. 11.

**Response**: Plaintiff objects to this request on the grounds it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, as the issues in this case relate to the fraudulent misappropriation of funds Mr. Pavlis invested, and does not relate to any loans Mr. Pavlis made to entities not named in, or otherwise involved with, this lawsuit.   Plaintiff objects to this request on the grounds that phrase "assisted with the making of the loan referenced in Request No. 11" is vague and ambiguous.  Subject to this objection, Plaintiff admits as follows: Plaintiff admits that she requested that Justin Billinglsey ask Mr. Pavlis to make a loan to Circle of Seasons.

13.    Admit that Frank E. Pavlis' net worth at the date of his death exceeded $70 million.

**Response**: Plaintiff objects to this request on the grounds it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, as the issues in this case relate to the fraudulent misappropriation of funds Mr. Pavlis invested, and does not relate to Mr. Pavlis' net worth at the date of his death.  Subject to this objection, Plaintiff responds as follows:  Denied.

14.    Admit that Deborah Skeans spoke directly with Craig Harris, a reporter from the

Arizona Republic, relating to Mr. Justin Billingsley and Frank E. Pavlis.

**Response**: Admitted.

6

4543013

15.     Admit that Darbin Skeans spoke directly with Craig Harris, a reporter from the Arizona Republic, relating to Mr. Justin Billingsley and Frank E. Pavlis.

**Response:**  Admitted.

                              STRADLEY RONON
                              STEVENS & YOUNG, LLP

                              */s/ Joelle E. Polesky*
                              Joelle E. Polesky (ID No. 3694)
                              1000 N. West Street, Suite 1200
                              Wilmington, DE  19801
                              Tel: (302) 295-4856
                              Fax: (302) 295-4801
                              Email: jpolesky@stradley.com

                              *Attorneys for Plaintiff, Deborah Skeans,*
                              *Executrix of the Estate of Frank E. Pavlis*

Dated: April 27, 2020

4543013

# **<u>EXHIBIT C</u>**

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

2
                            - - -

3

     DEBORAH S. SKEANS,            :   CIVIL ACTION
4    Executrix of the ESTATE       :   NUMBER
     OF FRANK E. PAVLIS,           :   1:18-cv-01516-
5                 Plaintiff,       :   CFC
                 v.                :
6    KEY COMMERCIAL FINANCE,       :
     LLC, KEY COMMERCIAL           :
7    FINANCE PROPERTIES, LLC,      :
     EQUITY PROS, LLC, and         :
8    MOBILE AGENCY, LLC,           :
                  Defendants.      :

9
                            - - -

10
                 Wednesday, April 29, 2020

11
                            - - -

12
13              Oral deposition of DEBORAH S.
14   SKEANS, taken remotely via Zoom, at 222 North
15   28th Street, Allentown, Pennsylvania  18104,
16   beginning at 9:32 a.m., reported
17   stenographically by Cheryl L. Goldfarb, a
18   Registered Professional Reporter, Notary
19   Public, and an approved reporter of the United
20   States District Court.
21                          - - -
22
                 VERITEXT LEGAL SOLUTIONS
23                 MID-ATLANTIC REGION
              1801 Market Street - Suite 1800
24         Philadelphia, Pennsylvania  19103

DEBORAH S. SKEANS

Page 58

```
 1        going to stop sharing this a second and
 2        then come back.
 3  BY MR. GREEN:
 4        Q.        Now, you had mentioned before,
 5  in listing the assets of the estate, you
 6  mentioned a $1 million Allwest note and a
 7  $4 million Key Commercial Finance note.
 8              Because it's part of the
 9  litigation, you're also aware that there is a
10  $3 million Key Commercial Finance note, yes?
11        A.        Yes.
12              MR. MAHONEY:  I'll object to the
13        extent that it calls for a legal
14        conclusion as to whether that note truly
15        exists or was valid.
16              I don't want to keep
17        interrupting you, Bill, on this.
18              MR. GREEN:  Sure.
19              MR. MAHONEY:  With that standing
20        objection whenever you or Ms. Skeans
21        refers to that note, I'm happy to let you
22        ask questions about it.
23              MR. GREEN:  Gotcha.
24  BY MR. GREEN:
```