## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEBORAH S. SKEANS, Executrix of the ESTATE OF FRANK E. PAVLIS, *Plaintiff*, <br><br> v. <br><br> KEY COMMERCIAL FINANCE, LLC, KEY COMMERCIAL FINANCE PROPERTIES, LLC, EQUITY PROS, LLC, and MOBILE AGENCY, LLC, <br>　　　　　*Defendants*. | C.A. No. 1:18-cv-01516-CFC-MPT <br><br> **MOTION TO STRIKE** |

## MOTION TO STRIKE CERTAIN PARAGRAPHS AND TEXT IN PLAINTIFF'S SUPPLEMENTAL COMPLAINT AND PRE-TRIAL DOCUMENTS

Now comes Intervenor Jeffrey Peterson to ask that this Honorable Court strike certain paragraphs from Plaintiff's Supplemental Complaint filed April 15, 2021 (D.I. 102) ("Supplemental Complaint"); and strike certain paragraphs from the Joint Pretrial Order filed July 2, 2021 (D.I. 106) ("July 2 Pretrial Order"), where, "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." [FRCP 12(f)].

The Intervenor seeks this relief because certain paragraphs and text within the Supplemental Complaint and consequently in the July 2 Pretrial Order represent yet another instance in which Plaintiffs knowingly files with this Court

1

pleadings containing false facts for the purpose of launching scandalous attacks, designed by Arizona attorney Dennis K. Burke—a former business colleague of the Intervenor—to mislead government investigators in order to gain improper advantage in other litigation designed and orchestrated by Burke. These filings are wholly inappropriate, and with regard to the case at bar, represent, "immaterial, impertinent, [and] scandalous," allegations. In the interest of justice, this material must be stricken from the record.

## Background

Since 2017, Burke and at least one of his colleagues, attorney Alan Bersin ("Bersin")[1] and Bersin's attorney Nate Bruggeman ("Bruggeman")[2], all of whom were previously employed as government prosecutors, (the "former prosecutors") have been attempting to inappropriately characterize Mobile Corporation ("Mobile"), a start-up business project in which Bersin invested $600,000 in the year 2013, as a "fraud scheme," as part of what Intervenor characterizes as their misguided legal efforts which rely on false facts.

One of the ways that Burke and the former prosecutors have attempted to put false facts on the public record is by persuading Philadelphia, PA attorney William

---

[1] Mr. Bersin, like Mr. Burke, is a lawyer who also formerly served as a United States Attorney and federal prosecutor.

[2] Mr. Bruggeman is a lawyer, presently employed by Mr. Bersin, who also formerly served as a government prosecutor.

E. Mahoney, Jr. ("Mahoney") to include certain paragraphs and textual passages containing false facts within legal documents filed in this *Skeans* litigation. Importantly, Intervenor does not make accusations regarding the use of false facts before this Court without proof. As further discussed throughout this Motion, clear and convincing proof of false facts contained within the *Skeans* Supplemental Complaint were already provided to Mahoney by Peterson during the past several months, yet nothing was done to remove such false facts from the Supplemental Complaint to date. Instead, Mahoney allowed further inappropriate, scandalous textual passages about Mr. Peterson and Mobile Corporation to be published on the record in the July 2 Pretrial Order.

      Mr. Peterson was previously the CEO of Mobile Corporation and has vigorously disputed the "fraud scheme" characterizations about Mobile Corporation made by Burke and the former prosecutors in multiple venues and within legal documents improperly influenced by them in this *Skeans* litigation.

      In approximately late 2017, Bersin hired the Arizona law firm of Beus, Gilbert to litigate his civil action against multiple defendants, including two law firms previously "in the room" during Mobile's start-up business operations: The Arizona law firm of Snell and Wilmer ("Snell"), and the Silicon Valley, California law firm of Wilson, Sonsini, Goodrich & Rosati ("WSGR"). Thereafter, Beus Gilbert hired Mr. Alexander Morris, a former federal law enforcement agent

3

licensed to practice law, who now represents the twenty-one plaintiffs who were gathered by Burke to stand as Plaintiffs in Mr. Bersin's *Bersin v. Bivens* litigation.[3]

At present, Bersin's *Bersin v. Bivens* civil litigation involves three former prosecutors: Burke, Bersin, and Bruggeman, while the remaining twenty plaintiffs are represented by a former federal law enforcement agent, Alexander Morris, as their legal counsel. In this context, it is almost as though a miniature United States Attorney's prosecution office has been organized by Burke and the former prosecutors while Mr. Bersin is seeking multi-million-dollar civil settlements through his *Bersin v. Bivens* litigation that was designed by Burke in Arizona. As permissible as that may be, the problem here is, Intervenor Peterson alleges Burke and the former prosecutors are utilizing demonstrably false material facts and made-up stories about things that never happened, including text published within the contents of legal documents filed in this *Skeans* litigation, to mislead government investigators in ways that would give the plaintiffs unfair advantages in their *Bersin v. Bivens* Arizona civil litigation, quite possibly to the detriment of Mr. Peterson, in furtherance of Bersin's multi-million-dollar legal settlement goals with Snell and WSGR, which Bersin's counsel refers to as "deep pockets."

Mr. Peterson alleges that Burke designed the *Bersin v. Bivens* civil litigation in such a way to first improperly allege that Mobile Corporation was a "fraud

---

[3] *Bersin v. Bivens*, Maricopa Super Ct. (CV2019-006555)

4

scheme" based upon false facts[4], then persuade the government to get involved in the matter while misleading investigators with such false facts[5], with intent to exert great pressure on the law firm defendants, Snell and WSGR, in order to "strong-arm" their insurance companies into paying multi-million-dollar settlements to *Bersin v. Bivens* plaintiffs while simultaneously retaliating against Intervenor Peterson, whom Burke in 2017 said he would "nuke" if Peterson did not "find a way" to recover investments that Bersin and Gardner previously made[6] in Mobile.

    In 2018, Dennis K. Burke contacted Philadelphia, PA lawyer William Mahoney, Jr. ("Mahoney"), counsel for the *Skeans* plaintiff in this matter, and

---

[4] In the *Bersin v. Bivens* litigation, the plaintiffs have amended their complaint three times since it was first filed in 2019, changing material facts each time. The first version of the complaint contained allegations of racketeering ("RICO") violations usually reserved for organized crime syndicates.

[5] The *Skeans* Supplemental Complaint contains numerous paragraphs, further discussed by this Motion, which rely on allegations of $500,000 supposedly invested in Mobile Corporation by Mr. Frank Pavlis on April 25, 2013 when in fact Mr. Pavlis's $500,000 was returned from a trust account by Mobile's corporate attorneys, Wilson, Sonsini, Goodrich & Rosati ("WSGR") on May 10, 2013. The fact that Mr. Pavlis's $500,000 never reached Mobile's bank account but was instead returned from trust *eliminates any possibility* that the allegations could be true.

[6] In 2017, Burke expressed discontent to Mr. Peterson that the Mobile business project did not work out the way Burke hoped it would, causing losses of $600,000 to Bersin who is an important business colleague of Burke, and $200,000 to Burke's relative, Charlie Gardner, whom Burke himself persuaded to invest in Mobile.

In signed investor subscription documents, Bersin and Gardner, and other Mobile investors certified that they were accredited, sophisticated investors with access to information about Mobile, and that they could economically withstand a loss of their entire investments.

provided Mahoney with ghost-written passages containing false facts and scandalous, untrue statements regarding Intervenor, for inclusion in legal documents Mahoney was authoring in connection with the present litigation.

After admitting to Peterson in a telephonic conversation that Burke was indeed the source of the multiple false, scandalous textual passages within the *Skeans* legal documents, Mahoney apparently continued to allow Burke and the former prosecutors to improperly influence the record in this litigation through present day, within the filing of the Supplemental Complaint on April 15, 2021 and the July 2 Pretrial Order, both which contain numerous, material false facts and factually impossible depictions of history about Intervenor Peterson and Mobile Corporation.

Shortly after publication of the Supplemental Complaint, Intervenor wrote a series of three detailed memos[7] to Mahoney, on April 21, April 28, and May 2nd of 2021, to request that Mahoney remove numerous false, scandalous textual passages from the Supplemental Complaint. On May 14th of 2021, Intervenor further discussed the improperly influenced legal documents with attorney Jeffrey Lutsky ("Lutsky"), the Managing Partner at Stradley Ronon Stevens & Young, LLP, the law firm where Mahoney is employed. At that time, Intervenor indicated that he

---

[7] The April 21, April 28, and May 2nd, 2021, memos are attached to this Motion to Strike as exhibits.

may file a Motion to Strike in this matter if the improperly influenced legal documents were not corrected.

On July 2, 2021, the July 2 Pretrial Order was filed on the record. Instead of reversing course or addressing the improperly influenced legal documents, counsel for Skeans—already well aware that the Supplemental Complaint contained false facts and factually impossible depictions of history—continued on the same path of allowing scandalous, false characterizations about Intervenor Peterson and Mobile Corporation to again be put on the record. Therefore, Intervenor Peterson now comes forth with this Motion to Strike.

**Discussion**

In support of this motion, Intervenor states as follows:

**I.    This Court Should Strike Certain Paragraphs from the Supplemental Complaint Because it Contains False Facts, Scandalous Character Attacks and Depictions of Factually Impossible History**

Rule 12(f) provides in part that "[u]pon motion made by a party . . . the court may order stricken from any pleading any . . . scandalous matter." Fed. R. Civ. P. 12(f); *see* 5C C. Wright and A. Miller, Federal Practice and Procedure (Civil) 2d §1382, at 465 (2004) ("'Scandalous' matter is that which improperly casts a derogatory light on someone, most typically on a party to the action.") (footnote omitted); 2 Moore's Federal Practice §12.37[3] at 12-97 ("'Scandalous generally refers to any allegation that unnecessarily reflects on the moral character of an

individual or states anything in repulsive language that detracts from the dignity of the court.") (footnote omitted).

While motions to strike are generally disfavored, "the disfavored character of Rule 12(f) is relaxed somewhat in the context of scandalous allegations and matter of this type often will be stricken from the pleadings in order to purge the court's files and protect the person who is the subject of the allegations." 5C C. Wright and A. Miller, Federal Practice and Procedure (Civil) 2d § 1382, at 466-67 (2004); *see* Metrokane, Inc. v. The Wine Enthusiast, 160 F. Supp. 2d 633, 641-42 (S.D.N.Y. 2001) ("Generally, motions to strike are disfavored and usually granted only for scandalous material.") (citation omitted).

The striking of offensive material is particularly appropriate when the offensive material is not responsive to an argument but, rather, constitutes an inappropriate attempt to abuse the Court's process to attack an individual personally. *See e.g.*, Magill v. Appalachia Intermediate Unit 08, 646 F. Supp. 339, 343 (W.D. Pa. 1986) (striking allegations that "reflect adversely on the moral character of an individual who is not a party to this suit" which were "unnecessary to a decision on the matters in question"); *see also* Pigford v. Veneman, 215 F.R.D. 2, 4-5 (D.D.C. 2003) (striking unfounded accusations that opposing counsel was racist); Murray v. Sevier, 156 F.R.D. 235, 258 (D. Kan. 1994) (striking allegation that defendant and his counsel "bought off" and paid "hush money" to prospective

8

witnesses); Cairns v. Franklin Mint Co., 24 F. Supp. 2d 1013, 1037 (C.D. Cal. 1998) (striking allegation that "defendants are '[l]ike vultures feeding on the dead'"); Nault's Automobile Sales, Inc. v. American Honda Motor Co., 148 F.R.D. 25, 29-34 (D.N.H. 1993) (noting that "[w]ith each passing week the pleadings assumed a more hostile and accusatory tone" and striking scandalous assertions).

While litigants at times attempt to restrict requests for relief under Rule 12(f) to specific offensive statements, here, the scandalous content encompasses significant portions of the Supplemental Complaint and the July 2 Pretrial Order that were improperly influenced by the former prosecutors through the use of patently false facts and text representing factual impossibilities.

The following sets forth certain examples[8] of Plaintiffs' rhetorical excesses, abuses, and use of false facts:

### The Supplemental Complaint

1. The second paragraph on page 11 of the Supplemental Complaint contains the following misleading language:

> "... *schemes* [sic] … created with his *recurring partner in fraudulent enterprises*, Jeffrey Peterson …" (emphasis added).

---

[8] By citing certain examples in this Motion, Intervenor does not intend to waive or otherwise limit the scope of his commentary regarding further false textual passages within the relevant legal document filings discussed herein.

The above are scandalous, speculative, highly charged inappropriate statements. Peterson is not Mr. Billingsley's "recurring partner in fraudulent enterprises." As one example of the falsity of the above statement, Billingsley's employment at Mobile Corporation was terminated two times while Peterson was CEO of Mobile.

Mr. Peterson is a well-known technology entrepreneur who was formerly the founder and CEO of Quepasa/MeetMe, the first Social Network to trade publicly on a stock exchange in the United States. After Peterson successfully lead Quepasa/MeetMe through two periods of rapid corporate growth culminating in an acquisition by then-Florida venture capitalist Richard L. Scott,[9] the company merged and was acquired by the German parent company of eHarmony.com for $500 million in March of 2020.

2. The third paragraph on page 11 of the Supplemental Complaint contains the following language:

> "a *pattern* that would become familiar: it targeted the savings of *naive and/or financially unsophisticated* retirees through the sale of high-risk, low-return "securities" that, invariably, proved worthless" (emphasis added).

The above text suggests Mobile Corporation was part of a "pattern" involving the alleged circumstances. It is inaccurate, however. Mobile investors signed subscription documents certifying they were sophisticated, accredited investors

---

[9] Richard L. Scott is now a United States Senator for Florida.

who could fend for themselves, and that they had access to information about Mobile, among other things.

3. The fourth paragraph on page 11 of the Supplemental Complaint contains the following language:

> "At all relevant times, Peterson was CEO and Chairman of the Board of Directors of LoanGo."

That is an untrue statement. John Ayers became the CEO and Chairman of the Board of Directors of LoanGo when Peterson distanced himself from the company in 2012.

4. The last paragraph on page 11 of the Supplemental Complaint contains the following misleading statement:

> "Beginning in September 2011, Billingsley *and* Peterson began *soliciting* investments in LoanGo by selling promissory notes" (emphasis added).

That is a untrue statement. Peterson never solicited investments in LoanGo.

5. The last paragraph on page 13 of the Supplemental Complaint contains the following scandalous depiction:

> "The Commission's findings confirm that Billingsley and his *co-conspirators*" (emphasis added)

That is untrue. Peterson was never referred to as a "co-conspirator" by the Arizona Corporation Commission. The former prosecutors may like the *Skeans* complaint to contain statements reflecting that Peterson and Billingsley were at one time

referred to as "co-conspirators" (they were not)—so that the former prosecutors may reference the Supplemental Complaint to support this specific characterization in other legal documents, however, it is not true.

6. Page 15, paragraph 52 of the Supplemental Complaint contains a false and scandalous depiction of Mr. Peterson:

> "Mobile Corp's Chairman and CEO – and Billingsley's *cohort* in the LoanGo fraud" (emphasis added)

Despite the fact that the allegations of this paragraph are factually impossible because the $500,000 transfer alleged to have been invested by Pavlis were never received by Mobile Corporation but instead returned to Pavlis, the statement is false, and scandalous. Paragraph 52 starts with the highly charged and groundless statement:

> "Within weeks of Mr. Pavlis' original $500,000 investment, all of *that money* was *gone*" (emphasis added)

That is impossible and therefore it is a highly improper and baseless allegation because the $500,000 was never received by Mobile Corporation, instead, as further discussed herein, the $500,000 was returned from trust by Mobile's lawyers, Wilson Sonsini Goodrich & Rosati ("WSGR") on May 10, 2013.

7. Paragraphs 32, 52, 53, 55, 65, 69, and 75 of the Supplemental Complaint contain false facts and depictions of factual impossibilities that rely on allegations of a $500,000 investment supposedly made in Mobile Corporation by Frank Pavlis.

However, the $500,000 sent by Mr. Pavlis to Mobile Corporation on April 25, 2013 did not reach Mobile Corporations' bank account; the $500,000 was returned by Mobile's lawyers, WSGR, from trust on May 10, 2013. As such, these paragraphs containing depictions of factual impossibilities should be stricken from the record.

### The July 2 Pretrial Order

8. The first paragraph on page 56 of the July 2 Pretrial Order uses the language "motive, intent, preparation, common plan and/or absence of mistake." The second paragraph also on page 56 uses the language "... it is similarly admissible as an exception to the hearsay rule as evidence of Defendants' motive, intent and plan ..." in a way that resembles a prosecutorial charging document. The words "motive, intent, preparation, common plan and/or absence of mistake" should be stricken as they are wholly inappropriate in the context of this civil litigation case; rather they are speculative, false, conclusory statements the former prosecutors persuaded counsel for Skeans to include in the July 2 Pretrial Order so that the former prosecutors can reference it from other legal documents as "evidence from the record of another case" while attempting to engineer (manufacture) an advantage in a civil matter.

That the former prosecutors caused words such as "common plan" to appear in the July 2 Pretrial Order ought not to give rise to a government prosecution based upon a finding of probable case about a "common plan."

9. Also on page 56 of the July 2 Pretrial Order, the following language appears:

> "evidence related to Mobile Pro Corporation, in addition to being probative of Defendants' *intent* and *common plan* ..."

The above language is conclusory, false, and speculative. The July 2 Pretrial Order is no place to make false, speculative statements about intent and allegations of an alleged "common plan." The former prosecutors may like it to appear there, so they can reference it as a "document that was filed in a court" containing those statements, but such slight-of-hand trickery amounting to the manufacture of false statements is strongly discouraged in federal courts.

10. Also on page 56 of the July 2 Pretrial Order, the following language appears:

> "… evidence relating to Mobile Pro [sic] is *inextricably intertwined* with and part of Plaintiff's fraud claims" (emphasis added).

The above language is conclusory, speculative, and false. The July 2 Pretrial Order is no place to make false, speculative statements about intent and allegations of "inextricably intertwined" evidence. The former prosecutors may like it to appear there, so they can reference it as a "document that was filed in a court" containing those statements, but such slight-of-hand trickery is strongly discouraged in federal courts.

14


That the former prosecutors caused words such as "common plan" to appear in the July 2 Pretrial Order ought not to give rise to a government prosecution based upon a finding of probable case about a "common plan."

9. Also on page 56 of the July 2 Pretrial Order, the following language appears:

> "evidence related to Mobile Pro Corporation, in addition to being probative of Defendants' *intent* and *common plan* ..."

The above language is conclusory, false, and speculative. The July 2 Pretrial Order is no place to make false, speculative statements about intent and allegations of an alleged "common plan." The former prosecutors may like it to appear there, so they can reference it as a "document that was filed in a court" containing those statements, but such slight-of-hand trickery amounting to the manufacture of false statements is strongly discouraged in federal courts.

10. Also on page 56 of the July 2 Pretrial Order, the following language appears:

> "… evidence relating to Mobile Pro [sic] is *inextricably intertwined* with and part of Plaintiff's fraud claims" (emphasis added).

The above language is conclusory, speculative, and false. The July 2 Pretrial Order is no place to make false, speculative statements about intent and allegations of "inextricably intertwined" evidence. The former prosecutors may like it to appear there, so they can reference it as a "document that was filed in a court" containing those statements, but such slight-of-hand trickery is strongly discouraged in federal courts.

11. The last paragraph on page 55 of the July 2 Pretrial Order refers to Mobile Corporation as a "parallel and overlapping" … "fraud scheme." Mobile Corporation was a start-up technology business. Mobile Corporation was not a "fraud scheme" and the former prosecutors or Burke persuading counsel in the *Skeans* matter to include such unsupported language in the July 2 Pretrial Order does not make it so. The language "other parallel and overlapping fraud schemes involving Loan Go and Mobile Corporation, and the Arizona Corporation Commission's regulatory action" should be stricken as speculative, false, and scandalous.

**II. The Skeans litigation is not about Mr. Peterson. Mr. Peterson was not a part of the business entities named by the Supplemental Complaint or the July 2 Pretrial Order. There is no legitimate reason to include Mr. Peterson's name in the *Skeans* pleadings other than for improper use by other parties described herein.**

Misleading, scandalous paragraphs containing untrue statements about Mr. Peterson represent efforts by the former prosecutors to utilize the *Skeans* pleadings as a canvas on which they paint misleading portrayals of Mobile Corporation and Mr. Peterson, for improper purposes.

Such misleading paragraphs were designed by Mr. Burke and the former prosecutors so that they may later cite such documents in other legal filings as "documents filed in a court" in furtherance of their underhanded efforts to manufacture probable cause and/or the appearance of general impropriety. In the

case of Mr. Burke, it was already established by the State Bar of Arizona and the Office of the Inspector General of the United States Department of Justice that Burke mislead government investigators by providing documents "through other people." On information and belief, that is happening again here.

What is seen in Burke's participation in the authorship of misleading and untrue paragraphs in this *Skeans* matter, is yet another example of Burke utilizing untrue statements, "through other people," with intent to mislead government investigators.

Indeed, the pleadings have already become part of the public record while containing misleading, scandalous statements about things that never happened.

**III. Paragraphs and textual passages described herein should be stricken from the record because the former prosecutors influenced documents filed in this *Skeans* civil litigation with paragraphs containing scandalous, untrue statements and false "facts" about Mr. Peterson and Mobile Corporation designed to help them mislead investigators in ways that would give them an unfair advantage in their *Bersin v. Bivens* civil litigation.**

The former prosecutors would like Mr. Peterson's name included on the *Skeans* record saturated with prose authored in the style of "government law enforcement vernacular" so they may utilize the *Skeans* pleadings themselves as part of their efforts to manufacture the appearance of *criminal conduct* that would help them pressure defendants in their Arizona civil litigation, i.e. by arguing that

16

untrue textual passages within the record of *Skeans* supposedly amount to probable cause for indictment or to "support" a misguided criminal action.

If Mr. Burke were able to mislead government investigators to initiate further actions against certain parties formerly associated with Mobile Corporation, it may serve as pressure on the remaining defendants in the Arizona *Bersin v. Bivens* litigation to "scare up" the multi-million-dollar settlements the former prosecutors have been seeking with what is in the opinion of Mr. Peterson an otherwise weak civil case. Such a scenario is not unreasonable to consider, as Mr. Burke was reprimanded by the State Bar of Arizona in 2014 for misleading government investigators.

In July of 2019, Mr. Peterson raised the concerns described herein with Attorney Leo Beus, counsel for one the former prosecutors in the Arizona civil litigation, Alan Bersin. In a stunning admission, Mr. Beus admitted to Mr. Peterson that he *knew* Dennis K. Burke had provided Beus's law firm with false facts, and that Mr. Burke was "out after you…" (referring to Peterson). Approximately two months later, on September 9, 2019, Mr. Beus and the twenty-one plaintiffs in the *Bersin v. Bivens* litigation dismissed Mr. Peterson, with prejudice, from the case.

Accordingly, the only meaningful relief for Plaintiffs' abuse of the judicial process presently on display here is an order striking the paragraphs and textual passages described herein, or the entire pleadings. To permit Plaintiffs to continue

to file pleadings of the nature described herein, without the Court's admonition, provides the Court's tacit approval of Plaintiffs' established abusive practices. Plaintiffs' tactics damage more than the targets of their vicious and groundless rhetoric; they damage the judicial process itself, and this Court should not tolerate them. The paragraphs and textual passages described herein must be stricken from the Supplemental Complaint and the July 2 pretrial order to prevent such manifest injustice.

## CONCLUSION

For the foregoing reasons, and considering the clear and convincing supporting evidence provided to the Court, Defendants respectfully ask this Court for an Order (a) striking certain paragraphs from Plaintiff's Supplemental Complaint filed April 15, 2021 (D.I. 102) ("Supplemental Complaint"); (b) striking certain paragraphs from the Joint Pretrial Order filed July 2, 2021 (D.I. 106) ("July 2 Pretrial Order").

**LAW OFFICE OF
GREGORY D. STEWART, P.A.**

  /s/ Gregory D. Stewart
Gregory D. Stewart (DE Id. No. 5826)
409 South Ridge Avenue
Middletown, DE 19709
Telephone: (302) 828-0101
Fax: (302) 449-0428
gstewart@gregstewartlaw.com
*Attorney for Movant*

OF COUNSEL:

Mark Ellis O'Brien *(pro hac vice)*
P. O. Box 342
Lunenburg, MA 01462
Tel: (978) 790-1936

## **Compliance with Local Rules of this Court**

Pursuant to Local Civil Rule 7.1.1, counsel for the Intervenor avers he attempted to confer with Plaintiffs' counsel regarding this motion. Plaintiffs' counsel refused to take Intervenor counsel's call or return phone calls or an e-mail message.